**FILED**

FEB − 5 2007

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ROBERT ANDERSON
3296 Saint Johns Lane
Ellicott City, MD 21042, Derivatively On
Behalf of SUNRISE SENIOR LIVING, INC.,

                Plaintiff,

    vs.

PAUL J. KLAASSEN
9050 FALLS RUN RD
MC LEAN, VA 22102

TERESA MERRITT KLAASSEN
9050 FALLS RUN RD
MCLEAN, VA 22102

THOMAS B. NEWELL
9119 MILL POND VALLEY DR
MC LEAN, VA 22102

TIFFANY L. TOMASSO
12834 PARAPET WAY
HERNDON, VA 20171-1736

JOHN F. GAUL
2250 CLARENDON BLVD APT 2011
ARLINGTON, VA 22201

BRADLEY B. RUSH
371 CHURCH NE ST
VIENNA, VA 22180

RONALD V. APRAHAMIAN
6822 MCLEAN PROVINCE CIR
FALLS CHURCH, VA 22043

THOMAS J. DONOHUE
8008 COACH ST
POTOMAC, MD 20854

DOUGLAS J. HOLLADAY
4786 OLD DOMINION DR
ARLINGTON, VA 22207

Civil Action No.

CASE NUMBER 1:07CV00286

JUDGE: Reggie B. Walton

DECK TYPE: General Civil

DATE STAMP: 02/■/2007

JURY ACTION

DEMAND FOR JURY TRIAL

1

CRAIG R. CALLEN
55 TRUMBULL ST APT 1201
HARTFORD, CT 06103-2426

WILLIAM G. LITTLE
118 HOPKINS RD
WASHINGTON, ME 04574

DAVID W. FAEDER
1133 CONNECTICUT NW AVE
WASHINGTON, DC 20036

TIMOTHY S. SMICK
225 OSPREY CT
VERO BEACH, FL 32963

BRIAN C. SWINTON
11283 INGLISH MILL DR
GREAT FALLS, VA 22066-1708

LARRY E. HULSE
1087 LARKSPUR TER
ROCKVILLE, MD 20850-1003

CHRISTIAN B.A. SLAVIN
9897 WINDY HO RD
GREAT FALLS, VA 22066

PETER A. KLISARES
2810 CHARLOTTE LN
BURLINGTON, NC 2721

RICHARD R. SLAGER
30210 N 148TH ST
SCOTTSDALE, AZ 85262

DAVID G. BRADLEY
2211 30TH NW ST
WASHINGTON, DC 20008

RICHARD A. DOPPELT
540 N HARVEY AVE
OAK PARK, IL 60302

SCOTT F. MEADOW
4950 S CHICAGO BEACH DR # 15A
CHICAGO, IL 60615

J. WILLARD MARRIOTT, JR.
27 BRACKETT HILL RD
ALFRED, ME 04002-3318

DARCY J. MOORE
4959 BILFORD LN
LAKE OSWEGO, OR 97035

Defendants,

-and-

SUNRISE SENIOR LIVING, INC., a Delaware
corporation,

           Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF
THE SARBANES OXLEY ACT OF 2002, SECTIONS 10(B) AND 14(A) OF THE
SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, ABUSE
OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS,
UNJUST ENRICHMENT, ACCOUNTING, RESCISSION AND FOR A
CONSTRUCTIVE TRUST**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought by a shareholder of Sunrise Senior Living, Inc. ("Sunrise" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including violations of the Securities Exchange Act of 1934 ("Exchange Act"), violations of the Sarbanes-Oxley Act of 2002 ("SOX"), breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that have caused substantial losses to Sunrise and other damages, such as to its reputation and goodwill. On behalf of Sunrise, this action seeks, among other things, damages, corporate governance reforms, an accounting, rescission, restitution and the declaration of a constructive trust to remedy defendants' violations of state and federal law.

### Defendants' Illegal Accounting Manipulations

2.    Sunrise provides residential and other services to retirees and elderly persons through facilities it develops and constructs and then manages, often through joint ventures. Sunrise makes profits from these activities and also by selling real estate, often to its joint ventures. For the last several years, Sunrise has been pursuing a vigorous expansion program.

However, because Sunrise's access to the capital necessary to fund this expansion program was limited, it has been forced to pursue various strategies, including utilizing joint venture arrangements (normally 20% owned by Sunrise and 80% owned by other investors), to raise the capital needed to fund its expansion program.

3.     For Sunrise's expansion program to succeed and for its top executives and other insiders to obtain the types of personal economic gains they wanted to obtain from the enterprise, it was critical that Sunrise appear to be achieving strong profits even during this expansionary – and capital intensive – phase of its business. However, Sunrise learned early on that because the Company's business model was not yet proven and its facilities normally suffered losses during their start-up phase and period of early operations, frequently it could not attract joint venture partners to participate in ventures to construct new residential facilities unless it gave to those partners preferential returns from the joint venture. These entities, the joint venture partner(s), were to receive guarantees of preferential distributions from the operations of the joint ventures or upon the sale of the facility. Sunrise also discovered early on that to sell certain of its real estate or facilities it was necessary to provide financial guarantees to the entity financing the sale.

4.     This created a problem for defendants. It could not obtain the capital it needed through the joint venture arrangements or sell real estate assets or completed facilities without providing these preferential distribution and guarantee arrangements. However, under applicable accounting rules, if Sunrise structured its joint ventures with preferential guarantees and distributions to its partners, Sunrise, as the managing entity in the joint venture, was required to absorb 100% of the early period or start-up losses of the new facilities, rather than just its 20% share, and was allowed to recoup those early period losses only later on when the joint venture's facility was operating successfully and profitably and/or was sold. And Sunrise could not record profits on sales of facilities if it provided financial guarantees in connection with the sale. Accounting for its joint venture operations or real estate sales in this manner – which was required by Generally Accepting Accounting Principles ("GAAP") and principles of fair presentation – would heavily penalize Sunrise's reported financial results, depriving it of real estate sales profits, while requiring it to recognize millions and millions of dollars of current

period losses from the joint venture operations. This would prevent it from showing the kind of strong profitable growth which was indispensable for the success of its business plan and necessary to allow its insiders to personally profit from large annual bonuses and to push its stock price to the high levels they desired so they could sell off their Sunrise stock at inflated – and very profitable – prices.

5. Thus, to achieve the ends they desired, defendants cheated, pursuing an improper course of business that misled Sunrise's investors. Instead of following the required accounting rules and principles, Sunrise's top officers and directors, including the members of its Audit Committee, caused or allowed Sunrise to report inflated profits from at least 1999-2005 and report over $100 million in improperly accounted for profits and conceal significant joint venture losses, which enabled Sunrise insiders to pocket large and unjustified cash bonuses and to personally profit by insider trading to take advantage of the artificially inflated price of Sunrise's common stock.

6. Beginning on May 9, 2006, a series of revelations concerning Sunrise's prior improper statements and accounting irregularities became apparent to Sunrise's shareholders. First, Sunrise was forced to disclose a "delay" in reporting its 1Q:06 results to allow a "review" of its financial statements, making it appear that Sunrise was "changing" accounting methods to adopt a more preferable method, which might or might not impact its prior financial reports. However, under pressure from the Securities and Exchange Commission ("SEC") – which questioned Sunrise's accounting and the accuracy of these statements – on July 31, 2006, Sunrise revealed it would be forced to restate its financial statements going back several years – at least to 1999 – because its prior accounting was improper and its prior financial statements could no longer be relied upon, and it would discontinue doing business with joint ventures with preferential returns and engaging in real estate sales with guarantees. Sunrise also admitted it could not file current period financial statements for the 1Q:06, 2Q:06 and 3Q:06 of 2006 and that when it restated its financial results, at least *$100 million* of previously reported profits from its joint ventures and real estate sales would be eliminated – and that, contrary to prior representations, Sunrise had serious weaknesses in its internal controls. As these revelations

unfolded, Sunrise's stock value fell from $39.62 per share on May 8, 2006 to as low as $24.40 per share on July 31, 2006.

7.    Defendants' improper accounting manipulations and contrivances had an enormous impact on Sunrise's publicly issued financial statements. For instance, in a joint venture in which Sunrise had a 20% interest and its partner an 80% interest, where the venture suffered $1 million in losses during its start-up and early operations phase, GAAP required Sunrise to recognize and report 100% of these losses, or $1 million. However, by manipulating the Company's accounting and acting as if the joint venture did not have a distribution preference, defendants caused Sunrise to recognize and report losses of only $200,000. This tricky manipulation over 1999-2005, when combined with Sunrise's manipulated real estate accounting to improperly recognize profits on sales where Sunrise provided guarantees, overstated Sunrise's reported profits by at least *$100 million*.

### Defendants' Illegal Backdating Practices

8.    In addition to the illegal accounting manipulations described above, dating back to at least 1997, defendants have caused or allowed Sunrise insiders to manipulate their stock-option grant dates so as to secretly maximize their profits from the stock options. Specifically, certain Sunrise insiders changed their respective stock-option grant dates to take advantage of lower exercise prices than the price on the actual grant date. The price of Sunrise shares on the reported option-grant date therefore was lower than the share price on the actual day options were issued. Thus, the backdating of these stock options brought Sunrise insiders an instant paper gain. By engaging in this scheme, defendants were able to conceal from investors that the Company was not recording material compensation expenses and materially overstating Sunrise's net income and earnings per share. By 2006, these defendants have allowed themselves and others the ability to sell over $170 million worth of Sunrise stock and realize illicit compensation through the exercise of backdated option grants and subsequent sale of Sunrise stock.

9.    Between 2000 and 2005, at times when defendants' illegally backdated options were vesting, defendants directed Sunrise to repurchase over $202.1 million of its own stock.

This repurchase led to an increase in the Company's stock, which served to further increase defendants' illegal backdating profits.

10.    The traditional rationale behind the granting of stock options is to align a company's officers, directors and employees with the interests of the company. When an option is granted at or below full market value, that option is worthless until the grantee builds value in the option by building value in the company. Thus, the company and the insider both share in the value created. The backdating of options, however, subverts this principle because the instant paper gain of a backdated stock option only benefits the insider.

11.    The granting of stock options to Sunrise insiders, at times relevant hereto, was controlled by nine stock option plans: the Sunrise Assisted Living, Inc. 1995, 1996, 1997, 1998, 1999, 2000 and 2001 Stock Option Plans (collectively referred to as the "Incentive Plans"), the Sunrise Assisted Living, Inc. 1996 Directors' Stock Option Plan ("Director's Plan") and the Sunrise Assisted Living, Inc. 1996 Non-Incentive Stock Option Plan ("Non-incentive Plan"). Defendants were required under law to present the stock plans to Sunrise's shareholders for approval. These plans contained restrictions as to the exercise price of options under the plans. For example, the 1996 Plan provides that "[t]he Option Price shall be not less than the greater of par value or 100 percent of the fair market value of a share of stock on the date on which the option is granted (as determined in good faith *by the Board*)." Thus, defendants' backdating practices, which resulted in below-fair-market-value-option grants, violated the stock plans. Further, defendants' backdating practices resulted in truncated stock-option vesting periods—a further violation of these plans. In turn, because the plans were violated, the backdated options granted under these plans must be cancelled and declared void.

12.    The Incentive Plans, Director's Plan and Non-Incentive Plan were administered by the Board of Directors (the "Board") and the Stock Option Committee. According to Sunrise's 1997 annual proxy: "[t]he Stock Option Committee has the power and authority to take all actions and make all determinations under the Company's stock option plans, including the grant of options thereunder." Accordingly, the Board and Stock Option Committee were directly responsible for the backdating and violations of the plans.

13.    Further, defendants have caused or allowed Sunrise: (i) to file materially false and misleading financial statements that materially understated its compensation expenses and materially overstated its quarterly and annual net income and earnings per share; and (ii) to make disclosures in its periodic filings and proxy statements that falsely portrayed Sunrise's options as having been granted at exercise prices equal to the fair market value of Sunrise's common stock on the date of the grant.  Under GAAP, the instant paper gain received from backdated stock options was equivalent to paying extra compensation and was thus a cost to Sunrise.  These costs were also not properly recorded.  In turn, since these costs were not properly recorded, Sunrise's profits were overstated.  Thus, a restatement of Sunrise's past financial results will be necessary to correct for these improprieties.

14.    In addition, the backdating of stock options can have severe tax consequences. While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment.  In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants.  For example, for performance-based stock options (generally granted to the five highest-paid executives) a company is allowed to take a tax deduction on that full amount *provided that the options were granted at the market price*.  Backdating, however, automatically disqualifies those options from receiving the tax break—instead, a company's tax deduction would be capped at $1 million for each of the top five executives.  In September 2006, in response to these types of tax implications, the Internal Revenue Service ("IRS") placed criminal investigators on an options-backdating task force formed by the U.S. Attorney for the Northern District of California.  That task force also includes the Federal Bureau of Investigation ("FBI").

### The "Outrageous" Backdating Scandal

15.    The backdating scandal is outrageous as evidenced by the following commentary: Lynn Turner, former Chief Accountant of the SEC, has described stock option backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line ...."  In a recent article published by the *Wall Street Journal*, Arthur Levitt, a former chairman of the SEC was quoted as stating that stock-option backdating "represents the ultimate

in greed." Further, Levitt stated: "It is stealing, in effect. It is ripping off shareholders in an unconscionable way." San Diego analyst Michael Cohen later made similar comments published by *Bloomberg*: "Stockholders are hit twice ... first you're stolen from, then the stock goes down when the theft is uncovered." Senator Chuck Grassley, Chairman of the Senate Finance Committee, concurs. He referred to stock-option backdating as "disgusting and repulsive." Grassley stated: "It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' Even worse in this situation, most of the perpetrators had already gotten 'theirs' in the form of six and seven-figure compensation packages of which most working Americans can only dream."

16.    On May 5, 2006, President George W. Bush stated in an interview on the *Kudlow & Company* show airing on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."

17.    On July 20, 2006, the SEC announced it had filed civil charges against two former Brocade Communications Systems, Inc. executives for illegally manipulating stock-option grant dates. Criminal charges were brought simultaneously, indicating the serious view taken by governmental agencies with respect to improperly backdated options.

18.    In a news conference detailing the charges, SEC Chairman Christopher Cox proclaimed that "the full weight of the federal government is being put behind this effort to stamp out fraudulent stock-option backdating." He disclosed that additional cases likely would be brought in the "coming weeks and months." In later testimony before a Senate committee, Cox indicated that the SEC is currently investigating more than 100 companies, a large percentage of which are tech companies, meaning many more executives could face criminal charges related to manipulating options.

19.    Government disgust at stock-option backdating reached a new level on July 31, 2006, when the FBI issued an arrest warrant for Kobi Alexander ("Alexander")—former Chief Executive Officer ("CEO") of Comverse Technology, Inc. ("Comverse"). Alexander is charged with conspiracy related to backdated stock options. Not surprisingly, on August 9, 2006, he and

fellow company cohorts David Kreinberg ("Kreinberg") (former Chief Financial Officer ("CFO") of Comverse) and William F. Sorin ("Sorin") (Comverse's former General Counsel) were criminally charged by the New York U.S. Attorney's Office for allegedly orchestrating a decade-old scheme to fraudulently backdate option grants and for operating a secret stock options slush fund. After transferring more than $57 million from the U.S. to accounts in the Middle East, Alexander fled the country. Emphasizing the importance that the U.S. government has placed on dealing with the backdating options scandal, Alexander was placed on the FBI's most wanted list. On September 27, 2006, after an international manhunt, Alexander was captured in Namibia, and is expected to be extradited to the United States to stand trial with his alleged co-conspirators Kreinberg and Sorin. On October 24, 2006, Kreinberg (Comverse's former CFO) pleaded guilty to securities fraud charges in federal court, and faces up to 15 years in prison. He was reportedly the first person to plead guilty in the widening stock option backdating scandal. Shortly afterward, on November 6, 2006, Sorin (Comverse's former General Counsel) pleaded guilty to a federal criminal conspiracy charge related to the backdating scheme at Comverse. The charge carries a maximum penalty of five years in prison. Kreinberg and Sorin are the first two executives succumbing to criminal charges in the widening backdating scandal, which now encompasses well over 100 companies under investigation by the SEC.

**Backdating Disclosures at Sunrise**

20. On December 11, 2006, Sunrise disclosed for the first time an internal investigation of prior stock option grants. Defendants' stated reason for launching the investigation is the receipt of letter from a shareholder that raised concerns of illegal backdating at the Company.

21. On January 15, 2007, Sunrise disclosed that it "will not be current will all SEC filings, including the 2006 Form 10-Qs and 2006 Form 10-K" due to the pending stock option investigation and the pending restatement. A continued delay in Sunrise's filings could cause problems for Sunrise's listing requirements on the New York Stock Exchange as well as potential problems with its debt covenants.

22.    Plaintiff's own investigation of Sunrise's prior option grants has revealed several option grants that were blatantly dated at the lowest share price for the period in which they were granted. Further, these suspicious grants span from at least 1997 to 2001. During this time, certain of the defendants engaged in excessive amounts of insider sales. Accordingly, this action is necessary to end these option-backdating practices and to restore assets to the Company that have been squandered via the payment of undisclosed and undeserved compensation to corporate insiders.

23.    As a result of the defendants' improprieties, the Company has and will need to expend significant sums of money and incur significant damage as described herein.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction in this case arising under Article III of the Constitution and 28 U.S.C. §1331 because of claims arising under the SOX and Section 14(a) of the Exchange Act.

25.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.    Venue is proper in the Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Sunrise occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District. Sunrise has four communities in operation or under development in Washington, D.C. Further, a number of defendants conduct business in this District.

## PARTIES

27.     Plaintiff Robert Anderson, is and was at times relevant hereto, an owner and holder of Sunrise common stock.

28.     Nominal defendant Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia.   Sunrise provides senior living services including housing, meals, transportation, activities and housekeeping.

29.     Defendant Paul J. Klaassen ("P. Klaassen") is Sunrise's CEO; Chairman of the Board and a director and has been since 1981.  P. Klaassen is also a trustee of Sunrise Senior Real Estate Investment Trust, established by Sunrise and has been since December 2004.  P. Klaassen is a co-founder of Sunrise.  Because of P. Klaassen's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  P. Klaassen received at least 350,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiff alleges that P. Klaassen backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders. Sunrise paid P. Klaassen the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | All Other Compensation |
|---|---|---|---|---|---|
| P. Klaassen | 2005 | $473,890 | $454,925 | $1,181,952 | $225,324 |
| | 2004 | $463,742 | - | - | $234,545 |
| | 2003 | $420,910 | $146,865 | $58,751 | $150,884 |
| | 2002 | $373,414 | $400,000 | - | $54,680 |
| | 2001 | $300,000 | $412,500 | - | - |
| | 2000 | $242,000 | $37,500 | - | $350,000 |
| | 1999 | $200,000 | $75,000 | - | - |
| | 1998 | $200,000 | - | - | - |
| | 1997 | $200,000 | - | - | $942 |

P. Klaassen sold 1,377,223 of his personally held shares for $54,718,139.05 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

30.    Defendant Teresa Merritt Klaassen ("T. Klaassen") is a Sunrise director and has been since 1981.  T. Klaassen is also Chief Cultural Officer and has been since 2001.  T. Klaassen was Secretary from 1981 to 2005 and Executive Vice President from 1981 to November 2003.  T. Klaassen is also a director of the Sunrise Senior Living Foundation (a non-profit organization affiliated with Sunrise) and has been since 2006.  T. Klaassen is a co-founder of Sunrise.  Because of T. Klaassen's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to her in connection therewith.    T. Klaassen sold 1,377,223 of her personally held shares for $54,718,139.05 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

31.    Defendant Thomas B. Newell ("Newell") is Sunrise's President and has been since April 2000.  Newell was General Counsel of Sunrise and President of Sunrise Development, Inc. (Sunrise's development subsidiary) from January 1996 to April 2000.   Newell was also Executive Vice President from May 1996 to April 2000.  Because of Newell's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Newell received at least 185,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.

Accordingly, on information and belief, plaintiff alleges that Newell backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders. Sunrise paid Newell the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Newell | 2005 | $396,498 | $309,344 | $96,000 | 100,000 |
| | 2004 | $360,688 | $446,000 | - | - |
| | 2003 | $339,769 | $87,500 | - | - |
| | 2002 | $289,897 | $225,000 | $3,268,530 | - |
| | 2001 | $252,465 | $131,000 | - | 70,000 |
| | 2000 | $215,600 | $37,500 | - | 85,000 |
| | 1999 | $175,000 | $75,000 | - | 65,000 |
| | 1998 | $175,000 | - | - | 400,000 |
| | 1997 | $175,000 | - | - | 100,000 |

Newell sold 636,366 of his personally held shares for $23,508,700 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

32.    Defendant Tiffany L. Tomasso ("Tomasso") is Sunrise's Chief Operating Officer and has been since November 2003. Tomasso was President of Sunrise's management services division from April 2000 to November 2003; Executive Vice President from March 1998 to November 2003; Senior Vice President from 1994 to March 1998; and Regional Vice President from 1993 to 1994. Because of Tomasso's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith. Tomasso received at least 70,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Tomasso backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders. Sunrise paid Tomasso the following compensation:

- 14 -

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| Tomasso | 2005 | $348,138 | $204,716 | $626,598 | 100,000 |
| | 2004 | $309,162 | $160,000 | - | - |
| | 2003 | $283,812 | $80,000 | $974,825 | - |
| | 2002 | $221,012 | $112,500 | - | 60,000 |
| | 2001 | $207,423 | $105,000 | - | 30,000 |
| | 2000 | $197,000 | $37,500 | - | 70,000 |
| | 1999 | $165,000 | $50,000 | - | 65,000 |
| | 1998 | $165,000 | - | - | 430,000 |

Tomasso sold 528,335 of her personally held shares for $19,337,618.50 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

33.    Defendant John F. Gaul ("Gaul") is Sunrise's General Counsel and has been since October 2002. Gaul is also Secretary and has been since May 2005. Gaul was Senior Vice President from October 2002 to November 2003. Because of Gaul's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Sunrise paid Gaul the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------|-------------------------------|
| Gaul | 2004 | $206,108 | $194,667 | - | - |
| | 2003 | $194,808 | $33,333 | $389,944 | - |
| | 2002 | $38,365 | $32,500 | - | 50,000 |

Gaul sold 26,503 of his personally held shares for $1,090,491.08 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

34.    Defendant Bradley B. Rush ("Rush") is Sunrise's CFO and has been since August 2005. Rush was Chief Investment Officer from January 2005 to August 2005; Managing Director and Senior Vice President, Capital Group (a division of Sunrise) from September 2004

- 15 -

to January 2005; and Executive Vice President of the properties division from July 2003 to September 2004. Because of Rush's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Sunrise paid Rush the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|-------|------------------------|------------------------------|
| Rush | 2005 | $286,711 | $177,421 | $1,658,927 | 80,000 |

Rush sold 6,937 of his personally held shares for $432,143.87 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

35.    Defendant Ronald V. Aprahamian ("Aprahamian") is a Sunrise director and has been since 1995. Aprahamian is Chairman of the Audit Committee and has been since 2000 and has been a member of the Audit Committee since 1996. Aprahamian is also a member of the Compensation Committee and has been since 1996. Aprahamian was a member of the Stock Option Committee in 1996. Because of Aprahamian's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Aprahamian received at least 111,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Aprahamian backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's

shareholders. Aprahamian sold 210,000 of his personally held shares for $7,819,569 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

36.    Defendant Thomas J. Donohue ("Donohue") is a Sunrise director and has been since 1995. Donohue is Chairman of the Compensation Committee and has been since 1996 and is a member of the Audit Committee and has been since 1996. Donohue was Chairman of the Stock Option Committee from 1996 to August 2002. Because of Donohue's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Donohue received at least 10,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Donohue backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders. Donohue sold 116,033 of his personally held shares for $4,056,919.68 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

37.    Defendant Douglas J. Holladay ("Holladay") is a Sunrise director and has been since 2000. Holladay was a member of the Audit Committee in 2000. Because of Holladay's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Holladay sold 39,000 of his personally

- 17 -

held shares for $1,873,125 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

38. Defendant Craig R. Callen ("Callen") is a Sunrise director and has been since 1999. Callen is a member of the Compensation Committee and has been since May 2004. Callen previously served on the Compensation Committee from October 1999 to August 2002. Callen is also a member of the Audit Committee and has been since 2004. Callen previously served on the Audit Committee in 1999. Callen was a member of the Stock Option Committee from October 1999 to 2002. Because of Callen's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Callen received at least 8,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Callen backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders. Callen sold 10,000 of his personally held shares for $521,100 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

39. Defendant William G. Little ("Little") is a Sunrise director and has been since 2004. Because of Little's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith.

40.    Defendant David W. Faeder ("Faeder") is a Sunrise director from 1993 to at least 2004. Faeder was a consultant from April 2000 to March 2004; Vice-Chairman of the Board from April 2000 to May 2003; President from July 1997 to April 2000; and Executive Vice President and CFO from 1993 to 1997. Because of Faeder's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Faeder received at least 100,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Faeder backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders. Sunrise paid Faeder the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Faeder | 1999 | $175,000 | $75,000 | 65,000 | - |
| | 1998 | $175,000 | - | 400,000 | - |
| | 1997 | $175,000 | - | 100,000 | $838 |

Faeder sold 749,727of his personally held shares for $22,118,868.50 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

41.    Defendant Timothy S. Smick ("Smick") was a Sunrise director from October 1996 to March 1998. Smick was also Sunrise's Chief Operating Officer from February 1996 to January 1998 and Executive Vice President from May 1996 to January 1998. Because of Smick's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Smick received at least 150,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Smick backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders. Smick sold 60,417 his personally held shares for $2,128,447.25 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

42.    Defendant Brian C. Swinton ("Swinton") was Sunrise's Executive Vice President from May 1996 to at least 2003. Swinton was also President of Sunrise Senior Ventures, Inc. (Sunrise's venture subsidiary) from April 2000 to at least 2003; and President of Sunrise At-Home Senior Living, Inc. (Sunrise's joint venture company) from September 2000 to December 2002. Because of Swinton's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Swinton received at least 135,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Swinton backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders. Sunrise paid Swinton the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|---|
| Swinton | 2001 | $207,423 | $27,500 | 30,000 |
| | 2000 | $197,000 | - | 60,000 |
| | 1999 | $165,000 | $50,000 | 40,000 |
| | 1998 | $165,000 | - | 200,000 |
| | 1997 | $165,000 | - | 75,000 |

Swinton sold 461,307 his personally held shares for $14,493,397 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

43.    Defendant Larry E. Hulse ("Hulse") was Sunrise's CFO from April 2000 to at least 2006. Hulse was Senior Vice President from April 2000 to November 2003 and Chief Accounting Officer from 1995 to April 2000.  Because of Hulse's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Sunrise paid Hulse the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Hulse | 2004 | $257,635 | $212,333 | - | - |
| | 2003 | $235,933 | $41,667 | $487,413 | - |
| | 2002 | $181,809 | $92,500 | $34,485 | 40,000 |
| | 2001 | $170,939 | $86,500 | - | 25,000 |
| | 2000 | $157,000 | $30,000 | - | 32,222 |
| | 1999 | $105,000 | $30,000 | - | 50,000 |

Hulse sold 231,947 his personally held shares for $9,100,883.47 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

44.    Defendant Christian B.A. Slavin ("Slavin") was Sunrise's Chief Investment Officer from November 2003 to at least 2004.  Slavin was also Executive Vice President from May 1999 to November 2003 and CFO from May 1999 to April 2000.  Because of Slavin's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other

- 21 -

information provided to him in connection therewith. Slavin received at least 130,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Slavin backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders. Sunrise paid Slavin the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|---|
| Slavin | 2003 | $283,812 | $80,000 | $974,825 | - |
|  | 2002 | $221,012 | $112,500 | - | 60,000 |
|  | 2001 | $207,423 | $105,000 | - | 60,000 |
|  | 2000 | $197,000 | $37,500 | - | 145,000 |
|  | 1999 | $111,000 | - | - | 220,000 |

Slavin sold 257,542 his personally held shares for $8,434,295.10 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

45.    Defendant Peter A. Klisares ("Klisares") was a Sunrise director from 2000 to 2004. Because of Klisares' position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Klisares sold 28,664 of his personally held shares for $999,177.05 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

46.    Defendant Richard R. Slager ("Slager") was a Sunrise director from 1999 to 2000. Because of Slager's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via

reports and other information provided to him in connection therewith. Slager received at least 5,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Slager backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders.

47.    Defendant David G. Bradley ("Bradley") was a Sunrise director from August 1997 to 2005. Bradley was a member of the Compensation Committee from August 2002 to 2004; a member of the Audit Committee from 2001 to 2003; and a member of the Stock Option Committee from 1997 to August 2002. Because of Bradley's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Bradley received at least 7,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Bradley backdated these stock options and received illegal compensation from Sunrise that was not disclosed to the Company's shareholders.

48.    Defendant Richard A. Doppelt ("Doppelt") was a Sunrise director from 1995 to at least 1999. Because of Doppelt's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith.

49.    Defendant Scott F. Meadow ("Meadow") was a Sunrise director from January 1995 to August 1995 and from February 1996 to November 1999. Meadow was a member of the Compensation Committee from 1996 to November 1999 and a member of the Stock Option

Committee from 1996 to 1998. Because of Meadow's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith.

50.     Defendant J. Willard Marriott, Jr. ("Marriot") was a Sunrise director from 2003 to 2004. Because of Marriott's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith.

51.     Defendant Darcy J. Moore ("Moore") was a Sunrise director from 1996 to August 1997. Because of Moore's position, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known about the improper joint venture and real estate accounting and that Sunrise insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to her in connection therewith.

52.     The defendants identified in ¶¶29-30, 35-41, 45-51 are referred to herein as the "Director Defendants." The defendants identified in ¶¶29-34, 40-44 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶29-38, 40-45 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

53.     By reason of their positions as officers, directors and/or fiduciaries of Sunrise and because of their ability to control the business and corporate affairs of Sunrise, the Individual Defendants owed Sunrise and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Sunrise in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sunrise and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

54.     Each director and officer of the Company owes to Sunrise and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the compensation paid to its executives, directors and employees.  These disclosures necessarily include the value of stock options granted to the Company's insiders.

55.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sunrise, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as the Company's disclosures of its financial results including expenses related to stock option grants.  Because of their advisory, executive, managerial and directorial positions with Sunrise, each of the Individual Defendants had access to adverse, non-public information about the financial condition and improper representations of Sunrise.

56.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sunrise, and was at all times acting within the course and scope of such agency.

57.     To discharge their duties, the officers and directors of Sunrise were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Sunrise were required to, among other things:

- ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide accurate disclosures of the Company's financials and to avoid wasting the Company's assets;

- properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, and ensuring that the Company maintained an adequate system of internal controls such that the Company's financial reporting would be true and accurate at all times;

- remain informed as to Sunrise's internal controls, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

- ensure that Sunrise was properly handling its tax liabilities;

- ensure that Sunrise's internal controls are sufficient to prevent backdating or other manipulations of stock options granted to Sunrise insiders; and

- ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

58. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sunrise, the absence of good faith on their part, and

a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprise all of Sunrise's Board.

59.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such improper actions. As a result of the defendants' improprieties, the Company has and will need to expend significant sums of money.

## THE BOARD'S DUTY TO
## ADMINISTER THE STOCK OPTION PLANS

60.    The Incentive Plans, Director's Plan and Non-Incentive Plan were administered by the Board of Directors (the "Board") and the Stock Option Committee. According to Sunrise's 1997 annual proxy: "[t]he Stock Option Committee has the power and authority to take all actions and make all determinations under the Company's stock option plans, including the grant of options thereunder."

61.    The Audit Committee of the Board is responsible by its charter for (i) discussing the Company's earnings releases, as well as financial information and earnings guidance provided to analysts and rating agencies; (ii) reviewing and discussing Sunrise's annual financial statements; and (iii) review reports concerning Sunrise's internal control procedures.

62.    Accordingly, defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Holladay, Callen, Klisares, Slager, Bradley, Doppelt, Meadow and Moore who were directors on the Board or members of the Compensation and Audit Committees between 1997 and 2001, were directly responsible for the stock-option backdating improprieties. Thus, these defendants are liable to Sunrise together with the defendants who received backdated options.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

64.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that Company insiders were improperly backdating their stock option grants; (ii) conceal the fact that as a result of the improperly backdated stock option grants, the Company's financial statements were inaccurate; (iii) maintain the Individual Defendants' executive and directorial positions at Sunrise and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iv) deceive the shareholders of Sunrise, regarding the level of compensation being paid to the Company's insiders and the Company's financial condition and future business prospects; and (v) artificially inflate the price of Sunrise common stock so they could dispose of over $170 million of their personally held stock. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

65.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct. During this time the Individual Defendants caused the Company to conceal the true fact that Sunrise was misrepresenting its financial results and that Sunrise insiders were improperly backdating their stock option grants.

66.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to grant themselves and other insiders undisclosed and unaccounted for compensation in the form of backdated stock option grants and to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, insider trading abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

67.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred

under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

68.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

69.     On August 4, 2005, the Individual Defendants caused or allowed Sunrise to report its 2Q:05 results via a press release which referred to *"growth in equity in earnings on investments in unconsolidated senior living properties."* The press release stated in part:

> 1)     "We are extremely pleased with the results we are reporting today," said Paul Klaassen, Sunrise Senior Living chairman and CEO." We are benefiting from our typical growth drivers which include revenue growth in our operating portfolio of management properties, additional community openings and new construction . . . ."

> 2)     *   *   *

> 3)     "At the end of the quarter, we had minority equity interests in 132 communities held in joint ventures, with a balance sheet investment book value of over $108 million," said Thomas Newell, president, Sunrise Senior Living. *"Since a substantial majority of our new development activity, and most of our acquisitions, are being conducted through joint ventures, we expect our minority equity investments to continue to grow. We participate in the earnings of the joint venture communities based on our percentage ownership and we also expect to continue to receive incentives as these ventures exceed performance thresholds. As a result, we expect to see substantial growth in our income from earnings and returns on equity investments going forward."*

70.     On August 4, 2005, defendants held a telephone conference call for analysts to discuss its business and its financial results. During the call, the following occurred:

> 1)     **[P. Klaassen – CEO:]** [We] had an excellent second quarter. Virtually every segment performed at or above expected levels. As a result we had a

significant increase in core earnings which we define as total earnings excluding income from property sales and acquisitions transition expenses.

2)    *  *  *

3)    We have now met or exceeded expectations every quarter for the past six years and we continued that unbroken streak in the second quarter as *we significantly exceeded the high end of our guidance range* .... *In hindsight, our forecast was probably a bit conservative as we outperformed in occupancy growth, management and professional services fees, earnings from joint ventures and lower interest costs.*

4)    *  *  *

5)    [Question:] [O]one of the things that drove numbers for the quarter I guess was little unexpected from my part was the equity in earnings line and I understand some of that were incentive fees related to sale. And I was wondering - if we can get a little more color on exactly the transaction for the quarter, and also if you can give us any help on thinking about projecting that on a go forward basis, additional sales and incentive fees that we might see?

6)    [P. Klaassen:] The transaction in the quarter I'm not going to break down too much -- we negotiate these things every day and I do not want to hurt ourselves in those negotiations by giving too much information on it. ... We try to make the best deal that we can. You can see the growth that occurred in that line item that gives you an idea sort of about the range. But for competitive reasons, I do not want to get too detailed. ... [A]ll I can say is those investments are long-term. We are very happy with the structure which rewards Sunrise for upside end results and we think those are good investments, the $108 million now $130 million was spent wisely. And we think over the long-term, they'll pay off.

71.    On August 9, 2005, the Individual Defendants caused or allowed Sunrise to file its 2Q:05 10-Q Report with the SEC. It was signed by Rush as CFO and Anschutz as CAO. The filing was certified under Sarbanes-Oxley certification. It also reported the following:

| | Three months ended June 30 | | Six months ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2005** | **2004** | **2005** | **2004** |
| Income from operations | $12,358 | $22,184 | $22,966 | $43,307 |
| Equity in earnings and return on investment in unconsolidated senior living properties | $3,696 | $2,072 | $5,220 | $3,740 |
| Net income | $10,338 | $15,132 | $18,350 | $29,063 |
| [EPS data:] | | | | |
| Diluted net income per common share | $.46 | $.66 | $.82 | $1.26 |

It also reported stockholders' equity of $550,702,000.

72.   The 2Q:05 10-Q also stated:

1)    *Stock-Based Compensation*

2)    Stock options are granted for a fixed number of shares to employees *with an exercise price equal to the fair value of the shares at the date of grant*. Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), and accordingly, *does not recognize compensation expense for stock option grants*.

3)    *     *     *

4)    **Controls and Procedures**

5)    We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at June 30, 2005.* In connection with the evaluation by management, including our Chief Executive Officer and Chief Financial Officer, no changes in Sunrise's internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the quarter ended June 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

73.   On September 13, 2005, officers of Sunrise met with Davenport Equity Research ("Davenport"). On September 14, 2005, Davenport reported the results of that meeting to the market, repeating what Sunrise's officers had told them. Davenport's September 14, 2005 report stated:

1)    •    **Reiterate Buy rating following meetings with management**. We are comfortable with our forecast for 15% earnings growth for the next several years. We believe our investment thesis remains sound, while the company continues to execute its *growth strategies under its new management services orientation*.

2)    *     *     *

3)    •    **Management services business model generates stable revenue and reduces the company's risk profile**. The sale of most consolidated facilities and subsequent increase in management contracts has made SRZ's revenue stream more predictable with upside potential from performance bonuses and the minority interest usually retained. In addition, capital, construction, and fill-ups risks are now shared with the development partners.

74.    On November 8, 2005, the Individual Defendants caused or allowed the Company

to issue a press release entitled "Sunrise Reports Third-Quarter 2005 Results and Re-Affirms

Full Year 2005 Earnings Guidance." The press release stated in part:

1)    Sunrise Senior Living, Inc. today reported third-quarter 2005 earnings per share of $0.24 (diluted) compared to $0.21 (diluted) per share in the third quarter of 2004. *The 14 percent increase in third-quarter, year-over-year earnings per share reflects ... growth in equity in earnings and return on investments in unconsolidated senior living properties.*

2)    * * *

3)    *Sunrise's income from equity in earnings and return on investments in unconsolidated senior living properties increased to $7.8 million in the third quarter of 2005 from $2.1 million in the prior year period primarily as a result of a transaction in which a venture partner sold its equity portion of 13 senior living communities.* Through this transaction, Sunrise's ownership interest in the venture increased to 25 percent from 20 percent and Sunrise received performance incentive distributions under the terms of the venture agreement. Sunrise venture agreements typically include provisions rewarding Sunrise through various performance incentives. Sunrise continues to manage these 13 senior living communities under long-term management contracts.

4)    "*We continue to benefit from* our management services business model and *our minority equity investments in unconsolidated properties*," said Thomas Newell, president, Sunrise Senior Living. "At the end of the third quarter, we had minority equity investments in 152 communities in unconsolidated ventures with a balance sheet investment book value of $128 million. We strive to create value for our investment partners through operational excellence and when we succeed we also generate substantial returns for Sunrise through our percentage ownership in these communities and the incentives triggered when these ventures exceed performance thresholds. We have set a long-term target to earn a 15 percent annual return on our investments in unconsolidated senior living properties."

75.    On November 8, 2005, defendants held a conference call for analysts to discuss

its business and finances. During the call, the following occurred:

1)    [P. Klaassen, CEO:] Our income statement, balance sheet, and cash flow are all in excellent shape and ready to support a very strong '06 outlook. Our growth drivers are producing consistent with our expectations and as a result we are able to report earnings per share excluding acquisition transition and hurricane related expenses of $0.26 a share in Q3 after adjusting for our recent two for one stock split .... *As anticipated, we also continued to benefit from growth in our equity and earnings line. Our 152 joint venture communities are making substantial contributions to our growth through our percentage ownership in these communities.* ... We target a 15% annual return on our $128 million investment in these unconsolidated senior living properties. And we expect to continue to benefit from our percentage ownership in these joint venture communities for many years to come.

2)    * * *

3)    [Question:] I wanted to actually just ask a little bit about equity and earnings and guidance. The equity and earnings bounces around a little bit because you're selling properties. You have got various things coming in. I guess I wanted to see if we could get some additional guidance on that beyond what you provided and also just clarify maybe what your own assumptions are say in '05, '06 numbers for that?

4)    [Newell – President:] We have given a target long-term of 15% earnings on the 128 million we've invested. That's through 152 properties and joint ventures and it is lumpy as you said because included in that line will be startup losses from homes and development ventures as they open. As they ramp up then, we begin to share in the earnings and cash from those joint ventures. And as performance hurdles are met, we began to share disproportionately which is what you saw in this quarter and in the last quarter as investor partners received distributions in excess of the hurdles we begin to generate substantial returns. Our assumptions internally are that over time from those investments we will hit a 15% IRR. We model out all 152 communities over a long period of time and calculate that in our guidance. It's very difficult to predict out more than one or two quarters. We have a sense of what's coming, we do our best in giving guidance what we are very confident of these are very good investments in communities that are performing very well. For the long run for Sunrise, we will generate a great return on that.

76.    On November 9, 2005, Jefferies & Co. reported:

1)    **Portfolio Development Activities**

2)    A major component of the company's development strategy is to make equity investments (usually 20%) with development JV partners. During the quarter, Sunrise opened four communities, assumed management of another three properties, and acquired an interest in and management of 18 communities as part of The Fountains acquisition (18 properties, resident capacity of 4,500, and $165 million of annualized revenue). In addition, the company terminated two management contracts in 3Q05. During the quarter, Sunrise started construction on five new properties (four in the U.S. and one in Canada) for a total of 39 communities under construction, with a combined capacity of 4,600 residents. The company expects 16 additional construction starts by the end of 2005. Of the 39 properties currently under construction, 26 are expected to open in the next four quarters. Of the 26 openings, three will be wholly owned by third parties, 20 are JVs, and three will be wholly owned by Sunrise. The 26 openings over the next year include: three JV properties and one third-party owned property in 4Q05; eight JV owned properties, and one third-party owned property in 1Q06; one wholly owned property; eight JV owned properties, and one third-party owned property in 2Q06; and two wholly owned properties and one JV property in 3Q06. Higher development and pre-opening management fees for facility openings (offset by corresponding pre-opening expenses) are expected to significantly contribute to earnings for the foreseeable future and can cause some earnings volatility as was experienced this quarter.

77.    On November 9, 2005, the Individual Defendants caused or allowed Sunrise to file its 3Q:05 10-Q. It was signed by Rush/CFO and Anschutz/CAO. It reported:

|  | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
|  | **2005** | **2004** | **2005** | **2004** |
| Income from operations | $9,395 | $11,821 | $32,361 | $55,130 |
| Equity in earnings and return on investment in unconsolidated senior living properties | $7,801 | $2,095 | $13,021 | $5,834 |
| Net income | $11,049 | $8,912 | $29,379 | $37,975 |
| EPS data: | | | | |
| Diluted net income per common share | $.24 | $.21 | $.66 | $84 |

78.    The 3Q:05 10-Q also stated:

*1)    Stock-Based Compensation*

2)    Stock options are granted to employees for a fixed number of shares *with an exercise price equal to the fair value of the shares at the date of grant*. Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), *and accordingly, does not recognize compensation expense for stock option grants*.

3)        * * *

**4)    Controls and Procedures**

5)    We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). *Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at September 30, 2005*. In connection with the evaluation by management, including our Chief Executive Officer and Chief Financial Officer, no changes in Sunrise's internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the quarter ended September 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

79.    The 3Q:05 10-Q also stated:

1)        **Certification of Chief Executive Officer and Chief Financial Officer Pursuant to Section 906**

2)        **of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350)**

3)    The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

4)    (a)    the Quarterly Report on Form 10-Q of the Company for the period Ended September 30, 2005 filed on the date hereof with the Securities and

Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

5)    (b)    *information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.*

80.    On March 7, 2006, the Individual Defendants caused or allowed the Company to issue a press release entitled " Sunrise Reports Fourth-Quarter 2005 Results, Reaffirms Full-Year 2006 Earnings Guidance and Expects 15 to 20 Percent Full-Year 2007 EPS Growth." The press release stated in part:

1)    Sunrise Senior Living, Inc. today reported fourth-quarter 2005 earnings of $1.01 per share (diluted) compared to $0.28 (diluted) per share in the fourth quarter of 2004. For the full year 2005, Sunrise reported earnings per share of $1.67 (diluted) compared to earnings per share of $1.12 (diluted) in 2004. ...

2)    "The fourth quarter and year closed strongly, as we expected, and positions us for a very good 2006 during which we will be celebrating our 25th anniversary," said Paul Klaassen, Sunrise Senior Living's chairman and CEO. ...

3)    *   *   *

4)    "We are extremely excited about the opportunities that lie ahead for our business," said Thomas Newell, president of Sunrise Senior Living. "As we move forward, we expect to continue to benefit from our expanded development program and our management services business model. In 2006, we anticipate a record number of community openings and substantial returns from our minority investments in joint venture partnerships. In addition, the strength of our balance sheet is expected to provide significant flexibility as we enter into the next phase of our growth strategy."

5)    *   *   *

6)    Sunrise's 2006 earnings per share is expected to be driven ... by further growth in earnings generated by Sunrise's equity investments in unconsolidated ventures.

81.    On March 7, 2006, defendants held a conference call for analysts to discuss Sunrise business and finances. During the call, the following occurred:

1)    **[P. Klaassen – CEO:]** The fourth quarter closed out strongly as we expected and ended a busy and successful year for Sunrise. All four of our growth engines, are firing on all cylinders. As you may know, those four growth engines are: 1, growth from new construction, 2, growth from new management contract acquisition: 3, internal growth from existing operations, and 4, growth generated by our balance sheet. ...

2)    *   *   *

3)    Our success in 2005 was the result of many factors ....

4)    *   *   *

- 35 -

*Regarding equity in earnings, excluding the 3.6 million one-time write-down of our original investment in the At-Home venture, we would have reported equity in earnings of unconsolidated senior-living communities of approximately 3.8 million in Q4, and, I guess that would be $16.8 million for the year. We expect an additional 15 % growth in this business segment in 2006.* Our ownership percentage in these 156 unconsolidated joint-venture communities in which we have invested $138 million should therefore generate about 19 million in pretax income this year. These minority ownership positions align our interests with our capital partners, and allows us to participate in community performance upside, without the negative impact of increased debt levels or additional amortization and depreciation expenses.

82.    In March 2006, the Individual Defendants caused or allowed Sunrise to issue its

2005 Annual Report to Shareholders. It contained the following financial statements:

FINANCIAL HIGHLIGHTS
(dollars in thousands)

| YEAR ENDED DECEMBER 31, | **2005** | **2004** | **2003** |
|---|---|---|---|
| Operating revenues | $1,819,479 | $1,446,471 | $1,096,260 |
| Net income | $79,742 | $50,687 | $62,178 |
| Total assets | $1,328,276 | $1,105,756 | $1,009,798 |
| Stockholders' equity | $632,677 | $523,518 | $490,276 |

83.    Sunrise's 2005 financial statements at Note 13 stated:

1)    **13.    Stockholders' Equity**

2)    *Stock Option Plan*

3)    Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. ... *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted. ... The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.*

(b)    *Under the terms of the Directors' Plan, the option exercise price was not less than the fair market value of a share of common stock on the date the option was granted.*

1)

84.    Sunrise's 2005 10-K contained an identical representation.

85.    The 2005 Annual Report contained a letter signed by Klaassen and Newell which

stated:

1)    **2005 Results**  Overall, we are very pleased with our performance in 2005.

2)        *   *   *

3)    **Joint Venture Partners**    Strong    industry    demographics, operational excellence, and our strong financial condition continue to accelerate interest among our impressive group of joint venture partners. At the end of 2005, 156 of our communities were held in joint ventures, and *nearly all of our new development and acquisitions are conducted through joint ventures*. Through our percentage ownership in these communities and the incentives we receive for exceeding performance thresholds, *these partnerships contributed significantly to our growth in 2005*. In addition, these joint venture partnerships reduce our corporate risk profile *since we share capital and construction risk with our partners*.

86.    Elsewhere, the 2005 Annual Report stated:

*1)    Equity in Earnings and Return on Investment in Unconsolidated Senior Living Communities*

2)    Equity in earnings and return on investment in unconsolidated senior living communities represents our allocation of the results of operations and returns on our investment from the distributions of proceeds from transactions with our unconsolidated ventures.

3)    **2005 Compared to 2004**

4)    Equity in earnings and return on investment in unconsolidated senior living communities was $13.2 million in 2005 compared to $9.4 million in 2004, an increase of $3.8 million, or 41%, which was primarily comprised of:

5)    •    $8.8 million return on our investment pursuant to the terms of a venture agreement;

6)    •    a decrease of $4.9 million from our portion of start-up losses associated with two international development ventures. In 2005, these two ventures opened four communities which incurred losses in 2005;

7)    •    $2.9 million return on our investment whereby an unconsolidated venture sold two senior living communities to Sunrise REIT;

8)    •    $3.0 million return on our investment whereby an unconsolidated venture sold its three senior living communities and distributed the proceeds to its members. We recognized the $3.0 million of cash received in excess of our investment;

9)    •    a decrease of $3.6 million from the write-down of our interest in Sunrise at Home; and

10)    •    a decrease of $2.5 million from the results of operations from other unconsolidated ventures, including our portion of start-up losses from development ventures.

11)    **2004 Compared to 2003**

12)    Equity in earnings and return on investment in unconsolidated senior living communities was $9.4 million in 2004 compared to $5.3 million in 2003, an increase of $4.1 million, or 76%, which primarily resulted from improved operations and additional incentive fees.

87. The 2005 Annual Report contained a section stating:

1)    **Management's Report on Internal Control over Financial Reporting**

2)    Management of Sunrise Senior Living, Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting and for the assessment of the effectiveness of internal control over financial reporting. As defined by the Securities and Exchange Commission, internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles.

3)    The Company's internal control over financial reporting is supported by written policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the Company's transactions and dispositions of the Company's assets; [and] (2) *provide reasonable assurance that transactions are recorded as necessary to permit preparation of the consolidated financial statements in accordance with generally accepted accounting principles . ...*

4)    *    *    *

5)    In connection with the preparation of the Company's annual consolidated financial statements, management has undertaken an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO Framework). *Management's assessment included an evaluation of the design of the Company's internal control over financial reporting and testing of the operational effectiveness of those controls.*

6)    *Based on this assessment, management has concluded that as of December 31, 2005, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.*

7)    *    *    *

8)    Paul J. Klaassen Chief Executive Officer

9)    Bradley B. Rush Chief Financial Officer

88. Note 2 to Sunrise's 2005 financial statements represented:

1)    *Investments in Unconsolidated Senior Living Communities*

2)    Sunrise holds an interest in ventures established to develop or acquire and own senior living communities. When these ventures are considered to be variable interest entities ("VIEs") in accordance with FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary. When Sunrise has determined it is not the primary beneficiary or, for non-VIEs when it determines that it owns a non-controlling interest (because other partners or

members control or participate in the management decisions of these ventures), *the investments are accounted for under the equity method.*

3)     *The equity method investments are recorded at cost* and subsequently are adjusted for equity in net income (losses) and distributions. Sunrise determines its share of the investees' earnings or losses based on the distributions of cash flow from a hypothetical liquidation of the investee's assets and liabilities. The equity earnings are adjusted for the impact on the investee's reported earnings, if any, for the basis differences between Sunrise's carrying value of the equity investments and the investee's underlying assets. Sunrise recognizes profits on sales of services to these ventures to the extent of the ventures' outside ownership interest.

4)     *Sunrise owned interests in 187 unconsolidated senior living communities (31 of which are under development) through ownership interests in 30 unconsolidated ventures at December 31, 2005 that are accounted for under the equity method and one unconsolidated venture accounted for under the cost method.* Those ventures are generally limited liability companies and partnerships. Sunrise's interest in those ventures generally range from five to 25%. Sunrise has one community in which it owns less than 10%, 147 communities in which it owns between 10% and 20%, and 20 communities in which it owns between 10% and 30%, and 19 communities in which it owns more than 30%.

5)          *   *   *

6)     *Variable Interest Entities*

7)     At December 31, 2005, Sunrise had an interest in 11 ventures that are considered VIEs. Sunrise is the primary beneficiary and, therefore, consolidates eight of these VIEs. Seven of these consolidated VIEs are development communities in which Sunrise has a majority of the voting interest and is developing for Sunrise REIT (see Note 4). At December 31, 2005, included in Sunrise's consolidated balance sheet were $56.1 million of development costs and $50.7 million of debt, including $6.6 million of third-party construction debt secured by the development communities and $44.1 million of borrowings from Sunrise REIT guaranteed by Sunrise. The only recourse to Sunrise with respect to these seven VGFIEs is under borrowings from Sunrise REIT.

89.     Sunrise's 2005 financial statements at Note 13 stated:

1)     **13.     Stockholders' Equity**

2)     *Stock Option Plans*

3)     Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. … *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted.* … The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.

90.     Sunrise's 2005 10-K contained an identical representation.

- 39 -

## THE TRUTH IS REVEALED

91.    The true facts, which were known by the defendants but improperly concealed from the Company's investors include:

• Sunrise's 2003, 2004 and 2005 and prior year financial results, including its net income, EPS, profit and shareholders' equity, were all materially overstated due to improper accounting for minority interests in joint ventures and real estate sales and contrivances and manipulations in the administration of Sunrise's stock options, including "backdating" and "spring-loading," and failing to properly record or account for the actual amount, and tax consequences, of the compensation expense of its executives.

• Sunrise's excellent financial and operating results reported, at times relevant hereto, were not due to the skill and business acumen of its top executives and directors, their successful management of its business or the outstanding performance of its business units, as represented.  In fact, a significant part was due to manipulation of Sunrise's financial statements by improperly avoiding recognizing losses on minority interests in joint ventures, improper recognition of gains on real estate sales and not properly accounting for (and thus understating) the true compensation expense of its executive and management team.

• Sunrise's top executives were manipulating the Company's stock option plan so as to enrich themselves by "backdating" or "spring-loading" the stock options they were granted to set the options at a much lower exercise price – one well below the market price or fair value of the stock when the option was actually granted – or by granting them before the release of positive corporate news that would boost the stock, thus giving them an instant, riskless profit, while exposing the Company to the risk of regulatory investigations, tax penalties, and even criminal proceedings.

• Sunrise's internal financial and accounting controls were materially deficient and not effective in providing the necessary and required degrees of assurance that Sunrise's financial results and reports were fairly and accurately presented and free from fraud.

92.    On May 8, 2006, Sunrise's value was as high as $39.30 per share.  On May 9, 2006, the Company was forced to suddenly reveal that it was "rescheduling its first quarter 2006

earnings release to allow additional time for further review of the accounting treatment applied to its investments in unconsolidated senior living communities, and to complete the review of its Form 10-Q for the first quarter ended March 31, 2006." On May 10, 2006, Sunrise was forced to reveal that the accounting treatment review was focused on the allocation of profits and losses for a "limited number" of Sunrise's joint ventures where Sunrise was a minority partner and the capital partner received a preference, either on the return of its capital over Sunrise's capital in the event of a refinancing or sale of the venture's properties, or cash flow from operations. On May 11, 2006, Sunrise disclosed "it has decided to use a different methodology to allocate profits and losses in its joint ventures."

93.    During a May 11, 2006 conference call, the following occurred:

1)    **[P. Klaassen – CEO:]** During the final preparation of our first-quarter Form 10-Q, an issue arose that required additional time for review by our team and our outside accountants to ensure the integrity and the accuracy of our financial statements. The issue that necessitated this additional review has to do with the accounting treatment applied to certain of our investments in unconsolidated senior living communities. Specifically, this accounting treatment review is focused on the allocation of profits and losses for those joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties.

2)    Now, approximately 15% of Sunrise's communities are held by joint ventures that would fall into this category. Throughout the year, and in connection with our quarterly filings, we conduct a review of our various accounting policies, including the methodology we use to allocate profits and losses in our joint ventures where our capital partner is entitled to a preferential return. In connection with this review, our accounting team determined and then brought to the attention of our auditors that there is a more preferable method under generally accepted accounting principles for allocating such profits and losses among the partners of these ventures and for determining the timing of such allocations during the lifecycle of the ventures, from startup losses to stabilized cash flow to refinancing or sale of the property.

3)    *Now, as a result, we are now in the process of assessing the implications of adopting this alternate methodology and whether adjustments are necessary to prior period financial statements.* In order to have time to effectively complete this review, we will not be filing our Form 10-Q with the Securities and Exchange Commission today. Instead, we will take the time it takes to carefully review and finalize this matter. ... [W]e do not expect the outcome of this review to adversely affect our previously furnished earnings guidance for 2006 or 2007, due to the limited number of current joint ventures affected and because of the various stages of those ventures.

4)    *    *    *

5)    *[W]e will completely avoid this accounting issue in the future by no longer providing preferential return on capital in any future ventures. We were*

*able to do this now because of the successful track record that we have established for these ventures.*

6)      * * *

7)      The general effect of using this different methodology – known, I am told, as the hypothetical liquidation at book value method – *is to shift more of any losses to Sunrise in the early days of any venture where the capital partner has a preference for return of capital.* ...

8)      Perhaps a simplified example will help illustrate this rather technical and complicated issue. Assuming a one-property development venture built a $20 million Sunrise community, it the venture obtains 75% or $15 million of construction debt, the partners would contribute $5 million of equity. If it is a typical 80/20 partnership, *our share of the equity would be 1 million* and our capital partner would contribute 4 million. In our now typical model, where there is no capital return preference to our partner, all losses and profits *would be allocated 80/20* ....

9)      Now, if this partnership were to experience 1 million of initial losses ... Sunrise would initially recognize *20% or $200,000 of the $1 million of losses* ... for a total of *$1 million profit from the venture.* ...

10)     Now, if the same venture had included a capital return preference ... Sunrise would be allocated 100% or all million dollars of the initial losses ....

11)      * * *

12)     **Derrick Dagnan, Analyst – Avondale Partners:**  Is the new accounting method or the new treatment under GAAP – is that a new option to you, or has that been available to you for a number of years and you just recently found it?

13)     **[Rush – CFO:]**  It has been available for a number of years. And again, with the scrutiny that Paul and Tom mentioned earlier, it came into consideration late in 2005. And when we took a look at it, we thought we should look deeper.

94.     On June 15, 2006, *MarketWatch* reported that:

1)      Sunrise Senior Living, Inc. had one quarter and two years' worth of per-share earnings estimates cut by Stifel Nicolaus on Thursday .... Preliminary first-quarter results provided by the company, coupled with the buyout of 10 management contracts by Five Start Quality Care Inc., prompted Stifel Nicolaus to take its full-year 2006 outlook to $1.15 from $1.18 a share. The firm also reduced its full-year 2007 per-share forecast to $1.32 from $1.36, and lowered its first-quarter forecast to 21 cents from 23 cents.

After this occurred, Sunrise's value dropped to $27.89 per share on 6/15/06 and to as low as

$26.29 on June 20, 2006, three trading days later. On June 15, 2006, Stifel Nicolaus reported:

2)      •      SRZ shares declined 5.3% yesterday, with most of the damage coming late in the day on a couple of large block trades.

3)      •      Shares are down 26.3% from their 4/4/06 high due to general market conditions. Sunrise's delay in reporting 1Q06 results as a result of

- 42 -

an accounting issue concerning its development joint ventures and yesterday's block sales.

95.    By late July 2006, Sunrise value fell to as low as $25.08 per share as rumors circulated of a massive financial restatement by Sunrise.  On July 27, 2006, Stifel Nicolaus reported:

**1)    Announced July 31, 2006 Date for Releasing 1Q06 Earnings Rapidly Approaching**

2)    •    SRZ shares are down 31.5% since the company delayed 1Q06 earnings due to an accounting question about recognition of earnings on some of its joint venture investments.

3)    •    In a 6/30/06 press release announcing an acquisition, Sunrise said it "expects to complete its accounting review prior to July 31, 2006."

4)    •    We believe the release of Sunrise's much delayed 1Q06 results will be a catalyst for the stock to rebound.

5)    •    With three business days to go, Sunrise has not scheduled an earnings release and it is our sense that the company may or may not meet its expected timetable for completing its accounting review.

96.    On July 31, 2006, Sunrise was forced to announce a huge, multi-year financial restatement.  Sunrise's press release stated in part:

1)    [T]he Company will *restate* its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the accounting treatment related to ventures that contain partner preferences and the timing of sale accounting and recognition of income from prior sales of real estate.  The cumulative impact of the restatement is expected to reduce net income for all periods impacted, including the years 1999 through 2005, by an estimated $60 million to $110 million. ... Sunrise is unable at this time to provide the precise impacts of the restatement since its review of these issues has not yet concluded. ... The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years *should no longer be relied upon*.

97.    In its July 31, 2006 announcement, Sunrise was forced to admit it had been *improperly accounting for its joint venture investments and operations and for certain real estate sales*, and that it would no longer engage in real estate sales with guarantees and other ongoing financial commitments.  On July 31, 2006, Sunrise stock fell to as low as $24.40 per share.  In November 2006, Sunrise disclosed its accounting review was still not completed and that, subject to completion of its auditor's review and clearing comments from the SEC, Sunrise

expected to file its restated 2005 Form 10-K before year-end, which would be followed by the filing of Sunrise's Forms 10-Q for the first three quarters of 2006, and to be current in its filings with the SEC, it would file its 2006 Form 10-K on or before March 1, 2007. Sunrise indicated that the cumulative impact of the restatement was anticipated to reduce net income for all periods impacted, including 1999 through 2005, by approximately $100 million. Approximately 50% of this amount related to the periods from 1999 through 2002.

98.     A November 26, 2006 *New York Times* article by Gretchen Morgenson, stated in part:

1)     Shareholders of Sunrise Senior Living, a provider of residential communities and services for the elderly, have seen their holdings decline 17 percent since last spring. Problematic bookkeeping kept the company from filing three quarterly financial statements on time, forced it to restate earnings for 2003 through 2005, drew Securities and Exchange Commission inquiries about its accounting and led it to warn that its internal controls were probably inadequate.

2)     All of that resulted in a $342 million hit to the market value of the company, based in McLean, VA. But a raft of insiders escaped some of that damage. Three of the company's directors and its two founders sold $32 million worth of Sunrise stock in the six months leading up to the May 9 announcement that it was changing it accounting practices and delaying its financial filing.

3)     Reviewing stock sales over the six months before the announcement is relevant because, during a conference call with investors in May, Sunrise officials said that "late in 2005" they had begun contemplating the accounting shift that later clobbered Sunrise shares.

4)     *   *   *

5)     Selling during the period were Paul J. Klaassen, the founder and chief executive; Theresa M. Klaassen, his wife and Sunrise's chief cultural officer; Ronald V. Aprahamian, a consultant and investor who is chairman of Sunrise's audit committee; Thomas J. Donohue, a Sunrise director who is chairman of the United States Chamber of Commerce; and J. Douglas Holladay, a founder of a private equity firm and a director.

6)     *   *   *

7)     The biggest sellers of Sunrise stock were the Klaassens, who generated $21.4 million in sales of 600,000 shares from December 2005 to April 4, 2006. The sales began last Dec. 19, around the time the company first contemplated the accounting review that resulted in the restatements. They were part of a series of planned sales put in place in December by the executives.

8)     An especially timely stock sale by Mr. and Mrs. Klaassen came a week before the company announced it was delaying its financial filings. On May 1 and 2, they sold 100,000 shares at an average price of $36.91. The day of the announcement, the price fell to $32.35. On Friday, the stock closed at $32.50

9)    Reached last Wednesday at a vacation home in Florida, Mrs. Klaassen, who is also a director, declined to comment. The Klaassens continue to hold a large stake in Sunrise – 5.2 million shares, or approximately 10 percent of the stock outstanding. Although they entered into a derivatives contract relating to a forward sale of 750,000 shares last year, the 600,000-share sales are their first outright disposal of Sunrise stock since the company went public in 1996.

10)    *   *   *

11)    Another apparently well-times sale took place last April 18, exactly three weeks before the company announced its filing delay, when Mr. Aprahamian, chairman of the company's audit committee, sold 20,000 shares at $37.85 each, generating $757,040. Mr. Aprahamian declined to comment when reached last Wednesday at his home in Virginia. He said he had not seen the shareholder letter, addressed to Sunrise directors and hand-delivered to the company last Monday. He declined to provide a fax number or e-mail address where a reporter could send a copy.

12)    Mr. Donohue, the Chamber of Commerce chairman, has been a Sunrise director since 1995 and heads its compensation committee. He is also a member of its audit committee. On Nov. 21, 2005, he sold shares worth $3.4 million, according to regulatory filings. Mr. Klaassen is on both the Chamber of Commerce's board and that of its research arm, the National Chamber Foundation.

## BACKGROUND TO DEFENDANTS' ILLEGAL BACKDATING PRACTICES

99.    On March 18, 2006, the *Wall Street Journal* published an article entitled: "The

Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable.

Luck – or something else?" The article stated in pertinent part:

1)    On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year. Oddly, that was good news for Chief Executive Jeffrey Rich.

2)    His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding. It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.

3)    Just lucky? A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote -- around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.

4)    Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.

5)    The Journal's analysis of grant dates and stock movements suggests the problem may be broader. It identified several companies with wildly improbable option-grant patterns. While this doesn't prove chicanery, it shows

something very odd: Year after year, some companies' top executives received options on unusually propitious dates.

6)    The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002. If so, it was another way some executives enriched themselves during the boom at shareholders' expense. And because options grants are long-lived, some executives holding backdated grants from the late 1990s could still profit from them today.

7)    * * *

8)    Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually doesn't vest for a year or more, but then it continues for several years. The exercise price is usually the stock's 4 p.m. price on the date of the grant, an average of the day's high and low, or the 4 p.m. price the day before. Naturally, the lower it is, the more money the recipient can potentially make someday by exercising the options.

9)    Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 options on a day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 times 100,000, or $2 million. But if the grant date was a month earlier and the stock then was at, say, $20, the options would bring in an extra $1 million.

100.    On May 5, 2006, President George W. Bush stated in an interview on the *Kudlow & Company* show airing on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."

## DEFENDANTS' ILLEGAL BACKDATING PRACTICES

101.    Dating back to at least 1997, the Individual Defendants have caused or allowed Sunrise insiders to manipulate their stock option grant dates so as to illegally maximize their profits from the stock options.  Specifically, Company insiders changed their respective stock option grant dates to take advantage of lower exercise prices than the price on the actual grant date.  The price of Sunrise shares on the reported option-grant date, therefore, was lower than the share price on the actual day the options were issued, thus providing defendants with more favorably priced options.  The Sunrise Board, in turn, approved the grants of the options to Sunrise insiders even though those options were improperly backdated.

102.    Further, the backdating of options granted to corporate insiders brought an instant paper gain to these insiders because the options were priced below the stock's fair market value

when they were actually awarded. Under GAAP, this instant paper gain was equivalent to extra compensation, and was thus a cost to Sunrise. Accordingly, since Sunrise failed to include the costs associated with this extra compensation in its financial results, its profits were overstated during the fiscal periods in which the options were granted. A restatement of Sunrise's past financial results will be necessary to correct for these improprieties.

103.    Specifically, since 1997, the Individual Defendants have caused or allowed Sunrise to report improper financial results—materially overstating its earnings—as follows:

| Fiscal Year (Ending December 31) | Reported Earnings (in thousands) | Calculated Shares | Reported Diluted EPS |
|---|---|---|---|
| 1997 | $4,001 | 40,010 | $0.10 |
| 1998 | $22,312 | 40,202 | $0.56 |
| 1999 | $20,213 | 43,006 | $0.47 |
| 2000 | $24,278 | 44,142 | $0.55 |
| 2001 | $49,101 | 47,213 | $1.04 |
| 2002 | $54,661 | 48,804 | $1.12 |
| 2003 | $62,178 | 47,105 | $1.32 |
| 2004 | $50,687 | 45,256 | $1.12 |
| 2005 | $79,742 | 47,750 | $1.67 |

**Stock Splits:** [2:1] October 4, 2005

104.    In addition to breaches of fiduciary duty and accounting issues, the backdating of stock options can have severe tax consequences. While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment. In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants. For example, for performance-based stock options (generally granted to the five highest-paid executives), a company is allowed to take a tax deduction on that full amount *provided that the options were granted at the market price*. Backdating, however, automatically disqualifies those options from receiving the tax break—instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

105.    In light of these serious potential tax-related ramifications, the IRS is now examining as many as 40 companies being investigated for backdating stock options to determine whether they owe millions of dollars in unpaid taxes. On July 28, 2006, the *New York*

- 47 -

*Times* published an article entitled "I.R.S. Reviewing Companies in Options Inquiries," which stated:

1)    The Internal Revenue Service is examining as many as 40 companies ensnared in various stock options investigations to determine whether they owe millions of dollars in unpaid taxes.

2)    In the last few weeks, the agency has directed its corporate auditors to start reviewing the tax returns of dozens of executives and companies, which may have improperly reported stock option grants. These preliminary investigations are expected to take months, but if there is early evidence of widespread tax trouble, I.R.S. officials said they were prepared to step up their effort.

3)    "Where there are indications of mischief, we want to now look at those cases and see if they complied with tax laws," said Bruce Ungar, the agency's deputy commissioner for large and midsize businesses. "It is possible that they are compliant, but the early indication is that there is a good likelihood there is some noncompliance.

4)    "If this is a big problem, we will apply more resources," he added.

5)    The I.R.S. auditors are focusing on the potential tax obligations from backdated stock options that have been cashed out since 2002. Federal rules bar the I.R.S. from opening cases that are more than three years old. Still, tax lawyers estimate the agency could reap hundreds of millions of dollars from civil penalties, unpaid taxes and interest payments if widespread wrongdoing is found.

6)    The agency appears to be taking aim both at companies that took improper tax deductions, and at executives who received favorable tax treatment and might have misreported income.

7)    So far, rank-and-file employees who simply received potentially backdated stock options are not in the agency's cross hairs.

8)    "If you were involved in the mischief, you would want to be worried," Mr. Ungar said. "If you weren't involved in it, then you are not in the same situation."

9)    The tax scrutiny is the latest twist in what is perhaps the biggest financial scandal of the year and comes as the agency cracks down on misreported executive pay. The I.R.S. follows several other federal agencies that have begun investigations into the myriad problems that arise from improperly reported or backdated stock option grants.

10)    The Securities and Exchange Commission has said it is examining 80 companies for potential accounting and disclosure problems. On Wednesday, it underlined that focus with new rules on reporting executive compensation. The Justice Department has issued subpoenas to at least 35 companies and last week brought its first criminal charges, against two former executives of Brocade Communications. Now, tax troubles may be next.

11)    By itself, backdating stock option grants is not necessarily illegal. But it can have severe tax consequences separate from potential accounting violations. While ordinary stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not. Backdating

effectively allows such in-the-money options to appear in regulatory filings as if they were ordinary grants.

12)    The I.R.S. is broadly focused on two main areas that may have been abused: performance-based stock options for top executives and incentive stock options that were frequently handed out to the rank and file. Each receives a different type of tax treatment.

13)    Performance-based stock options are generally granted to the five highest-paid executives and can often be worth tens, if not hundreds of millions of dollars when they are cashed out. So long as the options meet certain standards, such as being granted at the market price, companies are allowed to take a tax deduction on that full amount.

14)    But backdating — effectively granting stock options with a discount — automatically disqualifies those options from receiving the tax break. Instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

15)    "If these companies have been deducting huge option grants that they actually couldn't deduct, that seems like a big pile of money out there," said Larry R. Langdon, a tax lawyer in Palo Alto, Calif., and a former I.R.S. commissioner.

16)    Improperly awarded incentive stock options could lead to even more tax trouble. Backdating, which grants a discounted option, effectively voids the favorable tax treatment that incentive stock options provide employees, rendering their individual tax returns inaccurate. Companies, meanwhile, could be faulted for underreporting their payroll tax.

17)    "Maybe it is not a widespread problem, but if this happened to five employees, you have five nightmares," said Fred Whittlesey, an executive pay consultant and head of the Compensation Venture Group. "Employees will have a legal and companies will have an ethical responsibility to insulate them from what happened based on actions of a few people."

18)    The I.R.S. assembled a five-member task force to oversee its examinations about two months ago. And in the last few weeks, the Internal Revenue commissioner, Mark W. Everson, directed the agency's corporate auditors to look into potential tax issues as dozens of companies have come forward. In a statement, he called on them to "consult closely with the S.E.C. to determine which companies merit scrutiny."

19)    Last week, I.R.S. officials held their first meeting with Linda Chatman Thomsen, the director of the S.E.C.'s enforcement division. She indicated that there were tax issues in the cases that securities regulators were investigating, Mr. Ungar said.

20)    For now, I.R.S. officials are reviewing the files of 30 to 40 of the companies that have publicly disclosed problems, including some already facing scrutiny on other tax issues. Mr. Ungar said it could take months to more than a year before these initial cases are resolved. Much of the information will need to be supplied by the companies themselves, not taken from tax returns. I.R.S. officials have not yet been in touch with the Justice Department about potential tax fraud.

106.    Sunrise is or will be added to the list of companies currently investigated by the IRS because of defendants' rampant backdating practices and the millions of dollars worth of improper deductions taken by the Company.

## IMPROPER STOCK REPURCHASE

107.    Between 2000 and 2005, at times when defendants were illegally backdating their options, defendants directed Sunrise to repurchase over $202.1 million of its own stock. Specifically, Sunrise repurchased over 13.5 million of its shares from 2000 to 2005.

108.    During these times, Sunrise's stock was artificially inflated because its published financial results did not properly account for the defendants' illegally backdated stock options. Further, the stock repurchases served to further inflate Sunrise's stock price and, thus, defendants' illegal-stock-option-backdating profits.

## MANIPULATED STOCK OPTION GRANTS

109.    The following charts identify the most egregious examples of instances between 1997 and 2001 in which options granted to certain defendants were purportedly dated at or very near the lowest share price for the month, quarter or year in which they were granted:





October 1998 Stock Option Grants

On October 8, 1998, defendants purportedly granted the following options at an exercise price of $30.81 per share - the lowest share price for the period beginning September 18, 1998 through February 12, 1999 - to the following Sunrise Senior Living Inc. insider:

Thomas J. Donohue (1)          10,000

(1) On February 12, 1999, defendant Donohue disclosed this grant on a Form 5



February 2000 Stock Option Grants

On February 25, 2000, defendants purportedly granted the following options at an exercise price of $12.38 per share - within $0.13 of the lowest share price for the fiscal year (January 1, 2000 through December 31, 2000) - to the following Sunrise Senior Living Inc. insiders:

| | | | |
|---|---|---|---|
| Ronald V. Aprahamian (1) | 11,000 | David G. Bradley (1) | 7,000 |
| Thomas B. Newell (1) | 60,000 | Richard R. Slager (1) | 5,000 |
| Christian B.A. Slavin (1) | 55,000 | Brian C. Swinton (1) | 45,000 |
| Tiffany L. Tomasso (1) | 55,000 | Craig R. Callen (2) | 8,000 |

The highest share price for the fiscal year was $29.38 on December 8, 2000.

(1) On April 10, 2000, defendants Aprahamian, Bradley, Newell, Slager, Slavin, Swinton and Tomasso disclosed these grants on a Form 4. The Form 4s were filed late in violation of SEC filing regulations.
(2) On January 12, 2001, defendant Callen disclosed this grant on a Form 5.

- 51 -







110.    The following table provides an estimate as to the illegal paper profit that—the

defendants identified in the prior charts—gained as a result of their stock option manipulations:

| Defendants | Reported Grant Date | Number of Securities Underlying Options | Price of Stock on Reported Date | Estimated Actual Exercise Price Range | | | Estimated Paper Profit Average |
|---|---|---|---|---|---|---|---|
| | | | | Low | | High | Average |
| Faeder | 5/2/1997 | 100,000 | $24.38 | $27.00 | - | $35.00 | $683,000.00 |
| Newell | 5/2/1997 | 100,000 | $24.38 | $27.00 | - | $35.00 | $683,000.00 |
| Smick | 5/2/1997 | 100,000 | $24.38 | $27.00 | - | $35.00 | $683,000.00 |
| Smick | 5/2/1997 | 50,000 | $24.38 | $27.00 | - | $35.00 | $341,500.00 |
| Swinton | 5/2/1997 | 75,000 | $24.38 | $27.00 | - | $35.00 | $512,250.00 |
| Newell | 2/25/2000 | 60,000 | $12.38 | $12.44 | - | $15.56 | $43,200.00 |
| Slavin | 2/25/2000 | 55,000 | $12.38 | $12.44 | - | $15.56 | $39,600.00 |
| Swinton | 2/25/2000 | 45,000 | $12.38 | $12.44 | - | $15.56 | $32,400.00 |
| Tomasso | 2/25/2000 | 55,000 | $12.38 | $12.44 | - | $15.56 | $39,600.00 |
| Newell | 3/28/2000 | 25,000 | $12.44 | $12.31 | - | $17.31 | $34,750.00 |
| Slavin | 3/28/2000 | 15,000 | $12.44 | $12.31 | - | $17.31 | $20,850.00 |
| Swinton | 3/28/2000 | 15,000 | $12.44 | $12.31 | - | $17.31 | $20,850.00 |
| Tomasso | 3/28/2000 | 15,000 | $12.44 | $12.31 | - | $17.31 | $20,850.00 |
| Klaassen, P. | 9/11/2000 | 350,000 | $17.00 | $17.50 | - | $28.38 | $1,519,000.00 |
| Slavin | 11/12/2001 | 60,000 | $26.95 | $28.47 | - | $29.50 | $81,600.00 |
| **Total** | | **1,120,000** | | | | | **$4,755,450.00** |

## THE TRUTH COMES TO LIGHT REGARDING DEFENDANTS' ILLEGAL BACKDATING PRACTICES

111.    On December 11, 2006, Sunrise disclosed for the first time an internal investigation of prior stock option grants. Defendants' stated reason for launching the investigation is the receipt of letter from a shareholder that raised concerns of illegal backdating at the Company.

112.    On January 15, 2007, Sunrise disclosed that it "will not be current will all SEC filings, including the 2006 Form 10-Qs and 2006 Form 10-K" due to the pending stock option investigation and the pending restatement. A continued delay in Sunrise's filings could cause problems for Sunrise's listing requirements on the New York Stock Exchange as well as potential problems with its debt covenants.

### SUNRISE'S IMPROPER FINANCIAL REPORTING

113.    In order to inflate the price of Sunrise's securities, defendants caused or allowed the Company to improperly report its results for 2003 through 2005 through improper accounting for investments in unconsolidated senior living communities. As a result of its improper accounting, Sunrise prematurely recognized income involving many of its joint ventures. The Company was also not properly accounting for backdated options given to certain executives.

114.    The 2003 through 2005 results were included in press releases disseminated to the public and Forms 10-Q and 10-K filed with the SEC.

115.    Sunrise has now been forced to admit that it will restate to change the accounting treatment applied to its investments in unconsolidated senior living communities because its prior accounting was in error. Sunrise also commenced a probe of its stock option practices.

116.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim

financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

**Improper Accounting for Unconsolidated Senior Living Centers**

117.   GAAP, as set forth in AICPA Statement of Position ("SOP") 78-9, Accounting for Investments in Real Estate Ventures, states that, under the equity method, inter-company profits should be eliminated until realized.  SOP 78-9.21.  Companies are also required to carefully consider substance over form in recognizing profits.  SOP 78-9.25.

118.   Also, GAAP, as set forth in FASB Interpretation ("FIN") No. 46R, addresses consolidation by companies of variable interest entities.  An entity must be consolidated if total investment at risk is not sufficient, or if the equity holders lack controlling financial interest or if voting rights are not proportional to obligations.  FIN 46R, ¶5.

119.   In its 2005 Form 10-K, the Company represented that it had complied with these standards:

> *1)   **Investments in Unconsolidated Senior Living Communities***
>
> 2)   Sunrise holds an interest in ventures established to develop or acquire and own senior living communities.  When these ventures are considered to be variable interest entities ("VIES") in accordance with FASB Interpretation No. 46, Consolidation of Variable Interest Entities ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary.  When Sunrise has determined it is not the primary beneficiary or, for non-VIE's when and it [sic] determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), the investments are accounted for under the equity method.

120.   GAAP, as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 66, Accounting for Sales of Real Estate, states that a seller's continuing involvement without the transfer of risks and rewards, such as guarantees of the return of investment, will prevent treating the transfer of the asset as a sale.  *See* SFAS No. 66, ¶¶25-29.

121.   Sunrise has now been forced to admit that certain of its partners in ventures received preference on their return of capital, such that it had not been complying with applicable accounting rules.  Sunrise was providing guarantees and commitments including construction completion, operating cash flow deficit guarantees and debt guarantees.  As such, sales of real estate should not have been recognized immediately.  Sunrise was able to inflate its earnings

through its misaccounting for unconsolidated ventures. In 2005, Sunrise reported $13.2 million in equity earnings from unconsolidated ventures. Yet those ventures' total income was $19.2 million. It is incongruous that Sunrise could recognize 69% of the income from the ventures when it presumably owns less than 50% of the ventures. In fact, Sunrise reported that it had much less than 50% ownership interest. In the 2005 Form 10-K it stated, "[w]e generally have ownership interests in these unconsolidated ventures ranging from five to 25%. We will manage these communities pursuant to long-term management contracts."

122.    Sunrise will restate its results from 2003 through 2005 and prior years. Sunrise has recently estimated the input of its pending restatement, "[t]he cumulative impact of the restatement is currently expected to reduce net income for all periods impacted, including 1999 through 2005, by an estimated $65 million to $100 million."

123.    Significantly, Sunrise has now mentioned the accounting standard at issue involves SOP 78-9, a standard in effect for more than 27 years. This long-standing accounting pronouncement, which controlled a significant aspect of Sunrise's financial reporting, was something with which the Individual Defendants would have been familiar.

124.    As a result of Sunrise's improper accounting practices, it will restate at least its 2003-2005 financial statements. The fact that Sunrise will restate its financial statements is an admission that:

• the financial results originally issued during times relevant hereto and its public statements regarding those results were materially false and misleading;

• the financial statements reported were incorrect based on information available to defendants at the time the results were originally reported; and

• the financial statements can no longer be relied upon as being accurate.

125.    The SEC has reiterated its position regarding statements:

1)    [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia, to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter.*

*In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and Restatement Report at 2 (S.D. Fla. Feb. 22, 2002).

126.    The fact that Sunrise will restate its past financial statements and that it has indicated that such financial statements should no longer be relied upon is an admission that the financial statements originally issued were false and that the overstatement of net income was material.  Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Sunrise was to correct for material errors in its previously issued financial statements.  *See* APB No. 20, ¶¶7-13.  Moreover, SFAS No. 154, ¶25, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements."  Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements.  Sunrise's restatement is due to an error.  Thus, the restatement is an admission by Sunrise that its previously issued financial results and its public statements regarding those results were false.

## IMPROPER FINANCIAL REPORTING RELATING TO DEFENDANTS' STOCK OPTION MANIPULATIONS

127.    Between 1997 and the present, the Individual Defendants caused or allowed Sunrise  to file Form 10-Qs and Form 10-Ks that presented the Company's financial results in violation of GAAP, due to improper accounting for backdated or otherwise manipulated stock option grants.  Specifically, Sunrise's compensation expenses were understated and its net earnings were overstated.

128.    The 1997 through 2006 Forms 10-Q and Forms 10-K were reviewed, prepared and/or endorsed by the Individual Defendants.  Specifically, the following chart details the defendants and other individuals who signed filings before the enactment of the SOX:

| Date | Filing | Person(s) Who Signed |
|------|--------|----------------------|
| 8/8/1996 | 10-Q | David W. Faeder (Executive Vice President and Chief Financial Officer); Larry E. Hulse (Controller and Chief Accounting Officer) |
| 11/12/1996 | 10-Q | David W. Faeder (Executive Vice President and Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |

| | | |
|---|---|---|
| 3/31/1997 | 10-K | Paul J. Klaassen (Chairman of the Board, President and Chief Executive Officer); David W. Faeder (Executive Vice President, Chief Financial Officer and Director); Larry E. Hulse (Controller); Ronald V. Aprahamian (Director); Thomas J. Donohue (Director); Richard A. Doppelt (Director); Teresa M. Klaassen (Executive Vice President, Secretary and Director); Scott F. Meadow (Director); Darcy J. Moore (Director); Timothy S. Smick (Executive Vice President, Chief Operating Officer and Director) |
| 5/15/1997 | 10-Q | David W. Faeder (Executive Vice President and Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |
| 8/14/1997 | 10-Q | David W. Faeder (President and Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |
| 11/12/1997 | 10-Q | David W. Faeder (President and Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |
| 3/31/1998 | 10-K | Paul J. Klaassen (Chairman of the Board, and Chief Executive Officer); David W. Faeder (President, Chief Financial Officer and Director); Larry E. Hulse (Controller); Ronald V. Aprahamian (Director); David G. Bradley (Director); Thomas J. Donohue (Director); Richard A. Doppelt (Director); Teresa M. Klaassen (Executive Vice President, Secretary and Director); Scott F. Meadow (Director) |
| 5/1/1998 | 10-Q | David W. Faeder (Executive Vice President and Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |
| 8/12/1998 | 10-Q | David W. Faeder (Executive Vice President and Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |
| 11/10/1998 | 10-Q | David W. Faeder (Executive Vice President and Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |
| 3/31/1999 | 10-K | Paul J. Klaassen (Chairman of the Board and Chief Executive Officer); David W. Faeder (President, Chief Financial Officer and Director); Larry E. Hulse (Controller); Ronald V. Aprahamian (Director); David G. Bradley (Director); Thomas J. Donohue (Director); Richard A. Doppelt (Director); Teresa M. Klaassen (Executive Vice President, Secretary and Director); Scott F. Meadow (Director) |
| 5/13/1999 | 10-Q | Christian B. A. Slavin (Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |
| 8/12/1999 | 10-Q | Christian B. A. Slavin (Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |
| 11/15/1999 | 10-Q | Christian B. A. Slavin (Chief Financial Officer); Larry E. Hulse (Chief Accounting Officer) |
| 3/30/2000 | 10-K | Paul J. Klaassen (Chairman of the Board and Chief Executive Officer); David W. Faeder (President and Director); Christian B.A. Slavin (Executive Vice President, and Chief Financial Officer) Larry E. Hulse (Senior Vice President and Chief Accounting Officer); Ronald V. Aprahamian (Director); Craig R. Callen (Director); David G. Bradley (Director); Thomas J. Donohue (Director); Teresa M. Klaassen (Executive Vice President, Secretary and Director); Richard R. Slager (Director) |
| 5/15/2000 | 10-Q | Larry E. Hulse (Chief Financial Officer) |
| 8/11/2000 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) |
| 11/13/2000 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) |
| 3/30/2001 | 10-K | Paul J. Klaassen (Chairman of the Board and Chief Executive Officer); Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer); David W. Faeder (Vice Chairman of the Board, Director); Ronald V. Aprahamian (Director); Craig R. Callen (Director); David G. Bradley (Director); Thomas J. Donohue (Director); Teresa M. |

| Date | Filing | |
|---|---|---|
| | | Klaassen (Executive Vice President, Secretary and Director); Pete A. Klisares (Director); J. Douglas Holladay (Director) |
| 5/11/2001 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) |
| 8/14/2001 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) |
| 11/14/2001 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) |
| 3/29/2002 | 10-K | Paul J. Klaassen (Chairman of the Board and Chief Executive Officer); Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer); David W. Faeder (Vice Chairman of the Board, Director); Ronald V. Aprahamian (Director); Craig R. Callen (Director); David G. Bradley (Director); Thomas J. Donohue (Director); Teresa M. Klaassen (Executive Vice President, Secretary and Director); Pete A. Klisares (Director); J. Douglas Holladay (Director) |
| 4/2/2002 | 10-K/A | Carl G. Adams (Chief Accounting Officer) |
| 5/14/2002 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) |
| 8/14/2002 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) |

129. The following chart details the defendants who made certifications of Sunrise filings under SOX after its enactment:

| Date | Filing | Person(s) Who Signed and Certified |
|---|---|---|
| 11/13/2002 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) **Sox Certification:** Paul J. Klaassen (Chief Executive Officer); Larry E. Hulse (CFO) |
| 3/27/2003 | 10-K | Paul J. Klaassen (Chairman of the Board and Chief Executive Officer); Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer); David W. Faeder (Vice Chairman of the Board, Director); Ronald V. Aprahamian (Director); Craig R. Callen (Director); David G. Bradley (Director); Thomas J. Donohue (Director); Teresa M. Klaassen (Executive Vice President, Secretary and Director); Pete A. Klisares (Director); J. Douglas Holladay (Director) **Sox Certification:** Paul J. Klaassen (CEO); Larry E. Hulse (CFO) |
| 5/15/2003 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) **Sox Certification:** Paul J. Klaassen (Chief Executive Officer); Larry E. Hulse (CFO) |
| 8/13/2003 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) **Sox Certification:** Larry E. Hulse (CFO); Paul J. Klaassen (Chief Executive Officer) |
| 11/13/2003 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) **Sox Certification:** Paul J. Klaassen (Chief Executive Officer); Larry E. Hulse (CFO) |
| 3/12/2004 | 10-K | Paul J. Klaassen (Chairman of the Board and Chief Executive Officer); Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer); David W. Faeder (Vice Chairman of the Board, Director); Ronald V. Aprahamian (Director); Craig R. Callen (Director); David G. Bradley (Director); Thomas J. Donohue (Director); Teresa M. Klaassen (Executive Vice President, Secretary and Director); Pete A. Klisares (Director); J. |

| | | Douglas Holladay (Director); J.W. Marriott, Jr. (Director) **Sox Certification:** Paul J. Klaassen (CEO); Larry E. Hulse (CFO) |
|---|---|---|
| 5/10/2004 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) **Sox Certification:** Paul J. Klaassen (Chief Executive Officer); Larry E. Hulse (CFO) |
| 8/6/2004 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) **Sox Certification:** Paul J. Klaassen (Chief Executive Officer); Larry E. Hulse (CFO) |
| 11/9/2004 | 10-Q | Larry E. Hulse (Chief Financial Officer); Carl G. Adams (Chief Accounting Officer) **Sox Certification:** Paul J. Klaassen (Chief Executive Officer); Larry E. Hulse (CFO) |
| 3/16/2005 | 10-K | Paul J. Klaassen (Chairman of the Board and Chief Executive Officer); Larry E. Hulse (Chief Financial Officer); J. Barron Anschutz (Chief Accounting Officer); Ronald V. Aprahamian (Director); Craig R. Callen (Director); David G. Bradley (Director); Thomas J. Donohue (Director); Teresa M. Klaassen (Secretary and Director); J. Douglas Holladay (Director); William G. Little (Director); **Sox Certification:** Paul J. Klaassen (CEO); Larry E. Hulse (CFO) |
| 5/10/2005 | 10-Q | Larry E. Hulse (Chief Financial Officer); J. Barron Anschutz (Chief Accounting Officer) **Sox Certification:** Paul J. Klaassen (Chief Executive Officer); Larry E. Hulse (CFO) |
| 8/9/2005 | 10-Q | Bradley B. Rush (Chief Financial Officer); J. Barron Anschutz (Chief Accounting Officer) **Sox Certification:** Paul J. Klaassen (Chief Executive Officer); Bradley B. Rush (CFO) |
| 11/9/2005 | 10-Q | Bradley B. Rush (Chief Financial Officer); J. Barron Anschutz (Chief Accounting Officer) **Sox Certification:** Paul J. Klaassen (Chief Executive Officer); Bradley B. Rush (CFO) |
| 3/16/2006 | 10-K | Paul J. Klaassen (Chairman of the Board and Chief Executive Officer); Bradley B. Rush (Chief Financial Officer); J. Barron Anschutz (Chief Accounting Officer); Ronald V. Aprahamian (Director); Craig R. Callen (Director); Thomas J. Donohue (Director); J. Douglas Holladay (Director); Teresa M. Klaassen (Director); William G. Little (Director) **Sox Certification:** Paul J. Klaassen (CEO); Bradley B. Rush (CFO) |

130.    The SOX certifications signed in conjunction with the filing of Sunrise's Form 10-Ks and 10-Qs contained language that was substantially similar or identical to the following certification attached to Sunrise's fiscal 2003 Form 10-K that was signed by defendants Klaassen and Hulse:

1)    I, [Paul J. Klaassen/Larry E. Hulse], certify that:

2)    1.    I have reviewed this annual report on Form 10-K of Sunrise Assisted Living, Inc.;

3)    2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

4)     3.     Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

5)     4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

6)     (a)     designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

7)     (b)     evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

8)     (c)     presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

9)     5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

10)     (a)     all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b)     (b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

## ILLEGAL INSIDER SELLING

131.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Sunrise stock that they had obtained, often by cashing in backdated stock options:

| Defendant | Start Date | End Date | Shares | Proceeds |
|-----------|-----------|----------|--------|----------|
| APRAHAMIAN | 7/2/2001 | 4/18/2006 | 210,000 | $7,819,569.00 |
| CALLEN | 5/26/2005 | 5/26/2005 | 10,000 | $521,100.00 |
| DONOHUE | 12/22/1998 | 11/21/2005 | 116,033 | $4,056,919.68 |
| FAEDER | 3/9/1998 | 2/25/2004 | 749,727 | $22,118,868.50 |

| | | | | |
|---|---|---|---|---|
| GAUL | 6/2/2004 | 4/20/2006 | 26,503 | $1,090,491.08 |
| HOLLADAY | 5/12/2005 | 3/21/2006 | 39,000 | $1,873,125.00 |
| HULSE | 3/10/1998 | 8/12/2005 | 231,947 | $9,100,883.47 |
| KLAASSEN, P. & KLAASSEN, T. (1) | 12/22/1997 | 5/2/2006 | 1,377,223 | $54,718,139.05 |
| KLISARES | 11/25/2003 | 5/7/2004 | 28,664 | $999,177.05 |
| NEWELL | 3/9/1998 | 4/24/2006 | 636,366 | $23,508,700.00 |
| RUSH | 9/8/2005 | 9/12/2005 | 6,937 | $432,143.87 |
| SLAVIN | 12/29/2000 | 5/17/2004 | 257,542 | $8,434,295.10 |
| SMICK | 3/26/1998 | 6/30/1998 | 60,417 | $2,128,447.25 |
| SWINTON | 12/1/1997 | 3/5/2004 | 461,307 | $14,493,397.00 |
| TOMASSO | 3/9/1998 | 2/2/2005 | 528,335 | $19,337,618.50 |
| | | | 4,740,001 | $170,632,874.55 |
| (1) KLAASSEN, PAUL J. & KLAASSEN TERESA MERRITT JOINTLY FILED FORMS 3, 4, 5. | | | | |

## DAMAGES TO SUNRISE

132.    As a result of the defendants' improprieties, the Company has and will need to expend significant sums of money including the following:

- Costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

- Costs of over $202.1 million spent to repurchase Company stock at artificially inflated prices;

- Costs incurred from increased Directors and Officers Insurance premiums as a result of the illegally manipulated stock option grants;

- Enormous tax liabilities from improper deductions taken on backdated option grants;

- Hundreds of millions of dollars of potential liability to shareholder classes who have filed suits against the Company alleging violations of federal securities laws;

- Devastation to Sunrise's public image and good will reflected in a loss of over $400 million in market capitalization;

- Costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

- Costs incurred from the Company's reduced ability to borrow funds or raise capital as a result of potential ratings downgrades;

- Costs incurred from directing manpower to correct Sunrise's defective internal controls; and

- Costs incurred from directing manpower to restate Sunrise's prior financial results to correct for the improperly dated stock option grants.

133. A recent study from the University of Michigan's Ross School of Business indicates that the fallout from a company's implication in the backdating scandal can result in a company's market value dropping an average of 7%. A similar 7% fall in Sunrise's market value would result in a decline of over $126 million *in addition* to the $400 million in market capitalization loss already suffered by the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

134. Plaintiff brings this action derivatively in the right and for the benefit of Sunrise to redress injuries suffered, and to be suffered, by Sunrise as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of SOX and the Exchange Act, as well as the aiding and abetting thereof, by the Individual Defendants. Sunrise is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

135. Plaintiff will adequately and fairly represent the interests of Sunrise in enforcing and prosecuting its rights.

136. Plaintiff is and was an owner of the stock of Sunrise during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

137. The current Board of Sunrise consists of the following seven individuals: defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Holladay, Callen and Little. Plaintiff did not make any demand on the Board of Sunrise to institute this action because such a demand would be a futile, wasteful and useless act.

138. Defendants P. Klaassen, Aprahamian, Donohue and Callen are liable to Sunrise for the undeserved compensation that they received as a result of the stock options that they

backdated or otherwise manipulated.  They are also interested because they engaged in self dealing in that they authorized the grant of backdated options to themselves and later sold shares, thus obtaining illegal proceeds at the Company's expense.  Accordingly, demand is futile as to P. Klaassen, Aprahamian, Donohue and Callen because: (i) they face a sufficiently substantial likelihood of liability in connection with their illegally backdated Company stock options; and (ii) they have a financial interest in the options that they illegally backdated and the proceeds they gained from the exercise of those options.

139.    Each of the defendants knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information regarding the improper accounting as a result of their access to and review of internal corporate documents, attendance at Board meetings, and conversations and connections with other corporate officers, employees and directors.  However, the following current members of the Sunrise Board participated in the illegal insider selling (some of which include the selling of stock acquired through the exercising of illegally backdated stock options):

(a)    Defendant P. Klaassen sold 1,377,223 of his personally held shares for $54,718,139.05 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices;

(b)    Defendant T. Klaaseen sold 1,377,223 of his personally held shares for $54,718,139.05 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices;

(c)    Defendant Aprahamian sold 210,000 of his personally held shares for $7,819,569 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices;

(d)    Defendant Donohue sold 116,033 of his personally held shares for $4,056,919.68 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices;

(e)    Defendant Holladay sold 39,000 of his personally held shares for $1,873,125 in proceeds while in possession of material, non-public information concerning the

illegally undisclosed backdating stock-option grant practices; and

      (f)    Defendant Callen sold 10,000 of his personally held shares for $521,100 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Also, these defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties for insider selling. Since the defendants have breached their fiduciary duties and are interested, any demand upon them is futile.

    140.    The Board is generally responsible for approving the compensation awarded to Sunrise's executive officers. This compensation includes the stock options that were secretly backdated by Sunrise insiders. Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to Sunrise in approving the option grants as dated. The Board should have properly informed itself of the circumstances surrounding the options granted to Sunrise's insiders before approving them. Indeed, these options were routinely approved by the Board when they were dated at the Company's lowest closing price for the respective month in which the options were granted establishing that these decisions were not informed. Accordingly, there is reason to doubt that defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Holladay and Callen—who served on the Board during the illegal backdating—are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to Sunrise. The Board's decision to approve the options was not the product of valid business judgment. Thus, demand is futile as to defendants P. Klaassen, T. Klaassen, Aprahamian, Donohue, Holladay and Callen.

    141.    The Stock Option Committee of the Board is specifically responsible for reviewing and approving grants of stock options and other equity awards to Sunrise insiders. According to Sunrise's 1997 annual proxy: "[t]he Stock Option Committee has the power and authority to take all actions and make all determinations under the Company's stock option plans, including the grant of options thereunder." Defendants Aprahamian, Donohue and Callen were

members of the Stock Option Committee at times relevant to the illegal backdating. Specifically, defendant Aprahamian was a member of the Stock Option Committee in 1996; defendant Donohue was a member of the Stock Option Committee from 1996 to 2002; and defendant Callen was a member of the Stock Option Committee from 1999 to 2002. These defendants were responsible as members of the Stock Option Committee to review and grant stock options granted to Sunrise insiders during their respective tenures on the Committee. Clearly, these defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding these option grants, thereby causing or allowing the Company's insiders to obtain unreasonable and unreported compensation via the backdating of stock option grants. Accordingly, there is a reasonable doubt that defendants Aprahamian, Donohue and Callen are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to Sunrise. The Stock Option Committee's decision to approve the options was not the product of valid business judgment. Thus, demand is futile as to defendants Aprahamian, Donohue and Callen.

142.   The Audit Committee of the Board is responsible by its charter for (i) discussing the Company's earnings releases, as well as financial information and earnings guidance provided to analysts and rating agencies; (ii) reviewing and discussing Sunrise's annual financial statements; and (iii) review reports concerning Sunrise's internal control procedures. The Audit Committee is currently comprised of defendants Aprahamian, Donohue and Callen. Defendants Aprahamian and Donohue have been members of the Audit Committee since 1996; and defendant Callen has been a member of the Audit Committee since 2004 and was a member of the Audit Committee during 1999. Additionally, defendant Holladay was a member of the Audit Committee during 2000. These defendants were responsible as members of the Audit Committee for insuring that Sunrise's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate. Sunrise's internal controls and published financials, however, were deficient as evidenced by its insiders' improper backdating of stock option grants and defendants' improper manipulation of Sunrise's accounting for joint ventures and real estate. As a result of the improper option backdating and accounting, the

Company's financials were rendered inaccurate because: (i) those financials did not account for the true amount of compensation being granted to Sunrise's insiders; and (ii) those financial grossly overstated Sunrise's earnings by hundreds of millions of dollars because of the improper accounting for joint ventures and real estate. Accordingly, there is a reasonable doubt that defendants Aprahamian, Donohue, Callen and Holladay are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to Sunrise. Thus, demand is futile as to defendants Aprahamian, Donohue, Callen and Holladay.

143.    The principal professional occupation of P. Klaassen is his employment with Sunrise, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.    Specifically, P. Klaassen was paid the following compensation at times relevant hereto:

| Defendant | Fiscal Year | Salary | Bonus | Restricted Stock Awards | All Other Compensation |
|---|---|---|---|---|---|
| P. Klaassen | 2005 | $473,890 | $454,925 | $1,181,952 | $225,324 |
| | 2004 | $463,742 | - | - | $234,545 |
| | 2003 | $420,910 | $146,865 | $58,751 | $150,884 |
| | 2002 | $373,414 | $400,000 | - | $54,680 |
| | 2001 | $300,000 | $412,500 | - | - |
| | 2000 | $242,000 | $37,500 | - | $350,000 |
| | 1999 | $200,000 | $75,000 | - | - |
| | 1998 | $200,000 | - | - | - |
| | 1997 | $200,000 | - | - | $942 |

Accordingly, P. Klaassen lacks independence from Aprahamian, Donohue and Callen, defendants who are not disinterested and/or independent and who exert influence over Fontaine's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve P. Klaassen's base salary, bonus and equity compensation. This lack of independence rendered defendant P. Klaassen incapable of impartially considering a demand to commence and vigorously prosecute this action.

144.    Defendants P. Klaassen and T. Klaassen would not entertain a demand by plaintiff that they take action against each other or the remaining defendants because they are husband and wife. Accordingly, demand is futile.

145. The Board's decision to authorize the repurchase of over $202.1 million of Sunrise's shares from 2000 to 2005 was not the product of valid business judgment. Defendants P. Klaasseen, Aprahmian, Donohue and Callen, who engaged in illegal backdating, were self dealing because they was improperly benefiting from an appreciation of his backdated-option grants. Defendants P. Klaassen, T. Klaasseen, Aprahamian, Donohue, Holladay and Callen, were also engaging in self dealing because they were improperly benefiting from the sales of their personally held shares while in possession of material non-public information concerning the improper accounting. The stock repurchases facilitated their illegal insider selling proceeds. The remaining defendants who approved the repurchases were grossly negligent because they approved repurchases during periods in which the illegally backdated options were vesting, thus facilitating an increase in the other defendants' illegal backdating profits. Because the decision to approve the repurchases was not the product of valid business judgment, defendants P. Klaassen, T. Klaasseen, Aprahamian, Donohue, Holladay, Callen and Little, who approved the repurchases, are interested. Thus, demand is futile.

146. Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

147. The Director Defendants of Sunrise, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Sunrise's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

148. In order to bring this suit, all of the directors of Sunrise would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

149. The acts complained of constitute violations of the fiduciary duties owed by Sunrise's officers and directors and these acts are incapable of ratification.

150. Sunrise has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct

to attempt to recover for Sunrise any part of the damages Sunrise suffered and will suffer thereby.

151.   If Sunrise's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Sunrise.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Sunrise against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Sunrise, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Sunrise to sue them, since they will face a large uninsured liability.

152.   Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Sunrise for any of the wrongdoing alleged by plaintiff herein.

153.   Plaintiff has not made any demand on shareholders of Sunrise to institute this action since such demand would be a futile and useless act for the following reasons:

   (a)   Sunrise is a publicly held company with over 50 million shares outstanding, and thousands of shareholders;

   (b)   making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## DEFENDANTS' ACTIVELY CONCEALED THEIR ILLEGAL BACKDATING PRACTICES

154.    At times relevant hereto, defendants took affirmative steps to conceal their backdating actions by authorizing or otherwise causing the Company to issue proxy statements, Form 3s, Form 4s, Form 5s, Form 10-Qs, Form 10-Ks and other SEC filings and public statements that contained false disclosures concerning the grant dates of options granted to Sunrise insiders. These false disclosures prevented plaintiff from recognizing that Sunrise insiders were illegally backdating their stock option grants.

155.    Indeed, prior to the March 18, 2006 *Wall Street Journal* article, titled "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable. Luck – or something else?", the public consensus was that favorable option timing could be largely explained by an insider's ability to predict that favorable company news was coming and that insiders were timing grants to take advantage of it. This consensus was not challenged until academic research—that included examinations of thousands of companies—revealed that it was likely that grant dates had been filled in retroactively.

156.    Thus, due to the public consensus that favorable option timing could be explained away by an insiders' ability to predict the stock price and defendants' active concealment of their backdating practices, shareholders were prevented from recognizing the validity of the claims prior to the March 18, 2006 *Wall Street Journal* article. Even after that article was published, there were insufficient warnings that implicated Sunrise in the backdating scandal. The first public disclosure of backdating specifically at Sunrise did not occur until December 11, 2006.

157.    Further, plaintiff's ignorance of defendants' illegal backdating practices was not attributable to a lack of due diligence. It would be unreasonable to expect plaintiff—a typical shareholder—to undertake costly and extensive academic research and statistical analysis when defendants' false public statements indicated that stock options were being properly granted. In any case, plaintiff is entitled to rely upon the truthfulness of the disclosures contained within Sunrise's public statements and SEC filings.

158.    Within weeks of the December 11, 2006 public disclosure of backdating practices at Sunrise, plaintiff conducted an investigation of defendants' prior option grants, discovered numerous suspicious grants dated at extremely favorable exercise prices and expeditiously brought this action on behalf of Sunrise to preserve the Company's claims against the wrongdoers responsible for illegal backdating.

## COUNT I

### Against Defendants P. Klaassen, Rush and Hulse for Disgorgement under the Sarbanes-Oxley Act of 2002

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.    Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's CEO and CFO must reimburse the company for certain payments made by the company to those executives.    Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

(a)    **Additional compensation prior to noncompliance with commission financial reporting requirements**.    If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, *the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for* –

1.    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

2.    any profits realized from the sale of securities of the issuer during that 12-month period.

(b)    **Commission exemption authority**.    The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

161.    Sunrise has announced that it will restated its financial statements all the way back to 1999 due to the material non-compliance of such statements with federal securities laws

- 71 -

reporting requirements. These restatements resulted from "misconduct" within the meaning of Section 304 of the SOX. As a result, defendant P. Klaassen, Sunrise's CEO; defendant Rush , Sunrise's CFO since August 2005 and; defendant Hulse, Sunrise's CFO from August 2000 to 2005, are required to reimburse Sunrise for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the SOX) through the present.

162.    Further, defendants P. Klaassen, Rush and Hulse are liable to Sunrise for any profits realized from the sales of securities by the Company during that same period of time.

163.    Defendants P. Klaassen, Rush and Hulse are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Sunrise.

### COUNT II
### Against the Director Defendants for Violation of Section 14(a) of the Exchange Act

164.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.    The Director Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to shareholders which were contained in the Company's proxy statements issued on March 31, 1997, April 3, 1998, April 6, 1999, April 14, 2000, March 29, 2001, April 5, 2002 and April 9, 2003 (collectively referred to as the "Proxies"). Each of the Proxies contained proposals to Sunrise's shareholders that they vote to approve stock option plans. The Proxies, however, misrepresented and failed to disclose that the Company's executives were engaging and had engaged in the improper backdating or manipulation of stock options and that the Board was approving those options as dated. By reasons of the conduct alleged herein, the Director Defendants, who were directors that caused or allowed the issuance of the Proxies, violated §14(a) of the Exchange Act. As a direct and proximate result of the Director Defendants' wrongful conduct, Sunrise misled and/or deceived its shareholders by falsely portraying how the plans would be administrated.

166.    The Proxies also falsely portrayed the compensation paid to Sunrise's insiders because the compensation presented did not take into account defendants' illegally backdated

options. These false compensation figures were republished in the Proxies from 1997 to the present.

167.    This information would have been material to Sunrise's shareholders in determining whether or not to approve the stock option plan proposals contained in the Proxies. This information was also material to the integrity of the directors that were proposed for election to the Board.

168.    The improper backdating of stock options is material and should have been disclosed in the Proxies.

169.    Plaintiff, on behalf of Sunrise, thereby seeks relief for damages inflicted upon the Company in connection with the improper approval of the plans based upon the misleading and incomplete proxy materials. Plaintiff, on behalf of Sunrise, also seeks a disgorgement of the compensation paid to the Individual Defendants in connection with the plans described in the Proxies and to void the election of the directors proposed in the Proxies that falsely portrayed their integrity.

## COUNT III
### Derivatively Against All Defendants for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

170.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.    Between 1997 and the present, the Individual Defendants disseminated or approved financial statements that did not disclose the backdating practices that were occurring at Sunrise and the resulting effects of those practices on the Company's financial results. Specifically, Sunrise's financial statements included financial results that did not properly account for stock options that were granted below fair market value as required under GAAP. Further, these statements concealed defendants' improper manipulation of Sunrise's joint venture and real estate accounting. The Individual Defendants knew or recklessly disregarded the fact that the Company's financial statements were misleading—due to the backdating and the improper accounting—in that the financial statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

172.    The Insider Selling Defendants also sold over 4,740,001 shares of Sunrise's common stock at inflated prices between 1997 and 2006, receiving over $170 million in proceeds, while in possession of material non-public information.    These defendants misappropriated Sunrise's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Sunrise stock without disclosing the information alleged to have been concealed herein.

173.    At the same time the price of the Company's common stock was inflated due to the improperly accounted for stock options and defendants' illegally backdated stock options were vesting, the Individual Defendants were causing Sunrise to repurchase approximately $202.1 million worth of its own stock on the open market at inflated prices between 2000 and 2005. The Company's share price was artificially inflated during this period due to the improper accounting treatment of Sunrise's joint ventures, real estate and the backdated options that were granted under fair market value.   Under applicable accounting rules, these options should have been expensed during their respective vesting periods.   Thus, Sunrise's 1997 through 2006 financials falsely portrayed the Company's true financial results.

174.    Sunrise has recently admitted that its financials going back to 1999 should not be relied upon and that it intends to restate those financials.

175.    As such, the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Sunrise and others in connection with their purchases of Sunrise common stock at relevant times.

176.    As a result of the Individual Defendants' misconduct, Sunrise has and will suffer

damages in that it paid artificially inflated prices for Sunrise common stock purchased on the open market. Sunrise would not have purchased Sunrise common stock at the prices it paid, had the market been aware that the market price of Sunrise's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Sunrise suffered damages in connection with its purchases of Sunrise common stock. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to § 10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT IV

### Against All Defendants for Unjust Enrichment

177.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Sunrise. These wrongful acts included the approval of improperly backdated stock options by the Director Defendant, the receipt of undeserved compensation in connection with those options by the Officer Defendants, the manipulation of Sunrise's accounting by all defendants, the receipt of underserved compensation in connection with the improper accounting manipulations, and the illegal insider selling.

179.    Plaintiff, a shareholder and representative of Sunrise, seeks restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V

### Against All Defendants for Breach of Fiduciary Duty for Approving Improperly Dated Stock Option Grants to Sunrise's Executive Officers

180.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181.    The Individual Defendants owed and owe Sunrise fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Sunrise the highest obligation of good faith, fair dealing, loyalty and due care.

182.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

183.    Each of the Individual Defendants had actual or constructive knowledge that they had approved the improper backdating of stock option grants and the corresponding issuance of inaccurate financial results that did not properly account for the stock option grants and failed to correct or prevent these improprieties. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

184.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Sunrise has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.    Plaintiff on behalf of Sunrise has no adequate remedy at law.

**COUNT VI**

**Against All Defendants for Breach of Fiduciary Duty in Connection with the Improper Financial Reporting and Improper Accounting Manipulations**

186.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

187.    The Individual Defendants owed and owe Sunrise fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Sunrise the highest obligation of good faith, fair dealing, loyalty and due care.

188.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

189.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Sunrise has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191. Plaintiff on behalf of Sunrise has no adequate remedy at law.

## COUNT VII

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

192. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193. At the time of the stock sales as set forth herein, the Insider Selling Defendants knew the information described above, and sold Sunrise common stock on the basis of such information.

194. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Sunrise common stock.

195. At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated because of the undisclosed stock option and other related compensation expenses. The Insider Selling Defendants also knew that the Company's revenues were materially overstated because of the undisclosed accounting manipulations. The Insider Selling Defendants' sales of Sunrise common stock while in possession and control of this material, adverse and non-public information was a breach of their fiduciary duties of loyalty and good faith.

196. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

197. Plaintiff on behalf of Sunrise has no adequate remedy at law.

## COUNT VIII

### Against All Defendants for Abuse of Control

198. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

- 77 -

199.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sunrise, for which they are legally responsible.

200.    As a direct and proximate result of the Individual Defendants' abuse of control, Sunrise has sustained significant damages.

201.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

202.    Plaintiff on behalf of Sunrise has no adequate remedy at law.

## COUNT IX

### Against All Defendants for Gross Mismanagement

203.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

204.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sunrise in a manner consistent with the operations of a publicly held corporation.

205.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sunrise has sustained significant damages.

206.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

207.    Plaintiff on behalf of Sunrise has no adequate remedy at law.

## COUNT X

### Against All Defendants for Waste of Corporate Assets

208.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

209.    As a result of the improprieties alleged herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Sunrise to waste valuable corporate assets and incur costs to conduct investigations, hire outside counsel, accounting firms and consultants, and to direct manpower to

the task of restating Sunrise's past financials to correct for the improperly backdated stock option grants.

210. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

211. Plaintiff on behalf of Sunrise has no adequate remedy at law.

## COUNT XI

### Against All Defendants for an Accounting

212. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213. At all relevant times, the defendants, as directors and/or officers of Sunrise, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

214. In breach of their fiduciary duties owed to Sunrise and its shareholders, the defendants authorized the granting of backdated Sunrise stock options to themselves and/or certain other Sunrise insiders. By this wrongdoing, the defendants breached their fiduciary duties owed to Sunrise and its shareholders.

215. The defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the defendants.

216. As a result of defendants' misconduct, Sunrise has been substantially injured and damaged financially, and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

217. Plaintiff demands an accounting be made of all stock options grants made to defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the defendants, as well as the disposition of any proceeds received by the defendants via sale or other exercise of backdated stock option grants received by the defendants.

## COUNT XII

### Against the Officer and Director Defendants for Rescission

218.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

219.    As a result of the acts alleged herein, the stock option contracts between the Officer and Director Defendants and Sunrise entered into at relevant times hereto were obtained through defendants' breaches of fiduciary duties, unjust enrichment, gross mismanagement and abuse of control. Further, the backdated stock options were illegal in that they were illegally backdated in violation applicable law. Moreover, defendants authorized these options in breach of the terms of the publicly filed employment agreements and the Company's stock option plans, which were also approved by Sunrise shareholders and filed with the SEC. Consequently, the option grants are void.

220.    All contracts which provide for stock option grants between the defendants and Sunrise and were entered into during times relevant hereto should, therefore, be rescinded, with all sums, proceeds and profits under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XIII

### Against All Defendants for Constructive Trust

221.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

222.    As a result of the acts alleged herein, defendants authorized the grant of backdated or otherwise manipulated equity based compensation to themselves and other Sunrise insiders. In effect, these backdated options and other manipulated equity or incentive based compensation constitutes illegal compensation in violation of Sunrise's stock option plans, employment contracts and other compensation polices.

223.    The Company has a right for the return of this compensation because it was illegally authorized by the defendants and paid out of the Company's assets.

224.    Defendants and other Sunrise insiders profited from the illegally backdated options by wrongful acts.

225.    Accordingly, plaintiff seeks a declaratory judgment that the illicit stock options, and all proceeds derived from exercise thereof and any assets or other property acquired in connection therewith, are and have been held in constructive trust for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of SOX and the Exchange Act;

B.    Declaring that defendants P. Klaassen, Rush and Hulse are liable under §302 of the SOX, and requiring them to reimburse Sunrise for all bonuses or other incentive based or equity based compensation received by them during the period in which Sunrise will restate its financial results;

C.    Declaring and decreeing that the Director Defendants caused the Company to act in violation of §14(a) of the Exchange Act;

D.    Declaring that the Individual Defendants are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Sunrise damages;

E.    Directing Sunrise to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Sunrise and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a proposal to ensure that all stock options granted to executive and non-executive employees are properly awarded, valued and administered;

3.      control and limit insider stock selling;

4.      a provision to permit the shareholders of Sunrise to nominate at least three candidates for election to the Board; and

5.      appropriately test and then strengthen the internal audit and control functions.

F.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding or otherwise restricting the proceeds of defendants' trading activities, backdated stock options or their other assets so as to assure that plaintiff on behalf of Sunrise has an effective remedy;

G.      Declaring that defendants' illicit and illegally obtained stock options, and all proceeds derived from the exercise thereof, and any assets or other property acquired in connection therewith, are and have been held in constructive trust by defendants for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation;

H.      Declaring that all stock options that were issued to defendants and illegally backdated are void and all proceeds from their exercise or sale are and have been held in constructive trust by defendants for the Company;

I.      Declaring that defendants' illicit and illegally obtained stock options, and all proceeds derived from the exercise thereof, and any assets or other property acquired in connection therewith, are and have been held in constructive trust by defendants for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation;

J.      Awarding to Sunrise restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants through the improper backdating of stock option grants;

K.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

L.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: February 5, 2007

Donna F. Solen
DC Bar #465098
Gary E. Mason
DC Bar #418073
THE MASON LAW FIRM
1225 19th Street, N.W.
Suite 500
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

ROBBINS, UMEDA & FINK LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
ASHLEY R. PALMER
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

G:\Cases\Sunrise Senior\Complaints\Derivative\Anderson Fed Der Cpt FINAL.doc

## VERIFICATION

I, ROBERT ANDERSON, have read the Sunrise Senior Living, Inc. Shareholder Derivative Complaint and know the contents thereof. Based upon my discussions with and reliance upon my counsel, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _Feb 1, 2007_

_Robert And_

ROBERT ANDERSON

07 0286

**FILED**

FEB - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

07-286
RBW

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Robert Anderson, Derivatively on Behalf of Sunrise Senior Living, Inc.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Howard Cty. MD
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Donna F. Solen
The Mason Law Firm, P.C.
1225 19th Street, N.W., Suite 500
Washington, DC 20036
(202) 429-2290

## DEFENDANTS

Paul J. Klaassen, et al.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

ATT

CASE NUMBER  1:07CV00286

JUDGE: Reggie B. Walton

DECK TYPE: General Civil

DATE STAMP: 02/  /2007

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
◉ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSH
FOR PLAINTIFF AN

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)** OR ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Section 14(a) of the Exchange Act Section 78n(a) Shareholder derivative action for breach of fiduciary duty.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint    JURY DEMAND:    YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE  2/5/2007    SIGNATURE OF ATTORNEY OF RECORD  *Donn ESC*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.