**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| In Re SUNRISE SENIOR LIVING, INC. | ) | **Civil Action No. 07-00143** |
| Derivative Litigation | ) | |
| _____ | ) | |
| | ) | |
| This Document Relates To: | ) | |
| | ) | |
| | ) | |
| ALL ACTIONS | ) | |
| _____ | ) | |

## PLAINTIFFS' OMNIBUS REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION TO PARTIALLY LIFT DISCOVERY STAY

### I.    INTRODUCTION

Plaintiffs here seek the same discovery that the Delaware Chancery Court ordered be produced to the Delaware derivative plaintiffs. Despite the Company's protestations, Plaintiffs here are in fact "unduly prejudiced" under the PSLRA if the Delaware plaintiffs and the SEC receive discovery while Plaintiffs here do not. Lead counsel here pioneered this derivative litigation, while the Delaware plaintiffs merely filed copycat pleadings and tagged along. Yet they, and not Plaintiffs here, will obtain documents that will likely affect the litigation strategy of both cases and the proceeding before the SEC. Unless Plaintiffs are given the same access to documents already disclosed to the Delaware plaintiffs and the SEC, Plaintiffs here will be "prejudiced by [their] inability to make informed decisions about its litigation strategy in a rapidly shifting landscape." *In re WorldCom Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002). Sunrise's opposition to this reasonable and limited request stands in contrast to its position in Delaware Chancery Court, where it has argued that the Delaware Action is "duplicative" of this action and should be stayed. Now that the Delaware plaintiffs have begun receiving discovery materials, however, the Company (and the Individual Defendants) have

reversed course, and seek to prevent this first-filed action from proceeding.

The eerie agreement between the Company and the Individual Defendants at each step of this litigation, including this recent change of course regarding which case should be allowed to go forward, is merely the most recent example of how the Board of Sunrise is letting its conflicted directors make the litigation decisions for the Board.    As the Delaware Vice Chancellor recently observed:    "[W]hen this derivative action was begun, all of the defendants (including the corporation) moved to dismiss on grounds of demand excusal ***although the corporation's motion to dismiss was, evidently, not authorized by any disinterested person or body***."    *See* Plaintiffs' Memorandum, Hanna Aff., Exhibit B at 2 n.5.    This confirms Plaintiffs' argument that to have made a demand on the Board of Directors before filing this derivative action would have been entirely futile.    *See* Plaintiffs' Amended Consolidated Complaint at ¶¶285-315.

Plaintiffs have established that "undue prejudice" would result by letting the later-filed Delaware Action proceed with discovery, while Lead Counsel in this earlier-filed action are denied this same information.    Alternatively, Plaintiffs have demonstrated that "particularized discovery is necessary to preserve evidence," because the Company has admitted that the conduct of at least one high-ranking Sunrise officer during the relevant period was "not consistent with the document retention directives issued by the Company."    *See* Plaintiffs' Amended Consolidated Complaint at ¶¶233-234.    Finally, Plaintiffs have narrowly tailored their discovery requests to mirror documents already assembled and produced; far from "unduly burdensome," all that the Company would have to do is make another set of copies and send them to Plaintiffs.    Plaintiffs' request to partially lift the PSLRA discovery stay should be granted.

## II.    ARGUMENT

### A.    A Partial Lifting of the PSLRA Stay is Necessary to Prevent "Undue Prejudice" to Plaintiffs

Under the PSLRA, withholding documents that have been or will be produced to others unfairly impedes a plaintiff's litigation and settlement strategy and results in "undue prejudice." 15 U.S.C. § 78u-4(b)(3)(B) ("In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.").  *See, e.g., In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 183 (S.D.N.Y. , 2004) (lifting stay because "Lead Plaintiffs will be the only interested party without access to those documents and will be prejudiced by their inability to make informed decisions about their litigation strategy"); *WorldCom*, 234 F. Supp. 2d at 305. ("Without access to documents already made available to the U.S. Attorney, the SEC, and in whole or in part to the WorldCom's Creditors Committee and the documents that will in all likelihood soon be in the hands of the ERISA plaintiffs, [lead plaintiff] would be prejudiced by its inability to make informed decisions about its litigation strategy in a rapidly shifting landscape."); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 252 (D. Md. 2004) (lifting the PSLRA stay and requiring production by defendants, because without access to documents produced outside of the litigation, the securities plaintiffs could suffer a "severe disadvantage in formulating their litigation and settlement strategy"); *In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004) (without discovery of documents already made available to government entities, Plaintiffs would be subject to undue prejudice in pursuing

litigation and settlement strategies").[1]  Here, this is exactly the prejudice that Plaintiffs will suffer if they are denied access to documents that are being disclosed to the Delaware plaintiffs and the SEC.

Sunrise mistakenly relies upon *In re Fannie Mae Sec. Litig.*, 362 F. Supp. 2d 37 (D.D.C. 2005), to argue that mere lack of information useful to planning litigation or settlement discussions is insufficient to lift the discovery stay.  In that case, the plaintiffs sought to lift the PSLRA's discovery stay even though it conceded that the documents it hoped to obtain were likely irrelevant to the claims in the case.  *Id.* at 39.   That is not the case here, where the documents being disclosed to other entities relate directly to arguments Defendants will be making in their motions to dismiss this action.  Even so, as demonstrated by numerous cases cited above, the *Fannie Mae* court incorrectly cited *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 129 (S.D.N.Y. 2003) for the proposition that a disadvantage in settlement discussions could not be the sole basis for finding undue prejudice.  Actually, the *Vivendi* Court explicitly noted that "settlement discussions or other intervening events" might justify a partial lifting of the PSLRA's discovery stay in a particular case.  *Id.* at 130-31.   Given the factual distinctions between this case and *Fannie Mae*, and its incorrect analysis of *Vivendi*, *Fannie Mae* offers no useful guidance here.

For purposes of lifting a stay under the PSLRA, undue prejudice need not rise to the level of irreparable harm, but need only be improper or unfair under the circumstances. *See In re Lernout & Hauspie Sec. Litig.*, 214 F. Supp. 2d 100, 107 (D. Mass. 2002); *Vacold LLC v. Cerami*, No. 00 Civ. 4024, 2001 WL 167704, at *6 (S.D.N.Y. Feb. 16, 2001); *Med. Imaging Ctrs. of Am., Inc. v. Lichtenstein*, 917 F. Supp. 717, 720-21 (S.D. Cal. 1996).  That standard is

---

[1] Defendants make no effort to distinguish the *FirstEnergy Corp.* decision, which is directly on point.

met here, where it would be grossly unfair to deprive Plaintiffs in this action of documents that are being disclosed in a later-filed, copy-cat litigation. This Court appointed Plaintiffs here as "Lead Plaintiffs" in this derivative action. Consistent with these obligations, Plaintiffs expended significant effort crafting original pleadings, seeking that the Company hold an annual meeting of shareholders, and fighting procedural battles with the Defendants. By contrast, the plaintiffs in the Delaware Action essentially photocopied Plaintiffs' complaint and filed it in Delaware more than a month after this Action was commenced.[2] Under the relevant case law, it unduly prejudices Plaintiffs for the Delaware Action to proceed with discovery while Lead Plaintiffs are kept in the dark.

Up until now, Defendants have apparently agreed that the Delaware Action was merely tagging along with this lead action in federal court. As the Company wrote in their motion to stay the Delaware Action:

> [The Delaware Chancery Court should] dismiss or stay the suit in favor of the first-filed claims pending in the District Court, particularly given (a) the duplicative nature of the [Delaware] Complaint, (b) the Plaintiffs' problems with the continuous ownership rule, (c) the fact that the [Delaware] complaint alleges only a subset of the claims asserted in the D.C. Derivative Suit, and (d) the pendency of the closely-related D.C. Class Actions in the same court before the same judge.

*See* excerpts from Sunrise's November 2, 2007 Opening Brief in support of their Motion to Dismiss the Delaware Action at 39-42, attached to the Hanna Aff. 2 as Exhibit B.

Now, however, with discovery being produced that likely implicates the Individual Defendants, both they and the Company are taking the position that only the plaintiffs in the

---

[2] More than 76 paragraphs appear to have been lifted verbatim from Plaintiff Molner's original complaint filed in January 2007. Compare Delaware Plaintiffs' Complaint filed on March 6, 2007, attached to the Second Affidavit of Mark Hanna ("Hanna Aff. 2") as Exhibit A (paragraphs 1, 5-7, 9-14, 16-25, 28-32, 54-70, 77-80, 82-101, 127-138 with paragraphs 1, 4, 6-7, 12-16, 18-33, 36, 55, 63-65, 67-69, 71-74, 77-78, 82-86, 91-102, 104, 106-108, 117, 119-120, 146-157, 163, respectively, in Lead Plaintiff Catherine Molner's initial complaint herein filed on January 31, 2007).

later-filed Action, who have asserted fewer claims, and who copied Plaintiffs' complaint, should

receive discovery.  This result should not be allowed to stand.

> **B.     Because Sunrise has Admitted that Certain Documents Have Already Been Destroyed, Discovery is Necessary to "Preserve Evidence"**

The PSLRA also states that discovery shall be stayed "unless … particularized discovery

is necessary to preserve evidence…"  15 U.S.C. § 78u-4(b)(3)(B).[3]  Recent events support this

independent basis for lifting the PSLRA stay in this action.  Indeed, Sunrise has ***admitted*** that the

actions of at least one of the Individual Defendants, Sunrise's Chief Financial Officer during the

relevant period, "were not consistent with the document retention directives issued by the

Company."  *See* Amended Consolidated Complaint at ¶¶233-34.  Specifically, defendant and

former Chief Financial Officer Bradley B. Rush violated the document retention policies put in

place by the Company's Special Committee in late 2006 in response to the allegations underlying

this litigation.  *Id.*  In light of this candid admission, there is a good faith basis to question

whether the Individual Defendants will retain and preserve documents while discovery is stayed.

Sunrise's admission that certain of the Individual Defendants have violated Sunrise's document

retention policies is more than just a "mere generalization[]," and shows the necessary degree of

particularity to meet the requisite standard to lift the PSLRA discovery stay.  *See Sarantakis v.*

*Gruttadauria,* No. 02 C 1609, 2002 U.S. Dist. LEXIS 14349 at *5-6 (N.D. Ill. August 5, 2002).

Plaintiffs have demonstrated that not only is "the loss of evidence imminent as opposed to

merely speculative," it has already happened.  *See id.*  Accordingly, preserving probative

evidence is a further and independent basis for the Court to direct a partial lifting of the PSLRA

---

[3] The Individual Defendants' Opposition papers wrongly ascribe to plaintiffs the view that a movant must demonstrate **both** "undue prejudice" **and** the necessity of "preserv[ing] evidence."  *See* Individual Defendants' Opposition to Plaintiffs' Motion at 2.  The statute clearly reads otherwise.  15 U.S.C. § 78u-4(b)(3)(B) (discovery shall be stayed "unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence **or** to prevent undue prejudice to that party.") (Emphasis added).

stay.

**C.    Plaintiffs' Discovery Requests are Sufficiently Particularized So As Not to Unduly Burden the Company**

Defendants will suffer no undue burden from producing documents that Sunrise has already reviewed and compiled for production to the plaintiffs in the Delaware Action and to the SEC.  Both of those proceedings relate to the Company's historical stock option granting practices and other accounting improprieties, so there is no basis for Sunrise's assertion that certain of the documents produced to the SEC might somehow be "irrelevant" in this action.

Plaintiffs' requests are sufficiently particular for Defendants to easily copy and produce the documents requested.  There is no ambiguity as to what documents are sought in Plaintiffs' request for "documents relating to the Special Committee's findings that have been ordered to be produced by Sunrise in the Delaware Action."  *See* Plaintiffs' Memorandum at 2.  Plaintiffs' demand for "documents that Sunrise has produced to the SEC in the course of the SEC's investigation" is likewise sufficiently particularized.  *Id.*  The SEC's investigation involves the same wrongful conduct underlying Plaintiffs' claims and there is no indication in the record that the issues being investigated by the SEC are somehow broader than those raised in Plaintiffs' Amended Consolidated Complaint.  Moreover, it was only in Sunrise's opposition to Plaintiffs' current motion that it was first revealed that Sunrise actually produced documents to the SEC. Given that identical allegations of wrongdoing are at issue in the SEC investigation, Plaintiffs should likewise be granted access to those documents through a partial lifting of the PSLRA's discovery stay.

**D.    Plaintiffs are not Barred from Conducting Discovery Simply Because the Court has not yet Determined Whether the Pleadings Would Survive a Motion to Dismiss on the Basis of Demand Futility**

Defendants misstate the law when they argue that a derivative plaintiff must first

establish derivative standing to conduct limited discovery.  Were this the case, (1) the Delaware Chancery Court would not have recently ordered Defendants to produce discovery to the Delaware plaintiff, who has not yet established his derivative standing; and (2) no derivative plaintiff would ever be able to lift a PLSRA stay, since the issue of standing virtually always underlies a Company's motion to dismiss a derivative action.  This is not the law.  *See e.g., Fleishman v. Huang*, 2007 Del. Ch. LEXIS 124 at *14-15 (August 22, 2007); *Gunther v. Tomasetta*, No. 2:06-cv-02529-R, slip op., at 1 (C.D. Cal. Oct. 2, 2006) (denying motion to stay discovery pending resolution of Rule 23.1 motion in a derivative action) (attached as Exhibit A to Hanna Decl.); *Turner Broad. Sys. v. Tracinda Corp.*, 175 F.R.D. 554, 556 (D. Nev. 1997) ("'[A] showing that discovery may involve some inconvenience and expense does not suffice to establish good cause for issuance of a protective order.'") (citation omitted); *Skellerup Indus. v. City of Los Angeles*, 163 F.R.D. 598, 600, 600-01 (C.D. Cal. 1995) ("idle speculation" that a defendant's motion to dismiss will succeed does not justify staying discovery pending the outcome of that motion).  Defendants do not, and cannot, articulate any reason why Plaintiffs should be prohibited from obtaining the same documents directed to be produced to the plaintiffs in the Delaware Action merely because a Rule 23.1 motion has not yet been adjudicated.

## III.   <u>CONCLUSION</u>

For all of the foregoing reasons, as well as for the reasons stated in Plaintiffs' opening Memorandum in support of their motion, Plaintiffs respectfully request that the Court grant their Motion to Partially Lift Discovery Stay, permitting them access to documents already produced or to be produced by Sunrise to the SEC and to the plaintiffs in the Delaware Action.

DATED: June 11, 2008                    Respectfully submitted,

                                        DAVIS, COWELL & BOWE, LLP


                                        __/s/ Mark Hanna_____
                                        George R. Murphy (DC Bar 75200)
                                        Mark Hanna (DC Bar 471960)
                                        Joni S. Jacobs (DC Bar 493846)
                                        1701 K Street NW, Suite 210
                                        Washington, DC 20006
                                        Telephone:     (202) 223-2620
                                        Facsimile:     (202) 223-8651

                                        *Liaison Counsel*

                                        SCHIFFRIN BARROWAY
                                        TOPAZ & KESSLER, LLP
                                        Lee D. Rudy
                                        Michael C. Wagner
                                        J. Daniel Albert
                                        280 King of Prussia Road
                                        Radnor, PA  19087
                                        Telephone:     (610) 667-7706
                                        Facsimile:     (610) 667-7056

                                        SAXENA WHITE P.A.
                                        Maya Saxena
                                        Joseph White
                                        Christopher Jones
                                        2424 North Federal Highway, Suite 257
                                        Boca Raton, FL  33431
                                        Telephone:     (561) 394-3399
                                        Facsimile:     (561) 394-3382

                                        ROBBINS, UMEDA, & FINK LLP
                                        Jeffrey P. Fink
                                        Felipe J. Arroyo
                                        Ashley R. Palmer
                                        610 West Ash Street, Suite 1800
                                        San Diego, CA  92101
                                        Telephone:     (619) 525-3990
                                        Facsimile:     (619) 525-3991

                                        *Co-Lead Counsels for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                  )
In Re SUNRISE SENIOR LIVING, INC.      )        **Civil Action No. 07-00143**
Derivative Litigation                           )
_____)
                                                  )
This Document Relates To:                  )
                                                  )
                                                  )
       ALL ACTIONS                           )
_____)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies, under penalty of perjury, that the foregoing was served

electronically on counsel for Defendants on June 11, 2008, and that no Defendant needs to be

served by mail.

                              DAVIS, COWELL & BOWE, LLP


                              _____/s/ Mark Hanna_____
                              George R. Murphy (DC Bar 75200)
                              Mark Hanna (DC Bar 471960)
                              Joni S. Jacobs (DC Bar 493846)
                              1701 K Street NW, Suite 210
                              Washington, DC 20006
                              Telephone:    (202) 223-2620
                              Facsimile:    (202) 223-8651

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
In Re SUNRISE SENIOR LIVING, INC.       )        **Civil Action No. 07-00143**
Derivative Litigation                   )
_____)
                                        )
This Document Relates To:               )
                                        )
ALL ACTIONS                             )
_____)

## SECOND AFFIDAVIT OF MARK HANNA

I, Mark Hanna, declare under penalty of perjury that the following is true and correct:

1.     Attached as Exhibit A is a true and correct copy of the Complaint, dated March 6, 2007 in the action styled *Young v. Klaassen, et al.*, C.A. No. 2770-VCL in Delaware Chancery Court.

2.     Attached as Exhibit B is a true and correct copy of excerpts from Nominal Defendant Sunrise Senior Living Inc.'s Opening Brief in Support of Motion to Dismiss or, in the Alternative, to Stay, dated November 2, 2007 in the action styled *Young v. Klaassen, et al.*, C.A. No. 2770-VCL in Delaware Chancery Court.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated: June 11, 2008                    Respectfully submitted,


                                        ___/s/ Mark Hanna_____
                                        Mark Hanna (DC Bar 471960)
                                        DAVIS, COWELL & BOWE, LLP
                                        1701 K Street NW, Suite 210
                                        Washington, DC 20006
                                        Tel. (202) 223-2620

Fax: (202) 223-8651
*Liaison Counsel*

# EXHIBIT A

EFiled: Mar 6 2007 4:58PM EST
Transaction ID 14029609
Case No. 2770-N

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| PETER V. YOUNG and ELLEN ROBERTS YOUNG, Derivatively on Behalf of Defendant SUNRISE SENIOR LIVING, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>PAUL L. KLAASSEN, TERESA M. KLAASSEN, DAVID W. FAEDER, TIMOTHY S. SMICK, THOMAS B. NEWELL, BRIAN C. SWINTON, CHRISTIAN B.A. SLAVIN, LARRY E. HULSE, TIFFANY L. TOMASSO, ROBERT R. SLAGER, CARL ADAMS, RONALD V. APRAHAMIAN, CRAIG R. CALLEN, DAVID G. BRADLEY, J. DOUGLAS HOLLADAY and THOMAS J. DONOHUE,<br><br>Defendants,<br><br>SUNRISE SENIOR LIVING, INC.,<br><br>Nominal Defendant. | C.A. No. |

### SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, Peter V. Young and Ellen Roberts Young, for their Derivative Complaint (the "Complaint"), alleges on personal knowledge as to themselves and as to all other facts based on the investigation of their counsel, alleges on information and belief as follows:

### NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers, seeking to remedy

defendants' breaches of fiduciary duties and other violations of law that have caused damage to Sunrise. This action arises out of defendants' conduct of authorizing, or through abdication of duty permitting, the back-dating of stock option grants to and for the benefit of Sunrise's officers and directors, including defendants Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Tomasso, Hulse, Aprahamian, Callen, Donohue, Bradley, Holladay, Slager, and Adams and at the expense of Sunrise and its shareholders. Based on this unlawful conduct, the Individual Defendants ("Individual Defendants") realized over $172 million in illicit proceeds through the sale of stock at a time when they knew of material non-public information concerning the improper backdating of options which led to the financial statements issued by Sunrise and its stock price being falsely inflated.

2.    A "stock option" is a contract that gives the holder the option to purchase a designated quantity of shares of a company's stock at a set price, the "exercise price."    Stock options are granted as part of employee compensation packages as a means to create incentives to boost profitability and stock value.    When the option is exercised, the holder acquires the designated number of shares from the company at the exercise price, regardless of the stock's contemporaneous market price. The exercise price of stock options is the market price on the date of the grant of the option. If the stock price goes up over time, the executive makes a profit when he sells the stock acquired by exercising the option. If the exercise price is lower than it should be, the employee pays less and the company gets less when the stock option is exercised.

3.    If the system is abused by "backdating" the options granted--which refers to picking an option-grant date earlier than the actual date the option was granted--a date when the stock price was lower than the actual grant date--the executive gets an instant profit.    The company is hurt, as the "spread" between the true grant exercise price and the market price is

2

required by law to be treated as compensation expense, which reduces profit. In addition, the backdating of options causes the corporate stock option plan to lose its tax protections, and results in the corporation's internal non-public information's being misappropriated by the executives for their personal profit.

4.     In violation of the Company's own stated policies, defendants engaged in or permitted "backdating" of options in the issuance of the executive stock options for many years. All of the Company's stock options plans required stock options to have an exercise price equal to the fair market value on the date of the grant, and defendants regularly represented that stock options covered by the stock options plans were not granted at less than 100% of fair market value on the date of the grant. Since at least 1999, backdated options have been granted to numerous Sunrise officers and directors.

5.     The Individual Defendants' illegal backdating scheme not only lined the pockets of the backdated option recipients and caused Sunrise to issue materially false financial statements, but also undermined the key purpose of stock option-based executive compensation: to provide incentives to improve the Company's performance and increase the Company's stock price and market capitalization. By manipulating options such that they carried an exercise price lower than the trading price of the stock on the date of grant, Sunrise insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

6.     In breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants colluded with one another to:

> a.     improperly backdate dozens of grants of Sunrise stock options to Sunrise executives and directors, in violation of the Company's shareholder-approved stock option plans;

3

      b.     improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

      c.     improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

      d.     produce and disseminate to Sunrise shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

7.     As a result of the Individual Defendants' misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## PARTIES

8.     Plaintiff Ellen Roberts Young is currently a shareholder of Sunrise and has continuously been a shareholder of Sunrise since April 19, 1999.

9.     Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of the Company since 1995, and as a member of the Audit Committee of the Board ("Audit Committee") since 1996, chairing the Audit Committee since 2003. Aprahamian also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in 1997, and has served as a consultant to the Company beginning in May 1997.

10.     Defendant Craig R. Callen ("Callen") has served as a director of the Company since 1999. Callen served as a member of the Audit Committee in 1999 and since 2004, and as a member of the Stock Option Committee from 1999 to August 23, 2002, when the Stock Option Committee merged with the Compensation Committee of the Board ("Compensation Committee").

4

11.     Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995 and as a member of the Audit Committee since 1996. Donohue served as a member of the Stock Option Committee from 1996 to August 23, 2002.

12.     Defendant David G. Bradley ("Bradley") served as a director of the Company from 1997 to 2005, as a member of the Stock Option Committee from 1998 to August 23, 2002, and as a member of the Audit Committee from 2002 to 2004.

13.     Defendant J. Douglas Holladay ("Holladay") has served as a director of Sunrise since 2000, and was a member of the Audit Committee in 2001.

14.     Defendant Paul J. Klaassen ("Klaassen") founded the Company with his wife, Sunrise Director Teresa M. Klaassen ("Teresa Klaassen"), and has served as Chairman of the Board and Chief Executive Officer of Sunrise since 1991.

15.     Defendant Teresa Klaassen ("T. Klaassen"), wife of Paul Klaassen, has served as a director of Sunrise since 1981 and was Executive Vice President from 1981 to November 2003. She currently serves as Sunrise's Chief Cultural Officer.

16.     Defendant David F. Faeder ("Faeder") served as the Company's and its predecessor entities' Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.

17.     Defendant Timothy S. Smick ("Smick") served as Chief Operating Officer of the Company from February 1996 to January 1998, as Executive Vice President of the Company from May 1996 to January 1998, and as a director of the Company from October 1996 to March 1998.

5

18.    Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000 and was President of Sunrise Development, Inc., the Company's development subsidiary, and General Counsel from January 1996 to April 2000.

19.    Defendant Brian C. Swinton ("Swinton") served as the Company's Executive Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc., from September 2000 to December 2002.

20.    Defendant Christian B.A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May 1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004.

21.    Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003. Tomasso previously served as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.

22.    Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.

23.    Defendant Robert R. Slager ("Slager") served as a director of the Company from 1999 to 2001.

6

24.    Defendant Carl Adams ("Adams") has served as Senior Vice President and Treasurer of Sunrise since December 2005. Previously, Adams served as Senior Vice President of Sunrise Capital Group from November 2004 to December 2005, and as Sunrise's Chief Accounting Officer from May 2000 to November 2004.

25.    Collectively, defendants Klaassen, T. Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Tomasso, Hulse, Aprahamian, Callen, Donohue, Bradley, Holladay, Slager, and Adams are referred to herein as the "Option Recipient Defendants."

26.    Collectively, all Defendants except nominal defendant Sunrise are referred to as the "Individual Defendants."

27.    Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102. According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, truth, loyalty, and due care, and were and are required to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not for self-aggrandizement. Each director and officer of the Company owes the Company and its shareholders the fiduciary duty to exercise good faith, loyalty and

7

diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.      exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;
>
> b.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and
>
> c.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

31.     The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate and complete financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

> (1)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

8

    (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        a.    transactions are executed in accordance with management's general or specific authorization;

        b.    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Option Recipient Defendants

32.    Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1996 Directors' Stock Option Plan ("1996 Director Plan"), the 1997 Stock Option Plan, the 1998 Stock Option Plan, the 1999 Stock Option Plan, the 2000 Stock Option Plan, and the 2001 Stock Option Plan (collectively, the "Plans"):

> The Plan is intended to advance the interests of the Corporation and any subsidiary thereof within the meaning of Rule 405 of Regulation C under the Securities Act of 1933, as amended (with the term "person" as used in such Rule 405 being defined as in Section 2(2) of such Act) (a "Subsidiary"), by providing eligible individuals (as designated pursuant to Section 4 below) with incentives to improve business results, by providing an opportunity to acquire or increase a proprietary interest in the Corporation, which thereby will create a stronger incentive to expend maximum effort for the growth and success of the Corporation and its Subsidiaries, and will encourage such eligible individuals to continue to serve the Corporation and its Subsidiaries, whether as an employee, as a director, as a consultant or advisor or in some other capacity. To this end, the Plan provides for the grant of stock options....

33.    According to the terms of each of the Plans, the Plans were administered by the Board of Directors of the Corporation, which had the full power and authority to take "all actions and to make all determinations required or provided for under the Plans or any Option granted or Option Agreement entered into hereunder and all such other actions and determinations not inconsistent with the specific terms and provisions of the Plans deemed by the Board to be necessary or appropriate to the administration of the Plan or any Option granted or Option Agreement entered into thereunder."

9

34.    The terms of the Plans further provide that "[t]he Option Price shall be not less than the greater of par value or 100 percent of the fair market value of a share of Stock on the date on which the Option is granted," where fair market value is defined as "the closing price of the Stock on such exchange or system or in such market ... on the trading date immediately before the Option is granted...." Additionally, each of the Plans specifically provides that "[t]he date of grant of an Option under this Plan shall be the date as of which the Board approves the grant."

35.    At the Annual meeting held on April 26, 1999, shareholders of Sunrise approved the 1999 Stock Option Plan.

36.    According to the 1999 Proxy Statement, the members of the Stock Option Committee were Meadow, Bradley, and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

37.    On March 5, 1999, Sunrise granted Hulse and Slavin a total of at least 165,000 stock options. However, Slavin did not even begin his employment with the Company until May 1999, according to the Company's 2003 proxy statement. These options were backdated to an adjusted exercise price of $18.81, one of the lowest prices of Sunrise stock for the first quarter.

38.    On November 8, 1999, Sunrise granted stock options to seven of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement. Callen, one of the recipients of these options, was on the Stock Option Committee and the Audit Committee on the date of grant. These options were

10

backdated to one of the lowest prices of Sunrise stock for the fiscal year, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Adjusted Exercise Price |
|---|---|---|---|---|
| 11/08/99 | Newell | $12.75 | 130,000 | $6.38 |
| | Swinton | $12.75 | 80,000 | $6.38 |
| | Tomasso | $12.75 | 130,000 | $6.38 |
| | Faeder | $12.75 | 130,000 | $6.38 |
| | Hulse | $12.75 | 35,000 | $6.38 |
| | Slavin | $12.75 | 70,000 | $6.38 |
| | Callen | $12.75 | 10,000 | $6.38 |

39.     According to Sunrise's Form 10-K for the year ended December 31, 1999: "Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 1999, these plans provided for the grant of options to purchase up to 6,324,910 shares of common stock. In February 2000, an additional 500,000 shares of common stock were allocated for the granting of options to employees. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four year period. The option exercise price is not less than the fair market value of a share of common stock on the date immediately before the day the option is granted (*i.e*, the prior day's closing price). Sunrise also had a stock option agreement with one of its senior executives. The agreement, as amended, was effective as of January 4, 1995 and covered 450,000 shares of common stock that were reserved for issuance at an exercise price of $8.00. As of December 31, 1999, all options were exercised."

40.     The 1999 Form 10-K further states:

11

Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

41.     At the Annual meeting held on May 12, 2000, shareholders of Sunrise were asked to vote on, and approved, the 2000 Stock Option Plan.

42.     According to the 2000 Proxy Statement, the members of the Stock Option Committee were Bradley, Callen, and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options

43.     On February 25, 2000 and March 28, 2000, Sunrise granted options to 11 of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement. Furthermore, Donohue and Bradley, two of the recipients of the February 25, 2000 options, were members of the Stock Option Committee on the date of grant, and Aprahamian, Donohue, and Callen, the recipients of the February 25, 2000 options, comprised the entire Audit Committee on the date of grant. These options were backdated to two of the lowest stock prices of $6.19 on February 24, 2000 and $6.22 on March 27, 2000 for the 2000 fiscal year.

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying | Adjusted Exercise Price |
|---|---|---|---|---|
| 02/25/00 | Newell | $12.38 | 120,000 | $6.19 |
| | Slavin | $12.38 | 110,000 | $6.19 |
| | Swinton | $12.38 | 90,000 | $6.19 |
| | Tomasso | $12.38 | 110,000 | $6.19 |
| | Faeder | $12.38 | 120,000 | $6.19 |
| | Hulse | $12.38 | 14,444 | $6.19 |
| | Donohue | $12.38 | 32,000 | $6.19 |
| | Aprahamian | $12.38 | 22,000 | $6.19 |
| | Slager | $12.38 | 10,000 | $6.19 |

12

|          |         |        |        |        |
|----------|---------|--------|--------|--------|
|          | Bradley | S12.38 | 14,000 | $6.19  |
|          | Callen  | S12.38 | 16,000 | $6.19  |
| 03/28/00 | Newell  | S12.44 | 50,000 | S6.22  |
|          | Slavin  | S12.44 | 30,000 | S6.22  |
|          | Swinton | $12.44 | 30,000 | S6.22  |
|          | Tomasso | $12.44 | 30,000 | $6.22  |
|          | Hulse   | $12.44 | 50,000 | $6.22  |

44.    On May 22, 2000, Sunrise granted Adams and Holladay a total of at least 14,500 stock options. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:

| Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Price   |
|------------|-----------|----------------|----------------------------------------------|---------|
| 05/22/00   | Adams     | $15.56         | At least 5,000                               | S7.78   |
|            | Holladay  | $15.56         | At Least 24,000                              | $18.81  |

45.    On September 11, 2000, Co-founder, Chairman of the Board, and CEO Klaassen was granted 350,000 stock options at an exercise price of $8.50. The Company's proxy statement indicates that this was pursuant to an new employment agreement entered into with Klaassen in September of 2000, which conveniently granted stock options to him when Sunrise stock was at the lowest price of the month of September and near the lowest price of the fiscal quarter.

46.    On November 24, 2000, Sunrise granted 75,000 options to Slavin. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock.

47.    According to Sunrise's Form 10-K for the year ended December 31, 2000:

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 2000, these plans provided for the grant of options to purchase up to 7,323,910 shares of common stock. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four-year period. The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.

48.    The 2000 Form 10-K further states:

Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

49.    At the Annual Meeting held on May 11, 2001, shareholders of Sunrise approved the 2001 Stock Option Plan.

50.    According to the 2001 Proxy Statement the members of the Stock Option Committee were Bradley, Callen and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

51.    On November 12, 2001, stock options were backdated to a point just prior to a precipitous rise in the price of Sunrise Stock, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Exercise Price |
|---|---|---|---|---|
| 11/12/01 | Slavin | $26.96 | 120,000 | $13.48 |

52.    On May 11, 2001, options were purportedly granted at one of the lowest prices

of Sunrise Stock for the fiscal year, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Adjusted Exercise Price |
|---|---|---|---|---|
| 05/11/01 | Faeder | $20.00 | 100,000 | $10.00 |
| | Newell | $20.00 | 140,000 | $10.00 |
| | Swinton | $20.00 | 60,000 | $10.00 |
| | Tomasso | $20.00 | 60,000 | $10.00 |
| | Hulse | $20.00 | 50,000 | $10.00 |
| | Adams | $20.00 | 30,000 | $10.00 |
| | Donohue | $20.00 | 24,000 | $10.00 |
| | Bradley | $20.00 | 14,000 | $10.00 |
| | Callen | $20.00 | 20,000 | $10.00 |

53.    According to Sunrise's Form 10-K for the year ended December 31, 2001:

Sunrise has stock option plans providing for the grant of incentive and
nonqualified stock options to employees, directors, consultants and advisors. At
December 31, 2001, these plans provided for the grant of options to purchase up
to 8,148,910 shares of common stock. The option exercise price and vesting
provisions of the options are fixed when the option is granted. The options expire
ten years from the date of grant and generally vest over a four-year period. The
option exercise price is not less than the fair market value of a share of common
stock on the date the option is granted.

54.    Each and every one of the aforementioned stock option grants was dated just

before a significant increase in Sunrise stock price and/or at or near Sunrise's lowest closing

price of the pertinent fiscal quarter or year. The reason for the extraordinary patterns set forth

in the preceding paragraphs is that the purported grant dates set forth therein were *not* the

actual dates on which the stock option grants were made. Rather, the Stock Option Committee,

with the knowledge and approval of the other members of the Board, knowingly and

15

deliberately backdated the stock option grants to make it appear as though the grants had been made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Option Recipient Defendants at the Company's expense. This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts the Option Recipient Defendants had to pay the Company upon exercise of the options.

### The Individual Defendants' Dissemination of False Financial Statements

55.     The Individual Defendants prepared, approved, and/or signed Sunrise's annual and quarterly SEC reports during the relevant period. The Individual Defendants knowingly and deliberately caused the Company to disseminate materially false and misleading statements in the periodic filings that the Individual Defendants prepared, approved, and/or signed.

56.     The Individual Defendants' option backdating scheme caused each of Sunrise's Forms 10-K and Forms 10-Q for the relevant period to materially understate Sunrise's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to expense the in-the-money portion of Sunrise's stock option grants during the period, as required by APB 25.

57.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants:

> a.     violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices that were less than the closing price of Sunrise stock on the day before the date of grant;

16

> b.    violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated options were granted;
>
> c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and
>
> d.    produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expense and overstated net income.

58.    Specifically, in the Company's annual reports on Form 10-K for fiscal years 1996 to 2003, the Individual Defendants caused Sunrise to falsely state that "the Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related interpretations, in accounting for its employee and director stock option stock option and stock incentive plans. Under APB 25, if the exercise price of the Company's stock options is not less than the market price of the underlying stock on the date of grant, no compensation expense is recognized. Such statements were materially false and misleading in each of these years because Sunrise had granted stock options at exercise prices that were below fair market value on the date immediately preceding the grant date, and failed to account for the in-the-money options as required by APB 25.

59.    As alleged previously, APB 25 required the Individual Defendants to record compensation expense for options that were in-the-money on the date of grant. However, they did not do so, thereby materially understating Sunrise's compensation expense and materially overstating Sunrise's net income or materially understating its net loss. These statements were designed to conceal, and did in fact conceal, the fact that the Individual Defendants were engaged in am unlawful continuous and systematic scheme of backdating stock option grants

17

to Sunrise insiders. These understatements also had the effect of inflating the stock price of Sunrise shares.

60.     Additionally, Sunrise's materially false and misleading financial statements for fiscal years 1998 to 2002 were included in its Forms 10-K filed for subsequent fiscal years. For this reason, and to the extent they included financials from earlier periods, Sunrise's annual reports on Form 10-K for fiscal years 2003 to 2005 were also materially false and misleading. By participating in the secret backdating scheme, and by reviewing and/or signing these subsequent annual reports, the Individual Defendants knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading, and inflated the Company's stock price.

61.     The Individual Defendants caused Sunrise to send shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period. The Individual Defendants prepared and/or reviewed each proxy statement between 1999 and 2006. Moreover, they knew, or were deliberately reckless in not knowing, that the proxies were materially false and misleading.

62.     The Sunrise proxy statements that were sent to shareholders in connection with annual shareholders' meetings concerned the election of directors, the approval and adoption of a new Sunrise stock option plan, and ratification of the selection of Sunrise's independent auditor. Each proxy statement sent to shareholders during this period contained materially false and misleading disclosures or omitted information about Sunrise's stock option practices, as detailed above.

63.     From 1998 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of

18

concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

64.    Sunrise's proxy statement filed with the SEC on April 3, 1998 falsely reported that options granted to Faeder, Smick, Newell, and Swinton were granted on May 2, 1997, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant.

65.    Sunrise's proxy statement filed with the SEC on April 6, 1999 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on September 14, 1998, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

66.    Sunrise's proxy statement filed with the SEC on April 14, 2000 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on November 8, 1999, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

67.    Sunrise's proxy statement filed with the SEC on March 29, 2001 falsely stated that options granted to Klaasen were granted on September 11, 2000, that options granted to Newell, Slavin, Swinton, and Tomasso were granted on February 25, 2000 and March 28, 2000, that options granted to Slavin were granted on November 24, 2000, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the

market price of the Common Stock at the date of the grant." Sunrise's proxy statement filed with the SEC on April 5, 2002 falsely stated that options granted to Newell, Swinton, Tomasso, and Hulse were granted on May 11, 2001 and that options granted to Slavin were granted on November 12, 2001, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

68.     Moreover, in the Compensation Committee Reports included in the Company's proxy statements filed from 1998 to 2002, the Company falsely stated that "[t]he full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price," when in fact the backdated stock options and *ultra vires* stock options provided the Option Recipient Defendants with immediate profits regardless of the Company's stock performance.

69.     On December 11, 2006, Sunrise announced an SEC investigation of the Company and the appointment of a special committee whose bifurcated purpose was to review insider sales of Sunrise stock and the Company's historical practices relating to stock option grants:

> Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that its Board of Directors has appointed a special independent committee to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants. The Board's decision followed receipt of a letter from a union shareholder that was simultaneously sent to news outlets, which resulted in media coverage and a subsequent request by the Securities and Exchange Commission (SEC) for information about matters raised in the media reports. The special committee has retained independent outside legal counsel to assist in its review.
>
> Sunrise is committed to sound corporate governance and transparency and the Board has determined that a comprehensive review by a special committee and independent counsel is the most appropriate way to address these matters in a timely manner.

> The review by the special committee will be conducted in parallel with the
> Company's ongoing efforts to complete the previously announced
> restatement of its financial statements. In view of these ongoing efforts
> and the special committee review, the Company now anticipates that its
> restated 2005 Form 10-K will be delayed beyond year-end, but still
> expects to be current in all of its filings with the SEC by March 1, 2007.

70.     As of the filing date of this Complaint, Sunrise has not released any finding

from the special committee. However on January 15, 2007, the Company did admit that

Sunrise will not be current in all of its filings with the SEC by March 1, 2007 contrary to the

statement in its December 11, 2006 press release.

71.     Defendants, who had a fiduciary duty to act with the utmost due care, loyalty

and good faith, either expressly authorized the practice of back-dating options or, in conscious

abrogation of their fiduciary duties, permitted the practice to recur repeatedly over the years.

The practice apparently ceased after the passage of sweeping changes to the federal securities

laws in 2002, which curtailed the potential for backdating by requiring companies to disclose

option grants within two days.

### The Individual Defendants Have Been Unjustly Enriched At Sunrise's Expense

72.     From 1999 to 2006, certain of the Individual Defendants, while in possession of

materially adverse non-public information regarding the backdating of stock options and the

false financial statements resulting therefrom, sold millions of dollars in Sunrise stock, a

significant portion of which was obtained through the exercise of improperly backdated stock

options, as demonstrated below:

**Carl G. Adams**

| ADAMS, CARL G. | | Sale | $33,153 | 1,250 | 9/3/2003 | $26.52 |
|---|---|---|---|---|---|---|

**Paul J Klaassen/ Teresa M. Klassssen**

| KLAASSEN PAUL J & TERESA M | Sale | $1,838,590 | 50,000 | 5/2/2006 | $36.77 |
|---|---|---|---|---|---|
| KLAASSEN PAUL J & TERESA M | Sale | $1,852,040 | 50,000 | 5/1/2006 | $37.04 |

21

| | | | | | |
|---|---|---|---|---|---|
| KLAASSEN PAUL J & TERESA M | Sale | $1,924,955 | 50,000 | 4/4/2006 | S38.50 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,940,940 | 50,000 | 4/3/2006 | S38.82 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,718,050 | 50,000 | 3/2/2006 | S34.36 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,738,240 | 50,000 | 3/1/2006 | S34.76 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,806,930 | 50,000 | 2/2/2006 | S36.14 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,813,600 | 50,000 | 2/1/2006 | S36.27 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,719,670 | 50,000 | 1/4/2006 | S34.39 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,605,610 | 50,000 | 1/3/2006 | S32.11 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,728,980 | 50,000 | 12/20/2005 | S34.58 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,738,975 | 50,000 | 12/19/2005 | S34.78 |

**Thomas Newell**

| | | | | | |
|---|---|---|---|---|---|
| NEWELL, THOMAS B. | Sale | $914,830 | 24,000 | 4/24/2006 | $38.12 |
| NEWELL, THOMAS B. | Sale | $918,401 | 24,000 | 3/22/2006 | $38.27 |
| NEWELL, THOMAS B. | Sale | $820,694 | 24,000 | 2/22/2006 | $34.20 |
| NEWELL, THOMAS B. | Sale | $846,996 | 24,000 | 1/23/2006 | $35.29 |
| NEWELL, THOMAS B. | Sale | $831,727 | 24,000 | 12/22/2005 | $34.66 |
| NEWELL, THOMAS B. | Sale | $808,361 | 24,000 | 11/22/2005 | S33.68 |
| NEWELL, THOMAS B. | Sale | $780,547 | 24,000 | 10/24/2005 | $32.52 |
| NEWELL, THOMAS B. | Sale | $756,120 | 12,000 | 9/22/2005 | $63.01 |
| NEWELL, THOMAS B. | Sale | $721,212 | 12,000 | 8/22/2005 | $60.10 |
| NEWELL, THOMAS B. | Sale | $637,913 | 12,000 | 7/22/2005 | $53.16 |
| NEWELL, THOMAS B. | Sale | $634,579 | 12,000 | 6/22/2005 | $52.88 |
| NEWELL, THOMAS B. | Sale | $624,282 | 12,000 | 5/23/2005 | $52.02 |
| NEWELL, THOMAS B. | Sale | $575,464 | 12,000 | 4/22/2005 | $47.96 |
| NEWELL, THOMAS B. | Sale | S592,463 | 12,000 | 3/22/2005 | S49.37 |
| NEWELL, THOMAS B. | Sale | $561,840 | 12,000 | 2/22/2005 | $46.82 |
| NEWELL, THOMAS B. | Sale | $522,360 | 12,000 | 1/24/2005 | $43.53 |
| NEWELL, THOMAS B. | Sale | $536,455 | 12,000 | 12/22/2004 | $44.70 |
| NEWELL, THOMAS B. | Sale | $509,698 | 12,000 | 11/22/2004 | $42.47 |
| NEWELL, THOMAS B. | Sale | $432,000 | 12,000 | 10/22/2004 | $36.00 |
| NEWELL, THOMAS B. | Sale | S422,110 | 12,000 | 9/22/2004 | $35.18 |
| NEWELL, THOMAS B. | Sale | $415,092 | 12,000 | 8/23/2004 | $34.59 |
| NEWELL, THOMAS B. | Sale | $427,980 | 12,000 | 7/22/2004 | $35.67 |
| NEWELL, THOMAS B. | Sale | $452,258 | 12,000 | 6/22/2004 | $37.69 |
| NEWELL, THOMAS B. | Sale | $410,388 | 12,000 | 5/21/2004 | $34.20 |
| NEWELL, THOMAS B. | Sale | $398,498 | 12,000 | 4/22/2004 | $33.21 |
| NEWELL, THOMAS B. | Sale | $421,416 | 12,000 | 3/22/2004 | S35.12 |
| NEWELL, THOMAS B. | Sale | $499,320 | 12,000 | 2/23/2004 | $41.61 |
| NEWELL, THOMAS B. | Sale | $483,144 | 12,000 | 1/22/2004 | $40.26 |
| NEWELL, THOMAS B. | Sale | S1,137,718 | 33,000 | 11/24/2003 | $34.48 |
| NEWELL, THOMAS B. | Sale | $464,400 | 12,000 | 12/22/2003 | $38.70 |
| NEWELL, THOMAS B. | Sale | $145,376 | 5,500 | 9/22/2003 | S26.43 |

| | | | | | |
|---|---|---|---|---|---|
| NEWELL, THOMAS B. | Sale | $138,555 | 5,000 | 10/22/2003 | $27.71 |
| NEWELL, THOMAS B. | Sale | $113,029 | 4,500 | 8/22/2003 | $25.12 |
| NEWELL, THOMAS B. | Sale | $292,500 | 11,700 | 11/22/2002 | $25.00 |
| NEWEII, THOMAS B. | Sale | $268,530 | 10,000 | 8/22/2002 | $26.85 |
| NEWELL, THOMAS B. | Sale | $147,555 | 5,000 | 6/24/2002 | $29.51 |
| NEWELL, THOMAS B. | Sale | $139,750 | 5,000 | 5/22/2002 | $27.95 |
| NEWELL, THOMAS B. | Sale | $147,000 | 5,000 | 4/22/2002 | $29.40 |
| NEWELL, THOMAS B. | Sale | $383,670 | 15,000 | 3/22/2002 | $25.58 |
| NEWELL, THOMAS B. | Sale | $133,250 | 5,000 | 12/24/2001 | $26.65 |
| NEWELL, THOMAS B. | Sale | $137,500 | 5,000 | 11/23/2001 | $27.50 |
| NEWELL, THOMAS B. | Sale | $281,000 | 10,000 | 10/22/2001 | $28.10 |
| NEWELL, THOMAS B. | Sale | $130,000 | 5,000 | 8/22/2001 | $26.00 |
| NEWELL, THOMAS B. | Sale | $148,150 | 5,000 | 7/23/2001 | $29.63 |
| NEWELL, THOMAS B. | Sale | $889,350 | 35,000 | 6/22/2001 | $25.41 |

**Thomas Donohue**

| | | | | | |
|---|---|---|---|---|---|
| DONOHUE, THOMAS J | Sale | $3,391,838 | 102,666 | 11/21/2005 | $33.04 |
| DONOHUE, THOMAS J | Sale | $340,684 | 6,667 | 5/6/2005 | $51.12 |

**Ronald Aprahamian**

| | | | | | |
|---|---|---|---|---|---|
| APRAHAMIAN, RONALD V. | Sale | $757,040 | 20,000 | 4/18/2006 | $37.85 |
| APRAHAMIAN, RONALD V. | Sale | $1,513,200 | 29,100 | 5/27/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $104,008 | 2,000 | 5/26/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $46,800 | 900 | 5/26/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $10,400 | 200 | 5/24/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,300,000 | 25,000 | 5/23/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $104,008 | 2,000 | 5/23/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,026,048 | 20,000 | 5/16/2005 | $51.30 |
| APRAHAMIAN, RONALD V. | Sale | $273,600 | 7,200 | 10/28/2004 | $38.00 |
| APRAHAMIAN, RONALD V. | Sale | $106,400 | 2,800 | 10/27/2004 | $38.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,084,400 | 40,000 | 7/9/2001 | $27.35 |
| APRAHAMIAN, RONALD V. | Sale | $681,040 | 20,000 | 11/13/2003 | $34.05 |
| APRAHAMIAN, RONALD V. | Sale | $149,163 | 6,100 | 6/5/2003 | $24.45 |
| APRAHAMIAN, RONALD V. | Sale | $340,565 | 13,900 | 6/4/2003 | $24.50 |

**Craig Callen**

| | | | | | |
|---|---|---|---|---|---|
| CALLEN, CRAIG | Sale | $521,093 | 10,000 | 5/26/2005 | $52.11 |

**Larry Hulse**

| | | | | | |
|---|---|---|---|---|---|
| HULSE, LARRY | Sale | $1,345,624 | 21,973 | 8/12/2005 | $61.24 |

23

| HULSE, LARRY | Sale | $864,300 | 15,000 | 8/4/2005 | $57.62 |
|---|---|---|---|---|---|
| HULSE, LARRY | Sale | $509,869 | 10,000 | 5/17/2005 | $50.99 |
| HULSE, LARRY | Sale | $319,569 | 6,250 | 5/11/2005 | $51.13 |
| HULSE, LARRY | Sale | $400,000 | 10,000 | 11/4/2004 | $40.00 |
| HULSE, LARRY | Sale | $214,142 | 6,250 | 3/29/2004 | $34.26 |
| HULSE, LARRY | Sale | $138,431 | 3,306 | 2/25/2004 | $41.87 |
| HULSE, LARRY | Sale | $2,000,000 | 50,000 | 1/21/2004 | $40.00 |
| HULSE, LARRY | Sale | $280,641 | 8,750 | 11/10/2003 | $32.07 |
| HULSE, LARRY | Sale | $787,500 | 22,500 | 11/7/2003 | $35.00 |
| HULSE, LARRY | Sale | $217,485 | 8,055 | 9/4/2003 | $27.00 |
| HULSE, LARRY | Sale | $217,512 | 8,056 | 5/13/2002 | $27.00 |
| HULSE, LARRY | Sale | $247,363 | 8,750 | 11/13/2001 | $28.27 |
| HULSE, LARRY | Sale | $923,503 | 33,890 | 6/27/2001 | $27.25 |

**David W. Faeder**

| FAEDER, DAVID W. | Sale | $627,429 | 15,000 | 2/25/2004 | $41.83 |
|---|---|---|---|---|---|
| FAEDER, DAVID W. | Sale | $394,875 | 11,700 | 11/19/2003 | $33.75 |
| FAEDER, DAVID W. | Sale | $153,563 | 4,550 | 11/17/2003 | $33.75 |
| FAEDER, DAVID W. | Sale | $523,660 | 16,250 | 11/10/2003 | $32.23 |
| FAEDER, DAVID W. | Sale | $301,925 | 10,800 | 10/13/2003 | $27.96 |
| FAEDER, DAVID W. | Sale | $698,100 | 25,000 | 10/10/2003 | $27.92 |
| FAEDER, DAVID W. | Sale | $3,169,518 | 114,200 | 10/7/2003 | $27.75 |
| FAEDER, DAVID W. | Sale | $2,049,038 | 74,000 | 10/6/2003 | $27.69 |
| FAEDER, DAVID W. | Sale | $1,961,023 | 71,100 | 10/3/2003 | $27.58 |
| FAEDER, DAVID W. | Sale | $4,260,044 | 154,900 | 10/2/2003 | $27.50 |
| FAEDER, DAVID W. | Sale | $117,970 | 4,700 | 8/29/2003 | $25.10 |
| FAEDER, DAVID W. | Sale | $383,049 | 15,300 | 8/21/2003 | $25.04 |
| FAEDER, DAVID W. | Sale | $399,686 | 16,300 | 8/20/2003 | $24.52 |
| FAEDER, DAVID W. | Sale | $58,822 | 2,400 | 8/18/2003 | $24.51 |
| FAEDER, DAVID W. | Sale | $31,850 | 1,300 | 8/15/2003 | $24.50 |
| FAEDER, DAVID W. | Sale | $242,637 | 10,000 | 8/14/2003 | $24.26 |
| FAEDER, DAVID W. | Sale | $44,345 | 1,810 | 8/12/2003 | $24.50 |
| FAEDER, DAVID W. | Sale | $701,250 | 28,050 | 7/15/2003 | $25.00 |
| FAEDER, DAVID W. | Sale | $655,576 | 26,200 | 6/2/2003 | $25.02 |
| FAEDER, DAVID W. | Sale | $125,000 | 5,000 | 5/30/2003 | $25.00 |
| FAEDER, DAVID W. | Sale | $105,823 | 3,250 | 1/14/2002 | $32.56 |
| FAEDER, DAVID W. | Sale | $1,389,593 | 47,917 | 7/16/2001 | $29.07 |

**James D. Holladay**

| HOLLADAY, J. DOUGLAS | Sale | $312,000 | 8,000 | 3/21/2006 | $39.00 |
|---|---|---|---|---|---|
| HOLLADAY, J. DOUGLAS | Sale | $219,000 | 6,000 | 12/12/2005 | $36.50 |
| HOLLADAY, J. DOUGLAS | Sale | $59,500 | 1,700 | 12/6/2005 | $35.00 |

| | | | | | |
|---|---|---|---|---|---|
| HOLLADAY, J. DOUGLAS | Sale | $80,500 | 2,300 | 11/7/2005 | $35.00 |
| HOLLADAY, J. DOUGLAS | Sale | $268,000 | 4,000 | 10/3/2005 | $67.00 |
| HOLLADAY, J. DOUGLAS | Sale | $320,000 | 5,000 | 9/23/2005 | $64.00 |
| HOLLADAY, J. DOUGLAS | Sale | $288,585 | 5,500 | 5/31/2005 | $52.54 |
| HOLLADAY, J. DOUGLAS | Sale | $325,520 | 6,500 | 5/12/2005 | $50.21 |

**Pete A. Klisares**

| | | | | | |
|---|---|---|---|---|---|
| KLISARES, PETE A. | Sale | $582,890 | 16,665 | 5/7/2004 | $34.98 |
| KLISARES, PETE A. | Sale | $346,417 | 9,999 | 12/2/2003 | $34.65 |
| KLISARES, PETE A. | Sale | $69,700 | 2,000 | 11/25/2003 | S34.92 |

**Bradley B. Rush**

| | | | | | |
|---|---|---|---|---|---|
| RUSH, BRADLEY B. | Sale | $391,188 | 6,250 | 9/12/2005 | $62.66 |
| RUSH, BRADLEY B. | Sale | $40,883 | 687 | 9/8/2005 | $59.51 |

**Christian B.A. Slavin**

| | | | | | |
|---|---|---|---|---|---|
| SLAVIN, CHRISTIAN B.A. | Sale | $28,050 | 1,000 | 10/15/2001 | S28.15 |
| SLAVIN, CHRISTIAN B.A. | Sale | $26,300 | 1,000 | 8/15/2001 | S26.31 |
| SLAVIN, CHRISTIAN B.A. | Sale | $29,000 | 1,000 | 7/16/2001 | $29.00 |
| SLAVIN, CHRISTIAN B.A. | Sale | $100,000 | 4,000 | 6/15/2001 | $25.00 |
| SLAVIN, CHRISTIAN B.A. | Sale | $422,188 | 17,500 | 12/29/2000 | $24.13 |

**Brian C. Swinton**

| | | | | | |
|---|---|---|---|---|---|
| SWINTON, BRIAN C. | Sale | $721,201 | 19,754 | 3/5/2004 | $36.51 |
| SWINTON, BRIAN C. | Sale | $320,732 | 10,000 | 11/10/2003 | $32.07 |
| SWINTON, BRIAN C. | Sale | $4,575,000 | 150,000 | 11/5/2003 | $32.50 |
| SWINTON, BRIAN C. | Sale | $2,950,000 | 100,000 | 11/4/2003 | $29.75 |
| SWINTON, BRIAN C. | Sale | $74,100 | 2,600 | 10/27/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $2,850 | 100 | 10/20/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $350,550 | 12,300 | 10/17/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $280,000 | 10,000 | 10/10/2003 | $28.00 |
| SWINTON, BRIAN C. | Sale | $309,375 | 11,250 | 10/2/2003 | $27.50 |
| SWINTON, BRIAN C. | Sale | $93,563 | 3,750 | 5/16/2003 | $24.95 |
| SWINTON, BRIAN C. | Sale | $426,904 | 15,695 | 4/18/2002 | $29.50 |
| SWINTON, BRIAN C. | Sale | $885,000 | 30,000 | 7/16/2001 | $29.50 |
| SWINTON, BRIAN C. | Sale | $600,150 | 25,000 | 6/26/2001 | $26.75 |
| SWINTON, BRIAN C. | Sale | $294,700 | 10,000 | 11/8/2001 | $29.47 |

**Tiffany L. Tomasso**

| | | | | | |
|---|---|---|---|---|---|
| TOMASSO, TIFFANY L. | Sale | $1,410,000 | 30,000 | 2/2/2005 | $47.00 |

25

| TOMASSO, TIFFANY L. | Sale | $337,500 | 7,500 | 12/15/2004 | $45.00 |
|---|---|---|---|---|---|
| TOMASSO, TIFFANY L. | Sale | $128,485 | 3,750 | 3/29/2004 | $34.26 |
| TOMASSO, TIFFANY L. | Sale | $575,751 | 13,750 | 2/25/2004 | $41.87 |
| TOMASSO, TIFFANY L. | Sale | $8,740,000 | 230,000 | 12/19/2003 | $38.00 |
| TOMASSO, TIFFANY L. | Sale | $2,072,000 | 56,000 | 12/18/2003 | $37.00 |
| TOMASSO, TIFFANY L. | Sale | $521,190 | 16,250 | 11/10/2003 | $32.07 |
| TOMASSO, TIFFANY L. | Sale | $525,000 | 15,000 | 11/7/2003 | $35.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $951,200 | 32,800 | 10/29/2003 | $29.00 |
| TOMASSO, TIFFANY L. | Sale | $208,800 | 7,200 | 10/28/2003 | $29.00 |
| TOMASSO, TIFFANY A. | Sale | $491,221 | 16,250 | 8/7/2001 | $30.23 |
| TOMASSO, TIFFANY A. | Sale | $437,500 | 17,500 | 6/6/2001 | $25.00 |
| TOMASSO, TIFFANY A. | Sale | $68,730 | 2,900 | 5/7/2001 | $23.70 |
| TOMASSO, TIFFANY L. | Sale | $178,222 | 8,101 | 3/14/2001 | $22.00 |

73.     Had defendants and the Stock Option Committee not permitted the stock options to be backdated, the Option Recipient Defendants' profits and unrealized gains on exercisable stock options would have been tens of millions of dollars less.

74.     The practice of backdating stock options not only lined the pockets of Sunrise executives at the direct expense of the Company, which dollar for dollar received money when the options are exercised, but also resulted in the overstatement of Sunrise's profits and an understatement of its tax liabilities.

75.     As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Sunrise to violate GAAP, SEC regulations and IRS rules and regulations.

76.     Sunrise's financial results for 1999 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Sunrise's financial results were presented in a fair manner and in accordance with GAAP.

26

77.     The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, and the financial information was not "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

78.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

79.     During the relevant period, the Individual Defendants caused the Company to understate its compensation expenses by improperly accounting for its stock options under GAAP, thus overstating the Company's net earnings.

80.     Under well-settled accounting principles in effect throughout the relevant period, Sunrise did not need to record an expense for options granted to employees at the current market price ("at the money"). The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money"). In order to provide Sunrise executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company

27

records to create the false appearance that options had been granted at the market price on an earlier date.

81.     From 1999 to 2006, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25, and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

82.     Throughout the relevant period, Sunrise accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees." Under APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed. Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

83.     Due to its failure to recognize necessary charges relating to options-based compensation, the Company presented its financial results and statements in a manner that violated GAAP, including the following principles:

> (a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, X10);

28

(b)    The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

84.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

85.    During the relevant period, the Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

86.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers--the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options... If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant......" Item 402(c)(2)(iv).

87.    The Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date that the Stock Option Committee approved the grant.

88.    During the relevant period, the Individual Defendants further caused Sunrise to violate IRS rules and regulations due to its improper accounting for the backdated stock

30

options. As a result, the Company's tax liabilities were understated, exposing Sunrise to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

89.    The Individual Defendants caused the Company to violate Internal Revenue Code §162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance based." In order for compensation to be performance-based, the Stock Option Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

90.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What Section [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

91.    The Individual Defendants caused Sunrise to violate IRC §162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As

31

a result, all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

92.     The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Sunrise's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

93.     ISOs are a form of equity compensation that may be provided to a company's employees. ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment because they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential treatment because they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

94.     By improperly treating its backdated options as ISOs, the Individual Defendants failed to provide proper income tax and FICA withholdings upon the exercise of options by its executives and employees, in violation of IRS rules and regulations.

95.     Meanwhile, the Option Recipient Defendants were causing the Company to grant them hundreds of thousands of backdated Sunrise stock options. The Company's

32

executives and directors received a significant number of backdated Sunrise stock options as compensation during the relevant period.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

96.     The Individual Defendants' misconduct alleged herein was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

97.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to: (a) the additional compensation expenses and tax liabilities the Company is required to incur; (b) loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grants; (c) costs and expenses incurred in connection with the Company's internal investigation and restatement of historical financial statements; and (d) the cost of the SEC investigation of the Company.

98.     As alleged herein, certain of the Option Recipient Defendants exercised hundreds of thousands of backdated Sunrise stock options at improperly low prices and then sold the shares for substantial profits. Consequently, these defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

33

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

99.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

100.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

101.    As a result of the facts set forth herein, plaintiff has not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants.    Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

102.    Plaintiff brings this action derivatively in the right and for the benefit of Sunrise to redress injuries suffered and to be suffered by Sunrise as a result of the breaches of fiduciary duty by the Individual Defendants.

103.    Plaintiff did not make a demand on the Sunrise Board to bring the claims alleged herein because such a demand would have been futile. At the time Plaintiff filed this derivative action, the Sunrise Board consisted of the following members: Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little (collectively, the "Director Defendants"). Each of these Board members has been named as a Defendant in this action. Of the seven Board members at the time of filing this Complaint, six benefited materially from the wrongdoing.    As detailed below, each of the directors faces a sufficiently substantial likelihood of liability on the derivative claims alleged herein and is therefore in no position to render a disinterested judgment as to whether the Company should bring such claims, and/or lacks sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims against the Individual Defendants.

34

104.    The Board is responsible for approving the compensation awarded to the Sunrise executive officers. This compensation includes the stock options that were secretly backdated by Sunrise insiders. Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to Sunrise in approving the option grants as dated. The Board should have properly informed itself of the circumstances surrounding the options granted to the Sunrise insiders before approving them. Accordingly, there is reason to doubt that the Director Defendants were disinterested because they face substantial liability for their breaches of fiduciary duty to Sunrise. The Board's decision to approve the options was not the product of valid business judgment. Thus, demand is futile as to the Director Defendants.

105.    The Compensation Committee of the Board is specifically responsible under its charter for reviewing and approving grants of stock options and other equity awards to Sunrise insiders. The Sunrise Compensation Committee Charter provides that the Compensation Committee shall, *inter alia*:

> a.    [A]dminister and implement the Company's incentive compensation plans and equity-based plans that are subject to Board approval in which directors, the CEO, other executive officers and other employees of the Company and its subsidiaries may be participants, including, but not limited to, (a) approving option grants and restricted stock or other awards, (b) interpreting the plans, (c) determining rules and regulations relating to the plans, (d) modifying or canceling existing grants or awards and (e) imposing limitations, restrictions and conditions upon any grant or award as the Compensation Committee deems necessary or advisable.

The Compensation Committee at the time this derivative action was filed consisted of Defendants Aprahamian, Callen, and Donohue. Director Defendants Aprahamian and Donohue have been members of the Compensation Committee since FY1996. Donohue has been Chair of the Compensation Committee since FY2001. Director Defendant Callen has been a member of the Committee from FY2004 to present and from FY1999 to August 23, 2002. On August 23,

35

2002 the Company reformed the then existing Compensation Committee and Stock Option Committee into one Compensation Committee. Director Defendants Callen and Donohue were both members of the Stock Option Committee before its reformation into the Compensation Committee. Defendant Callen was a member of the Stock Option Committee from FY1999 until August 2002. Defendant Donohue was a member of the Stock Option Committee from FY1996 until August 2002 and Chair during FY2001. These Defendants were responsible as members of the Compensation Committee and/or Stock Option Committee to review and grant stock options to Sunrise insiders during their respective tenures on the Committee. The Compensation Committee's and/or Stock Option Committee's practice of allowing and/or authorizing the practice of granting back-dated stock options during this time was not the product of valid business judgment. Alternatively, these Defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding these option grants, thereby causing or allowing the Company's insiders to obtain unreasonable and unreported compensation via the backdating of stock option grants. Accordingly, there is a reasonable doubt that Defendants Aprahamian, Callen, and Donohue are disinterested as they face substantial liability for their breaches of fiduciary duty to Sunrise. Thus, demand is futile as to Defendants Aprahamian, Callen, and Donohue on these additional bases.

106.    The Audit Committee is responsible, by its Charter, for reviewing and discussing, with management and the independent auditors, Sunrise financial statements and earnings releases. The Sunrise Audit Committee Charter provides that the Audit Committee shall, *inter alia*:

a.      Meet to review and discuss the company's annual audited financial statements with management and the independent auditor, including reviewing the company's specific disclosures;

b.      Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the company's selection or application of accounting principles, and major issues as to the adequacy of the company's internal controls and any special audit steps adopted in light of material control deficiencies;

c.      Review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements; and

d.      Prepare the audit committee report required by the rules of the SEC to be included in the company's annual proxy statement.

The Audit Committee is responsible for assisting the Board in its oversight responsibilities relating to the integrity of the Company's systems of internal accounting and financial controls, and the compliance by the Company with legal and regulatory requirements. The Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls. Thus, the Audit Committee was responsible for overseeing and directly participating in the Sunrise financial reporting process. The Audit Committee at the time of the filing of this derivative action was comprised of Director Defendants Aprahamian, Callen, and Donohue. Defendants Aprahamian and Donohue are and have been members of the Audit Committee since FY1996. Defendant Callen has been a member of the Audit Committee since FY2004. Defendant Aprahamian has been the Chair of the Audit Committee since FY2001. Accordingly, Defendants Aprahamian, Callen, and Donohue breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of earnings press releases and financial statements that contained false and/or misleading material information. Particularly, these Defendants reviewed

37

and failed to correct the Sunrise improper earnings releases and financial statements issued from

FY1997 to present which contained false and/or misleading material information during the

relevant time period. Additionally, during the relevant time period of the practice at Sunrise in

granting back-dated stock options, the Audit Committee was meeting only once or twice per

year. Specifically, the Audit Committee only met once in FY1997, once in FY1998, and twice in

FY1999. As a result, these Defendants face a likelihood of liability for their breach of fiduciary

duties. Therefore, demand is futile as to Defendants Aprahamian, Callen, and Donohue.

107. The Nominating and Corporate Governance Committee is composed of members

of the Board and is charged with the general duties of reviewing and reassessing the adequacy of

the Corporate Governance Guidelines of the Company and recommending membership to and

monitoring membership of the Board. The Sunrise Nominating and Corporate Governance

Committee Charter provides that the Nominating and Corporate Governance Committee shall,

*inter alia*:

> a. [R]eceive comments from all directors and report annually to the Board on
> an assessment of the Board's performance, to be discussed with the Board
> following the end of each fiscal year. The Nominating and Corporate
> Governance Committee shall also oversee the annual evaluation of
> management, and periodically make a report to the Board on succession
> planning for the Chief Executive Officer; and
>
> b. [R]eview and reassess the adequacy of the corporate governance
> principles of the Company annually and recommend any proposed
> changes to the Board for approval, including any changes in director fees.

The Nominating and Corporate Governance Committee at the time this derivative action was

filed was comprised of Director Defendants Donohue, Holladay and Little. Defendants Donohue

and Holladay have been members of the Nominating and Corporate Governance Committee

since the Committee's inception in August 2002. Defendant Little has been a member of the

Committee since FY2005. Defendant Aprahamian was a member of the Committee from August

38

2002 through FY2003. Defendant Holladay has been the Chair of the Committee since August 2002. These Defendants were responsible, as members of the Nominating and Corporate Governance Committee, for reviewing and/or reassessing governance principles at Sunrise and reviewing and/or maintaining the Board's membership during their tenures on the Committee. Clearly, these Defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding certain practices such as the back-dating of stock option grants which were adverse or should have been adverse to corporate governance principles, thereby causing or allowing the Company to issue false and/or misleading statements and/or press releases. Additionally, the Committee members, during their respective tenures, did not fulfill this duty because they did not fully and adequately monitor and/or remedy the actions of the Board complained of herein. Accordingly, there is a reasonable doubt that Defendants Aprahamian, Donohue, Holladay, and Little are disinterested because they face substantial liability for their breaches of fiduciary duty to Sunrise. The Nominating and Corporate Governance Committee's decisions to not adequately respond to clear departures from corporate governance procedures and not monitor and/or remedy the actions of the Board complained of herein were not the product of valid business judgment. Thus, demand is futile as to Defendants Aprahamian, Donohue, Holladay and Little.

108. Each of the Director Defendants faces a substantial likelihood of liability in this action because of his or her failure, as a director, to ensure that reliable systems of financial controls and information and reporting were in place and functioning effectively. The dramatic breakdowns and gaps in those controls were so widespread and systemic that each of the Director Defendants faces substantial exposure to liability for his or her total abrogation of his or her duty of oversight. These directors either knew or should have known, in the absence of

complete recklessness, that violations of law were occurring and took no steps in good faith to prevent or remedy that situation, proximately causing millions of dollars of losses to the Company. Thus, demand is futile as to Defendants P. Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little.

109. Each of the Director Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings during the relevant time period. As such, Director Defendants face a sufficiently substantial likelihood of liability for the same. Thus, demand is futile as to Defendants P. Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little.

110. Certain Director Defendants participated in the wrongdoing complained of herein so that they could: (a) protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby; and (b) inflate the price of the Company's common stock in order to enhance the value of their securities holdings and options to purchase Sunrise stock and allow them to sell and reap millions of dollars in illegal insider trading proceeds. Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of), authorizing, approving and acquiescing in the conduct complained of herein. Specifically, certain Director Defendants benefited immensely from the disposition of the following Sunrise shares from 1997 to 2006, as seen below:

| DEFENDANT(S) | SHARES SOLD | AGGREGATE PROCEEDS |
|---|---|---|
| P. KLAASSEN & T. KLAASSEN, JOINTLY | 1,462,106 | $56,363,094.63 |
| APRAHAMIAN | 215,200 | $8,848,497.20 |
| CALLEN | 10,000 | $521,093.00 |
| DONOHUE | 134,378 | $3,732,527.28 |

| HOLLADAY | 39,000 | $1,873,125.00 |
|----------|--------|---------------|

These Director Defendants reaped extreme profits in the disposition of shares during the practices complained of herein. Therefore, any demand upon the Board would have been futile.

111.    The Sunrise Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Sunrise stockholders or recklessly, consciously and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors, and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting. Pursuant to their specific duties as Board members, Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to Sunrise in that they failed to prevent and correct the improper stock option granting and financial reporting. Certain directors are also dominated and controlled by other Defendants and cannot act independently of them. Thus, the Sunrise Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

112.    Also, as revealed by the Company in its Press Release dated December 11, 2006, the staff of the SEC has commenced an inquiry into the Company's stock option practices requesting relevant information from the Company. Defendants face a substantial likelihood of

41

being held liable for these practices.    Accordingly, as such any demand upon Director Defendants would have been futile.

### The Members of the Board of Directors Lack Independence

113.    Director Defendant Paul J. Klaassen founded Sunrise with his wife, Director Defendant Teresa M. Klaassen, in 1981.  Since its inception, P. Klaassen has served as Chief Executive Officer and Chairman of the Board of Sunrise. His principal occupation since 1981 is his employment with Sunrise.  As to the wrongdoing alleged herein, P. Klaasen is neither disinterested nor independent.

114.    Director Defendant Teresa M. Klaassen founded Sunrise with her husband, Director Defendant P. Klaassen, in 1981.  T. Klaassen currently serves as Chief Cultural Officer of Sunrise.  T. Klaassen served as Executive Vice President from 1981 until November 2003. Her principal occupation, since 1981, has been her employment with Sunrise.  As to the wrongdoing alleged herein, T. Klaasen is neither disinterested nor independent.

115.    Director Defendants P. Klaassen and T. Klaassen, because they are husband and wife, have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein.  Because of their personal and professional relationships, it is reasonable to conclude that they would not authorize suit against each other. Therefore, demand upon Defendants P. Klaassen and T. Klaassen is futile.

116.    P. Klaassen and T. Klaassen, also have significant business relationships with the Company, and therefore, have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Specifically,

    a.    Defendants P. Klaassen and T. Klaassen lease the real property on which the Fairfax facility is located to the Company under a 99-year ground lease. Sunrise has paid rents to Defendants P. Klaassen and T. Klaassen for the following years totaling approximately:  $262,000 in FY1996,

42

$262,000 in FY1997, $262,000 in FY1998, $262,000 in FY1999, $262,000 in FY2000, $447,236 in FY2001, $299,000 in FY2002, $258,333 in FY2003, $158,700 in FY2004, and $300,000 in FY2005; and

b.    Sunrise leases certain real property located in Fairfax County, Virginia to Defendants P. Klaassen and T. Klaassen for use as a residence under a 99-year ground lease entered into in June 1994. Defendants P. Klaassen and T. Klaassen pay rent to the Company under this lease totaling $1.00 per month.

Due to Defendants P. Klaassen's and T. Klaassen's significant interest in these properties and their deep inter-related business and personal relationships with the Company, demand as to Director Defendants P. Klaassen and T. Klaassen is futile.

117.    P. Klaassen also has other significant business dealings with the Company, the potential risk of loss of which creates debilitating conflicts of interest that prevent him from taking the necessary and proper action on behalf of the Company as requested herein. Specifically, a company owned by Defendant P. Klaassen owns an airplane used by Sunrise for business travel. Sunrise made payments for the use of the airplane during FY1999 and FY2000 of approximately $76,433.00 per year.

118.    Director Defendants P. Klaassen, T. Klaassen, and Donohue, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Specifically,

43

  c. Defendants P. Klaassen and Donohue have served on the Board of Trustees for Marymount University together;

  d. It has been reported that for a period of time, Defendants P. Klaassen and T. Klaassen lived with Defendant Donohue; and

  e. It has been reported that Defendant Donohue invested in the first home of Defendants P. Klaassen and T. Klaassen.

During the time these Defendants were working, investing and living together, Defendants P. Klaassen, T. Klaassen, and Donohue developed social, personal, and professional relationships from which it is reasonable to conclude that they would not authorize suit against each other. Therefore, demand on Director Defendants P. Klaassen, T. Klaassen, and Donohue is futile.

  119. Director Defendants P. Klaassen, Donohue, and Little enjoy certain professional relationships outside of Sunrise such that they have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Specifically,

  f. Defendants P. Klaassen, Donohue, and Little serve together on the Board of Directors of the U.S. Chamber of Commerce. Defendant Donohue serves as the President and Chief Executive Officer of the U.S. Chamber of Commerce; and

  g. Defendants P. Klaassen, Donohue, and Little serve together on the Board of Directors of the National Chamber Foundation. Defendant Little serves as Chairman of the Board of the National Chamber Foundation. Defendant Donohue serves as President of the National Chamber Foundation.

During their several years working together at the U.S. Chamber of Commerce and the National Chamber Foundation, Defendants P. Klaassen, Donohue and Little developed both social and professional relationships from which it is reasonable to conclude that they would not authorize suit against each other.

  120. Further, Defendant Donohue has demonstrated an indifference regarding ethical corporate governance procedures. Defendant Donohue has served as a member of the Board of

44

Directors of XM Satellite Radio Holdings, Inc. ("XM") since October 1999. Additionally, Defendant Donohue, during the relevant times, served on the Compensation Committee and Nominating Committee at XM. For an extended period of time while Donohue was a member of the Board at XM, XM improperly misrepresented the financial condition and business prospects of the company. As a result of these practices, XM and its Board members, including Defendant Donohue, have been named as defendants in and exposed to millions of dollars of liability from securities class action lawsuits, as well as an SEC investigation into the conduct of XM. Due to Defendant Donohue's alleged corporate misconduct during his tenure as a member of the Compensation Committee, Nominating Committee, and the Board of Directors at XM, it is unlikely that Donahue would prosecute claims on behalf of Sunrise related to alleged director or officer misconduct.Director Defendant Callen, because of his inter-related business with the Company, has debilitating conflicts of interest that prevent him from taking the necessary and proper action on behalf of the Company as requested herein. Specifically, Defendant Callen is a managing director and head of US Health Care Investment Banking at Credit Suisse First Boston ("CSFB"). CSFB acquired Donaldson, Lufkin & Jenrette Securities Corporation in 2001. Defendant Callen was a managing director of Health Care Investment Banking at Donaldson, Lufkin & Jenrette before the acquisition. From 1999 to 2001, Donaldson, Lufkin & Jenrette provided financial advisory services to Sunrise. Additionally, in 1998 and 1999, Sunrise entered into joint ventures with several affiliates of Donaldson, Lufkin & Jenrette in order to raise over \$70 million in capital to develop up to 37 assisted living projects.

121.    Further, Defendant Callen owns a 1.1375% interest in two of the joint ventures entered into between Sunrise and these certain affiliates of Donaldson, Lufkin & Jenrette. Also, CSFB was the initial purchaser of Sunrise's January 2002 Rule 14A private placement of \$125

45

million aggregate principal amount of 5 ¼% convertible subordinated notes due February 1, 2009. Due to Defendant Callen's significant interest in these inter-related business relationships between the Company and himself, CSFB, and/or Donaldson, Lufkin & Jenrette, Callen is unlikely to take any action that would jeopardize those relationships and the benefits thereof.In addition, should the Director Defendants decide to bring claims against themselves, it would likely trigger an "insured vs. insured" exclusion which is typical for D&O insurance policies, which would make D&O insurance coverage unavailable to them. Therefore, demand is futile as to all Director Defendants.

122.    In addition, demand would be futile and useless for the additional following reasons:

a.    The Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

b.    The Director Defendants of Sunrise, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Sunrise stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.    Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c.    In order to bring this suit, a majority of the directors of Sunrise would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

d.    The acts complained of constitute violations of the fiduciary duties owed by the Sunrise officers and directors and these acts are incapable of ratification;

46

e.  Sunrise has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sunrise any part of the damages Sunrise suffered and will continue to suffer;

f.  The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands; and

g.  Any suit by the directors of Sunrise to remedy these wrongs would likely expose the Director Defendants and Sunrise to liability for violations of securities laws which could result in additional civil actions being filed against one or more of the Director Defendants. Thus, they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

123.  Sunrise has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

(a)  Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

(b)  Costs incurred relating to the informal SEC probe.

(c)  Taxes, penalties, interest, etc.

124.  Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Sunrise's proxy statements, the stated purpose of granting stock options is to attract and retain skilled executive personnel and align their interests with those of the stockholders. Specifically, the Compensation Committee reports state: "[s]tock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains." However, by granting Sunrise stock options with backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by

47

awarding employees compensation that had intrinsic value regardless of Sunrise's performance. In effect, this practice constituted nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the Company.

125.    There was no basis or justification for backdating the stock options, which practice was *ultra vires* and in violation of the stock option plans. Backdating was designed solely to surreptitiously benefit the Option Recipient Defendants in a manner that was inconsistent with the Plans and the Company's public disclosures, to the detriment of the Company.

126.    The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Sunrise to potentially massive liability. The SEC has initiated an investigation into Sunrise's stock option granting practices. Sunrise will also likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unfairly benefiting himself and other Company insiders at the expense of the Company.

129.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to

48

themselves and/or certain other officers and directors of the Company and cover up their misconduct.

130.    In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

131.    The Individual Defendants' misconduct as alleged herein was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to and did unduly benefit the Option Recipient Defendants at the expense of the Company.

132.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, as well as the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT II

### Against the Option Recipient Defendants for Unjust Enrichment

133.    Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

134.    The Option Recipient Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

135.    To remedy the Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received,

49

including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT III

### Against the Option Recipient Defendants for Recission

136.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

137.   As a result of the acts alleged herein, the stock option contracts between the Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control. Further, the backdated Sunrise stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

138.   All contracts that provide for stock option grants to the Option Recipient Defendants and were entered into during the relevant period should therefore be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

WHEREFORE, Plaintiff demands judgment as follows:

> a. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

> b. Awarding to Sunrise restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Option Recipient Defendants as a result of the conduct alleged herein;

50

c.  Rescinding and/or repricing the back-dated stock options granted to the Options Recipient Defendants;

d.  Equitable and/or injunctive relief as permitted by law and equity, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendant's trading activities or their other assets so as to assure that plaintiff on behalf of Sunrise has an effective remedy;

e.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f.  Granting such other and further relief as the Court deems just and proper.

Dated: March 6, 2007

ROSENTHAL, MONHAIT & GODDESS, P.A.

By: _Carmella P. Keener_

Carmella P. Keener (DSBA No. 2810)
919 North Market Street
Suite 1401, Citizens Bank Center
Wilmington, Delaware 19899
 (302) 656-4433
Attorneys for Plaintiff

**OF COUNSEL:**

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
Roy L. Jacobs
20 East 42nd Street, 46th Floor
New York, New York 10016
(212) 685-0969

**JACOBS LAW GROUP, PC**
Samuel R. Simon
1800 John F. Kennedy Boulevard, Suite 404
Philadelphia, PA 19103
(215) 569-9701

**ABBEY SPANIER RODD ABRAMS & PARADIS, LLP**
Nancy Kaboolian
212 East 39th Street
New York, New York 10016
(212) 889-3700

52

# EXHIBIT B

EFiled: Nov 2 2007 4:21PM EDT
Transaction ID 16920123
Case No. 2770-VCL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| PETER V. YOUNG and | ) | |
| ELLEN ROBERTS YOUNG, | ) | |
| | ) | |
| Derivative Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL J. KLAASSEN, et al., | ) | C.A. No. 2770-VCL |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SUNRISE SENIOR LIVING, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

**OPENING BRIEF IN SUPPORT OF
MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY
BY NOMINAL DEFENDANT SUNRISE SENIOR LIVING, INC.**

ASHBY & GEDDES
Lawrence C. Ashby (#468)
Richard D. Heins (#3000)
Richard L. Renck (3893)
OF COUNSEL                                500 Delaware Avenue, 8th Floor
HOGAN & HARTSON LLP                        Wilmington, DE 19801
George H. Mernick, III                     (302-654-1888)
Columbia Square
555 Thirteenth Street, NW                  *Attorneys for Sunrise Senior Living, Inc.*
Washington, DC 20004
(202-637-5600)

HOGAN & HARTSON LLP
N. Thomas Connally
Jon M. Talotta
8300 Greensboro Drive, Suite 1100
McLean, VA 22102
(703-610-6100)

Dated:  November 2, 2007

**VI.    Under <u>McWane</u>, the Court Should Dismiss or Stay the Delaware Derivative Suit in Favor of the Federal Suits**

Even if the Court does not dismiss the Delaware Derivative Suit for failure to make the required demand, it should nevertheless dismiss or stay the suit in favor of the first-filed claims pending in the District Court, particularly given (a) the duplicative nature of the Young Complaint, (b) the Plaintiffs' problems with the continuous ownership rule, (c) the fact that the Young Complaint alleges only a subset of the claims asserted in the D.C. Derivative Suit, and (d) the pendency of the closely-related D.C. Class Actions in the same court before the same judge.

A Delaware court "should liberally exercise [its] discretion" under <u>McWane</u> to dismiss or stay a case when "(1) a first-filed prior pending action exists in another jurisdiction, (2) that action involves similar parties and issues, and (3) the court in the other jurisdiction is capable of rendering prompt and complete justice." <u>Enodis Corp. v. Amana Co., L.P.</u>, Civ. A. Nos. 18836, 19688, 2007 WL 1242193, at *2 (Del. Ch. Apr. 26, 2007) (unpublished), <u>citing</u> <u>McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.</u>, Del. Supr., 263 A.2d 281, 283 (1970).  In exercising its discretion to dismiss or stay a later-filed action, the Court must also take into account forum non conveniens factors intended to ensure the orderly and efficient administration of justice. <u>Schnell v. Porta Systems Corp.</u>, Civ. A. No. 12,948, 1994 WL 148276, at *3 (Del. Ch. Apr. 12, 1994) (unpublished) (citation omitted).  In this case, all three elements of the <u>McWane</u> doctrine are satisfied, and the relevant forum non conveniens factors favor the dismissal or stay of the instant suit.

### A.    The Federal Suits Were Filed First

All of the Federal Suits were filed before Plaintiffs filed the instant suit. Although first-filed status is given less weight in representative actions, it is still a relevant factor for the Court to consider and weighs in favor of dismissing or staying the Delaware Derivative Suit.  See Biondi v. Scrushy, Del. Ch., 820 A.2d 1148, 1159 (2003); see also Kaufman v. Kumar, et al., Civ. A. No. 2418, 2007 WL 1765617, at *2 (Del. Ch. Jun. 8, 2007) (unpublished) (considering first-filed status in applying McWane in context of derivative suit).

### B.    The Same Parties and Issues Are Involved

Plaintiffs in the Delaware Derivative Suit named as defendants 15 current or former Sunrise directors and/or current or former Sunrise officers.  All 15 of these individual defendants are named defendants in the D.C. Derivative Suit as well. 24/ Although not all 15 of these individual defendants are named in the D.C. Class Actions, there is sufficient identity between the defendants in these cases to satisfy the McWane identity of parties requirement.  See Derdiger v. Tallman, Del. Ch., 773 A.2d 1005, 1014 (2000) ("[I]t is not required that the parties... in both actions be identical. Substantial or functional identity is sufficient.") (citations omitted).

The Delaware Derivative Suit and the Federal Suits also share the same core facts, and the Delaware Derivative Suit and the D.C. Derivative Suit share the same legal claims – the claims in this case are a subset of the more comprehensive claims

---

24/    Named as individual defendants in this case are: P. Klaassen; T. Klaassen; D. Faeder; T. Newell; B. Swinton; C. Slavin; L. Hulse; T. Tomasso; R. Slager; C. Adams; R. Aprahamiam; C. Callen; D. Bradley; J. Holladay; T. Donohue.  All of these individual defendants are named in the D.C. Derivative Suit.

asserted in the D.C. Derivative Suit.  Under <u>McWane</u>, the relevant inquiry is whether the

claims arise from a common nucleus of operative facts, such that they ought to be

brought in the same court at the same time.  <u>Derdiger</u>, 773 A.2d at 1016-17 (citations

omitted).  The instant suit "arises out of" the Defendants' alleged conduct "of authorizing,

or through abdication of duty, permitting the back-dating of stock options grants to and

for the benefit" of the Defendants.  <u>See</u> <u>Young</u> Compl. ¶ 1.  Plaintiffs in this suit allege

that backdated options were granted on ten dates between May 2, 1997, and November

12, 2001.  <u>See</u> <u>Young</u> Compl. ¶¶ 41-68, 81-82.  Plaintiffs in the D.C. Derivative Suit

allege that backdated options were granted on seven of these same dates.  D.C. Derivative

Suit Compl. ¶¶ 66, 72, 73, 74, 75, 76, 78. <u>25</u>/

        With regard to the claims alleged, both the Delaware Derivative Suit and

the D.C. Derivative Suit claim that by approving and/or receiving these allegedly

backdated stock options, the defendants breached their fiduciary duties and were unjustly

enriched.  <u>See</u> D.C. Derivative Suit Compl. ¶¶ 336-347, 348-350.  Both the Delaware

Derivative Suit and the D.C. Derivative Suit also seek rescission of the allegedly

backdated stock options.  <u>See</u> D.C. Derivative Suit Compl. ¶¶ 199-201; <u>Young</u> Compl.

¶¶ 163-165.

---

<u>25</u>/    The D.C. Derivative Suit plaintiffs challenge five additional options grants that
are not challenged in the Delaware Derivative Suit.  <u>See</u> <u>D.C. Derivative Suit</u> Compl. at
¶¶ 67-68, 70-71, 77.  The D.C. Class Actions plaintiffs allege backdating with respect to
five of the options grants challenged in the Delaware Derivative Suit.  <u>See</u> <u>United Food</u>
Compl. ¶ 96.

### C.    The District Court Is Capable of Providing Complete Justice

The final McWane factor is met because the District Court is capable of rendering prompt and complete justice. In addition to alleging all of the same claims alleged in the Delaware Derivative Suit, the D.C. Derivative Suit includes other claims arising from both state and federal law. See D.C. Derivative Suit Compl. ¶¶ 170-175 (Securities and Exchange Act §10(b) and SEC Rule 10b-5); 176-181 (Securities and Exchange Act §14(a)); 182-183 (Securities and Exchange Act §10(a)). Thus, there is no risk that less than complete justice will be done in the D.C. Derivative Suit, as the claims before the District Court are "broader in scope than those in this action." See Kaufman, 2007 WL 1765617, at *2 ("well-reasoned decisions of this court…teach that when the allegations in a complaint are essentially a subset of a larger group of prior-pending claims in another jurisdiction, complete and orderly justice is ordinarily more probable to ensue in the foreign court").

### D.    Relevant Forum Non Conveniens Factors Favor a Stay

In addition, the forum non conveniens factors weigh in favor of the Federal Suits. It is undoubtedly more convenient and less costly for the derivative claims to proceed along with the direct claims before the same judge in the District Court.

Among the factors considered in this analysis are the relative ease of access to proof; the availability of compulsory process for witnesses; and "all other practical considerations that would make the trial easy, expeditious, and inexpensive." Schnell, 1994 WL 148276, at *3. Plaintiffs do not allege any personal connections to Delaware, but acknowledge that Sunrise is headquartered in McLean, Virginia (see

<u>Young</u> Compl. ¶ 32), which is within 15 miles driving distance of the District Court.  As

such, the vast majority of potential witnesses, documents, and other sources of proof are

located in the Washington metropolitan area.  Moreover, if both the D.C. Derivative Suit

and the D.C. Class Actions were to survive the pleadings stage and proceed to discovery,

the District Court is best positioned to ensure that discovery in those two cases is

coordinated and that cumulative effort and expense (nearly all of which is ultimately

borne by the Company) is avoided or at least minimized.

       In addition to the unnecessary burden and expense of litigating in two fora,

Sunrise also faces substantive prejudice if the Delaware Derivative Suit proceeds in this

Court on a different schedule from the D.C. Class Actions.  Absent careful staging and

coordination, discovery on the derivative claims could undermine the Company's

defenses to the direct claims asserted against it in the D.C. Class Actions.  <u>See, e.g.,</u>

<u>Breault v. Folino</u>, Civ. A. No. SACV010826GLTANX, 2002 WL 31974381 (C.D. Cal.

Mar. 15, 2002) (staying derivative suit in favor of class action was in company's best

interest because the prosecution of the derivative suit would conflict with company's

defense in pending class action); <u>cf.</u> <u>In re E.F. Hutton Banking Practices Litig.</u>, 634 F.

Supp. 265, 270 (S.D.N.Y. 1986) (recognizing that directors whom plaintiffs wished to

sue derivatively would be important witnesses for the corporation in pending direct

litigation, and that the derivative suit might "undercut their veracity and general

effectiveness as witnesses" on the corporation's behalf).

       Furthermore, the direct and derivative claims arise from the same conduct

and involve many of the same issues.. <u>Compare</u> <u>Young</u> Compl. ¶¶ 72-86, <u>with</u> <u>First New</u>

York Compl. ¶¶ 51-89.  Resolution of the derivative claims may be driven by the

outcome of the earlier-filed direct claims.  See, e.g., Brudno v. Wise, Civ. A. No. 19953,

2003 WL 1874750, at *3-5 (Del. Ch. Apr. 1, 2003) (unpublished) (staying derivative suit

in favor of federal securities class action that was based on same underlying conduct).

For example, if the direct claims fail because it is established that there was no

backdating, the derivative claims would likewise not survive. 26/

           Finally, dismissing or staying this action in favor of the previously-filed

Federal Suits comports with traditional notions of comity between the state and federal

courts.  See Brudno, 2003 WL 1874750, at *1 (staying Delaware derivative suit in favor

of pending federal derivative and securities class action).  The District Court certainly has

the competence and ability to address the derivative claims.  Federal courts "have proven

time and again their ability to apply and even extend Delaware law in appropriate ways."

Corwin v. Silverman, Civ. A. No. 16347, 1999 WL 499456, at *6 (Del. Ch. Jun. 30, 1999)

(unpublished).  And the District Court's jurisdiction over the direct claims is

unquestioned.  For all these reasons, it is in Sunrise's best interest (the interest the

Plaintiffs ostensibly seek to protect) that the direct and derivative claims proceed under

the supervision of one judge in one forum, and thus in Sunrise's interest that the

Delaware Derivative Suit be dismissed or, at a minimum, stayed.

---

26/    The D.C. Class Actions allege that the defendants violated the Securities
Exchange Act by failing to disclose the allegedly backdated stock options in proxies
distributed to shareholders and other SEC filings.  See United Food Compl. ¶¶ 167-195.
In order to resolve this issue, the federal court will first need to make a factual
determination as to whether any of the alleged backdating actually occurred.