# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: SUNRISE SENIOR LIVING, INC. Derivative Litigation : : : | |
| This Document Relates To: : : ALL ACTIONS : : | Civil Action No. 07-00143 (RBW) |

## DAVID G. BRADLEY'S MOTION TO DISMISS THE AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Pursuant to Rules 9(b), 12(b)(6), and 23.1 of the Federal Rules of Civil Procedure, Defendant David G. Bradley hereby moves to dismiss the Amended Consolidated Shareholder Derivative Complaint filed in the consolidated actions for failure to state a claim upon which relief can be granted.

The supporting memorandum of points and authorities and a proposed form of Order are attached.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP


/s/      Scott K. Dasovich
Philip A. Sechler (D.C. Bar No. 426358)
Scott K. Dasovich (D.C. Bar No. 975575)
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (fax)

*Counsel for Defendant David G. Bradley*

Dated: June 16, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

In re: SUNRISE SENIOR LIVING, INC.           :
Derivative Litigation                                      :
                                                                       :
_____:          Civil Action No. 07-00143
This Document Relates To:                            :                              (RBW)
                                                                       :
            ALL ACTIONS                                   :
_____:


**MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF DEFENDANT DAVID G. BRADLEY'S MOTION TO DISMISS**

Philip A. Sechler (D.C. Bar No. 426358)
Scott K. Dasovich (D.C. Bar No. 975575)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (fax)

_Counsel for Defendant David G. Bradley_

Dated: June 16, 2008

# TABLE OF CONTENTS

**Page**

ALLEGATIONS OF THE COMPLAINT.................................................................................. 3

ARGUMENT ....................................................................................................................... 6

I.    COUNT I (§ 10(b) AND RULE 10b-5) FAILS TO STATE A CLAIM AS TO
DAVID G. BRADLEY.............................................................................................. 6

    A.    Plaintiffs' § 10(b) and Rule 10b-5 Claims Are Barred by the Statute of
Limitations. ................................................................................................ 6

    B.    Plaintiffs Fail To Plead Particularized Facts Sufficient To State § 10(b)
and Rule 10b-5 Claims Against David G. Bradley................................... 6

II.    COUNT II (§ 14(a)) FAILS TO STATE A CLAIM AS TO DAVID G.
BRADLEY............................................................................................................. 11

    A.    Plaintiffs' § 14(a) Claim Is Barred by the Statute of Limitations......... 11

    B.    Plaintiffs Fail To Plead Particularized Facts Sufficient To State a §
14(a) Claim Against David G. Bradley.................................................... 11

III.    COUNT III (§ 20(a)) FAILS TO STATE A CLAIM AS TO DAVID G.
BRADLEY............................................................................................................. 12

    A.    Plaintiffs' § 20(a) Claim Is Barred by the Statute of Limitations......... 12

    B.    Plaintiffs Fail To Plead That Sunrise Engaged in a Primary Violation. .............. 13

    C.    Plaintiffs Plead No Facts Suggesting Bradley Was a Culpable
Participant in Any Alleged Primary Violations. ..................................... 14

    D.    Bradley Was Not a "Controlling Person" of Sunrise............................. 15

IV.    COUNTS V AND VI (BREACH OF FIDUCIARY DUTY AND/OR AIDING
AND ABETTING) FAIL TO STATE A CLAIM AS TO DAVID G.
BRADLEY............................................................................................................. 15

    A.    Plaintiffs Do Not State a Claim for Breach of the Duty of Care. ......... 16

    B.    Plaintiffs Do Not State a Claim for Breach of the Duty of Loyalty. ................... 17

    C.    Plaintiffs Do Not State a Claim for Aiding and Abetting..................... 19

V.    COUNTS VII AND IX (UNJUST ENRICHMENT) FAIL TO STATE A
CLAIM AS TO DAVID G. BRADLEY................................................................. 19

VI.    COUNTS IV, VIII, AND X (RESCISSION AND ACCOUNTING) FAIL TO
STATE A CLAIM AS TO DAVID G. BRADLEY. ........................................... 21

CONCLUSION................................................................................................................. 22

## <u>TABLE OF AUTHORITES</u>

<u>Page</u>

### FEDERAL CASES

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) ..................................15

*Atl. Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F. Supp. 2d 75 (D.D.C. 2003) ........................................................................................................................11

*Britton v. Parker*, 2007 WL 2871003 (D. Colo. Sept. 26, 2007)................................8, 9

*Cal. Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004)............8

*Dodds v. Cigna Secs., Inc.*, 12 F.3d 346 (2d Cir. 1993) ..............................................12

*Dura Pharm. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627 (2005)......................................6

*Durning v. Citibank, Int'l*, 990 F.2d 1133 (9th Cir. 1993) ............................................6

*Ezra Charitable Trust v. Tyco Intern., Ltd.*, 466 F.3d 1 (1st Cir. 2006).......................13

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999).........................................8

*In re Atmel Corp. Deriv. Litig.*, 2007 WL 2070299 (N.D. Cal. July 16, 2007)...........11

\* *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947 (N.D. Cal. 2007) ......................9, 19

\* *In re Ditech Networks, Inc. Deriv. Litig.*, 2007 WL 2070300 (N.D. Cal. July 16, 2007)........................................................................................6, 10, 15

*In re Exxon Mobil Corp. Secs. Litig.*, 387 F. Supp. 2d 407 (D.N.J. 2005) .............10, 11

\* *In re Fed. Nat'l Mortgage Ass'n Sec., Derivative and "ERISA" Litig.* 503 F. Supp. 2d 25 (D.D.C. 2007) ....................................................................................................6, 7

*In re Glaxo Smithkline PLC Sec. Litig.*, No. 05 Div. 3751 (LAP), 2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) .....................................................................................6

*In re MBIA Inc.*, 2007 WL 473708 (S.D.N.Y. Feb. 14, 2007) ....................................12

*In re U.S. Office Products Secs. Litig.*, 326 F. Supp. 2d 68 (D.D.C. 2004)..................11

*In re U.S. West, Inc. Secs. Litig.*, 65 Fed. Appx. 856 (3rd Cir. 2003) .........................11

*In re Zoran Corp. Derivative Litig.*, 2007 WL 1650948 (N.D. Cal. June 5, 2007)................18, 21

*Authorities on which we chiefly rely are marked with asterisks.

*Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674 (9th Cir. 2005)............................................11

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .....................................................6

*Leykin v. AT & T Corp.*, 216 Fed. Appx. 14 (2d Cir. 2007) ............................................................13

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)..................................................................................8

*S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ...................................................13

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ...........................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ........................................7, 9

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251 (D.C. Cir. 2004) ........................................................................................................................................16

*Walker v. Cardinal Sav. and Loan Ass'n*, 690 F. Supp. 494 (E.D. Va. 1988)..............................14

## STATE CASES

*\* Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007)...........................................10, 16, 17, 18

*Empire Fin. Servs., Inc. v. Bank of N.Y.*, 2003 WL 22701442 (Del. Super. Nov. 13, 2003).........21

*Highland Legacy Ltd. v. Singer*, 2006 WL 741939 (Del. Ch. Mar. 17, 2006) .............................20

*In re Caremark Int'l*, 698 A.2d 959 (Del. Ch. 1996)....................................................................18

*In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021 (Del. Ch. May 4, 2005) ...........18

*Palese v. Del. State Lottery Office*, 2006 WL 1875915 (Del. Ch. June 29, 2006) ........................20

*Schock v. Nash*, 732 A.2d 217 (Del. Super. 1999)........................................................................19

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ...................................................................................15

*Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043 (Del. Super. 2001)................................19

## OTHER AUTHORITIES

15 U.S.C. § 78t(a) ......................................................................................................................12, 13

15 U.S.C. § 78u-4(b)......................................................................................................................7, 8

28 U.S.C. § 1658(b) ..........................................................................................................................6

17 C.F.R. § 240.10b-5..............................................................................................................5, 6, 12

Fed. R. Civ. P. 9(b) ......................................................................................................................11, 15

8 Del. C. § 102(b)(7)................................................................................................16

8 Del. C. § 141(e)...................................................................................................17

**MEMORANDUM OF POINTS AND AUTHORITIES IN
<u>SUPPORT OF DEFENDANT DAVID G. BRADLEY'S MOTION TO DISMISS</u>**

Despite the passage of well over a year since filing their original complaints, Plaintiffs continue to lodge conclusory and largely undifferentiated allegations of wrongdoing against all defendants, including former outside director David G. Bradley.  Alleging little more than one actual fact—that the price of Sunrise Senior Living, Inc.'s ("Sunrise") stock increased after the company made certain stock option grants between 1997 and 2001—Plaintiffs concoct an alleged web of options backdating that somehow ensnares every current and former Sunrise director (and numerous officers) dating back to 1997.  As should be expected given this shotgun approach, several of Plaintiffs' allegations regarding Bradley are simply wrong according to judicially noticeable SEC filings that have been publicly available to Plaintiffs for years.  Moreover, Plaintiffs' attempt to allege particularized facts linking Bradley to any alleged backdating at Sunrise boils down to their anemic statement that they possess "information and belief" that Bradley chose the dates of backdated options at Sunrise and "falsified" documents in support of that scheme.  Tellingly, Plaintiffs do not allege <u>any</u> facts that support those allegations against Bradley, or any basis for their "information and belief" that he "falsified" documents and participated in alleged backdating, despite the express statutory requirement that Plaintiffs specify <u>all</u> facts that form the basis of any such "information and belief."  Thus, Plaintiffs' claims against Bradley should be dismissed.

Even setting aside, however, Plaintiffs' failure to allege any facts regarding Bradley's knowledge of or role in the alleged backdating, Plaintiffs' claims against Bradley fail for several other reasons:

First, Plaintiffs' claims are barred by the applicable statutes of limitation. The most recent alleged backdated option grant occurred in November 2001—more than five years before Plaintiffs filed their original complaints. Because Plaintiffs' claims are subject to statutes of limitations from one to five years in length, each of their claims is time-barred.

Second, Plaintiffs fail sufficiently to plead their backdating allegations. Plaintiffs point to a few cherry-picked option grant dates and the unsupported conclusion of their own "statistical analysis" as support for their claim of a "striking pattern" of backdating. Upon closer analysis, however, it is clear that no such backdating occurred. For instance, publicly filed documents establish that the dates of several of the allegedly backdated grants correspond precisely with corporate events, providing judicially noticeable explanations for the timing of those grants (including, notably, that the Sunrise board met on the day that Plaintiffs claim Bradley received "backdated" options). Moreover, many of the grants were not favorable to their recipients and thus cannot legally support any inference of backdating. Since each of the claims against Bradley is predicated upon Plaintiffs' allegations of a backdating scheme, each should be dismissed.

Third, Plaintiffs have failed to meet the heightened pleading standards applicable to their claims under the Private Securities Litigation Reform Act ("PSLRA"), Rule 23.1, and Rule 9(b). Under those standards, Plaintiffs must plead with particularity the role of each defendant in the alleged backdating and improper accounting at Sunrise. They do not. In addition to failing to allege any fact regarding Bradley's involvement in alleged backdating, the Complaint also fails to allege any fact suggesting that Bradley had knowledge of or participated in any improper accounting of real estate joint ventures. For these reasons, as well as for the reasons stated in the Memorandum in Support of Sunrise's Motion to Dismiss, or in the Alternative Stay, and in the

Memorandum in Support of Individual Defendants' Motion to Dismiss, the Complaint against Bradley should be dismissed.

## ALLEGATIONS OF THE COMPLAINT

In their amended consolidated Complaint, Plaintiffs allege a scheme to backdate stock options at Sunrise that involved twenty-one individuals, including seven members of Sunrise's current board (Ronald V. Aprahamian, Paul L. Klaassen, Teresa Klaassen, Craig R. Callen, Thomas J. Donahue, J. Douglas Holladay, William G. Little), four former outside directors (David G. Bradley, Peter A. Klisares, Scott F. Meadow, Robert R. Slager), two current officers (Tiffany L. Tomasso, John F. Gaul), and eight former officers (Carl Adams, Bradley B. Rush, David W. Faeder, Larry E. Hulse, Thomas B. Newell, Timothy S. Smick, Brian C. Swinton, Christian B.A. Slavin).

Bradley served as outside director of Sunrise from August 1997 through May 11, 2005. *See* Sunrise Form 8-K (March 18, 2005), at 2, Ex. A hereto; Sunrise Schedule 14A (April 7, 2005), excerpts[1] attached as Ex. B hereto.[2] According to the Complaint, Bradley was a member of Sunrise's Stock Option Committee from August 1997 through August 23, 2002, and a member of the Audit Committee from 2001 through 2003. Compl. ¶ 25. Plaintiffs further allege that Bradley generally had authority to approve option grants, approved certain of the allegedly

---

[1] Complete filing available at http://www.sec.gov/Archives/edgar/data/1011064/000095013305001480/0000950133-05-001480-index.htm.

[2] The Court may take judicial notice of documents filed with the SEC. *See, e.g.*, *In re XM Satellite Radio Holdings Secs. Litig.*, 479 F. Supp. 2d 165, 174 (D.D.C. 2007) ("In deciding a motion to dismiss, . . . the Court may . . . consider documents that are required to be filed, and actually have been filed, with the SEC.").

backdated option grants, and was aware of Sunrise's stock option plans. *See, e.g.*, Compl. ¶¶ 84, 85.

Plaintiffs also make a number of other unsubstantiated assertions regarding Bradley's role in the selection of dates for the allegedly backdated option grants, and even claim that they have "information" (which Plaintiffs fail to specify) demonstrating that an unspecified number of defendants, including Bradley, "falsified" documents at Sunrise in support of the alleged backdating scheme. For instance, Plaintiffs claim—"upon information and belief"—that those defendants "would review historical stock prices before issuing stock options to determine the date upon which stock prices were significantly below the current market price. They would then falsify the relevant documents to make it appear as if the stock options were granted on the earlier date." Compl. ¶ 77. But Plaintiffs do not specify the source of such "information" or "belief" in the Complaint. Indeed, the Complaint does not identify a single document allegedly "falsified" by Bradley (or any other defendant), does not identify a single witness who allegedly witnessed Bradley (or any other defendant) "falsifying" documents or "review[ing] historical stock prices," and does not allege any single fact that possibly suggests that Bradley chose the dates of any backdated option or was involved in any way with the administrative procedures by which the date and pricing of options would be determined.

Plaintiffs further allege that Bradley received "backdated" and "ultra vires" grants of 7000 stock options each on February 25, 2000 and May 11, 2001. Compl. ¶¶ 116, 138. Though Plaintiffs claim that the February 25, 2000 grant was backdated and that the May 11, 2001 grant was "ultra vires," *id.*, a review of documents publicly filed with the SEC demonstrates that both claims are wrong. Those filings explicitly indicate that the Sunrise board met on February 25, 2000 and approved the 2000 stock option plan; thus, the February 25, 2000 grant could not

possibly have been "backdated."  Sunrise Schedule 14A (April 14, 2000), at 20, excerpts

attached as Ex. C hereto.[3]  Similarly, Plaintiffs' claim that Bradley received an options grant on

May 11, 2001 is wrong.  According to Sunrise's SEC filings, Bradley received only one grant of

7000 shares in 2001—on January 9.[4]

Finally, Plaintiffs allege that, between 2005 and 2006, several defendants—not including

Bradley—were involved with "improper accounting" of certain real estate joint ventures.

Compl. ¶¶ 44-57.  The Complaint does not allege a single fact regarding Bradley's participation

in or knowledge of any such "improper accounting."  *See id.*

Based on these allegations, Plaintiffs have asserted the following claims against Bradley:

violations of §§ 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (and Rule 10b-5

promulgated thereunder),[5] "breach of fiduciary duty and/or aiding and abetting," unjust

enrichment, accounting, and rescission.

---

[3] Complete filing available at http://www.sec.gov/Archives/edgar/data/1011064/0000950133-00-001528-index.html.

[4] Sunrise's Schedule 14A filed with the SEC on April 5, 2002, which reports "compensation for directors" in 2001, states that Bradley received one grant of 7000 shares at an exercise price of $20.56 per share in 2001.  Ex. D (excerpts) at 6.  (A complete copy of Exhibit D is available at http://www.sec.gov/Archives/edgar/data/1011064/000095013302001374/0000950133-02-001374-index.htm).  According to Bradley's Form 4, filed July 9, 2001, that grant occurred on January 9, 2001.  Ex. E hereto.

[5] 15 U.S.C. §§ 78j(b), 78n(a), 78t(a), and 17 C.F.R. § 240.10b-5, respectively.

## ARGUMENT

**I.    COUNT I (§ 10(b) AND RULE 10b-5) FAILS TO STATE A CLAIM AS TO DAVID G. BRADLEY.**

**A.    Plaintiffs' § 10(b) and Rule 10b-5 Claims Are Barred by the Statute of Limitations.**

"[T]he statute of limitations for an Exchange Act claim [sounding in fraud, including a claim under section 10(b) or Rule 10b-5,] is the shorter of five years from the occurrence or two years from the time plaintiff had actual or inquiry notice of the claim." *In re Glaxo Smithkline PLC Sec. Litig.*, No. 05 Div. 3751 (LAP), 2006 WL 2871968, at *8 (S.D.N.Y. Oct. 6, 2006); *see also* 28 U.S.C. § 1658(b). The statute is not subject to equitable tolling. *See, e.g., Durning v. Citibank, Int'l*, 990 F.2d 1133, 1136-37 (9th Cir. 1993). In the options backdating context, the "period of repose starts on the date that the option grant was made." *In re Ditech Networks, Inc. Deriv. Litig.*, 2007 WL 2070300, at *7 (N.D. Cal. July 16, 2007) (finding § 10(b) claim "time-barred to the extent that it is based upon . . . actual backdated grants").

Here, Plaintiffs claim that Bradley violated § 10(b) and Rule 10b-5 by "granting . . . backdated and ultra vires stock options to purchase shares of the Company's common stock." Compl. ¶ 320. However, the allegedly backdated options grants at issued occurred between May 2, 1997 and November 12, 2001, and the allegedly "ultra vires" option grants occurred on March 3, 1998 and May 11, 2001. *Id.* ¶¶ 66-85. Because the latest grant at issue is November 12, 2001, the statute of limitations expired on November 12, 2006, before the instant actions were filed. Plaintiffs' § 10(b) claim is therefore time-barred.

**B.    Plaintiffs Fail To Plead Particularized Facts Sufficient To State § 10(b) and Rule 10b-5 Claims Against David G. Bradley.**

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege: "(1) the making of a material misrepresentation, or the use of a manipulative or deceptive device; (2) with scienter

. . . ; (3) in connection with the purchase or sale of a security; (4) reliance by plaintiff; (5) economic loss; and (6) loss causation (proximate cause)." *In re Fed. Nat'l Mortgage Ass'n Sec., Derivative and "ERISA" Litig.* ("*In re Fannie Mae*"), 503 F. Supp. 2d 25, 38 (D.D.C. 2007) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)); *see also Dura Pharm. v. Broudo*, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 1630-31 (2005).

      "Complaints brought under Section 10(b) and Rule 10b-5 are governed by special pleading standards adopted by Congress in the [Private Securities Litigation Reform Act ("PSLRA")]." *In re Fannie Mae*, 503 F. Supp. 2d at 36. Those standards "are unique to securities fraud cases and were adopted in an attempt to curb abuses of this type of litigation." *Id.* The PSLRA contains two heightened pleading requirements: First, a complaint must "specify <u>each</u> misleading statement or omission and specify why the statement or omission was misleading." *Id.* (emphasis added) (citing 15 U.S.C. § 78u-4(b)(1)). In particular, "if an allegation regarding the statement or omission is made on information and belief, <u>the complaint shall state with particularity all facts on which that belief is formed</u>." § 78u-4(b)(1) (emphasis added). Second, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 503 F. Supp. 2d at 37 (quoting 15 U.S.C. § 78u-4(b)(2)). Indeed, "under the PSLRA, any alleged false statements must be set forth with <u>particularity as to each defendant</u>, and <u>scienter must be plead as to each act or omission</u> sufficient to give rise to a strong inference that the defendant acted with at least extreme recklessness." *Id.* at 40 (emphases added); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007) (stating that PSLRA requires "plaintiffs to plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference"). The "extreme recklessness" standard is met only by an "extreme departure from the standards of ordinary

care." 503 F. Supp. 2d at 37 (quoting *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992)).

If either requirement is not met, the court should dismiss the complaint. *Id.* (citing 15 U.S.C. §

78u-4(b)(3)).

Plaintiffs' allegations against Bradley fail to meet the PSLRA's heightened pleading

requirements. In addition to general allegations that Bradley was at various times a member of

Sunrise's Stock Option Committee and Audit Committee, Compl. ¶ 25, Plaintiffs make a number

of conclusory claims regarding Bradley's role in alleged backdating. Principally, Plaintiffs state

that Bradley (as well as a number of other Defendants) "would review historical stock prices

before issuing stock options to determine the date upon which stock prices were significantly

below the current market price. They would then falsify the relevant documents to make it

appear as if the stock options were granted on the earlier date." Compl. ¶ 77. Plaintiffs do not

identify any factual basis for this allegation, but instead make this allegation "upon information

and belief."

As the PSLRA makes clear, and as numerous courts have held, Plaintiffs' unsubstantiated

allegations "upon information and belief" are insufficient to state a claim for a violation of

§ 10(b). Indeed, the PSLRA states that "if an allegation regarding [a] statement or omission is

made on information and belief, the complaint shall state with particularity all facts on which

that belief is formed." § 78u-4(b)(1). Numerous courts have held that a plaintiff must as a result

"provid[e] sufficient documentary evidence and/or a sufficient description of the personal

sources of the plaintiff's beliefs." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126,

147 (3d Cir. 2004) (holding plaintiff's allegations, which included citations to documentary

evidence and references to confidential sources, failed to meet requirements of PSLRA); *Novak

v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("[A] complaint can meet the new pleading

requirement imposed by paragraph (b)(1) by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs."); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 194 (1st Cir. 1999) (holding that "plaintiffs who bring their claims on information and belief [are] to 'set forth the source of the information and the reasons for the belief.'").   Here, Plaintiffs do not identify <u>any</u> source—whether a single document, a single witness, or any other basis—for their baseless claim that Bradley "falsified" documents or had any role in selecting the dates of the allegedly backdated grants.  As the court in *Britton v. Parker*, 2007 WL 2871003, (D. Colo. Sept. 26, 2007) held in dismissing similarly unfounded allegations of participation in backdating, "[t]here are no allegations of any meetings or conversations between . . . [Bradley] and anyone else which gave rise to the Plaintiffs' suspicion that the stock options were backdated.  There are also no allegations of any memoranda, e-mails, or other written documentation to suggest that the stock options were backdated.  There are also no allegations as to any statements made by . . . [Bradley] which could suggest that . . . [Bradley] participated in a backdating scheme."  *Id.* at *7.  In short, Plaintiffs have failed to allege a single specific fact that could possibly tie Bradley to any alleged "falsification" of documents at Sunrise or that could link him to any scheme to backdate stock options.   Plaintiffs' § 10(b) claims against Bradley should be dismissed.

Plaintiffs further allege—again, in conclusory fashion—that numerous Defendants, including Bradley, approved stock option grants "on a date after the reported grant date and knowingly used hindsight to select a date when Sunrise's stock was near" a quarterly or yearly low.  *E.g.*, ¶ 85; *see also, e.g.*, ¶ 86 ("Bradley granted Tomasso stock options dated August 28, 1997 . . . knowing that August 28, 1997 was not the date they actually approved the grants.").  That allegation also fails to "give rise to a 'strong'—i.e., a powerful or cogent—inference" of

scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007). Again, Plaintiffs allege no facts to support their allegation that Bradley was involved in the selection of the date of the allegedly backdated stock option grants, and thus fail to state a claim that he "knowingly" participated in any alleged backdating.

As numerous courts have recognized, the fact that an outside director serves on a Stock Option Committee is not sufficient to support a § 10(b) claim that the outside director was involved in the administrative process by which the option dates and prices are selected. *See In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 965 (N.D. Cal. 2007) (dismissing backdating claims where "plaintiffs ma[d]e no allegations indicating that [compensation committee members] chose the date on which the allegedly backdated options were to be granted or that they knew the grant's true date"); *see also Desimone v. Barrows*, 924 A.2d 908, 939 (Del. Ch. 2007) (finding that while court could infer "that the Compensation Committee approved the amount and recipients of the Officer Grants," it could "infer nothing from the pled facts about whether and to what extent any director was involved in the mechanics by which the options were issued or the dates on which that administrative task was carried out"). Plaintiffs' § 10(b) claim should be dismissed.

Finally, Plaintiffs fail to state a § 10(b) claim against Bradley for "improper accounting treatment for the recognition of profits from real estate joint ventures and gains on the sale of real estate." Compl. ¶ 320. Plaintiffs fail to plead any particularized facts regarding Bradley's involvement in the alleged improper accounting, let alone any facts sufficient to establish that he acted with scienter. Indeed, Plaintiffs do not refer to Bradley even once in their entire discussion of the alleged accounting improprieties. *See* Compl. ¶¶ 44-55 (alleging that "the Klaassens, Newell, Gaul, Rush, Aprahamain, Callen and Donohue forced the Company to make material

misrepresentations regarding the overall performance of the Company and specifically the performance of Sunrise's real estate joint ventures in relationship to the Company's overall performance"). Plaintiffs' § 10(b) claims against Bradley, to the extent premised on alleged accounting improprieties, should likewise be dismissed.

## II.    COUNT II (§ 14(a)) FAILS TO STATE A CLAIM AS TO DAVID G. BRADLEY.

### A.    Plaintiffs' § 14(a) Claim Is Barred by the Statute of Limitations.

"[A] Section 14(a) claim must be filed one year after discovery of the facts constituting the violation, and in no event more than three years following publication of the false statement." *In re Ditech*, 2007 WL 2070300, at *9 (emphasis added); *see also In re Exxon Mobil Corp. Secs. Litig.*, 387 F. Supp. 2d 407, 421 (D.N.J. 2005). "[T]he three-year repose period for Section 14(a) claims begins to run at the time the misleading statement is made." *In re Exxon*, 387 F. Supp. 2d at 421.

Here, Plaintiffs allege Defendants made false statements in proxy statements between April 3, 1998 and April 5, 2002. Compl. ¶¶ 206-215. Under the applicable statute of limitations, those claims expired between April 3, 2001 and April 5, 2005. *See In re Atmel Corp. Deriv. Litig.*, 2007 WL 2070299, at *8 (N.D. Cal. July 16, 2007) ("As currently pled, the Section 14(a) claim alleges false statements made more than three years prior to the filing of this action. Accordingly, the claim will be dismissed . . . ."). Thus, Plaintiffs' § 14(a) claims are time-barred.

### B.    Plaintiffs Fail To Plead Particularized Facts Sufficient To State a § 14(a) Claim Against David G. Bradley.

"[S]ection 14(a) of the Exchange Act . . . prohibit[s] solicitation of a proxy by a statement that contains a false or misleading fact or the omission of a material fact that makes any portion of the statement misleading." *In re U.S. Office Prods. Secs. Litig.*, 326 F. Supp. 2d 68, 80

(D.D.C. 2004). "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff's injury and (3) that the proxy solicitation . . . was an essential link in the accomplishment of the transaction." *In re U.S. Office Products*, 326 F. Supp. 2d at 80 (quoting *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F. Supp. 75, 81-82 (D.D.C. 2003)) (alteration in original). The heightened pleading requirements of the PSLRA apply to § 14(a) claims. *See, e.g.*, *Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674, 682-83 (9th Cir. 2005) ("[T]he PSLRA pleading requirements apply to claims brought under Section 14(a) and Rule 14a-9."); *accord In re U.S. West, Inc. Secs. Litig.*, 65 Fed. Appx. 856, 865 (3rd Cir. 2003); *cf. In re U.S. Office Products*, 326 F. Supp. 2d at 81 (D.D.C. 2004) (applying Rule 9(b) heightened pleading standard to § 14(a) claims).

Here, Plaintiffs' § 14(a) claim fails for two independent reasons. First, Plaintiffs failed to plead that any Sunrise proxy statement contained a "material misrepresentation or omission." The false statements alleged by Plaintiffs in Sunrise's proxy filings each involve alleged backdating. *See* Compl. ¶¶ 206-215. Since Plaintiffs fail to adequately allege any "backdating" scheme, see *supra* at 1-2, their § 14(a) claim must also fail.

Second, as set forth above, Plaintiffs fail to plead with particularity Bradley's involvement in or knowledge of the alleged backdating scheme. *See supra* Part I. Thus, their claims that he was aware of the alleged misrepresentations in the proxies regarding alleged backdating fail. Plaintiffs' § 14(a) claim against Bradley should be dismissed.

## III.    COUNT III (§ 20(a)) FAILS TO STATE A CLAIM AS TO DAVID G. BRADLEY.

### A.    Plaintiffs' § 20(a) Claim Is Barred by the Statute of Limitations.

Under § 20(a), "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable

jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Because Section 20 merely creates a derivative liability for violations of other sections of the Act, claims under Section 20 are governed by the limitations periods for those other sections." *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 n.2 (2d Cir. 1993). Here, Plaintiffs allege violations of §§ 10(b) and 14(a) of the Exchange Act. Thus, for the reasons set forth above, their derivative § 20(a) claims are barred under the statutes of limitations applicable to their primary §§ 10(b) and 14(a) claims. *See, e.g.*, *In re MBIA Inc.*, 2007 WL 473708, at *9 (S.D.N.Y. Feb. 14, 2007) ("Because the direct claims under Section 10(b) and Rule 10b-5 are time barred, the Section 20(a) claims must also be dismissed.").

### B.    Plaintiffs Fail To Plead That Sunrise Engaged in a Primary Violation.

"In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant." *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Moreover, "to state a Section 20(a) claim, plaintiffs must adequately plead 'culpable participation' on the part of the [controlling persons] in the underlying primary securities violation." *In re Fannie Mae*, 503 F. Supp. 2d at 44. Plaintiffs fail to allege any facts suggesting (1) that Sunrise (the alleged controlled person) engaged in a primary violation, (2) that Bradley (an alleged controlling person) was a culpable participant therein, or (3) that Bradley had control of Sunrise.

To state a claim for a § 20(a) violation, Plaintiffs must plead a primary violation of the Securities Exchange Act of 1934 by the controlled person—here, Sunrise. 15 U.S.C. § 78t(a); *First Jersey Secs.*, 101 F.3d at 1472. A party that fails to establish a primary violation cannot

sustain a § 20(a) claim.  *See, e.g.*, *Leykin v. AT & T Corp.*, 216 Fed. Appx. 14, 17 (2d Cir. 2007)

("Because plaintiffs have failed to allege primary violations of § 10b or § 14(a), their claims of

control person liability under § 20(a) must also fail.").

Plaintiffs fail to plead a primary violation.  The Complaint includes only two potential

"primary violations"—§§ 10(b) and 14(a).  However, the Complaint does not state a claim for a

violation of either.  *See supra* Parts I and II.  As a result, Plaintiffs' § 20(a) claim should be

dismissed.  *See Ezra Charitable Trust v. Tyco Intern., Ltd.*, 466 F.3d 1, 13 (1st Cir. 2006) ("Our

rejection of the § 10(b) claims . . . dooms the plaintiffs' claims against the defendants under

§ 20(a).").

### C.    Plaintiffs Plead No Facts Suggesting Bradley Was a Culpable Participant in Any Alleged Primary Violations.

"[T]o plead culpable participation under Section 20(a), [a plaintiff] must plead, at a

minimum, 'particularized facts' of a defendant's culpable participation, because the Reform

Act's heightened pleading standard applies to 'any private action arising under this chapter in

which the plaintiff may recover money damages only on proof that the defendant acted with a

particular state of mind.'"  *In re Fannie Mae*, 503 F. Supp. 2d at 45; *see also Walker v. Cardinal

Sav. and Loan Ass'n*,  690 F. Supp. 494, 501 (E.D. Va. 1988) ("In the controlling persons

context, plaintiffs must plead each defendant outside director's authority to participate in or

effect the type of primary violation alleged, and that director's culpable conduct on the specific

occasion in question.").

Here, Plaintiffs do not allege any particularized facts showing that Bradley had any role

in any alleged primary violation by Sunrise.  Because Plaintiffs have not alleged sufficient

particularized facts regarding Bradley's role in the alleged backdating, they have failed to plead

that Bradley was a culpable participant in, or exercised any control over, the options grants at

issue.  Similarly, Plaintiffs do not allege a single fact connecting Bradley to the purportedly misleading § 14(a) proxy statements.  In particular, they do not allege particularized facts sufficient to support an inference that he was aware of any alleged backdating.  Plaintiffs therefore have failed to plead that Bradley was a culpable participant in Sunrise's alleged violations.

### D.    Bradley Was Not a "Controlling Person" of Sunrise.

Plaintiffs also fail to plead facts sufficient to establish that Bradley was a "controlling person" of Sunrise.  Plaintiffs' only argument is that defendants, "by virtue of their positions with Sunrise and their specific acts, were . . . controlling persons of Sunrise."  Compl. ¶ 329.  That conclusory statement is not enough: "[t]he assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003).  Moreover, Plaintiffs do not allege what "specific acts" Bradley engaged in that gave him influence over the operations of the company.  The § 20(a) claim against Bradley should be dismissed.

## IV.    COUNTS V AND VI (BREACH OF FIDUCIARY DUTY AND/OR AIDING AND ABETTING) FAIL TO STATE A CLAIM AS TO DAVID G. BRADLEY.

To state a claim for breach of fiduciary duty under Delaware law, Plaintiffs must plead either breach of the duty of care or breach of the duty of loyalty.  *See, e.g.*, *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  Here, Plaintiffs claim that Bradley violated those duties by participating in fraudulent backdating and fraudulent accounting of backdated stock options at Sunrise.  Because Plaintiffs fail to allege particularized facts regarding Bradley's role in or

knowledge of the alleged backdating, Plaintiffs fail to state a claim that Bradley violated either duty.

### A.    Plaintiffs Do Not State a Claim for Breach of the Duty of Care.

When a fiduciary duty claim sounds in fraud, it is subject to the heightened pleading standards of Rule 9(b).  *See, e.g.*, *In re Ditech*, 2007 WL 2070300, at *10 (holding Rule 9(b) standard applied when options backdating claim sounds in fraud).  Here, Plaintiffs claim that defendants "had actual knowledge of the fraud set forth herein" and were "directly responsible for the fraud alleged herein," Compl. ¶ 319.  Those allegations clearly sound in fraud.  *See also id.* ¶¶ 320, 321, 352.  Under Rule 9(b), "the pleader [must] . . . state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud . . . [and must] identify individuals allegedly involved in the fraud." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (citations omitted) (second alteration in original).

Plaintiffs fail to satisfy that heightened pleading standard.[6]  As set forth above, Plaintiffs offer no specific factual allegations as to any participation by Bradley in the alleged backdating scheme, or any improper accounting related to stock option grants.  Instead, the Complaint offers only bare assertions—not supported by a single pleaded objective fact—that Bradley falsified records and participated in a scheme to choose backdated option grant dates.  Such unsupported allegations are not sufficient to state a claim.

Further, Sunrise's Certificate of Incorporation expressly exculpates Bradley from any liability for breaches of the duty of care.  In relevant part, the Certificate states that "[n]o director

---

[6] Even under Rule 12(b)(6), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citation omitted).  Plaintiffs' allegations fail under the Rule 12(b)(6) standard as well.

of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director . . . ."  Ex. F § 6.2.  Delaware law recognizes that such exculpatory provisions shield directors from claims alleging breach of the duty of care.  *See* 8 Del. C. § 102(b)(7).  Thus, Plaintiffs' claim for a violation of the duty of care against Bradley fails.

**B.      Plaintiffs Do Not State a Claim for Breach of the Duty of Loyalty.**

Directors who are protected by an exculpation clause "can only be held liable [for breach of fiduciary duty] if they act with a state of mind that is disloyal to their obligations to the corporation."  *Desimone*, 924 A.2d at 933.  In the backdating context, "that would likely require a finding that the compensation committee knew that the options violated the stock option plan and that the options were being accounted for in a manner that was improper, or that their failure to obtain that information resulted from their knowing abdication of their directorial duties."  *Id.*

Here, Plaintiffs fail to allege any specific facts that support their assertion that Bradley knew that the challenged option grants violated Sunrise's stock option plan or that they were being accounted for in an improper manner.   Indeed, the only facts upon which Plaintiffs base their assertion that Bradley was aware of, and engaged in, the alleged backdating are that (1) he served on the Stock Option Committee, (2) was aware of the terms of the operative Sunrise stock option plans; and (3) knew that backdating options violated those plans.  *E.g.*, Compl. ¶¶ 25, 85.  Those general facts are insufficient to state a breach of fiduciary duty claim.  *See Desimone*, 924 A.2d at 938 (finding "vague and conclusory statement [that outside directors served on compensation committee] does not suggest in any way that the Compensation Committee was involved in or had knowledge of any backdating").  Moreover, under Delaware law "[a] member of the board of directors . . . shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation, and in good faith upon such

information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees or committees of the board of directors." 8 Del. C. § 141(e). Plaintiffs allege no facts suggesting that Bradley did not rely in good faith upon the corporation's officers and employees during his service on the Committees, or that Bradley, as opposed to Sunrise officers and employees, handled the mechanics by which dates and prices were assigned to option grants once approved by the Stock Option Committee.

Plaintiffs also allege that the Defendants breached an alleged duty to "maintain[] and establish[] adequate internal accounting controls for the Company." Compl. ¶ 42. However, in order to state a claim for failure to exercise proper oversight, a plaintiff must allege a "sustained or systemic failure of the board to exercise oversight . . . [that] will establish the lack of good faith that is a necessary condition to liability." *In re Caremark Int'l*, 698 A.2d 959, 971 (Del. Ch. 1996). That claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* at 967.

To state a *Caremark* claim, "a plaintiff must plead the existence of facts suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed." *Desimone*, 924 A.2d at 940. Plaintiffs clearly fail to satisfy this high pleading standard. Indeed, Plaintiffs allege that four other defendants—not including Bradley—were principally responsible for any alleged *Caremark* violations. Compl. ¶ 42. In any event, the Complaint does not allege which internal controls were inadequate, that Bradley knew they were inadequate, that Bradley knew the inadequacies could result in illegal or materially harmful behavior, or that Bradley chose to do nothing about such inadequacies. Plaintiffs' breach of fiduciary duty claim should be dismissed for failure to state a claim.

-18-

#### C.    Plaintiffs Do Not State a Claim for Aiding and Abetting.

"Under Delaware law, in order to state a valid claim for aiding and abetting a breach of fiduciary duty, plaintiffs must allege [*inter alia*] . . . 'a defendant, who is not a fiduciary, knowingly participated in a breach . . . .'" *In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *23 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).  Plaintiffs have failed to allege that Bradley knowingly participated in any breach of fiduciary duty by any Defendant. Moreover, "Plaintiff has not pled the existence of a defendant who is not already a fiduciary . . . ." *In re Zoran Corp. Derivative Litig.*, 2007 WL 1650948, at *26 (N.D. Cal. June 5, 2007) (dismissing aiding and abetting breach of fiduciary claim).  Plaintiffs' aiding and abetting breach of fiduciary duty claim should be dismissed.

### V.    COUNTS VII AND IX (UNJUST ENRICHMENT) FAIL TO STATE A CLAIM AS TO DAVID G. BRADLEY.

Plaintiffs' claim for unjust enrichment against Bradley fails for several reasons.  Under Delaware law, "[t]he elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1056 (Del. Super. 2001).  "To obtain restitution, the plaintiffs [a]re required to show that the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit." *Schock v. Nash*, 732 A.2d 217, 232 (Del. Super. 1999).

Plaintiffs allege the "recipients of backdated stock options were unjustly enriched by their receipt and retention of backdated stock option grants."  Compl. ¶ 349.  Similarly, they claim that the "Ultra Vires Option Recipient Defendants were unjustly enriched by their receipt and

retention of ultra vires stock option grants and the proceeds they received through exercising ultra vires stock options." *Id.* ¶ 355. Those claims fail for the following reasons:

First, Plaintiffs plead no facts supporting an inference that Bradley received backdated or "ultra vires" stock options. The Complaint alleges he received grants of 7000 stock options each on February 25, 2000 and May 11, 2001. *Id.* ¶¶ 74, 85. However, the Sunrise Board adopted the 2000 stock option plan on February 25, 2000—the same day as the alleged "backdated" grant. Ex. C at 16. Thus, that grant date does not support an inference of backdating. *See In re CNET*, 483 F. Supp. 2d at 960 (finding no inference of backdating where grant coincided with "occurrence of an event in the company"). Moreover, the alleged "ultra vires" grant on May 11, 2001 to Bradley never occurred. Bradley received in 2001 only one grant of 7000 shares—on January 9, 2001, at an exercise price of $20.56 per share. *See supra* at 5 & n.4. Plaintiffs' allegations wholly fail to suggest Bradley received either "backdated" or "ultra vires" options.

Second, Plaintiffs have not pleaded facts supporting the element of impoverishment. Plaintiffs' theory that Sunrise suffered a "loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant," Compl. ¶ 321, is inapplicable because Plaintiffs have failed to allege that Bradley received either backdated or "ultra vires" options. Moreover, option grants are a form of compensation for services rendered to the corporation. Here, Plaintiffs allege no facts suggesting that Bradley was not entitled to the grants he received. *Cf. Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *7 (Del. Ch. Mar. 17, 2006) ("[A]s a matter of law, the court cannot reasonably conclude that the defendants were unjustly enriched when [defendants] received compensation

for providing services to Motient pursuant to a contractual agreement approved by the Motient board.").

Third, there is no absence of a remedy provided by law. Unjust enrichment is a fall-back remedy, "developed . . . as a theory of recovery to remedy the absence of a formal contract." *Palese v. Del. State Lottery Office*, 2006 WL 1875915, at *5 (Del. Ch. June 29, 2006). The many other counts Plaintiffs advance here predicated upon the same basic claim—alleged backdating—make clear that there would be numerous remedies at law available if the allegations did sufficiently allege a cognizable claim (which they do not).

## VI.   COUNTS IV, VIII, AND X (RESCISSION AND ACCOUNTING) FAIL TO STATE A CLAIM AS TO DAVID G. BRADLEY.

Plaintiffs' additional claims of rescission and accounting are founded upon Bradley's alleged receipt of backdated options, or his involvement in an alleged scheme to backdate stock options. Those claims each fail for the same reasons that Plaintiffs' other claims fail: Plaintiffs do not sufficiently allege that any of the stock option grants were backdated, that Bradley had any role in the alleged backdating, or that he received any backdated (or "ultra vires") options.

Moreover, both "claims" are simply remedies, not cognizable theories of relief. *E.g.*, *In re Zoran*, 2007 WL 1650948, at *26 (dismissing rescission claim because "rescission is a form of remedy, not a claim under the law."); *Empire Fin. Servs., Inc. v. Bank of N.Y.*, 2003 WL 22701442, at *2 (Del. Super. Nov. 13, 2003) (granting motion for judgment on pleadings on "accounting" claim because "accounting is a form of relief, not a cause of action"). Plaintiffs' rescission and accounting "claims," as well as all other counts against Bradley, should be dismissed.

### **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed.


Respectfully submitted,

WILLIAMS & CONNOLLY LLP


/s/      Scott K. Dasovich
Philip A. Sechler (D.C. Bar No. 426358)
Scott K. Dasovich (D.C. Bar No. 975575)
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (fax)

*Counsel for Defendant David G. Bradley*

Dated: June 16, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 16, 2008, copies of the foregoing David G. Bradley's Motion to Dismiss the Amended Consolidated Shareholder Derivative Complaint, the Memorandum of Points and Authorities in support thereof, and proposed Order were served via electronic filing and/or first-class United States mail, postage pre-paid, upon the following:

HOGAN & HARTSON, LLP
George H. Mernick, III
Columbia Square
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5726
Facsimile: (202) 637-5910

N. Thomas Connally
Jon M. Talotta
8300 Greensboro Drive, Suite 1100
McLean, VA 22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200

*Counsel for Nominal Defendant*
*Sunrise Senior Living, Inc.*

GIBSON, DUNN & CRUTCHER LLP
John C. Millian
Matthew R. Estabrook
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for Defendants Carl Adams, Ronald*
*V. Aprahmian, Craig R. Callen, Thomas J.*
*Donohue, Richard A. Doppelt, David W.*
*Faeder, John F. Gaul, J. Douglas Holladay,*
*Larry E. Hulse, Paul L. Klaassen, Teresa M.*
*Klaassen, Pete A. Klisares, William Little, J.*
*Willard Marriott, Jr., Scott F. Meadow, Darcy*
*Moore, Thomas B. Newell, Robert R. Slager,*
*Christian B.A. Slavin, Timothy S. Smick, Brian*
*C. Swinton and Tiffany L. Tomasso*

DAVIS, COWELL & BOWE, LLP
George R. Murphy
Mark Hanna
Joni S. Jacobs
1701 K Street NW, Suite 210
Washington, DC 20006
Telephone: (202) 223-2620
Facsimile: (202) 223-8651

*Liaison Counsel for Plaintiffs*

AKIN GUMP STRAUSS HAUER & FELD,
LLP
John M. Dowd
Paul W. Butler
Jeffrey M. King
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

*Counsel for Defendant Bradley B. Rush*

SCHIFFRIN BARROWAY TOPAZ &
KESSLER, LLP
Lee Rudy
Eric Lechtzin
J. Daniel Albert
280 King of Prussia Road
Radnor, PA  19087
Telephone (610) 667-7706
Facsimile: (610) 667-7056

SAXENA WHITE, P.A.
Maya Saxena
Joseph E. White, III
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

ROBBINS, UMEDA & FINK, LLP
Brian J. Robbins
Felipe J. Arroyo
Ashley R. Palmer
610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

*Co-Lead Counsels for Plaintiff*

/s/      Scott K. Dasovich
Scott K. Dasovich

# EXHIBIT A



# SUNRISE SENIOR LIVING INC (SRZ)

7902 WESTPARK DR
MCLEAN, VA 22102
703. 273.7500
http://www.sunrise-al.com

# 8-K

**FORM 8-K**
**Filed on 03/18/2005 – Period: 03/14/2005**
File Number 001-16499



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

# FORM 8−K

**CURRENT REPORT PURSUANT TO SECTION 13 OR 15 (d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): **March 14, 2005**

# SUNRISE SENIOR LIVING, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **1−16499** | **54−1746596** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**7902 Westpark Drive**
**McLean, Virginia 22102**
(Address of principal executive offices) (Zip Code)

**(703) 273−7500**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8−K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a−12 under the Exchange Act (17 CFR 240.14a−12)

☐ Pre−commencement communications pursuant to Rule 14d−2(b) under the Exchange Act (17 CFR 240.14d−2(b))

☐ Pre−commencement communications pursuant to Rule 13e−4(c) under the Exchange Act (17 CFR 240.13e−4(c))

**Item 5.02. Departure of Directors.**

On March 14, 2005, Mr. David G. Bradley informed the Board of Directors of Sunrise Senior Living, Inc. (the "Company") that he will be concluding his tenure as a member of the Board of Directors of the Company upon the expiration of his current term, which term expires at the 2005 annual meeting of stockholders of the Company.

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SUNRISE SENIOR LIVING, INC.
(Registrant)

Date: March 18, 2005

By:   /s/ Thomas B. Newell
Thomas B. Newell
President

3

# EXHIBIT B



# SUNRISE SENIOR LIVING INC (SRZ)

7902 WESTPARK DR
MCLEAN, VA 22102
703. 273.7500
http://www.sunrise-al.com

# DEF 14A

**DEFINITIVE PROXY STATEMENT FOR SUNRISE SENIOR LIVING, INC.**
**Filed on 04/07/2005 − Period: 05/11/2005**
File Number 001−16499



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a) of the Securities**
**Exchange Act of 1934 (Amendment No.  )**

Filed by the Registrant ☑
Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement
☐ Confidential, for Use of the Commission Only (as permitted by
  Rule 14a–6(e)(2))
☑ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to §240.14a–12

---

**Sunrise Senior Living, Inc.**

---

(Name of Registrant as Specified in Its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a–6(i)(4) and 0–11.

(1) Title of each class of securities to which transaction applies:

---

(2) Aggregate number of securities to which transaction applies:

---

(3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (Set forth the
    amount on which the filing fee is calculated and state how it was determined):

---

(4) Proposed maximum aggregate value of transaction:

---

(5) Total fee paid:

---

☐  Fee paid previously with preliminary materials.

☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0–11(a)(2) and identify the filing for which
   the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or
   schedule and the date of its filing.

(1) Amount previously paid:

---

(2) Form, schedule or registration statement no.:

---

(3) Filing party:

---

(4) Date filed:

---

**SUNRISE SENIOR LIVING, INC.**
7902 Westpark Drive
McLean, VA 22102
(703) 273–7500

April 7, 2005

Dear Stockholder:

You are cordially invited to attend the 2005 annual meeting of stockholders of Sunrise Senior Living, Inc. to be held on Wednesday, May 11, 2005, at 9:00 a.m., at The Hilton McLean, 7920 Jones Branch Drive, McLean, Virginia.

The annual meeting has been called for the following purposes:

- to elect two directors for terms of three years each;

- to approve an amendment to Sunrise's employee stock purchase plan to increase the aggregate number of shares of Sunrise's common stock that may be made available for purchase under the plan from 300,000 shares to 1,050,000 shares; and

- to transact such other business as may properly come before the annual meeting or any adjournments or postponements of the meeting.

It is important that your shares be represented at the annual meeting. Whether or not you plan to attend the annual meeting, you are requested to complete, date, sign and return the enclosed proxy card in the enclosed postage–paid envelope.

Very truly yours,

Paul J. Klaassen
Chairman of the Board
and Chief Executive Officer

**SUNRISE SENIOR LIVING, INC.**
7902 Westpark Drive
McLean, VA 22102
(703) 273–7500

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
### TO BE HELD ON MAY 11, 2005

NOTICE IS HEREBY GIVEN that the 2005 annual meeting of stockholders of Sunrise Senior Living, Inc. will be held at The Hilton McLean, 7920 Jones Branch Drive, McLean, Virginia on Wednesday, May 11, 2005 at 9:00 a.m., for the following purposes:

(1) to elect two directors of Sunrise for three–year terms and until their successors shall have been elected and qualified;

(2) to approve an amendment to Sunrise's employee stock purchase plan to increase the aggregate number of shares of Sunrise's common stock that may be made available for purchase under the plan from 300,000 shares to 1,050,000 shares; and

(3) to transact such other business as may properly come before the meeting or any adjournments or postponements of the meeting.

The board of directors has fixed March 15, 2005 as the record date for the determination of stockholders entitled to notice of and to vote at the annual meeting and any adjournments or postponements. Only stockholders of record at the close of business on that date are entitled to notice of and to vote at the annual meeting. All stockholders are cordially invited to attend the annual meeting.

In the event that there are not sufficient votes to approve the foregoing proposals at the time of the annual meeting, the annual meeting may be adjourned or postponed to permit further solicitation of proxies by Sunrise.

By Order of the Board of Directors,

Paul J. Klaassen
Chairman of the Board
and Chief Executive Officer

McLean, Virginia
April 7, 2005

**Whether or not you plan to attend the annual meeting, you are urged to complete, sign, date and return the enclosed proxy in the accompanying pre–addressed, postage–paid envelope. Your proxy may be revoked prior to the voting by filing with the secretary of Sunrise a written revocation or a duly executed proxy bearing a later date or by attending the annual meeting and voting in person.**

**SUNRISE SENIOR LIVING, INC.**
7902 Westpark Drive
McLean, VA 22102
(703) 273−7500

---

**PROXY STATEMENT**
**2005 ANNUAL MEETING OF STOCKHOLDERS**
**MAY 11, 2005**

---

## SOLICITATION, VOTING AND REVOCABILITY OF PROXIES

This proxy statement is furnished to stockholders of Sunrise Senior Living, Inc. in connection with the solicitation by the board of directors of Sunrise of proxies to be used at the 2005 annual meeting of stockholders, to be held at The Hilton McLean, 7920 Jones Branch Drive, McLean, Virginia on Wednesday, May 11, 2005 at 9:00 a.m., and at any adjournments or postponements of the meeting.

If the enclosed form of proxy is properly executed and returned to Sunrise in time to be voted at the annual meeting, the shares represented by the proxy will be voted consistent with the instructions marked on the proxy. **Executed but unmarked proxies will be voted (a) FOR the election of the board of directors' two nominees as directors and (b) FOR the approval of an amendment to Sunrise's employee stock purchase plan to increase the aggregate number of shares of Sunrise's common stock that may be made available for purchase under the plan from 300,000 shares to 1,050,000 shares.** If any other matters are properly brought before the annual meeting, the persons named in the accompanying proxy will vote the shares represented by the proxies on the other matters in the manner recommended by Sunrise's board of directors, or, if no such recommendation is given, in the discretion of the proxy holders. The presence of a stockholder at the annual meeting will not automatically revoke a stockholder's proxy. Stockholders may, however, revoke a proxy at any time prior to its exercise by filing with the secretary of Sunrise a written revocation or a duly executed proxy bearing a later date or by attending the annual meeting and voting in person.

It is anticipated that this proxy statement will be mailed to stockholders on or about April 7, 2005. Sunrise will pay for the cost of soliciting proxies. In addition to soliciting proxies by mail, Sunrise, through its directors, officers and regular employees, may also solicit proxies personally or by telephone or telegraph. Sunrise also will request persons, firms and corporations holding shares in their names, or in the name of their nominees, to send proxy materials to and obtain proxies from beneficial owners and will reimburse these holders for their reasonable expenses in so doing. Sunrise also has retained Georgeson Shareholder, a proxy soliciting firm, to assist with the solicitation of proxies for a fee not to exceed $5,500, plus reimbursement for out−of−pocket expenses.

The securities which can be voted at the annual meeting consist of shares of common stock of Sunrise, par value $.01 per share. Each share entitles its owner to one vote on all matters. Sunrise's restated certificate of incorporation does not provide for cumulative voting in the election of directors. The close of business on March 15, 2005 has been fixed by the board of directors as the record date for determination of stockholders entitled to vote at the annual meeting. The number of shares of common stock outstanding on that date was 20,809,817.

The presence, in person or by proxy, of at least a majority of the outstanding shares of common stock entitled to vote at the annual meeting is necessary to constitute a quorum at the annual meeting. Stockholders' votes will be tabulated by the persons appointed by the board of directors to act as inspectors of election for the annual meeting. Abstentions and broker non−votes will be treated as shares that are present, in person or by proxy, and entitled to vote, for purposes of determining the presence of a quorum at the annual meeting. Abstentions will have the same effect as a negative vote on Proposal 2. Broker non−votes will not be counted as a vote cast or entitled to vote on any matter presented.

If you and other residents at your mailing address own common stock in street name, your broker or bank may have sent you a notice that your household will receive only one annual report to stockholders and proxy statement for each company in which you hold shares through that broker or bank. This practice of sending only one copy of proxy materials is known as "householding." If you did not respond that you did not want to participate in householding, you were deemed to have consented to the process. If the foregoing procedures apply to you, your broker has sent one copy of our annual report to stockholders and proxy statement to your address. You may revoke your consent to householding at any time by sending your name, the name of your brokerage firm, and your account number to Householding Department, 51 Mercedes Way, Edgewood, NY 11717 (telephone number: 1–800–542–1061). The revocation of your consent to householding will be effective 30 days following its receipt. In any event, if you did not receive an individual copy of this proxy statement or our annual report to stockholders, we will deliver promptly a copy to you if you address your written request to or call Sunrise Senior Living, Inc., 7902 Westpark Drive, McLean, Virginia 22102, Attention: Investor Relations (telephone number: 703–273–7500). If you are receiving multiple copies of our annual report and proxy statement, you can request householding by contacting Sunrise Senior Living, Investor Relations in the same manner.

**ELECTION OF DIRECTORS**
**(Proposal 1)**

Sunrise's restated certificate of incorporation provides for a minimum of two directors and a maximum of 11 directors. The board of directors of Sunrise currently consists of eight members, however, the size of the board of directors has been reduced to seven members, effective as of the annual meeting. The directors are divided into three classes, each consisting of approximately one–third of the total number of directors. The term of office of only one class expires in each year and their successors are elected for terms of three years and until their successors are elected and qualified. At the annual meeting, two directors will be elected, both for a three–year term. As described below, the board of directors' nominees are Ronald V. Aprahamian and Teresa M. Klaassen. **The board of directors recommends that you vote FOR the board of directors' two nominees for election as directors.**

Unless otherwise specified on the proxy, it is the intention of the persons named in the proxy to vote the shares represented by each properly executed proxy for the election as directors of Mr. Aprahamian and Ms. Klaassen for three–year terms. The board of directors believes that these nominees will stand for election and will serve if elected as directors, however, there is no assurance that these nominees will serve if elected. If any person nominated by the board of directors fails to stand for election or is unable to accept election, the proxies will be voted for the election of another person or persons as Sunrise's board of directors shall recommend, or, if no such recommendation is given, in the discretion of the proxy holders. Under Sunrise's bylaws, directors are elected by plurality vote.

2

EXHIBIT C



# SUNRISE SENIOR LIVING INC (SRZ)

7902 WESTPARK DR
MCLEAN, VA 22102
703. 273.7500
http://www.sunrise-al.com

# DEF 14A

**DEFINITIVE PROXY STATEMENT**
**Filed on 04/14/2000 – Period: 05/12/2000**
File Number 000-20765



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

1

```
                         SCHEDULE 14A
                         (RULE 14A-101)

              INFORMATION REQUIRED IN PROXY STATEMENT

                      SCHEDULE 14A INFORMATION
      PROXY STATEMENT PURSUANT TO SECTION 14(A) OF THE SECURITIES
                   EXCHANGE ACT OF 1934 (AMENDMENT NO.  )
```

Filed by the Registrant [X]

Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ] Preliminary Proxy Statement      [ ] Confidential, for Use of the
                                         Commission Only (as permitted by
                                         Rule 14a-6(e)(2))

[X] Definitive Proxy Statement

[ ] Definitive Additional Materials

[ ] Soliciting Material Pursuant to Rule 14a-11(c) or Rule 14a-12

                    Sunrise Assisted Living, Inc.
--------------------------------------------------------------------------
             (Name of Registrant as Specified in Its Charter)

--------------------------------------------------------------------------
  (Name of Person(s) Filing Proxy Statement if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

   [X] No fee required.

   [ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and
0-11.

   (1) Title of each class of securities to which transaction applies:

--------------------------------------------------------------------------

   (2) Aggregate number of securities to which transaction applies:

--------------------------------------------------------------------------

   (3) Per unit price or other underlying value of transaction computed
       pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the
       filing fee is calculated and state how it was determined):

--------------------------------------------------------------------------

   (4) Proposed maximum aggregate value of transaction:

--------------------------------------------------------------------------

   (5) Total fee paid:

--------------------------------------------------------------------------

   [ ] Fee paid previously with preliminary materials.

   [ ] Check box if any part of the fee is offset as provided by Exchange Act
       Rule 0-11(a)(2) and identify the filing for which the offsetting fee
       was paid previously. Identify the previous filing by registration
       statement number, or the form or schedule and the date of its filing.

   (1) Amount previously paid:

--------------------------------------------------------------------------

   (2) Form, schedule or registration statement no.:

--------------------------------------------------------------------------

   (3) Filing party:

--------------------------------------------------------------------------

   (4) Date filed:

--------------------------------------------------------------------------

24

A company owned by Paul J. Klaassen owns an airplane used by Mr. Klaassen and, from time to time, other Sunrise employees for business travel. In April 2000, Sunrise reimbursed Potomac Pilots, the company that operates the airplane for Mr. Klaassen, $76,433 for fuel and other costs of operating the airplane for Sunrise business travel during 1999.

For a description of certain other transactions involving Sunrise and its directors, see "Compensation Committee Interlocks and Insider Participation."

APPROVAL OF
2000 STOCK OPTION PLAN
(PROPOSAL 2)

On February 25, 2000, the board of directors adopted the 2000 stock option plan, subject to approval of stockholders at the annual meeting. As of that date, there were approximately 1,400 directors, officers and employees of Sunrise and its subsidiaries who would be eligible to participate in the 2000 stock option plan.

The principal provisions of the 2000 stock option plan are summarized below. This summary is not complete and is qualified in its entirety by the terms of the 2000 stock option plan, a copy of which is attached to this proxy statement as Exhibit A.

DESCRIPTION OF 2000 STOCK OPTION PLAN

The 2000 stock option plan will be administered by the stock option committee. A total of 500,000 shares of common stock will be reserved for issuance under the 2000 stock option plan. All directors, officers and employees of Sunrise or any subsidiary, and any consultant or adviser providing bona fide services to Sunrise or any subsidiary, whose participation in the 2000 stock option plan is determined by the stock option committee to be in the best interests of Sunrise will be eligible to receive option grants under the plan. The 2000 stock option plan does not have a termination date, but the grant of a qualified stock option within the meaning of Section 422 of the Internal Revenue Code may not occur more than ten years after February 25, 2000, the effective date of the plan. Only employees may be granted qualified stock options.

The option exercise price of options granted under the 2000 stock option plan will be fixed by the stock option committee when the option is granted. However, the per share option exercise price may not be less than the fair market value of Sunrise common stock on the date of grant, as determined under the plan. Options to purchase no more than 250,000 shares of common

20

25

stock may be granted to any one eligible individual during the first ten years after the effective date of the 2000 stock option plan and 100,000 shares per year thereafter. The stock option committee may modify or waive any limitation or condition imposed at the time of grant on the vesting or exercise of an option, including to accelerate or extend the period during which an option may be exercised.

No person may receive a qualified stock option if, at the time of grant, the person owns directly or indirectly more than 10% of the total combined voting power of Sunrise unless the option price is at least 110% of the fair market value of the common stock and the exercise period of the qualified stock option is by its terms limited to five years. There is also a $100,000 limit on the value of common stock, determined at the time of grant, covered by qualified stock options that first become exercisable by an optionee in any calendar year. No option granted to a reporting person under Section 16 of the Securities Exchange Act may be exercisable during the first six months after the date of grant.

Payment for shares purchased under the 2000 stock option plan may be made: (a) in cash; (b) if permitted by the option agreement, by exchanging shares of common stock with a fair market value equal to or less than the total option price plus cash for any difference; (c) if permitted by the option agreement, by delivery of a promissory note of the person exercising the option; (d) if permitted by the option agreement, by causing Sunrise to withhold shares of common stock otherwise issuable upon the exercise of the option; or (e) by a combination of the foregoing. Payment in full of the option price need not accompany the written notice of exercise if the notice directs that the stock certificate for the shares for which the option is exercised are to be delivered to a licensed broker acceptable to Sunrise as the agent for the individual exercising the option and, at the time the stock certificate is delivered, the broker pays to Sunrise the option price.

In the event of stock splits, stock dividends, recapitalizations, combinations of shares and similar events, the 2000 stock option plan provides for adjustment of the number of shares available for grant, including the limitation on the number of shares subject to options that may be granted to eligible individuals, and the number of shares and the per share exercise price for shares subject to unexercised options. Upon any dissolution or liquidation of Sunrise, the sale of substantially all of Sunrise's assets, a merger, reorganization or consolidation in which Sunrise is not the surviving corporation or any other transaction approved by the board of directors which results in any person or entity owning 80% or more of the total combined voting power of all classes of stock of Sunrise, the 2000 stock option plan and

21

26

the options granted under the plan will terminate, unless provision is made for the continuation of the plan, the assumption of outstanding options or the substitution of new options of the successor corporation or a parent or subsidiary.

Options granted under the 2000 stock option plan generally are non-transferable except by will or by the laws of descent and distribution upon the death of the option holder.

The board of directors may terminate or amend the 2000 stock option plan at any time. However, any plan amendment, which, if not approved by Sunrise's stockholders, would cause the plan not to comply with Sections 162(m) or 422 of the Internal Revenue Code must be approved by stockholders by the affirmative vote of stockholders who hold more than 50% of the combined voting power of the outstanding shares of voting stock of Sunrise present or represented, and entitled to vote thereon, at a duly constituted stockholders' meeting.

Based on the closing price of $14.56 per share on March 13, 2000, the aggregate market value of the 500,000 shares of common stock reserved for issuance under the 2000 stock option plan is $7.3 million. In addition to the 2000 stock option plan, Sunrise has several other stock options plans adopted in prior years. A total of 6,898,900 shares are reserved for issuance under these plans, of which 5,814,373 shares have been granted, net of forfeitures, as of March 13, 2000. In January 1995, Sunrise also made a non-plan option grant to Mr. Faeder for 450,000 shares of common stock. As of December 31, 1999, all of these options had been exercised.

FEDERAL INCOME TAX CONSEQUENCES

The grant of an option will not be a taxable event for the optionee or Sunrise.

Qualified Stock Options. An optionee will not recognize taxable income upon exercise of a qualified stock option, except that the alternative minimum tax may apply and any gain realized upon a disposition of shares of stock received upon the exercise of a qualified stock option will be taxed as long-term capital gain if the optionee holds the shares for at least two years after the date of grant and for one year after the date of exercise. Sunrise will not be entitled to any business expense deduction with respect to the exercise of a qualified stock option, except as discussed below.

For the exercise of an option to qualify for the foregoing tax treatment, the optionee generally must be an employee of Sunrise or a subsidiary from the

22

EXHIBIT D



# SUNRISE SENIOR LIVING INC (SRZ)

7902 WESTPARK DR
MCLEAN, VA 22102
703. 273.7500
http://www.sunrise-al.com

# DEF 14A

**SUNRISE ASSISTED LIVING, INC.**
**Filed on 04/05/2002 – Period: 05/17/2002**
File Number 001–16499



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the Securities Exchange
Act of 1934

Filed by the Registrant [X]
Filed by a Party other than the Registrant [ ]
Check the appropriate box:
[ ] Preliminary Proxy Statement
[ ] Confidential, for Use of the Commission Only (as permitted by
    Rule 14a-6(e)(2))
[X] Definitive Proxy Statement
[ ] Definitive Additional Materials
[ ] Soliciting Material Pursuant to Section 240.14a-12

Sunrise Assisted Living, Inc.
-------------------------------------------------------------------
(Name of Registrant as Specified In Its Charter)


-------------------------------------------------------------------
(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.

[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    1) Title of each class of securities to which transaction
       applies: _____

    2) Aggregate number of securities to which transaction applies: _____

    3) Per unit price or other underlying value of transaction computed
       pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the
       filing fee is calculated and state how it was determined): _____

    4) Proposed maximum aggregate value of transaction: _____

    5) Total fee paid: _____

[ ] Fee paid previously with preliminary materials.

[ ] Check box if any part of the fee is offset as provided by Exchange Act
    Rule 0-11(a)(2) and identify the filing for which the offsetting fee was
    paid previously. Identify the previous filing by registration statement
    number, or the Form or Schedule and the date of its filing.

    1) Amount Previously Paid: -------------------------------------------------

    2) Form, Schedule or Registration Statement No.: -------------------------

    3) Filing Party: ----------------------------------------------------------

    4) Date Filed: ------------------------------------------------------------

date or public disclosure was made. Public notice of the expected date of the annual meeting was made on February 27, 2002 by the issuance of a press release. A stockholder's notice of nomination must set forth information specified in Sunrise's bylaws concerning each person the stockholder proposes to nominate for election and the nominating stockholder. Sunrise's bylaws provide that no person may be elected as a director unless nominated in accordance with the procedures set forth in the bylaws.

COMPENSATION OF DIRECTORS

Non-employee directors are reimbursed for expenses incurred in attending meetings of the board of directors. No fees are paid for attendance at board or committee meetings. However, Sunrise directors are typically granted stock options on an annual basis.

In 2001, Mr. Aprahamian received a grant of ten-year non-qualified stock options for 9,000 shares of common stock at an exercise price of $20.56 per share. Mr. Bradley received a grant of ten-year non-qualified stock options for 7,000 shares of common stock at an exercise price of $20.56 per share. Mr. Callen received a grant of ten-year non-qualified stock options for 10,000 shares of common stock at an exercise price of $20.56 per share. Mr. Donohue received a grant of ten-year non-qualified stock options for 12,000 shares of common stock at an exercise price of $20.56 per share. Mr. Holladay received a grant of ten-year non-qualified stock options for 7,000 shares of common stock at an exercise price of $20.56 per share. Peter A. Klisares received and option grant for 5,000 shares of common stock at an exercise price of $20.56 per share.

Sunrise has entered into a consulting agreement with David W. Faeder, effective as of April 1, 2000. Under the consulting agreement, Mr. Faeder performs consulting services as and when reasonably requested by the chairman of the board and chief executive officer or by the president of Sunrise. Initially, the consulting agreement provided for Mr. Faeder to receive, during the term of the agreement, annual compensation of $262,000 and reimbursement of reasonable expenses incurred in connection with the performance of consulting services. On May 31, 2001, the consulting agreement was amended to provide an annual compensation rate of $177,000 per year and up to $131,000 in additional bonuses per year, payable quarterly or at certain milestones. At that time, Mr. Faeder was rehired as an employee for limited purposes and receives an annual salary of $85,000 and is eligible to participate in the company's health and benefits plans. The consulting agreement expires on March 31, 2003, unless extended or earlier terminated by the parties. Either party may terminate the consulting agreement upon 30 days' prior notice. Under the terms of the consulting agreement, all of Mr. Faeder's then existing options continue to vest and be exercisable or available as if his employment with Sunrise had continued through March 31, 2003. In addition, the consulting agreement provides that Mr. Faeder is entitled to the benefits under the senior executive severance plan, as described below, on the same basis as Sunrise's president. The total compensation paid in 2001 to Mr. Faeder under these arrangement was $393,000.

In September 2001, Mr. Faeder was awarded 52.5 shares of restricted stock in Sunrise At-Home, or .0525% of the issued and outstanding Sunrise At-Home common stock at the time of the award. In February 2002, Mr. Faeder surrendered his restricted stock award for cancellation. In December 2001, Mr. Faeder was awarded restricted limited partnership points in ordinary partnership units in Holdings I, our international joint venture with DLJ (now Credit Suisse First Boston) and affiliated entities ("Holdings I"), or 0.66% of the issued and outstanding ordinary partnership interests in that joint venture at the date of the award. See "Report on Executive Compensation" and "Compensation Committee Interlocks and Insider Participation" for additional information. In February 2002, Mr. Faeder surrendered his restricted ordinary partnership award in Holdings I for cancellation.

6

EXECUTIVE COMPENSATION AND OTHER INFORMATION

The following table sets forth, for the years ended December 31, 2001, 2000 and 1999, the cash compensation paid by Sunrise, as well as other compensation paid or accrued during those years, to Sunrise's chief executive officer and each of the other four most highly compensated executive officers whose total annual salary and bonus exceeded $100,000 in 2001.

SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION(S) (1) | ANNUAL COMPENSATION | | | OTHER ANNUAL COMPENSATION | AWARDS RESTRICTED STOCK AWARDS | NUMBER OF SECURITIES UNDERLYING OPTIONS# | ALL OTHER COMPENSATION($) |
|---|---|---|---|---|---|---|---|
| | YEAR | SALARY($) | BONUS($) | | | | |
| Paul J. Klaassen........... Chairman of the Board and Chief Executive Officer | 2001 | $300,000 | $412,500(4) | $113,592(6) | $ -0-(2)(3) | 0 | $-0- |
| | 2000 | 242,000 | 37,500 | -0- | -0- | 350,000 | -0- |
| | 1999 | 200,000 | 75,000 | -0- | -0- | N/A | -0- |
| Thomas B. Newell........... President | 2001 | 252,465 | 131,000 | -0- | -0-(2)(3) | 70,000 | -0- |
| | 2000 | 215,600 | 37,500 | -0- | -0- | 85,000 | -0- |
| | 1999 | 175,000 | 75,000 | -0- | -0- | 65,000 | -0- |
| Tiffany L. Tomasso......... Executive Vice President and President, Management Services | 2001 | 207,423 | 105,000 | -0- | -0-(3) | 30,000 | -0- |
| | 2000 | 197,000 | 37,500 | -0- | -0- | 70,000 | -0- |
| | 1999 | 165,000 | 50,000 | -0- | -0- | 65,000 | -0- |
| Christian B.A. Slavin...... Executive Vice President and President, Properties | 2001 | 207,423 | 105,000 | -0- | -0-(3) | 60,000 | -0- |
| | 2000 | 197,000 | 37,500 | -0- | -0- | 145,000(5) | -0- |
| | 1999 | 111,000 | -0- | -0- | -0- | 220,000 | -0- |
| Brian C. Swinton.......... Executive Vice President | 2001 | 207,423 | 27,500 | -0- | -0-(2) | 30,000 | -0- |
| | 2000 | 197,000 | -0- | -0- | -0- | 60,000 | -0- |
| | 1999 | 165,000 | 50,000 | -0- | -0- | 40,000 | -0- |
| Larry E. Hulse ........... Senior Vice President and Chief Financial Officer | 2001 | 170,939 | 86,500 | -0- | -0- | 25,000 | -0- |
| | 2000 | 157,000 | 30,000 | -0- | -0- | 32,222 | -0- |
| | 1999 | 105,000 | 30,000 | -0- | -0- | 50,000 | -0- |

----------------

(1) Reflects current positions held.

(2) Includes awards on September 12, 2001 of 52.5 shares of restricted stock (.0525% of the issued and outstanding common stock) in Sunrise At-Home, Sunrise's at-home assisted living joint venture to Paul Klaassen and Thomas Newell, respectively, and 210 shares of restricted stock (.21% of the issued and outstanding common stock) to Brian C. Swinton, for their participation as directors and, in the case of Mr. Swinton, an officer of Sunrise At-Home. Each paid $.01 per share, the fair market value at the date of grant, as determined by the Sunrise At-Home board based upon the then perceived value of the restricted shares. The awards are made at the discretion of Sunrise At-Home's board of directors, which currently is comprised of three representatives of Sunrise (Messrs. Klaassen, Newell and Faeder), two representatives of Sunrise's joint venture partner, and one independent board member. The awards vest at the rate of 25% on anniversary of January 1, 2001, provided that the awardee continually serves as a director or employee of Sunrise At-Home, with acceleration of vesting upon the occurrence of specified events, including change in ownership of Sunrise At-Home. The aggregate value of the unvested Sunrise At-Home restricted stock held by Messrs. Klaassen, Newell and Swinton at December 31, 2001 approximated their fair market value at the grant date. In February 2002, Mssrs. Klassen and Newell surrendered their restricted stock awards in Sunrise At-Home for cancellation.

(3) Includes awards of 2,815 partnership units, 2,815 partnership units, 1,267 partnership units, and 1,267 partnership units in Holdings I, Sunrise's international DLJ joint venture, for 0.66%, 0.66%, 0.3%, and 0.3% of the issued and outstanding ordinary partnership interests in that joint venture on September 24, 2001 to Paul Klaassen, Thomas Newell, Tiffany Tomasso and Christian Slavin, respectively. Each paid $.10 per unit, the fair market value at the date of grant, as determined by Sunrise Assisted Living Investments, Inc. ("SALII"), as the general partner of Holdings I, based upon the then perceived value of the ordinary partnership units. SALII is a wholly-owned subsidiary of Sunrise. The aggregate value of the Holdings I ordinary partnership units held by Messrs. Klaassen,

7

Newell and Slavin and Ms. Tomasso at December 31, 2001 approximated their fair market value at the grant date. In February 2002, Mssrs. Klaassen and Newell surrendered their partnership units in Holdings I for cancellation. The partnership units vest 75% as of the date of grant and the remaining 25% shall become vested as of July 30, 2002 provided the participant's employment has not terminated prior to July 30, 2002. Under the terms of the joint venture, after Sunrise's joint venture partners (DLJ now Credit Suisse First Boston and certain of its affiliated entities) receive preferred distributions of 9% on their $39 million initial equity investment in Holdings I, holders of ordinary partnership interests are entitled to share on a pro rata basis with Sunrise's joint venture partners in distributions up to an amount that would provide our joint venture partners with a return equal to the greater of (a) two and one-half times their initial investment in the joint venture or (b) the total of (x) 100% of the partners invested capital plus (x) a 30% cumulative annual return on their investment.

(4) In 2001, Mr. Klaassen earned $412,500 in bonus. However, at his option, he elected to convert $400,000 of this bonus amount to a grant of restricted stock at 1.5 times such amount, subject to approval by the shareholders of the 2002 stock option and restricted stock plan. See "Report on Executive Compensation, CEO's Compensation" and "Approval of 2002 Stock Option and Restricted Stock Plan (Proposal 2)".

(5) Includes options on 75,000 shares repriced in 2001. See "Report on Option Repricing".

(6) Includes $105,000 representing the value of the personal use by Mr. Klaassen of a corporate jet leased by Sunrise and a car allowance of $8,592.

OPTION GRANTS

The following table contains certain information with respect to stock options granted in 2001 to each of the named executive officers of Sunrise. All options granted in 2001 were ten-year non-qualified options.

OPTION GRANTS IN LAST FISCAL YEAR

| NAME | SHARES OF COMMON STOCK UNDERLYING OPTIONS GRANTED | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE ($/SH) | EXPIRATION DATE | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|
| Paul J. Klaassen...... | -0- | 0% | $  -0- | N/A | $   -0- | $   -0- |
| Thomas B. Newell...... | 70,000(1) | 5.8% | 20.00 | 5/11/11 | 991, 054 | 2,407,355 |
| Tiffany L. Tomasso.... | 30,000(1) | 2.5% | 20.00 | 5/11/11 | 424,738 | 1,031,723 |
| Christian B.A. Slavin.... | 60,000(1) | 5.0% | 26.35 | 11/12/11 | 1,016,923 | 2,577,082 |
| Brian C. Swinton...... | 30,000(1) | 2.5% | 20.00 | 5/11/11 | 429,738 | 1,031,723 |
| Larry E. Hulse........ | 25,000(1) | 2.0% | 20.00 | 5/11/11 | 353,948 | 859,769 |

----------------

(1) These options vest over a four-year period. Vesting is accelerated if the options are not assumed in connection with any dissolution or liquidation of Sunrise, the sale of substantially all of Sunrise's assets, a merger, reorganization or consolidation in which Sunrise is not the surviving corporation or any other transaction (including, without limitation, a merger or reorganization in which Sunrise is the surviving corporation) approved by the board of directors of Sunrise which results in any person or entity owning 80% or more of the total combined voting power of all classes of stock of Sunrise.

OPTION EXERCISES AND HOLDINGS

The following table sets forth information with respect to each of the named executive officers of Sunrise concerning the exercise of stock options during 2001, the number of securities underlying unexercised options at the 2001 year-end and the 2001 year-end value of all unexercised in-the-money options held by such individuals.

REPORT ON OPTION REPRICING

On November 24, 2000, the stock option committee determined that, as a result of declines in the market price of the common stock, Christopher B.A. Slavin, a Sunrise executive officer, held options on 150,000 shares at an exercise price of $37.625 per share that limited their effectiveness as a tool for employee retention and as a long-term incentive. After considering the matter, the stock option committee voted to offer Mr. Slavin a grant of options on 75,000 shares in exchange for his agreement to cancel options on 150,000 shares with an exercise price of $37.625 per share six months and one day after the grant. Mr. Slavin accepted the offer and his options for 150,000 shares were cancelled on May 24, 2001. The exercise price of the repriced

8

EXHIBIT E

SUN 003275

FORM 4

□ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL

| OMB Number: | 3235-0287 |
| Expires: | December 31, 2001 |
| Estimated average burden hours per response.......... | 0.5 |

1. Name and Address of Reporting Person*

(Print or Type Responses)

| Bradley | David | G. |
| (Last) | (First) | (Middle) |

7902 Westpark Drive
(Street)

| McLean | VA | 22102 |
| (City) | (State) | (Zip) |

2. Issuer Name and Ticker or Trading Symbol

Sunrise Assisted Living, Inc. (SNRZ)

5. If Amendment, Date of Original (Month/Year)

6. Relationship of Reporting Person(s) to Issuer (Check all applicable)

| X | Director |
| | 10% Owner |
| | Officer (give title below) |
| | Other (specify below) |

7. Individual or Joint/Group Filing (Check Applicable Line)
| X | Form filed by One Reporting Person |
| | Form filed by More than One Reporting Person |

3. I.R.S. Identification Number of Reporting Person, if an entity (voluntary)

4. Statement for Month/Year

January 2001

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Transaction Date | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC 1474 (1-99)
(Over)

SUN 003276

FORM 4 (... ontinued)

Table II - Derivative Securities Acqu.. ., Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $20.5625 | 1/9/01 | A | | 7,000 | | 1/9/01 | 1/9/11 | Common Stock | 7,000 | | 7,000 | D | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Explanation of Response:

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are not to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

**Signature of Reporting Person
As attorney-in-fact for David G. Bradley

7/9/01
Date

Page 2

EXHIBIT F

FILED 02:40 PM 06/05/1996
960163689 - 2461436

# RESTATED CERTIFICATE OF INCORPORATION

## OF

## SUNRISE ASSISTED LIVING, INC.

Sunrise Assisted Living, Inc., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1. The name of the corporation is Sunrise Assisted Living, Inc., and the name under which the corporation was originally incorporated was Sunrise Assisted Living Holdings, Inc.  The date of filing its original Certificate of Incorporation with the Secretary of State of the State of Delaware was December 14, 1994.

2. Pursuant to Section 245 of the General Corporation Law of the State of Delaware, this Restated Certificate of Incorporation restates and integrates but does not further amend the provisions of this corporation's Certificate of Incorporation as heretofore amended or supplemented, and there is no discrepancy between those provisions and the provisions of this Restated Certificate of Incorporation (except for the omission, as permitted by Section 245(c) of the General Corporation Law of the State of Delaware, of such provisions contained in previous amendments to this corporation's Certificate of Incorporation as were necessary to effect changes, exchanges, reclassifications or cancellations of stock, which changes, exchanges, reclassifications or cancellations have become effective).

3. The text of the Restated Certificate of Incorporation is as follows:

## RESTATED CERTIFICATE OF INCORPORATION

## OF

## SUNRISE ASSISTED LIVING, INC.

**ARTICLE 1.    NAME**

The name of this corporation is Sunrise Assisted Living, Inc. (the "Corporation").

\\\DC - 62844/4 - 0242567.02

## ARTICLE 2.    REGISTERED OFFICE AND AGENT

The registered office of the Corporation shall be located at 1018 Centre Road, Wilmington, New Castle County, Delaware 19805. The registered agent of the Corporation at such address shall be Corporation Service Company.

## ARTICLE 3.    PURPOSE AND POWERS

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "Delaware General Corporation Law"). The Corporation shall have all power necessary or convenient to the conduct, promotion or attainment of such acts and activities.

## ARTICLE 4.    CAPITAL STOCK

### 4.1. Authorized Shares

The total number of shares of all classes of stock that the Corporation shall have authority to issue is 70,000,000 of which 60,000,000 shall be Common Stock, having a par value of $.01 per share ("Common Stock"), and 10,000,000 shall be Preferred Stock, having a par value of $.01 per share ("Preferred Stock"). Attached as Exhibit A is the Certificate of Designation, Preferences and Rights of Series C Junior Participating Preferred Stock.

### 4.2. Common Stock

#### 4.2.1. Relative Rights

The Common Stock shall be subject to all of the rights, privileges, preferences and priorities of the Preferred Stock as set forth in the certificate(s) of designations filed to establish the respective series of Preferred Stock. Each share of Common Stock shall have the same relative rights as and be identical in all respects to all the other shares of Common Stock.

#### 4.2.2. Dividends

Whenever there shall have been paid, or declared and set aside for payment, to the holders of shares of any class of stock having preference over the Common Stock as to the payment of dividends, the full amount of dividends and of sinking fund or retirement payments, if any, to which such holders are respectively entitled in preference to the Common Stock, then dividends may be paid on the Common Stock and on any class or series of stock entitled to participate therewith as to dividends, out of any assets legally available for the payment of dividends thereon, but only when and as declared by the Board of Directors of the Corporation.

- 2 -

### 4.2.3. Dissolution, Liquidation, or Winding Up

In the event of any dissolution, liquidation, or winding up of the Corporation, whether voluntary or involuntary, the holders of the Common Stock, and holders of any class or series of stock entitled to participate therewith, in whole or in part, as to the distribution of assets in such event, shall become entitled to participate in the distribution of any assets of the Corporation remaining after the Corporation shall have paid, or provided for payment of, all debts and liabilities of the Corporation and after the Corporation shall have paid, or set aside for payment, to the holders of any class of stock having preference over the Common Stock in the event of dissolution, liquidation or winding up the full preferential amounts (if any) to which they are entitled.

### 4.2.4. Voting Rights

Each holder of shares of Common Stock shall be entitled to attend all special and annual meetings of the stockholders of the Corporation and, share for share and without regard to class, together with the holders of all other classes of stock entitled to attend such meetings and to vote (except any class or series of stock having special voting rights), to cast one vote for each outstanding share of Common Stock so held upon any matter or thing (including, without limitation, the election of one or more directors) properly considered and acted upon by the stockholders.

## 4.3. Preferred Stock

The Board of Directors is authorized, subject to limitations prescribed by the Delaware General Corporation Law and the provisions of this Certificate of Incorporation, to provide, by resolution or resolutions from time to time and by filing a certificate(s) pursuant to the Delaware General Corporation Law, for the issuance of the shares of Preferred Stock in series, to establish from time to time the number of shares to be included in each such series, to fix the powers, designations, preferences and relative, participating, optional or other special rights of the shares of each such series and to fix the qualifications, limitations or restrictions thereof.

## ARTICLE 5.    INCORPORATOR

The name and mailing address of the incorporator (the "Incorporator") are Corporation Service Company, 1013 Centre Road, Wilmington, Delaware 19805. The powers of the Incorporator shall terminate upon the filing of this Certificate of Incorporation.

- 3 -

# ARTICLE 6.    BOARD OF DIRECTORS

## Article 6.1.  Number; Election; and Classification

The number of directors of the Corporation shall be not less than two nor more than eleven directors, the exact number of directors to be fixed from time to time by or in the manner provided in the bylaws of the Corporation.  The directors of the Corporation shall be divided into three classes, each consisting of approximately one-third of the total number of directors.  The term of office of each class shall be three years and shall expire in successive years at the time of the annual meeting of stockholders.  Upon the filing in the Office of the Secretary of State of Delaware of the Certificate of Amendment of Certificate of Incorporation of the Corporation, whereby this Article 6.1 is amended to read as set forth herein, the classes of directors are as follows:

Class I (terms of office expiring at the 1998 annual meeting of stockholders) -- Paul J. Klaassen and Richard Doppelt;

Class II (terms of office expiring at the 1999 annual meeting of stockholders) -- Teresa M. Klaassen, Ronald V. Aprahamian and Darcy Moore; and

Class III (terms of office expiring at the 1997 annual meeting of stockholders) -- David W. Faeder, Thomas Donohue and Scott Meadow.

At each annual meeting of stockholders, the successors to the class of directors whose term shall then expire shall be elected to hold office for a term expiring at the third succeeding annual meeting and until their successors shall be elected and qualified.  Unless and except to the extent that the bylaws of the Corporation shall otherwise require, the election of directors of the Corporation need not be by written ballot.

Any vacancy occurring in the Board of Directors, including any vacancy created by an increase in the number of directors, shall be filled for the unexpired term by the vote of a majority of the directors then in office, whether or not a quorum, or by a sole remaining director, and any director so chosen shall hold office for the remainder of the full term of the class in which the new directorship was created or the vacancy occurred and until such director's successor shall have been elected and qualified.  No director may be removed except for cause and then only by an affirmative vote of the holders of at least a majority of the outstanding shares of stock of the Corporation entitled to vote thereon at a duly constituted meeting of stockholders called for such purpose.  At least 30 days prior to such meeting of stockholders, written notice shall be sent to the director or directors whose removal shall be considered at such meeting.

- 4 -

## 6.1. Management of Business and Affairs of the Corporation

The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

## 6.2. Limitation of Liability

No director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that this provision shall not eliminate or limit the liability of a director (a) for any breach of the director's duty of loyalty to the Corporation or its stockholders; (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (c) under Section 174 of the Delaware General Corporation Law; or (d) for any transaction from which the director derived an improper personal benefit. Any repeal or modification of this Article 6.3 shall be prospective only and shall not adversely affect any right or protection of, or any limitation on the liability of, a director of the Corporation existing at, or arising out of facts or incidents occurring prior to, the effective date of such repeal or modification.

## ARTICLE 7.    COMPROMISE OR ARRANGEMENT

Whenever a compromise or arrangement is proposed between the Corporation and its creditors or any class of them and/or between the Corporation and its stockholders of any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of the Corporation or any creditor or stockholder thereof, or on the application of any receiver or receivers appointed for the Corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for the Corporation under the provisions of Section 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of the Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of the Corporation, as the case may be, and also on the Corporation.

## ARTICLE 8.    AMENDMENT OF BYLAWS

The Board of Directors or the stockholders may from time to time adopt, amend or repeal the by-laws of the Corporation. Such action by the Board of Directors shall require the affirmative vote of at least two-thirds of the directors then in office at a duly constituted meeting of the Board of Directors called for such purpose. Such action by the stockholders shall require the affirmative vote of the holders of at least two-thirds of the outstanding shares of stock of the Corporation entitled to vote thereon at a duly constituted meeting of stockholders called for such purpose.

## ARTICLE 9.    RESERVATION OF RIGHT TO AMEND CERTIFICATE OF INCORPORATION

The Corporation reserves the right at any time, and from time to time, to amend, alter, change, or repeal any provision contained in this Certificate of Incorporation, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by law; and all rights, preferences, and privileges of any nature conferred upon stockholders, directors, or any other persons by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the rights reserved in this Article 9.

## ARTICLE 10.    STOCKHOLDER MATTERS

### 10.1.  Consent in Lieu of Meeting

Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of such holders and may not be effected by any consent in writing by such holders, unless such consent is unanimous.

### 10.2.  Call of Special Meetings

Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Board of Directors, the Chairman of the Board or the President of the Corporation, and shall be called by the President or the Secretary of the Corporation at the request in writing of stockholders possessing at least 25 percent of the voting power of the issued and outstanding voting stock of the Corporation entitled to vote generally for the election of directors. Such request shall include a statement of the purpose or purposes of the proposed meeting.

- 6 -

WWDC - 63844/4 - 0242567.02

**ARTICLE 11.    OTHER CONSTITUENCIES**

The Board of Directors of the Corporation, when evaluating any offer, bid, proposal, or similar communication of another party to (a) make a tender or exchange offer for any equity security of the Corporation, (b) merge or consolidate the Corporation with or into another corporation or corporations, or (c) purchase or otherwise acquire all or substantially all of the properties and assets of the Corporation, shall, in connection with the exercise of its judgment in determining what is in the best interests of the Corporation and its stockholders, give due consideration to all relevant factors, including, without limitation, the social, economic and regulatory effects on the Corporation, on employees, providers and payors of the Corporation and its subsidiaries, on residents and families served by the Corporation and its subsidiaries, on operations of the Corporation's subsidiaries and on the communities in which the Corporation and its subsidiaries operate or are located.

**ARTICLE 12.    AMENDMENT OF CERTIFICATE OF INCORPORATION**

Except as set forth in this Article 12 or as otherwise specifically required by law, no amendment of any provision of this Certificate of Incorporation shall be made unless such amendment has been first proposed by the Board of Directors of the Corporation upon the affirmative vote of at least two-thirds of the directors then in office at a duly constituted meeting of the Board of Directors called for such purpose and thereafter approved by stockholders of the Corporation by the affirmative vote of the holders of at least a majority of the outstanding shares of stock of the Corporation entitled to vote thereon; provided, however, if such amendment is to the provisions set forth in this clause of Article 12 or in Articles 4.1 (insofar as relating to the authorized number of shares of Preferred Stock), 4.3, 6, 8, 10 or 11 hereof, such amendment must be approved by the affirmative vote of the holders of at least two-thirds of the outstanding shares of stock of the Corporation entitled to vote thereon rather than a majority of such shares.

4.    This Restated Certificate of Incorporation was duly adopted by the Board of Directors of the corporation in accordance with the applicable provisions of Section 245 of the General Corporation Law of the State of Delaware.

\\\DC - 63544/4 - 0242567.02

IN WITNESS WHEREOF, Sunrise Assisted Living, Inc. has caused this Restated Certificate of Incorporation to be signed by its duly authorized officer, as of the 5th day of June, 1996.

SUNRISE ASSISTED LIVING, INC.

By: _____
Paul J. Klaassen
Chairman of the Board, President
and Chief Executive Officer

\\\DC - 63914/4 - 0242567.02

EXHIBIT A

# CERTIFICATE OF DESIGNATION, PREFERENCES AND RIGHTS OF
# SERIES C JUNIOR PARTICIPATING PREFERRED STOCK

of

## SUNRISE ASSISTED LIVING, INC.

### Pursuant to Section 151 of the General Corporation Law
### of the State of Delaware

Sunrise Assisted Living, Inc., a corporation organized under the laws of the State of Delaware (the "Corporation"), hereby certifies that, pursuant to the authority conferred upon the Board of Directors by the Certificate of Incorporation, as amended, of the said Corporation, the said Board of Directors on April 25, 1996, adopted the following resolution creating a series of 30,000 shares of Preferred Stock designated as Series C Junior Participating Preferred Stock:

RESOLVED, that pursuant to the authority granted to and vested in the Board of Directors of this Corporation (the "Board") in accordance with the provisions of its Certificate of Incorporation, as amended, a series of Preferred Stock of the Corporation be and it hereby is created, and that the designation and amount thereof and the voting rights or powers, preferences and relative, participating, optional and other special rights of the shares of such series, and the qualifications, limitations or restrictions thereof are as follows:

Section 1. <u>Designation and Amount</u>. The shares of such series, par value $0.01 per share, shall be designated as "Series C Junior Participating Preferred Stock" and the number of shares constituting such series shall be 30,000. Such number of shares may be increased or decreased by resolution of the Board of Directors; provided, that no decrease shall reduce the number of shares of Series C Junior Participating Preferred Stock to a number less than the number of shares then outstanding plus the number of shares reserved for issuance upon the exercise of outstanding options, rights or warrants or upon the conversion of any outstanding securities issued by the Corporation convertible into Series C Junior Participating Preferred Stock.

Section 2.  Dividends and Distributions.

(A)  Subject to the prior and superior rights of the holders of any shares of any series of Preferred Stock ranking prior and superior to the shares of Series C Junior Participating Preferred Stock with respect to dividends, the holders of shares of Series C Junior Participating Preferred Stock shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available for the purpose, quarterly dividends payable in cash on the 15th day of April, July, October and January, in each year (each such date being referred to herein as a "Quarterly Dividend Payment Date"), commencing on the first Quarterly Dividend Payment Date after first issuance of a share or fraction of a share of Series C Junior Participating Preferred Stock, in an amount per share (rounded to the nearest cent) equal to the greater of (a) $10.00 or (b) subject to the provision for adjustment hereinafter set forth, 1,000 times the aggregate per share amount of all cash dividends, and 1,000 times the aggregate per share amount (payable in kind) of all non-cash dividends or other distributions, other than a dividend payable in shares of common stock, par value $.01 per share, of the Corporation (the "Common Stock"), or a subdivision of the outstanding shares of Common Stock (by reclassification or otherwise), declared on the Common Stock, since the immediately preceding Quarterly Dividend Payment Date, or, with respect to the first Quarterly Dividend Payment Date, since the first issuance of any share or fraction of a share of Series C Junior Participating Preferred Stock. In the event the Corporation shall at any time after April 25, 1996 (the "Rights Declaration Date") (i) declare or pay any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the amount to which holders of shares of Series C Junior Participating Preferred Stock were entitled immediately prior to such event under clause (b) of the preceding sentence shall be adjusted by multiplying such amount by a fraction, the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B)  The Corporation shall declare a dividend or distribution on the Series C Junior Participating Preferred Stock as provided in paragraph (A) above immediately after it declares a dividend or distribution on the Common Stock (other than a dividend payable in shares of Common Stock); provided that, in the event no dividend or distribution shall have been declared on the Common Stock during the period between any Quarterly Dividend Payment Date and the next subsequent Quarterly Dividend Payment Date, a dividend of $10.00 per share on the Series C Junior Participating Preferred Stock shall nevertheless be payable on such subsequent Quarterly Dividend Payment Date.

- 2 -

(C) Dividends shall begin to accrue and be cumulative on outstanding shares of Series C Junior Participating Preferred Stock from the Quarterly Dividend Payment Date next preceding the date of issue of such shares of Series C Junior Participating Preferred Stock, unless the date of issue of such shares is prior to the record date set for the first Quarterly Dividend Payment Date, in which case dividends on such shares shall begin to accrue from the date of issue of such shares, or unless the date of issue is a Quarterly Dividend Payment Date or is a date after the record date for the determination of holders of shares of Series C Junior Participating Preferred Stock entitled to receive a quarterly dividend and before such Quarterly Dividend Payment Date, in either of which event such dividends shall begin to accrue and be cumulative from such Quarterly Dividend Payment Date.  Accrued but unpaid dividends shall not bear interest.  Dividends paid on the shares of Series C Junior Participating Preferred Stock in an amount less than the total amount of such dividends at the time accrued and payable on such shares shall be allocated pro rata on a share-by-share basis among all such shares at the time outstanding. The Board of Directors may fix a record date for the determination of holders of shares of Series C Junior Participating Preferred stock entitled to receive payment of a dividend or distribution declared thereon, which record date shall be no more than 60 days prior to the date fixed for the payment thereof.

Section 3.  <u>Voting Rights</u>.  The holders of shares of Series C Junior Participating Preferred Stock shall have the following voting rights:

(A)    Subject to the provision for adjustment hereinafter set forth, each share of Series C Junior Participating Preferred Stock shall entitle the holder thereof to 1,000 votes on all matters submitted to a vote of the stockholders of the Corporation. In the event the Corporation shall at any time after the Rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the number of votes per share to which holders of shares of Series C Junior Participating Preferred Stock were entitled immediately prior to such event shall be adjusted by multiplying such number by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B)    Except as otherwise provided by law, the holders of shares of Series C Junior Participating Preferred Stock and the holders of shares of Common Stock shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation.

- 8 -

\\\DC - 6364474 - 01931059.03

(C)  Except as set forth herein, holders of Series C Junior Participating Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for taking any corporate action.

Section 4.  Certain Restrictions.

(A)  Whenever dividends or distributions payable on the Series C Junior Participating Preferred Stock as provided in Section 2 are not paid, thereafter and until such dividends and distributions, whether or not declared, on shares of Series C Junior Participating Preferred Stock outstanding shall have been paid in full, the Corporation shall not:

(i)  declare or pay dividends on, or make any other distributions on, or redeem or purchase or otherwise acquire for consideration any shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series C Junior Participating Preferred Stock; or

(ii)  declare or pay dividends on, or make any other distributions on, any shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series C Junior Participating Preferred Stock, except dividends paid ratably on the Series C Junior Participating Preferred Stock and all such parity stock on which dividends are payable in proportion to the total amounts to which the holders of all such shares are then entitled; or

(iii)  redeem or purchase or otherwise acquire for consideration shares of any stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series C Junior Participating Preferred Stock, provided that the Corporation may at any time redeem, purchase or otherwise acquire shares of any such parity stock in exchange for shares of any stock of the Corporation ranking junior (either as to dividends or upon dissolution, liquidation or winding up) to the Series C Junior Participating Preferred Stock; or

(iv)  redeem or purchase or otherwise acquire for consideration any shares of Series C Junior Participating Preferred Stock, or any shares of stock ranking on a parity with the Series C Junior Participating Preferred Stock, except in accordance with a purchase offer made in writing or by publication (as determined by the Board of Directors) to all holders of such shares upon such terms as the Board of Directors, after consideration of the respective annual dividend rates and other relative rights and preferences of the respective series and classes, shall determine in good faith will result in fair and equitable treatment among the respective series or classes.

- 4 -

(B) The Corporation shall not permit any subsidiary of the Corporation to purchase or otherwise acquire for consideration any shares of stock of the Corporation unless the Corporation could, under paragraph (A) of this Section 4, purchase or otherwise acquire such shares at such time and in such manner.

Section 5.  Reacquired Shares.  Any shares of Series C Junior Participating Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and cancelled promptly after the acquisition thereof.  All such shares shall upon their cancellation become authorized but unissued shares of Preferred Stock and may be reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors, subject to the conditions and restrictions on issuance set forth herein.

Section 6.  Liquidation. Dissolution or Winding Up.

(A) Upon any liquidation (voluntary or otherwise), dissolution or winding up of the Corporation, no distribution shall be made to the holders of shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series C Junior Participating Preferred Stock unless, prior thereto, the holders of shares of Series C Junior Participating Preferred Stock shall have received $55,000 per share, plus any unpaid dividends and distributions payable thereon, whether or not declared, to the date of such payment (the "Series C Liquidation Preference").  Following the payment of the full amount of the Series C Liquidation Preference, no additional distributions shall be made to the holders of Series C Junior Participating Preferred Stock unless, prior thereto, the holders of shares of Common Stock shall have received an amount per share (the "Common Adjustment") equal to the quotient obtained by dividing (i) the Series C Liquidation Preference by (ii) 1,000 (as appropriately adjusted as set forth in subparagraph (C) below to reflect such events as stock splits, stock dividends and recapitalizations with respect to the Common Stock) (such number in clause (ii) immediately above being referred to as the "Adjustment Number").  Following the payment of the full amount of the Series C Liquidation Preference and the Common Adjustment in respect of all outstanding shares of Series C Junior Participating Preferred Stock and Common Stock, respectively, holders of Series C Junior Participating Preferred Stock and holders of shares of Common Stock shall receive their ratable and proportionate share of the remaining assets to be distributed in the ratio of the Adjustment Number to one (1) with respect to such Preferred Stock and Common Stock, on a per share basis, respectively.

- 5 -

(B) In the event, however, that there are not sufficient assets available to permit payment in full of the Series C Liquidation Preference and the liquidation preferences of all other series of preferred stock, if any, which rank on a parity with the Series C Junior Participating Preferred Stock, then such remaining assets shall be distributed ratably to the holders of such parity shares in proportion to their respective liquidation preferences. In the event, however, that there are sufficient assets available to permit payment in full of the Common Adjustment, then such remaining assets shall be distributed ratably to the holders of Common Stock.

(C) In the event the Corporation shall at any time after the Rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the Adjustment Number in effect immediately prior to such event shall be adjusted by multiplying such Adjustment Number by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Section 7. Consolidation, Merger, etc.  In case the Corporation shall enter into any consolidation, merger, combination or other transaction in which the shares of Common Stock are exchanged for or changed into other stock or securities, cash and/or any other property, then in any such case the shares of Series C Junior Participating Preferred Stock shall at the same time be similarly exchanged or changed in an amount per share (subject to the provision for adjustment hereinafter set forth) equal to 1,000 times the aggregate amount of stock, securities, cash and/or any other property (payable in kind), as the case may be, into which or for which each share of Common Stock is changed or exchanged. In the event the Corporation shall at any time after the Rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the amount set forth in the preceding sentence with respect to the exchange or change of shares of Series C Junior Participating Preferred Stock shall be adjusted by multiplying such amount by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Section 8. Redemption.  The outstanding shares of Series C Junior Participating Preferred Stock may be redeemed as a whole, but not in part, at any time, or from time to time, at the option of the Board, at a cash

- 6 -

price per share equal to 105 percent of (i) the product of the Adjustment Number times the Average Market Value (as such term is hereinafter defined) of the Common Stock, plus (ii) all dividends which on the redemption date are payable on the shares to be redeemed and have not been paid or declared, and a sum sufficient for the payment thereof set apart, without interest.    The "Average Market Value" is the average of the closing sale prices of the Common Stock during the 30 day period immediately preceding the date before the redemption date on the Composite Tape for New York Stock Exchange Listed Stocks, or, if such stock is not quoted on the Composite Tape, on the New York Stock Exchange, or, if such stock is not listed on such Exchange, on the principal United States securities exchange registered under the Securities Exchange Act of 1934, as amended, on which such stock is listed, or, if such stock is not listed on any such exchange, the average of the closing sale prices with respect to a share of Common Stock during such 30 day period, as quoted on the National Association of Securities Dealers, Inc. Automated Quotations System or any system then in use, or if no such quotations are available, the fair market value of the Common Stock as determined by the Board in good faith.

Section 9.  Ranking.  Notwithstanding anything contained herein to the contrary, the Series C Junior Participating Preferred Stock shall rank junior to all other series of the Corporation's Preferred Stock as to voting rights, the payment of dividends and the distribution of assets in liquidation, unless the terms of any such series shall provide otherwise.

Section 10. Amendment.    The Certificate of Incorporation, as amended, of the Corporation shall not be further amended in any manner which would materially alter or change the powers, preferences or special rights of the Series C Junior Participating Preferred Stock so as to affect them adversely without the affirmative vote of the holders of at least a majority of the outstanding shares of Series C Junior Participating Preferred Stock, voting separately as a class.

Section 11. Fractional Shares.    Series C Junior Participating Preferred Stock may be issued in fractions of a share which shall entitle the holders, in proportion to such holders fractional shares, to exercise voting rights, receive dividends, participate in distributions and to have the benefit of all other rights of holders of Series C Junior Participating Preferred Stock.

- 7 -

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
In re: SUNRISE SENIOR LIVING, INC.              :
Derivative Litigation                                       :
                                                                      :
_____:        Civil Action No. 07-00143 (RBW)
This Document Relates To:                            :
                                                                      :
        ALL ACTIONS                                      :
_____:

**<u>ORDER</u>**

      This case is before the Court upon David G. Bradley's Motion to Dismiss the

Amended Consolidated Shareholder Derivative Complaint.  Upon consideration of the motion,

the opposition thereto, and the entire record herein, it is hereby

      ORDERED that the motion is granted, and it is further

      ORDERED that all claims against David G. Bradley are dismissed.


      So ORDERED this _____ day of _____, 2008.


                                _____
                                HON. REGGIE B. WALTON
                                UNITED STATES DISTRICT JUDGE