# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In Re SUNRISE SENIOR LIVING, INC.  )
Derivative Litigation  )

)  Civil Action No. 1:07CV00143
)  Judge Reggie B. Walton

)
This Document Relates To:  )
)
ALL ACTIONS  )
)

# MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF
## THE MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY
## BY NOMINAL DEFENDANT SUNRISE SENIOR LIVING, INC.

George H. Mernick, III (D.C. Bar No. 294256)
HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004

N. Thomas Connally (D.C. Bar No. 448355)
Jon M. Talotta (D.C. Bar No. 473626)
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, VA 22102

DATED: June 16, 2008

*Attorneys for Nominal Defendant*
*Sunrise Senior Living, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 4

SUMMARY OF ARGUMENT.......................................................................................... 9

ARGUMENT .................................................................................................................... 12

    I.     Plaintiffs Must Plead Particularized Facts Establishing that Presuit Demand
        Would Have Been Futile for Each Claim Asserted..................................................... 12

        A.    Delaware Law Governs the Demand Futility Analysis. ................................... 12

        B.    Based on Plaintiffs' Allegations, Rales Provides the Framework for the
             Demand Futility Analysis. ............................................................................... 13

        C.    Under Rales, Plaintiffs Must Establish that A Majority of the Current Directors
             Is Interested or Lacks Independence................................................................ 14

    II.    Plaintiffs Failed to Plead Demand Futility for Each of Their Claims, and Thus
        Lack Standing. .......................................................................................................... 15

        A.    Demand Was Required in Von Guggenberg and Cannot Be Re-Litigated on the
             Same Claims Asserted Here.............................................................................. 15

        B.    No Particularized Facts Are Pled to Excuse Demand for Claims Based on
             Alleged Options Backdating............................................................................. 18

        C.    No Particularized Facts Are Pled to Excuse Demand for Claims Based on
             Alleged Accounting Issues................................................................................ 28

        D.    No Particularized Facts Are Pled to Excuse Demand for Claims Based on
             Alleged Ultra Vires Grants. .............................................................................. 30

        E.    No Particularized Facts Are Pled to Excuse Demand for Claims Based on
             Alleged Insider Trading. ................................................................................... 30

        F.    No Particularized Facts Are Pled to Excuse Demand for Claims Based on
             Alleged Approval of Challenged Transactions or Financial Statements. ......... 32

        G.    No Particularized Facts Are Pled to Establish that Any Current Director Is
             Beholden To An Interested Current Director. ................................................... 34

    III.    In the Alternative, the Court Should Stay the Instant Suit Until the Federal Class
        Action Claims Have Been Resolved......................................................................... 38

CONCLUSION.................................................................................................................. 42

REQUEST FOR ORAL HEARING .................................................................................. 42

# TABLE OF AUTHORITIES

## CASES

Air Line Pilots Ass'n v. Miller, 523 U.S. 866 (1998) .................................................... 38

Angstadt v. Atlantic Mutual Ins. Co., 457 S.E.2d 86 (Va. 1995) ................................ 16

Aronson v. Lewis, 473 A.2d 805, 808 (Del. 1984) ............................................ 9, 13, 33

Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961
    (Del. Ch. 2003) ..................................................................................................... 13

Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040
    (Del. 2004) ....................................................................................................... 15, 37

Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150 (Del. Ch. 2005) ................ 38

Blasband v. Rales, 971 F.2d 1034 (3d Cir. 1992) ........................................................ 33

Breault v. Folino, No. 01-00826, 2002 WL 31974381 (C.D. Cal. Mar. 15, 2002) ................ 39, 41

Brudno v. Wise, No. 03-19953, 2003 WL 1874750 (Del. Ch. Apr. 1, 2003) ................ 40

Columbia Plaza Corp. v. Sec. Nat'l Bank, 525 F.2d 620 (D.C. Cir. 1975) .................. 39

Cramer v. Gen. Tel. & Elec. Corp., 582 F.2d 259 (3d Cir. 1978) ................................ 17

Dellinger v. Mitchell, 442 F.2d 782 (D.C. Cir. 1971) .................................................. 39

Desimone v. Barrows, 924 A.2d 908 (Del. Ch. 2007) ...................................... 19, 25, 26

Fairview Hosp. v. Leavitt, No. 05-1065, 2007 WL 1521233 (D.D.C. May 22,
    2007) ..................................................................................................................... 40

Ferre v. McGrath, No. 06-01684, 2007 WL 1180650 (S.D.N.Y. 2006) ...................... 29

Gaubert v. Federal Home Loan Bank Bd., 863 F.2d 59 (D.C. Cir. 1988) ................... 13

Grobow v. Perot, 526 A.2d 914 (Del. Ch. 1987) ......................................................... 33

Grobow v. Perot, 539 A.2d 180 (Del. 1988) ................................................................ 15

Guttman v. Huang, 823 A.2d 492 (Del. Ch. 2003) ............................................... passim

Halpert Enters., Inc. v. Harrison, 362 F. Supp. 2d 426 (S.D.N.Y. 2005) ................... 12

Henik ex rel. LaBranche & Co., Inc. v. LaBranche, 433 F. Supp. 2d 372 (S.D.N.Y.
    2006) ..................................................................................................................... 17

Highland Legacy Ltd. v. Singer, No. 1566, 2006 WL 741939 (Del. Ch. Mar. 17, 2006) ........................................................................................................... 37

Hisler v. Gallaudet Univ., 344 F. Supp. 2d 29 (D.D.C. 2004) ...................................... 39

In re CNET Networks, Inc., 483 F. Supp. 2d 947 (N.D. Cal. 2007) ................................ 15, 19, 22

In re Computer Sciences Corp. Derivative Litig., No. 06-05288, 2007 WL 1321715 (C.D. Cal. 2007) .......................................................................... 29, 34

In re E.F. Hutton Banking Practices Litig., 634 F. Supp. 265 (S.D.N.Y. 1986) ............................ 41

In re Finisar Corp. Derivative Litig., 542 F. Supp. 2d 980 (N.D. Cal. 2008) .............................. 26

In re Infousa, Inc. S'holders Litig., No. 1956, 2007 WL 2419611 (Del. Ch. 2007) ..................... 15

In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808 (Del Ch. 2005) ............................ 14

In re Openwave Sys. Inc. S'holder Derivative Litig., No. 06-03468, 2007 WL 1456039 (N.D. Cal. May 17, 2007) ........................................................................ 26

In re Oracle Corp. Derivative Litig., 808 A.2d 1206 (Del. Ch. 2002) ........................................... 31

In re Silicon Graphics Sec. Litig., 183 F.3d 970 (9th Cir. 1999) .................................................. 32

In re Walt Disney Co. Derivative Litig., 731 A.2d 342 (Del. Ch. 1998) ...................................... 36

In re Xcel Energy, Inc., 222 F.R.D. 603 (D. Minn. 2004)............................................................. 14

In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165 (D.D.C. 2007)................... 20

In re Zoran Corp. Derivative Litig., No. 06-05503, 2007 WL 1650948 (N.D. Cal. Jun. 5, 2007)................................................................................................................. 19, 23

Jones ex rel. CSK Auto Corp. v. Jenkins, 503 F. Supp. 2d 1325 (D. Ariz. 2007)........................ 29

Kamen v. Kemper Fin. Serv., 500 U.S. 90 (1991) ................................................................. 12, 13

Massey v. Merrill Lynch & Co., Inc., 464 F.3d 642 (7th Cir. 2006)............................................. 39

Meng v. Schwartz, 116 F. Supp. 2d 92 (D.D.C. 2000) ................................................................... 1

Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins, No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004)............................................. 38

Orman v. Cullman, 794 A.2d 5 (Del. Ch. 2002) ................................................................... 35, 37

Rales v. Blasband, 634 A.2d 927 (Del. 1993) ....................................................................... 13, 14

iii

Rattner v. Bidzos, No. 03-19700, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003) ....................... 31

Reiter v. Universal Marion Corp., 173 F. Supp. 13 (D.D.C 1959) ................................................ 39

Reiter v. Universal Marion Corp., 299 F.2d 449 (D.C. Cir. 1962)................................................ 16

Ryan v. Gifford, 918 A.2d 341 (Del. Ch. 2007)........................................................................... 14

West Coast Mgmt. & Capital, LLC v. Carrier Access Corp., 914 A.2d 636 (Del.
    Ch. 2006) ............................................................................................................................. 17

**STATUTES**

28 U.S.C. § 1367................................................................................................................................ 1

Del. Code Ann. tit. 8, § 141 ........................................................................................................... 9

**RULES**

Del. Ch. Ct. R. 23.1........................................................................................................................ 9

Del. R. Evid. 201............................................................................................................................ 21

Fed. R. Evid. 201 ........................................................................................................................... 20

Va. Sup. Ct. R. 1:6(a) .................................................................................................................... 16

**TREATISES**

16 James Wm. Moore, Moore's Federal Practice § 106.66[1] (3d ed. 2007)................................. 1

## INTRODUCTION

The Amended Consolidated Shareholder Derivative Complaint (the "Amended Complaint") is the <u>fourth</u> attempt by this plaintiff group and their counsel to plead particularized facts establishing that presuit demand on the Board of Directors (the "Board") of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") would have been futile, and that Plaintiffs' failure to make a presuit demand should thus be excused.  Their first attempt was a derivative suit filed in Virginia in 2006 and dismissed for failure to make demand.  Their second was a suit also filed in Virginia (with Catherine Molner as plaintiff, now one of the lead plaintiffs here) and withdrawn after being challenged on a motion to dismiss.  Their third, the original consolidated complaint in this suit (which overtook Molner's complaint filed in this Court), was amended after being challenged on motions to dismiss.  Their fourth, the Amended Complaint now before the Court, is no less defective than the previous attempts.

As an initial matter, subject matter jurisdiction in the instant suit is founded solely upon the federal questions said to arise from Plaintiffs' three claims under the Securities Exchange Act of 1934 (Counts I – III).  However, if those federal law claims are dismissed, Plaintiffs' pendant state law claims should also be dismissed for lack of subject matter jurisdiction. <u>1</u>/  Thus, if the individual defendants' motions to dismiss Plaintiffs' federal securities claims are granted, the  Amended Complaint would be subject to dismissal in its entirety for that reason alone.

Additionally, however, the Amended Complaint must be dismissed because Plaintiffs have failed adequately to plead demand futility as to any of their claims.  Having done

---

1/      <u>See</u> 28 U.S.C. § 1367 (granting discretion to decline to exercise supplemental jurisdiction over pendant state law claims); <u>Meng v. Schwartz</u>, 116 F. Supp. 2d 92, 97 (D.D.C. 2000) (refusing to maintain pendant state law claims after dismissal of federal claims). <u>See also</u> 16 James Wm. Moore, <u>Moore's Federal Practice</u> § 106.66[1], pp. 106-86 to 106-89 (3d ed. 2007).

no presuit investigation of their own, the Plaintiffs do not allege direct evidence that any current directors engaged in any improper conduct that would render them incapable of disinterestedly and independently considering a presuit demand. Indiscriminately embracing certain matters of public record while ignoring others, Plaintiffs' sweeping assertions simply cannot satisfy the stringent particularized factual pleading required to establish demand futility. Specifically, the only alleged factual basis for Plaintiffs' conclusory claims of stock options backdating is that, with respect to a select few of the numerous options granted, the Company's stock price fell before or rose after the date of those grants. From the movement of the stock price alone, Plaintiffs would have the Court infer that there was intentional backdating, and that none of the Current Directors is capable of considering a presuit demand. The other allegedly improper conduct identified in the Amended Complaint is that certain current and former directors and officers approved or were aware of purported accounting issues at Sunrise, and that they sold stock and approved financial statements with knowledge of the purported options backdating and/or alleged accounting issues. Yet, none of Plaintiffs' conclusory assertions is supported by any particularized factual allegations.

        Under Federal Rule of Civil Procedure 23.1 and the applicable Delaware law, conclusory assertions cannot establish demand futility. Thus, the entire Amended Complaint (like the original consolidated complaint) rises and falls with Plaintiffs' circumstantial allegations of backdating. As courts have held, however, allegations based on fluctuations in a company's stock price before and after a handful of cherry-picked option grants (all of which were granted more than six years ago, and some more than 10 years ago) cannot support any inference of backdating, much less meet the stringent pleading requirements applicable here. Conclusory claims of backdating based solely on stock price movement fail as a matter of law in the face of legitimate, judicially-noticeable explanations for the grant dates at issue. Properly

looking past Plaintiffs' broad-brush conclusions, the Amended Complaint plainly lacks the particularized factual allegations required to establish that a majority of Sunrise's current directors received backdated options or are otherwise "interested" with respect to each of the claims alleged.

In addition, one of the derivative suits referenced above already has been dismissed by the Virginia courts for failure to make the required presuit demand.  Thus, not only do Plaintiffs fail to allege particularized facts explaining why no demand was made, they assert demand futility on claims for which it has already been determined that demand is required.  Plaintiffs are precluded from re-litigating demand futility on these claims.  Thus, demand was not excused here, and Plaintiffs' claims should be dismissed.

Finally, even assuming, _arguendo_, that (a) Plaintiffs have alleged particularized facts justifying their failure to make a presuit demand, and (b) they are not precluded from re-litigating demand futility, this case should be stayed while the Company defends itself in the consolidated securities class action case pending before this Court (the "Federal Class Action").  Many of the same claims are raised in both cases.  Sunrise should not be placed in the position of having to defend itself from these claims in the Federal Class Action, while simultaneously having to pursue those same claims against its current and former directors and officers in this suit.  Once the Federal Class Action is resolved, and with the clarity and focus provided by the rulings in that case, determinations can be made whether any viable derivative claims remain and whether it is in the best interest of the Company – on whose behalf Plaintiffs purport to act – to pursue them.  Staying the Federal Derivative Suit is thus in the Company's best interest, and would allow for the fair, efficient and orderly resolution of both direct and derivative claims, thereby promoting justice and preserving the resources of the Court, the Company and the individual defendants.

For these reasons, the Court should dismiss the Federal Derivative Suit or, in the alternative, exercise its discretion to stay the instant suit pending resolution of the Federal Class Action.

## FACTUAL BACKGROUND

Nominal defendant Sunrise is incorporated under the laws of the state of Delaware, and has its corporate headquarters in McLean, Virginia. Am. Compl. ¶ 18. The Company operates senior living communities throughout the United States, Canada, the United Kingdom, and Germany. Id.

Sunrise was founded by individual defendants Paul Klaassen and Teresa Klaassen. Am. Compl. ¶ 19. The other individual defendants are current or former members of Sunrise's board of directors and/or current or former officers of the Company. Id. ¶¶ 20-38. At the time the first derivative complaint was filed in this Court, Sunrise had seven directors: Ronald Aprahamian, Craig Callen, Thomas Donohue, J. Douglas Holladay, Paul Klaassen, Teresa Klaassen, and William Little (the "Current Directors"). 2/ Id. ¶ 164.

**Virginia Derivative Suits.** The first claims of stock option backdating or other improper conduct at Sunrise regarding option grants was made in a derivative suit filed by the Co-Lead Counsel for the Plaintiffs in this case in the Virginia Circuit Court for Fairfax County on August 11, 2006, captioned Von Guggenberg v. Klaassen, et al., Case No. CL-2006-10174 ("Von Guggenberg"). See Von Guggenberg Complaint, Ex. 3 hereto. Sunrise moved to dismiss the Von Guggenberg suit for failure to make demand and on statute of limitations grounds. On September 15, 2006, the Virginia Circuit court granted Sunrise's motions to dismiss Von

---

2/     Sunrise appointed an eighth director, Stephen D. Harlan, effective June 20, 2007, and a ninth director, Lynn Krominga, effective September 5, 2007. See June 21, 2007 Press Release, Ex. 1 hereto; September 10, 2007 Press Release, Ex. 2 hereto. Krominga is now the Chair of Sunrise's Board of Directors. Harlan and Krominga are not named as individual defendants in the operative complaint.

<u>Guggenberg</u> on both of those grounds. <u>See</u> September 15, 2006 Final Order, Ex. 4 hereto. Von Guggenberg filed a petition for appeal to the Supreme Court of Virginia. After briefing and argument to a three-justice writ panel, Von Guggenberg's petition for appeal was denied on April 27, 2007, thus concluding that suit. <u>See</u> April 27, 2007 Order, Ex. 5 hereto.

On September 6, 2006, before the Circuit Court ruled on Sunrise's motions, another shareholder, acting through the same counsel, filed a substantially identical derivative suit in the same court asserting similar claims of backdating and other improper conduct involving stock option grants. <u>Molner v. Klaassen, et al.</u>, Case No. CL-2006-11244 ("<u>Molner I</u>") (collectively, with <u>Von Guggenberg</u>, the "Virginia Derivative Suits"). <u>See</u> <u>Molner I</u> complaint, Ex. 6 hereto. On December 22, 2006, the Virginia Circuit Court stayed <u>Molner I</u> pending resolution of the appeal in <u>Von Guggenberg</u>. Molner subsequently filed an uncontested notice of non-suit (permitted by right under Virginia law) and re-filed her complaint in this Court, as described further below.

**Special Committee Investigation.** On December 11, 2006, in response to a letter sent simultaneously to Sunrise and media outlets by a union shareholder, Sunrise's Board appointed an independent special committee (the "Special Committee"), assisted by independent counsel and accountants, to review Sunrise's historic practices related to stock option grants and insider stock sales. Am. Compl. ¶ 229. The review by the Special Committee was conducted in parallel with Sunrise's then-ongoing efforts to complete a restatement of its financial disclosures. <u>Id.</u> ¶¶ 221-232. On September 28, 2007, Sunrise issued a news release providing an update on the Special Committee investigation and related matters, which included a report of the Special Committee's findings with respect to Sunrise's historic stock options grants. <u>Id.</u> ¶ 236. The press release stated that the Special Committee found no evidence of backdating, accounting

manipulations, or insider trading.  Id. ¶ 237.  On October 1, 2007, Sunrise filed a Form 8-K with

the SEC that incorporated the September 28, 2007 news release.  See Form 8-K, Ex. 7 hereto.

       **SEC Investigation.**  On December 11, 2006, the same day the appointment of the

Special Committee was announced, Sunrise announced that the SEC had requested information

regarding matters including those raised in the SEIU letter.  See December 11, 2006 Sunrise

News Release, Ex. 8 hereto.  On May 29, 2007, the SEC initiated a formal investigation relating

to Sunrise.  See May 29, 2007 Sunrise News Release, Ex. 9 hereto.  The SEC investigation

remains ongoing.  Sunrise has produced a substantial volume of documents to the SEC in

connection with the investigation.

       **Federal Securities Cases.**  In January and early-February 2007, just weeks after

Sunrise had disclosed the appointment of the Special Committee, five complaints were filed in

this Court against the Company and its current and former officers and directors:  the two

securities class actions now consolidated into the Class Action, 3/ and the three derivative suits

now consolidated into the Derivative Suit (collectively, the "Federal Securities Cases"). 4/

       Federal Class Action.  The two class actions were consolidated into the Class

Action on July 31, 2007.  See July 31, 2007 Minute Order.  On June 6, 2008, the plaintiffs filed a

Consolidated and Amended Class Action Complaint, alleging violations of Sections 10(b) and

20(a) of the Exchange Act against Sunrise, Paul Klaassen, Teresa Klaassen, Thomas Newell,

Tiffany Tomasso, Larry Hulse, Carl Adams, J. Barron Anschultz and Kenneth Abod.  Case No.

---

3/     These two cases were captioned: United Food & Commercial Workers Union Local 880-Retail Food Employers Joint Pension Fund, et al. v. Sunrise Senior Living, Inc., et al., Case No. 1:07CV00102, filed Jan. 16, 2007 ("United Food"); First New York Securities, L.L.C. v. Sunrise Senior Living, Inc., et al., Case No. 1:07CV00294, filed Feb. 8, 2007 ("First New York") (collectively, the "Federal Class Action").

4/     The three suits were captioned: Brockton Contributory Retirement System v. Klaassen, et al., Case No. 1:07CV00143, filed Jan. 19, 2007 ("Brockton"); Molner v. Klaassen, et al., Case No. 1:07CV00227, filed Jan. 31, 2007 ("Molner II"); Anderson v. Klaassen, et al., Case No. 1:07CV00286, filed Feb. 5, 2007 ("Anderson") (collectively, the "Federal Derivative Suit").

07-CV-00102 (RBW), Docket No. 41.  The Class Action plaintiffs' claims arise from allegations similar to those alleged in the present suit.  The defendants' responses to the operative class action complaint are due on or before July 21, 2008.

           <u>Federal Derivative Suit.</u>  The three derivative suits filed in this Court were consolidated into the Derivative Suit on May 9, 2007, and captioned <u>In re Sunrise Senior Living, Inc. Derivative Litig.</u>, Case No. 07-00143.  Docket No. 20.  The Plaintiffs filed their Consolidated Shareholder Derivative Complaint on June 29, 2007.  Docket No. 26.  Ten of the 11 counts in the Original Complaint arose from the alleged grant, receipt, and/or concealment of improperly dated stock options. <u>5</u>/  Consol. Shareholder Deriv. Compl. ¶¶ 174, 178, 183, 186, 192, 197, 200, 203, 206, 216.  Nine of the 16 option grants challenged in the original complaint were also challenged in <u>Von Guggenberg</u>.  The original complaint also alleged improper accounting practices relating to joint ventures, <u>see</u> <u>id.</u> ¶¶ 45-58, but Plaintiffs' claims relied principally on the stock option grant allegations.  <u>Id.</u> ¶¶ 170-201; 213-17.

           On August 27, 2007, nominal defendant Sunrise and the individual defendants filed preliminary motions to dismiss the instant suit on several grounds, including based on Plaintiffs' failure to make the required presuit demand on Sunrise's Board of Directors.  Docket Nos. 36, 38-42.  In the alternative, Sunrise moved to stay this case pending resolution of the class actions also pending before this Court.  Docket Nos. 38-39.  On October 26, 2007, rather than oppose those motions, Plaintiffs attempted to file a second amended complaint (the "Amended Complaint").  Docket No. 59.  Plaintiffs subsequently sought leave to amend their original complaint.  Docket No. 50.  On March 28, 2008, the Court held that the plaintiffs did not need

---

<u>5</u>/     The eleventh count sought to force Sunrise to hold a shareholder's meeting.  Consol. Shareholder Deriv. Compl. ¶¶ 208-12.  Independent of the claim in Plaintiffs' original complaint, Sunrise held a shareholder meeting on October 16, 2007.  <u>See</u> Am. Compl. ¶ 240.  Accordingly, the claim was mooted and is not included in the Amended Complaint.

leave to amend and denied the then-pending motions to dismiss without prejudice.  Docket No.
58.  The Amended Complaint was deemed filed on March 28, 2008.  Id.

       In the Amended Complaint, Plaintiffs made only a few substantive changes:
(1) dropping the only institutional lead plaintiff, Brockton Contributory Retirement System, and
adding a third individual lead plaintiff, Janie Morrison (Am. Compl. ¶ 14); (2) dropping
allegations that stock options granted on May 22, 2000 were backdated, and adding conclusory
assertions about the Special Committee investigation and findings concerning historic stock
options grants and other matters (id. ¶¶ 236-39); and (3) adding a second claim for breach of
fiduciary duty based on allegedly improper accounting practices.  Id. ¶¶ 342-47.

       Shortly before Sunrise's and the individual defendants' motions to dismiss were
due to be filed, Plaintiffs filed a motion to partially lift the PSLRA discovery stay to obtain what
can only be described as full-blown merits discovery, including depositions.  Docket No. 62.
Sunrise filed its opposition on May 30, 2008.  Docket No. 64.  As of the filing of this motion,
Plaintiffs' motion to partially lift the PSLRA discovery stay remains pending.

       **Delaware Derivative Suit.**  A sixth derivative suit was filed on March 6, 2007, in
Delaware Chancery Court, captioned Young, et al. v. Klaassen, et al., C.A. No. 2770-N ("Young"
or the "Delaware Derivative Suit").  The original Young complaint was virtually identical to the
previously-dismissed Molner I complaint filed in the Virginia Circuit Court, and asserted state
law claims based on the same allegedly backdated stock options first challenged in Von
Guggenberg.  See Young Compl., Ex. 10 hereto.  On June 6, 2007, Sunrise and the individual
defendants filed motions to dismiss the original Young complaint.  Sunrise's motion asserted that
the Delaware Derivative Suit was precluded by Von Guggenberg, and that the Young plaintiffs
had failed to make the required presuit demand on Sunrise's Board and to adequately allege
demand futility.  In the alternative, Sunrise requested that the Delaware Derivative Suit be stay

altogether in favor of the earlier-filed Federal Securities Cases pending in this Court. In response to these motions, the Young plaintiffs filed an Amended Shareholder Derivative Complaint on September 17, 2007 (the "Amended Young Complaint"). See Amended Young Compl., Ex. 11 hereto. On November 2, 2007, Sunrise and the individual defendants filed motions to dismiss the Amended Young Complaint. See Sunrise Mot. to Dismiss Young Compl., Ex. 12 hereto. Those motions have been fully briefed and remain pending before the Delaware Chancery Court.

## SUMMARY OF ARGUMENT

As a Delaware corporation, Sunrise is managed by its Board of Directors. See Del. Code Ann. tit. 8, § 141. By filing suit, Plaintiffs seek to displace the Board's statutory responsibility to manage the business and affairs of the Company, and thereby make decisions, assert claims, and control litigation on its behalf. Under Federal Rule of Civil Procedure 23.1 ("Federal Rule 23.1"), Plaintiffs' standing to bring a derivative suit is determined by Delaware substantive law. The applicable Delaware law requires, among other things, that Plaintiffs either (i) make a presuit demand on the Board to take appropriate action to address the Plaintiffs' concerns, or (ii) allege particularized facts sufficient to explain why the required demand would have been futile. Aronson v. Lewis, 473 A.2d 805, 808 (Del. 1984); see Del. Ch. Ct. R. 23.1.

Plaintiffs admittedly did not make the statutorily required demand. In order to maintain derivative standing to sue on behalf of Sunrise, Plaintiffs were required to establish that – for each claim asserted – presuit demand on the Current Directors would have been futile. To show this, Plaintiffs were required to plead particularized facts establishing that a majority of the Current Directors either (a) lack disinterestedness, because they benefited directly from the challenged transactions or face a substantial threat of liability due to their direct or active participation in the challenged transactions, or (b) lack independence from other interested Current Directors. The Amended Complaint does not meet either requirement. In short, the

"facts" alleged do not support, nor can they reasonably be inferred to support, Plaintiffs'

conclusory demand futility assertions.

Initially, all of Plaintiffs' claims arise, in whole or in part, from allegedly

improper grants of stock options on 15 different dates.  In Von Guggenberg, however, the

Virginia courts rendered a final judgment on the merits that presuit demand on Sunrise's Board

was required with respect to claims arising from options granted on nine of those dates.  That

ruling should not be re-litigated simply because Plaintiffs challenge a few additional options.

Even if the Virginia courts' final judgment on the merits is not given preclusive

effect, Plaintiffs were nonetheless required to plead particularized facts establishing that demand

would have been futile with respect to each claim they have asserted in this suit.  The conclusory

assertions in the Amended Complaint simply cannot satisfy this stringent pleading requirement

for any of Plaintiffs' claims:

- Alleged Options Backdating.  Counts I-VIII and XI are based, in whole or in part, on a circumstantial inference of a "pattern" of backdating, based on options granted on 13 different dates.  No reasonable inference can be drawn from these grants.  Options granted on eight of those dates were tied to specific corporate events taking place on the same day, which negate any inference of backdating, or present no indicia of backdating, circumstantial or otherwise.  When viewed in the context of all options grant dates during the relevant period, including the six grant dates that Plaintiffs simply ignore, the remaining five challenged grants do not provide sufficient basis to draw a reasonable inference that any backdating occurred.

- Alleged Accounting Issues.  Counts I-IV, VI, and XI are based, in whole or in part, on alleged accounting issues at Sunrise.  Plaintiffs' conclusory assertions that various individuals "knowingly and deliberately" misstated Sunrise's financial condition are insufficient to excuse demand.  Plaintiffs plead no facts suggesting that any Current Director benefited from or engaged in any of the challenged transactions.

- Alleged Ultra Vires Grants.  Counts IX and X are based on the alleged receipt of ultra vires options grants.  Plaintiffs allegations fail to establish that any Current Director received the challenged grants.

- <u>Alleged Insider Trading.</u>  Count XI claiming "insider trading" alleges that several individual defendants traded Sunrise stock while in possession of material, non-public information relating to backdated option grants and/or the alleged accounting issues.  Not only have Plaintiffs failed to establish that any options grants were backdated, or that the Current Directors had knowledge of the alleged accounting issues, Plaintiffs have failed to plead even the most basic information about the alleged insider sales – e.g., the dates and amounts of each transaction.

- <u>Alleged Approval of Challenged Transactions and/or Financial Statements.</u>  All of Plaintiffs' claims are based, in whole or in part, on the Current Directors' alleged approval of backdated options and/or Sunrise financial statements.  Here as well, Plaintiffs' conclusory assertions that various individuals "knowingly and deliberately" approved the challenged transactions and signed financial statements are insufficient.

As such, Plaintiffs fail to establish any basis to conclude that any Current Director is interested in a challenged transaction and thus incapable of considering a presuit demand.  Even assuming, <u>arguendo</u>, that one or more Current Directors were interested for purposes of demand futility, Plaintiffs fail to establish that any other Current Directors lack independence from those interested Current Directors.  For these reasons, Plaintiffs have failed to establish that a majority of the Current Directors is interested or lacks independence, such that demand would have been futile for each of the claims asserted in this suit.

Finally, even if the Court does not dismiss the Complaint for failure to make the required presuit demand, it should nevertheless enter a stay in favor of the Federal Class Action also pending before this Court.  If the Federal Class Action and this derivative suit proceed together (or this suit proceeds ahead of the Federal Class Action), Sunrise will be required to defend itself in one case (the class action) by disproving claims of options backdating, while at the same time pursuing claims against its current and former directors and officers for the same alleged conduct in another (this derivative suit).  <u>6</u>/  Staying this suit in favor of the Federal Class

---

<u>6</u>/    Any misconduct by Sunrise's directors and senior officers would be imputed to Sunrise and form the basis for the Company's liability in the Federal Class Action.  Thus, by insisting

Action is thus in the Company's best interest, and would allow for the fair, efficient and orderly resolution of both direct and derivative claims, thereby promoting justice and preserving the resources of the Court and the Company.

## ARGUMENT

I. **Plaintiffs Must Plead Particularized Facts Establishing that Presuit Demand Would Have Been Futile for Each Claim Asserted.**

A derivative suit "permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties." 7/ Kamen v. Kemper Fin. Serv., 500 U.S. 90, 95 (1991) (citation omitted). A shareholder seeking to assert a claim on behalf of a corporation must first exhaust intracorporate remedies by making a demand on the corporation's board of directors to obtain the action desired. See id. at 102 n.7. Demand may be excused only where a shareholder is able to show that it would have been futile. Id. at 102.

### A. **Delaware Law Governs the Demand Futility Analysis.**

Federal Rule 23.1 requires a derivative plaintiff "to allege with particularity" why demand was not made, and thus "filter[s] unfounded claims[ ]" by excusing demand "only if the complaining stockholder, in his complaint, makes well pleaded allegations that demand on the corporation is futile." Halpert Enters., Inc. v. Harrison, 362 F. Supp. 2d 426, 429 (S.D.N.Y. 2005) (citation omitted). 8/ The mandate to plead with particularity "requires substantially

---

that this suit proceed, the Plaintiffs – who purport to be acting for the benefit of the Company – are acting in a manner directly against the Company's interests.

7/    Concerned with the potential for shareholders to abuse derivative suits, "equity courts established as a precondition for the suit that the shareholder demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." Kamen, 500 U.S. at 95-96.

8/    The purpose of Federal Rule 23.1 is to "affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." Kamen, 500 U.S. at 95 (citation omitted).

more" than mere notice pleading.  Gaubert v. Federal Home Loan Bank Bd., 863 F.2d 59, 68

(D.C. Cir. 1988).

The "demand requirement" of Federal Rule 23.1 relates to the "adequacy of the

shareholder representative's pleadings," but the federal rule itself does not require demand.

Kamen, 500 U.S. at 96.  While federal courts hearing shareholder derivative claims apply the

federal procedural requirement of particularized factual pleading, they apply state substantive

law to determine whether demand was required and, if so, whether the facts pled establish that

demand would have been futile and should thus be deemed excused.  Id.  Because Sunrise is a

Delaware corporation, Delaware law governs the demand analysis in this case.  See id. at 98.

### B. Based on Plaintiffs' Allegations, Rales Provides the Framework for the Demand Futility Analysis.

Delaware courts have developed two tests to determine whether a derivative

plaintiff has alleged particularized facts sufficient to explain why presuit demand was not made.

The first test applies only to derivative claims arising from affirmative actions taken or expressly

approved by a corporation's board of directors.  Aronson, 473 A.2d at 808, 814.  The second test

applies where the derivative claims do not arise from an affirmative action or decision of the

board itself.  Rales v. Blasband, 634 A.2d 927, 933-934 (Del. 1993).  Delaware courts perform

the demand futility analysis for each separate claim asserted in a derivative suit.  Beam ex rel.

Martha Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961, 977 n.48 (Del. Ch. 2003),

aff'd, 845 A.2d 1040 (Del. 2004).

The Rales test applies to each of Plaintiffs' claims because the claims do not arise

from affirmative actions or express approvals of Sunrise's current Board of Directors.

Underlying all of Plaintiffs' claims are allegations of improper stock option grants (alleged to be

either backdated, ultra vires, or springloaded), improper accounting, and/or trading of Sunrise

stock by Individual Defendants while in possession of material, non-public information. None of these challenged transactions involves concerted action by the current Board of Directors.

Plaintiffs acknowledge that one of the Board's committees – not the Board as a whole – was authorized to approve and issue stock options. Am. Compl. ¶ 68. 9/ Plaintiffs do not allege Board decision or concerted action with respect to the alleged accounting issues. Plaintiffs' allegations of "insider trading" simply do not involve any decision made by the Board – such alleged transactions involve decisions by individual defendants acting for themselves.

Thus, Rales provides the applicable standard in this case for all of Plaintiffs' claims. In re Xcel Energy, Inc., 222 F.R.D. 603, 607 (D. Minn. 2004) (applying Delaware law) (where derivative complaint lacks " particularized facts that link a majority of the directors to any concerted board action….analysis under Aronson is inappropriate"); Guttman v. Huang, 823 A.2d 492, 505-07 (Del. Ch. 2003) (applying Rales to allegations that company failed to accurately account for and disclose corporate financial results).

**C. Under Rales, Plaintiffs Must Establish that A Majority of the Current Directors Is Interested or Lacks Independence.**

Under Rales, demand will be excused only if Plaintiffs can allege sufficient particularized facts to create a reasonable doubt that a majority of the directors could have exercised disinterested and independent judgment in response to a demand. Rales, 634 A.2d at 933-34. A director is interested (and, thus, incapable of considering demand) if he derives a direct personal benefit from a challenged transaction in the sense of self-dealing. In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 821 (Del Ch. 2005) (citation omitted). A

---

9/    Only two of the Current Directors served on the Compensation Committee/Stock Option Committee (the "Compensation Committee") during the time period when the challenged options were granted – Callen and Donohue. See Am. Compl. at ¶¶ 80, 92, 112, 135, 138. Thus, the actions of the Compensation Committee/Stock Options Committee cannot be imputed to the full board, and Rales is the proper test to determine demand futility. See Ryan v. Gifford, 918 A.2d 341, 353 (Del. Ch. 2007).

director also may be deemed interested if he faces a "substantial likelihood" of personal liability, thereby compromising his ability to consider a presuit demand. <u>Guttman</u>, 823 A.2d at 501 (citation omitted). A director may be deemed to lack "independence" from other interested directors if he is dominated or otherwise beholden to them. <u>In re Infousa, Inc. S'holders Litig.</u>, No. 1956, 2007 WL 2419611, at *13 (Del. Ch. 2007).

In conducting the demand analysis, a trial court need not blindly accept as true all allegations, nor must it draw inferences from them in a plaintiff's favor, unless they are <u>reasonable</u> inferences. <u>Grobow v. Perot</u>, 539 A.2d 180, 187 (Del. 1988); <u>In re CNET Networks, Inc.</u>, 483 F. Supp. 2d 947, 954 (N.D. Cal. 2007). A "key principle" under Delaware law is that "directors are entitled to a presumption that they were faithful to their fiduciary duties." <u>Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart</u>, 845 A.2d 1040, 1048-49 (Del. 2004). The burden is on the plaintiff in a derivative action to overcome that presumption by pleading particularized facts. <u>Id.</u>

## II.    Plaintiffs Failed to Plead Demand Futility for Each of Their Claims, and Thus Lack Standing.

Plaintiffs assert numerous sweeping conclusions in an attempt to establish that a majority of the Current Directors are interested or otherwise incapable of considering a demand. These statements fall into three categories: allegedly improper approvals; allegedly improper receipt of benefits (options grants and sales of Sunrise stock); and allegedly disqualifying relationships. None is sufficient to excuse demand here.

### A.    Demand Was Required in <u>Von Guggenberg</u> and Cannot Be Re-Litigated on the Same Claims Asserted Here.

Initially, all of Plaintiffs' claims should be dismissed for failure to make demand to the extent that they challenge options grants previously challenged in <u>Von Guggenberg</u>. The Virginia courts held that demand was required with respect to claims based on the options grants

challenged in that suit. 10/  The Amended Complaint challenges 15 options grants, including the nine previously challenged in Von Guggenberg.  Compare Von Guggenberg Compl. ¶¶ 26-29 and 43 with Am. Compl. ¶¶ 83, 94, 111,115-16, 120, 124, 138, 128.  Because it has been determined on the merits that demand was required with respect to claims based on these nine grants, Plaintiffs are precluded from re-litigating that issue for claims based on the same grants.

A federal court is required to give the same preclusive effect to a judgment from a state court as would a court sitting in that state.  Reiter v. Universal Marion Corp., 299 F.2d 449, 452 (D.C. Cir. 1962).  Under Virginia law, collateral estoppel/issue preclusion applies where, as here: (1) the parties to the prior and subsequent proceedings (or their privies) are the same; (2) the issue sought to be re-litigated was actually litigated in the prior action; (3) the issue was essential to the judgment in the prior proceeding; (4) the prior proceeding resulted in a judgment that is valid, final, and adverse to the party against whom the collateral estoppel/issue preclusion is sought to be applied; and (5) there is "mutuality" in the sense that the litigant who has invoked collateral estoppel/issue preclusion in the later litigation would have been bound had the litigation of the issue in the prior proceeding reached the opposite result.  Angstadt v. Atlantic Mutual Ins. Co., 457 S.E.2d 86, 87 (Va. 1995). 11/

All of these factors are present here.  First, the real parties in interest in Von Guggenberg and the Derivative Suit are the same. 12/  Second, the issue of whether demand

---

10/    The nine grants challenged in Von Guggenberg were:  May 2, 1997; September 14, 1998; November 8, 1999; February 25, 2000; March 28, 2000; September 11, 2000; November 24, 2000; May 11, 2001; and November 12, 2001.

11/    See also Va. Sup. Ct. R. 1:6(a) (West 2007) (eff. July 1, 2006) ("A party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence....") (emphasis added).

12/    Although different shareholders brought the two suits, the actual plaintiff on whose behalf the claims were brought is the identical corporation – Sunrise.  See West Coast Mgmt. &

futility with respect to claims based on these allegedly backdated options grants was litigated in

Von Guggenberg.  Third, the Von Guggenberg court's determination that demand would not have

been futile with respect to claims based on these challenged grants was the essential issue in its

decision to sustain Sunrise's demurrer.  See September 15, 2006 Order, Ex. 4.  Fourth, the court's

ruling on Sunrise's demurrer was a valid and final judgment on the merits.  Finally, Virginia's

mutuality requirement is satisfied because the defendants in Von Guggenberg would have been

bound had the court reached the opposite result.

   Plaintiffs should not be permitted to make an end-run around the demand

requirement in their second attempt (and their counsel's fourth attempt) to plead demand futility

simply by challenging a few additional option grants, particularly where there are no facts

alleged in the Amended Complaint from which an inference of backdating can be drawn with

respect to those additional grants (discussed below).  Otherwise, Sunrise risks being subjected to

an endless stream of suits by other shareholder plaintiffs who file complaints based on the same

grants but include a few additional grants in an attempt to avoid the effect of a prior judgment.

   Moreover, as a practical matter, for purposes of demand futility, there is scarcely

any difference between the grants challenged by Plaintiffs in this suit, and the grants previously

challenged in Von Guggenberg.  Only Callen and/or Donohue are alleged to have approved these

newly challenged grants, Am. Compl. ¶¶ ¶¶ 86, 89, 99, 102, 107 (the same two Current

Directors alleged to have approved the grants challenged in Von Guggenberg), and no new

---

Capital, LLC v. Carrier Access Corp., 914 A.2d 636, 643 n.22 (Del. Ch. 2006) ("a prior suit by
another plaintiff with similar allegations of demand futility may bar a second plaintiff from filing
the same suit"); Cramer v. Gen. Tel. & Elec. Corp., 582 F.2d 259, 267 (3d Cir. 1978), cert.
denied, 439 U.S. 1129 (1979) (previous shareholder derivative suit precluded subsequent
derivative suit by different plaintiff asserting the same claim); Henik ex rel. LaBranche & Co.,
Inc. v. LaBranche, 433 F. Supp. 2d 372, 380 (S.D.N.Y. 2006) (same).  In addition, four Current
Directors (Aprahamian, Callen, Donohue and Klaassen – a majority of the Current Directors)
were among the individuals named as defendants in both suits.

Current Directors are alleged to have received the newly challenged grants (only Donohue is alleged to have received any of the additional challenged grants, on October 8, 1999).

For these reasons, all of Plaintiffs' claims should be dismissed for failure to make demand to the extent they arise from option grants previously challenged in <u>Von Guggenberg</u>.

### B. No Particularized Facts Are Pled to Excuse Demand for Claims Based on Alleged Options Backdating.

Plaintiffs' claims in Counts I-VIII and Count XI arise, in whole or in part, from the alleged approval and/or receipt of backdated options granted on 13 different dates. Am. Compl. ¶¶ 320, 324, 329, 332, 338, 344-45, 349, 352, 364. Plaintiffs allege that Aprahamian, Callen, Donohue, and Klaassen approved and/or received backdated stock options, and are thus incapable of considering demand on these claims. Am. Compl. ¶¶ 288, 299, 300, 304. Setting aside the preclusive effect of <u>Von Guggenberg</u>, Plaintiffs have nevertheless failed to plead particularized facts sufficient to establish a reasonable inference that <u>any</u> backdating occurred. As a result, to the extent that Plaintiffs' demand futility allegations depend on the Current Directors' mere approval and/or the options in question, demand is not excused.

### 1. Plaintiffs' Circumstantial Conclusions Do Not Support A Reasonable Inference of Backdating.

Plaintiffs' conclusions are insufficient to establish an inference of backdating for several reasons. First, five of the challenged grants were made on dates tied to corporate events at Sunrise, which negate any suggested inference of backdating. Second, two other challenged grants were not favorable to the recipients, and thus cannot support an inference of backdating. Third, Plaintiffs' assertion of backdating with respect to one grant is belied by their allegations that this same grant was "springloaded." Finally, setting aside these eight grants, the remaining five challenged grants do not support an inference of a "<u>pattern</u>" of backdating when viewed, as they must be, along with all grants to directors and/or officers during the relevant period – which

-18-

include six grants not mentioned in the Amended Complaint. Viewed in the proper context,
Plaintiffs' central thesis – that an "extraordinary pattern" of intentional backdating should be
inferred based on some phantom "statistical analysis" (discussed below) – is revealed as utterly
baseless.

### a. Five Challenged Grants Were Tied To Corporate Events, Negating Any Inference of Backdating.

Because Plaintiffs did no presuit investigation of their own, their backdating
allegations are purely circumstantial and require the Court to <u>infer</u> backdating based solely on the
performance of Sunrise stock during time periods surrounding the challenged grants. When a
plaintiff relies solely "on the numbers" to allege backdating, as Plaintiffs do here, no inference of
backdating can be drawn when a grant date is tied to a related corporate event. See, e.g., In re
CNET Networks, Inc., 483 F. Supp. 2d at 960 ("[m]ere reliance on the numbers is not sufficient
when plaintiffs are confronted with a legitimate, judicially-noticeable explanation for the grant
date"); In re Zoran Corp. Derivative Litig., No. 06-05503, 2007 WL 1650948, at *13 (N.D. Cal.
Jun. 5, 2007) (slip copy) (no inference of backdating where options grant occurred in connection
with company's annual shareholders meeting or in connection with a director's joining the
board); Desimone v. Barrows, 924 A.2d 908, 948 (Del. Ch. 2007) (plaintiff failed to sufficiently
plead backdating where the option grants occurred on the occurrence of a specific corporate
event). Five of the 13 challenged grants coincided with Sunrise corporate events.

### (i) September 14, 1998 Grants.

Plaintiffs allege that September 14, 1998 options grants were backdated because
the "grant date coincided with one of the lowest prices of Sunrise's stock for the fiscal quarter, as
well as the fiscal year…." Am. Compl. ¶ 95. No Current Director is alleged to have received
these grants. As disclosed in Sunrise's SEC filings, on September 14, 1998, previously-granted
options originally priced in excess of $29 ($14.50 split-adjusted) were cancelled and re-granted

at $25 ($12.50 split-adjusted).  See Sunrise 10-Q filed Nov. 10, 1998, p. 8, Ex. 13 hereto; proxy

statement filed Apr. 6, 1999, p. 10, Ex. 14 hereto. 13/  In fact, Plaintiffs previously acknowledged

that these grants could not have been backdated, because they were issued pursuant to a

"repricing" of previously-granted options.  Consol. Shareholder Deriv. Compl. p.3, n.1 (Docket

No. 26).  Thus, there is no basis to conclude that these options were backdated.

### (ii)    November 8, 1999 Grants.

Plaintiffs allege that options granted to Callen on November 8, 1999, were

backdated because Sunrise's stock was "near its yearly low" on this date.  Am. Compl. ¶ 110.

These grants were tied to the commencement of Callen's service as a director of the Company,

and are thus tied to a corporate event.  The 1996 Directors' Stock Option plan provides that each

director "shall be granted an Initial Option, as of the date of the Director's Commencement of

Service."  See 1996 Directors' Stock Option Plan at ¶ 7 (a complete copy of which was attached

to Sunrise's 10-K, filed with the SEC on March 31, 1998 and March 31, 1999), Exs. 15 and 16

hereto.  Other than the options granted on November 8, 1999, no other options were granted to

Callen in 1999.  Sunrise proxy statement filed Apr. 14, 2000, p. 8, Ex. 17 hereto.  The only

inference to be drawn is that these options were granted in conjunction with Callen's

commencement of service as a director. 14/

---

13/     The Court may take judicial notice of these filings.  On a motion to dismiss, the Court
may consider "facts stated on the face of the complaint, in documents appended to the complaint
or incorporated into the complaint by reference, and [ ] matters of which judicial notice may be
taken."  In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 174 (D.D.C. 2007)
(citations omitted).  The Court may take judicial notice of a fact which is "not subject to
reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of
the trial court or (2) capable of accurate and ready determination by resort to sources whose
accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  In a securities action, the
Court may take judicial notice of documents that are required to be filed, and actually have been
filed, with the SEC.  XM Satellite Radio, 479 F. Supp. 2d at 174.

14/     Callen's service as a director commenced on November 8, 1999.  This fact is subject to
judicial notice, because it is clearly capable of accurate and ready determination by resort to

Plaintiffs assert that options granted to directors pursuant to their appointment/election as directors would not be included in the "pattern" alleged, because these grants were not discretionary.  Am. Compl. p.4, n.2.  In any event, Plaintiffs' own chart belies their assertion of backdating.  Id. ¶ 49.  In the first week of October 1999, the price of Sunrise stock dropped precipitously.  Id.  Options granted at any time following that significant price drop would have been granted "near" the stock's yearly low.  Moreover, in the 20 trading days following the grant, the price of Sunrise stock continued to decline.  Id.  When the stock price has declined steadily in the period before the grant, and continues to fall even further after the grant, any suggestion of backdating is nonsensical.

### (iii)    February 25, 2000 Grants.

Plaintiffs allege that options granted to Aprahamian, Callen and Donohue on February 25, 2000, must have been backdated because their exercise price was "near" the yearly low for Sunrise stock (Am. Compl. ¶ 113), and was among the "lowest closing prices…for the fiscal quarter…."  Id.  ¶ 116.  Sunrise's public filings disclosed that these options were granted on the same date on which the Company's 2000 Stock Option Plan was approved. 15/  See Apr. 14, 2000 Proxy Statement at 20, Ex. 17.  The grant of options on this date was tied to an event at the Company.  Thus, there is no basis to infer backdating.

### (iv)    March 28, 2000 Grants.

Plaintiffs allege that options granted on March 28, 2000, must have been backdated because their exercise price was "near" the yearly low for Sunrise stock (Am. Compl. ¶ 113), and was among the "lowest closing prices…for the fiscal quarter…."  Id.  ¶ 116.  No

---

sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b); see also Del. R. Evid. 201(b).

15/    The Board also approved senior executive severance plans on this same date, further demonstrating that the Board, and its committees, were conducting business on February 25, 2000.  See Apr. 14, 2000 Proxy Statement at 16, Ex. 17.

Current Director is alleged to have received these grants. These options coincided with the recipients' commencement of service in new positions at Sunrise, which was announced in a press release published by the PR Newswire on the same day as the grants. 16/ Ex. 18 hereto. Thus, this grant was tied to a corporate event and does not support an inference of backdating. see In re CNET Networks, Inc, 483 F. Supp. 2d 947, 959 (N.D. Cal. 2007) (corporation's contemporaneous public announcement of the event connected with challenged stock options grant negates inference of backdating).

Moreover, there simply is no basis to infer backdating from the performance of Sunrise's stock, or the observation that these options were granted "near" Sunrise's yearly low. Sunrise stock increased dramatically from late April 2000 through the end of the year. Thus, options granted on any date between January 1 and the middle of April 2000 (a period covering more than the entire first quarter of that year) would have been granted "near" Sunrise's yearly low. But, as Plaintiffs acknowledge, these options were publicly disclosed in SEC filings on April 10, 2000. Am. Compl. ¶ 115. Any change in price after that date is irrelevant, because the options could not possibly have been granted after they were disclosed. 17/. Thus, there is no basis to infer backdating.

### (v)    September 11, 2000 Grants.

Plaintiffs allege that options granted to Paul Klaassen on September 11, 2000, must have been backdated because they were granted "just prior to a precipitous rise in the price of Sunrise's stock," (Am. Compl. ¶ 118) and because the grant "coincided with the lowest

---

16/    Newell (25,000 options) was elected president of Sunrise; Slavin (15,000 options) was named president of Sunrise Properties; Swinton (15,000 options) was named president of Sunrise Ventures; Tomasso (15,000 options) was named president of Sunrise Management Services; Hulse (25,000 options) was elected senior vice president and chief financial officer of Sunrise. Mar. 28, 2000 PR Newswire, Ex. 18.

17/    During the time between the grant date and its disclosure, Sunrise's stock price ranged from $6.22 on the grant date to $6.97 on April 10, 2000, the date the grants were disclosed.

closing price of Sunrise stock for the month of September and one of the lowest closing prices for the fiscal quarter…." Id. at ¶ 120. These options were granted pursuant to an employment agreement entered into by Paul Klaassen and Sunrise on September 12, 2000. See Employment Agreement at Sec. 3(c) (a complete copy of which was attached to Sunrise's 10-Q, filed with the SEC on November 13, 2000), Ex. 19 hereto. That agreement specifically provides that Klaassen was "awarded an incentive stock option grant on September 11, 2000." Id. The grant date was thus tied to an event at the Company, and there is no basis to infer backdating.

> **b.    Sunrise's Stock Performance Belies Any Inference that Two Challenged Grants were Backdated.**

Similarly, there is no basis to infer backdating from two other challenged grant dates in light of Sunrise's stock performance during the relevant period. When a court is asked to draw an inference of backdating from "the numbers" alone, those numbers must, in fact, support such an inference – conclusory allegations of backdating do not suffice. See In re Zoran, 2007 WL 1650948, at *12-13 (no inference of backdating where options grant was not favorable to recipient). Plaintiffs challenge two grants based solely on conclusions devoid of support from "the numbers" on which Plaintiffs' purport to rely.

> **(i)    November 24, 2000 Grants.**

Plaintiffs allege that options issued on November 24, 2000 must have been backdated because they "preceded a dramatic rise in the price of Sunrise stock. Am. Compl. ¶ 124. No Current Director is alleged to have received these grants. Again, Plaintiffs' own chart belies their assertion of backdating. See id. While Sunrise shares increased slightly in the ten days immediately following this grant (4.9%), the shares actually declined in value by more than 10% in the 20-day period following this grant. Id. Moreover, there were 21 trading days in the month, and these options were granted at the 11[th] highest price for the month. Id. Thus, there is no basis to infer that these options were backdated.

-23-

### (ii)    November 12, 2001 Grants.

Plaintiffs allege options issued on November 12, 2001 must have been backdated because they were granted "just prior to a precipitous rise in the price of Sunrise stock," (Am. Compl. ¶ 126) and "coincided with one of the lowest prices for the fiscal quarter…." Id. at 128. No Current Director is alleged to have received these grants. Once again, Plaintiffs' own graph (see id.) belies their contention that any "precipitous rise" followed these options. Id. There is nothing unusual about the performance of Sunrise shares following this grant – it reflects nothing more than ordinary, day-to-day fluctuations of the market. As for Plaintiffs' claim that the options coincided with "one of the lowest prices for the fiscal quarter," there were 63 trading days in the fourth quarter of 2001. Sunrise shares traded lower than $26.96 on 22% of those days. These options were hardly granted at "one of the lowest prices for the fiscal quarter." As such, there is no basis to infer that these options were backdated.

### c.    Plaintiffs' Own Allegations Contradict Any Suggestion That the November 4, 1997 Grants Were Backdated.

Plaintiffs' allegations regarding the November 4, 1997 grants are inherently contradictory and cannot support an inference of backdating. No Current Director is alleged to have received these grants. Plaintiffs begin by alleging that the members of the Compensation Committee "approved this grant on a date after the reported grant date and knowingly used hindsight to select a date just prior to a precipitous increase in the price of Sunrise's stock," and thus the grant was approved sometime after November 4, 1997. Am. Compl. ¶¶ 89-90 (emphasis added). But in the very next paragraph, Plaintiffs assert that this grant was actually "springloaded…to take advantage of the non-public material information [released on Nov. 4, 1997] regarding Sunrise's better than expected earnings…which [the committee members] knew would positively affect the stock price." Id. at ¶ 91.

"Springloading" occurs when a company grants options <u>before</u> the release of favorable information. <u>Desimone</u>, 924 A.2d at 917. Thus, Plaintiffs allege that the Compensation Committee used hindsight to select the grant date sometime after November 4, 1997, while at the same time alleging that the Compensation Committee actually granted the options on November 4, 1997, in order to take advantage of favorable information released on that date. Plaintiffs cannot have it both ways. Such contradictory allegations cannot support an inference of backdating.

### d.    The Five Remaining Challenged Grants Cannot Establish a Pattern of Backdating.

The five remaining challenged grants (May 2, 1997; August 28, 1997; October 8, 1998; December 10, 1998; and March 5, 1999) cannot be considered in a vacuum. When viewed the proper context, the allegations relating to these grants are insufficient to establish a reasonable inference of any backdating, much less the "extraordinary pattern" alleged.

When a series of stock options are granted over time, it is expected that some will subsequently appear to have been "favorable," some will appear to have been "neutral," and still others will appear to have been "unfavorable" due to natural fluctuations in the price of the stock. An inference of backdating cannot be drawn from a purported "pattern" that is based <u>only</u> on grants that appear to have been favorably timed with the benefit of hindsight, without any consideration of other grants that may appear to have been neutral or unfavorable.

That is exactly what Plaintiffs are attempting to do here. In <u>Desimone</u>, however, the court found that the plaintiff had not sufficiently pled demand futility, and expressed skepticism over the plaintiff's attempt to establish an inference of backdating based solely on a limited number of favorable grants, without a statistical analysis of <u>all</u> of the company's grants.

2007 WL 1670255, at *23 n.114. 18/ Plaintiffs purport to have conducted "a statistical analysis identical in methodology to that of the Merrill Lynch analysis" cited in other cases. Am. Compl. ¶ 71. Yet, Plaintiffs do not disclose any details of this phantom analysis. Regardless, the purported analysis is inherently flawed, because Plaintiffs failed to account for all grants during the relevant time period. Such an incomplete analysis cannot establish a basis to infer a "pattern" of backdating. In re Openwave Sys. Inc. S'holder Derivative Litig., No. 06-03468, 2007 WL 1456039, *5 (N.D. Cal. May 17, 2007); In re Finisar Corp. Derivative Litig., 542 F. Supp. 2d 980, 993 (N.D. Cal. 2008).

      If there were a scheme to backdate stock options, as Plaintiffs allege, this scheme would be evidenced by an unusually high ratio of favorable grants among all grants. No such ratio exists. Plaintiffs have alleged in their Complaint that 13 option grants were backdated. Of those grants, as discussed above, one clearly cannot support an inference of backdating due to Plaintiffs' contradictory allegations (November 4, 1997); five were tied to corporate events (September 14, 1998; November 8, 1999; February 25, 2000; March 28, 2000; and September 11, 2000), and Sunrise's stock price during the relevant periods does not support any inference of backdating for another two (November 24, 2000; and November 12, 2001).

      In addition to the 13 option grants challenged in the Complaint, SEC filings show that options were granted to Sunrise officers and/or directors on six other dates during the relevant period (April 28, 1997; January 19, 1998; April 27, 1998; April 26, 1999; May 22, 2000; and January 9, 2001). 19/ Plaintiffs do not challenge any of these grants, presumably because the

---

18/    See also In re Linear Tech. Corp., No. 06-03290, 2006 WL 3533024, at *3 (N.D. Cal. Dec. 7, 2006) (slip copy) (rejecting assertion of "striking pattern" of backdating where plaintiffs pled no facts concerning how often and at what times options were granted in past).

19/    See Form 5 filed by Aprahamian Feb. 5, 1998 (disclosing Apr. 28, 1997 options grant), Ex. 20 hereto; Form 3 filed by Tomasso Mar. 4, 1998 (disclosing Jan. 19, 1998 options grant), Ex. 21 hereto; Form 5 filed by Aprahamian Feb. 15, 2000 (disclosing Apr. 27, 1998 and April 26,

"numbers" are either neutral or unfavorable. When these 19 different options grants (including the six omitted from the Amended Complaint) are examined, it is evident that at least 14, or 74% of the total, <u>refute</u> any suggestion of backdating.

Thus, even if the five remaining option grants challenged in the Complaint could be classified as "favorable," there is no basis to infer the alleged "extraordinary pattern" based on just five out of 19 grants.

**2.    The Alleged Backdating Does Not Establish that A Majority of the Current Directors Is Interested.**

As illustrated in Table 1, below, none of the Current Directors alleged to have received options on one or more of the challenged grants is interested for purposes of demand futility. Plaintiffs failed to plead particularized facts upon which a reasonable inference of backdating can be drawn with respect to any of those grants. In addition, Plaintiffs are precluded from asserting demand futility with respect to grant dates for which the Virginia courts have already held that demand was required in <u>Von Guggenberg</u>.

Table 1

| Grant Date | Alleged to Have Approved | Alleged to Have Received | Reason(s) Demand is Not Excused |
|---|---|---|---|
| 05/02/1997 | Donohue | Aprahamian | • Precluded by <u>Von Guggenberg</u><br>• Cannot establish pattern in isolation |
| 10/08/1998 | Donohue | Donohue | • Cannot establish pattern in isolation |
| 11/08/1999 | Donohue, Callen | Callen | • Precluded by <u>Von Guggenberg</u><br>• Grant date tied to corporate event<br>• Stock price belies alleged backdating |
| 02/25/2000 | Donohue, Callen | Aprahamian, Callen, Donohue | • Precluded by <u>Von Guggenberg</u><br>• Grant date tied to corporate event |
| 09/11/2000 | Donohue, Callen | Klaassen | • Precluded by <u>Von Guggenberg</u><br>• Grant date tied to corporate event |

1999 options grants), Ex. 22 hereto; Form 4 filed by Aprahamian Jul. 9, 2001 (disclosing Jan. 9, 2001 options grant), Ex. 23 hereto.

Even assuming that (1) an inference of backdating can be inferred from grants that were not tied to a corporate event and appear to be "favorable" when considered in isolation, and (2) that Plaintiffs are not precluded from asserting demand futility with respect to grant dates for which the Virginia courts have already determined that demand is required, at most, only two Current Directors are alleged to have granted and/or received such options:  Aprahamian (May 2, 1997) and Donohue (October 8, 1998).  As a result, at least five Current Directors (Callen, Holladay, Paul Klaassen, Teresa Klaassen and Little) are disinterested and could consider a demand on Counts I-VIII and Count XI.

### C. No Particularized Facts Are Pled to Excuse Demand for Claims Based on Alleged Accounting Issues.

Plaintiffs' claims in Counts I-III, VI, and XI arise, in whole or in part, from various alleged accounting issues at Sunrise.  There are two factual predicates underlying all of these allegations: (1) the purported backdating of stock options grants and (2) the allegedly improper accounting for real estate joint ventures and sales of real estate.  Id. at ¶¶ 268-69.  As discussed above, Plaintiffs have failed to plead particularized facts sufficient to establish a reasonable inference that any backdating occurred.  Similarly, Plaintiffs have failed to plead particularized facts to support their conclusory allegations that the Current Directors "knowingly and deliberately" participated in the alleged accounting irregularities.

Indeed, Plaintiffs allege that every Current Director "knowingly and deliberately" participated in the alleged accounting issues, and thus assert that every Current Director is incapable of considering a demand on these claims.  Am. Compl. ¶¶ 287, 294, 298, 300, 304, 307, 309.  Plaintiffs' "factual allegations" regarding Sunrise's accounting for real estate transactions consist of nothing but generic statements of the titles and job descriptions of the various directors and officers (Am. Compl. ¶¶ 39-43), excerpts from Company statements about

-28-

Sunrise's finances (id. at ¶¶ 44-55, 140-220), and recitations of various accounting rules and regulations.  Id. at ¶¶ 243-267.  Based on these generalized statements alone, Plaintiffs assert that each of the Current Directors is incapable of considering a demand on any accounting-related claim because they "knowingly and deliberately" misstated Sunrise's financial position, and thus face a substantial threat of liability.  Id. at ¶¶ 287, 294, 298, 300, 304, 307, 309.

        "[A] complaint cannot establish a 'substantial likelihood' of director liability that excuses demand by merely making conclusory allegations that a director disseminated financial statements he knew to be false."  In re Computer Sciences Corp. Derivative Litig., No. 06-05288, 2007 WL 1321715, at *9 (C.D. Cal. 2007) (applying Delaware law) (citations omitted); accord Jones ex rel. CSK Auto Corp. v. Jenkins, 503 F. Supp. 2d 1325, 1334 (D. Ariz. 2007) (applying Delaware law).  Instead, a plaintiff must provide particularized allegations detailing the precise role that the director played at the company, the information that would have come to his attention in that role, and an indication as to why he would have perceived the accounting irregularities.  Guttman v. Huang, 823 A.2d at 502 (allegation that directors "had reason to know that the company's financial statements were misstated" not sufficient to excuse demand).

        Plaintiffs provide no such particularized allegations in their Amended Complaint.  Thus, Plaintiffs' allegations are insufficient to create a reasonable doubt that any of the Current Directors is interested because they face a substantial threat of liability.  E.g., Ferre v. McGrath, No. 06-01684, 2007 WL 1180650, at *6 (S.D.N.Y. 2006) (slip) (applying Delaware law) ("[a]llegations of knowledge explained solely by the directors' service as directors, without more, are insufficient as a matter of law"); CSK Auto Corp., 503 F. Supp. 2d at 1334 (demand not excused where complaint made "no mention of how [the directors] learned of [the company's] improper accounting, who presented [the directors] with the information, when, or

how the [directors'] response or lack thereof rendered them active participants in [the company's] wrongdoing").

**D.    No Particularized Facts Are Pled to Excuse Demand for Claims Based on Alleged <u>Ultra</u> <u>Vires</u> Grants.**

Demand was required with respect to Plaintiffs' Counts IX (unjust enrichment) and X (rescission).  These claims both arise from the alleged receipt of purportedly <u>ultra</u> <u>vires</u> stock options on March 3, 1998, and May 11, 2001.  Am. Compl. at ¶¶ 133-39, 354-60.  No Current Directors received the challenged grants on either date.

Plaintiffs do not allege that any Current Directors were granted options on March 3, 1998.  However, Plaintiffs do allege that options were granted to Callen and Donohue on May 11, 2001.  <u>Id.</u> at ¶¶ 80-85.  This is simply wrong.  As stated in the April 5, 2002 Proxy Statement (cited at Am. Compl. ¶ 102(e)), as well as in Form 4s filed with the SEC by both Callen and Donohue (<u>see</u> Proxy Statement, Ex. 24 hereto, and Form 4s, Ex. 25 hereto), the only options granted to these directors in 2001 were those granted on January 9, 2001 (not challenged in the Complaint). 20/  Plaintiffs cannot claim that Callen or Donohue are interested based on the alleged receipt of options that were not, in fact, granted.

**E.    No Particularized Facts Are Pled to Excuse Demand for Claims Based on Alleged Insider Trading.**

Plaintiffs' Count XI (Insider Selling and Misappropriation of Information) is based on the alleged sale of Sunrise stock with the knowledge of purportedly improper option grants and accounting practices.  Am. Compl. ¶ 364.  Plaintiffs allege that six of the Current Directors – Aprahamian, Callen, Donohue, Holladay, Paul Klaassen, and Teresa Klaassen – sold

---

20/    The Form 4s stated that Callen received 10,000 options and Donohue received 12,000 on the actual grant date of January 9, 2001, and these amounts correspond precisely with the total number of options listed in the Proxy Statement for that year.  <u>See</u> Proxy Statement, Ex. 24, and Form 4s, Ex. 25.

Sunrise shares while in possession of material, non-public information regarding the alleged

stock options backdating and/or purported accounting irregularities.  Id. ¶¶ 361-65.

Initially, there is no cause of action under Delaware law for "insider selling and

misappropriation of information."  Such claims are typically brought as claims for breach of

fiduciary duty.  See, e.g., In re Oracle Corp. Derivative Litig., 808 A.2d 1206, 1208 (Del. Ch.

2002).  For this reason alone, Count XI should be dismissed.

In any event, Plaintiffs' allegations are insufficient to excuse demand because they

fail to establish that a majority of the Current Directors participated in any improper insider

trading or are otherwise incapable of considering a demand on this claim.

First, as discussed above, Plaintiffs have failed to create an inference that any

backdating occurred or that any Current Director had knowledge of the alleged accounting

issues.  Thus, the premise of Plaintiffs' insider trading claim is baseless.

Second, Delaware law "makes the same policy judgment as federal law does with

regard to claims of insider trading, which is that insider trading claims depend importantly on

proof that the selling defendants acted with scienter."  Guttman, 823 A.2d at 505.  Thus, in order

to excuse demand on an insider trading claim under Delaware law, Plaintiffs must plead specific

facts creating an inference that "each sale by each individual defendant was entered into and

completed on the basis of, and because of, adverse material non-public information."  Rattner v.

Bidzos, No. 03-19700, 2003 WL 22284323, at *11 (Del. Ch. Sept. 30, 2003) (unpublished)

(emphasis added); see also Guttman, 823 A.2d at 503-04.  Conclusory allegations that a director

"had reason to know that the company's financial statements were misstated" are not sufficient.

Guttman, 823 A.2d at 503.  Rather, Plaintiffs must provide "well-pled, particularized allegations

of fact detailing the precise roles that these directors played at the company, the information that

would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities." Id.

Other than some paragraphs excerpted from a newspaper article that vaguely describe a few transactions (see Am. Compl. ¶ 228), Plaintiffs provide no specific details of the transactions underlying their insider trading claims. Instead, Plaintiffs provide a chart that lists only the total sales of Sunrise shares by various Defendants over a nine-year period. See Am. Compl. ¶ 241.

For these reasons, Plaintiffs' allegations are insufficient to create an inference that any Current Director is incapable of considering a demand on Count XI.

**F.    No Particularized Facts Are Pled to Excuse Demand for Claims Based on Alleged Approval of Challenged Transactions or Financial Statements.**

Plaintiffs' generalized allegations that one or more of the Current Directors breached fiduciary duties are "insufficient to demonstrate that the [director] engaged in conduct that resulted in a substantial risk of personal liability." In re Silicon Graphics Sec. Litig., 183 F.3d 970, 990 (9th Cir. 1999) (applying Delaware law). So, too, are Plaintiffs' conclusory allegations that one or more of the Current Directors approved options grants or other challenged transactions or financial statements. See, e.g., Guttman, 823 A.2d at 503 (demand not excused where plaintiff's complaint lacked "well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities").

Specifically, Plaintiffs' sweeping conclusions that Callen and Donohue face a substantial threat of liability simply because of their service on the Compensation Committee are insufficient to render them interested. Even assuming, arguendo, that a reasonable inference of

backdating can be drawn, Plaintiffs conclusory assertions cannot establish that any Current

Director is interested based on his approval of the challenged grants.  "[T]he mere threat of

personal liability for approving a questioned transaction, standing alone, is insufficient to

challenge either the independence or disinterestedness of directors."  Aronson, 473 A.2d at 815;

see also Blasband v. Rales, 971 F.2d 1034, 1049 (3d Cir. 1992) (applying Delaware law)

("plaintiff may not bootstrap allegations of futility merely by pleading that the directors

participated in the challenged transaction.").  Plaintiffs have not pled facts establishing that any

of these Current Directors approved a particular challenged grant. 21/  Such conclusory

allegations of generalized director approvals are insufficient to excuse demand.  See Guttman,

823 A.2d at 503; Grobow v. Perot, 526 A.2d 914, 924 (Del. Ch. 1987), aff'd, 539 A.2d 180 (Del.

1988) (demand not excused based on mere allegations that the directors "approved, participated,

or acquiesced in a challenged transaction").

       Similarly, Plaintiffs allege that Aprahamian, Callen, Donohue, and Holladay are

interested because they face a substantial threat of liability due to their service on the Audit

Committee.  Am. Compl. ¶¶ 298, 300, 304, 307.  In particular, Plaintiffs assert in a purely

conclusory fashion that these Current Directors "knowingly and deliberately participated in and

approved the filing of false financial statements and other S.E.C. filings" and "knowingly and

deliberately participated in and approved" purported accounting violations.  Id.  Here as well,

Plaintiffs' conclusory allegations are insufficient to excuse demand. 22/  See Guttman, 823 A.2d

---

21/     Indeed, Callen did not join the Compensation Committee until 1999, and thus could not
have approved any of the six challenged options granted prior to that time.  Am. Compl. ¶ 21.

22/     Without particularized factual allegations as to how, why, and when these Current
Directors would have become aware of the alleged issuance of backdated options, the Court
cannot infer they knowingly approved any false financial statements as members of the Audit
Committee.  See, e.g., In re Computer Sciences Corp., 2007 WL 1321715, at *9; In re Xcel
Energy, Inc., 222 F.R.D. 603, 607 (D. Minn. 2004) (looking to Delaware law for guidance and
holding that generalized statements that Audit Committee members "knew or should have

at 503; In re Computer Sciences Corp. Derivative Litig., 2007 WL 1321715, at *9 (plaintiffs must plead "specific allegations of facts concerning the likely or actual time, place and manner of specific communications related to the wrongful backdating as well as facts supporting the alleged knowledge of the Audit Committee Defendants of the backdating").

**G.    No Particularized Facts Are Pled to Establish that Any Current Director Is Beholden To An Interested Current Director.**

As discussed above, Plaintiffs have not pled particularized facts to support their conclusions that any of the Current Directors is interested, and thus incapable of considering pre-suit demand, based on their purported approval or receipt of backdated stock options, their purported approval of accounting issues, their purported receipt of ultra vires options, or their purported insider trading.  Because no Current Directors are interested in any of the challenged transactions or events, the relationships among the Current Directors are irrelevant for demand analysis purposes.

Nevertheless, even if one or more Current Directors were deemed "interested" in any transaction or event, Plaintiffs allegations are insufficient to establish that any other Current Director is beholden to an interested Current Director, such that a majority of Current Directors is interested with respect to any of Plaintiff's claims.

**1.    The Fact That Paul and Teresa Klaassen Are Married Is Irrelevant, Because Neither Is Interested.**

Plaintiffs assert that Paul and Teresa Klaassen are incapable of considering a demand simply because they are married.  Am. Compl. ¶¶ 290, 296.  That the Klaassens are married, however, does not render them incapable of considering a presuit demand.  Under

---

known" of false statements did "not constitute facts pleaded with particularity").  Indeed, Plaintiffs concede that the Audit Committee relied on management and an independent auditor in carrying out its duties.  Am. Compl. ¶ 43.  Under Delaware law, a director is not liable for accounting errors when relying in good faith on corporate officials or independent accountants. Prince v. Bensinger, 244 A.2d 89, 94 (Del. Ch. 1968); Del. Code Ann. tit 8, § 141(e).

Rules, Plaintiffs must first establish that one of the Klaassens is interested before both can be disqualified on the basis of their marriage. Plaintiffs have not alleged that Teresa Klaassen received any challenged options, or that either of the Klaassens approved them. And, as explained above, the only challenged options allegedly received by Paul Klaassen (September 11, 2000) were issued in conjunction with his employment agreement, so there is no basis to infer that the options were backdated, or that Paul Klaassen is interested for purposes of demand futility.

## 2. Paul Klaassen's Relationship With Swinton Is Irrelevant, Because Swinton is Not a Current Director.

Plaintiffs' allegation that Paul Klaassen and Swinton share a personal and professional relationship is irrelevant. Am. Compl. ¶ 293. Swinton is not a Current Director, and thus (by definition) Paul Klaassen cannot be beholden to him for purposes of demand futility.

## 3. Paul and Teresa Klaassen Are Not Beholden to the Compensation Committee.

Plaintiffs claim that Paul Klaassen and Teresa Klaassen are not independent because they are beholden to the current members of the Compensation Committee (Aprahamian, Callen, and Donohue). Am. Compl. ¶¶ 287, 294. Under Delaware law, a director may be considered beholden to an entity only when that entity, directly or indirectly, has the unilateral power to decide whether the director "continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively." Orman v. Cullman, 794 A.2d 5, 25 n.50 (Del. Ch. 2002) (emphasis added).

Plaintiffs vaguely assert that the Klaassens "stand[ ] to earn millions of dollars in annual salary, bonuses, and other compensation, all of which must be approved by" the

Compensation Committee. Am. Compl. ¶¶ 287, 294. This assertion, however, ignores the overriding reality that the Klaassens own in excess of 5,000,000 shares of Sunrise stock worth more than $130 million. See Form 4 filed Mar. 19, 2008, Ex. 26 hereto. It defies common sense to suggest that the Klaassens' annual compensation would cause them to elevate the wishes of one or more members of the Compensation Committee over the welfare of the Company, in which they hold an enormous stake, or their fiduciary duties to their shareholders, with whom their interests clearly are aligned. See, e.g., In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 356 (Del. Ch. 1998), rev'd on other grounds sub nom., Brehm v. Eisner, 746 A.2d 244 (Del. 2000). (where a director owns substantial stake in the corporation, the "only reasonable inference [the court can draw] is that he is an economically rational individual whose priority is to protect the value of his" investment, "not someone who would intentionally risk his own and his family's interests in order to placate" another director).

### 4.    Little, Donohue, and Paul and Teresa Klaassen Are Not Beholden to One Another.

Plaintiffs allege that Paul Klaassen, Teresa Klaassen, Little, and Donohue are beholden to each other based on alleged personal and business relationships. Am. Compl. ¶¶ 291, 292, 297, 302, 303, 310. Specifically, Plaintiffs assert that Paul Klaassen, Little, and Donohue "share a long-standing personal and professional relationship" based on their mutual service on the Board of Directors of the U.S. Chamber of Commerce (of which Donohue is the President and Chief Executive Officer), and as fellow members of the U.S. Chamber Foundation (of which Donohue is President and Little is Chairman). Id. 291, 303, 310. Plaintiffs assert that Paul Klaassen and Donohue have served together on the Board of Trustees of Marymount University. Id. at 292. And Plaintiffs assert the Paul Klaassen and Teresa Klaassen share a "long-standing personal and professional relationship" with Donohue. Am. Compl. ¶¶ 292, 297,

-36-

303. These allegations are insufficient to create an inference that Paul Klaassen, Teresa

Klaassen, Little, and Donohue are incapable of considering demand.

       Delaware courts have consistently held that directors are not deemed to lose their

independence merely because they move in the same social circles or hold seats on the same

corporate boards. <u>Beam ex rel. Martha Stewart Living</u>, 845 A.2d at 1051-52; <u>see also</u> <u>Orman</u>,

794 A.2d at 27 (Del. Ch. 2002) ("the naked assertion of a previous business relationship is not

enough to overcome the presumption of a director's independence"); <u>Highland Legacy Ltd. v.</u>

<u>Singer</u>, No. 1566, 2006 WL 741939, at *6 (Del. Ch. Mar. 17, 2006) (conclusory allegations that

directors are dominated because they serve together on the boards of unaffiliated companies is

not enough to overcome the presumption of a director's independence).

       To create a reasonable doubt about the independence of the Klaassens, Little, and

Donohue, Plaintiffs were required to plead facts that would support a reasonable inference that,

because of the nature of their relationship, the Klaassens, Little, and Donohue would be more

willing to risk their own personal fortunes and reputations than risk their relationships with each

other. <u>Beam ex rel. Martha Steward Living</u>, 845 A.2d at 1052. Plaintiffs' conclusory allegations

about mutual service on boards of the U.S. Chamber of Commerce and Marymount University

are insufficient to overcome the presumption that Klaassen, Little, and Donahue are independent

of each other. Likewise, Plaintiffs' allegations about the personal relationship between Paul and

Teresa Klaassen and Donohue are similarly insufficient to overcome the presumption of

independence. [23]/ <u>See, e.g.</u>, <u>Benihana of Tokyo, Inc. v. Benihana, Inc.</u>, 891 A.2d 150, 178-79

---

[23]/    Plaintiffs allegations fall far short of the detailed factual pleading required to overcome
the Klaassens' presumption of independence. For example, Plaintiffs assert that Paul and Teresa
Klaassen "lived with Donohue for a period of time" (<u>see</u> Am. Compl. ¶ 303), and that Donohue
"invested" in the Klaassen's first home (<u>id.</u>), but allege no particularized facts about the timing or
circumstances of these events. These broad allegations cannot create an inference that the
Klaassens' relationship with Donohue is such that they are beholden to him, especially when
considered in light of the Klaassens' substantial personal wealth.

(Del. Ch. 2005) (40-year friendship between directors not enough to establish lack of independence from each other).

### 5. Callen's Employment Does Not Disqualify Him from Considering a Demand.

Plaintiffs vaguely allege that Callen's ability to exercise independent judgment is affected by his employment with Donaldson, Lufkin, & Jenrette ("DLJ"); Credit Suisse First Boston; and Aetna. Am. Compl. ¶ 306. Plaintiffs' provide no details about Callen's alleged employment with these companies or their relationship with Sunrise, other than to state that the companies "have done business" with Sunrise or, with regard to DLJ, "provided financial advisory services to Sunrise." Id. These allegations are insufficient to establish that Callen is incapable of independent judgment. See, e.g., Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins, No. 20228, 2004 WL 1949290, at *11 (Del. Ch. Aug. 24, 2004) (unpublished) (no inference of control where complaint did not specify the amount of money the challenged director's law firm received from the corporation because court could not determine whether those fees constituted such a large part of the firm's income so as to be material to either the firm or the director).

### III. In the Alternative, the Court Should Stay the Instant Suit Until the Federal Class Action Claims Have Been Resolved.

Even if the Court does not dismiss the instant suit for failure to make the required demand, it should nevertheless enter a stay in favor of the Federal Class Action pending before the Court. The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 879 n. 6 (1998). Thus, a trial court may find it is efficient for its own docket, and the fairest course for the parties, to enter

a stay of an action before it, pending resolution of independent proceedings that bear upon the case. Hisler v. Gallaudet Univ., 344 F. Supp. 2d 29, 35 (D.D.C. 2004).

The party moving for a stay must show that it will suffer hardship or inequity in being required to go forward, and the decision whether to grant a stay is "an exercise of judgment" in which the Court must "weigh competing interests" of itself, counsel, and the litigants involved. Dellinger v. Mitchell, 442 F.2d 782, 786 (D.C. Cir. 1971) (citations omitted). Under the circumstances, all of these factors are readily apparent.

Because a derivative suit is brought by a shareholder on the corporation's behalf, the beneficial plaintiff is the corporation itself. Reiter v. Universal Marion Corp., 173 F. Supp. 13, 15 (D.D.C 1959), aff'd, 299 F.2d 449 (D.C. Cir. 1962). Thus, a trial court may stay a derivative suit if it determines that it is not in the corporation's best interests for the suit to go forward. See, e.g., Breault v. Folino, No. 01-00826, 2002 WL 31974381, at *1-2 (C.D. Cal. Mar. 15, 2002); cf. Massey v. Merrill Lynch & Co., Inc., 464 F.3d 642, 647 (7th Cir. 2006) (recognizing that the derivative plaintiff and the corporation "may have different interests and goals in litigation, and [the shareholder plaintiff] could act in ways that harm the corporation, even if unintentionally"). In this case, the interests of judicial economy and the interests of the beneficial plaintiff – Sunrise – clearly favor a stay of the Federal Derivative Suit in favor of the Federal Class Action.

Sound judicial administration counsels against the "wasteful expenditure of energy and money" implicated by litigation the same issues in separate proceedings. Columbia Plaza Corp. v. Sec. Nat'l Bank, 525 F.2d 620, 626 (D.C. Cir. 1975). Although one action is brought directly and the other derivatively, the claims asserted by the Plaintiffs in the Federal Derivative Suit and the Federal Class Action arise from virtually identical factual predicates – allegedly improper stock option grants and other transactions, and financial misstatements

-39-

arising from those challenged transactions. [24]/  Accordingly, the outcome of many of the claims asserted in the Federal Class Action and the Federal Derivative Suit will turn on the determination of the same factual and legal issues.

        For example, a finding in the Federal Class Action that no backdating occurred at Sunrise would conclusively resolve at least nine of the 11 claims asserted in the Federal Derivative Suit.  It would be a waste of the Court's time and resources for such potentially dispositive issues to be litigated in separate proceedings.  See Fairview Hosp. v. Leavitt, No. 05-1065, 2007 WL 1521233, at *2-3 (D.D.C. May 22, 2007) (unpublished) (citations omitted) ("[g]iven the indistinguishable nature of the legal issues and defenses raised [in the simultaneous proceeding] and the case at hand, efficiency requires that this case be stayed"); Brudno v. Wise, No. 03-19953, 2003 WL 1874750, at *1 (Del. Ch. Apr. 1, 2003) (staying derivative suit based on the same misconduct alleged in class action against corporate defendant because if corporation successfully defended against the class action, at least some of the derivative claims would not survive). [25]/

---

[24]/    Counts I-VIII of the Federal Derivative Suit arise directly from allegedly backdated options granted between May 2, 1997 and Nov. 12, 2001; Count XI of the Federal Derivative Suit arises from alleged "insider trading" by certain Individual Defendants while in possession of knowledge about the alleged backdating and accounting improprieties.  The Federal Class Action claims are based on the same alleged misconduct.  See Consolidated and Am. Class Action Compl. ¶¶ 239-41, 230.

[25]/    Although the derivative suit in Brudno sought to hold the directors of El Paso Corporation liable for damages and costs resulting from a federal securities class action, the success of the derivative complaint hinged on the truthfulness of the same alleged misconduct underlying the federal securities class action.  Brudno, 2003 WL 1874750, at *3-4.  The principles in Brudno, therefore, are applicable to the instant suit.  It should be noted that the district judge assigned to the securities class action and derivative suit stayed the derivative suit pending the securities class action.  Id.

Sunrise's interests will be best served if these issues are litigated directly in the Class Action rather than derivatively in the shareholders' suit. 26/ Because the issues in both suits are so similar, the prosecution of the Federal Derivative Suit will inevitably conflict with Sunrise's ability to defend itself in the Federal Class Action.

For example, a finding in this suit of intentional wrongdoing by Sunrise directors or senior officers, and any preclusive effect such findings would be given in the Federal Class Action, could be imputed to Sunrise and form the basis for its own liability in the Federal Class Action. Thus, the very action that Plaintiffs bring purportedly to benefit Sunrise would have just the opposite effect. See also In re E.F. Hutton Banking Practices Litig., 634 F. Supp. 265, 270 (S.D.N.Y. 1986) (recognizing that directors whom plaintiffs wished to sue derivatively would be important witnesses for the corporation in pending direct litigation, and that the derivative suit might "undercut their veracity and general effectiveness as witnesses" on the corporation's behalf); Breault, 2002 WL 31974381, at *2 (staying derivative action because named defendants would likely be witnesses for the corporation in pending direct action).

Moreover, by consuming valuable financial and management resources at a time when those resources are needed to defend itself in the Federal Class Action, allowing the Federal Derivative Suit to proceed now will harm Sunrise's ability to protect the Company, and as a result, the interests of its shareholders. See Breault, 2002 WL 31974381, at *2 (staying derivative action because it would divert corporation's resources from defense of direct action).

Finally, because a derivative suit is brought by a shareholder on behalf of the corporation and for the corporation's (not the shareholders') benefit, the Plaintiffs' interests here should be equivalent to Sunrise's best interests. Plaintiffs cannot claim any prejudice in light of

---

26/    Given the nature of derivative suits, the protection of the defendant corporation's interests are especially important.

the benefits to Sunrise likely to flow from a stay of the Federal Derivative Suit.  Thus, for all these reasons a stay is appropriate.

## CONCLUSION

For these reasons, the Court should dismiss the instant suit in its entirety or, in the alternative, and at a minimum, enter a stay until the Federal Class Action has been resolved.

## REQUEST FOR ORAL HEARING

Pursuant to Local Rules 7(f) and 78.1, Sunrise hereby requests an oral hearing on Nominal Defendant's Sunrise Senior Living, Inc.'s Motion to Dismiss, or in the Alternative, to Stay.

Respectfully Submitted,

HOGAN & HARTSON LLP

By:  /s/  Jon M. Talotta
George H. Mernick, III (D.C. Bar No. 294256)
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone:  (202) 637-5726
Fax:  (202) 637-5910
E-mail:  GHMernick@hhlaw.com

N. Thomas Connally (D.C. Bar No. 448355)
Jon M. Talotta (D.C. Bar No. 473626)
8300 Greensboro Drive, Suite 1100
McLean, VA 22102
Telephone:  (703) 610-6100
Fax:  (703) 610-6200
E-mail:  NTConnally@hhlaw.com
E-mail:  JMTalotta@hhlaw.com

Dated:  June 16, 2008

*Attorneys for Nominal Defendant*
*Sunrise Senior Living, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on June 16, 2008, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, and mailed via U.S. Mail, postage prepaid, a copy of the

foregoing to:


George R. Murphy
Mark Hanna
Joni S. Jacobs
DAVIS, COWELL & BOWE, LLP
1701 K Street NW, Suite 210
Washington, DC 20006

*Liaison Counsel for Plaintiffs*


Eric L. Zagar
Michael C. Wagner
J. Daniel Albert
SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
280 King of Prussia Road
Radnor, PA  19087

Maya Saxena
Joseph White
SAXENA WHITE P.A.
2424 North Federal Highway, Suite 257
Boca Raton, FL  33431

Brian J. Robbins
Felipe J. Arroyo
Ashley R. Palmer
ROBBINS, UMEDA, & FINK LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101

*Co-Lead Counsels for Plaintiffs*

John C. Millian
Matthew R. Estabrook
GIBSON DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

*Attorneys for Defendants Carl Adams, Ronald V. Aprahamian,
Craig R. Callen, Thomas J. Donohue, Richard A. Doppelt, David
W. Faeder, John F. Gaul, J. Douglas Holladay, Larry E. Hulse,
Paul L. Klaassen, Teresa M. Klaassen, Pete A. Klisares, William
Little, J. Willard Marriott, Jr., Scott F. Meadow, Darcy Moore,
Thomas B. Newell, Robert R. Slager, Christian B.A. Slavin,
Timothy S. Smick, Brian C. Swinton, Tiffany L. Tomasso*

John M. Dowd
Jeffrey M. King
Elizabeth C. Peterson
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

*Attorneys for Defendant Bradley R. Rush*

Philip A. Sechler
Vidya Atre Mirmira
Scott K. Dasovich
WILLIAMS & CONNOLLY, LLP
725 12th Street, N.W.
Washington, DC 20005

*Attorneys for Defendant David G. Bradley*

/s/     Jon M. Talotta
Jon M. Talotta (DC Bar 473626)
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, Virginia  22102
Telephone:   (703) 610-6100
Facsimile:    (703) 610-6200
E-mail:  jmtalotta@hhlaw.com

*Attorney for Nominal Defendant
Sunrise Senior Living, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
In Re SUNRISE SENIOR LIVING, INC.         )
Derivative Litigation                             )          Civil Action No. 1:07CV00143
_____)          Judge Reggie B. Walton
                                                    )
This Document Relates To:                     )
                                                    )
    ALL ACTIONS                                 )
_____)


## INDEX OF EXHIBITS TO MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY BY NOMINAL DEFENDANT SUNRISE SENIOR LIVING, INC.

## INDEX OF EXHIBITS

1.      June 21, 2007 Sunrise News Release

2.      September 10, 2007 Sunrise News Release

3.      Von Guggenberg Complaint (VA)

4.      September 15, 2006 Final Order

5.      April 27, 2007 Order

6.      Molner Complaint (VA)

7.      October 1 2007 Sunrise 8-K

8.      December 11, 2006 Sunrise News Release

9.      May 29, 2007 Sunrise News Release

10.     Young Complaint (DE)

11.     Amended Young Complaint. (DE)

12.     November 2, 2007 Sunrise Motion to Dismiss Amended Complaint (Young)

13.     November 10, 1998 Sunrise 10-Q

14.     April 6, 1999 Sunrise Proxy Statement

15.     March 31, 1998 Sunrise 10-K

16.     March 31, 1999 Sunrise 10-K

17.     April 14, 2000 Sunrise Proxy Statement

18.     March 28, 2000 PRNewswire

19.     November 13, 2000 Sunrise 10-Q (Klaassen Employment Agreement attached)

20.     February 5, 1998 Aprahamian Form 5

21.     March 4, 1998 Tomasso Form 3

22.     February 15, 2000 Aprahamian Form 5

23.     July 9, 2001 Aprahamian Form 4

24.     April 5, 2002 Sunrise Proxy Statement

25.     July 9, 2001 Callen and Donohue Form 4s

26.     March 19, 2008 Klaassens Form 4

# EXHIBIT  1



## News Release

### Sunrise Announces Appointment of New Director

MCLEAN, Va., June 21, 2007 /PRNewswire-FirstCall via COMTEX News Network/ -- Sunrise Senior Living, Inc. (NYSE: SRZ), today announced that, effective June 20, 2007, its board of directors had expanded the size of the board from seven to eight members and appointed Stephen D. Harlan to the newly created directorship in the class of directors whose term of office expires at the 2008 annual meeting of stockholders.

"Steve is a welcome addition to Sunrise's board of directors," said Doug Holladay, chairman of Sunrise's nominating and corporate governance committee. "He shares Sunrise's mission and commitment to seniors, and we believe his accounting and business expertise will be extremely beneficial to the company."

Mr. Harlan was vice chairman of KPMG Peat Marwick, where he also served on KPMG's international council, board of directors, and management committee. In June 1995, President Clinton appointed Mr. Harlan to the District of Columbia Financial Responsibility and Management Assistance Authority, where he served as vice chairman until September 1998. Mr. Harlan also served as a director of FBR Asset Investment Corporation, a real estate investment trust that invested in mortgage-backed securities and in debt and equity securities of companies engaged in real estate-related and other businesses, since its founding in 1997 and, upon the merger of FBR Asset Investment Corporation with Friedman, Billings, Ramsey Group, Inc., an investment banking firm, in March 2003, he became a director of Friedman, Billings, Ramsey Group, Inc. He also serves as chairman of the audit committee of its board of directors. He is the chairman of Harlan Enterprises, LLC, a specialized real estate firm that invests in commercial real estate. Before joining Harlan Enterprises, LLC, he was chairman of H.G. Smithy, a specialized real estate firm that provides mortgage banking, finance, investment advisory and property management services to commercial real estate investors, from 1993 to 2001. Mr. Harlan is a member of the board of directors of Harris Interactive Inc., a market research, polling and consulting company and of ING Direct Bank, a retail virtual bank offering services over the internet, phone or by mail. He is also a director of Medstar Health, a non-profit, community-based healthcare organization serving the Baltimore/Washington region, a director of the Loughran Foundation, a non-profit organization dedicated to education and the performing arts, and a Trustee of the Carnegie Endowment for International Peace, a private, non-profit organization dedicated to advancing cooperation between nations and promoting active international engagement by the United States.

In addition to his appointment as a director of the Company, Mr. Harlan was also appointed as a member of the audit committee. In connection with Mr. Harlan's appointment as a director, the Company's board determined that Mr. Harlan is "independent" within the meaning of the rules of the New York Stock Exchange and the Company's corporate governance guidelines and qualifies as an "audit committee financial expert" as defined under the rules of the Securities and Exchange Commission. As a member of the Company's audit committee, it is expected that Mr. Harlan will play an important role in overseeing completion of the pending restatement of the Company's historical financial statements.

Mr. Harlan's appointment as a director was unanimously recommended by the nominating and corporate governance committee of Sunrise's board of directors. Consistent with the Company's corporate governance guidelines, the nominating and corporate governance committee will continue to review and evaluate the composition of Sunrise's board, including the appointment of additional directors as necessary.

About Sunrise Senior Living

Sunrise Senior Living, a McLean, Va.-based company, employs approximately 40,000 people. As of March 31, 2007, Sunrise operated 444 communities in the United States, Canada, Germany and the United Kingdom, with a combined capacity for more than 52,000 residents. At quarter end, Sunrise also had 42 communities under construction in these countries with a combined capacity for more than 6,300 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing, rehabilitative and hospice care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

SOURCE Sunrise Senior Living, Inc.

Case 1:07-cv-00286-RBW     Document 62-3     Filed 06/16/2008     Page 3 of 3

Lisa Mayr, Vice President, Investor Relations and Capital Markets for Sunrise Senior Living, Inc., +1-703-744-1787

# EXHIBIT  2



---

## News Release

## Sunrise Appoints New Chief Financial Officer; Settles 2007 Annual Meeting Litigation and Appoints New Director

MCLEAN, Va., Sept. 10 /PRNewswire-FirstCall/ -- Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that on September 6, 2007 its board of directors appointed Richard J. Nadeau as Sunrise's new chief financial officer. Julie A. Pangelinan, who served as acting chief financial officer from April 23, 2007 through September 5, 2007, will continue as Sunrise's chief accounting officer and work closely with Mr. Nadeau in that role.

"We are extremely pleased that an individual of Mr. Nadeau's caliber and extensive public company accounting experience and expertise has joined us as our new chief financial officer," said Paul Klaassen, chairman and CEO of Sunrise. "We believe Mr. Nadeau will assist greatly in the completion of our pending restatement and also with our board's ongoing exploration of strategic alternatives."

Mr. Nadeau previously served since July 2007 as a consultant to Sunrise to assist with the completion of Sunrise's pending restatement and Sarbanes-Oxley Section 404 compliance efforts. From July 2006 to May 2007, Mr. Nadeau served as chief financial officer of The Mills Corporation, a publicly traded developer, owner and manager of a diversified portfolio of regional shopping malls and retail and entertainment centers. From April 2006 until July 2006, Mr. Nadeau was executive vice president of finance and accounting at Mills. Mr. Nadeau joined Mills following Mills' announcement in January 2006 of a pending restatement of its financial statements. In his role as Mills' chief financial officer, he oversaw approximately 200 people in the areas of accounting, finance and budgeting, information technology and human resources, and assisted in Mills' sale process which was successfully completed in April 2007 when Mills was acquired by Simon Property Group and Farallon Capital. From May 2005 to March 2006, Mr. Nadeau was chief financial officer of Colt Defense LLC, a privately held designer, developer and manufacturer of small arms and weapon systems. From 2002 to 2005, Mr. Nadeau was a partner at the accounting firm of KPMG LLP. While at KPMG LLP, Mr. Nadeau was the engagement and audit partner for several real estate companies, including two publicly traded REITs, and served as an SEC reviewing partner for several large public companies in the Mid-Atlantic region. From 1977 to 2002, he worked for Arthur Andersen LLP, where he served as a national practice director and audit partner, serving real estate companies, service-related companies and government contractors.

Sunrise also announced today that it has settled the litigation previously filed by Millenco, L.L.C. seeking an order from the Court of Chancery of the State of Delaware pursuant to Section 211 of the Delaware General Corporation Law requiring that Sunrise hold its 2007 annual meeting of stockholders within forty-five days after the date on which any such court order is entered. As reflected in a Stipulated Final Order entered by the Delaware Chancery Court on September 5, 2007:

- Sunrise will hold its 2007 annual meeting on October 16, 2007;
- the record date for the 2007 annual meeting will be September 24, 2007;
- the shares of stock represented at the 2007 annual meeting, either in person or by proxy, and entitled to vote thereat, will constitute a quorum for the purpose of the 2007 annual meeting, notwithstanding any provision in Sunrise's certificate of incorporation or bylaws to the contrary;
- at the 2007 annual meeting, Paul J. Klaassen and Craig R. Callen, two incumbent directors whose terms of office expire at the 2007 annual meeting, and Lynn Krominga, one of the candidates proposed by Millenco and agreed to by the Sunrise board of directors, will stand for election to the director class that will next stand for election in 2010;
- no other nominees will stand for election at the 2007 annual meeting; and
- no business will be conducted at the 2007 annual meeting other than the election of directors.

In connection with the settlement of this litigation, effective September 5, 2007 Sunrise's board of directors also expanded the size of the board from eight to nine members and appointed Ms. Krominga as a director to an initial term of office expiring at the 2007 annual meeting.

Ms. Krominga was also appointed as a member of the committee of non- management directors. As previously announced on July 25, 2007, Sunrise's board of directors has decided to explore strategic alternatives intended to enhance shareholder value, including a possible sale of Sunrise. The committee of non-management directors, originally established in April 2007, with the assistance of its legal and financial advisors, will consider and review the terms and conditions of any transaction and make a recommendation to the full board. The committee's work is ongoing. There can be no assurance that the exploration of strategic alternatives will result in a transaction.

Ms. Krominga is an attorney and business executive. Since 1999, Ms. Krominga has been a consultant to private equity and venture capital firms and to start-up and early stage technology companies. From 1981 to 1999, Ms. Krominga held various senior executive and legal offices at Revlon Consumer Products Group, including President, Licensing Division from 1992 until 1998. Prior to that, Ms. Krominga was an attorney at American Express and at Cleary, Gottlieb, Steen & Hamilton. Ms. Krominga also currently serves on the board of directors, audit committee and compensation committee of Avis Budget Group, Inc.

"Ms. Krominga's 20 plus years of experience in senior management and as a public company director make her a welcome addition to our board," said Paul Klaassen, Chairman and CEO of Sunrise.

About Sunrise Senior Living

Sunrise Senior Living, a McLean, Va.-based company, employs approximately 40,000 people. As of June 30, 2007, Sunrise operated 453 communities in the United States, Canada, Germany and the United Kingdom, with a combined capacity for more than 53,000 residents. At quarter end, Sunrise also had 38 communities under construction in these countries with a combined capacity for 6,000 additional residents. Sunrise offers a full range of personalized senior living

services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing, rehabilitative and hospice care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

Forward-Looking Statements

Certain matters discussed in this press release may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward- looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to, completion of the Company's restatement of its historical financial statements, identification of any additional matters requiring restatement, the length of time needed for Sunrise to complete the restatement and for Ernst & Young LLP to complete its procedures for any reason, including the detection of new errors or adjustments, the time required for the special independent committee to complete its review and for the Company to clear comments with the SEC, the findings of the special independent committee review, the time required for the Company to prepare and file an amended 2005 Form 10-K and its Form 10-Qs for the first three quarters of 2006, its 2006 Form 10-K and its Form 10-Qs for the first and second quarters of 2007 and its Form 10-Qs for subsequent quarters that are delayed, the outcome of the SEC's investigation, the outcome of pending putative class action and derivative litigation, the outcome of the Trinity OIG investigation, the outcome of the exploration of strategic alternatives, the possible delisting of the Company's stock from the NYSE in the event the NYSE does not grant the Company an extension of trading in September 2007 or at the expiration of any additional trading extension period, the Company's ability to comply with the terms of the amendment of its bank credit facility or to obtain a further extension of the period for providing the lenders with required financial information, development and construction risks, acquisition risks, licensing risks, business conditions, competition, changes in interest rates, the Company's ability to manage its expenses, market factors that could affect the value of the Company's properties, the risks of downturns in general economic conditions, satisfaction of closing conditions, availability of financing for development and acquisitions and other risks detailed in the Company's annual report on Form 10-K filed with the SEC. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.

SOURCE Sunrise Senior Living, Inc.

CONTACT: Lisa Mayr, Vice President, Investor Relations and Capital Markets, +1-703-744-1787

# EXHIBIT  3

VIRGINIA:

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

FILED
[illegible stamp]
06 AUG 11 PH 2: 04
[illegible]
CLERK CIRCUIT COURT
FAIRFAX VA

| | |
|---|---|
| NICHOLAS VON GUGGENBERG, Derivatively on Behalf of Nominal Defendant SUNRISE SENIOR LIVING, INC., <br><br> Plaintiff, <br><br> v. <br><br> PAUL J. KLAASSEN, DAVID W. FAEDER, TIMOTHY S. SMICK, THOMAS B. NEWELL, BRIAN C. SWINTON, CHRISTIAN B.A. SLAVIN, LARRY E. HULSE, TIFFANY L. TOMASSO, RONALD V. APRAHAMIAN, CRAIG R. CALLEN, and THOMAS J. DONAHUE, <br><br> SERVE ALL DEFENDANTS AT: <br><br> 7902 WESTPARK DRIVE MCLEAN, VA 22102 <br><br> Defendants, <br><br> and <br><br> SUNRISE SENIOR LIVING, INC., <br><br> SERVE: Any officer, director or managing Agent at: 7902 WESTPARK DRIVE MCLEAN, VA 22102 <br><br> Nominal Defendant. | Case No. CL 2006 10 174 <br><br><br><br> **JURY TRIAL DEMANDED** |

1

## VERIFIED DERIVATIVE COMPLAINT

COMES NOW THE Plaintiff, NICHOLAS VON GUGGENBERG, by his undersigned attorneys, submits this Verified Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of Directors (the "Board"), and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

2.     In gross breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants (as defined herein) colluded with one another to:

> a.     improperly backdate dozens of grants of Sunrise stock options to Sunrise executives, in violation of the Company's shareholder-approved stock option plans;
>
> b.     improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP"); and
>
> c.     produce and disseminate to Sunrise shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

3.     As a result of the Individual Defendants' egregious misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## PARTIES

4.    Plaintiff Nicholas Von Guggenberg is, and was at all relevant times, a shareholder of nominal defendant Sunrise.

5.    Nominal defendant Sunrise Senior Living, Inc. is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102. According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

6.    Defendant Paul J. Klaassen ("Klaassen") founded the Company with his wife, Sunrise director Teresa M. Klaassen ("Teresa Klaassen"), and has served as Chairman and Chief Executive Officer of Sunrise since 1991.

7.    Defendant David W. Faeder ("Faeder") served as the Company's and its predecessor entities' Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.

8.    Defendant Timothy S. Smick ("Smick") served as the Chief Operating Officer from February 1996 to January 1998, as Executive Vice President from May 1996 to January 1998, and as a director from October 1996 to March 1998.

9.    Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000, and as President of Sunrise Development, Inc., the Company's development subsidiary, and General Counsel from January 1996 to April 2000.

10.    Defendant Brian C. Swinton ("Swinton") served as the Company's Executive

3

Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc. from September 2000 to December 2002.

11. Defendant Christian B.A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May 1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004.

12. Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.

13. Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003, as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.

14. Collectively, defendants Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Hulse, and Tomasso are referred to herein as the "Officer Defendants."

15. Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of the Company since 1995. Aprahamian has also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in at least 1996, the Compensation Committee of the Board ("Compensation Committee") since at least 1996, and as a member of the Audit Committee of the Board ("Audit Committee") since at least 1996, including serving as Chair

4

since 2003.

16.    Defendant Craig R. Callen ("Callen") has served as a director of the Company since 1999, and as a member of the Compensation Committee and Audit Committee since 2004. Callen also served as a member of the Stock Option Committee from 1999 to 2002, as a member of the Compensation Committee from 1999 to 2002, and as a member of the Audit Committee in 1999.

17.    Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995. Donohue has also served as a member of the Compensation Committee since at least 1996, including serving as Chair since 2002, and as a member of the Audit Committee since at least 1996. Donohue also served as a member of the Stock Option Committee from at least 1996 to 2002.

18.    Collectively, defendants Aprahamian, Callen, and Donohue are referred to herein as the "Committee Defendants."

19.    Collectively, the Officer Defendants and Committee Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

20.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal

5

interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

21.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

22.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

    d.     exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

    e.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

23.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

(1)    make and keep books, records, and accounts, which, in reasonable and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)    transactions are executed in accordance with management's general or specific authorization;

(b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

24.    Sunrise's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.    meet to review and discuss the company's annual audited financial statements and quarterly financials statements with management and the independent auditor, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

b.    review major issues regarding accounting principles and financial statement presentations, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

c.    review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of financial statements; and

7

d.    determine whether to recommend to the Board of Directors that the annual audited financial statements be included in the Company's annual report on Form 10-K.

## FACTUAL ALLEGATIONS

25.    At all times relevant hereto the Stock Option Committee and the Compensation Committee approved grants under and supervised the administration of the Company's stock option plans.

26.    From 1996 to 2002, the Stock Option Committee and the Compensation Committee granted the Officer Defendants Sunrise stock options as follows:

| Name | Purported Date of Grant | Exercise Price | Number of Options |
|------|------------------|---------|------------|
| Klaassen | 9/11/00 | $17.00 | 350,000 |
| | | | |
| Faeder | 12/13/96 | $25.625 | 150,000 |
| | 5/2/97 | $24.375 | 100,000 |
| | 9/14/98 | $25.00 | 200,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | | | |
| Smick | 12/13/96 | $25.625 | 100,000 |
| | 5/2/97 | $24.375 | 150,000 |
| | | | |
| Newell | 12/13/96 | $25.625 | 125,000 |
| | 5/2/97 | $24.375 | 100,000 |
| | 9/14/98 | $25.00 | 200,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | 2/25/00 | $12.38 | 60,000 |
| | 3/28/00 | $12.44 | 25,000 |
| | 5/11/01 | $20.00 | 70,000 |
| | | | |
| Swinton | 12/13/96 | $25.625 | 75,000 |
| | 5/2/97 | $24.375 | 75,000 |
| | 9/14/98 | $25.00 | 100,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | 2/25/00 | $12.38 | 45,000 |
| | 3/28/00 | $12.44 | 15,000 |
| | 5/11/01 | $20.00 | 30,000 |

| | | | |
|---|---|---|---|
| Slavin | 2/25/00 | $12.38 | 55,000 |
| | 3/28/00 | $12.44 | 15,000 |
| | 11/24/00 | $26.31 | 75,000 |
| | 11/12/01 | $26.95 | 60,000 |
| | 5/17/02 | $27.15 | 60,000 |
| Hulse | 5/11/01 | $20.00 | 25,000 |
| | 5/17/02 | $27.15 | 40,000 |
| Tomasso | 9/14/98 | $25.00 | 230,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | 2/25/00 | $12.38 | 55,000 |
| | 3/28/00 | $12.44 | 15,000 |
| | 5/11/01 | $20.00 | 30,000 |
| | 5/17/02 | $27.15 | 60,000 |

27.     Pursuant to the terms of the Company's stock option plans, the exercise price of the options must be equal to the market price of the Company's stock at the date of the grant or the Company's closing stock price on the day before the grant.

28.     Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

29.     In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just before a substantial rise in Sunrise's stock price, as demonstrated in the following chart:

9

**Summary of Option Grants and Surrounding Stock Price Performance**

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days Before Grant | Stock Price 10 Trading Days After Grant | % Rise in Stock Price After Grant |
|---|---|---|---|---|
| 12/13/96 | $25.625 | $24.25 | $26.62 | 3.9% |
| 5/2/97 | $24.375 | $25.00 | $29.50 | 21.0% |
| 9/14/98 | $25.00 | $27.38 | $34.63 | 38.5% |
| 11/8/99 | $12.75 | $10.94 | $12.81 | 0.5% |
| 9/11/00 | $17.00 | $19.94 | $24.00 | 41.2% |
| 2/25/00 | $12.38 | $13.81 | $15.56 | 25.7% |
| 3/28/00 | $12.44 | $14.50 | $13.88 | 11.6% |
| 11/24/00 | $26.31 | $26.19 | $29.38 | 11.7% |
| 5/11/01 | $20.00 | $21.87 | $23.85 | 19.3% |
| 11/12/01 | $26.95 | $30.00 | $28.05 | 4.1% |
| 5/17/02 | $27.15 | $26.05 | $28.03 | 3.2% |

30.    The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Officer Defendants, the Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates. This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

### Dissemination of False Financial Statements

31.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

    a.    violated the terms of the Company's shareholder-approved stock option plans;

      b.    violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

      c.    produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants.

32.    The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

      a.    Form 10-K for the fiscal year ended December 31, 1996, filed with the SEC on March 31, 1997 and signed by defendants Klaassen, Faeder, Smick, Hulse, and Aprahamian;

      b.    Form 10-K for the fiscal year ended December 31, 1997, filed with the SEC on March 31, 1998 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

      c.    Form 10-K for the fiscal year ended December 31, 1998, filed with the SEC on March 31, 1999 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

      d.    Form 10-K for the fiscal year ended December 31, 1999, filed with the SEC on March 30, 2000 and signed by defendants Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, and Donohue;

      e.    Form 10-K405 for the fiscal year ended December 31, 2000, filed with the SEC on March 30, 2001 and signed by defendants Klaassen, Faeder, Hulse, and Donohue;

      f.    Form 10-K for the fiscal year ended December 31, 2001, filed with the SEC on March 29, 2002 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

      g.    Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003 and signed by defendants Klaassen, Hulse, and Callen.

33.    Furthermore, from 1996 to 2003, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of

11

concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Officer Defendants.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

34.    The Officer Defendants breached their fiduciary duties by:

    a.    colluding with the Committee Defendants to backdate stock option grants;

    b.    colluding with the Committee Defendants to violate GAAP;

    c.    colluding with the Committee Defendants to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.    colluding with the Committee Defendants to file false proxy statements in order to conceal the improper backdating of stock options.

35.    The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company.

36.    The Committee Defendants breached their fiduciary duties by:

    a.    colluding with the Officer Defendants to backdate stock option grants;

    b.    colluding with the Officer Defendants to violate GAAP;

    c.    colluding with the Officer Defendants to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.    colluding with the Officer Defendants to file false proxy statements in order to conceal the improper backdating of stock options.

37.    The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly

benefit the Officer Defendants at the expense of the Company.

38.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

39.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

40.    Plaintiff is an owner of Sunrise common stock and was an owner of Sunrise common stock at all times relevant hereto.

41.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

42.    As a result of the facts set forth herein, plaintiff has not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

43.    The Board currently consists of seven directors: defendants Klaassen, Aprahamian, Callen, and Donohue, and directors Teresa Klaassen, J. Douglas Holladay, and William G. Little.  The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

> a.    Klaassen, because he is directly interested in the improperly backdated stock option grants complained of herein;

13

b.    Aprahamian, Callen, and Donohue, because as members of the Stock Option Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

c.    Aprahamian, Callen, and Donohue because as members of the Compensation Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

d.    Aprahamian, Callen, and Donohue because as members of the Audit Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants; and

e.    Klaassen, Aprahamian, Callen, and Donohue, because as directors of the Company they directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Klaassen, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants.

f.    Teresa Klaassen, the wife of defendant Klaassen and the co-founder of the Company, because of her close familial and business relationship with Klaassen.

44.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS

14

## FOR BREACH OF FIDUCIARY DUTY

45. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

46. As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

47. As alleged in detail herein, the Officer Defendants breached their fiduciary duties by:

    a.    colluding with the Committee Defendants to backdate stock option grants;

    b.    colluding with the Committee Defendants to violate GAAP;

    c.    colluding with the Committee Defendants to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.    colluding with the Committee Defendants to file false proxy statements in order to conceal the improper backdating of stock options.

48. The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company.

49. As alleged in detail herein, the Committee Defendants breached their fiduciary duties by:

    a.    colluding with the Officer Defendants to backdate stock option grants;

    b.    colluding with the Officer Defendants to violate GAAP;

    c.    colluding with the Officer Defendants to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and

15

concealed the improper backdating of stock options; and

d.      colluding with the Officer Defendants to file false proxy statements in order to conceal the improper backdating of stock options.

50.     The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

51.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## COUNT II

### AGAINST THE OFFICER DEFENDANTS
### FOR UNJUST ENRICHMENT

52.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

53.     The Officer Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

54.     To remedy the Officer Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

16

WHEREFORE, Plaintiff demands judgment as follows:

A.  Against all of the Individual Defendants and in favor of the Company for the amount of $25,000,000.00 in damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.  Ordering the Officer Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.  Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.  Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: *8/11/06*

Respectfully submitted,

LAW OFFICES OF JOHN C. PASIERB, PLC

John C. Pasierb (27446)
2200 Wilson Boulevard, Suite 800
Arlington, VA 22201
Telephone: (703) 875-2260
Fax: (703) 528-3692

SCHIFFRIN & BARROWAY, LLP
Eric L. Zagar
Sandra G. Smith
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056

*Attorneys for Plaintiff*

## VERIFICATION

I, Nicholas Von Guggenberg hereby verify that I have reviewed the Complaint and authorized its filing and that the foregoing is true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

DATE: _August 8, 2006_

_____
Nicholas Von Guggenberg

COMMONWEALTH OF VIRGINIA
## CIRCUIT COURT OF FAIRFAX COUNTY
4110 CHAIN BRIDGE ROAD
FAIRFAX, VIRGINIA 22030
703-691-7320
(Press 3, Press 1)

Nicholas Von Guggenberg  vs.  Paul J Klaassen, etal.

CL-2006-0010174

> TO:    Sunrise Senior Living Inc
> Serve Any Officer director or Managing Agent
> 7902 Westpark Drive
> McLean VA 22102

## SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on Monday, August 21, 2006.

JOHN T. FREY, CLERK

By: _____
Deputy Clerk

Plaintiff's Attorney  John C. Pasierb

VIRGINIA:

# EXHIBIT  4



VIRGINIA:

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

NICHOLAS VON GUGGENBERG,                    )
                                            )
          Derivative Plaintiff,             )
                                            )
     v.                                     )      Case No. CL-200610174
                                            )
PAUL J. KLAASSEN, ET AL.,                   )
                                            )
          Defendants,                       )
                                            )
     and                                    )
                                            )
SUNRISE SENIOR LIVING, INC.,                )
                                            )
          Nominal Defendant.                )
                                            )

### *Final*    ORDER

This matter comes before the Court on Nominal Defendant Sunrise Senior Living, Inc.'s ("Sunrise") Demurrer. Having considered Sunrise's Demurrer and memorandum in support thereof, the opposition thereto, the oral arguments of counsel, and the entire record herein, it is hereby ORDERED, ADJUDGED, and DECREED that:

1.   The Demurrer is SUSTAINED;

2.   The Verified Derivative Complaint of derivative defendant Nicholas Von Guggenberg shall be and hereby is DISMISSED without prejudice. *AND LEAVE TO AMEND IS DENIED.*

Entered this __15__ day of September, 2006.

_____
Circuit Court Judge

**WE ASK FOR THIS:**

N. Thomas Connally, VSB #36318
Jon M. Talotta, VSB #44590
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, Virginia 22102
Phone: (703) 610-6100
Fax: (703) 610-6200

Charlie C.H. Lee, VSB #30410
MOORE & LEE LLP
1750 Tysons Boulevard
Suite 1450
McLean, Virginia 22102
Phone: 703-506-2050
Fax: 703-506-2051

OF COUNSEL:
George H. Mernick
HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: 202-637-5726
Fax: 202-637-5910

Counsel for Nominal Defendant
Sunrise Senior Living, Inc.

SEEN AND OBJECTED TO FOR THE REASONS IN PLAINTIFFS PLEADINGS + IN ORAL ARGUMENT

John C. Pasierb, VSB #27446
LAW OFFICES OF JOHN C. PASIERB, PLC
2200 Wilson Boulevard
Suite 800

Arlington, Virginia 22201
Phone: 703-875-2260
Fax: 703-528-3692

Eric L. Zagar
Sandra G. Smith
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Phone: 610-667-7706
Fax: 610-667-7056

Counsel for Derivative Plaintiff
Nicholas Von Guggenberg

A COPY TESTE:
JOHN T. FREY, CLERK
BY: _____
               Deputy Clerk
Dated: _____ 7-25-06
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

# EXHIBIT  5

# VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on* Friday *the* 27th *day of* April, 2007.

Nicholas Von Guggenberg,                                      Appellant,

 against        Record No. 062587
                Circuit Court No. CL-2006-10174

Paul J. Klaassen, et al.,                                      Appellees.

              From the Circuit Court of Fairfax County

        Upon review of the record in this case and consideration
of the argument submitted in support of and in opposition to the
granting of an appeal, the Court is of opinion there is no
reversible error in the judgment complained of.  Accordingly, the
Court refuses the petition for appeal.

                        A Copy,

                        Teste:

                                    Patricia L. Harrington, Clerk

                        By:

                        Deputy Clerk

# EXHIBIT  6

**V I R G I N I A:**

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

CATHERINE MOLNER, Derivatively on )
Behalf of Nominal Defendant SUNRISE )
SENIOR LIVING, INC., )
)
      Plaintiff, )
)
      v. )   Case No. _____ CL 2006 11244
)
PAUL J. KLAASSEN, DAVID W. )
FAEDER, TIMOTHY S. SMICK, )
THOMAS B. NEWELL, BRIAN C. )
SWINTON, CHRISTIAN B.A. SLAVIN, )
LARRY E. HULSE, TIFFANY L. )
TOMASSO, RONALD V. )
APRAHAMIAN, CRAIG R. CALLEN, )
and THOMAS J. DONOHUE, )
)
    SERVE ALL DEFENDANTS AT: )
)
    7902 WESTPARK DRIVE )
    MCLEAN, VA 22102 )
)
      Defendants, )
)
      and )
)
SUNRISE SENIOR LIVING, INC., )
)
      Nominal Defendant. )
_____ )

## DERIVATIVE COMPLAINT
## JURY TRIAL DEMANDED

    COMES NOW THE Plaintiff, CATHERINE MOLNER, by her attorneys, submits this

Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

    1.    This is a shareholder's derivative action brought for the benefit of nominal defendant

Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of

-1-

Directors (the "Board"), and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

2.    In gross breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants (as defined herein) colluded with one another to:

> a.    improperly backdate dozens of grants of Sunrise stock options to Sunrise executives and directors, in violation of the Company's shareholder-approved stock option plans;
>
> b.    improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP"); and
>
> c.    produce and disseminate to Sunrise shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

3.    As a result of the Individual Defendants' egregious misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## PARTIES

4.    Plaintiff Catherine Monlner is, and was at all relevant times, a shareholder of nominal defendant Sunrise.

5.    Nominal defendant Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102. According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

6.    Defendant Paul J. Klaassen ("Klaassen") founded the Company with his wife, Sunrise director Teresa M. Klaassen ("Teresa Klaassen"), and has served as Chairman and Chief Executive Officer of Sunrise since 1991.

7.    Defendant David W. Faeder ("Faeder") served as the Company's and its predecessor

entities' Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.

8.    Defendant Timothy S. Smick ("Smick") served as Chief Operating Officer of the Company from February 1996 to January 1998, as Executive Vice President of the Company from May 1996 to January 1998, and as a director of the Company from October 1996 to March 1998.

9.    Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000, and as President of Sunrise Development, Inc., the Company's development subsidiary, and General Counsel from January 1996 to April 2000.

10.    Defendant Brian C. Swinton ("Swinton") served as the Company's Executive Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc. from September 2000 to December 2002.

11.    Defendant Christian B.A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May 1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004.

12.    Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003, as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.

13. Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.

14. Collectively, defendants Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Tomasso, and Hulse are referred to herein as the "Officer Defendants."

15. Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of the Company since 1995. Aprahamian has also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in 1996 and as a member of the Audit Committee of the Board ("Audit Committee") since 1996, including serving as Chair since 2003. Aprahamian also served as a consultant to the Company beginning in May 1997.

16. Defendant Craig R. Callen ("Callen") has served as a director of the Company since 1999. Callen served as a member of the Audit Committee in 1999 and since 2004, and as a member of the Stock Option Committee from 1999 to August 23, 2002, when the Stock Option Committee merged with the Compensation Committee of the Board.

17. Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995 and as a member of the Audit Committee since 1996. Donohue served as a member of the Stock Option Committee from 1996 to August 23, 2002.

18. Collectively, defendants Aprahamian, Callen, and Donohue are referred to herein as the "Committee Defendants."

19. Collectively, the Officer Defendants and Committee Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

20. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants

owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

21.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

22.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

-5-

d.  exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e.  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

23.  The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1)  make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)  devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)  transactions are executed in accordance with management's general or specific authorization;

(b)  transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

24.  Sunrise's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.  meet to review and discuss the company's annual audited financial statements and quarterly financials statements with management and the independent auditor, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

b.  review major issues regarding accounting principles and financial statement presentations, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

c.  review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection

with the preparation of financial statements; and

d.    determine whether to recommend to the Board of Directors that the annual audited financial statements be included in the Company's annual report on Form 10-K.

## FACTUAL ALLEGATIONS

### Stock Option Grants to the Officer Defendants and Committee Defendants

25.    According to the Company's annual proxy statements, from June 5, 1996 to August 23, 2002, the Stock Option Committee had the power and authority to take all actions and make all determinations under the Company's stock option plans, including the grant of options thereunder.  On August 23, 2002, the Stock Option Committee merged with the Compensation Committee, and thereafter the Compensation Committee was responsible for administering the Company's stock option plans and determining the grants awarded under the stock option plans.

26.    From 1997 to 2001, the Stock Option Committee granted the Officer Defendants and Committee Defendants Sunrise stock options as follows:

| Name | Purported Date of Grant | Exercise Price[1] | Number of Options |
|---|---|---|---|
| Klaassen | 9/11/00 | $17.00 | 350,000 |
| Faeder | 5/2/97 | $24.375 | 100,000 |
| | 9/14/98 | $25.00 | 200,000 |
| | 11/8/99 | $12.75 | 65,000 |
| Smick | 5/2/97 | $24.375 | 150,000 |

---

[1]    The options purportedly granted on September 14, 1998 were granted pursuant to a repricing program authorized and implemented by the Stock Option Committee.  The repricing program allowed Sunrise officers to trade in options with an exercise price of more than $29.00 in exchange for an equal number of options at an exercise price of $25.00, which was the closing price of Sunrise stock on September 14, 1998.

| Name | Purported Date of Grant | Exercise Price[2] | Number of Options |
|------|------|------|------|
| Newell | 5/2/97 | $24.375 | 100,000 |
| | 9/14/98 | $25.00 | 200,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | 2/25/00 | $12.38 | 60,000 |
| | 3/28/00 | $12.44 | 25,000 |
| | 5/11/01 | $20.00 | 70,000 |
| Swinton | 5/2/97 | $24.375 | 75,000 |
| | 9/14/98 | $25.00 | 100,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | 2/25/00 | $12.38 | 45,000 |
| | 3/28/00 | $12.44 | 15,000 |
| | 5/11/01 | $20.00 | 30,000 |
| Slavin | 2/25/00 | $12.38 | 55,000 |
| | 3/28/00 | $12.44 | 15,000 |
| | 11/24/00 | $26.31 | 75,000 |
| | 11/12/01 | $26.95 | 60,000 |
| Tomasso | 9/14/98 | $25.00 | 230,000 |
| | 11/8/99 | $12.75 | 65,000 |
| | 2/25/00 | $12.38 | 55,000 |
| | 3/28/00 | $12.44 | 15,000 |
| | 5/11/01 | $20.00 | 30,000 |
| Hulse | 5/11/01 | $20.00 | 25,000 |
| Aprahamian | 5/2/97 | $24.375 | 105,000 |
| | 2/25/00 | $12.38 | 11,000 |
| Callen | 11/8/99 | $12.75 | 10,000 |
| | 2/25/00 | $12.38 | 8,000 |
| Donohue | 5/2/97 | $24.375 | 5,000 |
| | 2/25/00 | $12.38 | 16,000 |

---

[2]    The options purportedly granted on September 14, 1998 were granted pursuant to a repricing program authorized and implemented by the Stock Option Committee.  The repricing program allowed Sunrise officers to trade in options with an exercise price of more than $29.00 in exchange for an equal number of options at an exercise price of $25.00, which was the closing price of Sunrise stock on September 14, 1998.

-8-

27.    Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1996 Directors' Stock Option Plan and the 1997, 1998, 1999, 2000, and 2001 Stock Option Plans, the exercise price of options must be no less than the fair market value of Sunrise stock on the date of grant, which is defined as the closing price of Sunrise stock on the trading date immediately preceding the date of grant.

28.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the measurement date exceeds the exercise price of the options, the company must recognize the difference as an expense.

29.    In a striking pattern that could not have been the result of chance, each and every one of the foregoing stock option grants was dated just after a steep drop and just before a substantial rise in Sunrise's stock price, as demonstrated in the following charts:

a.    Summary of Option Grants and Surrounding Stock Price Performance

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days Before Grant | Stock Price 10 Trading Days After Grant | % Rise in Stock Price After Grant |
|---|---|---|---|---|
| 5/2/97 | $24.375 | $25.00 | $29.50 | 21.0% |
| 9/14/98 | $25.00[3] | $27.38 | $34.63 | 38.5% |
| 11/8/99 | $12.75 | $10.94 | $12.81 | 0.5% |
| 2/25/00 | $12.38 | $13.81 | $15.56 | 25.7% |
| 3/28/00 | $12.44 | $14.50 | $13.88 | 11.6% |
| 9/11/00 | $17.00 | $19.19 | $24.00 | 41.2% |
| 11/24/00 | $26.31 | $26.19 | $29.38 | 11.7% |
| 5/11/01 | $20.00 | $21.87 | $23.85 | 19.3% 11/12/01 |
| $26.95 | $30.00 | $28.05 | 4.1% | |

---

[3]    *See* note 1, *supra.*

b.     Stock Price Performance Surrounding Option Grant Dated 5/2/97



c.     Stock Price Performance Surrounding Option Grant Dated 9/14/98



d.     Stock Price Performance Surrounding Option Grant Dated 11/8/99



-10-

e.   Stock Price Performance Surrounding Option Grant Dated 2/25/00



f.   Stock Price Performance Surrounding Option Grant Dated 3/28/00



g.   Stock Price Performance Surrounding Option Grant Dated 9/11/00



h.    Stock Price Performance Surrounding Option Grant Dated 11/24/00



i.    Stock Price Performance Surrounding Option Grant Dated 5/11/01



j.    Stock Price Performance Surrounding Option Grant Dated 11/12/01



30.    The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were

-12-

made.   Rather, at the behest of the Officer Defendants, the Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates.  This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and Committee Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

     31.    Further evidence of defendants' backdating of stock options is the fact that the prices of many of the foregoing options coincide with some of Sunrise's lowest closing prices of the respective years 1997 to 2001, as demonstrated in the following charts:

     a.    1997 Closing Prices



-13-

b.    1998 Closing Prices



c.    1999 Closing Prices



d.    2000 Closing Prices



e.    2001 Closing Prices



## Dissemination of False Financial Statements

32.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

a.    violated the terms of the Company's shareholder-approved stock option plans;

b.    violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted; and

c.    produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and falsely stated that "[t]he Company grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. The Company accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees and accordingly recognizes no compensation expense for the stock option grants."

33.    The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

a.    Form 10-K for the fiscal year ended December 31, 1997, filed with the SEC on March 31, 1998 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

b.    Form 10-K for the fiscal year ended December 31, 1998, filed with the SEC on March 31, 1999 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue;

-15-

    c.       Form 10-K for the fiscal year ended December 31, 1999, filed with the SEC on March 30, 2000 and signed by defendants Klaassen, Faeder, Slavin, Hulse, Aprahamian, Callen, and Donohue;

    d.       Form 10-K for the fiscal year ended December 31, 2000, filed with the SEC on March 30, 2001 and signed by defendants Klaassen, Faeder, Hulse, and Donohue;

    e.       Form 10-K for the fiscal year ended December 31, 2001, filed with the SEC on March 29, 2002 and signed by defendants Klaassen, Faeder, Hulse, Aprahamian, and Donohue.

### Defendants' Concealment of Their Misconduct

34.     From 1998 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant," as follows:

    a.       Sunrise's proxy statement filed with the SEC on April 3, 1998 falsely reported that options granted to Faeder, Smick, Newell, and Swinton were granted on May 2, 1997, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

    b.       Sunrise's proxy statement filed with the SEC on April 6, 1999 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on September 14, 1998, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

    c.       Sunrise's proxy statement filed with the SEC on April 14, 2000 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on November 8, 1999, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

    d.       Sunrise's proxy statement filed with the SEC on March 29, 2001 falsely reported that options granted to Klaasen were granted on September 11, 2000, that options granted to Newell, Slavin, Swinton, and Tomasso were granted on

-16-

February 25, 2000 and March 28, 2000, and that options granted to Slavin were granted on November 24, 2000, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant;"

e.    Sunrise's proxy statement filed with the SEC on April 5, 2002 falsely reported that options granted to Newell, Swinton, Tomasso, and Hulse were granted on May 11, 2001 and that options granted to Slavin Were granted on November 12, 2001, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

35.    From 2003 to 2006, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Form 4's that falsely reported the dates of stock option grants to the Individual Defendants, as follows:

a.    Faeder's Form 4 filed with the SEC on July 16, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

b.    Faeder's Form 4 filed with the SEC on August 21, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

c.    Faeder's Form 4 filed with the SEC on August 22, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

d.    Newell's Form 4 filed with the SEC on August 25, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

e.    Faeder's Form 4 filed with the SEC on September 2, 2003 falsely reported that options granted to Faeder had been granted on May 11, 2001;

f.    Hulse's Form 4 filed with the SEC on September 5, 2003 falsely reported that options granted to Faeder had been granted on February 25, 2000 and March 28, 2000;

g.    Newell's Form 4 filed with the SEC on September 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

h.    Faeder's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Faeder had been granted on May 2, 1997;

i.    Swinton's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Swinton had been granted on February 25, 2000;

j.    Swinton's Form 4 filed with the SEC on October 14, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

k.    Swinton's two Form 4's filed with the SEC on October 21, 2003 falsely reported that options granted to Swinton had been granted on May 11, 2001;

l.    Newell's Form 4 filed with the SEC on October 23, 2003 falsely reported that options granted to Newell had been granted on February 25, 2000;

m.    Swinton's Form 4 filed with the SEC on October 29, 2003 falsely reported that options granted to Swinton had been granted on May 11, 2001;

n.    Tomasso's Form 4 filed with the SEC on October 30, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

o.    Tomasso's Form 4 filed with the SEC on October 31, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999 and March 28, 2000;

p.    Swinton's Form 4 filed with the SEC on November 6, 2003 falsely reported that options granted to Swinton had been granted on May 2, 1997;

q.    Slavin's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Slavin had been granted on February 25, 2000;

r.    Tomasso's Form 4 filed with the SEC on November 7, 2003 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

s.    Hulse's Form 4 filed with the SEC on November 12, 2003 falsely reported that options granted to Hulse had been granted on May 11, 2001;

t.    Slavin's Form 4 filed with the SEC on November 12, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999, February 25, 2000, March 28, 2000, November 24, 2000, and November 12, 2001;

u.    Faeder's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Faeder had been granted on November 8, 1999;

v.    Hulse's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Hulse had been granted on November 8, 1999;

w.    Swinton's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Swinton had been granted on November 8, 1999;

x.    Tomasso's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Tomasso had been granted on November 8, 1999;

y.      Slavin's Form 4 filed with the SEC on November 13, 2003 falsely reported that options granted to Slavin had been granted on November 8, 1999;

z.      Newell's Form 4 filed with the SEC on November 26, 2003 falsely reported that options granted to Newell had been granted on March 28, 2000;

aa.     Slavin's Form 4 filed with the SEC on December 5, 2003 falsely reported that options granted to Slavin had been granted on November 24, 2000 and November 12, 2001;

bb.     Tomasso's Form 4 filed with the SEC on December 22, 2003 falsely reported that options granted to Tomasso had been granted on May 11, 2001;

cc.     Newell's Form 4 filed with the SEC on December 23, 2003 falsely reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

dd.     Newell's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ee.     Newell's Form 4 filed with the SEC on February 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ff.     Hulse's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Hulse had been granted on February 25, 2000;

gg.     Tomasso's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Tomasso had been granted on February 25, 2000;

hh.     Faeder's Form 4 filed with the SEC on February 27, 2004 falsely reported that options granted to Faeder had been granted on February 25, 2000;

ii.     Slavin's Form 4 filed with the SEC on March 4, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

jj.     Slavin's Form 4 filed with the SEC on March 5, 2004 falsely reported that options granted to Slavin had been granted on February 25, 2000;

kk.     Swinton's Form 4 filed with the SEC on March 9, 2004 falsely reported that options granted to Swinton had been granted on February 25, 2000;

ll.     Newell's Form 4 filed with the SEC on March 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

mm.     Hulse's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Hulse had been granted on March 28, 2000;

nn.     Tomasso's Form 4 filed with the SEC on March 31, 2004 falsely reported that

-19-

options granted to Tomasso had been granted on March 28, 2000;

oo.    Slavin's Form 4 filed with the SEC on March 31, 2004 falsely reported that options granted to Slavin had been granted on March 28, 2000;

pp.    Newell's Form 4 filed with the SEC on April 23, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

qq.    Newell's Form 4 filed with the SEC on May 24, 2004 falsely reported that options granted to Newell had been granted on February 25, 2000;

rr.    Hulse's Form 4 filed with the SEC on May 26, 2004 falsely reported that options granted to Hulse had been granted on May 11, 2001;

ss.    Newell's Form 4 filed with the SEC on June 23, 2004 falsely reported that options granted to Newell had been granted on March 28, 2000;

tt.    Newell's Form 4 filed with the SEC on July 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999 and March 28, 2000;

uu.    Newell's Form 4 filed with the SEC on August 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

vv.    Newell's Form 4 filed with the SEC on September 24, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

ww.    Newell's Form 4 filed with the SEC on October 25, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

xx.    Newell's Form 4 filed with the SEC on November 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

yy.    Tomasso's Form 4 filed with the SEC on December 16, 2004 falsely reported that options granted to Tomasso had been granted on May 11, 2001;

zz.    Newell's Form 4 filed with the SEC on December 23, 2004 falsely reported that options granted to Newell had been granted on November 8, 1999;

aaa.    Newell's Form 4 filed with the SEC on January 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

bbb.    Newell's Form 4 filed with the SEC on February 24, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ccc.    Newell's Form 4 filed with the SEC on March 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ddd.    Newell's Form 4 filed with the SEC on April 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

eee.    Hulse's Form 4 filed with the SEC on May 12, 2005 falsely reported that options granted to Hulse had been granted on May 2, 1997;

fff.    Newell's Form 4 filed with the SEC on May 24, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

ggg.    Aprahamian's Form 4 filed with the SEC on May 24, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

hhh.    Aprahamian's Form 4 filed with the SEC on May 26, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

iii.    Aprahamian's Form 4 filed with the SEC on May 31, 2005 falsely reported that options granted to Aprahamian had been granted on May 2, 1997;

jjj.    Newell's Form 4 filed with the SEC on June 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

kkk.    Newell's Form 4 filed with the SEC on July 25, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

lll.    Newell's Form 4 filed with the SEC on August 23, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

mmm. Newell's Form 4 filed with the SEC on September 26, 2005 falsely reported that options granted to Newell had been granted on May 2, 1997;

nnn.    Donohue's Form 4 filed with the SEC on November 22, 2005 falsely reported that options granted to Donohuel had been granted on February 25, 2000;

ooo.    Aprahamian's Form 4 filed with the SEC on April 20, 2006 falsely reported that options granted to Aprahamian had been granted on May 2, 1997.

36.    The Individual Defendants have never disclosed the true grant dates of the stock options described herein.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF
## FIDUCIARY DUTIES AND UNJUST ENRICHMENT

37.    The Officer Defendants breached their fiduciary duties by:

a.    colluding with the Committee Defendants and each other to backdate stock option grants;

   b.    colluding with the Committee Defendants and each other to violate GAAP;

   c.    colluding with the Committee Defendants and each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

   d.    colluding with the Committee Defendants and each other to file false proxy statements, false financial statements, and False Form 4's in order to conceal the improper backdating of stock options.

38.    The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves and the Committee Defendants at the expense of the Company.

39.    The Committee Defendants breached their fiduciary duties by:

   a.    colluding with the Officer Defendants and each other to backdate stock option grants;

   b.    colluding with the Officer Defendants and each other to violate GAAP;

   c.    colluding with the Officer Defendants and each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

   d.    colluding with the Officer Defendants and each other to file false proxy statements, false financial statements, and false Form 4's in order to conceal the improper backdating of stock options.

40.    The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves and the Officer Defendants at the expense of the Company.

41.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

42.     The Officer Defendants and Committee Defendants have exercised hundreds of thousands of backdated options at improperly low prices and have then sold the shares for substantial profits. Consequently, these defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

43.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

44.     Plaintiff is an owner of Sunrise common stock and was an owner of Sunrise common stock at all times relevant hereto.

45.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

46.     As a result of the facts set forth herein, plaintiff has not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

47.     At the time this action was commenced the Board consisted of seven directors: defendants Klaassen, Aprahamian, Callen, and Donohue, and directors Teresa Klaassen, J. Douglas Holladay, and William G. Little. The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

    a.    Klaassen, Aprahamian, Callen, and Donohue, because they are directly interested in the improperly backdated stock option grants complained of herein;

    b.    Aprahamian, Callen, and Donohue, because as members of the Stock Option Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants,

-23-

as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

c.    Aprahamian, Callen, and Donohue because as members of the Audit Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

d.    Klaassen, Aprahamian, Callen, and Donohue, because as directors of the Company they directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Klaassen, Aprahamian, Callen, and Donohue have demonstrated that they are unable or unwilling to act independently of the Officer Defendants; and

e.    Teresa Klaassen, the wife of defendant Klaassen and the co-founder of the Company, because of her close familial and business relationship with Klaassen.

48.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

49.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

50.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

51.    As alleged in detail herein, the Officer Defendants breached their fiduciary duties by:

a.    colluding with the Committee Defendants and each other to backdate stock option grants;

b.    colluding with the Committee Defendants and each other to violate GAAP;

-24-

  c. colluding with the Committee Defendants and each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

  d. colluding with the Committee Defendants and each other to file false proxy statements, false financial statements, and False Form 4's in order to conceal the improper backdating of stock options.

  52. The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves and the Committee Defendants at the expense of the Company.

  53. As alleged in detail herein, the Committee Defendants breached their fiduciary duties by:

  a. colluding with the Officer Defendants and each other to backdate stock option grants;

  b. colluding with the Officer Defendants and each other to violate GAAP;

  c. colluding with the Officer Defendants and each other to produce and disseminate to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

  d. colluding with the Officer Defendants and each other to file false proxy statements, false financial statements, and false Form 4's in order to conceal the improper backdating of stock options.

  54. The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves and the Officer Defendants at the expense of the Company.

  55. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR UNJUST ENRICHMENT

56.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

57.    The Individual Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

58.    To remedy the Individual Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of $25,000,000.00 in damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Ordering the Individual Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.    Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: September 5, 2006

Respectfully submitted,

LAW OFFICES OF JOHN C. PASIERB, PLC

John C. Pasierb (27446)
2200 Wilson Boulevard, Suite 800
Arlington, VA 22201
Telephone: (703) 525-2260
Fax: (703) 525-2489

SCHIFFRIN & BARROWAY, LLP
Eric L. Zagar
Sandra G. Smith
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (610) 667-7056

*Attorneys for Plaintiff*

-27-

I, **Catherine R. Molner** hereby verify that I have reviewed the Complaint and authorized its filing and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: ___8/24/06___                     *Catherine R. Molner*

**CATHERINE R. MOLNER**

# EXHIBIT  7



# FORM 8-K

## SUNRISE SENIOR LIVING INC - SRZ

Exhibit:

**Filed: October 01, 2007 (period: September 28, 2007)**

Report of unscheduled material events or corporate changes.

**Item 8.01.** Other Events.

**Item 9.01.** Financial Statements and Exhibits.

SIGNATURES
INDEX TO EXHIBITS
EX-99.1 (Exhibits not specifically designated by another
number and by investment companies)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### WASHINGTON, D.C. 20549

## FORM 8-K

**CURRENT REPORT PURSUANT TO SECTION 13 OR 15 (d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): **September 28, 2007**

# SUNRISE SENIOR LIVING, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **1-16499** | **54-1746596** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**7902 Westpark Drive
McLean, Virginia 22102**
(Address of principal executive offices) (Zip Code)

**(703) 273-7500**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01. Other Events.**

On September 28, 2007, Sunrise Senior Living, Inc. (the "Company") issued a press release providing a status report on the investigation by the Special Independent Committee of the Company's Board of Directors and providing updates on management's internal control review efforts and on legal proceedings. A copy of the Company's press release dated September 28, 2007 is attached as Exhibit 99.1 hereto and is incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits.**

(a) Not applicable

(b) Not applicable

(c) Not applicable

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Company press release dated September 28, 2007 |

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SUNRISE SENIOR LIVING, INC.
(Registrant)

Date: October 1, 2007                          By:  /s/ John G. Gaul

                                                    John G. Gaul
                                                    General Counsel

3

**INDEX TO EXHIBITS**

| Exhibit No. | Exhibit Name | Page No. |
|---|---|---|
| 99.1 | Company press release dated September 28, 2007 | |

4

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

**SUNRISE PROVIDES STATUS REPORT ON SPECIAL INDEPENDENT COMMITTEE INVESTIGATION; PROVIDES UPDATES ON MANAGEMENT'S INTERNAL CONTROL REVIEW EFFORTS AND ON LEGAL PROCEEDINGS**

MCLEAN, Va., September 28, 2007 /PRNewswire-FirstCall/ -- Sunrise Senior Living, Inc. (NYSE: SRZ) today announced an update on the status of the independent investigation being conducted by the Special Independent Committee of its Board of Directors, provided an update on management's Sarbanes-Oxley Section 404 internal control review efforts and provided an update on legal proceedings.

**Special Independent Committee Investigation**

As previously disclosed, in December 2006, Sunrise's Board of Directors established a Special Independent Committee to review certain allegations made by the Service Employees International Union ("SEIU") that questioned the timing of certain stock option grants to Sunrise directors and officers over a period of time, and stock sales by certain directors in the months prior to the May 2006 announcement of the Company's accounting review. As also previously disclosed, in March 2007, Sunrise's Board of Directors expanded the scope of the Special Independent Committee's mandate to include the review of facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the pending restatement, and to develop recommendations regarding any remedial measures, including those pertaining to internal controls and processes over financial reporting, that it may determine to be warranted. The Special Independent Committee, advised by its independent counsel, WilmerHale, has been conducting that investigation. In support of the investigation, WilmerHale engaged FTI Consulting, Inc. and Huron Consulting Group, forensic accounting firms, to provide technical accounting guidance and analysis, as well as to assist with document collection and review, interview support, and transaction review.

The Special Independent Committee has now concluded the fact-finding portion of its investigation with respect to three issues. The first involves the timing of certain stock option grants. The second involves the facts and circumstances with respect to two significant categories of errors in the pending restatement relating to real estate accounting: accounting for the effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate; and accounting for allocation of profits and losses in those ventures in which Sunrise's partners received a preference on cash flow. The third involves whether directors and executive officers had non-public knowledge of possible accounting errors related to these real estate transactions prior to Sunrise's May 2006 announcement of its accounting review.

As described in greater detail below, the Special Independent Committee found:

- no evidence of backdating or other intentional misconduct with respect to the grants on the 38 grant dates examined, including those specifically questioned by the SEIU, or the possible errors identified by the Special Independent Committee in the accounting for stock options;

- □□ □□no evidence of an intention to reach an inappropriate accounting result with respect to the two categories of real estate accounting errors reviewed, no knowledge that these accounting errors were incorrect at the time they were made, and no evidence that information was concealed from review by the external auditors at the time the accounting judgments were made; and

- □□ □□no evidence that any director or officer who traded in the months prior to the announcement of the accounting review had material non-public information relating to either of these two categories of real estate accounting errors.

The investigation of the Special Independent Committee is continuing with respect to certain other categories of restatement items and issues identified in work done to date, primarily related to certain accruals and reserves, which may produce material adjustments to the Company's historical financial statements in addition to those previously disclosed by the Company, and with respect to remedial recommendations. Based on the current status of its review, the Special Independent Committee expects to complete its review by December 15, 2007.

The Special Independent Committee believes that its investigation of the three issues reported on today was comprehensive and thorough. The investigation included the collection and review, by manual inspection, electronic word search and other means, of more than 2.5 million electronic and hard copy documents and interviews of 37 individuals, including current and former employees, current and former directors and audit engagement team members of its external auditor, Ernst & Young, LLP ("E&Y"). The Special Independent Committee held frequent in-person meetings throughout the course of the investigation, as well as regular update calls and other communications with WilmerHale and its experts. The Company and its officers, employees and directors cooperated fully with the investigation. The Special Independent Committee and WilmerHale also received good cooperation from other individuals, including E&Y professionals and former employees of the Company.

Options Investigation. With respect to its options investigation, the Special Independent Committee comprehensively examined grants made on 14 grant dates comprising approximately 46% of the options granted during the period from June 1996 (when the Company went public through an IPO) to May 2006. Those grants included all of the grants specifically questioned by SEIU, including all grants at the four lowest quarterly closing stock prices for Sunrise stock in each quarter that involved more than 80,000 shares (split-adjusted) regardless of the recipients; and all of the grants at the four lowest monthly closing stock prices in each month that involved grants to directors or executive officers regardless of size, or grants of more than 500,000 shares (split-adjusted) in aggregate. The Special Independent Committee also reviewed certain limited written material on additional grants made on 24 other grant dates, which represent all of the remaining post-IPO grants involving 20 or more employees, officers and/or directors and/or one or more senior Sunrise officers. Based on its review of this written material for the 24 different grant dates, the Special Independent Committee concluded that no further review of those grants was warranted. The Special Independent Committee found no evidence of backdating or other intentional misconduct in connection with the award of grants that were examined.

2

---

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

The Special Independent Committee identified a number of accounting issues under U.S. Generally Accepted Accounting Principles ("GAAP") in connection with certain of these option grants. The Special Independent Committee concluded that these accounting issues did not result from intentional misconduct by Company employees. Evidence developed during the course of the investigation indicates that these accounting issues were caused, or contributed to, by a variety of different factors, including but not limited to the improper application of GAAP, lack of technical expertise regarding appropriate GAAP standards, inadequate or poor recordkeeping, and inadequate controls. The grants identified by the Special Independent Committee investigation with possible accounting issues that have the potential to affect the accuracy of the Company's previously reported financial results include:

- The September 1998 option repricing, after which a substantial period of time elapsed from the date the Stock Option Committee approved the repricing and when most employees signed their repricing acknowledgments, and during which the Company's stock price increased substantially.

- Grants made in 2000 and 2001 in connection with an opportunity provided to certain employees with options exercisable above the then applicable market price to cancel those options and receive new, market-priced options.

- Three grants in which the exercise price for the options was set at the closing price for the Company's stock on the date of the grant, rather than at the closing price of the trading date immediately prior to the date of the grant, as contemplated by the terms of the Company's stock option plans.

- Certain grants which lacked sufficient documentation to determine when the stock option grant was authorized.

- Certain grants in connection with which the Company corrected administrative errors retroactively, which included adding grants to new hires who had been inadvertently omitted from a recommendation list and correcting the number of options granted to individuals.

- Certain grants in which the Company modified the terms of a grant after it was made.

- Certain grants in which the Company granted options to consultants but accounted for such options as grants issued to employees.

The Special Independent Committee has provided its findings to the Company. As disclosed in the Company's July 25, 2007 press release, the Company has concluded that errors were made in connection with the accounting for the September 1998 repricing and certain other stock option grants.

The Company is in the process of quantifying the amount of the non-cash stock compensation expense that it will be required to record as part of its restatement related to the 1998 repricing and these other stock option grants, which amount is likely to be material. The Company has retained Navigant Consulting, Inc. to assist with stock compensation matters. Once the Company has quantified such amount and E&Y has reviewed the Company's calculation, the Company will promptly report such amount. The Company is also reviewing whether there are any tax impacts with respect to the accounting errors relating to stock options.

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

<u>Review of Two Significant Categories of Real Estate -Related Accounting Errors.</u> The Special Independent Committee also has concluded its fact finding on:

- □□ □□the accounting for the effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate; and

- □□ □□the accounting for allocation of profits and losses in those ventures in which Sunrise's partners received a preference on cash flow.

Errors in the first category resulted from erroneous judgments made by the Company regarding the proper application of GAAP to account for sales of real estate where Sunrise had continuing involvement in the real estate in the form of guarantees and preferences to partners. The nature of certain guarantees and their duration and the recognition of the sales and/or income from the sales of the property were not concealed from review by the external auditors at the time the accounting judgments were made. Based on the totality of the evidence available to the Special Independent Committee, the Special Independent Committee concluded that this large group of errors did not result from an intention to reach an inappropriate accounting result and that the erroneous accounting judgments in this category were not known to be incorrect at the time they were made.

Errors in the second category resulted from failure by the Company to understand relevant accounting guidance regarding accounting for preferences in distributions of income to joint venture partners. The preferences were contained in written transaction documents and the accounting analyses for these preferences were documented in writing and reviewed by the company's external auditors in a timely manner. Based on the totality of the evidence available to the Special Independent Committee, the Special Independent Committee concluded that these errors did not result from an intention to reach an inappropriate accounting result and that the erroneous accounting analyses were not known to be incorrect at the time they were prepared.

<u>Review of Insider Trading by Certain Directors and Executive Officers.</u> The Special Independent Committee investigated whether certain directors and executive officers had material, non-public knowledge of the two real estate accounting errors discussed above when they sold Sunrise stock in the months prior to May 2006 when Sunrise announced its accounting review. The Special Independent Committee concluded that Sunrise's executive officers and members of its Board of Directors had no such knowledge at the time that any of those trades were made.

**Sarbanes-Oxley Section 404 Internal Control Review Efforts of Management**

As previously disclosed by the Company, the occurrence of a restatement of previously issued financial statements is a strong indicator that material weaknesses in internal controls exist. In connection with the Company's pending restatement of its historical financial statements, the Company's management is evaluating management's report on internal controls included in the Company's previously filed Annual Report on Form 10-K for the year ended December 31, 2005 to assess the effectiveness of its internal control over financial reporting as of December 31, 2005. To date, the Company's management has preliminarily identified the following three control deficiencies:

<div align="center">4</div>

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

- □□Lack of personnel with sufficient technical accounting expertise to determine and document the appropriate application of accounting principles. This deficiency impacted the Company's accounting for real estate sales, capitalization of direct and indirect costs of real estate projects, equity accounting for variable interest entities, accounting for guarantees and accounting for stock options.

- □ □Lack of policies and procedures to ensure proper accounting of significant transactions. This deficiency impacted the Company's accounting for real estate sales and equity accounting.

- □ □Lack of a sufficient level of experienced personnel to enable the Company to close its books in a timely and accurate manner.

Additional control deficiencies may be identified by the Company's management or the Special Independent Committee as part of its ongoing review. At the present time, the Company's management expects to conclude that some of the identified control deficiencies were material weaknesses as of December 31, 2005. In addition, E&Y's audit reports are also expected to concur with management's preliminary conclusions regarding weaknesses in internal controls over financial reporting by the Company as of December 31, 2005. The Audit Committee and management have been evaluating appropriate remediation measures to address these control deficiencies and intend to develop and oversee a comprehensive remediation plan to address these control deficiencies.

The Company's management believes the accounting errors previously disclosed by the Company indicate a need to improve the quality and staffing of the Company's internal accounting resources. The following are among the changes implemented by the Company to date, which are in addition to any remedial measures that may be recommended by the Special Independent Committee and adopted by the Board following completion of the Special Independent Committee investigation:

- *New Chief Financial Officer.* As previously disclosed, on September 6, 2007, Richard J. Nadeau was hired as the Company's new Chief Financial Officer.

- *New Chief Accounting Officer.* As previously disclosed, in April 2006, Julie A. Pangelinan was hired as the Company's new Chief Accounting Officer.

- *Expansion of Accounting Policy Group.* The Company has expanded its accounting policy group from one professional to six professionals, including five certified public accountants.

- *SOX Compliance.* In October 2006, the Company hired a Senior Director of SOX Compliance, who reports to the Chief Accounting Officer.

5

- *Other Additional Accounting Personnel.* In June 2006, the Company added the position of Assistant Controller. In October 2006, the Company named a new Controller. The Company has also added four additional staff members in the financial reporting group, three additional corporate staff members in the international reporting group and three additional staff members in the operations accounting group.

Separately, at the Board level and as previously disclosed, in June 2007, the Company's Board of Directors appointed Stephen D. Harlan as a new member of the Board and as a member of the Audit Committee. In connection with his appointment to the Audit Committee, the Board also determined that Mr. Harlan qualified as an "audit committee financial expert" as defined under the rules of the SEC.

As also previously disclosed, effective September 5, 2007 Sunrise's Board of Directors also appointed Lynn Krominga as a new member of the Board. On September 28, 2007, the Board of Directors appointed Ms. Krominga as a member of the Audit Committee.

## Update on Legal Proceedings

CGB Occupational Therapy. As previously disclosed, Sunrise is a defendant in a lawsuit filed by CGB Occupational Therapy, Inc. ("CGB") in September 2000 in the U.S. District Court for the Eastern District of Pennsylvania. CGB provided therapy services to two nursing home communities in Pennsylvania that were owned by RHA Pennsylvania Nursing Homes ("RHA") and managed by one of Sunrise's subsidiaries. In 1998, RHA terminated CGB's contract. In its lawsuit, CGB alleged, among other things, that in connection with that termination, Sunrise tortiously interfered with CGB's contractual relationships with RHA and several of the therapists that CGB employed on an at-will basis. In a series of court decisions during 2002 through 2005, CGB was awarded compensatory damages of $109,000 and punitive damages of $2 million. In 2005, Sunrise appealed the punitive damages award. On August 23, 2007, a panel of the U.S. Court of Appeals for the Third Circuit vacated the $2 million punitive damages award and remanded the case with instructions that the district court enter a new judgment for punitive damages in the amount of $750,000. On September 5, 2007, CGB filed a petition for rehearing with the U.S. Court of Appeals for the Third Circuit. That petition was denied on September 24, 2007. Either party may file a petition for certiorari in the Supreme Court by December 24, 2007.

Trinity OIG Investigation and *Qui Tam* Action. As previously disclosed, on September 14, 2006, Sunrise acquired all of the outstanding stock of Trinity Hospice, Inc. ("Trinity") for a purchase price of approximately $76 million. As a result of this transaction, Trinity became an indirect, wholly owned subsidiary of Sunrise. On January 3, 2007, Trinity received a subpoena from the Phoenix field office of the Office of the Inspector General of the Department of Health and Human Services ("OIG") requesting certain information regarding Trinity's operations in three locations for the period between January 1, 2000 through June 30, 2006, a period that is prior to the Company's acquisition of Trinity. The Company was advised that the subpoena was issued in connection with an investigation being conducted by the Commercial Litigation Branch of the U.S. Department of Justice and the civil division of the U.S. Attorney's office in Arizona. The subpoena indicates that the OIG is investigating possible improper Medicare billing under the Federal False Claims Act ("FCA"). In addition to recovery of any Medicare reimbursements previously paid for false claims, an entity found to have submitted false claims under the FCA may be subject to treble damages plus a fine of between $5,500 and $11,000 for each false claim submitted. Trinity has complied with the subpoena and continues to supplement its responses as requested.

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

On September 11, 2007, Trinity and Sunrise were served with a Complaint filed on September 5, 2007 in the United States District Court for the District of Arizona. That filing amended a Complaint filed under seal on November 21, 2005 by four former employees of Trinity under the *qui tam* provisions of the FCA. The *qui tam* provisions authorize persons ("relators") claiming to have evidence that false claims may have been submitted to the United States to file suit on behalf of the United States against the party alleged to have submitted such false claims *Qui tam* suits remain under seal for a period of at least 60 days to enable the government to investigate the allegations and to decide whether to intervene and litigate the lawsuit, or, alternatively, to decline to intervene, in which case the *qui tam* Plaintiff, or "relator," may proceed to litigate the case on behalf of the United States. *Qui tam* relators are entitled to 15% to 30% of the recovery obtained for the United States by trial or settlement of the claims they file on its behalf. On June 6, 2007, the Department of Justice and the U.S. Attorney for Arizona filed a Notice with the Court advising of its decision not to intervene in the case, indicating that its investigation was still ongoing. This action followed previous applications by the U.S. Government for extensions of time to decide whether to intervene. As a result, on July 10, 2007, the Court ordered the Compliant unsealed and the litigation to proceed. The matter is therefore currently being litigated by the four individual relators. However, under the FCA, the U.S. Government could still intervene in the future. The amended Complaint alleges that during periods prior to the acquisition by Sunrise, Trinity engaged in certain actions intended to obtain Medicare reimbursement for services rendered to beneficiaries whose medical conditions were not of a type rendering them eligible for hospice reimbursement and violated the FCA by submitting claims to Medicare as if the services were covered services. The relators allege in their amended Complaint that the total loss sustained by the United States is probably in the $75 million to $100 million range. The original Complaint named KRG Capital, LLC (an affiliate of former stockholders of Trinity) and Trinity Hospice LLC (a subsidiary of Trinity) as defendants. The amended Complaint names Sunrise Senior Living, Inc., KRG Capital, LLC and Trinity as defendants. The lawsuit is styled *United States ex rel. Joyce Roberts, et al., v. KRG Capital, LLC, et al.*, CV05 3758 PHX-MEA (D. Ariz.).

Sunrise is unable at this time to estimate the possible loss or range of loss relating to this matter.

IRS Audit. By letter dated August 28, 2007, the Company was advised that the Internal Revenue Service will be auditing its federal income tax return for the year ended December 31, 2005. The Company believes that the audit will consider the pending restatement of the Company's historical financial statements. On September 27, 2007, the Company was orally advised that the IRS will also be auditing the Company's employment tax returns.

Lawsuit Filed by Former CFO. On September 18, 2007, Bradley B. Rush, the Company's former Chief Financial Officer, filed suit against the Company in the Circuit Court of Fairfax County, Virginia, relating to the termination of his employment. As previously

7

disclosed, on April 23, 2007, Mr. Rush was suspended with pay. The action was taken by the Board of Directors following a briefing of the independent directors by Wilmer Hale, independent counsel to the Special Independent Committee. The Board concluded, among other things, that actions taken by Mr. Rush were not consistent with the document retention directives issued by the Company. Mr. Rush's employment thereafter was terminated on May 2, 2007. Mr. Rush's lawsuit asserts that his termination was part of an alleged campaign of retaliation against him for purportedly uncovering and seeking to address accounting irregularities, and it contends that his termination was not for "cause" under the Company's Long Term Incentive Cash Bonus Plan and prior awards made to him of certain stock options and shares of restricted stock, to which he claims entitlement notwithstanding his termination. Mr. Rush also asserts a claim for defamation arising out of comments attributed to the Company concerning the circumstances of his earlier suspension of employment. His complaint seeks compensatory damages in an amount of not more than $13 million, and punitive damages in an amount of not more than $350,000. The Company believes that the allegations in Mr. Rush's complaint lack both factual and legal merit, and it intends to defend vigorously against his claims.

**About Sunrise Senior Living**

Sunrise Senior Living, a McLean, Va.-based company, employs approximately 40,000 people. As of June 30, 2007, Sunrise operated 453 communities in the United States, Canada, Germany and the United Kingdom, with a combined capacity for more than 53,000 residents. At quarter end, Sunrise also had 38 communities under construction in these countries with a combined capacity for 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing, rehabilitative and hospice care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

**Forward-Looking Statements**

Certain matters discussed in this press release - including the expected timing for completion of the Special Independent Committee's review - may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to, completion of the Company's restatement of its historical financial statements, identification of any additional matters requiring restatement, the length of time needed for Sunrise to complete the restatement and for Ernst & Young LLP to complete its procedures for any reason, including the detection of new errors or adjustments, the time required for the Special Independent Committee to complete its review, including with respect to any necessary remedial measures, and for the Company to clear comments with the SEC, the findings of the Special Independent Committee review, including with respect to any necessary remedial measures, the time required for the Company to prepare and file an amended 2005 Form 10-K and its Form 10-Qs for the first three quarters of 2006, its 2006 Form 10-K and its Form 10-Qs for the first and second quarters of 2007 and its Form 10-Qs for subsequent quarters that are delayed, the outcome of the SEC's investigation, the outcome of pending putative class

8

action and derivative litigation, the outcome of the Trinity OIG investigation and *qui tam* proceeding, the outcome of the IRS audit of the Company's tax return for the tax year ended December 31, 2005 and employment tax returns, the outcome of the exploration of strategic alternatives, the delisting of the Company's stock from the NYSE in the event the Company does not file its 2006 Form 10-K prior to the expiration of its NYSE listing extension, the Company's ability to comply with the terms of the amendment of its bank credit facility or to obtain a further extension of the period for providing the lenders with required financial information, development and construction risks, acquisition risks, licensing risks, business conditions, competition, changes in interest rates, the Company's ability to manage its expenses, market factors that could affect the value of the Company's properties, the risks of downturns in general economic conditions, satisfaction of closing conditions, availability of financing for development and acquisitions and other risks detailed in the Company's annual report on Form 10-K filed with the SEC. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.

**SOURCE:** Sunrise Senior Living

**CONTACT:** Lisa Mayr, Vice President, Investor Relations and Capital Market, Sunrise Senior Living, +1-703-744-1787 CO: Sunrise Senior Living

9

Created by 10K Wizard    www.10KWizard.com

# EXHIBIT  8



**News Release**

## Sunrise Board Forms Special Committee

MCLEAN, Va., Dec 11, 2006 /PRNewswire-FirstCall via COMTEX News Network/ -- Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that its Board of Directors has appointed a special independent committee to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants. The Board's decision followed receipt of a letter from a union shareholder that was simultaneously sent to news outlets, which resulted in media coverage and a subsequent request by the Securities and Exchange Commission (SEC) for information about matters raised in the media reports. The special committee has retained independent outside legal counsel to assist in its review.

Sunrise is committed to sound corporate governance and transparency and the Board has determined that a comprehensive review by a special committee and independent counsel is the most appropriate way to address these matters in a timely manner.

The review by the special committee will be conducted in parallel with the Company's ongoing efforts to complete the previously announced restatement of its financial statements. In view of these ongoing efforts and the special committee review, the Company now anticipates that its restated 2005 Form 10-K will be delayed beyond year-end, but still expects to be current in all of its filings with the SEC by March 1, 2007.

About Sunrise

Sunrise Senior Living, a McLean, Va.-based company, employs more than 40,000 people. As of September 30, 2006, Sunrise operated 436 communities in the United States, Canada, Germany and the United Kingdom, with a combined capacity for more than 50,000 residents. Sunrise also had 46 communities under construction in these countries with a combined capacity for more than 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing, rehabilitative and hospice care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

Certain matters discussed in this press release, including as to the timing of completion of its restatement and filing of Sunrise's restated 2005 Form 10-K and Form 10-Qs for the first three quarters of 2006, may be forward- looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward- looking statements as a result of various factors, including, but not limited to risks that are detailed in the Company's annual report on Form 10-K filed with the Securities and Exchange Commission. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.

SOURCE Sunrise Senior Living, Inc.

Lisa Mayr, Vice President, Investor Relations and Capital Markets of Sunrise Senior Living, Inc., +1-703-744-1787

# EXHIBIT  9



## News Release

### Sunrise Announces Update On SEC Investigation

MCLEAN, Va., May 29 /PRNewswire-FirstCall/ -- Sunrise Senior Living, Inc. (NYSE: SRZ), today announced that on May 25, 2007 it was advised by the staff of the Securities and Exchange Commission (the "SEC") that the SEC has commenced a formal investigation. Sunrise previously announced on December 11, 2006 that it had received a request from the SEC for information about insider stock sales, timing of stock option grants and matters relating to Sunrise's historical accounting practices that had been raised in media reports in the latter part of November 2006 following receipt of a letter by Sunrise from Service Employees International Union. Sunrise has fully cooperated, and intends to continue to fully cooperate, with the SEC.

About Sunrise Senior Living

Sunrise Senior Living, a McLean, Va. - based company, employs approximately 39,000 people. As of March 31, 2007, Sunrise operated 444 communities in the United States, Canada, Germany and the United Kingdom, with a combined capacity for more than 52,000 residents. At quarter end, Sunrise also had 42 communities under construction in these countries with a combined capacity for more than 6,300 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing, rehabilitative and hospice care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

SOURCE Sunrise Senior Living

CONTACT: Lisa Mayr, Vice President, Investor Relations and Capital Market, Sunrise Senior Living, +1-703-744-1787 CO: Sunrise Senior Living

# EXHIBIT  10

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| PETER V. YOUNG and ELLEN ROBERTS YOUNG, Derivatively on Behalf of Defendant SUNRISE SENIOR LIVING, INC., <br><br>  Plaintiffs, <br><br> v.  <br><br> PAUL L. KLAASSEN, TERESA M. KLAASSEN, DAVID W. FAEDER, TIMOTHY S. SMICK, THOMAS B. NEWELL, BRIAN C. SWINTON, CHRISTIAN B.A. SLAVIN, LARRY E. HULSE, TIFFANY L. TOMASSO, ROBERT R. SLAGER, CARL ADAMS, RONALD V. APRAHAMIAN, CRAIG R. CALLEN, DAVID G. BRADLEY, J. DOUGLAS HOLLADAY and THOMAS J. DONOHUE, <br><br>  Defendants, <br><br> SUNRISE SENIOR LIVING, INC., <br><br>  Nominal Defendant. | C.A. No. |

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, Peter V. Young and Ellen Roberts Young, for their Derivative Complaint (the "Complaint"), alleges on personal knowledge as to themselves and as to all other facts based on the investigation of their counsel, alleges on information and belief as follows:

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers, seeking to remedy

defendants' breaches of fiduciary duties and other violations of law that have caused damage to Sunrise. This action arises out of defendants' conduct of authorizing, or through abdication of duty permitting, the back-dating of stock option grants to and for the benefit of Sunrise's officers and directors, including defendants Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Tomasso, Hulse, Aprahamian, Callen, Donohue, Bradley, Holladay, Slager, and Adams and at the expense of Sunrise and its shareholders. Based on this unlawful conduct, the Individual Defendants ("Individual Defendants") realized over \$172 million in illicit proceeds through the sale of stock at a time when they knew of material non-public information concerning the improper backdating of options which led to the financial statements issued by Sunrise and its stock price being falsely inflated.

2.     A "stock option" is a contract that gives the holder the option to purchase a designated quantity of shares of a company's stock at a set price, the "exercise price."    Stock options are granted as part of employee compensation packages as a means to create incentives to boost profitability and stock value.    When the option is exercised, the holder acquires the designated number of shares from the company at the exercise price, regardless of the stock's contemporaneous market price. The exercise price of stock options is the market price on the date of the grant of the option. If the stock price goes up over time, the executive makes a profit when he sells the stock acquired by exercising the option. If the exercise price is lower than it should be, the employee pays less and the company gets less when the stock option is exercised.

3.     If the system is abused by "backdating" the options granted--which refers to picking an option-grant date earlier than the actual date the option was granted--a date when the stock price was lower than the actual grant date--the executive gets an instant profit.   The company is hurt, as the "spread" between the true grant exercise price and the market price is

2

required by law to be treated as compensation expense, which reduces profit. In addition, the backdating of options causes the corporate stock option plan to lose its tax protections, and results in the corporation's internal non-public information's being misappropriated by the executives for their personal profit.

4.    In violation of the Company's own stated policies, defendants engaged in or permitted "backdating" of options in the issuance of the executive stock options for many years. All of the Company's stock options plans required stock options to have an exercise price equal to the fair market value on the date of the grant, and defendants regularly represented that stock options covered by the stock options plans were not granted at less than 100% of fair market value on the date of the grant. Since at least 1999, backdated options have been granted to numerous Sunrise officers and directors.

5.    The Individual Defendants' illegal backdating scheme not only lined the pockets of the backdated option recipients and caused Sunrise to issue materially false financial statements, but also undermined the key purpose of stock option-based executive compensation: to provide incentives to improve the Company's performance and increase the Company's stock price and market capitalization. By manipulating options such that they carried an exercise price lower than the trading price of the stock on the date of grant, Sunrise insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

6.    In breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants colluded with one another to:

        a.    improperly backdate dozens of grants of Sunrise stock options to Sunrise executives and directors, in violation of the Company's shareholder-approved stock option plans;

b.   improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

c.   improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

d.   produce and disseminate to Sunrise shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

7.     As a result of the Individual Defendants' misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## PARTIES

8.     Plaintiff Ellen Roberts Young is currently a shareholder of Sunrise and has continuously been a shareholder of Sunrise since April 19, 1999.

9.     Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of the Company since 1995, and as a member of the Audit Committee of the Board ("Audit Committee") since 1996, chairing the Audit Committee since 2003. Aprahamian also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in 1997, and has served as a consultant to the Company beginning in May 1997.

10.    Defendant Craig R. Callen ("Callen") has served as a director of the Company since 1999. Callen served as a member of the Audit Committee in 1999 and since 2004, and as a member of the Stock Option Committee from 1999 to August 23, 2002, when the Stock Option Committee merged with the Compensation Committee of the Board ("Compensation Committee").

4

11.     Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995 and as a member of the Audit Committee since 1996. Donohue served as a member of the Stock Option Committee from 1996 to August 23, 2002.

12.     Defendant David G. Bradley ("Bradley") served as a director of the Company from 1997 to 2005, as a member of the Stock Option Committee from 1998 to August 23, 2002, and as a member of the Audit Committee from 2002 to 2004.

13.     Defendant J. Douglas Holladay ("Holladay") has served as a director of Sunrise since 2000, and was a member of the Audit Committee in 2001.

14.     Defendant Paul J. Klaassen ("Klaassen") founded the Company with his wife, Sunrise Director Teresa M. Klaassen ("Teresa Klaassen"), and has served as Chairman of the Board and Chief Executive Officer of Sunrise since 1991.

15.     Defendant Teresa Klaassen ("T. Klaassen"), wife of Paul Klaassen, has served as a director of Sunrise since 1981 and was Executive Vice President from 1981 to November 2003. She currently serves as Sunrise's Chief Cultural Officer.

16.     Defendant David F. Faeder ("Faeder") served as the Company's and its predecessor entities' Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.

17.     Defendant Timothy S. Smick ("Smick") served as Chief Operating Officer of the Company from February 1996 to January 1998, as Executive Vice President of the Company from May 1996 to January 1998, and as a director of the Company from October 1996 to March 1998.

5

18.     Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000 and was President of Sunrise Development, Inc., the Company's development subsidiary, and General Counsel from January 1996 to April 2000.

19.     Defendant Brian C. Swinton ("Swinton") served as the Company's Executive Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc., from September 2000 to December 2002.

20.     Defendant Christian B.A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May 1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004.

21.     Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003. Tomasso previously served as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.

22.     Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.

23.     Defendant Robert R. Slager ("Slager") served as a director of the Company from 1999 to 2001.

6

24.     Defendant Carl Adams ("Adams") has served as Senior Vice President and Treasurer of Sunrise since December 2005. Previously, Adams served as Senior Vice President of Sunrise Capital Group from November 2004 to December 2005, and as Sunrise's Chief Accounting Officer from May 2000 to November 2004.

25.     Collectively, defendants Klaassen, T. Klaassen, Faeder, Smick, Newell, Swinton, Slavin, Tomasso, Hulse, Aprahamian, Callen, Donohue, Bradley, Holladay, Slager, and Adams are referred to herein as the "Option Recipient Defendants."

26.     Collectively, all Defendants except nominal defendant Sunrise are referred to as the "Individual Defendants."

27.     Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102. According to its public filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, truth, loyalty, and due care, and were and are required to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not for self-aggrandizement. Each director and officer of the Company owes the Company and its shareholders the fiduciary duty to exercise good faith, loyalty and

7

diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;
>
> b.     exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and
>
> c.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

31.     The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate and complete financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

> (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

8

(2) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

    a. transactions are executed in accordance with management's general or specific authorization;

    b. transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Option Recipient Defendants

32. Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1996 Directors' Stock Option Plan ("1996 Director Plan"), the 1997 Stock Option Plan, the 1998 Stock Option Plan, the 1999 Stock Option Plan, the 2000 Stock Option Plan, and the 2001 Stock Option Plan (collectively, the "Plans"):

The Plan is intended to advance the interests of the Corporation and any subsidiary thereof within the meaning of Rule 405 of Regulation C under the Securities Act of 1933, as amended (with the term "person" as used in such Rule 405 being defined as in Section 2(2) of such Act) (a "Subsidiary"), by providing eligible individuals (as designated pursuant to Section 4 below) with incentives to improve business results, by providing an opportunity to acquire or increase a proprietary interest in the Corporation, which thereby will create a stronger incentive to expend maximum effort for the growth and success of the Corporation and its Subsidiaries, and will encourage such eligible individuals to continue to serve the Corporation and its Subsidiaries, whether as an employee, as a director, as a consultant or advisor or in some other capacity. To this end, the Plan provides for the grant of stock options....

33. According to the terms of each of the Plans, the Plans were administered by the Board of Directors of the Corporation, which had the full power and authority to take "all actions and to make all determinations required or provided for under the Plans or any Option granted or Option Agreement entered into hereunder and all such other actions and determinations not inconsistent with the specific terms and provisions of the Plans deemed by the Board to be necessary or appropriate to the administration of the Plan or any Option granted or Option Agreement entered into thereunder."

9

34.    The terms of the Plans further provide that "[t]he Option Price shall be not less than the greater of par value or 100 percent of the fair market value of a share of Stock on the date on which the Option is granted," where fair market value is defined as "the closing price of the Stock on such exchange or system or in such market ... on the trading date immediately before the Option is granted...." Additionally, each of the Plans specifically provides that "[t]he date of grant of an Option under this Plan shall be the date as of which the Board approves the grant."

35.    At the Annual meeting held on April 26, 1999, shareholders of Sunrise approved the 1999 Stock Option Plan.

36.    According to the 1999 Proxy Statement, the members of the Stock Option Committee were Meadow, Bradley, and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

37.    On March 5, 1999, Sunrise granted Hulse and Slavin a total of at least 165,000 stock options. However, Slavin did not even begin his employment with the Company until May 1999, according to the Company's 2003 proxy statement. These options were backdated to an adjusted exercise price of $18.81, one of the lowest prices of Sunrise stock for the first quarter.

38.    On November 8, 1999, Sunrise granted stock options to seven of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement. Callen, one of the recipients of these options, was on the Stock Option Committee and the Audit Committee on the date of grant. These options were

10

backdated to one of the lowest prices of Sunrise stock for the fiscal year, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Adjusted Exercise Price |
|---|---|---|---|---|
| 11/08/99 | Newell | $12.75 | 130,000 | $6.38 |
| | Swinton | $12.75 | 80,000 | $6.38 |
| | Tomasso | $12.75 | 130,000 | $6.38 |
| | Faeder | $12.75 | 130,000 | $6.38 |
| | Hulse | $12.75 | 35,000 | $6.38 |
| | Slavin | $12.75 | 70,000 | $6.38 |
| | Callen | $12.75 | 10,000 | $6.38 |

39.     According to Sunrise's Form 10-K for the year ended December 31, 1999: "Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 1999, these plans provided for the grant of options to purchase up to 6,324,910 shares of common stock. In February 2000, an additional 500,000 shares of common stock were allocated for the granting of options to employees. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four year period. The option exercise price is not less than the fair market value of a share of common stock on the date immediately before the day the option is granted (*i.e*, the prior day's closing price). Sunrise also had a stock option agreement with one of its senior executives. The agreement, as amended, was effective as of January 4, 1995 and covered 450,000 shares of common stock that were reserved for issuance at an exercise price of $8.00. As of December 31, 1999, all options were exercised."

40.     The 1999 Form 10-K further states:

11

Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

41.    At the Annual meeting held on May 12, 2000, shareholders of Sunrise were asked to vote on, and approved, the 2000 Stock Option Plan.

42.    According to the 2000 Proxy Statement, the members of the Stock Option Committee were Bradley, Callen, and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options

43.    On February 25, 2000 and March 28, 2000, Sunrise granted options to 11 of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement. Furthermore, Donohue and Bradley, two of the recipients of the February 25, 2000 options, were members of the Stock Option Committee on the date of grant, and Aprahamian, Donohue, and Callen, the recipients of the February 25, 2000 options, comprised the entire Audit Committee on the date of grant. These options were backdated to two of the lowest stock prices of $6.19 on February 24, 2000 and $6.22 on March 27, 2000 for the 2000 fiscal year.

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying | Adjusted Exercise Price |
|---|---|---|---|---|
| 02/25/00 | Newell | $12.38 | 120,000 | $6.19 |
| | Slavin | $12.38 | 110,000 | $6.19 |
| | Swinton | $12.38 | 90,000 | $6.19 |
| | Tomasso | $12.38 | 110,000 | $6.19 |
| | Faeder | $12.38 | 120,000 | $6.19 |
| | Hulse | $12.38 | 14,444 | $6.19 |
| | Donahue | $12.38 | 32,000 | $6.19 |
| | Aprahamian | $12.38 | 22,000 | $6.19 |
| | Slager | $12.38 | 10,000 | $6.19 |

12

|          | Bradley | S12.38  | 14,000 | $6.19 |
|----------|---------|---------|--------|-------|
|          | Callen  | S12.38  | 16,000 | $6.19 |
| 03/28/00 | Newell  | S12.44  | 50,000 | S6.22 |
|          | Slavin  | S12.44  | 30,000 | S6.22 |
|          | Swinton | $12.44  | 30,000 | S6.22 |
|          | Tomasso | $12.44  | 30,000 | $6.22 |
|          | Hulse   | $12.44  | 50,000 | $6.22 |

44.    On May 22, 2000, Sunrise granted Adams and Holladay a total of at least 14,500 stock options. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:

| Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Price |
|------------|-----------|----------------|----------------------------------------------|-------|
| 05/22/00   |           |                |                                              |       |
|            | Adams     | $15.56         | At least 5,000                               | S7.78 |
|            | Holladay  | $15.56         | At Least 24,000                              | $18.81 |

45.    On September 11, 2000, Co-founder, Chairman of the Board, and CEO Klaassen was granted 350,000 stock options at an exercise price of $8.50. The Company's proxy statement indicates that this was pursuant to an new employment agreement entered into with Klaassen in September of 2000, which conveniently granted stock options to him when Sunrise stock was at the lowest price of the month of September and near the lowest price of the fiscal quarter.

46.    On November 24, 2000, Sunrise granted 75,000 options to Slavin. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock.

47.    According to Sunrise's Form 10-K for the year ended December 31, 2000:

13

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 2000, these plans provided for the grant of options to purchase up to 7,323,910 shares of common stock. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four-year period. The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.

48.     The 2000 Form 10-K further states:

Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

49.     At the Annual Meeting held on May 11, 2001, shareholders of Sunrise approved the 2001 Stock Option Plan.

50.     According to the 2001 Proxy Statement the members of the Stock Option Committee were Bradley, Callen and Donohue.  The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

51.     On November 12, 2001, stock options were backdated to a point just prior to a precipitous rise in the price of Sunrise Stock, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Exercise Price |
|---|---|---|---|---|
| 11/12/01 | Slavin | $26.96 | 120,000 | $13.48 |

52.    On May 11, 2001, options were purportedly granted at one of the lowest prices of Sunrise Stock for the fiscal year, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Adjusted Exercise Price |
|---|---|---|---|---|
| 05/11/01 | Faeder | $20.00 | 100,000 | $10.00 |
|  | Newell | $20.00 | 140,000 | $10.00 |
|  | Swinton | $20.00 | 60,000 | $10.00 |
|  | Tomasso | $20.00 | 60,000 | $10.00 |
|  | Hulse | $20.00 | 50,000 | $10.00 |
|  | Adams | $20.00 | 30,000 | $10.00 |
|  | Donohue | $20.00 | 24,000 | $10.00 |
|  | Bradley | $20.00 | 14,000 | $10.00 |
|  | Callen | $20.00 | 20,000 | $10.00 |

53.    According to Sunrise's Form 10-K for the year ended December 31, 2001:

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 2001, these plans provided for the grant of options to purchase up to 8,148,910 shares of common stock. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four-year period. The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.

54.    Each and every one of the aforementioned stock option grants was dated just before a significant increase in Sunrise stock price and/or at or near Sunrise's lowest closing price of the pertinent fiscal quarter or year. The reason for the extraordinary patterns set forth in the preceding paragraphs is that the purported grant dates set forth therein were *not* the actual dates on which the stock option grants were made. Rather, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and

15

deliberately backdated the stock option grants to make it appear as though the grants had been made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Option Recipient Defendants at the Company's expense. This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts the Option Recipient Defendants had to pay the Company upon exercise of the options.

### The Individual Defendants' Dissemination of False Financial Statements

55.     The Individual Defendants prepared, approved, and/or signed Sunrise's annual and quarterly SEC reports during the relevant period. The Individual Defendants knowingly and deliberately caused the Company to disseminate materially false and misleading statements in the periodic filings that the Individual Defendants prepared, approved, and/or signed.

56.     The Individual Defendants' option backdating scheme caused each of Sunrise's Forms 10-K and Forms 10-Q for the relevant period to materially understate Sunrise's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to expense the in-the-money portion of Sunrise's stock option grants during the period, as required by APB 25.

57.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants:

        a.      violated the terms of the Company's shareholder-approved stock
                option plans by granting stock options with exercise prices that were
                less than the closing price of Sunrise stock on the day before the
                date of grant;

16

      b.     violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

      c.     violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

      d.     produced and disseminated to Sunrise shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expense and overstated net income.

58. Specifically, in the Company's annual reports on Form 10-K for fiscal years 1996 to 2003, the Individual Defendants caused Sunrise to falsely state that "the Company has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"), and related interpretations, in accounting for its employee and director stock option stock option and stock incentive plans. Under APB 25, if the exercise price of the Company's stock options is not less than the market price of the underlying stock on the date of grant, no compensation expense is recognized. Such statements were materially false and misleading in each of these years because Sunrise had granted stock options at exercise prices that were below fair market value on the date immediately preceding the grant date, and failed to account for the in-the-money options as required by APB 25.

59. As alleged previously, APB 25 required the Individual Defendants to record compensation expense for options that were in-the-money on the date of grant. However, they did not do so, thereby materially understating Sunrise's compensation expense and materially overstating Sunrise's net income or materially understating its net loss. These statements were designed to conceal, and did in fact conceal, the fact that the Individual Defendants were engaged in am unlawful  continuous and systematic scheme of backdating stock option grants

to Sunrise insiders. These understatements also had the effect of inflating the stock price of Sunrise shares.

60.     Additionally, Sunrise's materially false and misleading financial statements for fiscal years 1998 to 2002 were included in its Forms 10-K filed for subsequent fiscal years. For this reason, and to the extent they included financials from earlier periods, Sunrise's annual reports on Form 10-K for fiscal years 2003 to 2005 were also materially false and misleading. By participating in the secret backdating scheme, and by reviewing and/or signing these subsequent annual reports, the Individual Defendants knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading, and inflated the Company's stock price.

61.     The Individual Defendants caused Sunrise to send shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period. The Individual Defendants prepared and/or reviewed each proxy statement between 1999 and 2006. Moreover, they knew, or were deliberately reckless in not knowing, that the proxies were materially false and misleading.

62.     The Sunrise proxy statements that were sent to shareholders in connection with annual shareholders' meetings concerned the election of directors, the approval and adoption of a new Sunrise stock option plan, and ratification of the selection of Sunrise's independent auditor. Each proxy statement sent to shareholders during this period contained materially false and misleading disclosures or omitted information about Sunrise's stock option practices, as detailed above.

63.     From 1998 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of

18

concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

64.    Sunrise's proxy statement filed with the SEC on April 3, 1998 falsely reported that options granted to Faeder, Smick, Newell, and Swinton were granted on May 2, 1997, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant.

65.    Sunrise's proxy statement filed with the SEC on April 6, 1999 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on September 14, 1998, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

66.    Sunrise's proxy statement filed with the SEC on April 14, 2000 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on November 8, 1999, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

67.    Sunrise's proxy statement filed with the SEC on March 29, 2001 falsely stated that options granted to Klaasen were granted on September 11, 2000, that options granted to Newell, Slavin, Swinton, and Tomasso were granted on February 25, 2000 and March 28, 2000, that options granted to Slavin were granted on November 24, 2000, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the

19

market price of the Common Stock at the date of the grant." Sunrise's proxy statement filed with the SEC on April 5, 2002 falsely stated that options granted to Newell, Swinton, Tomasso, and Hulse were granted on May 11, 2001 and that options granted to Slavin were granted on November 12, 2001, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

68.     Moreover, in the Compensation Committee Reports included in the Company's proxy statements filed from 1998 to 2002, the Company falsely stated that "[t]he full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price," when in fact the backdated stock options and *ultra vires* stock options provided the Option Recipient Defendants with immediate profits regardless of the Company's stock performance.

69.     On December 11, 2006, Sunrise announced an SEC investigation of the Company and the appointment of a special committee whose bifurcated purpose was to review insider sales of Sunrise stock and the Company's historical practices relating to stock option grants:

> Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that its Board of Directors has appointed a special independent committee to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants. The Board's decision followed receipt of a letter from a union shareholder that was simultaneously sent to news outlets, which resulted in media coverage and a subsequent request by the Securities and Exchange Commission (SEC) for information about matters raised in the media reports. The special committee has retained independent outside legal counsel to assist in its review.
>
> Sunrise is committed to sound corporate governance and transparency and the Board has determined that a comprehensive review by a special committee and independent counsel is the most appropriate way to address these matters in a timely manner.

20

The review by the special committee will be conducted in parallel with the Company's ongoing efforts to complete the previously announced restatement of its financial statements. In view of these ongoing efforts and the special committee review, the Company now anticipates that its restated 2005 Form 10-K will be delayed beyond year-end, but still expects to be current in all of its filings with the SEC by March 1, 2007.

70.    As of the filing date of this Complaint, Sunrise has not released any finding from the special committee. However on January 15, 2007, the Company did admit that Sunrise will not be current in all of its filings with the SEC by March 1, 2007 contrary to the statement in its December 11, 2006 press release.

71.    Defendants, who had a fiduciary duty to act with the utmost due care, loyalty and good faith, either expressly authorized the practice of back-dating options or, in conscious abrogation of their fiduciary duties, permitted the practice to recur repeatedly over the years. The practice apparently ceased after the passage of sweeping changes to the federal securities laws in 2002, which curtailed the potential for backdating by requiring companies to disclose option grants within two days.

## The Individual Defendants Have Been Unjustly Enriched At Sunrise's Expense

72.    From 1999 to 2006, certain of the Individual Defendants, while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold millions of dollars in Sunrise stock, a significant portion of which was obtained through the exercise of improperly backdated stock options, as demonstrated below:

### Carl G. Adams

| ADAMS, CARL G. | Sale | $33,153 | 1,250 | 9/3/2003 | $26.52 |
|---|---|---|---|---|---|

### Paul J Klaassen/ Teresa M. Klasssssen

| KLAASSEN PAUL J & TERESA M | Sale | $1,838,590 | 50,000 | 5/2/2006 | $36.77 |
|---|---|---|---|---|---|
| KLAASSEN PAUL J & TERESA M | Sale | $1,852,040 | 50,000 | 5/1/2006 | $37.04 |

21

| KLAASSEN PAUL J & TERESA M | Sale | $1,924,955 | 50,000 | 4/4/2006 | S38.50 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,940,940 | 50,000 | 4/3/2006 | S38.82 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,718,050 | 50,000 | 3/2/2006 | S34.36 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,738,240 | 50,000 | 3/1/2006 | $34.76 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,806,930 | 50,000 | 2/2/2006 | $36.14 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,813,600 | 50,000 | 2/1/2006 | $36.27 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,719,670 | 50,000 | 1/4/2006 | $34.39 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,605,610 | 50,000 | 1/3/2006 | $32.11 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,728,980 | 50,000 | 12/20/2005 | $34.58 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,738,975 | 50,000 | 12/19/2005 | $34.78 |

## Thomas Newell

| NEWELL, THOMAS B. | Sale | $914,830 | 24,000 | 4/24/2006 | $38.12 |
| NEWELL, THOMAS B. | Sale | $918,401 | 24,000 | 3/22/2006 | $38.27 |
| NEWELL, THOMAS B. | Sale | $820,694 | 24,000 | 2/22/2006 | $34.20 |
| NEWELL, THOMAS B. | Sale | $846,996 | 24,000 | 1/23/2006 | $35.29 |
| NEWELL, THOMAS B. | Sale | $831,727 | 24,000 | 12/22/2005 | $34.66 |
| NEWELL, THOMAS B. | Sale | S808,361 | 24,000 | 11/22/2005 | S33.68 |
| NEWELL, THOMAS B. | Sale | S780,547 | 24,000 | 10/24/2005 | S32.52 |
| NEWELL, THOMAS B. | Sale | $756,120 | 12,000 | 9/22/2005 | $63.01 |
| NEWELL, THOMAS B. | Sale | $721,212 | 12,000 | 8/22/2005 | $60.10 |
| NEWELL, THOMAS B. | Sale | $637,913 | 12,000 | 7/22/2005 | $53.16 |
| NEWELL, THOMAS B. | Sale | $634,579 | 12,000 | 6/22/2005 | $52.88 |
| NEWELL, THOMAS B. | Sale | $624,282 | 12,000 | 5/23/2005 | $52.02 |
| NEWELL, THOMAS B. | Sale | $575,464 | 12,000 | 4/22/2005 | $47.96 |
| NEWELL, THOMAS B. | Sale | S592,463 | 12,000 | 3/22/2005 | S49.37 |
| NEWELL, THOMAS B. | Sale | $561,840 | 12,000 | 2/22/2005 | $46.82 |
| NEWELL, THOMAS B. | Sale | $522,360 | 12,000 | 1/24/2005 | $43.53 |
| NEWELL, THOMAS B. | Sale | $536,455 | 12,000 | 12/22/2004 | $44.70 |
| NEWELL, THOMAS B. | Sale | $509,698 | 12,000 | 11/22/2004 | $42.47 |
| NEWELL, THOMAS B. | Sale | $432,000 | 12,000 | 10/22/2004 | $36.00 |
| NEWELL, THOMAS B. | Sale | $422,110 | 12,000 | 9/22/2004 | S35.18 |
| NEWELL, THOMAS B. | Sale | $415,092 | 12,000 | 8/23/2004 | $34.59 |
| NEWELL, THOMAS B. | Sale | $427,980 | 12,000 | 7/22/2004 | $35.67 |
| NEWELL, THOMAS B. | Sale | $452,258 | 12,000 | 6/22/2004 | $37.69 |
| NEWELL, THOMAS B. | Sale | $410,388 | 12,000 | 5/21/2004 | $34.20 |
| NEWELL, THOMAS B. | Sale | $398,498 | 12,000 | 4/22/2004 | $33.21 |
| NEWELL, THOMAS B. | Sale | S421,416 | 12,000 | 3/22/2004 | S35.12 |
| NEWELL, THOMAS B. | Sale | $499,320 | 12,000 | 2/23/2004 | $41.61 |
| NEWELL, THOMAS B. | Sale | $483,144 | 12,000 | 1/22/2004 | $40.26 |
| NEWELL, THOMAS B. | Sale | S1,137,718 | 33,000 | 11/24/2003 | $34.48 |
| NEWELL, THOMAS B. | Sale | $464,400 | 12,000 | 12/22/2003 | $38.70 |
| NEWELL, THOMAS B. | Sale | S145,376 | 5,500 | 9/22/2003 | $26.43 |

| NEWELL, THOMAS B. | Sale | $138,555 | 5,000 | 10/22/2003 | $27.71 |
| NEWELL, THOMAS B. | Sale | $113,029 | 4,500 | 8/22/2003 | $25.12 |
| NEWELL, THOMAS B. | Sale | $292,500 | 11,700 | 11/22/2002 | $25.00 |
| NEWEII, THOMAS B. | Sale | $268,530 | 10,000 | 8/22/2002 | $26.85 |
| NEWELL, THOMAS B. | Sale | $147,555 | 5,000 | 6/24/2002 | $29.51 |
| NEWELL, THOMAS B. | Sale | $139,750 | 5,000 | 5/22/2002 | $27.95 |
| NEWELL, THOMAS B. | Sale | $147,000 | 5,000 | 4/22/2002 | $29.40 |
| NEWELL, THOMAS B. | Sale | $383,670 | 15,000 | 3/22/2002 | $25.58 |
| NEWELL, THOMAS B. | Sale | $133,250 | 5,000 | 12/24/2001 | $26.65 |
| NEWELL, THOMAS B. | Sale | $137,500 | 5,000 | 11/23/2001 | $27.50 |
| NEWELL, THOMAS B. | Sale | $281,000 | 10,000 | 10/22/2001 | $28.10 |
| NEWELL, THOMAS B. | Sale | $130,000 | 5,000 | 8/22/2001 | $26.00 |
| NEWELL, THOMAS B. | Sale | $148,150 | 5,000 | 7/23/2001 | $29.63 |
| NEWELL, THOMAS B. | Sale | $889,350 | 35,000 | 6/22/2001 | $25.41 |

**Thomas Donohue**

| DONOHUE, THOMAS J | Sale | $3,391,838 | 102,666 | 11/21/2005 | $33.04 |
| DONOHUE, THOMAS J | Sale | $340,684 | 6,667 | 5/6/2005 | $51.12 |

**Ronald Aprahamian**

| APRAHAMIAN, RONALD V. | Sale | $757,040 | 20,000 | 4/18/2006 | $37.85 |
| APRAHAMIAN, RONALD V. | Sale | $1,513,200 | 29,100 | 5/27/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $104,008 | 2,000 | 5/26/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $46,800 | 900 | 5/26/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $10,400 | 200 | 5/24/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,300,000 | 25,000 | 5/23/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $104,008 | 2,000 | 5/23/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,026,048 | 20,000 | 5/16/2005 | $51.30 |
| APRAHAMIAN, RONALD V. | Sale | $273,600 | 7,200 | 10/28/2004 | $38.00 |
| APRAHAMIAN, RONALD V. | Sale | $106,400 | 2,800 | 10/27/2004 | $38.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,084,400 | 40,000 | 7/9/2001 | $27.35 |
| APRAHAMIAN, RONALD V. | Sale | $681,040 | 20,000 | 11/13/2003 | $34.05 |
| APRAHAMIAN, RONALD V. | Sale | $149,163 | 6,100 | 6/5/2003 | $24.45 |
| APRAHAMIAN, RONALD V. | Sale | $340,565 | 13,900 | 6/4/2003 | $24.50 |

**Craig Callen**

| CALLEN, CRAIG | Sale | $521,093 | 10,000 | 5/26/2005 | $52.11 |

**Larry Hulse**

| HULSE, LARRY | Sale | $1,345,624 | 21,973 | 8/12/2005 | $61.24 |

23

| HULSE, LARRY | Sale | $864,300 | 15,000 | 8/4/2005 | $57.62 |
| HULSE, LARRY | Sale | $509,869 | 10,000 | 5/17/2005 | $50.99 |
| HULSE, LARRY | Sale | $319,569 | 6,250 | 5/11/2005 | $51.13 |
| HULSE, LARRY | Sale | $400,000 | 10,000 | 11/4/2004 | $40.00 |
| HULSE, LARRY | Sale | $214,142 | 6,250 | 3/29/2004 | $34.26 |
| HULSE, LARRY | Sale | $138,431 | 3,306 | 2/25/2004 | $41.87 |
| HULSE, LARRY | Sale | $2,000,000 | 50,000 | 1/21/2004 | $40.00 |
| HULSE, LARRY | Sale | $280,641 | 8,750 | 11/10/2003 | $32.07 |
| HULSE, LARRY | Sale | $787,500 | 22,500 | 11/7/2003 | $35.00 |
| HULSE, LARRY | Sale | $217,485 | 8,055 | 9/4/2003 | $27.00 |
| HULSE, LARRY | Sale | $217,512 | 8,056 | 5/13/2002 | $27.00 |
| HULSE, LARRY | Sale | $247,363 | 8,750 | 11/13/2001 | $28.27 |
| HULSE, LARRY | Sale | $923,503 | 33,890 | 6/27/2001 | $27.25 |

**David W. Faeder**

| FAEDER, DAVID W. | Sale | $627,429 | 15,000 | 2/25/2004 | $41.83 |
| FAEDER, DAVID W. | Sale | $394,875 | 11,700 | 11/19/2003 | $33.75 |
| FAEDER, DAVID W. | Sale | $153,563 | 4,550 | 11/17/2003 | $33.75 |
| FAEDER, DAVID W. | Sale | $523,660 | 16,250 | 11/10/2003 | $32.23 |
| FAEDER, DAVID W. | Sale | $301,925 | 10,800 | 10/13/2003 | $27.96 |
| FAEDER, DAVID W. | Sale | $698,100 | 25,000 | 10/10/2003 | $27.92 |
| FAEDER, DAVID W. | Sale | $3,169,518 | 114,200 | 10/7/2003 | $27.75 |
| FAEDER, DAVID W. | Sale | $2,049,038 | 74,000 | 10/6/2003 | $27.69 |
| FAEDER, DAVID W. | Sale | $1,961,023 | 71,100 | 10/3/2003 | $27.58 |
| FAEDER, DAVID W. | Sale | $4,260,044 | 154,900 | 10/2/2003 | $27.50 |
| FAEDER, DAVID W. | Sale | $117,970 | 4,700 | 8/29/2003 | $25.10 |
| FAEDER, DAVID W. | Sale | $383,049 | 15,300 | 8/21/2003 | $25.04 |
| FAEDER, DAVID W. | Sale | $399,686 | 16,300 | 8/20/2003 | $24.52 |
| FAEDER, DAVID W. | Sale | $58,822 | 2,400 | 8/18/2003 | $24.51 |
| FAEDER, DAVID W. | Sale | $31,850 | 1,300 | 8/15/2003 | $24.50 |
| FAEDER, DAVID W. | Sale | $242,637 | 10,000 | 8/14/2003 | $24.26 |
| FAEDER, DAVID W. | Sale | $44,345 | 1,810 | 8/12/2003 | $24.50 |
| FAEDER, DAVID W. | Sale | $701,250 | 28,050 | 7/15/2003 | $25.00 |
| FAEDER, DAVID W. | Sale | $655,576 | 26,200 | 6/2/2003 | $25.02 |
| FAEDER, DAVID W. | Sale | $125,000 | 5,000 | 5/30/2003 | $25.00 |
| FAEDER, DAVID W. | Sale | $105,823 | 3,250 | 1/14/2002 | $32.56 |
| FAEDER, DAVID W. | Sale | $1,389,593 | 47,917 | 7/16/2001 | $29.07 |

**James D. Holladay**

| HOLLADAY, J. DOUGLAS | Sale | $312,000 | 8,000 | 3/21/2006 | $39.00 |
| HOLLADAY, J. DOUGLAS | Sale | $219,000 | 6,000 | 12/12/2005 | $36.50 |
| HOLLADAY, J. DOUGLAS | Sale | $59,500 | 1,700 | 12/6/2005 | $35.00 |

24

| HOLLADAY, J. DOUGLAS | Sale | $80,500 | 2,300 | 11/7/2005 | $35.00 |
|---|---|---|---|---|---|
| HOLLADAY, J. DOUGLAS | Sale | $268,000 | 4,000 | 10/3/2005 | $67.00 |
| HOLLADAY, J. DOUGLAS | Sale | $320,000 | 5,000 | 9/23/2005 | $64.00 |
| HOLLADAY, J. DOUGLAS | Sale | $288,585 | 5,500 | 5/31/2005 | $52.54 |
| HOLLADAY, J. DOUGLAS | Sale | $325,520 | 6,500 | 5/12/2005 | $50.21 |

**Pete A. Klisares**

| KLISARES, PETE A. | Sale | $582,890 | 16,665 | 5/7/2004 | $34.98 |
|---|---|---|---|---|---|
| KLISARES, PETE A. | Sale | $346,417 | 9,999 | 12/2/2003 | $34.65 |
| KLISARES, PETE A. | Sale | $69,700 | 2,000 | 11/25/2003 | $34.92 |

**Bradley B. Rush**

| RUSH, BRADLEY B. | Sale | $391,188 | 6,250 | 9/12/2005 | $62.66 |
|---|---|---|---|---|---|
| RUSH, BRADLEY B. | Sale | $40,883 | 687 | 9/8/2005 | $59.51 |

**Christian B.A. Slavin**

| SLAVIN, CHRISTIAN B.A. | Sale | $28,050 | 1,000 | 10/15/2001 | $28.15 |
|---|---|---|---|---|---|
| SLAVIN, CHRISTIAN B.A. | Sale | $26,300 | 1,000 | 8/15/2001 | $26.31 |
| SLAVIN, CHRISTIAN B.A. | Sale | $29,000 | 1,000 | 7/16/2001 | $29.00 |
| SLAVIN, CHRISTIAN B.A. | Sale | $100,000 | 4,000 | 6/15/2001 | $25.00 |
| SLAVIN, CHRISTIAN B.A. | Sale | $422,188 | 17,500 | 12/29/2000 | $24.13 |

**Brian C. Swinton**

| SWINTON, BRIAN C. | Sale | $721,201 | 19,754 | 3/5/2004 | $36.51 |
|---|---|---|---|---|---|
| SWINTON, BRIAN C. | Sale | $320,732 | 10,000 | 11/10/2003 | $32.07 |
| SWINTON, BRIAN C. | Sale | $4,575,000 | 150,000 | 11/5/2003 | $32.50 |
| SWINTON, BRIAN C. | Sale | $2,950,000 | 100,000 | 11/4/2003 | $29.75 |
| SWINTON, BRIAN C. | Sale | $74,100 | 2,600 | 10/27/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $2,850 | 100 | 10/20/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $350,550 | 12,300 | 10/17/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $280,000 | 10,000 | 10/10/2003 | $28.00 |
| SWINTON, BRIAN C. | Sale | $309,375 | 11,250 | 10/2/2003 | $27.50 |
| SWINTON, BRIAN C. | Sale | $93,563 | 3,750 | 5/16/2003 | $24.95 |
| SWINTON, BRIAN C. | Sale | $426,904 | 15,695 | 4/18/2002 | $29.50 |
| SWINTON, BRIAN C. | Sale | $885,000 | 30,000 | 7/16/2001 | $29.50 |
| SWINTON, BRIAN C. | Sale | $600,150 | 25,000 | 6/26/2001 | $26.75 |
| SWINTON, BRIAN C. | Sale | $294,700 | 10,000 | 11/8/2001 | $29.47 |

**Tiffany L. Tomasso**

| TOMASSO, TIFFANY L. | Sale | $1,410,000 | 30,000 | 2/2/2005 | $47.00 |
|---|---|---|---|---|---|

| TOMASSO, TIFFANY L. | Sale | $337,500 | 7,500 | 12/15/2004 | $45.00 |
|---|---|---|---|---|---|
| TOMASSO, TIFFANY L. | Sale | $128,485 | 3,750 | 3/29/2004 | $34.26 |
| TOMASSO, TIFFANY L. | Sale | $575,751 | 13,750 | 2/25/2004 | $41.87 |
| TOMASSO, TIFFANY L. | Sale | $8,740,000 | 230,000 | 12/19/2003 | $38.00 |
| TOMASSO, TIFFANY L. | Sale | $2,072,000 | 56,000 | 12/18/2003 | $37.00 |
| TOMASSO, TIFFANY L. | Sale | $521,190 | 16,250 | 11/10/2003 | $32.07 |
| TOMASSO, TIFFANY L. | Sale | $525,000 | 15,000 | 11/7/2003 | $35.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $951,200 | 32,800 | 10/29/2003 | $29.00 |
| TOMASSO, TIFFANY L. | Sale | $208,800 | 7,200 | 10/28/2003 | $29.00 |
| TOMASSO, TIFFANY A. | Sale | $491,221 | 16,250 | 8/7/2001 | $30.23 |
| TOMASSO, TIFFANY A. | Sale | $437,500 | 17,500 | 6/6/2001 | $25.00 |
| TOMASSO, TIFFANY A. | Sale | $68,730 | 2,900 | 5/7/2001 | $23.70 |
| TOMASSO, TIFFANY L. | Sale | $178,222 | 8,101 | 3/14/2001 | $22.00 |

73.     Had defendants and the Stock Option Committee not permitted the stock options to be backdated, the Option Recipient Defendants' profits and unrealized gains on exercisable stock options would have been tens of millions of dollars less.

74.     The practice of backdating stock options not only lined the pockets of Sunrise executives at the direct expense of the Company, which dollar for dollar received money when the options are exercised, but also resulted in the overstatement of Sunrise's profits and an understatement of its tax liabilities.

75.     As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Sunrise to violate GAAP, SEC regulations and IRS rules and regulations.

76.     Sunrise's financial results for 1999 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Sunrise's financial results were presented in a fair manner and in accordance with GAAP.

77.     The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, and the financial information was not "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

78.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

79.     During the relevant period, the Individual Defendants caused the Company to understate its compensation expenses by improperly accounting for its stock options under GAAP, thus overstating the Company's net earnings.

80.     Under well-settled accounting principles in effect throughout the relevant period, Sunrise did not need to record an expense for options granted to employees at the current market price ("at the money"). The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money"). In order to provide Sunrise executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company

27

records to create the false appearance that options had been granted at the market price on an earlier date.

81.     From 1999 to 2006, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25, and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

82.     Throughout the relevant period, Sunrise accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees." Under APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed. Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

83.     Due to its failure to recognize necessary charges relating to options-based compensation, the Company presented its financial results and statements in a manner that violated GAAP, including the following principles:

> (a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, X10);

28

(b)  The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

(d)  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)  The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

84.  Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

85.     During the relevant period, the Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

86.     Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers--the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options... If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant......" Item 402(c)(2)(iv).

87.     The Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date that the Stock Option Committee approved the grant.

88.     During the relevant period, the Individual Defendants further caused Sunrise to violate IRS rules and regulations due to its improper accounting for the backdated stock

30

options. As a result, the Company's tax liabilities were understated, exposing Sunrise to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

89.     The Individual Defendants caused the Company to violate Internal Revenue Code §162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance based." In order for compensation to be performance-based, the Stock Option Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

90.     Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What Section [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

91.     The Individual Defendants caused Sunrise to violate IRC §162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As

a result, all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

92.    The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Sunrise's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

93.    ISOs are a form of equity compensation that may be provided to a company's employees. ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment because they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential treatment because they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

94.    By improperly treating its backdated options as ISOs, the Individual Defendants failed to provide proper income tax and FICA withholdings upon the exercise of options by its executives and employees, in violation of IRS rules and regulations.

95.    Meanwhile, the Option Recipient Defendants were causing the Company to grant them hundreds of thousands of backdated Sunrise stock options. The Company's

executives and directors received a significant number of backdated Sunrise stock options as compensation during the relevant period.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

96.    The Individual Defendants' misconduct alleged herein was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

97.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to: (a) the additional compensation expenses and tax liabilities the Company is required to incur; (b) loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grants; (c) costs and expenses incurred in connection with the Company's internal investigation and restatement of historical financial statements; and (d) the cost of the SEC investigation of the Company.

98.    As alleged herein, certain of the Option Recipient Defendants exercised hundreds of thousands of backdated Sunrise stock options at improperly low prices and then sold the shares for substantial profits. Consequently, these defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

99.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

100.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

101.    As a result of the facts set forth herein, plaintiff has not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

102.    Plaintiff brings this action derivatively in the right and for the benefit of Sunrise to redress injuries suffered and to be suffered by Sunrise as a result of the breaches of fiduciary duty by the Individual Defendants.

103.    Plaintiff did not make a demand on the Sunrise Board to bring the claims alleged herein because such a demand would have been futile.  At the time Plaintiff filed this derivative action, the Sunrise Board consisted of the following members: Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little (collectively, the "Director Defendants"). Each of these Board members has been named as a Defendant in this action.  Of the seven Board members at the time of filing this Complaint, six benefited materially from the wrongdoing.  As detailed below, each of the directors faces a sufficiently substantial likelihood of liability on the derivative claims alleged herein and is therefore in no position to render a disinterested judgment as to whether the Company should bring such claims, and/or lacks sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims against the Individual Defendants.

34

104. The Board is responsible for approving the compensation awarded to the Sunrise executive officers. This compensation includes the stock options that were secretly backdated by Sunrise insiders. Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to Sunrise in approving the option grants as dated. The Board should have properly informed itself of the circumstances surrounding the options granted to the Sunrise insiders before approving them. Accordingly, there is reason to doubt that the Director Defendants were disinterested because they face substantial liability for their breaches of fiduciary duty to Sunrise. The Board's decision to approve the options was not the product of valid business judgment. Thus, demand is futile as to the Director Defendants.

105. The Compensation Committee of the Board is specifically responsible under its charter for reviewing and approving grants of stock options and other equity awards to Sunrise insiders. The Sunrise Compensation Committee Charter provides that the Compensation Committee shall, *inter alia*:

    a. [A]dminister and implement the Company's incentive compensation plans and equity-based plans that are subject to Board approval in which directors, the CEO, other executive officers and other employees of the Company and its subsidiaries may be participants, including, but not limited to, (a) approving option grants and restricted stock or other awards, (b) interpreting the plans, (c) determining rules and regulations relating to the plans, (d) modifying or canceling existing grants or awards and (e) imposing limitations, restrictions and conditions upon any grant or award as the Compensation Committee deems necessary or advisable.

The Compensation Committee at the time this derivative action was filed consisted of Defendants Aprahamian, Callen, and Donohue. Director Defendants Aprahamian and Donohue have been members of the Compensation Committee since FY1996. Donohue has been Chair of the Compensation Committee since FY2001. Director Defendant Callen has been a member of the Committee from FY2004 to present and from FY1999 to August 23, 2002. On August 23,

35

2002 the Company reformed the then existing Compensation Committee and Stock Option Committee into one Compensation Committee. Director Defendants Callen and Donohue were both members of the Stock Option Committee before its reformation into the Compensation Committee. Defendant Callen was a member of the Stock Option Committee from FY1999 until August 2002. Defendant Donohue was a member of the Stock Option Committee from FY1996 until August 2002 and Chair during FY2001. These Defendants were responsible as members of the Compensation Committee and/or Stock Option Committee to review and grant stock options to Sunrise insiders during their respective tenures on the Committee. The Compensation Committee's and/or Stock Option Committee's practice of allowing and/or authorizing the practice of granting back-dated stock options during this time was not the product of valid business judgment. Alternatively, these Defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding these option grants, thereby causing or allowing the Company's insiders to obtain unreasonable and unreported compensation via the backdating of stock option grants. Accordingly, there is a reasonable doubt that Defendants Aprahamian, Callen, and Donohue are disinterested as they face substantial liability for their breaches of fiduciary duty to Sunrise. Thus, demand is futile as to Defendants Aprahamian, Callen, and Donohue on these additional bases.

106. The Audit Committee is responsible, by its Charter, for reviewing and discussing, with management and the independent auditors, Sunrise financial statements and earnings releases. The Sunrise Audit Committee Charter provides that the Audit Committee shall, *inter alia*:

a.   Meet to review and discuss the company's annual audited financial statements with management and the independent auditor, including reviewing the company's specific disclosures;

b.   Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the company's selection or application of accounting principles, and major issues as to the adequacy of the company's internal controls and any special audit steps adopted in light of material control deficiencies;

c.   Review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements; and

d.   Prepare the audit committee report required by the rules of the SEC to be included in the company's annual proxy statement.

The Audit Committee is responsible for assisting the Board in its oversight responsibilities relating to the integrity of the Company's systems of internal accounting and financial controls, and the compliance by the Company with legal and regulatory requirements.   The Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls. Thus, the Audit Committee was responsible for overseeing and directly participating in the Sunrise financial reporting process.   The Audit Committee at the time of the filing of this derivative action was comprised of Director Defendants Aprahamian, Callen, and Donohue. Defendants Aprahamian and Donohue are and have been members of the Audit Committee since FY1996.   Defendant Callen has been a member of the Audit Committee since FY2004.   Defendant Aprahamian has been the Chair of the Audit Committee since FY2001.   Accordingly, Defendants Aprahamian, Callen, and Donohue breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of earnings press releases and financial statements that contained false and/or misleading material information.  Particularly, these Defendants reviewed

and failed to correct the Sunrise improper earnings releases and financial statements issued from FY1997 to present which contained false and/or misleading material information during the relevant time period. Additionally, during the relevant time period of the practice at Sunrise in granting back-dated stock options, the Audit Committee was meeting only once or twice per year. Specifically, the Audit Committee only met once in FY1997, once in FY1998, and twice in FY1999. As a result, these Defendants face a likelihood of liability for their breach of fiduciary duties. Therefore, demand is futile as to Defendants Aprahamian, Callen, and Donohue.

107. The Nominating and Corporate Governance Committee is composed of members of the Board and is charged with the general duties of reviewing and reassessing the adequacy of the Corporate Governance Guidelines of the Company and recommending membership to and monitoring membership of the Board. The Sunrise Nominating and Corporate Governance Committee Charter provides that the Nominating and Corporate Governance Committee shall, *inter alia*:

a. [R]eceive comments from all directors and report annually to the Board on an assessment of the Board's performance, to be discussed with the Board following the end of each fiscal year. The Nominating and Corporate Governance Committee shall also oversee the annual evaluation of management, and periodically make a report to the Board on succession planning for the Chief Executive Officer; and

b. [R]eview and reassess the adequacy of the corporate governance principles of the Company annually and recommend any proposed changes to the Board for approval, including any changes in director fees.

The Nominating and Corporate Governance Committee at the time this derivative action was filed was comprised of Director Defendants Donohue, Holladay and Little. Defendants Donohue and Holladay have been members of the Nominating and Corporate Governance Committee since the Committee's inception in August 2002. Defendant Little has been a member of the Committee since FY2005. Defendant Aprahamian was a member of the Committee from August

38

2002 through FY2003. Defendant Holladay has been the Chair of the Committee since August 2002. These Defendants were responsible, as members of the Nominating and Corporate Governance Committee, for reviewing and/or reassessing governance principles at Sunrise and reviewing and/or maintaining the Board's membership during their tenures on the Committee. Clearly, these Defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding certain practices such as the back-dating of stock option grants which were adverse or should have been adverse to corporate governance principles, thereby causing or allowing the Company to issue false and/or misleading statements and/or press releases. Additionally, the Committee members, during their respective tenures, did not fulfill this duty because they did not fully and adequately monitor and/or remedy the actions of the Board complained of herein. Accordingly, there is a reasonable doubt that Defendants Aprahamian, Donohue, Holladay, and Little are disinterested because they face substantial liability for their breaches of fiduciary duty to Sunrise. The Nominating and Corporate Governance Committee's decisions to not adequately respond to clear departures from corporate governance procedures and not monitor and/or remedy the actions of the Board complained of herein were not the product of valid business judgment. Thus, demand is futile as to Defendants Aprahamian, Donohue, Holladay and Little.

108. Each of the Director Defendants faces a substantial likelihood of liability in this action because of his or her failure, as a director, to ensure that reliable systems of financial controls and information and reporting were in place and functioning effectively. The dramatic breakdowns and gaps in those controls were so widespread and systemic that each of the Director Defendants faces substantial exposure to liability for his or her total abrogation of his or her duty of oversight. These directors either knew or should have known, in the absence of

complete recklessness, that violations of law were occurring and took no steps in good faith to prevent or remedy that situation, proximately causing millions of dollars of losses to the Company. Thus, demand is futile as to Defendants P. Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little.

109.    Each of the Director Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings during the relevant time period. As such, Director Defendants face a sufficiently substantial likelihood of liability for the same. Thus, demand is futile as to Defendants P. Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little.

110.    Certain Director Defendants participated in the wrongdoing complained of herein so that they could: (a) protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby; and (b) inflate the price of the Company's common stock in order to enhance the value of their securities holdings and options to purchase Sunrise stock and allow them to sell and reap millions of dollars in illegal insider trading proceeds. Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of), authorizing, approving and acquiescing in the conduct complained of herein. Specifically, certain Director Defendants benefited immensely from the disposition of the following Sunrise shares from 1997 to 2006, as seen below:

| DEFENDANT(S) | SHARES SOLD | AGGREGATE PROCEEDS |
|---|---|---|
| P. KLAASSEN & T. KLAASSEN, JOINTLY | 1,462,106 | $56,363,094.63 |
| APRAHAMIAN | 215,200 | $8,848,497.20 |
| CALLEN | 10,000 | $521,093.00 |
| DONOHUE | 134,378 | $3,732,527.28 |

| HOLLADAY | 39,000 | $1,873,125.00 |

These Director Defendants reaped extreme profits in the disposition of shares during the practices complained of herein. Therefore, any demand upon the Board would have been futile.

111.    The Sunrise Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Sunrise stockholders or recklessly, consciously and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors, and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting. Pursuant to their specific duties as Board members, Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to Sunrise in that they failed to prevent and correct the improper stock option granting and financial reporting. Certain directors are also dominated and controlled by other Defendants and cannot act independently of them.   Thus, the Sunrise Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

112.    Also, as revealed by the Company in its Press Release dated December 11, 2006, the staff of the SEC has commenced an inquiry into the Company's stock option practices requesting relevant information from the Company.  Defendants face a substantial likelihood of

being held liable for these practices. Accordingly, as such any demand upon Director Defendants would have been futile.

## The Members of the Board of Directors Lack Independence

113. Director Defendant Paul J. Klaassen founded Sunrise with his wife, Director Defendant Teresa M. Klaassen, in 1981. Since its inception, P. Klaassen has served as Chief Executive Officer and Chairman of the Board of Sunrise. His principal occupation since 1981 is his employment with Sunrise. As to the wrongdoing alleged herein, P. Klaasen is neither disinterested nor independent.

114. Director Defendant Teresa M. Klaassen founded Sunrise with her husband, Director Defendant P. Klaassen, in 1981. T. Klaassen currently serves as Chief Cultural Officer of Sunrise. T. Klaassen served as Executive Vice President from 1981 until November 2003. Her principal occupation, since 1981, has been her employment with Sunrise. As to the wrongdoing alleged herein, T. Klaasen is neither disinterested nor independent.

115. Director Defendants P. Klaassen and T. Klaassen, because they are husband and wife, have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Because of their personal and professional relationships, it is reasonable to conclude that they would not authorize suit against each other. Therefore, demand upon Defendants P. Klaassen and T. Klaassen is futile.

116. P. Klaassen and T. Klaassen, also have significant business relationships with the Company, and therefore, have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Specifically,

    a.    Defendants P. Klaassen and T. Klaassen lease the real property on which the Fairfax facility is located to the Company under a 99-year ground lease. Sunrise has paid rents to Defendants P. Klaassen and T. Klaassen for the following years totaling approximately: \$262,000 in FY1996,

$262,000 in FY1997, $262,000 in FY1998, $262,000 in FY1999, $262,000 in FY2000, $447,236 in FY2001, $299,000 in FY2002, $258,333 in FY2003, $158,700 in FY2004, and $300,000 in FY2005; and

b.    Sunrise leases certain real property located in Fairfax County, Virginia to Defendants P. Klaassen and T. Klaassen for use as a residence under a 99-year ground lease entered into in June 1994. Defendants P. Klaassen and T. Klaassen pay rent to the Company under this lease totaling $1.00 per month.

Due to Defendants P. Klaassen's and T. Klaassen's significant interest in these properties and their deep inter-related business and personal relationships with the Company, demand as to Director Defendants P. Klaassen and T. Klaassen is futile.

117.    P. Klaassen also has other significant business dealings with the Company, the potential risk of loss of which creates debilitating conflicts of interest that prevent him from taking the necessary and proper action on behalf of the Company as requested herein. Specifically, a company owned by Defendant P. Klaassen owns an airplane used by Sunrise for business travel. Sunrise made payments for the use of the airplane during FY1999 and FY2000 of approximately $76,433.00 per year.

118.    Director Defendants P. Klaassen, T. Klaassen, and Donohue, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Specifically,

c.     Defendants P. Klaassen and Donohue have served on the Board of
       Trustees for Marymount University together;

d.     It has been reported that for a period of time, Defendants P. Klaassen and
       T. Klaassen lived with Defendant Donohue; and

e.     It has been reported that Defendant Donohue invested in the first home of
       Defendants P. Klaassen and T. Klaassen.

During the time these Defendants were working, investing and living together, Defendants P.

Klaassen, T. Klaassen, and Donohue developed social, personal, and professional relationships

from which it is reasonable to conclude that they would not authorize suit against each other.

Therefore, demand on Director Defendants P. Klaassen, T. Klaassen, and Donohue is futile.

119.   Director Defendants P. Klaassen, Donohue, and Little enjoy certain professional

relationships outside of Sunrise such that they have debilitating conflicts of interest that prevent

them from taking the necessary and proper action on behalf of the Company as requested herein.

Specifically,

f.     Defendants P. Klaassen, Donohue, and Little serve together on the Board
       of Directors of the U.S. Chamber of Commerce. Defendant Donohue
       serves as the President and Chief Executive Officer of the U.S. Chamber
       of Commerce; and

g.     Defendants P. Klaassen, Donohue, and Little serve together on the Board
       of Directors of the National Chamber Foundation. Defendant Little serves
       as Chairman of the Board of the National Chamber Foundation. Defendant
       Donohue serves as President of the National Chamber Foundation.

During their several years working together at the U.S. Chamber of Commerce and the National

Chamber Foundation, Defendants P. Klaassen, Donohue and Little developed both social and

professional relationships from which it is reasonable to conclude that they would not authorize

suit against each other.

120.   Further, Defendant Donohue has demonstrated an indifference regarding ethical

corporate governance procedures. Defendant Donohue has served as a member of the Board of

44

Directors of XM Satellite Radio Holdings, Inc. ("XM") since October 1999. Additionally, Defendant Donohue, during the relevant times, served on the Compensation Committee and Nominating Committee at XM. For an extended period of time while Donohue was a member of the Board at XM, XM improperly misrepresented the financial condition and business prospects of the company. As a result of these practices, XM and its Board members, including Defendant Donohue, have been named as defendants in and exposed to millions of dollars of liability from securities class action lawsuits, as well as an SEC investigation into the conduct of XM. Due to Defendant Donohue's alleged corporate misconduct during his tenure as a member of the Compensation Committee, Nominating Committee, and the Board of Directors at XM, it is unlikely that Donahue would prosecute claims on behalf of Sunrise related to alleged director or officer misconduct.Director Defendant Callen, because of his inter-related business with the Company, has debilitating conflicts of interest that prevent him from taking the necessary and proper action on behalf of the Company as requested herein. Specifically, Defendant Callen is a managing director and head of US Health Care Investment Banking at Credit Suisse First Boston ("CSFB"). CSFB acquired Donaldson, Lufkin & Jenrette Securities Corporation in 2001. Defendant Callen was a managing director of Health Care Investment Banking at Donaldson, Lufkin & Jenrette before the acquisition. From 1999 to 2001, Donaldson, Lufkin & Jenrette provided financial advisory services to Sunrise. Additionally, in 1998 and 1999, Sunrise entered into joint ventures with several affiliates of Donaldson, Lufkin & Jenrette in order to raise over $70 million in capital to develop up to 37 assisted living projects.

121.    Further, Defendant Callen owns a 1.1375% interest in two of the joint ventures entered into between Sunrise and these certain affiliates of Donaldson, Lufkin & Jenrette. Also, CSFB was the initial purchaser of Sunrise's January 2002 Rule 14A private placement of $125

million aggregate principal amount of 5 ¼% convertible subordinated notes due February 1,
2009. Due to Defendant Callen's significant interest in these inter-related business relationships
between the Company and himself, CSFB, and/or Donaldson, Lufkin & Jenrette, Callen is
unlikely to take any action that would jeopardize those relationships and the benefits thereof.In
addition, should the Director Defendants decide to bring claims against themselves, it would
likely trigger an "insured vs. insured" exclusion which is typical for D&O insurance policies,
which would make D&O insurance coverage unavailable to them. Therefore, demand is futile as
to all Director Defendants.

122.    In addition, demand would be futile and useless for the additional following
reasons:

      a.      The Director Defendants, because of their inter-related business,
professional and personal relationships, have developed debilitating
conflicts of interest that prevent the Board members of the Company from
taking the necessary and proper action on behalf of the Company as
requested herein;

      b.      The Director Defendants of Sunrise, as more fully detailed herein,
participated in, approved and/or permitted the wrongs alleged herein to
have occurred and participated in efforts to conceal or disguise those
wrongs from the Sunrise stockholders or recklessly and/or negligently
disregarded the wrongs complained of herein, and are therefore not
disinterested parties.    Each of the Director Defendants exhibited a
sustained and systemic failure to fulfill their fiduciary duties, which could
not have been an exercise of good faith business judgment and amounted
to gross negligence and extreme recklessness;

      c.      In order to bring this suit, a majority of the directors of Sunrise would be
forced to sue themselves and persons with whom they have extensive
business and personal entanglements, which they will not do, thereby
excusing demand;

      d.      The acts complained of constitute violations of the fiduciary duties owed
by the Sunrise officers and directors and these acts are incapable of
ratification;

e.   Sunrise has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sunrise any part of the damages Sunrise suffered and will continue to suffer;

f.   The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands; and

g.   Any suit by the directors of Sunrise to remedy these wrongs would likely expose the Director Defendants and Sunrise to liability for violations of securities laws which could result in additional civil actions being filed against one or more of the Director Defendants. Thus, they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

123.   Sunrise has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

(a)   Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

(b)   Costs incurred relating to the informal SEC probe.

(c)   Taxes, penalties, interest, etc.

124.   Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Sunrise's proxy statements, the stated purpose of granting stock options is to attract and retain skilled executive personnel and align their interests with those of the stockholders. Specifically, the Compensation Committee reports state: "[s]tock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains." However, by granting Sunrise stock options with backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by

47

awarding employees compensation that had intrinsic value regardless of Sunrise's performance. In effect, this practice constituted nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the Company.

125.    There was no basis or justification for backdating the stock options, which practice was *ultra vires* and in violation of the stock option plans. Backdating was designed solely to surreptitiously benefit the Option Recipient Defendants in a manner that was inconsistent with the Plans and the Company's public disclosures, to the detriment of the Company.

126.    The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Sunrise to potentially massive liability. The SEC has initiated an investigation into Sunrise's stock option granting practices. Sunrise will also likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unfairly benefiting himself and other Company insiders at the expense of the Company.

129.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to

48

themselves and/or certain other officers and directors of the Company and cover up their misconduct.

130.    In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

131.    The Individual Defendants' misconduct as alleged herein was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to and did unduly benefit the Option Recipient Defendants at the expense of the Company.

132.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, as well as the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT II

### Against the Option Recipient Defendants for Unjust Enrichment

133.    Plaintiff incorporates by reference all preceding paragraphs as if set forth fully herein.

134.    The Option Recipient Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

135.    To remedy the Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received,

49

including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT III

### Against the Option Recipient Defendants for Recission

136.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

137.    As a result of the acts alleged herein, the stock option contracts between the Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control. Further, the backdated Sunrise stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

138.    All contracts that provide for stock option grants to the Option Recipient Defendants and were entered into during the relevant period should therefore be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

WHEREFORE, Plaintiff demands judgment as follows:

        a.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

        b.    Awarding to Sunrise restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Option Recipient Defendants as a result of the conduct alleged herein;

c. Rescinding and/or repricing the back-dated stock options granted to the Options Recipient Defendants;

d. Equitable and/or injunctive relief as permitted by law and equity, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendant's trading activities or their other assets so as to assure that plaintiff on behalf of Sunrise has an effective remedy;

e. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f. Granting such other and further relief as the Court deems just and proper.

Dated: March 6, 2007

ROSENTHAL, MONHAIT & GODDESS, P.A.

By: _Carmella P Keener_
Carmella P. Keener (DSBA No. 2810)
919 North Market Street
Suite 1401, Citizens Bank Center
Wilmington, Delaware 19899
(302) 656-4433
Attorneys for Plaintiff

**OF COUNSEL:**

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
Roy L. Jacobs
20 East 42nd Street, 46th Floor
New York, New York 10016
(212) 685-0969

**JACOBS LAW GROUP, PC**
Samuel R. Simon
1800 John F. Kennedy Boulevard, Suite 404
Philadelphia, PA 19103
(215) 569-9701

**ABBEY SPANIER RODD ABRAMS & PARADIS, LLP**
Nancy Kaboolian
212 East 39th Street
New York, New York 10016
(212) 889-3700

# EXHIBIT 11

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| PETER V. YOUNG and ELLEN ROBERTS YOUNG, Derivatively on Behalf of Defendant SUNRISE SENIOR LIVING, INC., <br><br>               Plaintiffs, <br><br>       -v- <br><br> PAUL L. KLAASSEN, TERESA M. KLAASSEN, DAVID W. FAEDER, THOMAS B. NEWELL, BRIAN C. SWINTON, CHRISTIAN B.A. SLAVIN, LARRY E. HULSE, TIFFANY L. TOMASSO, ROBERT R. SLAGER, CARL ADAMS, RONALD V. APRAHAMIAN, CRAIG R. CALLEN, DAVID G. BRADLEY, J. DOUGLAS HOLLADAY and THOMAS J. DONOHUE, <br><br>               Defendants, <br><br> SUNRISE SENIOR LIVING, INC., <br><br>               Nominal Defendant. | C.A. No.  2770-VCL |

## AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, Peter V. Young and Ellen Roberts Young, for their Amended Shareholder Derivative Complaint (the "Complaint"), allege on personal knowledge as to themselves and as to all other facts based on the investigation of their counsel, and on information and belief as follows:

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of nominal defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") against certain members of

its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of law that have caused damage to Sunrise. This action arises out of defendants' conduct of authorizing, or through abdication of duty permitting, the back-dating of stock option grants to and for the benefit of Sunrise's officers and directors, including defendants Klaassen, Faeder, Newell, Swinton, Slavin, Tomasso, Hulse, Aprahamian, Callen, Donohue, Bradley, Holladay, Slager, and Adams and at the expense of Sunrise and its shareholders. Based on this unlawful conduct, the Individual Defendants ("Individual Defendants") realized over $172 million in illicit proceeds through the sale of stock at a time when they knew of material non-public information concerning the improper backdating of options which led to the financial statements issued by Sunrise and its stock price being falsely inflated.

2.    A "stock option" is a contract that gives the holder of the option the right to purchase a designated quantity of shares of a company's stock at a set price, the "exercise price." Stock options are granted as part of employee compensation packages as a means to create incentives to boost profitability and stock value. When the option is exercised, the holder acquires the designated number of shares from the company at the exercise price, regardless of the stock's contemporaneous market price. The exercise price of stock options is the market price on the date of the grant of the option. If the stock price goes up over time, the executive makes a profit when he sells the stock acquired by exercising the option. If the exercise price is lower than it should be, the employee pays less and the company gets less when the stock option is exercised.

3.    If the system is abused by "backdating" the options granted--which refers to picking an option-grant date earlier than the actual date the option was granted--a date when the

2

stock price was lower than the actual grant date--the executive gets an instant profit. The company is hurt, as the "spread" between the true grant exercise price and the market price is required by law to be treated as compensation expense, which reduces profit. In addition, the backdating of options causes the corporate stock option plan to lose its tax protections, and results in the corporation's internal non-public information's being misappropriated by the executives for their personal profit.

4.      The practice of backdating remained virtually undetected until academic research recently revealed patterns of stock option grants that could not be explained by chance. These studies noted the frequency with which stock option grants occurred just after a drop in stock price and immediately before the price rose, often at the lowest price of the year.

5.      In violation of the Company's own stated policies, defendants at Sunrise engaged in or permitted "backdating" of options in the issuance of the executive stock options for many years. All of the Company's stock options plans required stock options to have an exercise price equal to the fair market value on the date of the grant, and defendants regularly represented that stock options covered by the stock options plans were not granted at less than 100% of fair market value on the date of the grant.

6.      Since at least 1999, backdated options have been granted to numerous Sunrise officers and directors. These options, described in detail below, were backdated to coincide with historically low closing prices of Sunrise's common stock in order to create artificially low option exercise prices. Indeed, on several separate occasions between 2000 and 2002, Sunrise's stock price on the purported date of the option grant was the lowest price in the month in which the option was granted.

3

7.     Plaintiffs have conducted several statistical analyses revealing a pattern that is strongly indicative of backdating. All automatic grants made in connection with Sunrise's annual meetings have been excluded from plaintiffs' calculations because such grants were made on specific, predetermined dates. The specific findings of these statistical analyses are discussed below. Overall, plaintiffs' expert determined that of the twenty-one option grants at Sunrise, where defendants had flexibility in choosing grant dates, from the time of its initial public offering until the passage of Sarbanes-Oxley Act after which Sunrise was required to file Form 4s for each option grant by the end of the second business day following the option grant date, six have been priced on the date on which Sunrise's stock traded at its lowest point for the calendar month of the grants. The odds of that occurring without manipulation through backdating are 1 in 2,265. Similarly, since 2000, but prior to the passage of Sarbanes-Oxley, of the eight option grants (again excluding annual meeting grants), four have been priced on the lowest trading day of the calendar month. The odds of that occurring without manipulation through backdating are 1 in 2,690. These statistically significant results indicate manipulation of option grants.

8.     After the passage of Sarbanes-Oxley, no stock option grants at Sunrise were priced at the lowest price point of the calendar month, quarter or year of the grant. In other words, once Sarbanes-Oxley limited discretion in dating option grants, the pattern at Sunrise of pricing options at conveniently low, and therefore favorable, points in time completely disappears.

9.     The timing and pattern of these option grants could not have been mere coincidence. A substantial number of the option grants analyzed by plaintiffs appear to have been backdated in order to provide the Individual Defendants with the largest possible return on

4

their stock, at the expense of Sunrise. By their actions, the Individual Defendants breached the fiduciary duties of good faith, loyalty and due care that they owed to the Company.

10.     The Individual Defendants' illegal backdating scheme not only lined the pockets of the backdated option recipients and caused Sunrise to issue materially false financial statements, but also undermined the key purpose of stock option-based executive compensation: to provide incentives to improve the Company's performance and increase the Company's stock price and market capitalization. By manipulating options such that they carried an exercise price lower than the trading price of the stock on the date of grant, Sunrise insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

11.     In breach of their fiduciary duties as officers and/or directors of Sunrise, the Individual Defendants colluded with one another to:

> a.     improperly backdate dozens of grants of Sunrise stock options to Sunrise executives and directors, in violation of the Company's shareholder-approved stock option plans;
>
> b.     improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");
>
> c.     improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and
>
> d.     produce and disseminate to Sunrise shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

12.     As a result of the Individual Defendants' misconduct, Sunrise has sustained millions of dollars in damages, and the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## PARTIES

13.    Plaintiff Ellen Roberts Young is currently a shareholder of Sunrise and has continuously been a shareholder of Sunrise since April 19, 1999.

14.    Plaintiff Peter V. Young is currently a shareholder of Sunrise and has continuously been a shareholder of Sunrise since April 19, 1999.

15.    Defendant Ronald V. Aprahamian ("Aprahamian") has served as a director of the Company since 1995, and as a member of the Audit Committee of the Board ("Audit Committee") since 1996, chairing the Audit Committee since 2003. Aprahamian also served as a member of the Stock Option Committee of the Board ("Stock Option Committee") in 1997, and has served as a consultant to the Company beginning in May 1997.

16.    Defendant Craig R. Callen ("Callen") has served as a director of the Company since 1999. Callen served as a member of the Audit Committee in 1999 and since 2004, and as a member of the Stock Option Committee from 1999 to August 23, 2002, when the Stock Option Committee merged with the Compensation Committee of the Board ("Compensation Committee").

17.    Defendant Thomas J. Donohue ("Donohue") has served as a director of Sunrise since 1995 and as a member of the Audit Committee since 1996. Donohue served as a member of the Stock Option Committee from 1996 to August 23, 2002.

18.    Defendant David G. Bradley ("Bradley") served as a director of the Company from 1997 to 2005, as a member of the Stock Option Committee from 1998 to August 23, 2002, and as a member of the Audit Committee from 2002 to 2004.

19.    Defendant J. Douglas Holladay ("Holladay") has served as a director of Sunrise since 2000, and as a member of the Audit Committee in 2001.

20.     Defendant Paul J. Klaassen ("Klaassen") founded the Company with his wife, Sunrise Director Teresa M. Klaassen, and has served as Chairman of the Board and Chief Executive Officer of Sunrise since 1991.

21.     Defendant Teresa M. Klaassen ("T. Klaassen"), wife of Paul Klaassen, has served as a director of Sunrise since 1981 and was executive vice president from 1981 until November 2003. She currently serves as Sunrise's "Chief Cultural Officer".

22.     Defendant David F. Faeder ("Faeder") served as the Company's and its predecessor entities' Executive Vice President and Chief Financial Officer from 1993 to 1997. Faeder also served as the Company's President from July 1997 to April 2000, as a director from 1993 to 2003, as Vice Chairman of the Board from April 2000 to May 2003, and as a consultant to the Company from April 2000 to March 2004.

23.     Defendant Thomas B. Newell ("Newell") has served as the Company's President since April 2000, as Executive Vice President from May 1996 to April 2000 and was President of Sunrise Development, Inc., the Company's development subsidiary, and General Counsel from January 1996 to April 2000.

24.     Defendant Brian C. Swinton ("Swinton") served as the Company's Executive Vice President from May 1996 to 2002, as President of the Company's venture subsidiary, Sunrise Senior Ventures, Inc., from April 2000 to 2002, and as President of the Company's joint venture company that provides assisted living services to individuals in their own homes, Sunrise At-Home Senior Living, Inc., from September 2000 to December 2002.

25.     Defendant Christian B.A. Slavin ("Slavin") served as the Company's Chief Investment Officer from November 2003 to July 2004, as Executive Vice President from May

7

1999 to November 2003, as Chief Financial Officer from May 1999 to April 2000, and as head of the Company's Properties Division from April 2000 to July 2004.

26.    Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003.    Tomasso previously served as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994.

27.    Defendant Larry E. Hulse ("Hulse") served as the Company's Chief Accounting Officer from 1995 to March 2000, as Senior Vice President from April 2000 to November 2003, and as Chief Financial Officer from April 2000 to 2005.

28.    Defendant Robert R. Slager ("Slager") served as a director of the Company from 1999 to 2001.

29.    Defendant Carl Adams ("Adams") has served as Senior Vice President and Treasurer of Sunrise since December 2005.  Previously, Adams served as Senior Vice President of Sunrise Capital Group from November 2004 to December 2005, and as Sunrise's Chief Accounting Officer from May 2000 to November 2004.

30.    Collectively, defendants Klaassen, T. Klaassen, Faeder, Newell, Swinton, Slavin, Tomasso, Hulse, Aprahamian, Callen, Donohue, Bradley, Holladay, Slager, and Adams are referred to herein as the "Option Recipient Defendants."

31.    Collectively, all Defendants except nominal defendant Sunrise are referred to as the "Individual Defendants."

32.    Nominal defendant Sunrise is a Delaware corporation with its principal executive offices located at 7902 Westpark Drive, McLean, Virginia 22102.  According to its public

8

filings, Sunrise is a provider of senior living services with over 415 communities in the United States, Canada, the United Kingdom, and Germany.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, truth, loyalty, and due care, and were and are required to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders, so as to benefit all shareholders equally and not for self-aggrandizement. Each director and officer of the Company owes the Company and its shareholders the fiduciary duty to exercise good faith, loyalty and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

9

b.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

c.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

36.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate and complete financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

a.    transactions are executed in accordance with management's general or specific authorization;

b.    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Option Recipient Defendants

37.    Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1996 Directors' Stock Option Plan ("1996 Director Plan"), the 1997 Stock Option Plan, the 1998 Stock Option Plan, the 1999 Stock Option Plan, the 2000 Stock Option Plan, and the 2001 Stock Option Plan (collectively, the "Plans"):

The Plan is intended to advance the interests of the Corporation and any subsidiary thereof within the meaning of Rule 405 of Regulation C under the Securities Act of 1933, as amended (with the term "person" as used in such Rule

10

405 being defined as in Section 2(2) of such Act) (a "Subsidiary"), by providing eligible individuals (as designated pursuant to Section 4 below) with incentives to improve business results, by providing an opportunity to acquire or increase a proprietary interest in the Corporation, which thereby will create a stronger incentive to expend maximum effort for the growth and success of the Corporation and its Subsidiaries, and will encourage such eligible individuals to continue to serve the Corporation and its Subsidiaries, whether as an employee, as a director, as a consultant or advisor or in some other capacity. To this end, the Plan provides for the grant of stock options....

38.     According to the terms of each of the Plans, the Plans were administered by the Board of Directors of the Corporation, which had the full power and authority to take "all actions and to make all determinations required or provided for under the Plans or any Option granted or Option Agreement entered into hereunder and all such other actions and determinations not inconsistent with the specific terms and provisions of the Plans deemed by the Board to be necessary or appropriate to the administration of the Plan or any Option granted or Option Agreement entered into thereunder."

39.     According to Sunrise's proxy statements, the Stock Option Committee of the Sunrise Board "ha[d] the power and authority to take all actions and make all determinations under the Company's stock option plans, including the grant of options thereunder." On August 23, 2002, the Stock Option Committee merged with the Compensation Committee, and the Compensation Committee became responsible for administering the Company's stock option plans and determining the grants awarded under the stock option plans.

40.     The terms of the Plans further provide that "[t]he Option Price shall be not less than the greater of par value or 100 percent of the fair market value of a share of Stock on the date on which the Option is granted," where fair market value is defined as "the closing price of the Stock on such exchange or system or in such market ... on the trading date immediately before the Option is granted...." Additionally, each of the Plans specifically provides that

11

"[t]he date of grant of an Option under this Plan shall be the date as of which the Board approves the grant."

## 1999 Backdated Option Grants

41.    At the Annual meeting held on April 26, 1999, shareholders of Sunrise approved the 1999 Stock Option Plan.

42.    According to the 1999 Proxy Statement, the members of the Stock Option Committee were Meadow, Bradley, and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

43.    On March 5, 1999, Sunrise granted Hulse and Slavin a total of at least 165,000 stock options. However, Slavin did not even begin his employment with the Company until May 1999, according to the Company's 2003 proxy statement. These options were backdated to an adjusted exercise price of $18.81, the third lowest price of Sunrise stock for the first quarter.

44.    In the 20-day period prior to the March 5, 1999 grant, Sunrise's stock price was down 9.6% but quickly rebounded after the option grant – rising 13% in the two days after the option grant and 12.1% in the 20 day period thereafter.

12



45.    As recognized by a leading academic on the topic of backdating, "in the absence of opportunistic grant timing or opportunistic timing of information flows around grants, the returns before and after grant dates should be similar.    Consequently, if opportunistic timing is absent, the distribution of the difference between the returns for a given number of days after the grants and the returns for the same number of days should be centered at roughly zero."    Randall Heron and Erik Lie, What Fraction of Stock Option Grants    to    Top    Executives    Have    Been    Backdated    or    Manipulated    (July    14, 2006)(http://www.issproxy.com.pdf/OptionsBackdatingStudy071406.pdf).

46.    On November 8, 1999, Sunrise granted stock options to seven of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement.    Callen, one of the recipients of these options, was on the Stock Option Committee and the Audit Committee on the date of grant.    These options were

13

backdated to one of the lowest prices of Sunrise stock for the fiscal year, as demonstrated

below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Adjusted Exercise Price |
|---|---|---|---|---|
| 11/08/99 | Newell | $12.75 | 130,000 | $6.38 |
| | Swinton | $12.75 | 80,000 | $6.38 |
| | Tomasso | $12.75 | 130,000 | $6.38 |
| | Faeder | $12.75 | 130,000 | $6.38 |
| | Hulse | $12.75 | 35,000 | $6.38 |
| | Slavin | $12.75 | 70,000 | $6.38 |
| | Callen | $12.75 | 10,000 | $6.38 |

47.     Just a few weeks prior to the date of these grants, Sunrise's stock price had

dropped sharply from $24.56 on October 5, 1999 to $11.69 on October 6, 1999.   The

November 8, 1999 grant, large both in size and number of recipients, was made on the heels of

this precipitous drop in Sunrise's stock price.

48.     According to Sunrise's Form 10-K for the year ended December 31, 1999:

Sunrise has stock option plans providing for the grant of incentive and
nonqualified stock options to employees, directors, consultants and advisors. At
December 31, 1999, these plans provided for the grant of options to purchase up
to 6,324,910 shares of common stock. In February 2000, an additional 500,000
shares of common stock were allocated for the granting of options to employees.
The option exercise price and vesting provisions of the options are fixed when the
option is granted. The options expire ten years from the date of grant and
generally vest over a four year period. The option exercise price is not less than
the fair market value of a share of common stock on the date immediately before
the day the option is granted (*i.e*, the prior day's closing price). Sunrise also had a
stock option agreement with one of its senior executives. The agreement, as
amended, was effective as of January 4, 1995 and covered 450,000 shares of
common stock that were reserved for issuance at an exercise price of $8.00. As of
December 31, 1999, all options were exercised.

49.     The 1999 Form 10-K further states:

Sunrise grants stock options for a fixed number of shares to employees with an
exercise price equal to the fair value of the shares at the date of grant. Sunrise

14

accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

## 2000 Backdated Option Grants

50.    At the Annual meeting held on May 12, 2000, shareholders of Sunrise were asked to vote on, and approved, the 2000 Stock Option Plan. The Proxy Statement dated April 14, 2000 made no mention of any grants having already been made under the Plan that had yet to be approved. The description of the plan to be considered by shareholders stated that its effective date was February 25, 2000 and stated that 500,000 shares may be awarded in the future. The Proxy Statement provided that the option exercise price "will be fixed by the stock option committee" and valued those shares at the then current price of $14.56.

51.    According to the 2000 Proxy Statement, the members of the Stock Option Committee were Bradley, Callen, and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options

52.    On February 25, 2000 and March 28, 2000, Sunrise granted options to 11 of the Option Recipient Defendants, including four of the five highest compensated executives as disclosed in the Company's proxy statement. Furthermore, Donohue and Bradley, two of the recipients of the February 25, 2000 options, were members of the Stock Option Committee on the date of grant, and Aprahamian, Donohue, and Callen, the recipients of the February 25, 2000 options, comprised the entire Audit Committee on the date of grant. These options were backdated to two of the lowest stock prices for the 2000 fiscal year.

15

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying | Adjusted Exercise Price |
|---|---|---|---|---|
| 02/25/00 | Newell | $12.38 | 120,000 | $6.19 |
| | Slavin | $12.38 | 110,000 | $6.19 |
| | Swinton | $12.38 | 90,000 | $6.19 |
| | Tomasso | $12.38 | 110,000 | $6.19 |
| | Faeder | $12.38 | 120,000 | $6.19 |
| | Hulse | $12.38 | 14,444 | $6.19 |
| | Donahue | $12.38 | 32,000 | $6.19 |
| | Aprahamian | $12.38 | 22,000 | $6.19 |
| | Slager | $12.38 | 10,000 | $6.19 |
| | Bradley | $12.38 | 14,000 | $6.19 |
| | Callen | $12.38 | 16,000 | $6.19 |
| 03/28/00 | Newell | $12.44 | 50,000 | $6.22 |
| | Slavin | $12.44 | 30,000 | $6.22 |
| | Swinton | $12.44 | 30,000 | $6.22 |
| | Tomasso | $12.44 | 30,000 | $6.22 |
| | Hulse | $12.44 | 50,000 | $6.22 |

53.    The February 25, 2000 grant was made at the lowest price of the month of February 2000, the fourth lowest price of the fiscal quarter, and the fourth lowest price of the entire year. Sunrise's stock price dropped 25.3% in the 20 days prior to the February 25 grant and then rose 13.5% in the two days following the grant, 25.3% in the 10 days following the grant and 4.0% in the 20 days following the grant. Sunrise's stock surged upward in the days following the pricing date on March 9th and 10th on news of excellent fourth quarter results.

16

February 25, 2000

54.    Similarly, while the March 28, 2000 grants were dated on the seventh lowest trading day of the month of March 2000, these grants were dated on the eighth lowest trading day of the fiscal quarter and the eighth lowest trading day for the entire fiscal year. Thus, while there were seven trading days within the quarter on which Sunrise's stock was trading at a lower price, there also were only seven trading days in the entire fiscal year on which Sunrise's stock price was trading at a price lower than the option price. These grants were made at the tail end of a fiscal quarter for which Sunrise later reported superior results. Within several weeks of this grant, defendants announced quarterly results and Sunrise's shares shot up to over $16 per share.

55.    The February 25, 2000 and March 28, 2000 option grants were not only backdated but also were *ultra vires*. As noted, the year 2000 option plan was presented to Sunrise shareholders for approval at the May 12, 2000 annual meeting. The Proxy Statement does not reference any grants previously made under the 2000 Plan that had yet to be

17

approved. The Proxy states that the effective date of the Plan was February 25, 2000, states that 500,000 options may be awarded in the future, and even values those options. The Proxy Statement speaks only prospectively and does not reference earlier grants under the Plan. Sunrise's shareholders, as a result, could not have approved these earlier grants at lower prices.

56.    On May 22, 2000, Sunrise granted Adams and Holladay a total of at least 14,500 stock options. These options were backdated to a point just prior to a precipitous rise in the price of Sunrise stock, as demonstrated below:

| Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Price |
|---|---|---|---|---|
| 05/22/00 | Adams | $15.56 | At least 5,000 | $7.78 |
| | Holladay | $15.56 | At Least 24,000 | $18.81 |

57.    The May 22, 2000 grant was priced on the second lowest trading day for Sunrise's shares in the month of May 2000.



58.    On September 11, 2000, Co-founder, Chairman of the Board, and CEO Klaassen was granted 350,000 stock options at an exercise price of $8.50. The Company's proxy statement indicates that this was pursuant to a new employment agreement entered into with Klaassen in September of 2000, which conveniently granted stock options to him when Sunrise stock was at the lowest price of the month of September and near the lowest price of the fiscal quarter.

59.    Specifically, the September 11, 2000 grant was priced on the lowest trading day of the month, the 10th lowest trading day of the fiscal quarter and the lowest trading day of the 41 day period on either side of the date of the grant.

19



While defendant Klaassen's employment agreement was purportedly dated September 12, 2000, that agreement was not filed with the SEC until November 13, 2000. Defendant Klassen had no previous employment agreement with Sunrise.

    60.    According to Sunrise's Form 10-K for the year ended December 31, 2000:

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 2000, these plans provided for the grant of options to purchase up to 7,323,910 shares of common stock. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four-year period. The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.

    61.    The 2000 Form 10-K further states:

Sunrise grants stock options for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. Sunrise accounts for stock option grants in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees, and accordingly recognizes no compensation expense for the stock option grants.

**2001 Backdated Option Grants**

62.     At the Annual Meeting held on May 11, 2001, shareholders of Sunrise approved the 2001 Stock Option Plan.

63.     According to the 2001 Proxy Statement the members of the Stock Option Committee were Bradley, Callen and Donohue. The Stock Option Committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

64.     On May 11, 2001, options were purportedly granted at one of the lowest prices of Sunrise Stock for the fiscal year, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Adjusted Exercise Price |
|---|---|---|---|---|
| 05/11/01 | Faeder | $20.00 | 100,000 | $10.00 |
|  | Newell | $20.00 | 140,000 | $10.00 |
|  | Swinton | $20.00 | 60,000 | $10.00 |
|  | Tomasso | $20.00 | 60,000 | $10.00 |
|  | Hulse | $20.00 | 50,000 | $10.00 |

65.     The May 11, 2001 options were dated on the lowest trading day for the month of May 2001. In the 20-day period prior to the grant, Sunrise's stock price rose 3.1% but in the 10-day period prior to the grant, it dropped 8.6% and in the two days prior to the grant, Sunrise's stock price dropped 13.6%. Conversely, in the 2-day, 10-day and 20-day period after these options were priced, Sunrise's stock price rose precipitously 5%, 19.3% and 25% respectively.

21



66. Further, for some unexplained reason, the May 11, 2001 stock options were priced on the date of the grant rather than using the one-day look back period dictated by the terms of the Plan. Had the one-day look back provision been utilized, as it historically had, the options would have been priced at $20.97 rather than at $20. By pricing the options on May 11, 2001, defendants locked in the exercise price at the lowest trading of the month.

67. On November 12, 2001, stock options were backdated to a point just prior to a precipitous rise in the price of Sunrise Stock, as demonstrated below:

| Purported Grant Date | Defendant | Exercise Price | Adjusted Number of Shares Underlying Options | Exercise Price |
|---|---|---|---|---|
| 11/12/01 | Slavin | $26.96 | 120,000 | $13.48 |

22

68.     This grant was priced on the lowest trading day of the month of November and the lowest trading day in the 41-day period encompassing 20-days on either side of the grant. Indeed, just prior to this grant, Sunrise's stock price had been trading at over $30 per share, fell sharply and then largely recovered in the days after the grant. Specifically, Sunrise's stock price fell 5.3% in the 20 days prior to the grant but recovered 5.7% in the 20 days following the grant.



69.     According to Sunrise's Form 10-K for the year ended December 31, 2001:

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. At December 31, 2001, these plans provided for the grant of options to purchase up to 8,148,910 shares of common stock. The option exercise price and vesting provisions of the options are fixed when the option is granted. The options expire ten years from the date of grant and generally vest over a four-year period. The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.

70.     Each and every one of the aforementioned stock option grants was dated just before a significant increase in Sunrise stock price and/or at or near Sunrise's lowest closing

price of the pertinent fiscal quarter or year. Out of all of the grants discussed above, on only one occasion did Sunrise's share price fall in the 10 and 20 day period after the date of the grant:

| **Purported Grant Date** | **10-Day Return** | **20-Day Return** |
|---|---|---|
| 03/05/99 | 16.8% | 12.1% |
| 11/08/99 | 6.4% | -2.0% |
| 02/25/00 | 25.3% | 4.0% |
| 03/28/00 | 12.1% | 4.5% |
| 05/22/00 | 23.3% | 15.3% |
| 09/11/00 | 33.8% | 15.1% |
| 05/11/01 | 19.3% | 25% |
| 11/12/01 | 3.7% | 5.7% |

In 1999, the only year when Sunrise's stock price fell after the pricing date of options, Sunrise's share price declined steadily over the course of the year from a closing price of $24.56 on January 4, 1999 to $6.88 on December 31, 1999. These returns, when annualized, far exceed the annual returns on an investment in Sunrise stock which opened at $26.00 per share (adjusted) on the first trading day of 1999 and closed at $6.88 on the last trading day; opened at $7.12 on the first trading day of 2000 and closed at $12.50 on the last trading day; and opened at $12.74 on the first trading day of 2001 and closed at $14.56 on the last trading day.

71.     The reason for the extraordinary patterns set forth in the preceding paragraphs is that the purported grant dates set forth therein were *not* the actual dates on which the stock

24

option grants were made. Rather, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately backdated the stock option grants to make it appear as though the grants had been made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Option Recipient Defendants at the Company's expense. This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts the Option Recipient Defendants had to pay the Company upon exercise of the options.

### The Individual Defendants' Dissemination of False Financial Statements

72.    The Individual Defendants prepared, approved, and/or signed Sunrise's annual and quarterly SEC reports during the relevant period. The Individual Defendants knowingly and deliberately caused the Company to disseminate materially false and misleading statements in the periodic filings that the Individual Defendants prepared, approved, and/or signed. By issuing false and misleading SEC filings and by assuring Sunrise's investors that Sunrise's option grants were being administered by Board committees, defendants concealed their manipulation of Sunrise stock option plans.

73.    The Individual Defendants' option backdating scheme caused each of Sunrise's Forms 10-K and Forms 10-Q for the relevant period to materially understate Sunrise's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to expense the in-the-money portion of Sunrise's stock option grants during the period, as required by APB 25.

74.     As a result of the improper backdating of stock options, the Company, with the

knowledge, approval, and participation of each of the Individual Defendants:

   a.   violated the terms of the Company's shareholder-approved stock
        option plans by granting stock options with exercise prices that were
        less than the closing price of Sunrise stock on the day before the
        date of grant;

   b.   violated APB 25 by failing to recognize compensation expenses
        incurred when the improperly backdated options were granted;

   c.   violated Section 162(m) by taking tax deductions based on stock
        option grants that were not payable solely on account of the
        attainment of one or more performance goals and violated the terms
        of the Company's shareholder-approved stock option plans; and

   d.   produced and disseminated to Sunrise shareholders and the market
        false financial statements that improperly recorded and accounted
        for the backdated option grants, and thereby understated
        compensation expense and overstated net income.

75.     Specifically, in the Company's annual reports on Form 10-K for fiscal years

1996 to 2003, the Individual Defendants caused Sunrise to falsely state that "the Company

has elected to follow Accounting Principles Board Opinion No. 25, "Accounting for Stock

Issued to Employees" ("APB 25"), and related interpretations, in accounting for its employee

and director stock option stock option and stock incentive plans. Under APB 25, if the

exercise price of the Company's stock options is not less than the market price of the

underlying stock on the date of grant, no compensation expense is recognized. Such

statements were materially false and misleading in each of these years because Sunrise had

granted stock options at exercise prices that were below fair market value on the date

immediately preceding the grant date, and failed to account for the in-the-money options as

required by APB 25.

76.     As alleged previously, APB 25 required the Individual Defendants to record

compensation expense for options that were in-the-money on the date of grant. However, they

did not do so, thereby materially understating Sunrise's compensation expense and materially overstating Sunrise's net income or materially understating its net loss. These statements were designed to conceal, and did in fact conceal, the fact that the Individual Defendants were engaged in an unlawful continuous and systematic scheme of backdating stock option grants to Sunrise insiders. These understatements also had the effect of inflating the stock price of Sunrise shares.

77.    Additionally, Sunrise's materially false and misleading financial statements for fiscal years 1998 to 2002 were included in its Forms 10-K filed for subsequent fiscal years. For this reason, and to the extent they included financials from earlier periods, Sunrise's annual reports on Form 10-K for fiscal years 2003 to 2005 were also materially false and misleading. By participating in the secret backdating scheme, and by reviewing and/or signing these subsequent annual reports, the Individual Defendants knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading, and inflated the Company's stock price.

78.    The Individual Defendants caused Sunrise to send shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period. The Individual Defendants prepared and/or reviewed each proxy statement between 1999 and 2006. Moreover, they knew, or were deliberately reckless in not knowing, that the proxies were materially false and misleading.

79.    The Sunrise proxy statements that were sent to shareholders in connection with annual shareholders' meetings concerned the election of directors, the approval and adoption of a new Sunrise stock option plan, and ratification of the selection of Sunrise's independent auditor. Each proxy statement sent to shareholders during this period contained materially false

27

and misleading disclosures or omitted information about Sunrise's stock option practices, as detailed above.

80.    From 1998 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

81.    Sunrise's proxy statement filed with the SEC on April 3, 1998 falsely reported that options granted to Faeder, Newell, and Swinton were granted on May 2, 1997, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

82.    Sunrise's proxy statement filed with the SEC on April 6, 1999 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on September 14, 1998, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

83.    Sunrise's proxy statement filed with the SEC on April 14, 2000 falsely reported that options granted to Faeder, Newell, Swinton, and Tomasso were granted on November 8, 1999, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

84.    Sunrise's proxy statement filed with the SEC on March 29, 2001 falsely stated that options granted to Klaassen were granted on September 11, 2000, that options granted to

28

Newell, Slavin, Swinton, and Tomasso were granted on February 25, 2000 and March 28, 2000, that options granted to Slavin were granted on November 24, 2000, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant." Sunrise's proxy statement filed with the SEC on April 5, 2002 falsely stated that options granted to Newell, Swinton, Tomasso, and Hulse were granted on May 11, 2001 and that options granted to Slavin were granted on November 12, 2001, and falsely stated that "[s]tock options are granted by the Stock Option Committee at an exercise price equal to the market price of the Common Stock at the date of the grant."

85.     Moreover, in the Compensation Committee Reports included in the Company's proxy statements filed from 1998 to 2002, the Company falsely stated that "[t]he full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price," when in fact the backdated stock options and *ultra vires* stock options provided the Option Recipient Defendants with immediate profits regardless of the Company's stock performance.

86.     On December 11, 2006, Sunrise announced an SEC investigation of the Company and the appointment of a special committee whose bifurcated purpose was to review insider sales of Sunrise stock and the Company's historical practices relating to stock option grants:

> Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that its Board of Directors has appointed a special independent committee to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants. The Board's decision followed receipt of a letter from a union shareholder that was simultaneously sent to news outlets, which resulted in media coverage and a subsequent request by the Securities and Exchange Commission (SEC) for information

29

> about matters raised in the media reports. The special committee has retained independent outside legal counsel to assist in its review.
>
> Sunrise is committed to sound corporate governance and transparency and the Board has determined that a comprehensive review by a special committee and independent counsel is the most appropriate way to address these matters in a timely manner.
>
> The review by the special committee will be conducted in parallel with the Company's ongoing efforts to complete the previously announced restatement of its financial statements. In view of these ongoing efforts and the special committee review, the Company now anticipates that its restated 2005 Form 10-K will be delayed beyond year-end, but still expects to be current in all of its filings with the SEC by March 1, 2007.

87.     On January 15, 2007, the Company disclosed that Sunrise would not be current in all of its filings with the SEC by March 1, 2007 contrary to the statement in its December 11, 2006 press release. The Company stated, "Sunrise believes that it is close – weeks, not months – to submitting its recast 2005 financial information to the SEC for its review. . . ." On February 27, 2007, Sunrise had yet to release its financials but indicated that it was "close" to completing the restatement that it estimated would "reduce net income for all periods impacted, including 1999 through 2005, by approximately $98 to $107 million."

88.     On March 2, 2007, Sunrise announced that it had extended the mandate of the Special Committee beyond reviewing certain insider sales and the Company's historical stock option grant practices.

89.     On April 26, 2007, Sunrise filed a Form 8-K announcing that defendant Rush, Sunrise's Chief Financial Officer, had been suspended with pay. According to the Company's filing:

> The action was taken by the Board following a briefing to the independent directors by independent legal counsel retained by the special independent committee of the Board. As previously disclosed, the special independent

30

committee is reviewing recent insider sales of the Company's stock, the Company's historical practices related to stock option grants and the facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the previously announced pending restatement of the Company's financial statements (the "Special Committee Investigation"). The Board concluded that that actions taken by Mr. Rush were not consistent with the document retention directives issued by the Company. Mr. Rush had served as the chief financial officer of the Company since August 2005.

The Board also announced that the Chief Accounting Officer of Sunrise would be appointed as acting Chief Financial Officer.

90. On, May 3, 2006, the Company filed another Form 8-K announcing that the Sunrise Board had terminated defendant Rush for cause.

91. On June 21, 2007, Sunrise announced the appointment of a new director to its Board and that the size of the Board had been expanded from seven to eight members. Steven D. Harlan, the new director, was also appointed to the Sunrise audit committee and was determined to be an "audit committee financial expert" as defined under SEC rules.

92. On July 25, 2007, Sunrise announced that its Board of Directors had decided to "explore strategic alternatives" including a possible sale of the Company. The Company engaged Citigroup Global Markets Inc. to act as its financial advisor. In the same press release, defendants stated that the special independent committee was still in the process of reviewing certain insider sales, the Company's historical practices with respect to stock option grants and certain accounting matters. The special committee was also empowered to recommend necessary remedial measures including those pertaining to internal controls. In announcing the Company's preliminary second quarter results, defendants had no further updates regarding the pending restatement or other matters being investigated.

93. On August 10, 2007, Sunrise announced that Richard G. Nadeau had been appointed as its new Chief Financial Officer. Sunrise also announced that it had settled

litigation in the Court of Chancery of the State of Delaware brought by Millenco, L.L.C. seeking an order requiring that Sunrise hold its long overdue annual meeting. Under the settlement, Sunrise will hold the meeting on October 16, 2007. Further, the Board will be expanded to nine members and a representative of Millenco was appointed to the new seat. The Millenco representative will stand for reelection at the annual meeting to be held on October 16.

94.     Defendants, who had a fiduciary duty to act with the utmost due care, loyalty and good faith, either expressly authorized the practice of backdating options or, in conscious abrogation of their fiduciary duties, permitted the practice to recur repeatedly over the years. The practice apparently ceased after the passage of sweeping changes to the federal securities laws in 2002, which curtailed the potential for backdating by requiring companies to disclose option grants within two days.

### The Individual Defendants Have Been Unjustly Enriched At Sunrise's Expense

95.     From 1999 to 2006, certain of the Individual Defendants, while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold millions of dollars in Sunrise stock, a significant portion of which was obtained through the exercise of improperly backdated stock options, as demonstrated below:

**Carl G. Adams**

| ADAMS, CARL G. | Sale | $33,153 | 1,250 | 9/3/2003 | $26.52 |
|---|---|---|---|---|---|

**Paul J Klaassen/ Teresa M. Klassen**

| KLAASSEN PAUL J & TERESA M | Sale | $1,838,590 | 50,000 | 5/2/2006 | $36.77 |
|---|---|---|---|---|---|
| KLAASSEN PAUL J & TERESA M | Sale | $1,852,040 | 50,000 | 5/1/2006 | $37.04 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,924,955 | 50,000 | 4/4/2006 | $38.50 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,940,940 | 50,000 | 4/3/2006 | $38.82 |

| KLAASSEN PAUL J & TERESA M | Sale | $1,718,050 | 50,000 | 3/2/2006 | $34.36 |
|---|---|---|---|---|---|
| KLAASSEN PAUL J & TERESA M | Sale | $1,738,240 | 50,000 | 3/1/2006 | $34.76 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,806,930 | 50,000 | 2/2/2006 | $36.14 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,813,600 | 50,000 | 2/1/2006 | $36.27 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,719,670 | 50,000 | 1/4/2006 | $34.39 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,605,610 | 50,000 | 1/3/2006 | $32.11 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,728,980 | 50,000 | 12/20/2005 | $34.58 |
| KLAASSEN PAUL J & TERESA M | Sale | $1,738,975 | 50,000 | 12/19/2005 | $34.78 |

**Thomas Newell**

| NEWELL, THOMAS B. | Sale | $914,830 | 24,000 | 4/24/2006 | $38.12 |
|---|---|---|---|---|---|
| NEWELL, THOMAS B. | Sale | $918,401 | 24,000 | 3/22/2006 | $38.27 |
| NEWELL, THOMAS B. | Sale | $820,694 | 24,000 | 2/22/2006 | $34.20 |
| NEWELL, THOMAS B. | Sale | $846,996 | 24,000 | 1/23/2006 | $35.29 |
| NEWELL, THOMAS B. | Sale | $831,727 | 24,000 | 12/22/2005 | $34.66 |
| NEWELL, THOMAS B. | Sale | $808,361 | 24,000 | 11/22/2005 | $33.68 |
| NEWELL, THOMAS B. | Sale | $780,547 | 24,000 | 10/24/2005 | $32.52 |
| NEWELL, THOMAS B. | Sale | $756,120 | 12,000 | 9/22/2005 | $63.01 |
| NEWELL, THOMAS B. | Sale | $721,212 | 12,000 | 8/22/2005 | $60.10 |
| NEWELL, THOMAS B. | Sale | $637,913 | 12,000 | 7/22/2005 | $53.16 |
| NEWELL, THOMAS B. | Sale | $634,579 | 12,000 | 6/22/2005 | $52.88 |
| NEWELL, THOMAS B. | Sale | $624,282 | 12,000 | 5/23/2005 | $52.02 |
| NEWELL, THOMAS B. | Sale | $575,464 | 12,000 | 4/22/2005 | $47.96 |
| NEWELL, THOMAS B. | Sale | $592,463 | 12,000 | 3/22/2005 | $49.37 |
| NEWELL, THOMAS B. | Sale | $561,840 | 12,000 | 2/22/2005 | $46.82 |
| NEWELL, THOMAS B. | Sale | $522,360 | 12,000 | 1/24/2005 | $43.53 |
| NEWELL, THOMAS B. | Sale | $536,455 | 12,000 | 12/22/2004 | $44.70 |
| NEWELL, THOMAS B. | Sale | $509,698 | 12,000 | 11/22/2004 | $42.47 |
| NEWELL, THOMAS B. | Sale | $432,000 | 12,000 | 10/22/2004 | $36.00 |
| NEWELL, THOMAS B. | Sale | $422,110 | 12,000 | 9/22/2004 | $35.18 |
| NEWELL, THOMAS B. | Sale | $415,092 | 12,000 | 8/23/2004 | $34.59 |
| NEWELL, THOMAS B. | Sale | $427,980 | 12,000 | 7/22/2004 | $35.67 |
| NEWELL, THOMAS B. | Sale | $452,258 | 12,000 | 6/22/2004 | $37.69 |
| NEWELL, THOMAS B. | Sale | $410,388 | 12,000 | 5/21/2004 | $34.20 |
| NEWELL, THOMAS B. | Sale | $398,498 | 12,000 | 4/22/2004 | $33.21 |
| NEWELL, THOMAS B. | Sale | $421,416 | 12,000 | 3/22/2004 | $35.12 |
| NEWELL, THOMAS B. | Sale | $499,320 | 12,000 | 2/23/2004 | $41.61 |
| NEWELL, THOMAS B. | Sale | $483,144 | 12,000 | 1/22/2004 | $40.26 |
| NEWELL, THOMAS B. | Sale | $1,137,718 | 33,000 | 11/24/2003 | $34.48 |
| NEWELL, THOMAS B. | Sale | $464,400 | 12,000 | 12/22/2003 | $38.70 |
| NEWELL, THOMAS B. | Sale | $145,376 | 5,500 | 9/22/2003 | $26.43 |
| NEWELL, THOMAS B. | Sale | $138,555 | 5,000 | 10/22/2003 | $27.71 |
| NEWELL, THOMAS B. | Sale | $113,029 | 4,500 | 8/22/2003 | $25.12 |

| NEWELL, THOMAS B. | Sale | $292,500 | 11,700 | 11/22/2002 | $25.00 |
| NEWEII, THOMAS B. | Sale | $268,530 | 10,000 | 8/22/2002 | $26.85 |
| NEWELL, THOMAS B. | Sale | $147,555 | 5,000 | 6/24/2002 | $29.51 |
| NEWELL, THOMAS B. | Sale | $139,750 | 5,000 | 5/22/2002 | $27.95 |
| NEWELL, THOMAS B. | Sale | $147,000 | 5,000 | 4/22/2002 | $29.40 |
| NEWELL, THOMAS B. | Sale | $383,670 | 15,000 | 3/22/2002 | $25.58 |
| NEWELL, THOMAS B. | Sale | $133,250 | 5,000 | 12/24/2001 | $26.65 |
| NEWELL, THOMAS B. | Sale | $137,500 | 5,000 | 11/23/2001 | $27.50 |
| NEWELL, THOMAS B. | Sale | $281,000 | 10,000 | 10/22/2001 | $28.10 |
| NEWELL, THOMAS B. | Sale | $130,000 | 5,000 | 8/22/2001 | $26.00 |
| NEWELL, THOMAS B. | Sale | $148,150 | 5,000 | 7/23/2001 | $29.63 |
| NEWELL, THOMAS B. | Sale | $889,350 | 35,000 | 6/22/2001 | $25.41 |

**Thomas Donohue**

| DONOHUE, THOMAS J | Sale | $3,391,838 | 102,666 | 11/21/2005 | $33.04 |
| DONOHUE, THOMAS J | Sale | $340,684 | 6,667 | 5/6/2005 | $51.12 |

**Ronald Aprahamian**

| APRAHAMIAN, RONALD V. | Sale | $757,040 | 20,000 | 4/18/2006 | $37.85 |
| APRAHAMIAN, RONALD V. | Sale | $1,513,200 | 29,100 | 5/27/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $104,008 | 2,000 | 5/26/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $46,800 | 900 | 5/26/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $10,400 | 200 | 5/24/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,300,000 | 25,000 | 5/23/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $104,008 | 2,000 | 5/23/2005 | $52.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,026,048 | 20,000 | 5/16/2005 | $51.30 |
| APRAHAMIAN, RONALD V. | Sale | $273,600 | 7,200 | 10/28/2004 | $38.00 |
| APRAHAMIAN, RONALD V. | Sale | $106,400 | 2,800 | 10/27/2004 | $38.00 |
| APRAHAMIAN, RONALD V. | Sale | $1,084,400 | 40,000 | 7/9/2001 | $27.35 |
| APRAHAMIAN, RONALD V. | Sale | $681,040 | 20,000 | 11/13/2003 | $34.05 |
| APRAHAMIAN, RONALD V. | Sale | $149,163 | 6,100 | 6/5/2003 | $24.45 |
| APRAHAMIAN, RONALD V. | Sale | $340,565 | 13,900 | 6/4/2003 | $24.50 |

**Craig Callen**

| CALLEN, CRAIG | Sale | $521,093 | 10,000 | 5/26/2005 | $52.11 |

**Larry Hulse**

| HULSE, LARRY | Sale | $1,345,624 | 21,973 | 8/12/2005 | $61.24 |
| HULSE, LARRY | Sale | $864,300 | 15,000 | 8/4/2005 | $57.62 |
| HULSE, LARRY | Sale | $509,869 | 10,000 | 5/17/2005 | $50.99 |

| HULSE, LARRY | Sale | $319,569 | 6,250 | 5/11/2005 | $51.13 |
| HULSE, LARRY | Sale | $400,000 | 10,000 | 11/4/2004 | $40.00 |
| HULSE, LARRY | Sale | $214,142 | 6,250 | 3/29/2004 | $34.26 |
| HULSE, LARRY | Sale | $138,431 | 3,306 | 2/25/2004 | $41.87 |
| HULSE, LARRY | Sale | $2,000,000 | 50,000 | 1/21/2004 | $40.00 |
| HULSE, LARRY | Sale | $280,641 | 8,750 | 11/10/2003 | $32.07 |
| HULSE, LARRY | Sale | $787,500 | 22,500 | 11/7/2003 | $35.00 |
| HULSE, LARRY | Sale | $217,485 | 8,055 | 9/4/2003 | $27.00 |
| HULSE, LARRY | Sale | $217,512 | 8,056 | 5/13/2002 | $27.00 |
| HULSE, LARRY | Sale | $247,363 | 8,750 | 11/13/2001 | $28.27 |
| HULSE, LARRY | Sale | $923,503 | 33,890 | 6/27/2001 | $27.25 |

**David W. Faeder**

| FAEDER, DAVID W. | Sale | $627,429 | 15,000 | 2/25/2004 | $41.83 |
| FAEDER, DAVID W. | Sale | $394,875 | 11,700 | 11/19/2003 | $33.75 |
| FAEDER, DAVID W. | Sale | $153,563 | 4,550 | 11/17/2003 | $33.75 |
| FAEDER, DAVID W. | Sale | $523,660 | 16,250 | 11/10/2003 | $32.23 |
| FAEDER, DAVID W. | Sale | $301,925 | 10,800 | 10/13/2003 | $27.96 |
| FAEDER, DAVID W. | Sale | $698,100 | 25,000 | 10/10/2003 | $27.92 |
| FAEDER, DAVID W. | Sale | $3,169,518 | 114,200 | 10/7/2003 | $27.75 |
| FAEDER, DAVID W. | Sale | $2,049,038 | 74,000 | 10/6/2003 | $27.69 |
| FAEDER, DAVID W. | Sale | $1,961,023 | 71,100 | 10/3/2003 | $27.58 |
| FAEDER, DAVID W. | Sale | $4,260,044 | 154,900 | 10/2/2003 | $27.50 |
| FAEDER, DAVID W. | Sale | $117,970 | 4,700 | 8/29/2003 | $25.10 |
| FAEDER, DAVID W. | Sale | $383,049 | 15,300 | 8/21/2003 | $25.04 |
| FAEDER, DAVID W. | Sale | $399,686 | 16,300 | 8/20/2003 | $24.52 |
| FAEDER, DAVID W. | Sale | $58,822 | 2,400 | 8/18/2003 | $24.51 |
| FAEDER, DAVID W. | Sale | $31,850 | 1,300 | 8/15/2003 | $24.50 |
| FAEDER, DAVID W. | Sale | $242,637 | 10,000 | 8/14/2003 | $24.26 |
| FAEDER, DAVID W. | Sale | $44,345 | 1,810 | 8/12/2003 | $24.50 |
| FAEDER, DAVID W. | Sale | $701,250 | 28,050 | 7/15/2003 | $25.00 |
| FAEDER, DAVID W. | Sale | $655,576 | 26,200 | 6/2/2003 | $25.02 |
| FAEDER, DAVID W. | Sale | $125,000 | 5,000 | 5/30/2003 | $25.00 |
| FAEDER, DAVID W. | Sale | $105,823 | 3,250 | 1/14/2002 | $32.56 |
| FAEDER, DAVID W. | Sale | $1,389,593 | 47,917 | 7/16/2001 | $29.07 |

**James D. Holladay**

| HOLLADAY, J. DOUGLAS | Sale | $312,000 | 8,000 | 3/21/2006 | $39.00 |
| HOLLADAY, J. DOUGLAS | Sale | $219,000 | 6,000 | 12/12/2005 | $36.50 |
| HOLLADAY, J. DOUGLAS | Sale | $59,500 | 1,700 | 12/6/2005 | $35.00 |
| HOLLADAY, J. DOUGLAS | Sale | $80,500 | 2,300 | 11/7/2005 | $35.00 |
| HOLLADAY, J. DOUGLAS | Sale | $268,000 | 4,000 | 10/3/2005 | $67.00 |

| HOLLADAY, J. DOUGLAS | Sale | $320,000 | 5,000 | 9/23/2005 | $64.00 |
|---|---|---|---|---|---|
| HOLLADAY, J. DOUGLAS | Sale | $288,585 | 5,500 | 5/31/2005 | $52.54 |
| HOLLADAY, J. DOUGLAS | Sale | $325,520 | 6,500 | 5/12/2005 | $50.21 |

**Pete A. Klisares**

| KLISARES, PETE A. | Sale | $582,890 | 16,665 | 5/7/2004 | $34.98 |
|---|---|---|---|---|---|
| KLISARES, PETE A. | Sale | $346,417 | 9,999 | 12/2/2003 | $34.65 |
| KLISARES, PETE A. | Sale | $69,700 | 2,000 | 11/25/2003 | $34.92 |

**Bradley B. Rush**

| RUSH, BRADLEY B. | Sale | $391,188 | 6,250 | 9/12/2005 | $62.66 |
|---|---|---|---|---|---|
| RUSH, BRADLEY B. | Sale | $40,883 | 687 | 9/8/2005 | $59.51 |

**Christian B.A. Slavin**

| SLAVIN, CHRISTIAN B.A. | Sale | $28,050 | 1,000 | 10/15/2001 | $28.15 |
|---|---|---|---|---|---|
| SLAVIN, CHRISTIAN B.A. | Sale | $26,300 | 1,000 | 8/15/2001 | $26.31 |
| SLAVIN, CHRISTIAN B.A. | Sale | $29,000 | 1,000 | 7/16/2001 | $29.00 |
| SLAVIN, CHRISTIAN B.A. | Sale | $100,000 | 4,000 | 6/15/2001 | $25.00 |
| SLAVIN, CHRISTIAN B.A. | Sale | $422,188 | 17,500 | 12/29/2000 | $24.13 |

**Brian C. Swinton**

| SWINTON, BRIAN C. | Sale | $721,201 | 19,754 | 3/5/2004 | $36.51 |
|---|---|---|---|---|---|
| SWINTON, BRIAN C. | Sale | $320,732 | 10,000 | 11/10/2003 | $32.07 |
| SWINTON, BRIAN C. | Sale | $4,575,000 | 150,000 | 11/5/2003 | $32.50 |
| SWINTON, BRIAN C. | Sale | $2,950,000 | 100,000 | 11/4/2003 | $29.75 |
| SWINTON, BRIAN C. | Sale | $74,100 | 2,600 | 10/27/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $2,850 | 100 | 10/20/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $350,550 | 12,300 | 10/17/2003 | $28.50 |
| SWINTON, BRIAN C. | Sale | $280,000 | 10,000 | 10/10/2003 | $28.00 |
| SWINTON, BRIAN C. | Sale | $309,375 | 11,250 | 10/2/2003 | $27.50 |
| SWINTON, BRIAN C. | Sale | $93,563 | 3,750 | 5/16/2003 | $24.95 |
| SWINTON, BRIAN C. | Sale | $426,904 | 15,695 | 4/18/2002 | $29.50 |
| SWINTON, BRIAN C. | Sale | $885,000 | 30,000 | 7/16/2001 | $29.50 |
| SWINTON, BRIAN C. | Sale | $600,150 | 25,000 | 6/26/2001 | $26.75 |
| SWINTON, BRIAN C. | Sale | $294,700 | 10,000 | 11/8/2001 | $29.47 |

**Tiffany L. Tomasso**

| TOMASSO, TIFFANY L. | Sale | $1,410,000 | 30,000 | 2/2/2005 | $47.00 |
|---|---|---|---|---|---|
| TOMASSO, TIFFANY L. | Sale | $337,500 | 7,500 | 12/15/2004 | $45.00 |
| TOMASSO, TIFFANY L. | Sale | $128,485 | 3,750 | 3/29/2004 | $34.26 |

| TOMASSO, TIFFANY L. | Sale | $575,751 | 13,750 | 2/25/2004 | $41.87 |
|---|---|---|---|---|---|
| TOMASSO, TIFFANY L. | Sale | $8,740,000 | 230,000 | 12/19/2003 | $38.00 |
| TOMASSO, TIFFANY L. | Sale | $2,072,000 | 56,000 | 12/18/2003 | $37.00 |
| TOMASSO, TIFFANY L. | Sale | $521,190 | 16,250 | 11/10/2003 | $32.07 |
| TOMASSO, TIFFANY L. | Sale | $525,000 | 15,000 | 11/7/2003 | $35.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $825,000 | 27,500 | 11/5/2003 | $30.00 |
| TOMASSO, TIFFANY L. | Sale | $951,200 | 32,800 | 10/29/2003 | $29.00 |
| TOMASSO, TIFFANY L. | Sale | $208,800 | 7,200 | 10/28/2003 | $29.00 |
| TOMASSO, TIFFANY A. | Sale | $491,221 | 16,250 | 8/7/2001 | $30.23 |
| TOMASSO, TIFFANY A. | Sale | $437,500 | 17,500 | 6/6/2001 | $25.00 |
| TOMASSO, TIFFANY A. | Sale | $68,730 | 2,900 | 5/7/2001 | $23.70 |
| TOMASSO, TIFFANY L. | Sale | $178,222 | 8,101 | 3/14/2001 | $22.00 |

96.     Had defendants and the Stock Option Committee not permitted the stock options to be backdated, the Option Recipient Defendants' profits and unrealized gains on exercisable stock options would have been tens of millions of dollars less.

97.     The practice of backdating stock options not only lined the pockets of Sunrise executives at the direct expense of the Company, which dollar for dollar received money when the options are exercised, but also resulted in the overstatement of Sunrise's profits and an understatement of its tax liabilities.

98.     As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Sunrise to violate GAAP, SEC regulations and IRS rules and regulations.

99.     Sunrise's financial results for 1999 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Sunrise's financial results were presented in a fair manner and in accordance with GAAP.

100.    The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity

with GAAP, and the financial information was not "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

101.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

102.    During the relevant period, the Individual Defendants caused the Company to understate its compensation expenses by improperly accounting for its stock options under GAAP, thus overstating the Company's net earnings.

103.    Under well-settled accounting principles in effect throughout the relevant period, Sunrise did not need to record an expense for options granted to employees at the current market price ("at the money"). The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money"). In order to provide Sunrise executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

38

104.    From 1999 to 2006, the Stock Option Committee, with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25, and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated options.

105.    Throughout the relevant period, Sunrise accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees." Under APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed. Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

106.    Due to its failure to recognize necessary charges relating to options-based compensation, the Company presented its financial results and statements in a manner that violated GAAP, including the following principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, X10);

(b)    The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, T34);

39

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that it represents   what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

107.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

108.    During the relevant period, the Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

109.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303].

40

Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers--the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options... If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant...." Item 402(c)(2)(iv).

110.    The Individual Defendants caused Sunrise to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date that the Stock Option Committee approved the grant.

111.    During the relevant period, the Individual Defendants further caused Sunrise to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing Sunrise to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

112.    The Individual Defendants caused the Company to violate Internal Revenue Code §162(m), which generally limits a publicly traded company's tax deductions for

41

compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance based." In order for compensation to be performance-based, the Stock Option Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

113.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What Section [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

114.    The Individual Defendants caused Sunrise to violate IRC §162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As a result, all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

115.    The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and

42

employees upon the exercise of Sunrise's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

116.    ISOs are a form of equity compensation that may be provided to a company's employees. ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment because they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential treatment because they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

117.    By improperly treating its backdated options as ISOs, the Individual Defendants failed to provide proper income tax and FICA withholdings upon the exercise of options by its executives and employees, in violation of IRS rules and regulations.

118.    Meanwhile, the Option Recipient Defendants were causing the Company to grant them hundreds of thousands of backdated Sunrise stock options. The Company's executives and directors received a significant number of backdated Sunrise stock options as compensation during the relevant period.

43

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

119. The Individual Defendants' misconduct alleged herein was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

120. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to: (a) the additional compensation expenses and tax liabilities the Company is required to incur; (b) loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grants; (c) costs and expenses incurred in connection with the Company's internal investigation and restatement of historical financial statements; and (d) the cost of the SEC investigation of the Company.

121. As alleged herein, certain of the Option Recipient Defendants exercised hundreds of thousands of backdated Sunrise stock options at improperly low prices and then sold the shares for substantial profits. Consequently, these defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

122. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress defendants' breaches of fiduciary duties and unjust enrichment.

123. Plaintiffs are owners of Sunrise common stock and were owners of Sunrise

common stock at all times relevant hereto.

124.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

125.    As a result of the facts set forth herein, plaintiffs have not made any demand on the Sunrise Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making and independent and disinterested decision to institute and vigorously prosecute this action.

126.    Plaintiffs did not make a demand on the Sunrise Board to bring the claims alleged herein because such a demand would have been futile. At the time Plaintiffs filed this derivative action, the Sunrise Board consisted of the following members: Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little. Each of these Board members has been named as a Defendant in this action. Of the seven Board members at the time of filing this Complaint, six benefited materially from the wrongdoing. As detailed below, each of the directors face a sufficiently substantial likelihood of liability on the derivative claims alleged herein and is therefore in no position to render a disinterested judgment as to whether the Company should bring such claims, and/or lacks sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims against the Individual Defendants.

127.    Beyond options backdating, Sunrise is currently embroiled in an investigation into its accounting practices, a possible restatement, and insider trading allegations. The Company has been late in filing financial statements and had, until recently, postponed its annual meeting. At least six of the seven directors, prior to the recent expansion of the Sunrise Board, are alleged to be involved in the activities within the scope of the current investigation of the Company.

128.    The Board is responsible for approving the compensation awarded to the Sunrise

executive officers. This compensation includes the stock options that were secretly backdated by

Sunrise insiders. Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to

Sunrise in approving the option grants as dated. The Board should have properly informed itself

of the circumstances surrounding the options granted to the Sunrise insiders before approving

them. Accordingly, there is reason to doubt that the members of the Board, consisting of

Defendants Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little, were

disinterested because they face substantial liability for their breaches of fiduciary duty to

Sunrise. The Board's decision to approve the options was not the product of valid business

judgment. Thus, demand is futile as to Defendants Klaassen, T. Klaassen, Aprahamian, Callen,

Donohue, Holladay, and Little.

129.    The Compensation Committee of the Board is specifically responsible under its

charter for reviewing and approving grants of stock options and other equity awards to Sunrise

insiders.    The Sunrise Compensation Committee Charter provides that the Compensation

Committee shall, *inter alia*:

> a.    [A]dminister and implement the Company's incentive compensation plans
> and equity-based plans that are subject to Board approval in which
> directors, the CEO, other executive officers and other employees of the
> Company and its subsidiaries may be participants, including, but not
> limited to, (a) approving option grants and restricted stock or other awards,
> (b) interpreting the plans, (c) determining rules and regulations relating to
> the plans, (d) modifying or canceling existing grants or awards and (e)
> imposing limitations, restrictions and conditions upon any grant or award
> as the Compensation Committee deems necessary or advisable.

The Compensation Committee at the time this derivative action was filed consisted of

Defendants Aprahamian, Callen, and Donohue. Director Defendants Aprahamian and Donohue

have been members of the Compensation Committee since FY1996. Donohue has been Chair of

46

the Compensation Committee since FY2001. Director Defendant Callen has been a member of the Committee from FY2004 to the present and from FY1999 to August 23, 2002. On August 23, 2002 the Company reformed the then existing Compensation Committee and Stock Option Committee into one Compensation Committee. Director Defendants Callen and Donohue were both members of the Stock Option Committee before its reformation into the Compensation Committee. Defendant Callen was a member of the Stock Option Committee from FY1999 until August 2002. Defendant Donohue was a member of the Stock Option Committee from FY1996 until August 2002 and Chair during FY2001. These Defendants were responsible as members of the Compensation Committee and/or Stock Option Committee to review and grant stock options to Sunrise insiders during their respective tenures on the Committee. The Compensation Committee's and/or Stock Option Committee's practice of allowing and/or authorizing the practice of granting back-dated stock options during this time was not the product of valid business judgment. Alternatively, these Defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding these option grants, thereby causing or allowing the Company's insiders to obtain unreasonable and unreported compensation via the backdating of stock option grants. Accordingly, there is a reasonable doubt that Defendants Aprahamian, Callen, and Donohue are disinterested as they face sufficiently substantial liability for their breaches of fiduciary duty to Sunrise. Thus, demand is futile as to Defendants Aprahamian, Callen, and Donohue.

130.    The Audit Committee is responsible, by its Charter, for reviewing and discussing, with management and the independent auditors, Sunrise financial statements and earnings releases. The Sunrise Audit Committee Charter provides that the Audit Committee shall, *inter alia*:

a.    Meet to review and discuss the company's annual audited financial statements with management and the independent auditor, including reviewing the company's specific disclosures;

b.    Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the company's selection or application of accounting principles, and major issues as to the adequacy of the company's internal controls and any special audit steps adopted in light of material control deficiencies;

c.    Review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements; and

d.    Prepare the audit committee report required by the rules of the SEC to be included in the company's annual proxy statement.

The Audit Committee is responsible for assisting the Board in its oversight responsibilities relating to the integrity of the Company's systems of internal accounting and financial controls, and the compliance by the Company with legal and regulatory requirements. The Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls. Thus, the Audit Committee was responsible for overseeing and directly participating in the Sunrise financial reporting process. The Audit Committee at the time of the filing of this derivative action was comprised of Director Defendants Aprahamian, Callen, and Donohue. Defendants Aprahamian and Donohue are and have been members of the Audit Committee since FY1996. Defendant Callen has been a member of the Audit Committee since FY2004. Defendant Aprahamian has been the Chair of the Audit Committee since FY2001. Accordingly, Defendants Aprahamian, Callen, and Donohue breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of earnings press releases and financial statements that contained false and/or misleading material information. Particularly, these Defendants reviewed

48

and failed to correct the Sunrise improper earnings releases and financial statements issued from

FY1997 to present which contained false and/or misleading material information during the

relevant time period. Additionally, during the relevant time period of the practice at Sunrise in

granting back-dated stock options, the Audit Committee was meeting only once or twice per

year. Specifically, the Audit Committee only met once in FY1997, once in FY1998, and twice in

FY1999. As a result, these Defendants face a sufficiently substantial likelihood of liability for

their breach of fiduciary duties. Therefore, demand is futile as to Defendants Aprahamian,

Callen, and Donohue.

     131.    The Nominating and Corporate Governance Committee is composed of members

of the Board and is charged with the general duties of reviewing and reassessing the adequacy of

the Corporate Governance Guidelines of the Company and recommending membership to and

monitoring membership of the Board. The Sunrise Nominating and Corporate Governance

Committee Charter provides that the Nominating and Corporate Governance Committee shall,

*inter alia*:

    a.    [R]eceive comments from all directors and report annually to the Board on
an assessment of the Board's performance, to be discussed with the Board
following the end of each fiscal year. The Nominating and Corporate
Governance Committee shall also oversee the annual evaluation of
management, and periodically make a report to the Board on succession
planning for the Chief Executive Officer; and

    b.    [R]eview and reassess the adequacy of the corporate governance
principles of the Company annually and recommend any proposed
changes to the Board for approval, including any changes in director fees.

The Nominating and Corporate Governance Committee at the time this derivative action was

filed was comprised of Director Defendants Donohue, Holladay and Little. Defendants Donohue

and Holladay have been members of the Nominating and Corporate Governance Committee

since the Committee's inception in August 2002. Defendant Little has been a member of the

Committee since FY2005. Defendant Aprahamian was a member of the Committee from August 2002 through FY2003. Defendant Holladay has been the Chair of the Committee since August 2002. These Defendants were responsible, as members of the Nominating and Corporate Governance Committee, for reviewing and/or reassessing governance principles at Sunrise and reviewing and/or maintaining the Board's membership during their tenures on the Committee. Clearly, these Defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding certain practices such as the back-dating of stock option grants which were adverse or should have been adverse to corporate governance principles, thereby causing or allowing the Company to issue false and/or misleading statements and/or press releases. Additionally, the Committee members, during their respective tenures, did not fulfill this duty because they did not fully and adequately monitor and/or remedy the actions of the Board complained of herein. Accordingly, there is a reasonable doubt that Defendants Aprahamian, Donohue, Holladay, and Little are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to Sunrise. The Nominating and Corporate Governance Committee's decisions to not adequately respond to clear departures from corporate governance procedures and not monitor and/or remedy the actions of the Board complained of herein were not the product of valid business judgment. Thus, demand is futile as to Defendants Aprahamian, Donohue, Holladay and Little.

132. Each of the Director Defendants faces a sufficiently substantial likelihood of liability in this action because of his or her failure, as a director, to ensure that reliable systems of financial controls and information and reporting were in place and functioning effectively. The dramatic breakdowns and gaps in those controls were so widespread and systemic that each of the Director Defendants faces substantial exposure to liability for his or her total abrogation of

50

his or her duty of oversight. These directors either knew or should have known, in the absence of complete recklessness, that violations of law were occurring and took no steps in good faith to prevent or remedy that situation, proximately causing millions of dollars of losses to the Company. Thus, demand is futile as to Defendants P. Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little.

133. Each of the Director Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings during the relevant time period. As such, Director Defendants face a sufficiently substantial likelihood of liability for the same. Thus, demand is futile as to Defendants P. Klaassen, T. Klaassen, Aprahamian, Callen, Donohue, Holladay, and Little.

134. Certain Director Defendants participated in the wrongdoing complained of herein so that they could: (a) protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby; and (b) inflate the price of the Company's common stock in order to enhance the value of their securities holdings and options to purchase Sunrise stock and allow them to sell and reap millions of dollars in illegal insider trading proceeds. Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of), authorizing, approving and acquiescing in the conduct complained of herein. Specifically, certain Director Defendants benefited immensely from the disposition of the following Sunrise shares from 1997 to 2006, as seen below:

| DEFENDANT(S) | SHARES SOLD | AGGREGATE PROCEEDS |
|---|---|---|
| P. KLAASSEN & T. KLAASSEN, JOINTLY | 1,462,106 | $56,363,094.63 |
| APRAHAMIAN | 215,200 | $8,848,497.20 |

51

| CALLEN | 10,000 | $521,093.00 |
|---|---|---|
| DONOHUE | 134,378 | $3,732,527.28 |
| HOLLADAY | 39,000 | $1,873,125.00 |

These Director Defendants reaped extreme profits in the disposition of shares during the practices complained of herein. Therefore, any demand upon the Board would have been futile.

135.    The Sunrise Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Sunrise stockholders or recklessly, consciously and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors, and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting. Pursuant to their specific duties as Board members, Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to Sunrise in that they failed to prevent and correct the improper stock option granting and financial reporting. Certain directors are also dominated and controlled by other Defendants and cannot act independently of them. Thus, the Sunrise Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

136.    Also, as revealed by the Company in its Press Release dated December 11, 2006, the staff of the SEC has commenced an inquiry into the Company's stock option practices requesting relevant information from the Company. Defendants face a sufficiently substantial

likelihood of being held liable for these practices. As such any demand upon Director Defendants would have been futile.

## The Members of the Board of Directors Lack Independence

137. Director Defendant Paul J. Klaassen founded Sunrise with his wife, Director Defendant Teresa M. Klaassen, in 1981. Since its inception, P. Klaassen has served as Chief Executive Officer and Chairman of the Board of Sunrise. His principal occupation since 1981 is his employment with Sunrise. P. Klaassen stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by defendants Aprahamian, Callen, and Donohue. As to the wrongdoing alleged herein, P. Klaassen is neither disinterested nor independent.

138. Director Defendant Teresa M. Klaassen founded Sunrise with her husband, Director Defendant P. Klaassen, in 1981. T. Klaassen currently serves as "Chief Cultural Officer" of Sunrise. T. Klaassen served as Executive Vice President from 1981 until November 2003. Her principal occupation, since 1981, has been her employment with Sunrise. T. Klaassen stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation all of which must be approved by defendants Aprahamian, Callen and Donohue. As to the wrongdoing alleged herein, T. Klaassen is neither disinterested nor independent.

139. Director Defendants P. Klaassen and T. Klaassen, because they are husband and wife, have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Defendants P. Klaassen and T. Klaassen have developed both a personal and professional relationship from which it is reasonable to conclude that they would not authorize suit against each other. Therefore, demand upon Defendants P. Klaassen and T. Klaassen is futile.

140.    P. Klaassen and T. Klaassen, also have significant business relationships with the

Company, and therefore, have debilitating conflicts of interest that prevent them from taking the

necessary and proper action on behalf of the Company as requested herein. Specifically,

> a.    Defendants P. Klaassen and T. Klaassen lease the real property on which
> the Fairfax facility is located to the Company under a 99-year ground
> lease. Sunrise has paid rents to Defendants P. Klaassen and T. Klaassen
> for the following years totaling approximately: $262,000 in FY1996,
> $262,000 in FY1997, $262,000 in FY1998, $262,000 in FY1999,
> $262,000 in FY2000, $447,236 in FY2001, $299,000 in FY2002,
> $258,333 in FY2003, $158,700 in FY2004, and $300,000 in FY2005; and

> b.    Sunrise leases certain real property located in Fairfax County, Virginia to
> Defendants P. Klaassen and T. Klaassen for use as a residence under a 99-
> year ground lease entered into in June 1994. Defendants P. Klaassen and
> T. Klaassen pay rent to the Company under this lease totaling $1.00 per
> month.

Due to Defendants P. Klaassen's and T. Klaassen's significant interest in these properties and

their deep inter-related business and personal relationships with the Company, demand as to

Director Defendants P. Klaassen and T. Klaassen is futile.

141.    P. Klaassen also has other significant business dealings with the Company, the

potential risk of loss of which creates debilitating conflicts of interest that prevent him from

taking the necessary and proper action on behalf of the Company as requested herein.

Specifically, a company owned by Defendant P. Klaassen owns an airplane used by Sunrise for

business travel. Sunrise made payments for the use of the airplane during FY1999 and FY2000

of approximately $76,433.00 per year. Due to Defendant P. Klaassen's ownership in this

company that has inter-related business relationships with Sunrise, demand upon P. Klaassen is

futile.

142.    Director Defendants P. Klaassen, T. Klaassen, and Donohue, because of their

inter-related business, professional and personal relationships, have developed debilitating

54

conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Specifically,

    a. Defendants P. Klaassen and Donohue have served on the Board of Trustees for Marymount University together;

    b. It has been reported that for a period of time, Defendants P. Klaassen and T. Klaassen lived with Defendant Donohue; and

    c. It has been reported that Defendant Donohue invested in the first home of Defendants P. Klaassen and T. Klaassen.

During the time these Defendants were working, investing and living together, Defendants P. Klaassen, T. Klaassen, and Donohue developed social, personal, and professional relationships from which it is reasonable to conclude that they would not authorize suit against each other. Therefore, demand on Director Defendants P. Klaassen, T. Klaassen, and Donohue is futile.

    143. Director Defendants P. Klaassen, Donohue, and Little enjoy certain professional relationships of Sunrise such that they have debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein. Specifically,

    a. Defendants P. Klaassen, Donohue, and Little serve together on the Board of Directors of the U.S. Chamber of Commerce. Defendant Donohue serves as the President and Chief Executive Officer of the U.S. Chamber of Commerce; and

    b. Defendants P. Klaassen, Donohue, and Little serve together on the Board of Directors of the National Chamber Foundation. Defendant Little serves as Chairman of the Board of the National Chamber Foundation. Defendant Donohue serves as President of the National Chamber Foundation.

During their several years working together at the U.S. Chamber of Commerce and the National Chamber Foundation, Defendants P. Klaassen, Donohue and Little developed both social and

professional relationships from which it is reasonable to conclude that they would not authorize suit against each other.

144.    Director Defendant Callen, because of his inter-related business with the Company, has debilitating conflicts of interest that prevent him from taking the necessary and proper action on behalf of the Company as requested herein. Specifically, Defendant Callen was a managing director and head of US Health Care Investment Banking at Credit Suisse First Boston ("CSFB"). CSFB acquired Donaldson, Lufkin & Jenrette Securities Corporation in 2001. Defendant Callen was a managing director of Health Care Investment Banking at Donaldson, Lufkin & Jenrette before the acquisition. From 1999 to 2001, Donaldson, Lufkin & Jenrette provided financial advisory services to Sunrise. Additionally, in 1998 and 1999, Sunrise entered into joint ventures with several affiliates of Donaldson, Lufkin & Jenrette in order to raise over $70 million in capital to develop up to 37 assisted living projects. Further, Defendant Callen owns a 1.1375% interest in two of the joint ventures entered into between Sunrise and these certain affiliates of Donaldson, Lufkin & Jenrette. Also, CSFB was the initial purchaser of Sunrise's January 2002 Rule 14A private placement of $125 million aggregate principal amount of 5 ¼% convertible subordinated notes due February 1, 2009.

145.    In April 2004, Defendant Callen joined Aetna as a senior vice president, strategic planning and business development. Since January 2004m Aetna Healthcare had been Sunrise's health and dental plan administrator, health benefit stop-loss carrier, and long-term care insurance provider.

146.    Due to Defendant Callen's prior and current interest in these inter-related business relationships between the Company and himself, CSFB, Donaldson, Lufkin & Jenrette, and

Aetna, Callen is unlikely to take any action that would jeopardize those relationships and the benefits thereof.

147.    In addition, demand would be futile and useless for the additional following reasons:

a.    The Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

b.    The Director Defendants of Sunrise, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Sunrise stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.    Each of the Director Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c.    In order to bring this suit, a majority of the directors of Sunrise would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

d.    The acts complained of constitute violations of the fiduciary duties owed by the Sunrise officers and directors and these acts are incapable of ratification;

e.    Sunrise has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual and Director Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sunrise any part of the damages Sunrise suffered and will continue to suffer;

f.    The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands; and

g.    Any suit by the directors of Sunrise to remedy these wrongs would likely expose the Director Defendants and Sunrise to liability for violations of

> securities laws which could result in additional civil actions being filed
> against one or more of the Director Defendants. Thus, they are hopelessly
> conflicted in making any supposedly independent determination as to
> whether to sue themselves.

148.    Sunrise has expended and will continue to expend significant sums of money as a

result of the illegal and improper actions described above. Such expenditures will include, but

are not limited to:

> (a)    Costs incurred to carry out internal investigations, including legal
>        fees paid to outside counsel and experts; and
>
> (b)    Costs incurred relating to the informal SEC probe.
>
> (c)    Taxes, penalties, interest, etc.

149.    Defendants Klassen, Aprahamian, Callen, Donahue and Holladay are each

recipients of backdated stock options and are therefore directly interested in the improperly

backdated stock option grants complained of. The positions of Defendants Klaassen,

Aprahamian, Callen, Donohue, and Holladay's during the relevant period are summarized in

the table below:

| Defendant | Recipient of Backdated Stock Options | Member of the Stock Option Committee | Member of the Audit Committee |
|-----------|--------------------------------------|--------------------------------------|-------------------------------|
| Klaassen | x | | |
| Aprahamian | x | x | x |
| Callen | x | x | x |
| Donohue | x | x | x |
| Holladay | x | | x |

150.    Furthermore, demand is excused because the misconduct complained of herein

was not, and could not have been, an exercise of good faith business judgment. As represented

in Sunrise's proxy statements, the stated purpose of granting stock options is to attract and

retain skilled executive personnel and align their interests with those of the stockholders.

Specifically, the Compensation Committee reports state: "[s]tock options are considered an

58

effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains." However, by granting Sunrise stock options with backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Sunrise's performance. In effect, this practice constituted nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders and the Company.

151.   There was no basis or justification for backdating the stock options, which practice was *ultra vires* and in violation of the stock option plans. Backdating was designed solely to surreptitiously benefit the Option Recipient Defendants in a manner that was inconsistent with the Plans and the Company's public disclosures, to the detriment of the Company.

152.   The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Sunrise to potentially massive liability. The SEC has initiated an investigation into Sunrise's stock option granting practices. Sunrise will also likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

## Against the Individual Defendants for Breach of Fiduciary Duty

153.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

59

154. As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unfairly benefiting himself and other Company insiders at the expense of the Company.

155. As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

156. In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

157. The Individual Defendants' misconduct as alleged herein was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to and did unduly benefit the Option Recipient Defendants at the expense of the Company.

158. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company is required to incur, as well as the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT II

### Against the Option Recipient Defendants for Unjust Enrichment

159. Plaintiffs incorporate by reference all preceding paragraphs as if set forth fully herein.

160.    The Option Recipient Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

161.    The Option Recipient Defendants were unjustly enriched by their receipt and retention of *ultra vires* stock option grants and the proceeds they received through exercising *ultra vires* stock options, as alleged herein, and it would be unconscionable to aloe them to retain the benefits thereof.

162.    To remedy the Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated an/or ultra vires stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT III

### Against the Option Recipient Defendants for Rescission

163.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

164.    As a result of the acts alleged herein, the stock option contracts between the Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control. Further, the backdated Sunrise stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

165.    All contracts that provide for stock option grants to the Option Recipient Defendants and were entered into during the relevant period should therefore be rescinded,

61

with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

WHEREFORE, Plaintiffs demand judgment as follows:

        a. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

        b. Awarding to Sunrise restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Option Recipient Defendants as a result of the conduct alleged herein;

        c. Rescinding and/or repricing the back-dated stock options granted to the Options Recipient Defendants;

        d. Equitable and/or injunctive relief as permitted by law and equity, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendant's trading activities or their other assets so as to assure that plaintiffs on behalf of Sunrise have an effective remedy;

        e. Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

f.   Granting such other and further relief as the Court deems just and proper.

Dated: September 17, 2007

ROSENTHAL, MONHAIT
& GODDESS, P.A.

By: *Carmella P. Keener*

Carmella Keener (DSBA No. 2810)
919 North Market Street
Suite 1401, Citizens Bank Center
Wilmington, Delaware 19899
 (302) 656-4433

Attorneys for Plaintiffs

**OF COUNSEL:**

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
Roy L. Jacobs
20 East 42nd Street, 46th Floor
New York, New York 10016
Tel:  (212) 685-0969
Fax:  (212) 685-2306

**JACOBS LAW GROUP, PC**
Samuel R. Simon
1800 John F. Kennedy Boulevard, Suite 404
Philadelphia, PA 19103
Tel:  (215) 569-9701
Fax:  (215) 569-9788

**ABBEY SPANIER RODD & ABRAMS, LLP**
Karin E. Fisch
Orin Kurtz
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

# EXHIBIT  12

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| PETER V. YOUNG and ELLEN ROBERTS YOUNG, | ) ) ) | |
| Derivative Plaintiffs, | ) ) | |
| v. | ) ) | |
| PAUL J. KLAASSEN, et al., | ) ) | C.A. No. 2770-VCL |
| Defendants, | ) ) | |
| and | ) ) | |
| SUNRISE SENIOR LIVING, INC., | ) ) | |
| Nominal Defendant. | ) | |

### OPENING BRIEF IN SUPPORT OF
### MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY
### BY NOMINAL DEFENDANT SUNRISE SENIOR LIVING, INC.

ASHBY & GEDDES
Lawrence C. Ashby (#468)
Richard D. Heins (#3000)
Richard L. Renck (3893)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
(302-654-1888)

OF COUNSEL
HOGAN & HARTSON LLP
George H. Mernick, III
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202-637-5600)

*Attorneys for Sunrise Senior Living, Inc.*

HOGAN & HARTSON LLP
N. Thomas Connally
Jon M. Talotta
8300 Greensboro Drive, Suite 1100
McLean, VA 22102
(703-610-6100)

Dated: November 2, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

FACTUAL BACKGROUND .............................................................................. 4

STATEMENT OF THE QUESTIONS PRESENTED ....................................... 9

ARGUMENT ...................................................................................................... 10

I.      Plaintiffs Lack Standing to Pursue Claims Based on
        Pre-April 19, 1999 Transactions ................................................... 10

II.     Demand Is Required with Respect to Claims Based on Grant
        Dates Challenged in Von Guggenberg, and Cannot Be
        Relitigated Here ............................................................................. 12

III.    Plaintiffs Must Plead Particularized Facts Establishing That
        Demand Was Futile with Respect to Each of Their Claims ........... 16

IV.     Plaintiffs Failed to Plead Particularized Facts Establishing a
        Reasonable Inference That Any Backdating Occurred ................... 20

        A.      Six of the Seven Challenged Grant Dates Are Tied to
                Corporate Events and, Thus, Cannot Support a
                Reasonable Inference of Backdating ................................ 20

        B.      The One Remaining Options Grant Cannot Alone
                Support a Reasonable Inference of Backdating ............... 27

        C.      Plaintiffs Fail to Establish That Any Current Director Is
                Interested Based on the Alleged Backdating .................... 28

V.      Plaintiffs Have Failed to Plead Particularized Facts
        Establishing That a Majority of the Current Directors Were
        Incapable of Exercising Independence in Considering a Presuit
        Demand for Each Claim .................................................................. 30

        A.      Plaintiffs Have Failed to Establish That a Majority of
                Current Directors Is "Interested" Based on the Receipt
                of Allegedly Backdated Options ...................................... 30

       B.     Plaintiffs Have Failed to Establish That a Majority of Current Directors Face a Substantial Threat of Personal Liability for Any of the Claims Alleged ........................................31

       C.     No Facts Are Alleged Establishing That Any Current Director Is Beholden to Another Interested Current Director ......................................................................................34

VI.    Under McWane, the Court Should Dismiss or Stay the Delaware Derivative Suit in Favor of the Federal Suits ...........................39

       A.     The Federal Suits Were Filed First ................................................40

       B.     The Same Parties and Issues Are Involved.....................................40

       C.     The District Court Is Capable of Providing Complete Justice...............................................................................................42

       D.     Relevant Forum Non Conveniens Factors Favor a Stay.................42

CONCLUSION.......................................................................................................45

## TABLE OF AUTHORITIES

### Cases

Angstadt v. Atlantic Mutual Ins. Co., 457 S.E.2d 86 (Va. 1995) ..................................... 13

Beam ex rel. Martha Steward Living Omnimedia, Inc. v. Stewart, Del. Supr.,
    845 A.2d 1040 (2004) ................................................................................... 18, 37

Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, Del. Ch., 833
    A.2d 961 (2003) ........................................................................................... 18, 19

Benihana of Tokyo, Inc. v. Benihana, Inc., Del. Ch., 891 A.2d 150 (2005) ................... 37

Biondi v. Scrushy, Del. Ch., 820 A.2d 1148 (2003) ........................................................ 40

Blasband v. Rales, 971 F.2d 1034 (3d Cir. 1992) ............................................................ 18

Breault v. Folino, Civ. A. No. SACV010826GLTANX, 2002 WL 31974381
    (C.D. Cal. Mar. 15, 2002) ................................................................................... 43

Brehm v. Eisner, Del. Supr., 746 A.2d 244 (2000) .......................................................... 30

Britton v. Parker, Civ. Action Nos. 06-cv-01797-MSK-KLM, 06-cv-1922-
    MSK-KLM, 06-cv-02017-MSK-KLM, 2007 WL 2871003 (D. Colo. Sept. 26,
    2007) .......................................................................................................... 27

Brudno v. Wise, Civ. A. No. 19953, 2003 WL 1874750 (Del. Ch. Apr. 1, 2003) ........... 44

Conrad v. Blank, Civ. A. No. 2611-VCL, 2007 WL 2593540 (Del. Ch. Sept. 7,
    2007) ............................................................................................... 11, 16, 17

Corwin v. Silverman, Civ. A. No. 16347, 1999 WL 499456 (Del. Ch. Jun. 30,
    1999) ........................................................................................................ 44

Cramer v. Gen. Tel. & Elec. Corp., 582 F.2d 259 (3d Cir. 1978) .................................... 13

Derdiger v. Tallman, Del. Ch., 773 A.2d 1005 (2000) ................................................ 40, 41

Desimone v. Barrows, Del. Ch., 924 A.2d 908 (2007) ............................................. passim

Enodis Corp. v. Amana Co., L.P., Civ. A. Nos. 18836, 19688, 2007 WL
    1242193 (Del. Ch. Apr. 26, 2007) ...................................................................... 39

Guttman v. Huang, Del. Ch., 823 A.2d 492 (2003) ..................................................... 17, 33

Henik ex rel. LaBranche & Co., Inc. v. LaBranche, 433 F. Supp. 2d 372
    (S.D.N.Y. 2006) .................................................................................................... 13

Highland Legacy Ltd. v. Singer, Civ. A. No. 1566-N, 2006 WL 741939 (Del.
    Ch. March 17, 2006) ...................................................................................... 18, 38

In re Career Education Corp. Derivative Litig., Civ. A. No. 1398-VCP (Del. Ch.
    Sept. 28, 2007) .................................................................................................... 14

In re Caremark Int'l, Inc. Derivative Litig., Del. Ch., 698 A.2d 959 (1996).................... 32

In re CNET Networks, Inc., 483 F. Supp. 2d 947 (N.D. Cal. 2007)................................. 21

In re E.F. Hutton Banking Practices Litig., 634 F. Supp. 265 (S.D.N.Y. 1986).............. 43

In re General Motors Shareholder Litig., Del. Supr., 897 A.2d 162 (2006)...................... 4

In re J.P. Morgan Chase & Co. Shareholder Litig., Del. Ch., 906 A.2d 808
    (2005) ................................................................................................................... 17

In re Walt Disney Co. Derivative Litig., Del. Ch., 731 A.2d 342 (1998)......................... 35

In re Zoran Corp. Derivative Litigation, __ F. Supp. 2d __, 2007 WL 1650948
    (N.D. Cal. 2007)................................................................................................... 21

Jacobs v. Yang, Civ. A. No. 206-N, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ........... 38

Kaufman v. Kumar, et al., Civ. A. No. 2418, 2007 WL 1765617 (Del. Ch. Jun.
    8, 2007) ........................................................................................................... 40, 42

McGowan v. Ferro, Del. Ch., 859 A.2d 1012 (2004) ...................................................... 34

McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co., Del. Supr.,
    263 A.2d 281 (1970) ........................................................................................... 39

Official Committee of Unsecured Creditors of Integrated Health Services, Inc.
    v. Elkins, Civ. A. No. 20228, 2004 WL 1949290 (Del Ch. Aug. 24, 2004) ............... 38

Orman v. Cullman, Del. Ch., 794 A.2d 5 (2002)................................................. 18, 35, 37

Rales v. Blasband, Del. Supr., 634 A.2d 927 (1993)....................................................... 16

Ryan v. Gifford, Del. Ch. 918 A.2d 341 (2007) ............................................................. 17

Schnell v. Porta Systems Corp., Civ. A. No. 12,948, 1994 WL 148276 (Del. Ch.
    Apr. 12, 1994) ................................................................................................ 39, 42

<u>Southmark Prime Plus, L.P. v. Falzone</u>, 776 F. Supp. 888 (D. Del.1991) ......................... 4

<u>Wal-Mart Stores v. AIG Life Ins. Co.</u>, Del. Supr., 860 A.2d 312 (2004)........................... 4

<u>West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.</u>, Del. Ch., 914 A.2d 636 (2006) ....................................................................................... 13, 15

<u>White v. Panic</u>, Del. Ch., 783 A.2d 356 (2000) ................................................................ 19

<u>Yaw v. Talley</u>, Civ. A. No. 12882, 1994 WL 89019 (Del. Ch. Mar. 2, 1994) ................ 18

**<u>Statutes</u>**

8 Del. C. § 220 .................................................................................................................. 19

8 Del. C. § 327 .................................................................................................................. 10

**<u>Rules</u>**

Del. R. of Evid. 201 ................................................................................................ 4, 22, 25

Rules of the Supreme Ct. of Va., Part 5 .............................................................................. 5

Va. Sup. Ct. R. 1:6(a) ........................................................................................................ 13

**<u>Treatises</u>**

Ward, Jr., Rodman, et al., Folk on the Delaware General Corporation Law § 327 (5th ed. 2006) .......................................................................................... 18

## **NATURE AND STAGE OF THE PROCEEDINGS**

This is the second motion filed by nominal defendant Sunrise Senior

Living, Inc. ("Sunrise" or the "Company") to dismiss the derivative claims of purported

shareholder plaintiffs Peter V. Young and Ellen Roberts Young (collectively,

"Plaintiffs").  On June 28, 2007, Sunrise moved to dismiss Plaintiffs' original complaint

for failure to make a presuit demand on Sunrise's Board of Directors (the "Board") or, in

the alternative, to stay this suit in favor of earlier-filed suits pending in the U.S. District

Court for the District of Columbia (the "District Court").  Rather than contest the merits

of Sunrise's first motion to dismiss, Plaintiffs requested additional time to either consent

to a stay or file an amended complaint.  Plaintiffs filed an Amended Shareholder

Derivative Complaint (the "Young Complaint") on September 17, 2007.  The cosmetic

changes in the latest version of the Young Complaint, however, are no cure for the fatal

defects in Plaintiffs' demand futility allegations and underlying claims.

This derivative suit (the "Delaware Derivative Suit"), initially filed on

March 6, 2007, is the sixth filed in the past 15 months against certain current and former

Sunrise directors and officers.  None of the plaintiffs in these suits made a presuit demand,

nor did any request to inspect Sunrise's books and records.  None of these suits has

progressed beyond preliminary motions. 1/

---

1/      The first two of suits were filed in August and September 2006, in the Circuit
Court for Fairfax County, Virginia (the "Virginia Suits"), and were dismissed following
preliminary motions filed by Sunrise.  The other three suits were filed in January and
February 2007, in the U.S. District Court for the District of Columbia, and were
subsequently consolidated (the "D.C. Derivative Suit").  As in this case, rather than
contest the preliminary motions of Sunrise and the individual defendants, the D.C.
Derivative Suit plaintiffs attempted to file an amended complaint on October 26, 2007.

Plaintiffs' claims in the Delaware Derivative Suit arise principally from allegations that Sunrise issued backdated stock options between 1997 and 2001. However, neither the Young Complaint nor any of the earlier-filed derivative complaints alleges any direct evidence of the alleged backdating. There are no corporate disclosures, admissions, documents, statements, or facts alleged that, if true, would establish that any backdating occurred. Rather, the backdating allegations in all of these cases are purely circumstantial. The only alleged basis for Plaintiffs' conclusory claims of an "extraordinary pattern" of backdating is that, with respect to a few grants cherry-picked from the numerous options granted by Sunrise since 1998, the Company's stock price fell before or rose after the grant date, or the options were granted on a day when Sunrise's stock price closed at or near a low point for an arbitrarily selected period of time.

Based solely on natural fluctuations in the Company's stock price, Plaintiffs would have the Court infer that there was intentional backdating. Properly looking past Plaintiffs' broad-brush and conclusory assertions, the Young Complaint plainly lacks the particularized factual allegations required by Delaware law to establish that a majority of Sunrise's directors received backdated options or are otherwise incapable of exercising independence in considering a presuit demand. Of the eight stock options grants that Plaintiffs claim were backdated, Plaintiffs allege standing to challenge only seven. Of those seven grants, six coincided with corporate events at Sunrise (e.g., annual shareholders meetings, the appointment of new members to the Board) and, thus, no inference of backdating can be drawn from the issuance of options on those dates. Circumstantial allegations regarding a single options grant cannot sustain the Plaintiffs'

claims of an "extraordinary pattern" of intentional backdating. In short, Plaintiffs have failed to allege facts supporting a reasonable inference that any backdating occurred.

More fundamentally, one of the earlier-filed Virginia Suits has been dismissed by the Virginia state courts for failure to make a presuit demand as required by Delaware law. Thus, not only do the Plaintiffs in this suit fail to allege particularized facts explaining why no presuit demand was made, they assert demand futility on claims for which it has already been determined that demand is <u>required</u>. As a result, Plaintiffs are precluded from re-litigating the issue of demand futility based on the claims asserted in the <u>Young</u> Complaint.

Finally, even assuming, <u>arguendo</u>, that Plaintiffs have alleged particularized facts justifying their failure to make a presuit demand, the Delaware Derivative Suit should be dismissed, or at least stayed, in favor of the earlier-filed D.C. Derivative Suit pending in the District Court, where Sunrise and several of the individual defendants in this suit also are defendants in a consolidated class action asserting violations of federal securities laws arising from the same alleged stock option backdating and related conduct (the "D.C. Class Actions"). The D.C. Derivative Suit and the D.C. Class Actions are assigned to the same judge and, thus, the District Court provides the forum where the parties can most fairly, efficiently, conveniently and comprehensively litigate their claims and defenses.

For these reasons, the Court should dismiss the Delaware Derivative Suit for failure to make a presuit demand or, in the alternative, exercise its discretion to dismiss or stay this suit in the interests of judicial economy and comity.

# FACTUAL BACKGROUND

Nominal defendant Sunrise is a Delaware corporation with its corporate headquarters in McLean, Virginia. Young Compl. ¶ 32. Sunrise operates senior living communities throughout the United States, Canada, the United Kingdom, and Germany. Id. Sunrise was founded by named defendants Paul Klaassen and Teresa Klaassen. Id. at ¶ 20. The other named defendants are current or former Sunrise directors and current or former Sunrise officers. Id. at ¶¶ 15-29.

At the time the Delaware Derivative Suit was filed, Sunrise had seven directors – Ronald Aprahamian, Craig Callen, Thomas Donohue, J. Douglas Holladay, Paul Klaassen, Teresa Klaassen and William Little (these seven, individually, "Current Director" and, collectively, the "Current Directors"). 2/ Id. at ¶ 126.

The first assertion of any claim of stock option backdating at Sunrise was made in a derivative suit filed by Schiffrin & Barroway, LLP ("Schiffrin & Barroway") in the Circuit Court for Fairfax County, Virginia, on August 11, 2006, captioned Von Guggenberg v. Klaassen, et al., Case No. CL-2006-10174 ("Von Guggenberg"). See Von Guggenberg complaint, Ex. 1 hereto. 3/ Sunrise moved to dismiss the Von Guggenberg suit for failure to make a presuit demand and on statute of limitations grounds. On

---

2/    Sunrise has subsequently appointed an eighth director, Stephen D. Harlan, and a ninth director, Lynn Krominga. See Young Compl. at ¶¶ 91, 93; 8-K filed Oct. 22, 2007, Ex. 2 hereto.

3/    On a motion to dismiss, the Court may take judicial notice of matters that are not subject to reasonable dispute. In re General Motors Shareholder Litig., Del. Supr., 897 A.2d 162, 169 (2006); Del. R. of Evid. 201(b). This includes, among other things, the contents of documents filed with state and federal courts and administrative agencies. See id.; Wal-Mart Stores v. AIG Life Ins. Co., Del. Supr., 860 A.2d 312, 320 n.28 (2004) (citing Southmark Prime Plus, L.P. v. Falzone, 776 F. Supp. 888, 891-92 (D. Del.1991)).

September 6, 2006, before the Virginia Circuit Court ruled on Sunrise's motions,

Schiffrin & Barroway filed another derivative suit in the same court asserting similar

claims of stock option backdating. Molner v. Klaassen, et al., Case No. CL-2006-11244

("Molner I"). On September 15, 2006, the Virginia Circuit Court granted Sunrise's

motions to dismiss the Von Guggenberg complaint for failure to make a presuit demand,

and on statute of limitations grounds. See September 15, 2006 Final Order, Ex. 3 hereto.

Von Guggenberg filed a petition for appeal to the Supreme Court of Virginia. After

briefing and argument to a three-justice writ panel, Von Guggenberg's petition was

denied on April 27, 2007, thus concluding that case. See April 27, 2007 Order, Ex. 4

hereto. 4/

On December 11, 2006, in response to a letter from the Service Employees

International Union, CLC (the "SEIU"), which was sent simultaneously to Sunrise and to

news outlets, Sunrise's Board appointed an independent special committee (assisted by

independent counsel and independent auditors) to review the Company's historical

practices related to stock options grants and insider sales of Sunrise stock. Young Compl.

at ¶ 86.

On December 22, 2006, the Virginia Circuit Court stayed Molner I

pending resolution of the Von Guggenberg appeal. Schiffrin & Barroway subsequently

filed an uncontested notice of nonsuit (permitted by right under Virginia law), and re-

filed on behalf of Molner in the District Court, as described further below.

---

4/     In Virginia, appeals from state circuit court civil cases are taken directly to the
Supreme Court of Virginia, and follow a two-step process. See generally Rules of the
Supreme Ct. of Va., Part 5.

In January and early February of 2007, just weeks after Sunrise had disclosed the appointment of the special committee, five complaints were filed in the District Court against Sunrise and certain of its current and former directors and officers, comprising three derivative suits now consolidated into the D.C. Derivative Suit, 5/ and two securities class actions now consolidated into the D.C. Class Actions, 6/ (collectively, the "Federal Suits"). The Federal Suits have all been assigned to U.S. District Judge Reggie B. Walton.

The derivative plaintiffs in D.C. filed their Consolidated Shareholder Derivative Complaint on June 29, 2007, alleging stock option backdating and, additionally, insider stock sales and accounting irregularities by the named defendants. 7/ See D.C. Derivative Suit complaint, Ex. 5 hereto. On August 27, 2007, Sunrise and the

---

5/      The three derivative suits were captioned Brockton Contributory Retirement System v. Klaassen, et al., Case No. 1:07CV00143, filed Jan. 19, 2007 ("Brockton"); Molner v. Klaassen, et al., Case No. 1:07CV00227, filed Jan. 31, 2007 ("Molner II"); Anderson v. Paul K. Klaassen, et al., Case No. 1:07CV00286, filed Feb. 5, 2007 ("Anderson"). A copy of the Molner II complaint is attached as Ex. 6 hereto. The three derivative suits were consolidated into the D.C. Derivative Suit on May 9, 2007, captioned In re Sunrise Senior Living, Inc. Derivative Litig., Case No. 07-00143.

6/      The two class actions were captioned United Food & Commercial Workers Union Local 880-Retail Food Employers Joint Pension Fund, et al. v. Sunrise Senior Living, Inc., et al., Case No. 1:07CV00102, filed Jan. 16, 2007 ("United Food"); First New York Securities, L.L.C. v. Sunrise Senior Living, Inc., et al., Case No. 1:07CV00294, filed Feb. 8, 2007 ("First New York"). Copies of the United Food and First New York complaints are attached as Exs. 7 and 8 hereto. An amended consolidated complaint will be filed, by agreed order, in conjunction with Sunrise's disclosure of restated financials.

7/      The original complaint in the Delaware Derivative Suit not only made the same allegations regarding stock options, but a majority of the numbered paragraphs in the Delaware Derivative Suit appeared to have been lifted directly from the earlier-filed Molner II complaint, including all of the claims alleged by Plaintiffs in the instant suit. See copy of original complaint in the Delaware Derivative Suit with highlighted text that matches text in Molner II complaint, Ex. 9 hereto.

individual defendants in the D.C. Derivative Suit filed preliminary motions. Specifically, Sunrise moved to dismiss the D.C. Derivative Suit based on the plaintiffs' failure to make a presuit demand on Sunrise's Board or, in the alternative, to stay the D.C. Derivative Suit in favor of the D.C. Class Actions, in which Sunrise is a named defendant, pending in the same court and before the same judge. The plaintiffs requested additional time in which to respond to Sunrise's and the individual defendants' preliminary motions. On October 26, 2007, rather than contest those preliminary motions, the plaintiffs attempted to file an Amended Consolidated Shareholder Derivative Complaint. See Ex. 10 hereto.

The D.C. Class Actions (United Food and First New York) arise from the same underlying alleged conduct as the D.C. Derivative Suit – claims of stock option backdating and subsequent insider stock sales and accounting irregularities. See United Food Compl. ¶¶ 3-9; First New York Compl. ¶¶ 3-8. The D.C. Class Actions, however, allege violations of federal law only. See United Food Compl. ¶¶ 141-197; First New York Compl. ¶¶ 130-157.

Plaintiffs filed their original complaint in the Delaware Derivative Suit on March 7, 2007, seven months after the first derivative suit (Von Guggenberg) was filed in the Virginia Circuit Court, nearly seven weeks after the first derivative suit (Brockton) was filed in the District Court, and more than one month after Molner II and Anderson were filed in that same court. On June 28, 2007, Sunrise moved to dismiss Plaintiffs' original complaint for failure to make a presuit demand or, in the alternative, to dismiss or stay this suit in favor of earlier-filed suits pending in the District Court. Rather than contest the merits of Sunrise's first preliminary motion, Plaintiffs requested additional

- 7 -

time to either consent to a stay or file an amended complaint. Plaintiffs filed the current Young Complaint on September 17, 2007. Ex. 11.

Unlike the D.C. Derivative Suit, the Delaware Derivative Suit makes no claims based on alleged accounting irregularities or arising under federal law. The Delaware Derivative Suit plaintiffs' claims of breach of fiduciary duty, unjust enrichment, and rescission are based solely on alleged stock option backdating – the same claims based on the same allegedly backdated options grants that were alleged and dismissed in Von Guggenberg for failure to make a presuit demand. Compare Young Compl. ¶¶ 153-165, with Von Guggenberg Compl. ¶¶ 45-54.

On September 28, 2007, Sunrise announced that the independent special committee had concluded the fact-finding portion of its investigation with respect to the timing of certain stock options granted by the Company. See 8-K filed Oct. 1, 2007, Ex. 12 hereto. The special committee examined options grants made on 14 dates, including six of the seven dates on which Plaintiffs allege that options were backdated: November 8, 1999; February 25, 2000; March 28, 2000; September 11, 2000; May 11, 2001; and November 12, 2001. Id. (stating that committee investigated all dates questioned by SEIU); SEIU memorandum, Ex. 13 hereto. 8/ The committee found no evidence of intentional backdating or other misconduct in connection with the options grants examined. Id.

---

8/    The SEIU memorandum is incorporated by reference in Plaintiffs' complaint. See Young Compl. ¶ 86.

## STATEMENT OF THE QUESTIONS PRESENTED

I.   Whether Plaintiffs lack standing under 8 Del. C. § 327 where they assert claims that predate their alleged ownership of Sunrise stock?

II.  Whether Plaintiffs can assert that demand was futile with respect to their derivative claims, when it has already been determined in earlier derivative litigation that demand is required on those same claims?

III. Whether Plaintiffs have pleaded particularized facts sufficient to justify their failure to make demand on Sunrise's Board, as required by Court of Chancery Rule 23.1?

IV.  Whether, under McWane, this Court should dismiss or stay the Delaware Derivative Suit in favor of more comprehensive and earlier-filed claims now pending in the District Court?

# ARGUMENT

## I.    Plaintiffs Lack Standing to Pursue Claims Based on Pre-April 19, 1999 Transactions

A shareholder seeking to assert derivative claims on behalf of a corporation must have been a shareholder at the time of the challenged transaction or hold shares that devolved upon him by operation of law.  8 Del. C. § 327; see Desimone v. Barrows, Del. Ch., 924 A.2d 908, 924-25(2007). 9/  Although Plaintiffs claim to have been Sunrise shareholders only since April 19, 1999, see Young Compl. ¶¶ 13-14, they appear to assert claims based on the following options grants:

Table 1:

| Challenged Grant | Young Complaint |
|------------------|-----------------|
| 05/02/97 | ¶ 81 |
| 09/14/98 | ¶ 82 |
| 03/05/99 | ¶ 43 |
| * Plaintiffs' alleged stock ownership begins on April 19, 1999 (¶¶ 13-14) | |
| 11/08/99 | ¶ 46 |
| 02/25/00 | ¶ 53 |
| 03/28/00 | ¶ 54 |
| 05/22/00 | ¶ 56 |
| 09/11/00 | ¶ 58 |
| 05/11/01 | ¶ 64 |
| 11/12/01 | ¶ 67 |

---

9/    Copies of all unreported decisions are included in a Compendium of Unreported Decisions Cited in the Opening Brief in Support of Motion to Dismiss or, in the Alternative, to Stay by Nominal Defendant Sunrise Senior Living, Inc., filed contemporaneously herewith.

Because Plaintiffs allege that they have been Sunrise shareholders only since April 19, 1999, they lack standing to maintain derivative claims on behalf of Sunrise based on transactions before that date.  See Conrad v. Blank, Civ. A. No. 2611-VCL, 2007 WL 2593540, at *10 (Del. Ch. Sept. 7, 2007) (holding that because Delaware courts "strictly interpret the contemporaneous ownership rule and firmly enforce its requirements," derivative plaintiff lacked standing to assert claims arising from stock options that were granted before she owned shares in the corporation). 10/

---

10/    Plaintiffs in the D.C. Derivative Suit allege ownership of Sunrise stock from May 2, 1997.  See D.C. Derivative Suit Compl. ¶¶ 14, 66.

II.    **Demand Is Required with Respect to Claims Based on Grant Dates Challenged in Von Guggenberg, and Cannot Be Relitigated Here**

Plaintiffs claims should be dismissed for failure to make presuit demand, because it has already been determined on the merits in Von Guggenberg that demand is required for those same claims based on the same options grants. The Young Complaint challenges seven grants, six of which were previously challenged in Von Guggenberg:

Table 2:

| Challenged Grant | Young Complaint | Von Guggenberg complaint |
|:---:|:---:|:---:|
| 11/08/99 | ¶ 46 | ¶ 26 |
| 02/25/00 | ¶ 53 | ¶ 26 |
| 03/28/00 | ¶ 54 | ¶ 26 |
| 05/22/00 | ¶ 56 | |
| 09/11/00 | ¶ 58 | ¶ 26 |
| 05/11/01 | ¶ 64 | ¶ 26 |
| 11/12/01 | ¶ 67 | ¶ 26 |

Compare Von Guggenberg Compl. ¶¶ 26-29 and 43 (alleging a "striking pattern" between 1997 and 2001 suggesting that options had been backdated), with Young Compl. ¶¶ 46, 53, 54, 56, 58, 64, 67. As a result, Plaintiffs should be precluded from re-litigating demand futility in the Delaware Derivative Suit with respect to these six options grants. Moreover, Plaintiffs ask the Court to draw an inference of backdating based on a purportedly "extraordinary pattern" and, thus, the entire Delaware Derivative Suit should be dismissed because no inference of any "pattern" can be drawn from a single options grant. See Section IV.B infra.

Under the doctrine of collateral estoppel/issue preclusion, this Court gives the same preclusive effect to a sister state's judgment as would a court sitting in that state. West Coast Mgmt. & Capital, LLC v. Carrier Access Corp., Del. Ch., 914 A.2d 636, 642

(2006). Under Virginia law, collateral estoppel/issue preclusion applies where, as here:

(1) the parties to the prior and subsequent proceedings (or their privies) are the same;

(2) the factual issue sought to be re-litigated was actually litigated in the prior action;

(3) the factual issue was essential to the judgment in the prior proceeding; (4) the prior

proceeding resulted in a judgment that is valid, final, and adverse to the party against

whom the collateral estoppel/issue preclusion is sought to be applied; and (5) there is

"mutuality" in the sense that the litigant who has invoked collateral estoppel/issue

preclusion in the later litigation would have been bound had the litigation of the issue in

the prior proceeding reached the opposite result. See, e.g., Angstadt v. Atlantic Mutual

Ins. Co., 457 S.E.2d 86, 87 (Va. 1995). 11/

     All of these factors are present in the instant suit. First, the real parties in

interest in Von Guggenberg and the Delaware Derivative Suit are the same. 12/ Second,

the issue of whether presuit demand on Sunrise's Board would have been futile with

regard to these allegedly backdated options was litigated in Von Guggenberg, and these

---

11/   See Va. Sup. Ct. R. 1:6(a) (West 2007) ("A party whose claim for relief arising
from identified conduct, a transaction, or an occurrence, is decided on the merits by a
final judgment, shall be forever barred from prosecuting any second or subsequent civil
action against the same opposing party or parties on any claim or cause of action that
arises from that same conduct, transaction or occurrence....") (emphasis added).

12/   Although different shareholders brought the two suits, the actual plaintiff on
whose behalf the claims were brought is the identical corporation – Sunrise. See West
Coast Mgmt., 914 A.2d at 643 n.22 ("a prior suit by another plaintiff with similar
allegations of demand futility may bar a second plaintiff from filing the same suit"); see
also Cramer v. Gen. Tel. & Elec. Corp., 582 F.2d 259, 267 (3d Cir. 1978), cert. denied,
439 U.S. 1129 (1979) (previous shareholder derivative suit precluded subsequent
derivative suit by different plaintiff asserting the same claim); Henik ex rel. LaBranche &
Co., Inc. v. LaBranche, 433 F. Supp. 2d 372, 380 (S.D.N.Y. 2006) (same). In addition,
four current directors (Aprahamian, Callen, Donohue and Paul Klaassen – a majority of
the Board) were among the individuals named as defendants in both suits.

options comprise the overwhelming majority of the options grants challenged in the

Young Complaint. Third, the Von Guggenberg court's determination that demand was

required with respect to claims based on these options grants was the essential issue in its

decision to sustain Sunrise's demurrer. See September 15, 2006 Order, Ex. 3. Fourth,

the court's ruling on Sunrise's demurrer was a valid and final judgment on the merits.

Finally, Virginia's mutuality requirement is satisfied because the defendants in

Von Guggenberg would have been bound had the court reached the opposite result.

　　　　Although this Court previously has expressed concern about applying

issue preclusion to bar subsequent derivative suits by different shareholder plaintiffs, see

West Coast Mgmt., 914 A.2d at 643 n.22 (noting that "if the second plaintiff makes

substantially different allegations of demand futility based on additional information,

issue preclusion, from both a logic and fairness standpoint, would not apply"), those

concerns are not implicated here. Far from "making substantially different allegations"

than the plaintiff in Von Guggenberg, Plaintiffs' allegations here are in substantial part

simply copied from the Molner II complaint. Furthermore, Plaintiffs do not allege that

the Von Guggenberg plaintiff did not represent them adequately. Thus, there is no basis

to suggest that it would be inequitable to preclude Plaintiffs from re-litigating the issue of

demand futility with respect to the same claims based on the same options grants

previously challenged in Von Guggenberg. See, e.g., In re Career Education Corp.

Derivative Litig., Civ. A. No. 1398-VCP (Del. Ch. Sept. 28, 2007) (demand futility could

not be relitigated in Delaware court after federal court had ruled that demand was

- 14 -

required, where complaints in both cases were similar, although filed by different shareholders).

Plaintiffs should not be permitted to make an end-run around the demand requirement by challenging one additional options grant.  Under the circumstances, if issue preclusion is not applied to bar the Delaware Derivative Suit, other plaintiffs will be encouraged to file hastily-drafted shareholder suits alleging the same claims and seeking to relitigate the issue of demand futility by strategically challenging a few additional options grants.  This is precisely the type of cumulative and tactical litigiousness that issue preclusion is intended to prevent.  See West Coast Mgmt., 914 A.2d at 645 n.36 (the purposes of issue preclusion are "to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication") (citation omitted).

### III.    Plaintiffs Must Plead Particularized Facts Establishing That Demand Was Futile with Respect to Each of Their Claims

Under Delaware law, before a shareholder can assert a derivative claim on behalf of a corporation, the shareholder must first demand that the board of directors take action to address the circumstances giving rise to the potential claims. This demand requirement affords the directors (who have the statutory responsibility to direct the corporation's affairs, including the pursuit of claims on its behalf) an opportunity to look into the circumstances and determine a course of action in the corporation's best interests. Among other things, the demand requirement serves to reduce frivolous litigation, the pursuit of which would be injurious to both the corporation and the proper administration of justice. Conrad, 2007 WL 2593540, at *6. Because Plaintiffs did not make a presuit demand on Sunrise's Board, they must plead particularized facts establishing that demand was futile or otherwise excused. Id.

Delaware courts have developed two tests to determine whether a derivative plaintiff has alleged facts sufficient to justify why presuit demand was not made. The first test applies to derivative claims arising from affirmative actions taken or expressly approved by a corporation's board of directors. Aronson, 473 A.2d at 808, 814. The second test applies where, as here, the derivative claims do not arise from an affirmative action or decision of the board itself. Rales v. Blasband, Del. Supr., 634 A.2d 927, 933-934 (1993). In this case, Plaintiffs acknowledge that the challenged options were granted by the Sunrise Board committee authorized to approve and issue stock options, not by the Board as a whole, and that this was a valid delegation by the Board

under the Company's stock options plans.  <u>Young</u> Compl. ¶ 71. <u>13</u>/  Thus, the <u>Rales</u> test

applies to Plaintiffs' claims.  <u>Conrad</u>, 2007 WL 2593540, at *6.

       Applying the <u>Rales</u> test, a derivative plaintiff must make specific factual

allegations that would establish that a majority of a corporation's directors (as of the time

the complaint is filed) were "interested" or otherwise lacked independence and were thus

unable to fairly consider a demand with respect to each claim asserted.  <u>Desimone</u>, 924

A.2d at 928.

       Under <u>Rales</u>, a director is deemed to be "interested" if he derives a direct

personal benefit from a challenged transaction in the sense of self-dealing.  A director

also may be deemed to lack "independence" from other interested directors if he is

dominated by them, or if he derives his main source of income from the corporation.  <u>In</u>

<u>re J.P. Morgan Chase & Co. Shareholder Litig.</u>, Del. Ch., 906 A.2d 808, 821 (2005)

(citation omitted).  In addition, a director may be deemed to lack the requisite

independence and disinterestedness to consider presuit demand if he faces a "substantial

likelihood" of personal liability arising from the challenged transaction.  <u>Guttman v.</u>

<u>Huang</u>, Del. Ch., 823 A.2d 492, 501 (2003) (citation omitted).

       However, "the mere threat of personal liability for approving a questioned

transaction, standing alone, is insufficient to challenge either the independence or

disinterestedness of directors."  <u>Aronson</u>, 473 A.2d at 815; <u>see also</u> <u>Blasband v. Rales</u>,

---

<u>13</u>/    Only two of the Current Directors served on the Compensation Committee/Stock
Option Committee during the time period when the challenged options were granted.  <u>See</u>
<u>Young</u> Compl. at ¶ 129.  Thus, the actions of the Compensation Committee/Stock
Options Committee cannot be imputed to the full board, and <u>Rales</u> is the proper test to
determine demand futility.  <u>See</u> <u>Ryan v. Gifford</u>, Del. Ch. 918 A.2d 341, 353 (2007).

971 F.2d 1034, 1049 (3d Cir. 1992) (applying Delaware law) ("plaintiff may not bootstrap allegations of futility merely by pleading that the directors participated in the challenged transaction."). Demand futility does not mean that any "approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' by directors," because such a rule would leave "the clear mandate of Chancery Rule 23.1 devoid of its purpose and substance." Aronson, 473 A.2d at 814. 14/

Finally, a derivative plaintiff must plead with particularity facts sufficient to justify why demand was not made with respect to each separate claim pled. Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, Del. Ch., 833 A.2d 961, 977 n.48 (2003), aff'd, Del. Supr., 845 A.2d 1040 (2004) ("[d]emand futility analysis is conducted on a claim-by-claim basis") (citation omitted); Yaw v. Talley, Civ. A. No. 12882, 1994 WL 89019, *9 (Del. Ch. Mar. 2, 1994) (unpublished) (same); see also Ward, Jr., Rodman, et al., Folk on the Delaware General Corporation Law § 327.4.2.2 (5th ed. 2006). Generalized allegations of interestedness or lack of independence are insufficient.

To counterbalance these stringent pleading requirements, Delaware law provides shareholders the means to gather necessary facts before filing suit, by

---

14/    Likewise, Delaware courts have consistently held that directors are not deemed to lose their independence merely because they move in the same social circles or hold seats on the same corporate boards. Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, Del. Supr., 845 A.2d 1040, 1051-52 (2004); see also Orman v. Cullman, Del. Ch., 794 A.2d 5, 27 (2002) ("the naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence"); Highland Legacy Ltd. v. Singer, Civ. A. No. 1566-N, 2006 WL 741939, at *6 (Del. Ch. March 17, 2006) (unpublished) (conclusory allegations that directors are dominated because they serve together on the boards of unaffiliated companies is not enough to overcome the presumption of a director's independence).

empowering them to request an inspection of a corporation's books and records.

8 Del. C. § 220. Where a shareholder fails to make a books and records request,

Delaware courts will not "give a broad reading to the facts alleged in the complaint…[or]

infer from them the existence of other facts that would have been proved or disproved by

a further presuit investigation." White v. Panic, Del. Ch., 783 A.2d 356, 364 (2000),

aff'd, Del. Supr., 783 A.2d 543 (2001) (demand not excused because "[f]or all of its

colorful language, what is missing from the complaint, in terms of the details of actions

taken by the Director Defendants, is at least as important as what is alleged"); see also

Beam, 833 A.2d at 981-82 (expressing concern that "notwithstanding repeated

suggestions, encouragement, and downright admonitions over the years both by this

Court and by the Delaware Supreme Court, litigants continue to bring derivative

complaints pleading demand futility on the basis of precious little investigation beyond

perusal of the morning newspapers."). No books and records request was made by the

Plaintiffs in this suit, nor has any such request been made by any of the other derivative

plaintiffs purporting to sue on Sunrise's behalf.

**IV.    Plaintiffs Failed to Plead Particularized Facts Establishing a Reasonable Inference That Any Backdating Occurred**

Plaintiffs' conclusory allegations are insufficient to establish any inference of backdating.  There is no allegation in the Young Complaint that anyone claims knowledge that the acts of dishonesty alleged therein are true, or that Plaintiffs so much as asked the Company about them before filing suit.  Indeed, Plaintiffs did not file suit until months after (and presumably prompted by) Sunrise's disclosure of a voluntary review of its historic stock-based compensation grants and procedures, conducted by an independent special committee assisted by independent counsel and independent accounting consultants.  <u>Young</u> Compl. ¶ 86.  Rather than waiting for the results of the special committee's investigation, <u>15</u>/ and without making a demand on the Board of Directors (or even a request to inspect Sunrise's books and records), Plaintiffs filed claims relying only on conjecture, press reports, and bits and pieces of the unsupported and conclusory allegations of other shareholders pled in earlier-filed suits.  Given their lack of substance, Plaintiffs' backdating allegations fall apart upon examination.

**A.    Six of the Seven Challenged Grant Dates Are Tied to Corporate Events and, Thus, Cannot Support a Reasonable Inference of Backdating**

Because Plaintiffs did no presuit investigation of their own, their backdating claims are purely circumstantial and depend entirely on the Court inferring that backdating occurred based on the performance of Sunrise stock during arbitrarily selected time periods surrounding the challenged grant dates.  However, when a plaintiff

---

<u>15</u>/    As noted, above, the independent special committee found no evidence of intentional backdating.

relies solely "on the numbers" to allege backdating, no inference of backdating can be drawn if the grant date is plainly tied to related corporate events. See, e.g., Desimone, 924 A.2d at 948 (plaintiff failed to sufficiently plead backdating where the options grants issued on the occurrence of a specific corporate event); In re CNET Networks, Inc., 483 F. Supp. 2d 947, 960 (N.D. Cal. 2007) ("[m]ere reliance on the numbers is not sufficient when plaintiffs are confronted with a legitimate, judicially-noticeable explanation for the grant date"); In re Zoran Corp. Derivative Litigation, ___ F. Supp. 2d ___, 2007 WL 1650948, at *13 (N.D. Cal. 2007) (no inference of backdating where options grant occurred in connection with company's annual shareholders meeting or in connection with a director joining the board).  Here, six of the seven allegedly backdated options grants coincided with corporate events at Sunrise and, thus, cannot support a reasonable inference of backdating that might render any of the Current Directors interested or otherwise incapable of considering a presuit demand.

### 1.    November 8, 1999

Plaintiffs allege that options granted on November 8, 1999, were backdated because they were granted at "one of the lowest prices of Sunrise stock for the fiscal year…." Young Compl. ¶ 46.  Callen is the only Current Director alleged to have received options on this date. Id. at ¶ 46.  Callen and Donohue are the only Current Directors alleged to have approved these options. Id. at ¶¶ 42, 26.  Plaintiffs acknowledge that Callen became a director in 1999. Id. at ¶ 16.  Pursuant to Sunrise's 1996 Directors' Stock Option Plan, each director "shall be granted an Initial Option, as of the date of the Director's Commencement of Service." See 1996 Directors' Stock Option

Plan at ¶ 7 (a complete copy of which was attached to 10-K's filed with the SEC on

March 31, 1998 and March 31, 1999), Exs. 14 and 15 hereto. Plaintiffs do not (and

cannot) allege that these options were not issued in connection with the commencement

of Callen's service as a director pursuant to the 1996 Directors' Stock Option Plan.

Indeed, Sunrise's April 14, 2000 proxy statement confirms that options granted to Callen

on this date were the only options he received during 1999, and that these options were

an "initial grant." 16/  Sunrise proxy statement filed Apr. 14, 2000 at 8, Ex. 16 hereto.

Thus, there is no basis to infer that these options were backdated.

### 2.        February 25, 2000

Plaintiffs allege that options granted on February 25, 2000, were

backdated because they were granted "at the lowest price of the month, the fourth lowest

price of the fiscal quarter, and the fourth lowest price of the year." Young Compl. ¶ 53.

Aprahamian, Callen, and Donohue are the only Current Directors alleged to have

received these options. Id. Callen and Donohue are the only Current Directors alleged to

have approved these options. Id. at ¶¶ 51, 52. Sunrise's public filings confirm that these

options were granted on the same date the Board approved the Company's 2000 Stock

Option Plan. See Apr. 14, 2000 proxy statement at 20, Ex. 16. The Board also approved

senior executive severance plans on this same date, further demonstrating that the Board,

and its committees, conducted business on February 25, 2000. See id. at 16. Thus, this

---

16/        In fact, Callen's service as a director did commence on November 8, 1999. This
fact is subject to judicial notice, because it is clearly capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be questioned. Del.
R. Evid. 201(b).

grant date was tied to events at the Company and could not have been retroactively selected.

Equally baseless is Plaintiffs' allegation that these options constituted an <u>ultra vires</u> grant. <u>Young</u> Compl. ¶ 55. These options were granted before Sunrise shareholders approved the 2000 Stock Option Plan at Sunrise's annual meeting on May 12, 2000. The 2000 Stock Option Plan provides that the plan "shall be effective as of the date of adoption by the Board, subject to approval of the Plan…[by shareholders] at a duly constituted stockholders' meeting," and that "[u]pon approval of the Plan by the stockholders of the Corporation…all Options granted under the Plan on or after the effective date shall be fully effective as if the stockholders of the Corporation had approved the Plan on the Plan's effective date." <u>See</u> Apr. 14, 2000 proxy statement at A-3, Ex. 16 hereto. Although this options grant was not required to be reported in the April 14, 2000 proxy statement, it was nevertheless first publicly disclosed in SEC filings on April 10, 2000. Ex. 17 hereto. Thus, there is no basis to infer that these options were backdated or otherwise improperly granted.

### 3. March 28, 2000

Plaintiffs allege that options granted on March 28, 2000, were backdated because they were granted on the "seventh lowest trading day of the month of March 2000," and "the eighth lowest trading day of the fiscal quarter and the eighth lowest trading day for the entire fiscal year." <u>Young</u> Compl. ¶ 54. No Current Directors are alleged to have received these options. <u>Id.</u> at 52. Callen and Donohue are the only Current Directors alleged to have approved these options. <u>Id.</u> at ¶ 51. Plaintiffs do not

(and cannot) allege that these options were not granted in connection with the recipient's appointment or election to a new position at Sunrise. 17/

Furthermore, there is no reason to infer backdating simply because these options were granted on the "seventh lowest trading day of the month." There were 23 trading days during March 2000. Thus, the odds are approximately one in three that <u>any</u> day on which options were granted would have been among the seven lowest trading days of the month.

Plaintiffs' allegation that these options were granted on "the eighth lowest trading day for the entire fiscal year" is meaningless. These options were first publicly disclosed in Form 4's filed with the SEC on April 10, 2000, and could not possibly have been granted after being disclosed. Ex. 18 hereto. Thus, any increase in the price of Sunrise shares after April 10, 2000 is irrelevant. 18/

Finally, for the same reasons as discussed with respect to the February 25, 2000 options grants, above, Plaintiffs' assertion that these options constituted an <u>ultra vires</u> grant, <u>see</u> <u>Young</u> Compl. ¶ 55, is baseless.

---

17/      In fact, as disclosed in Sunrise's 2000 proxy statement, four of the five grantees (Newell, Slavin, Swinton, and Tomasso) assumed new positions within the Company effective April 1, 2000. Sunrise proxy statement filed Apr. 14, 2000 at 6-7, Ex. 16. Plaintiffs do not (and cannot) allege that Hulse did not also assume a new position effective April 1, 2000.

18/      In any event, Sunrise stock increased in price by only $0.75 (from $6.22 to $6.97, or 12%) between the March 28, 2000 grant date and the April 10, 2000 disclosure. This minimal increase does not support an inference of backdating, particularly in light of the much greater increase of $5.56 (from $6.94 to $12.50, or 80%) occurring after the grant was disclosed through the end of the trading year, i.e., from April 11, 2000, through December 29, 2000.

### 4.    May 22, 2000

Plaintiffs allege that options granted on May 22, 2000, were backdated because they were granted "just prior to a precipitous rise in the price of Sunrise stock...." <u>Young</u> Compl. ¶ 56.  Holladay is the only Current Director alleged to have received options on this date. <u>Id.</u>  Callen and Donohue are the only current directors alleged to have approved these options. <u>Id.</u> at ¶ 51. Plaintiffs acknowledge that Holladay became a director in 2000. <u>Id.</u> at ¶ 19.  Plaintiffs do not (and cannot) allege that these options were not issued in connection with the commencement of Holladay's service as a director.  Indeed, Sunrise's proxy statement confirms that options granted to Holladay on this date were the only options he received during 2000, and that these options were an "initial grant." <u>19/</u>  March 29, 2001 proxy statement at 5-6, Ex. 19, hereto.  Moreover, this grant was disclosed in a Form 3 filed with the SEC dated May 25, 2000 – just three days after the grant.  <u>See</u> May 25, 2000 Form 3, Ex. 20 hereto.  Thus, there is no basis to infer that these options were backdated.

### 5.    September 11, 2000

Plaintiffs allege that options granted to Paul Klaassen on September 11, 2000, must have been backdated because they were "conveniently granted...when Sunrise stock was at the lowest price of the month of September and near the lowest price of the fiscal quarter." <u>Young</u> Compl. ¶ 58.  These options, however,

---

19/    In fact, Holladay's service as a director commenced on Friday, May 19, 2000, the business day immediately preceding the Monday, May 22, 2000 grant date.  Holladay's commencement of service is a fact subject to judicial notice, because it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Del. R. Evid. 201(b).

were granted pursuant to an employment agreement entered into by Paul Klaassen and Sunrise on September 12, 2000. See Young Compl. ¶ 59; Employment Agreement at Sec. 3(c) (a complete copy of which was attached to Sunrise's 10-Q, filed with the SEC on November 13, 2000), Ex. 21 hereto. That agreement specifically provides that Klaassen was "awarded an incentive stock options grant on September 11, 2000." Id.

### 6.    May 11, 2001

Plaintiffs allege that options granted on May 11, 2001, were backdated because they were "granted at one of the lowest prices of Sunrise stock for the fiscal year," "the lowest trading day for the month of May 2001," and because Sunrise's stock price "rose precipitously" in the 2-, 10-, and 20-day periods following the grant. Young Compl. ¶¶ 64-65. No Current Directors are alleged to have received options on this date. Id. at ¶ 64. Callen and Donohue are the only Current Directors alleged to have approved these options. Id. at ¶ 51. As Plaintiffs acknowledge, these grants coincided with Sunrise's annual meeting of shareholders, which was held on the same date as the options grant. Id. at ¶ 62. Plaintiffs do not (and cannot) allege that these options were not issued in connection with that meeting.

In sum, Plaintiffs fail to establish that any of these six grants was the result of arbitrary selection untethered from the occurrence of corporate events at Sunrise, from which backdating could potentially be inferred if the stock price movement around the grant date were suspicious. Rather, each of the challenged options grants was made in connection with a particular corporate event at Sunrise. Thus, there is no basis to infer that any of these options was backdated.

**B.      The One Remaining Options Grant Cannot Alone Support a Reasonable Inference of Backdating**

The one remaining challenged option alleged to have been backdated was granted on November 12, 2001.  <u>Young</u> Compl. ¶ 67.  No Current Directors are alleged to have received options on this date.  <u>Id.</u> at ¶ 67.  Callen and Donohue are the only Current Directors alleged to have approved these options.  <u>Id.</u> at ¶ 51.

As a practical matter, a reasonable inference of backdating cannot be drawn from this one options grant based solely on Sunrise's stock price before or after the grant date.  When a series of stock options are granted over time, it is expected that some will subsequently appear to have been "favorable," some will appear to have been "neutral," and still others will appear to have been "unfavorable" due to natural fluctuations in the price of the stock.  Thus, an inference of backdating simply cannot be drawn from a single purportedly "favorable" options grant.  <u>Cf.</u> <u>Britton v.Parker</u>, Civ. Action Nos. 06-cv-01797-MSK-KLM, 06-cv-1922-MSK-KLM, 06-cv-02017-MSK-KLM, 2007 WL 2871003, at *7 (D. Colo. Sept. 26, 2007) (slip copy) ("if the reported date of a stock options grant, alone, were sufficient to maintain a claim of securities fraud, then any stock options granted on a favorable date would immediately become suspect, and could become the subject of a lawsuit").

Indeed, this one options grant cannot be considered in a vacuum.  If there were an ongoing scheme to backdate stock options, as Plaintiffs allege, this scheme would be evidenced by an unusually high number of favorable grants among all of the options granted to Sunrise directors and officers.  Yet, Plaintiffs have failed to plead particularized facts establishing that any such "pattern" exists.  In addition to the seven

- 27 -

options grants challenged in the Young Complaint, SEC filings show that options were granted to Sunrise directors and officers on three other dates during the relevant period: April 26, 1999; November 24, 2000; and January 9, 2001. Exs. 22, 23, and 24. Plaintiffs thus have alleged that seven options grants out of ten were backdated. As shown above, however, six of the seven challenged grants were tied to corporate events and thus cannot support a reasonable inference of backdating. Plaintiffs do not challenge options granted on any of the remaining three dates, presumably because they are either neutral or unfavorable. 20/ Even assuming, arguendo, that the November 12, 2001, grant could be classified as "favorable," that grant alone (just one out of 10) cannot support a reasonable inference of backdating, much less Plaintiffs' baseless assertion of an "extraordinary pattern." Young Compl. ¶ 71.

### C. Plaintiffs Fail to Establish That Any Current Director Is Interested Based on the Alleged Backdating

For these reasons, and as illustrated in Table 3, below, Plaintiffs have failed to allege a basis upon which to draw a reasonable inference that any backdating occurred. Even assuming, arguendo, that Plaintiffs are not precluded from relitigating the issue of demand futility on the same claims and options grants as those alleged in Von Guggenberg, none of the Current Directors is interested for purposes of demand futility based on the receipt of allegedly backdated options. Similarly, none of the Current

---

20/    Indeed, the options granted on April 26, 1999 were granted at the third highest price for Sunrise shares in the month (out of 21 trading days); the options granted on November 24, 2000 were granted at the twelfth highest price for Sunrise shares in the month (out of 21 trading days); and the options granted on January 9, 2001 were granted at the ninth highest price for Sunrise shares in the month (out of 21 trading days).

Directors faces a substantial threat of personal liability based on the approval of allegedly backdated options.

Table 3:

| Challenged Grant | Reason(s) Demand is Required | Current Director Recipient(s) | Approved by Current Director(s) |
|---|---|---|---|
| 11/08/99 | • Tied to corporate event<br>• Precluded by Von Guggenberg | Callen | Callen, Donohue |
| 02/25/00 | • Tied to corporate event<br>• Precluded by Von Guggenberg | Aprahamian, Callen, Donohue | Callen, Donohue |
| 03/28/00 | • Tied to corporate event<br>• Precluded by Von Guggenberg | | Callen, Donohue |
| 05/22/00 | • Tied to corporate event | Holladay | Callen, Donohue |
| 09/11/00 | • Tied to corporate event<br>• Precluded by Von Guggenberg | P. Klaassen | Callen, Donohue |
| 05/11/01 | • Tied to corporate event<br>• Precluded by Von Guggenberg | | Callen, Donohue |
| 11/12/01 | • No reasonable inference<br>• Precluded by Von Guggenberg | | Callen, Donohue |

**V.     Plaintiffs Have Failed to Plead Particularized Facts Establishing That a Majority of the Current Directors Were Incapable of Exercising Independence in Considering a Presuit Demand for Each Claim**

As stated, Rule 23.1 requires that Plaintiffs plead particularized facts establishing that a majority of Sunrise's Current Directors either are "interested" or face a substantial threat of personal liability for the underlying challenged transactions, such that they are incapable of exercising independence in considering a presuit demand for each claim alleged.  See, e.g., Brehm v. Eisner, Del. Supr., 746 A.2d 244, 254 (2000). Yet, despite taking a second bite at the apple by amending their complaint, Plaintiffs continue to rely on conclusory allegations drawn from baseless circumstantial inferences.

**A.     Plaintiffs Have Failed to Establish That a Majority of Current Directors Is "Interested" Based on the Receipt of Allegedly Backdated Options**

Plaintiffs allege that Aprahamian, Callen, Donohue, Holladay and Paul Klaassen are "interested" for purposes of demand futility based on their receipt of allegedly backdated options.  Id. ¶¶ 46, 52, 56, 58, 126.  As demonstrated above, however, none of these Current Directors is interested, because (1) all of the options granted to these Current Directors were tied to corporate events at Sunrise, and (2) Plaintiffs are precluded by the ruling in Von Guggenberg from relitigating demand futility with respect to all but one of the grants at issue (the May 22, 2000, grant received by Holladay). See Table 3, above, and Section IV, generally.

**B.**     **Plaintiffs Have Failed to Establish That a Majority of Current Directors Face a Substantial Threat of Personal Liability for Any of the Claims Alleged**

**1.**     **No Facts Are Alleged Establishing That a Majority of Current Directors Approved the Challenged Options**

As demonstrated above, Plaintiffs have failed to plead facts sufficient to establish that any of the challenged options were backdated. Thus, as a practical matter, no Current Directors could have approved backdated options and, as a result, none faces any threat of personal liability. See Table 3, above, and Section IV, generally. Even assuming, arguendo, that Plaintiffs had created an inference of backdating with respect to any of the challenged grants, Plaintiffs acknowledge that, during the relevant time period, the Board delegated its authority for granting stock options to the Stock Option Committee. There is no allegation that the Board as a whole, rather than the Stock Option Committee, approved the challenged grants. Callen and Donohue are the only Current Directors alleged to have served on the Stock Option Committee during the relevant time period. 21/ Thus, Plaintiffs have failed to establish that a majority of the Current Directors face any threat (much less a substantial one) of personal liability for approving allegedly backdated options.

---

21/     Although they do not directly allege that Aprahamian approved any of the challenged options, Plaintiffs nevertheless allege that he faces a substantial threat of personal liability due to his service on the Compensation Committee, which is now responsible for approving options grants. Young Compl. ¶ 129. As Plaintiffs acknowledge, however, the Stock Option Committee was responsible for approving options grants until it merged with the Compensation Committee in August 2002 – well after the last of the challenged options was granted. Id.

2.      **No Facts Are Alleged Establishing That a Majority of Directors Face a Substantial Threat of Personal Liability Due to Service on the Board or Committees**

Further, even assuming, <u>arguendo</u>, that Plaintiffs had established a reasonable inference of backdating, Plaintiffs' allegations that various Current Directors face a substantial threat of personal liability as a result of their service on the Board itself or one of the Board's committees are insufficient to excuse demand. These allegations constitute an attempt to plead a "failure of oversight" claim. Delaware courts "routinely reject the conclusory allegation that because improper behavior occurred, internal controls must have been deficient, and the members of the board must have known so." <u>Desimone</u>, 924 A.2d at 940. Indeed, this type of lack of oversight claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." <u>In re Caremark Int'l, Inc. Derivative Litig.</u>, Del. Ch., 698 A.2d 959, 967 (1996).

Imposition of liability on this theory "requires a showing that the directors knew that they were not discharging their fiduciary duties....[and] only a sustained or systematic failure of oversight ...will establish the lack of good faith that is a necessary condition to liability." <u>Desimone</u>, 924 A.2d at 940 (internal quotations and citations omitted). Thus, in order to establish a substantial likelihood of personal liability, Plaintiffs were required to plead the existence of facts establishing that each of the Current Directors (or at least a majority of them) knew that internal controls at Sunrise were inadequate, that the inadequacies could leave room for unlawful or materially adverse conduct, and that the Current Directors chose to do nothing about the control

deficiencies despite their knowledge of them.  Id.  Such a claim requires a showing, for

example, that Sunrise's Board or a Board committee devoted patently inadequate time to

its work, or that the Board or a Board committee had clear notice of wrongdoing and

simply chose to ignore it.  See Guttman, 823 A.2d at 505-07.  There are no such factual

allegations pled in the Young Complaint.

        Plaintiffs conclusory allegations that certain Current Directors face a

substantial threat of personal liability merely due to their service on the Board, or on its

Audit Committee or Nominating and Corporate Governance Committee, fall far short of

the required level of factual specificity.  Indeed, these assertions amount to nothing more

than a recitation of the Current Directors' duties as members of the Board and those

committees.  Mere membership on a board or committee, however, without specific

factual allegations establishing a director's actual role and conduct, is insufficient to

support a finding that a director is conflicted.  Plaintiffs have not alleged any facts

establishing that Sunrise's internal controls were deficient, much less that the Board, the

Audit Committee, or the Nominating and Corporate Governance Committee had

knowledge of improper conduct.

        In any event, Plaintiffs have only asserted that Callen and Donohue

approved any of the allegedly backdated options, and thus have failed to establish that a

majority of the Current Directors is interested or faces a substantial threat of personal

liability.

**C.    No Facts Are Alleged Establishing That Any Current Director Is Beholden to Another Interested Current Director**

Initially, as a practical matter, Plaintiffs cannot possibly establish that any Current Director is beholden to another interested Current Director, because Plaintiffs have failed to allege particularized facts establishing that any Current Director is interested or otherwise faces a substantial likelihood of personal liability.

Regardless, even assuming, <u>arguendo</u>, that Plaintiffs had established that one or more Current Directors were interested, the Young Complaint fails to allege facts establishing that any Current Director is beholden to another interested Current Director. Under Delaware law, Directors are presumed to be independent. <u>McGowan v. Ferro</u>, Del. Ch., 859 A.2d 1012, 1029 (2004) (citation omitted).  In order to rebut that presumption, Plaintiffs are required to show that the Current Directors' self-interest materially affected their independence. <u>Id.</u>  In other words, to be disqualifying, the nature of the director's self-interest must be "substantial, not merely incidental." <u>Id.</u>

**1.    No Facts Are Alleged Establishing That Paul and Teresa Klaassen Are Beholden to Compensation Committee Members**

Plaintiffs assert that Paul Klaassen and Teresa Klaassen are not independent because they are beholden to the current members of the Compensation Committee (Aprahamian, Callen, and Donohue). <u>Young</u> Compl. ¶¶ 137-138.  Under Delaware law, however, a director may be considered beholden to an entity only when that entity, directly or indirectly, has the unilateral power to decide whether the director "continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such material importance to him that the threatened loss of that

- 34 -

benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively." Orman, 794 A.2d at 25 n.50 (emphasis added).

Plaintiffs assert that the Klaassens "stand[ ] to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by" the Compensation Committee. Young Compl. ¶¶ 137-138. This assertion, however, ignores the overriding fact that the Klaassens own in excess of 6,000,000 shares of Sunrise stock (see Schedule 13G filed by P. and T. Klaassen, Feb. 14, 2007, Ex. 25 hereto) worth more than $200 million. It defies common sense to suggest that the "hundreds of thousands of dollars" of compensation referred to in the Complaint would cause the Klaassens to elevate the wishes of one or more members of the Compensation Committee over the welfare of their enormous stake in the Company or their fiduciary duties to its shareholders, with whom their interests are clearly aligned. See, e.g., In re Walt Disney Co. Derivative Litig., Del. Ch., 731 A.2d 342, 356 (1998), rev'd on other grounds sub nom., Brehm v. Eisner, Del. Supr., 746 A.2d 244 (2000) (where a director owns substantial stake in the corporation, the "only reasonable inference [the court can draw] is that he is an economically rational individual whose priority is to protect the value of his" investment, "not someone who would intentionally risk his own and his family's interests in order to placate" another director).

2.    **No Facts Are Alleged Establishing That Paul and Teresa Klaassen Are Incapable of Considering a Demand Based on Their Relationship with Sunrise**

Plaintiffs suggest that Paul and Teresa Klaassen cannot properly consider demand due to their financial relationship with the Company. <u>Young</u> Compl. ¶¶ 139-141. It is absurd to suggest that the Klaassens "deep inter-related business and personal relationships with the Company" render them incapable of acting independently. <u>Id.</u> at 140. Indeed, the Klaassens' personal and financial ties to the Company support the opposite inference, as their interests are aligned with the Company.

3.    **No Facts Are Alleged Establishing That Paul Klaassen, Teresa Klaassen, and Donohue Are Incapable of Acting Independently**

Plaintiffs allege that Paul Klaassen, Teresa Klaassen, and Donohue cannot act independently of each other because of "inter-related business, professional and personal relationships…." <u>Young</u> Compl. ¶ 142. Specifically, Plaintiffs allege that Paul Klaassen served on the Board of Trustees of Marymount University; that the Klaassens lived with Donohue "for a period of time"; and that Donohue invested in the Klaassens' "first home." <u>Id.</u>

To create a reasonable doubt about the Klaassens' and Donohue's independence, Plaintiffs were required to plead facts that would support a reasonable inference that, because of the nature of their relationship, the Klaassens and Donohue would be more willing to risk their own reputations than risk their relationship with each other. <u>Beam</u>, 845 A.2d at 1052. Plaintiffs' conclusory allegations about mutual service on the Marymount University Board of Trustees are insufficient to overcome the

presumption that the Klaasens and Donohue are independent from each other, as are

Plaintiffs' allegations about the personal relationship between Paul and Teresa Klaasen

and Donohue. 22/ See, e.g., Benihana of Tokyo, Inc. v. Benihana, Inc., Del. Ch., 891

A.2d 150, 178-79 (2005) (40-year friendship between directors not enough to establish

lack of independence from each other).

###### 4.    No Facts Are Alleged Establishing That Paul Klaassen, Little, and Donohue Are Incapable of Acting Independently

Plaintiffs allege that Paul Klaassen, Little, and Donohue cannot act

independently of each other because of "certain professional relationships."

Young Compl. ¶ 143. Specifically, Plaintiffs assert that Paul Klaasen, Little, and

Donohue serve together on the Board of Directors of the U.S. Chamber of Commerce (of

which Donohue is the President and Chief Executive Officer), and as fellow members of

the U.S. Chamber Foundation (of which Donohue is President and Little is Chairman).

Id.

Delaware courts have consistently held that directors are not deemed to

lose their independence merely because they move in the same social circles or hold seats

on the same corporate boards. Beam, 845 A.2d at 1051-52; see also Orman, 794 A.2d at

27 ("the naked assertion of a previous business relationship is not enough to overcome

---

22/    Plaintiffs allegations fall far short of the detailed factual pleading required to overcome the Klaasens' presumption of independence. For example, Plaintiffs assert that Paul and Teresa Klaasen "lived with Donohue for a period of time" and that Donohue "invested" in the Klaasen's first home, but allege no particularized facts about the timing or circumstances of these events. These broad allegations cannot create an inference that the Klaasens' relationship with Donohue is such that they are incapable of acting independentlyof him, especially when considered in light of the Klaassens' substantial personal wealth.

the presumption of a director's independence"); <u>Highland Legacy</u>, 2006 WL 741939, at

*6 (conclusory allegations that directors are dominated because they serve together on the

boards of unaffiliated companies is not enough to overcome the presumption of a

director's independence). Plaintiffs' conclusory allegations about mutual service on

boards of the U.S. Chamber of Commerce are insufficient to overcome the presumption

that Paul Klaassen, Little, and Donohue are capable of acting independently.

### 5. No Facts Are Alleged Establishing That Callen Is Incapable of Acting Independently

Plaintiffs vaguely allege that Callen's ability to exercise independent

judgment is affected by his employment with Donaldson, Lufkin & Jenrette; Credit

Suisse First Boston; and Aetna. <u>Young</u> Compl. ¶¶ 144-146. Plaintiffs provide few

details about Callen's alleged employment with these companies or their relationship

with Sunrise, other than to assert that the companies have done business with Sunrise.

There are no allegations demonstrating that Callen, Donaldson, Lufkin & Jenrette, Credit

Suisse First Boston, or Aetna are so dependent on their relationship with Sunrise that

Callen is incapable of acting independently. Thus, these allegations are insufficient to

establish that Callen is incapable of independent judgment. <u>23</u>/

---

<u>23</u>/    See, e.g., <u>Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins</u>, Civ. A. No. 20228, 2004 WL 1949290, at *11 (Del Ch. Aug. 24, 2004) (unpublished) (no inference of control where complaint did not specify the amount of money the challenged director's law firm received from the corporation because court could not determine whether those fees constituted such a large part of the firm's income so as to be material to either the firm or the director); <u>Jacobs v. Yang</u>, Civ. A. No. 206-N, 2004 WL 1728521, at *6 (Del. Ch. Aug. 2, 2004) (no inference of dependence where plaintiff failed to plead facts establishing that the value of the relationship between corporations was material to the allegedly dependent corporation).

**VI.    Under <u>McWane</u>, the Court Should Dismiss or Stay the Delaware Derivative Suit in Favor of the Federal Suits**

Even if the Court does not dismiss the Delaware Derivative Suit for failure to make the required demand, it should nevertheless dismiss or stay the suit in favor of the first-filed claims pending in the District Court, particularly given (a) the duplicative nature of the Young Complaint, (b) the Plaintiffs' problems with the continuous ownership rule, (c) the fact that the Young Complaint alleges only a subset of the claims asserted in the D.C. Derivative Suit, and (d) the pendency of the closely-related D.C. Class Actions in the same court before the same judge.

A Delaware court "should liberally exercise [its] discretion" under <u>McWane</u> to dismiss or stay a case when "(1) a first-filed prior pending action exists in another jurisdiction, (2) that action involves similar parties and issues, and (3) the court in the other jurisdiction is capable of rendering prompt and complete justice." <u>Enodis Corp. v. Amana Co., L.P.</u>, Civ. A. Nos. 18836, 19688, 2007 WL 1242193, at *2 (Del. Ch. Apr. 26, 2007) (unpublished), <u>citing</u> <u>McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.</u>, Del. Supr., 263 A.2d 281, 283 (1970).  In exercising its discretion to dismiss or stay a later-filed action, the Court must also take into account forum non conveniens factors intended to ensure the orderly and efficient administration of justice. <u>Schnell v. Porta Systems Corp.</u>, Civ. A. No. 12,948, 1994 WL 148276, at *3 (Del. Ch. Apr. 12, 1994) (unpublished) (citation omitted).  In this case, all three elements of the <u>McWane</u> doctrine are satisfied, and the relevant forum non conveniens factors favor the dismissal or stay of the instant suit.

A.    **The Federal Suits Were Filed First**

All of the Federal Suits were filed before Plaintiffs filed the instant suit.

Although first-filed status is given less weight in representative actions, it is still a

relevant factor for the Court to consider and weighs in favor of dismissing or staying the

Delaware Derivative Suit.  See Biondi v. Scrushy, Del. Ch., 820 A.2d 1148, 1159 (2003);

see also Kaufman v. Kumar, et al., Civ. A. No. 2418, 2007 WL 1765617, at *2 (Del. Ch.

Jun. 8, 2007) (unpublished) (considering first-filed status in applying McWane in context

of derivative suit).

B.    **The Same Parties and Issues Are Involved**

Plaintiffs in the Delaware Derivative Suit named as defendants 15 current

or former Sunrise directors and/or current or former Sunrise officers.  All 15 of these

individual defendants are named defendants in the D.C. Derivative Suit as well. 24/

Although not all 15 of these individual defendants are named in the D.C. Class Actions,

there is sufficient identity between the defendants in these cases to satisfy the McWane

identity of parties requirement.  See Derdiger v. Tallman, Del. Ch., 773 A.2d 1005, 1014

(2000) ("[I]t is not required that the parties... in both actions be identical. Substantial or

functional identity is sufficient.") (citations omitted).

The Delaware Derivative Suit and the Federal Suits also share the same

core facts, and the Delaware Derivative Suit and the D.C. Derivative Suit share the same

legal claims – the claims in this case are a subset of the more comprehensive claims

---

24/    Named as individual defendants in this case are: P. Klaassen; T. Klaassen; D.
Faeder; T. Newell; B. Swinton; C. Slavin; L. Hulse; T. Tomasso; R. Slager; C. Adams; R.
Aprahamiam; C. Callen; D. Bradley; J. Holladay; T. Donohue.  All of these individual
defendants are named in the D.C. Derivative Suit.

asserted in the D.C. Derivative Suit.  Under McWane, the relevant inquiry is whether the

claims arise from a common nucleus of operative facts, such that they ought to be

brought in the same court at the same time.  Derdiger, 773 A.2d at 1016-17 (citations

omitted).  The instant suit "arises out of" the Defendants' alleged conduct "of authorizing,

or through abdication of duty, permitting the back-dating of stock options grants to and

for the benefit" of the Defendants.  See Young Compl. ¶ 1.  Plaintiffs in this suit allege

that backdated options were granted on ten dates between May 2, 1997, and November

12, 2001.  See Young Compl. ¶¶ 41-68, 81-82.  Plaintiffs in the D.C. Derivative Suit

allege that backdated options were granted on seven of these same dates.  D.C. Derivative

Suit Compl. ¶¶ 66, 72, 73, 74, 75, 76, 78. 25/

   With regard to the claims alleged, both the Delaware Derivative Suit and

the D.C. Derivative Suit claim that by approving and/or receiving these allegedly

backdated stock options, the defendants breached their fiduciary duties and were unjustly

enriched.  See D.C. Derivative Suit Compl. ¶¶ 336-347, 348-350.  Both the Delaware

Derivative Suit and the D.C. Derivative Suit also seek rescission of the allegedly

backdated stock options.  See D.C. Derivative Suit Compl. ¶¶ 199-201; Young Compl.

¶¶ 163-165.

---

25/ The D.C. Derivative Suit plaintiffs challenge five additional options grants that
are not challenged in the Delaware Derivative Suit.  See D.C. Derivative Suit Compl. at
¶¶ 67-68, 70-71, 77.  The D.C. Class Actions plaintiffs allege backdating with respect to
five of the options grants challenged in the Delaware Derivative Suit.  See United Food
Compl. ¶ 96.

**C.    The District Court Is Capable of Providing Complete Justice**

The final <u>McWane</u> factor is met because the District Court is capable of rendering prompt and complete justice. In addition to alleging all of the same claims alleged in the Delaware Derivative Suit, the D.C. Derivative Suit includes other claims arising from both state and federal law.  <u>See</u> D.C. Derivative Suit Compl. ¶¶ 170-175 (Securities and Exchange Act §10(b) and SEC Rule 10b-5); 176-181 (Securities and Exchange Act §14(a)); 182-183 (Securities and Exchange Act §10(a)).  Thus, there is no risk that less than complete justice will be done in the D.C. Derivative Suit, as the claims before the District Court are "broader in scope than those in this action."  <u>See</u> <u>Kaufman</u>, 2007 WL 1765617, at *2 ("well-reasoned decisions of this court...teach that when the allegations in a complaint are essentially a subset of a larger group of prior-pending claims in another jurisdiction, complete and orderly justice is ordinarily more probable to ensue in the foreign court").

**D.    Relevant Forum Non Conveniens Factors Favor a Stay**

In addition, the forum non conveniens factors weigh in favor of the Federal Suits.  It is undoubtedly more convenient and less costly for the derivative claims to proceed along with the direct claims before the same judge in the District Court.

Among the factors considered in this analysis are the relative ease of access to proof; the availability of compulsory process for witnesses; and "all other practical considerations that would make the trial easy, expeditious, and inexpensive." <u>Schnell</u>, 1994 WL 148276, at *3.  Plaintiffs do not allege any personal connections to Delaware, but acknowledge that Sunrise is headquartered in McLean, Virginia (<u>see</u>

Young Compl. ¶ 32), which is within 15 miles driving distance of the District Court. As

such, the vast majority of potential witnesses, documents, and other sources of proof are

located in the Washington metropolitan area. Moreover, if both the D.C. Derivative Suit

and the D.C. Class Actions were to survive the pleadings stage and proceed to discovery,

the District Court is best positioned to ensure that discovery in those two cases is

coordinated and that cumulative effort and expense (nearly all of which is ultimately

borne by the Company) is avoided or at least minimized.

      In addition to the unnecessary burden and expense of litigating in two fora,

Sunrise also faces substantive prejudice if the Delaware Derivative Suit proceeds in this

Court on a different schedule from the D.C. Class Actions. Absent careful staging and

coordination, discovery on the derivative claims could undermine the Company's

defenses to the direct claims asserted against it in the D.C. Class Actions. See, e.g.,

Breault v. Folino, Civ. A. No. SACV010826GLTANX, 2002 WL 31974381 (C.D. Cal.

Mar. 15, 2002) (staying derivative suit in favor of class action was in company's best

interest because the prosecution of the derivative suit would conflict with company's

defense in pending class action); cf. In re E.F. Hutton Banking Practices Litig., 634 F.

Supp. 265, 270 (S.D.N.Y. 1986) (recognizing that directors whom plaintiffs wished to

sue derivatively would be important witnesses for the corporation in pending direct

litigation, and that the derivative suit might "undercut their veracity and general

effectiveness as witnesses" on the corporation's behalf).

      Furthermore, the direct and derivative claims arise from the same conduct

and involve many of the same issues.. Compare Young Compl. ¶¶ 72-86, with First New

York Compl. ¶¶ 51-89. Resolution of the derivative claims may be driven by the outcome of the earlier-filed direct claims. See, e.g., Brudno v. Wise, Civ. A. No. 19953, 2003 WL 1874750, at *3-5 (Del. Ch. Apr. 1, 2003) (unpublished) (staying derivative suit in favor of federal securities class action that was based on same underlying conduct). For example, if the direct claims fail because it is established that there was no backdating, the derivative claims would likewise not survive. 26/

Finally, dismissing or staying this action in favor of the previously-filed Federal Suits comports with traditional notions of comity between the state and federal courts. See Brudno, 2003 WL 1874750, at *1 (staying Delaware derivative suit in favor of pending federal derivative and securities class action). The District Court certainly has the competence and ability to address the derivative claims. Federal courts "have proven time and again their ability to apply and even extend Delaware law in appropriate ways." Corwin v. Silverman, Civ. A. No. 16347, 1999 WL 499456, at *6 (Del. Ch. Jun. 30, 1999) (unpublished). And the District Court's jurisdiction over the direct claims is unquestioned. For all these reasons, it is in Sunrise's best interest (the interest the Plaintiffs ostensibly seek to protect) that the direct and derivative claims proceed under the supervision of one judge in one forum, and thus in Sunrise's interest that the Delaware Derivative Suit be dismissed or, at a minimum, stayed.

---

26/     The D.C. Class Actions allege that the defendants violated the Securities Exchange Act by failing to disclose the allegedly backdated stock options in proxies distributed to shareholders and other SEC filings. See United Food Compl. ¶¶ 167-195. In order to resolve this issue, the federal court will first need to make a factual determination as to whether any of the alleged backdating actually occurred.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the Delaware

Derivative Suit or, in the alternative, stay this suit in favor of earlier-filed claims in the

District Court. At a minimum, the Court should limit the claims of plaintiffs Peter V.

Young and Ellen Roberts Young to those arising from events allegedly taking place

during the period of their purported continuous ownership of Sunrise stock.

ASHBY & GEDDES
*/s/ Lawrence C. Ashby (#468)*
Lawrence C. Ashby (#468)
Richard D. Heins (#3000)
Richard L. Renck (3893)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
(302-654-1888)

*Attorneys for Sunrise Senior Living, Inc.*

OF COUNSEL
HOGAN & HARTSON LLP
George H. Mernick, III
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202-637-5600)

HOGAN & HARTSON LLP
N. Thomas Connally
Jon M. Talotta
8300 Greensboro Drive, Suite 1100
McLean, VA 22102
(703-610-6100)

Dated: November 2, 2007

## <u>CERTIFICATE OF SERVICE</u>

I, Richard L. Renck, hereby certify that on the 2nd day of November 2007, I caused a true

and correct copy of the **Opening Brief In Support of Motion to Dismiss Or, In the**

**Alternative, To Stay By Nominal Defendant Sunrise Senior Living, Inc.** to be served on

counsel listed below via LexisNexis File & Serve:

Carmella P. Keener
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070

Arthur G. Connolly, III
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE 19801

Kenneth Nachbar
Morris Nichols Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

*/s/ Richard L. Renck (#3893)*
Richard L. Renck (#3893)

# EXHIBIT  13



# FORM 10-Q

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: November 10, 1998 (period: September 30, 1998)**

Quarterly report which provides a continuing view of a company's financial position

1

=====================================================================================

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-Q

(Mark One)
[X] Quarterly Report Pursuant to Section 13 or 15(d) of the Securities
    Exchange Act of 1934 For the Period Ended September 30, 1998

OR

[ ] Transition Report Pursuant to Section 13 or 15(d) of the Securities
    Exchange Act of 1934 For the Transition Period From _____ to
    _____

COMMISSION FILE NUMBER:  0-20765

SUNRISE ASSISTED LIVING, INC.
(Exact name of registrant as specified in its charter)

DELAWARE                                      54-1746596
(State or other jurisdiction of               (I.R.S. Employer
incorporation of organization)                Identification No.)

9401 LEE HIGHWAY, SUITE 300
FAIRFAX, VIRGINIA 22031
(Address of principal executive offices)

(703) 273-7500
(Registrant's telephone number, including area code)

        Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter periods that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.

            Yes  X               No   _____
                 -----

As of November 2, 1998, there were 19,384,082 shares of the Registrant's Common
Stock outstanding.

=====================================================================================

Source: SUNRISE SENIOR LIVIN, 10-Q, November 10, 1998

2

SUNRISE ASSISTED LIVING, INC.

FORM 10-Q

SEPTEMBER 30, 1998

INDEX

PART I.  FINANCIAL INFORMATION                                    PAGE

Item 1. Financial Statements

    Consolidated Balance Sheets at September 30, 1998 and
    December 31, 1997                                            3

    Consolidated Statements of Operations for the three months
    ended September 30, 1998 and 1997 and nine months ended
    September 30, 1998 and 1997                                  4

    Consolidated Statements of Cash Flows for the nine
    months ended September 30, 1998 and 1997                     5

    Notes to Consolidated Financial Statements                   6

Item 2. Management's Discussion and Analysis of Financial
    Condition and Results of Operations                         12


PART II. OTHER INFORMATION

    Item 6. Exhibits and Reports on Form 8-K                    22

    Signatures                                                  22

2

Source: SUNRISE SENIOR LIVIN, 10-Q, November 10, 1998

8

SUNRISE ASSISTED LIVING, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Unaudited)

3. STOCK OPTION PLANS (CONTINUED)

A summary of the Company's stock option activity and related information as of September 30, 1998, is presented below:

| Fixed Options | Shares (000) | Weighted - Average Exercise Price |
|---|---|---|
| Outstanding - January 1, 1998 | 3,156 | $22.76 |
| Granted | 2,969 | 31.72 |
| Exercised | (318) | 15.43 |
| Forfeited | (1,973) | 36.74 |
| Outstanding - September 30, 1998 | 3,834 | 23.12 |
| Exercisable - September 30, 1998 | 761 | |

The following table summarizes information about stock options outstanding at September 30, 1998:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Number Outstanding (000) | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable (000) | Weighted-Average Exercise Price |
| $ 3.00 to 8.00 | 236 | 6.9 | $ 5.55 | 152 | $ 5.64 |
| 8.01 to 20.00 | 375 | 7.6 | 16.97 | 226 | 16.70 |
| 20.01 to 25.63 | 3,188 | 9.2 | 24.95 | 352 | 25.04 |
| 25.64 to 44.56 | 35 | 9.2 | 40.06 | 31 | 41.28 |
| | 3,834 | | | 761 | |

In September 1998, the Company canceled 1.6 million options granted to employees at exercise prices greater than $29 and granted an equal number of options with an exercise price of $25. In connection with the new grants certain vesting periods of the executive officers were extended.

8

# EXHIBIT  14



# FORM DEF 14A

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: April 06, 1999 (period: April 26, 1999)**

Official notification to shareholders of matters to be brought to a vote (Proxy)

13

OPTION GRANTS

The following table contains certain information with respect to stock options granted in 1998 to each of the named executive officers of Sunrise, including repriced options. All options granted in 1998, other than repriced options, were ten-year non-qualified options.

OPTION GRANTS IN LAST FISCAL YEAR

| NAME | SHARES OF COMMON STOCK UNDERLYING OPTIONS GRANTED | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE ($/SH) | EXPIRATION DATE | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM | |
|---|---|---|---|---|---|---|
| | | | | | 5% ($) | 10% ($) |
| Paul J. Klaassen | -0- | -0-% | $-0- | -0- | $-0- | $-0- |
| David W. Faeder | 200,000(1) | 6.0 | 43.50 | 3/3/08 | 5,512,106 | 13,930,403 |
| | 200,000(2) | 6.0 | 25.00 | 3/3/08 | 2,523,942 | 6,436,046 |
| Thomas B. Newell | 200,000(1) | 6.0 | 43.50 | 3/3/08 | 5,512,106 | 13,930,403 |
| | 200,000(2) | 6.0 | 25.00 | 3/3/08 | 2,523,942 | 6,436,046 |
| Brian C. Swinton | 100,000(1) | 3.0 | 43.50 | 3/3/08 | 2,756,053 | 6,965,201 |
| | 100,000(2) | 3.0 | 25.00 | 3/3/08 | 1,261,971 | 3,218,023 |
| Tiffany Tomasso | 100,000(1) | 3.0 | 43.50 | 3/3/08 | 2,756,053 | 6,965,201 |
| | 100,000(1) | 3.0 | 44.00 | 1/19/08 | 2,767,136 | 7,012,467 |
| | 100,000(2) | 3.0 | 25.00 | 3/3/08 | 1,261,971 | 3,218,023 |
| | 100,000(2) | 3.0 | 25.00 | 1/19/08 | 1,261,971 | 3,218,023 |
| | 30,000(2) | 0.9 | 25.00 | 8/28/07 | 378,591 | 965,407 |

- ----------------------

(1)    These options were canceled upon the regrant of a corresponding number of options in September 1998, as indicated in the table. The original vesting period of the options was four years. Vesting of options is accelerated if the options are not assumed in connection with any dissolution or liquidation of Sunrise, the sale of substantially all of Sunrise's assets, a merger, reorganization or consolidation in which Sunrise is not the surviving corporation or any other transaction approved by the board of directors which results in any person or entity owning 80% or more of the total combined voting power of all classes of stock of Sunrise.

(2)    Represents options regranted in September 1998. The regranted options vest over a five-year period, as follows: 15%, 15%, 20%, 20%, and 30%.

- 10 -

Source: SUNRISE SENIOR LIVIN, DEF 14A, April 06, 1999

# EXHIBIT  15



# FORM 10–K

## SUNRISE SENIOR LIVING INC – SRZ

**Filed: March 31, 1998 (period: December 31, 1997)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## PART IV

Item 14. Exhibits. Financial Statement Schedules. and Reports

## PART I

**ITEM 1.**   BUSINESS.
**ITEM 2.**   PROPERTIES.
**ITEM 3.**   LEGAL PROCEEDINGS.
**ITEM 4.**   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

## PART II

**ITEM 5.**   MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED
STOCKHOLDER
**ITEM 6.**   SELECTED FINANCIAL DATA.
**ITEM 7.**   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND
**ITEM 7A.**  QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK.
**ITEM 8.**   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.
**ITEM 9.**   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON
ACCOUNTING AND

## PART III

**ITEM 10.**  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.
**ITEM 11.**  EXECUTIVE COMPENSATION.
**ITEM 12.**  SECURITIES OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND
MANAGEMENT.
**ITEM 13.**  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.

## PART IV

**ITEM 14.**  EXHIBITS. FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON
FORM 8–K
SIGNATURES
INDEX TO EXHIBITS
EX–10.20 (SUNRISE ASSISTED LIVING, INC.1995 STOCK OPTION PLAN, AS
AMENDED)
EX–10.21 (Material contracts)

EX–10.24 (Material contracts)

EX–10.25 (SUNRISE ASSISTED LIVING, INC.1997 STOCK OPTION PLAN, AS
AMENDED)
EX–10.31.1 (with the Agent, the "Lenders") who are particto an Amended and Restated
Agency Agreement orestated or substituted from time to time, th)


EX-10.31.2 (AMENDED AND RESTATED FINANCING AND SECURITY A(MASTER AGREEMENT))

EX-10.31.3 (AMENDED AND RESTATED MASTER CONSTRUCTION LOAN)

EX-10.31.4 (MANAGEMENT FEE SUBORDINATION AGREEMENT)

EX-10.31.5 (AMENDED AND RESTATED PLEDGE,ASSIGNMENT AND SECURITY AGREEMENT(MASTER))

EX-10.31.6 (THIS MASTER GUARANTY OF PERFORMANCE (the "Agr23rd day of December, 1997, by SUNRISE ASSISTcorporation (the "Guarantor") in favor of NAT)

EX-10.31.7 (COLLATERAL ASSIGNMENT OF OPERATINGAGREEMENTS AND MANAGEMENT CONTRACTS(MASTER))

EX-10.31.8 (AMENDED AND RESTATED COLLATERAL ASSIGNMENT OFPARTICIPATION AGREEMENTS AND RESIDENT AGREEME(MASTER))

EX-10.31.9 (AMENDED AND RESTATED MASTERGUARANTY OF PAYMENT AGREEMENT)

EX-13 (Annual report to security holders)

EX-21 (Subsidiaries of the registrant)

EX-23 (Consents of experts and counsel)

EX-27.1

EX-27.2

EX-27.3

22

INDEX TO EXHIBITS

| Exhibit Number | Identity of Exhibit | Page (by Sequential Numbering System) |
|---|---|---|
| 3.1 | Restated Certificate of Incorporation of the Company (Exhibit 3.1 to the Company's Form S-1 Registration Statement No. 333- 13731). | |
| 3.2 | Amended and Restated Bylaws of the Company, as amended (Exhibit 3 to the Company's Form 10-Q for the quarter ended September 30, 1997). | |
| 4.1 | Form of Common Stock certificate (Exhibit 4.1 to the Company's Form S-1 Registration Statement No. 333-13731). | |
| 4.2 | Stockholder Rights Agreement (Exhibit 4.2 to the Company's Form S-1 Registration Statement No. 333-13731). | |
| 10.1 | Assignment and Contribution Agreement, effective as of January 4, 1995, by and between Paul and Teresa Klaassen and the Company (Exhibit 10.1.1 to the Company's Form S-1 Registration Statement No. 333-2582). | |
| 10.2 | Assignment and Contribution Agreement, dated as of January 4, 1995, by and between Paul J. Klaassen and Teresa M. Klaassen, Sunrise Partners, L.P. and Sunrise Assisted Living Investments, Inc. (Exhibit 10.1.2 to the Company's Form S-1 Registration Statement No. 333-2582). | |
| 10.3 | Letter Agreement, dated January 4, 1995, from Paul J. Klaassen and Teresa M. Klaassen to the Series A Preferred Stockholders regarding cash distributions from Sunrise Retirement Investments, Inc., Sunrise Terrace of Gunston, Inc., Sunrise Terrace of Countryside, Inc. and Sunrise Atrium, Inc. (Exhibit | |

-22-

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

23

10.19 to the Company's Form S-1 Registration Statement No. 33-2852).

10.4      Registration Agreement, dated January 4, 1995, by and among the Company, the Investors (as defined therein) and Paul and Teresa Klaassen (Exhibit 10.3 to the Company's Form S-1 Registration Statement No. 333-2582).

10.5      Promissory Note, dated June 8, 1994, executed by Sunrise Assisted Living Limited Partnership in favor of General Electric Capital Corporation (Exhibit 10.4 to the Company's Form S-1 Registration Statement No. 333-2582).

10.6      Indemnity Agreement dated as of June 8, 1994 by Paul J. Klaassen and Teresa M. Klaassen to and for the benefit of General Electric Capital Corporation (Exhibit 10.4.1 to the Company's Form S-1 Registration Statement No. 333-2582).

10.7      First Loan Modification Agreement dated as of February 15, 1996 by and between General Electric Capital Corporation and Sunrise Assisted Living Limited Partnership (Exhibit 10.4.2 to the Company's Form S-1 Registration Statement No. 333-2582).

10.8      Second Loan Modification Agreement dated as of May 1, 1996 by and between General Electric Capital Corporation and Sunrise Assisted Living Limited Partnership (Exhibit 10.4.3 to the Company's Form S-1 Registration Statement No. 333-2582).

10.9      Letter Agreement dated as of May 1, 1996 by and between General Electric Capital Corporation and Sunrise Assisted Living Limited Partnership (Exhibit 10.4.4 to the Company's Form S-1 Registration Statement No. 333-2582).

10.10    Letter agreement dated as of December 30, 1996 by and between General Electric Capital Corporation and Sunrise Assisted Living Partnership (Exhibit 10.11 to the Company's 1996 Form 10-K).

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

24

| | |
|---|---|
| 10.11 | Third Loan Modification Agreement dated as of March 4, 1997 by and between General Electric Capital Corporation and Sunrise Assisted Living Limited Partnership. |
| 10.12 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Arlington, Bluemont Park and Falls Church) (Exhibit 10.5 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.13 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Gunston and Oakton) (Exhibit 10.6 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.14 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and financing Statement, dated as of June 8, 1994 (Fairfax Leasehold) (Exhibit 10.7 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.15 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Warrenton) (Exhibit 10.8 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.16 | Credit Line Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Countryside and Leesburg) (Exhibit 10.9 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.17 | First Mortgage and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, dated as of June 8, 1994 (Boca Raton) (Exhibit 10.10 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.18 | First Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and |

-24-

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

25

|       | Financing Statement, dated as of June 8, 1994 (Frederick) (Exhibit 10.11 to the Company's Form S-1 Registration Statement No. 333-2582). |
|-------|---|
| 10.19 | First Deed of Trust and Security Agreement, Assignment of Leases and Rents, Fixture Filing and Financing Statement, Dated as of June 8, 1994 (Mercer Island) (Exhibit 10.12 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.20 | 1995 Stock Option Plan, as amended. |
| 10.21 | 1996 Directors' Stock Option Plan, as amended. |
| 10.22 | Stock Option Agreement, entered into, effective as of January 4, 1995, by and between the Company and David W. Faeder (Exhibit 10.14 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.23 | Amendment No. 1 to Stock Option Agreement by and between the Company and David W. Faeder (Exhibit 10.14.1 to the Company's Form S-1 Registration Statement No. 333-13731). |
| 10.24 | 1996 Non-Incentive Stock Option Plan, as amended. |
| 10.25 | 1997 Stock Option Plan, as amended. |
| 10.26 | Amended and Restated Lease Agreement and Assignment of Leasehold Right, dated June 6, 1994, by and among Barbara M. Volentine and Teresa M. Klaassen, the Executor of the Estate of Eldon J. Merritt, Sunrise Assisted Living Limited Partnership Assisted Living Group -- Fairfax Associates, and Sunrise Foundation, Inc. (Exhibit 10.15 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.27 | Ground Lease, dated June 7, 1994, by and between Sunrise Assisted Living Limited Partnership and Paul J. Klaassen and Teresa M. Klaassen (Exhibit 10.16 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 10.28 | Amended and Restated Agreement of Sublease, Indemnification and Easements dated February 5, |

-25-

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

26

       1995 by and between Assisted Living Group -- Fairfax Associates and
Sunrise Foundation, as amended (Exhibit 10.17 to the Company's Form
S-1 Registration Statement No. 333-2582).

10.29     Loan Agreement, dated as of March 19, 1996, between the Company and
Creditanstalt-Bankverein (Exhibit 10.20 to the Company's Form S-1
Registration Statement No. 333-2582).

10.30     Warrant Agreement, dated as of March 19, 1996, between the Company
and Creditanstalt-Bankverein (Exhibit 10.21 to the Company's Form S-1
Registration Statement No. 333-2582).

10.31.1   Amended, Restated, Consolidated and Increased Master Promissory Note
dated as of December 23, 1997 by and between NationsBank, N. A. as
agent and for certain additional lenders and Sunrise East Assisted
Living Limited Partnership.

10.31.2   Amended and Restated Financing and Security Agreement dated as of
December 23, 1997 by and between NationsBank, N. A. as agent and for
certain additional lenders and Sunrise East Assisted Living Limited
Partnership.

10.31.3   Amended and Restated Master Construction Loan Agreement dated as of
December 23, 1997 by and between NationsBank, N. A. as agent and for
certain additional lenders and Sunrise East Assisted Living Limited
Partnership.

10.31.4   Management Fee Subordination Agreement dated as of December 23, 1997
by and between NationsBank, N. A. as agent and for certain additional
lenders and Sunrise East Assisted Living Limited Partnership.

10.31.5   Amended and Restated Pledge, Assignment and Security Agreement dated
as of December 23, 1997 by and between NationsBank, N. A. as agent
and for certain additional lenders and Sunrise East Assisted Living
Limited Partnership.

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

27

| | |
|---|---|
| 10.31.6 | Master Guaranty of Performance dated as of December 23, 1997 by and between NationsBank, N. A. as agent and for certain additional lenders and Sunrise East Assisted Living Limited Partnership. |
| 10.31.7 | Amended and Restated Collateral Assignment of Operating Agreements and Management Contracts dated as of December 23, 1997 by and between NationsBank, N. A. as agent and for certain additional lenders and Sunrise East Assisted Living Limited Partnership. |
| 10.31.8 | Amended and Restated Collateral Assignment of Licenses, Participation Agreements and Resident Agreements dated as of December 23, 1997 by and between NationsBank, N. A. as agent and for certain additional lenders and Sunrise East Assisted Living Limited Partnership. |
| 10.31.9 | Amended and Restated Master Guarantee of Payment Agreement dated as of December 23, 1997 by and between NationsBank, N. A. as agent and for certain additional lenders and Sunrise East Assisted Living Limited Partnership. |
| 10.32 | Form of Indemnification Agreement (Exhibit 10.24 to the Company's Form S-1 Registration Statement No. 333-2582). |
| 13 | 1997 Annual Report to Stockholders (which is not deemed to be "filed" except to the extent that portions thereof are expressly incorporated by reference in this Annual Report on Form 10-K). |
| 21 | Subsidiaries of the Registrant. |
| 23 | Consent of Ernst & Young LLP. |
| 27.1 | Financial Data Schedule as of and for the year ended December 31, 1997. |
| 27.2 | Restated Financial Data Schedule as of and for the nine months ended September 30, 1997, as of and for the six months ended June 30, 1997, and as of and for the three months ended March 31, 1997. |
| 27.3 | Restated Financial Data Schedule as of and for the year ended December 31, 1996, as of and for the nine months ended September 30, 1996, and as of and for the six months ended June 30, 1996. |

-27-

</TEXT>
</DOCUMENT>

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

1

EXHIBIT 10.21

SUNRISE ASSISTED LIVING, INC.
1996 DIRECTORS' STOCK OPTION PLAN, AS AMENDED

1.      NAME AND PURPOSE.

1.1      This plan is the SUNRISE ASSISTED LIVING, INC. 1996 DIRECTORS' STOCK OPTION PLAN (the "Plan").

1.2      The purposes of the Plan are to enhance the Company's ability to attract and retain highly qualified individuals to serve as members of the Company's Board of Directors and to provide additional incentives to Directors to promote the success of the Company. The Plan provides Directors of the Company an opportunity to purchase shares of the Stock of the Company pursuant to Options. Options granted under the Plan shall not constitute "incentive stock options" within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended.

1.3      This Plan is intended to constitute a "formula plan" and the Directors are intended to be "disinterested administrators" of Other Plans for purposes of Rule 16b-3 under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

2.      DEFINITIONS.

For purposes of interpreting the Plan and related documents (including Stock Option Agreements), the following definitions shall apply:

2.1      "Additional Option" means any Option other than an Initial Option.

2.2      "Board" means the Board of Directors of the Company.

2.3      "Commencement of Service" means the date of election of the Director to his or her first term as a Director.

2.4      "Company" means Sunrise Assisted Living, Inc., a Delaware corporation.

2.5      "Director" means a member of the Company's Board who is not an officer or employee of the Company or any of its subsidiaries and was not serving as a Series A Director (as defined in that certain Stockholders' Agreement dated as of January 4, 1995) on the Effective Date.

2.6      "Effective Date" means the date the Plan was adopted by the Board.

2.7      "Exercise Price" means the Option Price multiplied by the number of shares of Stock purchased pursuant to exercise of an Option.

2.8      "Expiration Date" means the tenth anniversary of the Grant Date, or, if earlier, the termination of the Option pursuant to Section 4.2(c).

2

2.9    "Fair Market Value" means the value of each share of Stock subject to this Plan determined as follows:  If on the Grant Date or other determination date the Stock is listed on an established national or regional stock exchange, is admitted to quotation on the National Association of Securities Dealers Automated Quotation System, or is publicly traded on an established securities market, the Fair Market Value of the Stock shall be the closing price of the Stock on such exchange or in such market (the highest such closing price if there is more than one such exchange or market) on the trading day immediately preceding the Grant Day or other determination date (or, if there is no such reported closing price, the Fair Market Value shall be the mean between the highest bid and lowest asked prices or between the high and low sale prices on such trading day), or, if no sale of the Stock is reported for such trading day, on the next preceding day on which any sale shall have been reported.  If the Stock is not listed on such an exchange, quoted on such System or traded on such a market, Fair Market Value shall be determined by the Board in good faith.

2.10    "Grant Date" means the date on which an Option takes effect pursuant to Section 7 of this Plan.

2.11    "Initial Option" means an Option received by each Director as of the Director's Commencement of Service.

2.12    "Option" means any option to purchase one or more shares of Stock pursuant to this Plan including both Initial Options and Additional Options.

2.13    "Optionee" means a person who holds an Option under this Plan.

2.14    "Option Period" means the period during which Options may be exercised as defined in Section 9.

2.15    "Option Price" means the purchase price for each share of Stock subject to an Option.

2.16    "Other Plan" means the Sunrise Assisted Living, Inc. 1995 Stock Option Plan and any other stock option plan adopted by the Company or any of its subsidiaries other than the Plan.

2.17    "1933 Act" means the Securities Act of 1933, as now in effect or as hereafter amended.

2.18    "Stock" means the Common Stock, par value $.01 per share, of the Company.

2.19    "Stock Option Agreement" means the written agreement evidencing the grant of an Option hereunder.

2

3

3.    ADMINISTRATION OF THE PLAN.

The Plan shall be administered by the Board.  The Board's responsibilities under the Plan shall be limited to taking all legal actions necessary to document the Options provided herein, to maintain appropriate records and reports regarding those Options, and to take all acts authorized by this Plan.

4.    STOCK SUBJECT TO THE PLAN.

4.1    Subject to adjustments made pursuant to Section 4.2, the maximum number of shares of Stock which may be issued pursuant to the Plan shall not exceed 100,000.  If any Option expires, terminates or is canceled for any reason before it is exercised in full, the shares of Stock that were subject to the unexercised portion of the Option shall be available for future Options granted under the Plan.

4.2    (a)    If the outstanding shares of Stock are increased or decreased or changed into or exchanged for a different number or kind of shares or other securities of the Company by reason of any recapitalization, reclassification, stock split-up, combination of shares, exchange of shares, stock dividend or other distribution payable on capital stock, or other increase or decrease in such shares effected without receipt of consideration by the Company, occurring after the effective date of the Plan, the number and kinds of shares for which Options may be granted under the Plan shall be adjusted proportionately and accordingly by the Company.  In addition, the number and kind of shares for which Options are outstanding shall be adjusted proportionately and accordingly so that the proportionate interest of the holder of the Option immediately following such event shall, to the extent practicable, be the same as immediately prior to such event.  Any such adjustment in outstanding Options shall not change the aggregate Option Price payable with respect to shares subject to the unexercised portion of the Option outstanding but shall include a corresponding proportionate adjustment in the Option Price per share.

(b)    Subject to Subsection (c) hereof, if the Company shall be the surviving corporation in any reorganization, merger or consolidation of the Company with one or more other corporations, any Option theretofore granted pursuant to the Plan shall pertain to and apply to the securities to which a holder of the number of shares of Stock subject to such Option would have been entitled immediately following such reorganization, merger or consolidation, with a corresponding proportionate adjustment of the Option Price per share so that the aggregate Option Price thereafter shall be the same as the aggregate Option Price of the shares remaining subject to the Option immediately prior to such reorganization, merger or consolidation.

(c)    Upon the dissolution or liquidation of the Company, or upon a merger, consolidation or reorganization of the Company with one or more other corporations in which the Company is not the surviving corporation, or upon a sale of all or substantially all of the assets of the Company to another corporation, or upon any transaction (including, without limitation, a merger or reorganization in which the Company is the surviving corporation) approved by the Board which results in any person

3

4

or entity owning 80 percent or more of the combined voting power of all classes of stock of the Company, the Plan and all Options outstanding hereunder shall terminate, except to the extent provision is made in writing in connection with such transaction for the continuation of the Plan, the assumption of the Options theretofore granted, or for the substitution for such Options of new options covering the stock of a successor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kinds of shares and exercise prices, in which event the Plan (if applicable) and Options theretofore granted shall continue in the manner and under the terms so provided.  In the event of any such termination of the Plan and Options, each individual holding an Option shall have the right immediately prior to the occurrence of such termination and during such period occurring prior to such termination as the Board in its sole discretion shall determine and designate, to exercise such Option to the extent that such Option was otherwise exercisable at the time such termination occurs.  The Board shall send written notice of an event that will result in such a termination to all individuals who hold Options not later than the time at which the Company gives notice thereof to its stockholders.

            (d)     Adjustments under this Section 4.2 related to stock or securities of the Company shall be made by the Board, whose determination in that respect shall be final, binding, and conclusive.  No fractional shares of Stock or units of other securities shall be issued pursuant to any such adjustment, and any fractions resulting from any such adjustment shall be eliminated in each case by rounding downward to the nearest whole share or unit.

            (e)     The grant of an Option pursuant to the Plan shall not affect or limit in any way the right or power of the Company to make adjustments, reclassifications, reorganizations or changes of its capital or business structure or to merge, consolidate, dissolve or liquidate, or to sell or transfer all or any part of its business or assets.

    5.     ELIGIBILITY.

            Eligibility under this Plan is limited to Directors of the Company.

    6.     THE OPTION PRICE.

            The Option Price of the Stock covered by each Option granted under this Plan shall be the greater of the Fair Market Value or the par value of such Stock on the Grant Date.  The Option Price shall be subject to adjustment as provided in Section 4.2 hereof.

    7.     NUMBER OF SHARES AND GRANT DATES.

            Each Director whose Commencement of Service is after the Effective Date and before termination of the Plan shall be granted an Initial Option, as of the date of the Director's Commencement of Service, to purchase 10,000 shares of Stock.  An Additional

4

5

Option to purchase 5,000 shares of Stock shall be granted immediately after each subsequent annual meeting of the Company's stockholders (commencing with the 1997 annual meeting) occurring before the Plan terminates to each Director who is then serving on the Board. Notwithstanding the foregoing, no Director shall be eligible to receive an Additional Option grant if on the Grant Date such individual also is an officer or employee of the Company or any of its subsidiaries.

8.     VESTING OF OPTIONS.

Subject to the provisions of Section 9, the Initial and Additional Options shall be vested upon the respective Grant Date (but shall not be exercisable before approval of the Plan by stockholders).

9.     OPTION PERIOD.

An Option shall be exercisable only during the Option Period. The Option Period shall commence six months after the later of (i) the Grant Date or (ii) the date on which the Plan is approved by the stockholders of the Company (or, if a six-month delay on the sale of stock acquired pursuant to the exercise of an Option is no longer necessary to satisfy the requirements of Rule 16b-3 under the Exchange Act, upon the later of such dates), and shall end at the close of business on the Expiration Date. Termination of the Optionee's status as a Director for any reason shall not cause an Option to terminate.

10.    TIMING AND METHOD OF EXERCISE.

Subject to the limitations of Sections 8 and 9, an Optionee may, at any time, exercise an Option with respect to all or any part of the shares of Stock then subject to such Option by giving the Company written notice of exercise, specifying the number of shares as to which the Option is being exercised. Such notice shall be addressed to the Secretary of the Company at its principal office, and shall be effective when actually received (by personal delivery, fax or other delivery) by the Secretary of the Company. Such notice shall be accompanied by an amount equal to the Exercise Price of such shares, in the form of any one or combination of the following: cash or cash equivalents, or shares of Stock valued at Fair Market Value in accordance with the Plan. If shares of Stock that are acquired by the Optionee through exercise of an Option or an option issued under an Other Plan are surrendered in payment of the Exercise Price of Options, the Stock surrendered in payment must have been (i) held by the Optionee for more than six months at the time of surrender, or (ii) acquired under an Option granted not less than six months prior to the time of surrender. However, payment in full of the Exercise Price need not accompany the written notice of exercise provided the notice of exercise directs that the Stock certificate or certificates for the shares for which the Option is exercised be delivered to a licensed broker acceptable to the Company as the agent for the individual exercising the Option and, at the time such Stock certificate or certificates are delivered, the broker tenders to the Company cash (or cash equivalents acceptable to the Company) equal to the Exercise Price.

5

6

11.    NO STOCKHOLDER RIGHTS UNDER OPTION.

No Optionee shall have any of the rights of a stockholder with respect to the shares of Stock subject to an Option except to the extent the certificates for such shares shall have been issued upon the exercise of the Option.

12.    CONTINUATION OF SERVICE.

Nothing in the Plan shall confer upon any person any right to continue to serve as a Director.

13.    STOCK OPTION AGREEMENT.

Each Option granted pursuant to the Plan shall be evidenced by a written Stock Option Agreement notifying the Optionee of the grant and incorporating the terms of this Plan.  The Stock Option Agreement shall be executed by the Company and the Optionee.

14.    WITHHOLDING.

The Company shall have the right to withhold, or require an Optionee to remit to the Company, an amount sufficient to satisfy any applicable federal, state, local or foreign withholding tax requirements imposed with respect to exercise of Options.  To the extent permissible under applicable tax, securities, and other laws, the Optionee may satisfy a tax withholding requirement by directing the Company to apply shares of Stock to which the Optionee is entitled as a result of the exercise of an Option to satisfy withholding requirements under this Section 14.

15.    NON-TRANSFERABILITY OF OPTIONS.

Each Option granted pursuant to this Plan shall, during Optionee's lifetime, be exercisable only by Optionee, and neither the Option nor any right thereunder shall be transferable by the Optionee by operation of law or otherwise other than by will or the laws of descent and distribution, or pursuant to a qualified domestic relations order as defined in Section 414(p)(1)(B) of the Internal Revenue Code of 1986, as amended and shall not be pledged or hypothecated (by operation of law or otherwise) or subject to execution, attachment or similar processes.

16.    USE OF PROCEEDS.

Cash proceeds realized from the sale of Stock pursuant to Options granted under the Plan shall constitute general funds of the Company.

6

Source: SUNRISE SENIOR LIVIN, 10-K, March 31, 1998

7

17.    ADOPTION, AMENDMENT, SUSPENSION AND TERMINATION OF THE PLAN.

17.1    The Plan shall be effective as of the date of adoption by the Board, subject to approval of the Plan within one year of its adoption by the Board by the affirmative votes of the holders of a majority of the Stock of the Company present, or represented, and entitled to vote at a meeting duly held in accordance with applicable laws of the state of Delaware, or by consent as permitted by law, provided, that upon approval of the Plan by the stockholders of the Company, all Options granted under the Plan on or after the Effective Date shall be fully effective as if the stockholders had approved the Plan on the Effective Date.

17.2    Subject to the limitation of Section 17.4, the Board may at any time suspend or terminate the Plan, and may amend it from time to time in such respects as the Board may deem advisable; provided, however, to the extent required under Rule 16b-3 under the Exchange Act as in effect at the time of such amendment, the Board shall not amend the Plan in the following respects without the approval of stockholders then sufficient to approve the Plan in the first instance:

(a)    To materially increase the benefits accruing to participants under the Plan (for example, to increase the number of Options that may be granted to any Director);

(b)    To materially increase the maximum number of shares of Stock that may be issued under the Plan; or

(c)    To materially modify the requirements as to eligibility for participation in the Plan.

17.3    No Option may be granted during any suspension or after the termination of the Plan, and no amendment, suspension or termination of the Plan shall, without the Optionee's consent, alter or impair any rights or obligations under any Stock Option Agreement previously entered into under the Plan.  This Plan shall terminate ten years after the Effective Date unless previously terminated pursuant to Section 4.2 or by the Board pursuant to this Section 17.

17.4    Notwithstanding the provisions of Section 17.2, except to the extent permissible under Rule 16b-3 under the Exchange Act, the formula provisions of this Plan shall not be amended more than once in any six-month period other than to comport with changes in the Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974, or the rules promulgated thereunder.

18.    REQUIREMENTS OF LAW.

18.1    The Company shall not be required to sell or issue any shares of Stock under any Option if the sale or issuance of such shares would constitute a violation by the individual exercising the Option or the Company of any provisions of any law or

7

8

regulation of any governmental authority, including without limitation any federal or state securities laws or regulations. Specifically in connection with the 1933 Act, upon exercise of any Option, unless a registration statement under such Act is in effect with respect to the shares of Stock covered by such Option, the Company shall not be required to sell or issue such shares unless the Board has received evidence satisfactory to the Board that the holder of such Option may acquire such shares pursuant to an exemption from registration under such Act. Any determination in this connection by the Board shall be final, binding, and conclusive. The Company may, but shall in no event be obligated to, register any securities covered hereby pursuant to the 1933 Act. The Company shall not be obligated to take any affirmative action in order to cause the exercise of an Option or the issuance of shares pursuant thereto to comply with any law or regulation of any governmental authority. As to any jurisdiction that expressly imposes the requirement that an Option shall not be exercisable unless and until the shares of Stock covered by such Option are registered or are subject to an available exemption from registration, the exercise of such Option (under circumstances in which the laws of such jurisdiction apply) shall be deemed conditioned upon the effectiveness of such registration or the availability of such an exemption.

18.2    The intent of this Plan is to qualify for the exemption provided by Rule 16b-3 under the Exchange Act. To the extent any provision of the Plan or action by the Plan administrators does not comply with the requirements of Rule 16b-3, it shall be deemed inoperative, to the extent permitted by law and deemed advisable by the Plan administrators, and shall not affect the validity of the Plan. In the event Rule 16b-3 is revised or replaced, the Board may exercise discretion to modify this Plan in any respect necessary to satisfy the requirements of the revised exemption or its replacement.

19.    GOVERNING LAW.

The validity, interpretation and effect of this Plan, and the rights of all persons hereunder, shall be governed by and determined in accordance with the laws of Delaware, other than the choice of law rules thereof.

* * * * *

8

</TEXT>
</DOCUMENT>

# EXHIBIT  16



# FORM 10−K

## SUNRISE SENIOR LIVING INC − SRZ

**Filed: March 31, 1999 (period: December 31, 1998)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## PART IV

Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K............ 68

## PART I

**ITEM 1.**   BUSINESS.
**ITEM 2.**   PROPERTIES.
**ITEM 3.**   LEGAL PROCEEDINGS.
**ITEM 4.**   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

## PART II

**ITEM 5.**   MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS.
**ITEM 6.**   SELECTED FINANCIAL DATA
**ITEM 7.**   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
**ITEM 7A.**  QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK.
**ITEM 8.**   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.
**ITEM 9.**   CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND

## PART III

**ITEM 10.**  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT.
**ITEM 11.**  EXECUTIVE COMPENSATION.
**ITEM 12.**  SECURITIES OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.
**ITEM 13.**  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.

## PART IV

**ITEM 14.**  EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K.
SIGNATURES
INDEX TO EXHIBITS
EX-10.36 (Material contracts)

EX-10.41 (SUNRISE ASSISTED LIVING, INC.1998 STOCK OPTION PLAN)

EX-21 (Subsidiaries of the registrant)

EX-23 (Consents of experts and counsel)

EX-27

EX−99.3 (FORM OFLETTER AGREEMENT)

EX−99.4 (EXHIBIT 99.4REVOLVING LOAN AGREEMENT)

EX−99.5 (FIRST AMENDMENT TO REVOLVING LOAN AGREEMENT)

EX−99.6 (Pursuant to paragraph 6 of Amendment No. 1 to4, 1999, Sunrise Assisted Living, Inc. ("SunrKarrington Health, Inc. ("Karrington") an add)

EX−99.7 (MANAGEMENT SERVICES AGREEMENTFOR)

EX−99.8 (MANAGEMENT CONSULTING AGREEMENT)

EX−99.9 (DEVELOPMENT AGREEMENT(Edina, Minnesota))

EX−99.10 (DEVELOPMENT AGREEMENT(Farmington Hills, Michigan))

EX−99.11 (DEVELOPMENT AGREEMENT)

72

INDEX TO EXHIBITS

| Exhibit Number | Identity of Exhibit | Page (by Sequential Numbering System) |
|---|---|---|
| 2.1 | Agreement of Merger, dated as of October 18, 1998, among Sunrise, Buckeye Merger Corporation and Karrington (Exhibit 2.1 to Sunrise's Form 8-K dated October 28, 1998). | |
| 2.2 | Amendment No. 1 to Agreement of Merger, dated as of March 4, 1999, among Sunrise, Buckeye Merger Corporation and Karrington (Exhibit 2.1 to Sunrise's From 8-K dated March 5, 1999). | |
| 2.3 | Letter dated October 16, 1998 from Sunrise to Meditrust Mortgage Investments, Inc. setting forth terms and conditions under which Sunrise would acquire certain properties subject to leases and certain mortgage loans. (Exhibit 2.1 to Sunrise's Form 8-K dated December 17, 1998). | |
| 2.4 | Trust Agreement, dated as of December 2, 1998, between the several holders from time to time parties thereto, as the holders, and First Security Bank, National Association, as the Owner Trustee (Sunrise Trust 1998-1) (Exhibit 2.2 to Sunrise's Form 8-K dated December 17, 1998). | |
| 2.5 | Credit Agreement, dated as of December 2, 1998, among First Security Bank, National Association, not individually, except as expressly stated therein, but solely as the Owner Trustee under the Sunrise Trust | |

-1-

73

1998-1, as the Borrower, the several lenders from time to time parties thereto, and Nationsbank, N.A., as the Agent (Exhibit 2.3 to Sunrise's Form 8-K dated December 17, 1998).

2.6    Participation Agreement, dated as of December 2, 1998, among Sunrise Midwest Leasing, L.L.C., as the Construction Agent and as the Lessee, Sunrise, as the Guarantor, First Security Bank, National Association, not individually, except as expressly stated therein, but solely as the Owner Trustee under the Sunrise Trust 1998-1, the various banks and other lending institutions which are parties thereto from time to time, as the holders, the various banks and other lending institutions which are parties thereto from time to time, as the lenders, and Nationsbank, N.A., as the Agent for the Lenders and respecting the Security Documents, as the Agent for the Lenders and the Holders, to the extent of their interests (Exhibit 2.4 to Sunrise's Form 8-K dated December 17, 1998).

2.7    Security Agreement, dated as of December 2, 1998, between First Security Bank, National Association, not individually, but solely as the owner trustee under the Sunrise Trust 1998-1 and Nationsbank, N.A., as the agent for the lenders and the holders and accepted and agreed to by Sunrise Midwest Leasing, L.L.C. (Exhibit 2.5 to Sunrise's Form 8-K dated December 17, 1998).

2.8    Lease Agreement, dated as of December 2, 1998, between First Security Bank, National Association, not individually, but solely as the Owner Trustee under the Sunrise Trust

-2-

74

1998-1, as Lessor and Sunrise Midwest Leasing, L.L.C., as Lessee
(Exhibit 2.6 to Sunrise's Form 8-K dated December 17, 1998).

3.1    Restated Certificate of Incorporation of Sunrise (Exhibit 3.1 to
       Sunrise's Form S-1 Registration Statement No. 333- 13731).

3.2    Amended and Restated Bylaws of Sunrise, as amended (Exhibit 3 to
       Sunrise's Form 10-Q for the quarter ended September 30, 1997).

4.1    Form of common stock certificate (Exhibit 4.1 to Sunrise's Form S-1
       Registration Statement No. 333-13731).

4.2    Stockholder Rights Agreement (Exhibit 4.2 to Sunrise's Form S-1
       Registration Statement No. 333-13731).

4.3    Amendment No. 1 to Rights Agreement, dated as of December 17, 1998,
       between Sunrise and First Union National Bank of North Carolina (Exhibit
       99(a) to Sunrise's Form 8-K dated December 18, 1998).

10.1   Assignment and Contribution Agreement, effective as of January 4, 1995,
       by and between Paul and Teresa Klaassen and Sunrise (Exhibit 10.1.1 to
       Sunrise's Form S-1 Registration Statement No. 333-2582).

10.2   Assignment and Contribution Agreement, dated as of January 4, 1995, by
       and between Paul J. Klaassen and Teresa M. Klaassen, Sunrise Partners,
       L.P. and Sunrise Assisted Living Investments, Inc.

-3-

1

EXHIBIT 10.36

SUNRISE ASSISTED LIVING, INC.
1996 DIRECTORS' STOCK OPTION PLAN, AS AMENDED

1.  NAME AND PURPOSE.

1.1 This plan is the SUNRISE ASSISTED LIVING, INC. 1996 DIRECTORS'
STOCK OPTION PLAN (the "Plan").

1.2 The purposes of the Plan are to enhance the Company's ability
to attract and retain highly qualified individuals to serve as members of the
Company's Board of Directors and to provide additional incentives to Directors
to promote the success of the Company. The Plan provides Directors of the
Company an opportunity to purchase shares of the Stock of the Company pursuant
to Options. Options granted under the Plan shall not constitute "incentive stock
options" within the meaning of Section 422 of the Internal Revenue Code of 1986,
as amended.

1.3 This Plan is intended to constitute a "formula plan" and the
Directors are intended to be "disinterested administrators" of Other Plans for
purposes of Rule 16b-3 under the Securities Exchange Act of 1934, as amended
(the "Exchange Act").

2.  DEFINITIONS.

For purposes of interpreting the Plan and related documents
(including Stock Option Agreements), the following definitions shall apply:

2.1 "Additional Option" means any Option other than an Initial
Option.

2.2 "Board" means the Board of Directors of the Company.

2.3 "Commencement of Service" means the date of election of the
Director to his or her first term as a Director; provided, however, that with
respect to Richard A. Doppelt and Scott A. Meadow, "Commencement of Service"
shall mean the date of each of their respective reelections to the Board of
Directors (if so reelected) at the 1998 annual meeting of stockholders (in the
case of Mr. Doppelt) and at the 2000 annual meeting of stockholders (in the case
of Mr. Meadow).

2.4 "Company" means Sunrise Assisted Living, Inc., a Delaware
corporation.

2.5 "Director" means a member of the Company's Board who is not an
officer or employee of the Company or any of its subsidiaries.

2.6 "Effective Date" means the date the Plan was adopted by the
Board.

2.7 "Exercise Price" means the Option Price multiplied by the
number of shares of Stock purchased pursuant to exercise of an Option.

1

2

2.8 "Expiration Date" means the tenth anniversary of the Grant Date, or, if earlier, the termination of the Option pursuant to Section 4.2(c).

2.9 "Fair Market Value" means the value of each share of Stock subject to this Plan determined as follows: If on the Grant Date or other determination date the Stock is listed on an established national or regional stock exchange, is admitted to quotation on the National Association of Securities Dealers Automated Quotation System, or is publicly traded on an established securities market, the Fair Market Value of the Stock shall be the closing price of the Stock on such exchange or in such market (the highest such closing price if there is more than one such exchange or market) on the trading day immediately preceding the Grant Date or other determination date (or, if there is no such reported closing price, the Fair Market Value shall be the mean between the highest bid and lowest asked prices or between the high and low sale prices on such trading day), or, if no sale of the Stock is reported for such trading day, on the next preceding day on which any sale shall have been reported. If the Stock is not listed on such an exchange, quoted on such System or traded on such a market, Fair Market Value shall be determined by the Board in good faith.

2.10 "Grant Date" means the date on which an Option takes effect pursuant to Section 7 of this Plan.

2.11 "Initial Option" means an Option received by each Director as of the Director's Commencement of Service.

2.12 "Option" means any option to purchase one or more shares of Stock pursuant to this Plan including both Initial Options and Additional Options.

2.13 "Optionee" means a person who holds an Option under this Plan.

2.14 "Option Period" means the period during which Options may be exercised as defined in Section 9.

2.15 "Option Price" means the purchase price for each share of Stock subject to an Option.

2.16 "Other Plan" means the Sunrise Assisted Living, Inc. 1995 Stock Option Plan and any other stock option plan adopted by the Company or any of its subsidiaries other than the Plan.

2.17 "1933 Act" means the Securities Act of 1933, as now in effect or as hereafter amended.

2.18 "Stock" means the Common Stock, par value $.01 per share, of the Company.

2.19 "Stock Option Agreement" means the written agreement evidencing the grant of an Option hereunder.

2

3

3.  ADMINISTRATION OF THE PLAN.

The Plan shall be administered by the Board. The Board's responsibilities under the Plan shall be limited to taking all legal actions necessary to document the Options provided herein, to maintain appropriate records and reports regarding those Options, and to take all acts authorized by this Plan.

4.  STOCK SUBJECT TO THE PLAN.

4.1 Subject to adjustments made pursuant to Section 4.2, the maximum number of shares of Stock which may be issued pursuant to the Plan shall not exceed 75,000. If any Option expires, terminates or is canceled for any reason before it is exercised in full, the shares of Stock that were subject to the unexercised portion of the Option shall be available for future Options granted under the Plan.

4.2 (a) If the outstanding shares of Stock are increased or decreased or changed into or exchanged for a different number or kind of shares or other securities of the Company by reason of any recapitalization, reclassification, stock split-up, combination of shares, exchange of shares, stock dividend or other distribution payable on capital stock, or other increase or decrease in such shares effected without receipt of consideration by the Company, occurring after the effective date of the Plan, the number and kinds of shares for the purchase of which Options may be granted under the Plan shall be adjusted proportionately and accordingly by the Company. In addition, the number and kind of shares for which Options are outstanding shall be adjusted proportionately and accordingly so that the proportionate interest of the holder of the Option immediately following such event shall, to the extent practicable, be the same as immediately prior to such event. Any such adjustment in outstanding Options shall not change the aggregate Option Price payable with respect to shares subject to the unexercised portion of the Option outstanding but shall include a corresponding proportionate adjustment in the Option Price per share.

(b) Subject to Subsection (c) hereof, if the Company shall be the surviving corporation in any reorganization, merger or consolidation of the Company with one or more other corporations, any Option theretofore granted pursuant to the Plan shall pertain to and apply to the securities to which a holder of the number of shares of Stock subject to such Option would have been entitled immediately following such reorganization, merger or consolidation, with a corresponding proportionate adjustment of the Option Price per share so that the aggregate Option Price thereafter shall be the same as the aggregate Option Price of the shares remaining subject to the Option immediately prior to such reorganization, merger or consolidation.

(c) Upon the dissolution or liquidation of the Company, or upon a merger, consolidation or reorganization of the Company with one or more other corporations in which the Company is not the surviving corporation, or upon a sale of all or substantially all of the assets of the Company to another corporation, or upon any transaction (including, without limitation, a merger or reorganization in which the Company is the surviving corporation) approved by the Board which results in any person or entity owning 80 percent or more of the combined voting power of all classes of stock of the Company, the

3

4

Plan and all Options outstanding hereunder shall terminate, except to the extent provision is made in writing in connection with such transaction for the continuation of the Plan, the assumption of the Options theretofore granted, or for the substitution for such Options of new options covering the stock of a successor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kinds of shares and exercise prices, in which event the Plan (if applicable) and Options theretofore granted shall continue in the manner and under the terms so provided. In the event of any such termination of the Plan and Options, each individual holding an Option shall have the right immediately prior to the occurrence of such termination and during such period occurring prior to such termination as the Board in its sole discretion shall determine and designate, to exercise such Option to the extent that such Option was otherwise exercisable at the time such termination occurs. The Board shall send written notice of an event that will result in such a termination to all individuals who hold Options not later than the time at which the Company gives notice thereof to its stockholders.

(d) Adjustments under this Section 4.2 related to stock or securities of the Company shall be made by the Board, whose determination in that respect shall be final, binding, and conclusive. No fractional shares of Stock or units of other securities shall be issued pursuant to any such adjustment, and any fractions resulting from any such adjustment shall be eliminated in each case by rounding downward to the nearest whole share or unit.

(e) The grant of an Option pursuant to the Plan shall not affect or limit in any way the right or power of the Company to make adjustments, reclassifications, reorganizations or changes of its capital or business structure or to merge, consolidate, dissolve or liquidate, or to sell or transfer all or any part of its business or assets.

5.   ELIGIBILITY.

Eligibility under this Plan is limited to Directors of the Company.

6.   THE OPTION PRICE.

The Option Price of the Stock covered by each Option granted under this Plan shall be the greater of the Fair Market Value or the par value of such Stock on the Grant Date. The Option Price shall be subject to adjustment as provided in Section 4.2 hereof.

7.   NUMBER OF SHARES AND GRANT DATES.

Each Director whose Commencement of Service is after the Effective Date and before termination of the Plan shall be granted an Initial Option, as of the date of the Director's Commencement of Service, to purchase 10,000 shares of Stock. An Additional Option to purchase 5,000 shares of Stock shall be granted immediately after each subsequent annual meeting of the Company's stockholders (commencing with the 1997 annual meeting) occurring before the Plan terminates to each Director who is then serving on the Board. Notwithstanding the foregoing, no Director shall be eligible to receive an Additional Option

4

5

grant if on the Grant Date such individual also is an officer or employee of the Company or any of its subsidiaries.

8.    VESTING OF OPTIONS.

Subject to the provisions of Section 9, the Initial and Additional Options shall be vested upon the respective Grant Date (but shall not be exercisable before approval of the Plan by stockholders).

9.    OPTION PERIOD.

An Option shall be exercisable only during the Option Period. The Option Period shall commence six months after the later of (i) the Grant Date or (ii) the date on which the Plan is approved by the stockholders of the Company (or, if a six-month delay on the sale of stock acquired pursuant to the exercise of an Option is no longer necessary to satisfy the requirements of Rule 16b-3 under the Exchange Act, upon the later of such dates), and shall end at the close of business on the Expiration Date. Termination of the Optionee's status as a Director for any reason shall not cause an Option to terminate.

10.    TIMING AND METHOD OF EXERCISE.

Subject to the limitations of Sections 8 and 9, an Optionee may, at any time, exercise an Option with respect to all or any part of the shares of Stock then subject to such Option by giving the Company written notice of exercise, specifying the number of shares as to which the Option is being exercised. Such notice shall be addressed to the Secretary of the Company at its principal office, and shall be effective when actually received (by personal delivery, fax or other delivery) by the Secretary of the Company. Such notice shall be accompanied by an amount equal to the Exercise Price of such shares, in the form of any one or combination of the following: cash or cash equivalents, or shares of Stock valued at Fair Market Value in accordance with the Plan. If shares of Stock that are acquired by the Optionee through exercise of an Option or an option issued under an Other Plan are surrendered in payment of the Exercise Price of Options, the Stock surrendered in payment must have been (i) held by the Optionee for more than six months at the time of surrender, or (ii) acquired under an Option granted not less than six months prior to the time of surrender. However, payment in full of the Exercise Price need not accompany the written notice of exercise provided the notice of exercise directs that the Stock certificate or certificates for the shares for which the Option is exercised be delivered to a licensed broker acceptable to the Company as the agent for the individual exercising the Option and, at the time such Stock certificate or certificates are delivered, the broker tenders to the Company cash (or cash equivalents acceptable to the Company) equal to the Exercise Price.

11.    NO STOCKHOLDER RIGHTS UNDER OPTION.

No Optionee shall have any of the rights of a stockholder with respect to the shares of Stock subject to an Option except to the extent the certificates for such shares shall have been issued upon the exercise of the Option.

5

6

12. CONTINUATION OF SERVICE.

Nothing in the Plan shall confer upon any person any right to continue to serve as a Director.

13. STOCK OPTION AGREEMENT.

Each Option granted pursuant to the Plan shall be evidenced by a written Stock Option Agreement notifying the Optionee of the grant and incorporating the terms of this Plan. The Stock Option Agreement shall be executed by the Company and the Optionee.

14. WITHHOLDING.

The Company shall have the right to withhold, or require an Optionee to remit to the Company, an amount sufficient to satisfy any applicable federal, state, local or foreign withholding tax requirements imposed with respect to exercise of Options. To the extent permissible under applicable tax, securities, and other laws, the Optionee may satisfy a tax withholding requirement by directing the Company to apply shares of Stock to which the Optionee is entitled as a result of the exercise of an Option to satisfy withholding requirements under this Section 14.

15. NON-TRANSFERABILITY OF OPTIONS.

Each Option granted pursuant to this Plan shall, during Optionee's lifetime, be exercisable only by Optionee, and neither the Option nor any right thereunder shall be transferable by the Optionee by operation of law or otherwise other than by will or the laws of descent and distribution, or pursuant to a qualified domestic relations order as defined in Section 414(p)(1)(B) of the Internal Revenue Code of 1986, as amended and shall not be pledged or hypothecated (by operation of law or otherwise) or subject to execution, attachment or similar processes.

16. USE OF PROCEEDS.

Cash proceeds realized from the sale of Stock pursuant to Options granted under the Plan shall constitute general funds of the Company.

17. ADOPTION, AMENDMENT, SUSPENSION AND TERMINATION OF THE PLAN.

17.1 The Plan shall be effective as of the date of adoption by the Board, subject to approval of the Plan within one year of its adoption by the Board by the affirmative votes of the holders of a majority of the Stock of the Company present, or represented, and entitled to vote at a meeting duly held in accordance with applicable laws of the state of Delaware, or by consent as permitted by law, provided, that upon approval of the Plan by the stockholders of the Company, all Options granted under the Plan on or after the Effective Date shall be fully effective as if the stockholders had approved the Plan on the Effective Date.

6

7

17.2 Subject to the limitation of Section 17.4, the Board may at any time suspend or terminate the Plan, and may amend it from time to time in such respects as the Board may deem advisable; provided, however, to the extent required under Rule 16b-3 under the Exchange Act as in effect at the time of such amendment, the Board shall not amend the Plan in the following respects without the approval of stockholders then sufficient to approve the Plan in the first instance:

(a) To materially increase the benefits accruing to participants under the Plan (for example, to increase the number of Options that may be granted to any Director);

(b) To materially increase the maximum number of shares of Stock that may be issued under the Plan; or

(c) To materially modify the requirements as to eligibility for participation in the Plan.

17.3 No Option may be granted during any suspension or after the termination of the Plan, and no amendment, suspension or termination of the Plan shall, without the Optionee's consent, alter or impair any rights or obligations under any Stock Option Agreement previously entered into under the Plan. This Plan shall terminate ten years after the Effective Date unless previously terminated pursuant to Section 4.2 or by the Board pursuant to this Section 17.

17.4 Notwithstanding the provisions of Section 17.2, except to the extent permissible under Rule 16b-3 under the Exchange Act, the formula provisions of this Plan shall not be amended more than once in any six-month period other than to comport with changes in the Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974, or the rules promulgated thereunder.

18. REQUIREMENTS OF LAW.

18.1 The Company shall not be required to sell or issue any shares of Stock under any Option if the sale or issuance of such shares would constitute a violation by the individual exercising the Option or the Company of any provisions of any law or regulation of any governmental authority, including without limitation any federal or state securities laws or regulations. Specifically in connection with the 1933 Act, upon exercise of any Option, unless a registration statement under such Act is in effect with respect to the shares of Stock covered by such Option, the Company shall not be required to sell or issue such shares unless the Board has received evidence satisfactory to the Board that the holder of such Option may acquire such shares pursuant to an exemption from registration under such Act. Any determination in this connection by the Board shall be final, binding, and conclusive. The Company may, but shall in no event be obligated to, register any securities covered hereby pursuant to the 1933 Act. The Company shall not be obligated to take any affirmative action in order to cause the exercise of an Option or the issuance of shares pursuant thereto to comply with any law or regulation of any governmental authority. As to any jurisdiction that expressly imposes the requirement that an Option shall not be

7

8

exercisable unless and until the shares of Stock covered by such Option
are registered or are subject to an available exemption from registration, the
exercise of such Option (under circumstances in which the laws of such
jurisdiction apply) shall be deemed conditioned upon the effectiveness of such
registration or the availability of such an exemption.

18.2 The intent of this Plan is to qualify for the exemption
provided by Rule 16b-3 under the Exchange Act. To the extent any provision of
the Plan or action by the Plan administrators does not comply with the
requirements of Rule 16b-3, it shall be deemed inoperative, to the extent
permitted by law and deemed advisable by the Plan administrators, and shall not
affect the validity of the Plan. In the event Rule 16b-3 is revised or replaced,
the Board may exercise discretion to modify this Plan in any respect necessary
to satisfy the requirements of the revised exemption or its replacement.

19. GOVERNING LAW.

The validity, interpretation and effect of this Plan, and the
rights of all persons hereunder, shall be governed by and determined in
accordance with the laws of Delaware, other than the choice of law rules
thereof.

* * * * *

8

</TEXT>
</DOCUMENT>

# EXHIBIT  17



# FORM DEF 14A

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: April 14, 2000 (period: May 12, 2000)**

Official notification to shareholders of matters to be brought to a vote (Proxy)

11

Stock Option Committee. The members of the stock option committee are Messrs. Bradley, Callen and Donohue, all of whom are non-employee directors. The stock option committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options. The stock option committee held six meetings during 1999.

The entire board of directors of Sunrise acts as a nominating committee for selecting management's nominees for election as directors and has made its nominations for the annual meeting. Sunrise's bylaws require that stockholder nominations for directors be made by timely notice in writing to the secretary of Sunrise. To be timely, notice must be delivered to, or mailed to and received at, the principal executive offices of Sunrise not less than 60 days prior to the meeting. However, if less than 75 days notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder to be timely must be received no later than the close of business on the 15th day following the day on which notice of the date or public disclosure was made. Public notice of the expected date of the annual meeting was made on March 8, 2000 by the issuance of a press release and on March 9, 2000 by the filing of a current report on Form 8-K with the SEC. The annual meeting date subsequently was rescheduled from April 28, 2000 to May 12, 2000 because of delays in printing the annual report to stockholders due to revisions made to reflect the Company's recent reorganization into three separate divisions and to permit additional time for the solicitation of proxies for the annual meeting. A stockholder's notice of nomination must set forth information specified in Sunrise's bylaws concerning each person the stockholder proposes to nominate for election and the nominating stockholder. No nominations by stockholders were received at the time of mailing of this proxy statement. Sunrise's bylaws provide that no person may be elected as a director unless nominated in accordance with the procedures set forth in the bylaws.

COMPENSATION OF DIRECTORS

Non-employee directors are reimbursed for expenses incurred in attending meetings of the board of directors. No fees are paid for attendance at board or committee meetings.

In 1999, Messrs. Aprahamian, Bradley and Donohue each received grants of ten-year non-qualified stock options for 5,000 shares of common stock at an exercise price of $41.25 per share under Sunrise's 1996 directors' stock option plan, as amended. Mr. Callen received an initial option grant in 1999 for 10,000 shares of common stock at an exercise price of $41.25 per share. Mr. Slager also received an initial option grant in 1999 for 10,000 shares of common stock at an exercise price of $36.50 per share. An aggregate of 75,000 shares of common stock were reserved for issuance under the 1996

8

Source: SUNRISE SENIOR LIVIN, DEF 14A, April 14, 2000

20

COMPENSATION DEDUCTIBILITY POLICY

Under Section 162(m) of the Internal Revenue Code of 1986, as amended, and applicable Treasury regulations, no deduction is allowed for annual compensation in excess of $1 million paid by a publicly traded corporation to its chief executive officer and the four other most highly compensated officers. Under those provisions, however, there is no limitation on the deductibility of "qualified performance-based compensation." In general, Sunrise's policy is to maximize the extent of tax deductibility of executive compensation under the provisions of Section 162(m) so long as doing so is compatible with its determinations as to the most appropriate methods and approaches for the design and delivery of compensation to Sunrise's executive officers.

Respectfully submitted,

| Participating Members<br>of the Board of Directors | Participating Members<br>of the Compensation Committee |
|---|---|
| Paul J. Klaassen, Chairman<br>Ronald A. Aprahamian<br>Thomas J. Donohue<br>David W. Faeder<br>Teresa M. Klaassen<br>David G. Bradley<br>Richard R. Slager | Thomas J. Donohue, Chairman<br>Ronald A. Aprahamian<br><br>Participating Members<br>of the Stock Option Committee<br><br>Thomas J. Donohue, Chairman<br>David G. Bradley |

SENIOR EXECUTIVE SEVERANCE PLANS

Effective as of February 25, 2000, the Sunrise board of directors adopted senior executive severance plans under which designated executive officers of Sunrise are eligible to receive severance benefits if such executive officer's employment with Sunrise is terminated by the executive officer within two years after a "change in control" for "good reason" or if, following a change in control, the executive officer's employment is terminated by Sunrise for any reason other than for "cause." Each of the named executive officers is eligible to participate under these plans. For purposes of the plans, a "change in control" means, generally, the acquisition by a third party of more than 50% of the outstanding common stock of Sunrise or of the combined voting power of all voting securities of Sunrise entitled to vote generally in the election of directors, a change in the composition of the board of directors of Sunrise whereby the members of the Sunrise board on the effective date of the plans, or any successor board member approved by a majority of the then-existing Sunrise board members, cease to constitute at least a majority of the board of directors

16

Source: SUNRISE SENIOR LIVIN, DEF 14A, April 14, 2000

24

A company owned by Paul J. Klaassen owns an airplane used by Mr. Klaassen and, from time to time, other Sunrise employees for business travel. In April 2000, Sunrise reimbursed Potomac Pilots, the company that operates the airplane for Mr. Klaassen, $76,433 for fuel and other costs of operating the airplane for Sunrise business travel during 1999.

For a description of certain other transactions involving Sunrise and its directors, see "Compensation Committee Interlocks and Insider Participation."

APPROVAL OF
2000 STOCK OPTION PLAN
(PROPOSAL 2)

On February 25, 2000, the board of directors adopted the 2000 stock option plan, subject to approval of stockholders at the annual meeting. As of that date, there were approximately 1,400 directors, officers and employees of Sunrise and its subsidiaries who would be eligible to participate in the 2000 stock option plan.

The principal provisions of the 2000 stock option plan are summarized below. This summary is not complete and is qualified in its entirety by the terms of the 2000 stock option plan, a copy of which is attached to this proxy statement as Exhibit A.

DESCRIPTION OF 2000 STOCK OPTION PLAN

The 2000 stock option plan will be administered by the stock option committee. A total of 500,000 shares of common stock will be reserved for issuance under the 2000 stock option plan. All directors, officers and employees of Sunrise or any subsidiary, and any consultant or adviser providing bona fide services to Sunrise or any subsidiary, whose participation in the 2000 stock option plan is determined by the stock option committee to be in the best interests of Sunrise will be eligible to receive option grants under the plan. The 2000 stock option plan does not have a termination date, but the grant of a qualified stock option within the meaning of Section 422 of the Internal Revenue Code may not occur more than ten years after February 25, 2000, the effective date of the plan. Only employees may be granted qualified stock options.

The option exercise price of options granted under the 2000 stock option plan will be fixed by the stock option committee when the option is granted. However, the per share option exercise price may not be less than the fair market value of Sunrise common stock on the date of grant, as determined under the plan. Options to purchase no more than 250,000 shares of common

20

# EXHIBIT  18

Westlaw.                                                    NewsRoom

3/28/00 PRWIRE 00:00:00                                        Page 1




3/28/00 PR Newswire 00:00:00

                          PR Newswire
            Copyright (c) 2000 PR Newswire. All rights reserved.

                          **March 28, 2000**


  **Sunrise    Announces    Management    Realignment** ; Closes $75 Million Freddie
                          Mac Secured Loan

MCLEAN, Va., March 28 PRNewswire Sunrise Assisted Living, Inc. (Nasdaq: SNRZ), a
leading, national provider of assisted living care for seniors, today announced a
realignment of senior management responsibilities corresponding to its previously
announced decision to manage and report its business operations as a parent com-
pany and three operating divisions.

    Sunrise also announced it closed its previously announced $75 million secured
loan with GMAC-CC, a Freddie Mac seller/servicer, on March 22, 2000. The net pro-
ceeds will be used to repay $59 million of floating rate construction debt and to
help fund Sunrise's development and $30 million stock repurchase programs.


    Business and Management Reorganization
    Sunrise earlier this month announced that beginning in the first quarter
of 2000 it would reorganize and report its business operations as a parent
company of three operating divisions -- Sunrise Management Services, Sunrise
Properties and Sunrise Ventures. Sunrise's reorganization will consolidate and
focus the management and growth of both existing and new lines of business and
allow Sunrise to better serve its residents and its growing number of third-
party property owners.  These management changes reflect new assignments and
responsibilities for existing Sunrise senior management team members, most of
who have been with Sunrise for many years.

    "We believe this new structure more clearly and accurately reflects the
way Sunrise runs its business and serves its customers and will streamline our
management and operations as we grow these divisions," explained Paul J.
Klaassen, Sunrise chairman and chief executive officer.  "We are fortunate to
have a large, experienced senior team that has worked together for many years
and is excited to take on new responsibilities and challenges.  It is a rare
and happy occurrence when a Company's needs are so well aligned with the
experience, talent and personal desires of its senior managers."

    Sunrise Assisted Living, Inc. (Sunrise) will continue as the parent
company of each division.  It will develop the Company's strategy and overall
business plan and coordinate the activities of all business divisions.  Parent
company functions will include corporate and brand marketing, investor

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

relations and communications, corporate budgeting and forecasting, cash
management, corporate finance, and coordination of human resources,
information technology, external reporting and legal matters.

     Sunrise founder Paul Klaassen will continue to act as Sunrise's chairman
and chief executive officer.  David Faeder, formerly Sunrise president, has
been appointed vice chairman of Sunrise and will serve as chairman of a newly
created Board of Directors Investment Committee to review and approve new
Company business ventures.  Faeder has entered into a full-time consulting
agreement with the Company to focus on further development and execution of
the Company's sale/manage-back strategy.  Tom Newell, who has served as
Sunrise's executive vice president, general counsel and president of Sunrise's
development subsidiary for the past four years, has been elected president of
Sunrise.  Larry Hulse, who has been the Company's chief accounting officer for
more than four years, has been elected senior vice president and chief
financial officer.

     "David Faeder has been a critical part of Sunrise since he joined us
almost seven years ago.  His new role will give him more flexibility to focus
on expanding Sunrise's core business into new areas of senior care and on
Sunrise's program to recycle its capital through our asset sale/manage-back
program," Klaassen said.  "Tom Newell has a 10-year history with Sunrise,
beginning his role as a principal company advisor when we had nine homes.  He
has been involved in every aspect of the Company's business and growth since
he joined us full-time in January 1996 and has led and helped build our
successful development team," Klaassen said.  "I am very confident that his
deep experience and strong relationships throughout our organization equip him
well for this new leadership position."

     Sunrise's new chief financial officer, Larry Hulse, has been the Company's
chief accounting officer since 1995, prior to Sunrise's initial public
offering.  "Larry has helped oversee our tremendous growth and has contributed
greatly to the development and implementation of our financial strategy and
the systems and infrastructure that have allowed us to properly manage our
business," Klaassen said.  "As a former partner with Ernst & Young, and with
his deep understanding of Sunrise's strategy, reporting, and accounting
systems, Larry is well prepared to assume the chief financial officer
position."

     Sunrise Management Services
     Sunrise Management Services division will provide full-service assisted
living management services, in the U.S. and internationally, for all homes
owned by Sunrise or managed by Sunrise for third-parties.  Management services
will include fully integrated operations, sales and marketing, administrative,
billing, payroll, human resources and accounting services for pre-opened and
operating homes.  Sunrise Management Services division also will provide
consulting services on market and site selection and pre-opening sales and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

marketing. Sunrise Management Services will actively seek new business from third-party owners.  Sunrise believes the Company's reputation and the operating performance of Sunrise Management Services properties has led and will continue to lead to an expanding number of third-party management opportunities.

The president of Sunrise Management Services will be Tiffany Tomasso, Sunrise executive vice president. Tiffany Tomasso has been a critical part of Sunrise's success in operating assisted living homes for more than seven years, including during her tenure for the last two years as Sunrise's executive vice president for operations.  She began her Sunrise career with responsibility for establishing the New Jersey/Philadelphia region. Two years ago she assumed responsibility for all of Sunrise's management operations. Since Tomasso assumed her role as the senior officer in charge of operations, Sunrise has grown from operating 61 communities to 149, an increase in resident capacity of 122 percent, while occupancy was maintained at consistently high levels.  Under Tomasso's leadership, Sunrise has created and implemented national programs for employee training, resident care, Alzheimer's care, dining services and the other Sunrise operating "signatures."

"Tiffany Tomasso and her operations team have helped Sunrise set the standard for high quality assisted living services," Klaassen said.  "The expansion of her responsibilities as president of Sunrise Management Services consolidates all aspects of management services under her leadership, including sales and marketing and accounting services for home operations. Our new, streamlined Management Services division should serve Sunrise and third-party owned homes equally well and help focus our efforts to meet the growing third-party demand for Sunrise Management Services."

Ken Abod, formerly Sunrise controller, has been elected senior vice president for Sunrise and has been named chief financial officer of the Sunrise Management Services division.  Abod has served the last four years as Sunrise controller.  As chief financial officer for Sunrise Management Services, he will assume responsibility for all financial strategy and accounting operations of the division.

Sunrise Properties Division
Sunrise Properties division will run all Sunrise real estate operations, including development, construction, property management, project and permanent financing, real estate and property sales.  Sunrise currently is the 100 percent owner of 108 assisted living communities and has ownership interests in 26 other communities.  Sunrise Properties currently has another 22 projects under construction for Sunrise and third-party owners, and more than 60 other properties under development.  Sunrise Properties plans to develop 25-to-35 assisted living communities each year over at least the next several years and to expand its third-party development services business.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Sunrise Properties will invest in new buildings, absorb start-up losses, and depreciation, and produce strong income and cash flows from the sale of older, more mature properties.

Sunrise announced earlier this month that it plans to sell approximately 20 of its properties each year in order to recycle its capital into new development projects and the Sunrise $30 million stock-buy back program, and to use for other uses. The properties sold under this program will continue to be managed by Sunrise Management Services under long-term operating agreements.

Chris Slavin, Sunrise executive vice president, will serve as president of Sunrise Properties. Slavin has served as executive vice president and chief financial officer of Sunrise for the last year. Slavin has more than 16 years of experience in senior real estate positions, including seven years as president of an integrated real estate management company that built and managed more than four million square feet of industrial and commercial properties, and eight years as an investment banker at Prudential Securities, Inc. focusing on real estate finance. Slavin has overseen Sunrise real estate finance activities as Sunrise chief financial officer, and he will retain that responsibility as president of Sunrise Properties.

"Chris Slavin's background, experience and skills make him extremely well qualified to run this important new division that will oversee all aspects of Sunrise's extensive real estate operations," Klaassen said. "Consolidating all the real estate functions and services in one division should provide substantial efficiencies and benefits to Sunrise and our third-party owner development clients."

Sunrise Ventures Division
Sunrise Ventures is a new division that will be responsible for the development of new business opportunities in senior care and services. Sunrise believes the growing awareness of the Sunrise brand, the Company's substantial customer base, its physical properties and its associated infrastructure create many new and tie-in business opportunities. The Sunrise Venture division is already at work exploring Internet strategies and service delivery vehicles for at-home assisted living and at-home pre-assisted living services. Sunrise believes that exploration and investments in these and other ancillary business opportunities should provide opportunities for enhancing shareholder value in the future.

Brian Swinton, Sunrise executive vice president, will serve as president of Sunrise Ventures, while retaining his responsibilities for corporate marketing at Sunrise. Swinton has more than 14 years experience in senior living. He has been executive vice president at Sunrise for almost four years with responsibility for a number of functions, including sales and marketing, product development, market feasibility, customer research, corporate marketing and communications, and customer and Internet services. Prior to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

coming to Sunrise, Swinton held senior executive positions in two other senior living companies, Marriott Corporation and Forum Group, Inc., where he spearheaded their entrance into the assisted living arena and developed new products and services.

"Brian Swinton's extensive senior living experience and market and product awareness makes him uniquely qualified to lead our effort to expand our senior care business through Sunrise Ventures," Klaassen said. "For years we have delayed efforts to expand into integrated and ancillary businesses until our market share and customer base created the necessary market awareness and leverage in our major metropolitan markets. We also wanted our corporate infrastructure to support new business development without draining resources and focus from our core business. We have now reached the point where we can form a dedicated new business team to explore the substantial new business opportunities, without detracting from, and even enhancing, the execution and growth of our core assisted living business."

GMAC-CC/Freddie Mac Loan Closing
On March 22, 2000, Sunrise closed its previously announced $75 million secured loan with GMAC-CC, a Freddie-Mac seller/servicer. The seven-year loan will bear interest at the fixed rate of 8.66 percent and is secured by eight Sunrise assisted living properties. The loan proceeds will be used to repay $59 million of project financing for the properties, and for other corporate needs, including the Sunrise $30 million stock repurchase program.

"The $75 million GMAC-CC/Freddie-Mac loan reduces our floating interest rate exposure, frees capacity under our existing $400 million revolving credit line that funds our expanded development program, and provides additional cash for development and other corporate purposes," said Chris Slavin, president of the Sunrise Properties division. "Refinancing of our construction debt is an important part of our capital recycling plan, and we are pleased to conclude our second major refinancing with Freddie-Mac and GMAC, two of the country's largest lenders."

Sunrise Assisted Living is one of the nation's oldest and largest providers of assisted living care for frail seniors who can no longer live on their own but do not need complex medical care. The McLean, Va.-based Company operates 149 communities in 23 states and the United Kingdom with a resident capacity of more than 11,700. Sunrise offers a full range of personalized assisted living services, from help with activities such as eating, bathing, dressing and medication management, to a specially designed program for residents with Alzheimer's disease and other forms of memory impairment. Assisted living services are delivered in a homelike, residential setting by staff trained to encourage the independence, preserve the dignity and protect the privacy of residents.

The forward-looking statements in this release are subject to certain risks and uncertainties that could cause actual results to differ materially,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

including, but without limitation to, licensing, permit and construction
delays on new development, business conditions, competition, the Company's
ability to operate the Karrington properties profitably, risks of downturns in
economic conditions generally, satisfaction of closing conditions such as
those pertaining to licensure, and availability of financing for development
and acquisitions. These and other risks are detailed in the Company's reports
filed with the Securities and Exchange Commission.

SOURCE Sunrise Assisted Living, Inc.
CONTACT: Kathleen Masters Dezio of Sunrise Assisted Living, Inc., 703-273-7500
Web site: http://www.sunrise-al.com


                         ---- INDEX REFERENCES ----

COMPANY: ERNST AND YOUNG INTL; PRUDENTIAL SECURITIES GROUP INC; GENERAL MOTORS AC-
CEPTANCE CORP; SUNRISE ASSISTED LIVING INC; MARRIOTT CORP; FREDDIE MAC

NEWS SUBJECT:  (HR & Labor Management (1HR87); Business Management (1BU42); Fore-
casts (1FO11))

INDUSTRY:  (Science & Engineering (1SC33); Construction (1CO11); Retirement Com-
munities (1RE03); Trends in Technology (1TR23); Residential Construction (1RE61);
Business Services (1BU80); Real Estate (1RE57))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (CC; COMPANYOPERATES; DIRECTORS INVESTMENT COMMITTEE; ERNST
YOUNG; EXCHANGE COMMISSION; FORUM GROUP; FREDDIE MAC; FREDDIE MAC LOAN CLOSING;
FREDDIE MAC SECURED LOAN; GMAC; GMAC CC; KARRINGTON; KATHLEEN MASTERS DEZIO; MAN-
AGEMENT REORGANIZATION SUNRISE; MARRIOTT CORP; NASDAQ: SNRZ; PROPERTIES; PRUDEN-
TIAL SECURITIES INC; SECURITIES; SOURCE SUNRISE ASSISTED LIVING INC; SUNRISE; SUN-
RISE ANNOUNCES MANAGEMENT REALIGNMENT; SUNRISE ASSISTED LIVING; SUNRISE ASSISTED
LIVING INC; SUNRISE MANAGEMENT SERVICES; SUNRISE MANAGEMENT SERVICES SUNRISE MAN-
AGEMENT SERVICES; SUNRISE MANAGEMENT SERVICESCONSOLIDATES; SUNRISE MANAGEMENTSER-
VICES; SUNRISE PROPERTIES; SUNRISE PROPERTIES DIVISION SUNRISE; SUNRISE VENTURES;
SUNRISE VENTURES DIVISION SUNRISE VENTURES; SUNRISEVENTURE)  (Abod; Alzheimer;
Brian Swinton; Chris Slavin; Consolidatingall; David Faeder; Faeder; Hehas; Ken
Abod; Klaassen; Larry; Larry Hulse; Paul J.Klaassen; Paul Klaassen; Slavin; Swin-
ton; Theexpansion; Tiffany Tomasso; Tom Newell; Tomasso)

Word Count: 2946
3/28/00 PRWIRE 00:00:00
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT  19



# FORM 10−Q

## SUNRISE SENIOR LIVING INC − SRZ

**Filed: November 13, 2000 (period: September 30, 2000)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART II.

OTHER INFORMATION
**ITEM 3.** QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK.
**ITEM 6.** EXHIBITS AND REPORTS ON FORM 8-K
SIGNATURES
Exhibit 10.1
EX-27

36

INDEX OF EXHIBITS

| Exhibit No. | Exhibit Name | Page |
| ----------- | ------------ | ---- |
| 10.1 | Employment Agreement, dated as of September 12, 2000, by and between Sunrise Assisted Living, Inc. and Paul J. Klaassen | |
| 27 | Financial Data Schedule, which is submitted electronically to the Securities and Exchange Commission for information only and is not filed | |

36

Source: SUNRISE SENIOR LIVIN, 10-Q, November 13, 2000

37

<div align="right">
Exhibit 10.1

September 12, 2000
</div>

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") made and effective as of September 12, 2000, (the "Effective Date"), by and between Sunrise Assisted Living, a corporation organized and existing under the laws of Delaware (the "Company") and Paul J. Klaassen (the "Executive").

W I T N E S S E T H:

WHEREAS, the Company wishes to employ the Executive as Chairman and Chief Executive Officer on the terms and conditions set forth in this Agreement; and

WHEREAS, the Executive is willing to accept such employment on such terms and conditions;

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations and covenants herein contained, the parties hereto agree as follows:

1.    SCOPE OF EMPLOYMENT. The Company hereby agrees to employ the Executive upon the terms and conditions herein set forth and to perform such executive duties as may be determined and assigned to him by the Board of Directors of the Company (the "Board"). The Executive hereby accepts such employment, subject to the terms and conditions herein set forth. The Executive shall have the title of Chairman and Chief Executive Officer. While serving as Chairman and Chief Executive Officer, the Executive shall have the customary duties and powers of such position. Executive shall not be employed by any other organization during the Term of this Agreement.

2.    TERM.

(a)    The term of Executive's employment under this Agreement shall be for five (5) years. It shall begin on the Effective Date and thereafter on an annual basis be extended for a five-year period, unless it is earlier terminated as follows:

(i)    By the Company for Good Cause (as hereinafter defined);

(ii)    By the Company for other than Good Cause upon the giving of thirty (30) days written notice. For purposes hereof, Executive shall be deemed terminated by the Company for other than Good Cause if he terminates employment for Good Reason (as hereinafter defined);

(iii)    In the event of the Company's dissolution or liquidation;

(iv)    By the Executive for any reason other than retirement upon the giving of thirty (30) days written notice;

38

    (v)      In the event of the death of the Executive; or

    (vi)     In the event of the disability of Executive (as hereinafter defined).

(b)    For purposes hereof, "Good Cause" shall mean, and be limited to, (i) any material breach by the Executive of the terms of this Agreement, (ii) the Executive's willful commission of acts of dishonesty in connection with his position, (iii) chronic absenteeism (other than by reason of disability), (iv) the Executive's willful failure or refusal to perform the essential duties of his position, (v) conviction of a felony, or (vi) the Executive's engaging in illegal or other wrongful conduct substantially detrimental to the business or reputation of the Company. If a ground for termination under this Section 2(b) is amenable to cure, the Company shall provide the Executive with written notice describing the nature of the ground for termination. If the Executive cures same within thirty (30) days after receiving such notice, there shall be no termination for Good Cause.

(c)    For purposes hereof, the term "Good Reason" shall mean the occurrence of any one or more of the following events unless Executive specifically agrees in writing that such event shall not be Good Reason:

    (i)      the assignment to Executive by the Board of Directors or other officers or representatives of Company of duties materially inconsistent with the duties associated with the position described in Section 1 as such duties are constituted as of the Effective Date;

    (ii)     a material change in the nature or scope of Executive's authority from those applicable to him as Chairman and Chief Executive Officer as such duties are constituted on the Effective Date;

    (iii)    the occurrence of material acts or conduct on the part of Company or its officers and representatives which have as their purpose forcing the resignation of Executive or preventing him from performing his duties and responsibilities pursuant to this Agreement;

    (iv)     a material breach by Company of any material provision of this Agreement, provided that failure of Company to pay any amount, or to provide any benefit, pursuant to the provision of Articles 3 and 4 hereof shall be deemed to be a material breach by Company of a material provision of this Agreement and shall provide Executive the right to terminate his employment under this Agreement at any time after such 30 day period; or

    (v)      requiring Executive to be principally based at any office or location more than 50 miles from the current offices of the Company in McLean, Virginia.

(d)    For purposes hereof, the term "disability" shall have the same definition as is set forth in the then current group disability policy, if any, maintained by the Company for its executive employees. In the event that the Company does not have such a group term disability policy, the definition of "disability" shall be as is set forth in the individual disability policy, if any, purchased in order to fund the Company's liability under this

Source: SUNRISE SENIOR LIVIN, 10-Q, November 13, 2000

39

Agreement in the event of the Executive's disability. In the event that the Company maintains no such disability policies, "disability" shall mean the inability of the Executive, due to illness, accident or any other physical or mental incapacity, to perform his duties in a normal manner for a period of six (6) consecutive months.

3.    COMPENSATION.

(a)    Annual Salary. The Company agrees to pay the Executive, and the Executive agrees to accept, in payment for services to be rendered by the Executive hereunder, an initial base salary of Three Hundred Thousand Dollars ($300,000) per annum. The salary shall be payable in equal periodic installments, not less frequently than monthly, less such sums as may be required to be deducted or withheld under the provisions of federal, state or local law. The Company agrees to review the Executive's salary annually at or around January 1st of each calendar year (or such other time as the Company and Executive mutually agree), commencing on or about January 1, 2001, for adjustment based on the Executive's performance.

(b)    Annual Bonus. In addition to Executive's salary, the Executive shall be eligible to receive an annual bonus based upon the achievement of goals established by the compensation committee of the Board of the Company (the "Compensation Committee") after due consultation with the Executive. Initially, the Executive's annual bonus will be targeted at a minimum of $300,000.

The Compensation Committee in its discretion, shall base such bonus payment upon the satisfaction of one or more performance goals ("Performance Goals"). The Performance Goals shall be based upon the achievement of (i) a specified level, of (x) the Company's consolidated pre-tax or after-tax earnings or EBITDA or (y) the pre-tax or after-tax earnings, or the EBITDA, of any particular subsidiary, division or other business unit of the Company, (ii) the achievement of a specified level of revenues, earnings, costs, return on assets, return or equity, return on capital, return on investment, return on assets under management, net operating income or net operating income as a percentage of book value with regard to the Company, particular subsidiaries, divisions or business units of the Company, particular assets or groups of assets or particular employees or groups of employees, or (iii) any combination of the foregoing. Prior to the payment of any such bonus hereunder, the Compensation Committee shall have certified that any applicable Performance Goals have been satisfied.

(c)    Stock Options. Executive was awarded an incentive stock option grant on September 11, 2000 under the Company's Stock Option Plan for 350,000 shares of stock. Such grant will vest at the rate of 25% (87,500 shares per year) at the end of each calendar year beginning on December 31, 2000, and ending on December 31, 2003.

40

4.    FRINGE BENEFITS, REIMBURSEMENT OF EXPENSES, ETC.

(a)    The Executive shall be entitled to paid vacation, holidays and sick leave benefits in accordance with the Company's policies for executive employees.

(b)    The Executive and/or his family shall be entitled to medical insurance from the Company in accordance with the Company's policies for employees. In addition, Executive shall be entitled to a fully-insured executive medical/dental plan providing supplemental coverage for Executive and his family for those items not covered under the Company's general health plan (for example, prescriptions, orthodontia, eye surgery or other coverages which may be excluded from the group medical plan). Notwithstanding the termination of this Agreement for any reason, the Company and any of its successors and assigns, shall provide to Executive until age 65, similar medical coverage to that described above, at the expense of the Company.

(c)    The Company agrees to pay the premiums on a permanent life insurance policy equal to $150,000 per year for 12 years and to pay Executive an additional amount equal to the tax due to the income imputed to Executive as a consequence of such policy. Such policy shall be a "split dollar" policy such that the Company shall recapture the cost of the premiums paid on the policy, to the extent and at such time as is permissible under the policy. Such policy shall be owned by the Executive and funded by the Company for the above described period even if this Agreement is terminated.

(d)    The Company agrees to pay, or promptly reimburse the Executive for, all reasonable expenses incurred by the Executive in furtherance of or in connection with the business of the Company, provided that the Executive furnishes appropriate documentation for such expenses in accordance with the Company's practices and procedures.

(e)    Executive shall be entitled to participate in those retirement plans, both defined contribution and defined benefit, qualified and non-qualified, as are then currently available to the Company's executive employees and such new retirement plans, if any, as may be adopted by the Company from time to time.

5.    TERMINATION BENEFITS: In addition to the benefits described under the Agreement that survive the termination of the Agreement, the following benefits will be paid on account of the termination of the Agreement for the following reasons:

(a)    Upon termination of this Agreement by the Company for Good Cause pursuant to Section 2(a)(i), or by the Executive for other than Good Reason, death or disability, Company shall pay to Executive immediately after the date of termination an amount equal to

(i)    the sum of Executive's accrued base salary and any bonus amount earned but not yet paid;

Source: SUNRISE SENIOR LIVIN, 10-Q, November 13, 2000

41

(ii)   the Company shall make additional payments to the Executive each year for three consecutive years following said termination equal to his annual salary and bonus for the year of termination; and

(iii)   the Company shall provide to Executive's spouse (and children through their attainment of age 22), in the event of death (after termination of the Agreement under this section), and the Executive in the event of disability (after the termination of the Agreement under this section), medical insurance through the date the Executive attains age 65.

(b)   Upon termination of this Agreement due to the Executive's death or disability, the Company shall pay to Executive, immediately after the Date of Termination, an amount which is equal to the Executive's base salary and annual bonus amount for the remaining term of the Agreement. The Company shall make additional payments each year for three consecutive years following said termination equal to his annual salary and bonus for the year of termination. The Company shall provide to Executive's spouse (and children through their attainment of age 22), in the event of death, and to the Executive and his family, in the event of disability (after the termination of the Agreement under this section) medical insurance through the date the Executive would attain age 65. In addition, any stock options, shall be fully vested in the event of the Executive's death or disability.

(c)   Upon termination of this Agreement by the Company for other than Good Cause or by the Executive for Good Reason, Executive shall be entitled to:

(i)   the Company shall pay to Executive or his beneficiaries, as the case may be, immediately after the Date of Termination an amount which is equal to the Executive's base salary and annual bonus amount for the remaining term of the Agreement;

(ii)   the Company shall make additional payments each year for three consecutive years following said termination equal to his annual salary and bonus for the year of termination;

(iii)   the Company shall provide to Executive's spouse (and children through their attainment of age 22), in the event of death (after the termination of the Agreement under this section), and the Executive in the event of disability (after the termination of the Agreement under this section), medical insurance through the date the Executive would attain age 65; and

(iv)   the Company shall fully vest any stock options previously granted to the Executive.

(d)   Upon a Change In Control, Executive shall be entitled to the following from either the Company or its successor, if any:

(i)   the Company shall pay to Executive or his beneficiaries, as the case may be, immediately after the Date of Termination an amount which is equal to the

42

Executive's base salary and annual bonus amount for the remaining term of the Agreement;

(ii)    the Company shall make additional payments each year for three consecutive years following said termination equal to his annual salary and bonus for the year of termination;

(iii)    Executive's spouse (and any children through their attainment of age 22), in the event of death (after the termination of the Agreement under this section), and the Executive in the event of disability (after the termination of the Agreement under this section) shall be entitled to medical insurance through the date the Executive would attain age 65;

(iv)    the Company shall fully vest any stock options previously granted to the Executive and shall pay Executive an amount determined in accordance with Section 4(a)(i)(D) of the Senior Executive Severance Plan in effect on the date of this Agreement;

(v)    In recognition of services by Executive in connection with any corporate activity that constitutes a Change of Control, the Company shall pay the Executive in a lump sum concurrent with or as soon as practicable following a Change in Control as defined in (vii)(A), (B) or (C), a disposition fee in the amount of 1% of the Company's enterprise value, defined as its market cap plus debt as of the date of the Change in Control. To the extent such amount is determined to be a golden parachute payment under section 280G of the Internal Revenue Code of 1986, as amended, the Company and its successors or assigns shall pay to the Executive an amount necessary to gross-up such amount for any taxes associated with such amount; and

(vi)    A "Change in Control" means any of the following events:

(A)    any person (as such term is used in Rule 13d-5 under the Securities Exchange Act of 1934 ("Exchange Act")) or group (as such term is defined in Sections 3(a)(9) and 13(d)(3) of the Exchange Act), other than a subsidiary or any employee benefit plan (or any related trust) of the Company or a subsidiary, becomes, after effective date of the Agreement the beneficial owner of 20% or more of the common stock or of securities of the Company that are entitled to vote generally in the election of directors of the Company ("Voting Securities") representing 20% or more of the combined voting power of all Voting Securities of the Company.

(B)    individuals who, as of the effective date of this Agreement, constitute the Board (the "Incumbent Board") cease for any reason to constitute a majority of the members of the Board; provided that any individual who becomes a director after the effective date of this Agreement whose election or nomination for election by the Company's shareholders was approved by a majority of the members of the Incumbent

43

Board (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened "election contest" relating to the election of the directors of the Company (as such terms are used in Rule 14a-11 under the Exchange Act), "tender offer" (as such term is used in Section 14(d) of the Exchange Act) or a proposed Merger (as defined below)) shall be deemed to be members of the Incumbent Board; or

(C)     approval by the stockholders of the Company of either of the following:

(I)     a merger, reorganization, consolidation or similar transaction (any of the foregoing, a "Merger") as a result of which the persons who were the respective beneficial owners of the outstanding common stock and Voting Securities of the Company immediately before such Merger are not expected to beneficially own, immediately after such Merger, directly or indirectly, more than 60% of, respectively, the common stock and the combined voting power of the Voting Securities of the corporation resulting from such Merger in substantially the same proportions as immediately before such Merger, or

(II)    a plan of liquidation of the Company or a plan or agreement for the sale or other disposition of all or substantially all of the assets of the Company.

Notwithstanding the foregoing, there shall not be a Change in Control if, in advance of such event, Executive agrees in writing that such event shall not constitute a Change in Control.

(e)     The Company's obligations under this Section 6 shall survive termination of this Agreement.

6.     INSURANCE. It is understood that the Company may purchase insurance policies to fund all or part of the obligations set forth in this Agreement, provided it is understood that said obligations shall not be affected by the availability or unavailability of insurance coverage. Executive agrees to execute such applications for insurance and to make himself available for and to undergo all reasonable medical examinations which may be required in the event the Company determines to procure or place any insurance to fund all or any part of the aforementioned obligations.

7.     ENTIRE AGREEMENT. This Agreement contains the entire understanding between the parties hereto and supersede all other oral and written agreements or understandings between them. All previous oral or written agreements between the parties hereto shall be deemed to have been completely fulfilled by both parties and shall be superseded by

44

this Agreement. No modification or addition hereto or waiver or cancellation of any provision shall be valid except by a writing signed by the party to be charged therewith.

8.    SUCCESSORS AND ASSIGNS. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their heirs, successors, assigns and personal representatives. As used herein, the successors of the Company shall include, but not be limited to, any successor by way of merger, consolidation, sale of all or substantially all of its assets, or similar reorganization. In no event may the Executive assign any duties or obligations under this Agreement.

9.    CONTROLLING LAW. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the Commonwealth of Virginia. The invalidity or unenforceability of any provision of this Agreement shall not affect or limit the validity and enforceability of the other provisions hereof.

10.   COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.   HEADINGS. The headings herein are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provisions thereof.

12.   INDEMNIFICATION. The Company shall indemnify and hold Executive harmless from and against all claims, investigations, actions, awards and judgments, including costs and attorneys' fees, incurred by Executive in connection with acts or decisions made by Executive in good faith in his capacity as either a director or as an officer of the Company, so long as Executive reasonably believed that the acts or decisions were in the best interests of the Company. The Company further agrees to retain and pay the fees and costs of counsel selected by Executive to represent him in any action or proceeding covered by this indemnification or in enforcing or pursuing his rights under this Agreement. The Company shall not settle any claim or action or pay any award or judgment against Executive without Executive's prior written consent, which shall not be unreasonably withheld. The Company may obtain coverage for Executive under an insurance policy covering the directors and officers of the Company against claims set forth herein if such coverage is possible at a reasonable cost, provided, however, it is understood and agreed that the Company's obligation to indemnify Executive as set forth in this Section 12 shall not be affected by the Company's ability or inability to obtain insurance coverage.

45

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date and year first above written.

WITNESS:                                Sunrise Assisted Living


   /s/  Gregori Lebedev                 By:   /s/ Thomas J. Donohue
---------------------------------             ---------------------------
                                        Thomas J. Donohue
                                        Director and
                                        Chairman, Compensation Committee


WITNESS:


   /s/  Linda Bolino                       /s/  Paul J. Klaassen
---------------------------------       ---------------------------------
                                        Paul J. Klaassen

</TEXT>
</DOCUMENT>

# EXHIBIT  20

**FORM 5**

☐ Check this box if no longer subject
to Section 16. Form 4 or Form 5
obligations may continue. *See*
Instruction 1(b).

☐ Form 3 Holdings Reported

☐ Form 4 Transactions Reported

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

ANNUAL STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0362 |
| Expires: | September 30, 1998 |
| Estimated average burden | |
| hours per response. . . . . . . .1.0 | |

| 1.  Name and Address of Reporting Person* | 2.  Issuer Name and Ticker or Trading Symbol | 6.  Relationship of Reporting Person(s) to Issuer  (Check all applicable) |
|---|---|---|
| Aprahamian   Ronald   V.  <br> (Last)          (First)          (Middle) | Sunrise Assisted Living, Inc  (SNRZ) | X    Director            _____ 10% Owner |
| 9401 Lee Highway, Suite 300 <br>(Street) | 3.  IRS or Social Security Number of Reporting Person (Voluntary) | 4.  Statement for Month/Year <br> **12/31/97** | _____ Officer (give title below)    _____ Other (specify below) |
| Fairfax     Virginia     22031 <br>(City)          (State)          (Zip) | 5.  If Amendment, Date of Original (Month/Year) | 7.  Individual or Joint/Group Filing (Check Applicable Line) <br> X  Form filed by One Reporting Person <br> _____ Form filed by More than One Reporting Person |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.  Title of Security (Instr. 3) | 2.  Transaction Date (Month/Day/Year) | 3.  Transaction Code (Instr. 8) | 4.  Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5.  Amount of Securities Beneficially Owned at End of Issuer's Fiscal Year (Instr. 3 and 4) | 6.  Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7.  Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|
| | | Year | Amount | (A) or (D) | Price | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, see instruction 4(b)(v).

Page 1 of 2
3270 (7-96)

FORM 5 (continued)

Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Year (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Director Stock Option (right to buy) | $24.875 | 4/28/97 | A | 5,000 | | (2) | 4/28/07 | Common Stock | 5,000 | | 5,000 | D | |
| Director Stock Option (right to buy) | $24.375 | 5/02/97 | A | 100,000 | | (1) | 5/02/07 | Common Stock | 100,000 | | 100,000 | D | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Explanation of Responses:

(1) The option vests in four equal annual installments beginning on May 2, 1998.
(2) The option vested on 4/28/97.

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
    See 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
    If space provided is insufficient, see Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

** Signature of Reporting Person
As attorney-in-fact for Ronald V. Aprahamian

February 5, 1998
Date

STIN 003257

# EXHIBIT 21

**FORM 3**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL

| OMB Number: | 3235-0104 |
|---|---|
| Expires: | September 30, 1998 |
| Estimated average burden | |
| hours per response.......0.5 | |

(Print or Type Responses)

| 1. Name and Address of Reporting Person* | | | 2. Date of Event Requiring Statement (Month/Day/Year) 03/03/98 | 4. Issuer Name and Ticker or Trading Symbol Sunrise Assisted Living, Inc. (SNRZ) |
|---|---|---|---|---|
| Tomasso (Last) | Tiffany (First) | L. (Middle) | | |

| c/o Sunrise Assisted Living, Inc. 9401 Lee Highway, Suite 300 (Street) | 3. IRS or Social Security Number of Reporting Person (Voluntary) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) ___Director          ___10% Owner   X Officer (give title below)    ___Other (specify below)   Executive Vice President | 6. If Amendment, Date of Original (Month/Day/Year)  7. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person ___Form filed by More than One Reporting Person |
|---|---|---|---|

| Fairfax (City) | Va. (State) | 22031 (Zip) | | |

Table I — Non-Derivative Securities Beneficially Owned

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, see Instruction 5(b)(v).

(Over)
SEC 1473 (7-96)

VADC - 62844/2 - 0394613.01

SUN 002275

0065

FORM 3 (continued)          Table II – Derivative Securities Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | | 4. Conversion or Exercise Price of Derivative Security. | 5. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | (1) | 7/21/05 | Common Stock | 10,501 | | $3.00 | D | |
| Employee Stock Option (right to buy) | (2) | 1215/05 | Common Stock | 3,334 | | $7.50 | D | |
| Employee Stock Option (right to buy) | (3) | 2/28/06 | Common Stock | 12,000 | | $10.50 | D | |
| Employee Stock Option (right to buy) | (4) | 5/30/06 | Common Stock | 20,000 | | $20.00 | D | |
| Employee Stock Option (right to buy) | (5) | 12/13/06 | Common Stock | 20,000 | | $25.625 | D | |
| Employee Stock Option (right to buy) | (6) | 12/13/06 | Common Stock | 45,000 | | $25.625 | D | |
| Employee Stock Option (right to buy) | (7) | 8/28/07 | Common Stock | 30,000 | | $30.75 | D | |
| Employee Stock Option (right to buy) | (8) | 1/19/08 | Common Stock | 100,000 | | $44.00 | D | |

Explanation of Responses:

(1) 2,167 options currently exercisable;  4,167 exercisable on 6/5/98, and 4,167 exercisable on 6/5/99.  (2) 1,667 options currently exercisable;  833 exercisable on 6/5/98; and 833 exercisable on 6/5/99.

(3) 6,000 options currently exercisable;  3,000 exercisable on 6/5/98, and 3,000 exercisable on 6/5/99.  (4) 5,000 options currently exercisable;  5,000 exercisable on 5/30/98; 5,000 exercisable on 5/30/99; 5,000 exercisable on 5/30/00.

(5) 20,000 options currently exercisable.  (6) 11,250 options currently exercisable; 11,250 exercisable on 12/13/98; 11,250 exercisable on 6/5/99; 11,250 exercisable on 12/13/00.

(7) 7,500 options exercisable on 8/28/98 and 25% on each of the next three anniversary dates thereof.  (8) 20,000 options exercisable on 1/19/99; 1/19/00; 1/19/01, respectively; and 40,000 exercisable on 1/19/02.

**Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
  *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:    File three copies of this Form, one of which must be manually signed.  If space provided is insufficient,
         *See* Instruction 6 for procedure.
Potential persons who are to respond to the collection of information contained in this form are not
required to respond unless the form displays a currently valid OMB Number.

_____  March 4, 1998
**Signature of Reporting Person        Date

SUN 002276

Page 2
SEC 1473 (7-96)

# EXHIBIT  22

**FORM 5**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See Instruction 1(b).*

☐ Form 3 Holdings Reported
☐ Form 4 Transactions Reported

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## ANNUAL STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

OMB APPROVAL

OMB Number:      3235-0362
Expires:    September 30, 1998
Estimated average burden
hours per response. . . . . . . .1.0

| 1. Name and Address of Reporting Person* | | | 2. Issuer Name and Ticker or Trading Symbol | | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|---|---|---|
| Aprahamian | Ronald | V. | **Sunrise Assisted Living, Inc (SNRZ)** | | X___ Director        _____ 10% Owner |
| (Last) | (First) | (Middle) | 3. IRS or Social Security Number of Reporting Person (Voluntary) | 4. Statement for Month/Year **12/31/99** | _____ Officer (give title below)    _____ Other (specify below) |
| 9401 Lee Highway, Suite 300 | | | | | |
| (Street) | | | | | 7. Individual or Joint/Group Filing (Check Applicable Line) |
| Fairfax | Virginia | 22031 | 5. If Amendment, Date of Original (Month/Year) | | X___ Form filed by One Reporting Person |
| (City) | (State) | (Zip) | | | ____ Form filed by More than One Reporting Person |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Issuer's Fiscal Year (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|
| | | | Amount | (A) or (D) | Price | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, see Instruction 4(b)(v).

Page 1 of 2
SEC 2270 (7-96)

SUN 003247

0008

FORM 5 (continued)

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Year (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Director Stock Option (right to buy) | $44.5625 | 4/27/98 | A | 5,000 | | (2) | 4/27/08 | Common Stock | 5,000 | | 5,000 | D | |
| Director Stock Option (right to buy) | $41.2500 | 4/26/99 | A | 5,000 | | (1) | 4/26/09 | Common Stock | 5,000 | | 5,000 | D | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Explanation of Responses:

(1) The option vested on 4/26/99.
(2) The option vested on 4/27/98.

SUN 003248

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
  *See* 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
  If space provided is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.

** Signature of Reporting Person
As attorney-in-fact for Ronald V. Aprahamian

February 15, 2000
Date

Page 2 of 2
SEC 2270 (7-96)

# EXHIBIT 23

# FORM 4

☐ Check this box if no longer
subject to Section 16. Form 4 or
Form 5 obligations may continue.
*See Instruction 1(b).*

(Print or Type Responses)

UNITED STATES SECU ...IES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number:        3235-0287 |
| Expires:    December 31, 2001 |
| Estimated average burden |
| hours per response. . . . . . . .0.5 |

| 1. Name and Address of Reporting Person* | | | 2. Issuer Name and Ticker or Trading Symbol | | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Aprahamian    Ronald    V. | | | Sunrise Assisted Living, Inc. (SNRZ) | | X    Director | | _____ 10% Owner |
| (Last)    (First)    (Middle) | | | 3. I.R.S. Identification Number of Reporting Person, if an entity (voluntary) | 4. Statement for Month/Year | _____ Officer (give title below) | | _____ Other (specify below) |
| 7902 Westpark Drive | | | | January 2001 | | | |
| (Street) | | | 5. If Amendment, Date of Original (Month/Year) | | 7. Individual or Joint/Group Filing (Check Applicable Line) | | |
| McLean    VA    22102 | | | | | X Form filed by One Reporting Person | | |
| (City)    (State)    (Zip) | | | | | _____ Form filed by More than One Reporting Person | | |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, *see Instruction 4(b)(v).*

Potential persons who are to respond to the collection of Information contained in this form are not required
to respond unless the form displays a currently valid OMB control number

(Over)
SEC 1474 (3-99)

SUN 003240



...ntinued)

Table II - Derivative Securities Acq, ...l, Disposed of, or Beneficially Owned
(*e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/ Day/ Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/ Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $20.5625 | 1/9/01 | A | | 9,000 | | 1/9/01 | 1/9/11 | Common Stock | 9,000 | | 9,000 | D | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Explanation of Responses:

SUN 003241

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
See 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note:  File three copies of this Form, one of which must be manually signed.
If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained
in this form are not required to respond unless the form displays a currently valid OMB Number.

** Signature of Reporting Person
As attorney-in-fact for Ronald V. Aprahamian

7/9/01
Date

# EXHIBIT  24



# FORM DEF 14A

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: April 05, 2002 (period: May 17, 2002)**

Official notification to shareholders of matters to be brought to a vote (Proxy)

date or public disclosure was made. Public notice of the expected date of the annual meeting was made on February 27, 2002 by the issuance of a press release. A stockholder's notice of nomination must set forth information specified in Sunrise's bylaws concerning each person the stockholder proposes to nominate for election and the nominating stockholder. Sunrise's bylaws provide that no person may be elected as a director unless nominated in accordance with the procedures set forth in the bylaws.

COMPENSATION OF DIRECTORS

Non-employee directors are reimbursed for expenses incurred in attending meetings of the board of directors. No fees are paid for attendance at board or committee meetings. However, Sunrise directors are typically granted stock options on an annual basis.

In 2001, Mr. Aprahamian received a grant of ten-year non-qualified stock options for 9,000 shares of common stock at an exercise price of $20.56 per share. Mr. Bradley received a grant of ten-year non-qualified stock options for 7,000 shares of common stock at an exercise price of $20.56 per share. Mr. Callen received a grant of ten-year non-qualified stock options for 10,000 shares of common stock at an exercise price of $20.56 per share. Mr. Donohue received a grant of ten-year non-qualified stock options for 12,000 shares of common stock at an exercise price of $20.56 per share. Mr. Holladay received a grant of ten-year non-qualified stock options for 7,000 shares of common stock at an exercise price of $20.56 per share. Peter A. Klisares received and option grant for 5,000 shares of common stock at an exercise price of $20.56 per share.

Sunrise has entered into a consulting agreement with David W. Faeder, effective as of April 1, 2000. Under the consulting agreement, Mr. Faeder performs consulting services as and when reasonably requested by the chairman of the board and chief executive officer or by the president of Sunrise. Initially, the consulting agreement provided for Mr. Faeder to receive, during the term of the agreement, annual compensation of $262,000 and reimbursement of reasonable expenses incurred in connection with the performance of consulting services. On May 31, 2001, the consulting agreement was amended to provide an annual compensation rate of $177,000 per year and up to $131,000 in additional bonuses per year, payable quarterly or at certain milestones. At that time, Mr. Faeder was rehired as an employee for limited purposes and receives an annual salary of $85,000 and is eligible to participate in the company's health and benefits plans. The consulting agreement expires on March 31, 2003, unless extended or earlier terminated by the parties. Either party may terminate the consulting agreement upon 30 days' prior notice. Under the terms of the consulting agreement, all of Mr. Faeder's then existing options continue to vest and be exercisable or available as if his employment with Sunrise had continued through March 31, 2003. In addition, the consulting agreement provides that Mr. Faeder is entitled to the benefits under the senior executive severance plan, as described below, on the same basis as Sunrise's president. The total compensation paid in 2001 to Mr. Faeder under these arrangement was $393,000.

In September 2001, Mr. Faeder was awarded 52.5 shares of restricted stock in Sunrise At-Home, or .0525% of the issued and outstanding Sunrise At-Home common stock at the time of the award. In February 2002, Mr. Faeder surrendered his restricted stock award for cancellation. In December 2001, Mr. Faeder was awarded restricted limited partnership points in ordinary partnership units in Holdings I, our international joint venture with DLJ (now Credit Suisse First Boston) and affiliated entities ("Holdings I"), or 0.66% of the issued and outstanding ordinary partnership interests in that joint venture at the date of the award. See "Report on Executive Compensation" and "Compensation Committee Interlocks and Insider Participation" for additional information. In February 2002, Mr. Faeder surrendered his restricted ordinary partnership award in Holdings I for cancellation.

6

Source: SUNRISE SENIOR LIVIN, DEF 14A, April 05, 2002

# EXHIBIT 25

**FORM 4**

☐ Check this box if no longer
subject to Section 16. Form 4 or
Form 5 obligations may continue.
*See* Instruction 1(b).

(Print or Type Responses)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires:    December 31, 2001 | |
| Estimated average burden | |
| hours per response. . . . . . . .0.5 | |

| 1. Name and Address of Reporting Person* | | | 2. Issuer Name and Ticker or Trading Symbol | 6. Relationship of Reporting Person(s) to Issuer (Check all applicable) | | |
|---|---|---|---|---|---|---|
| Callen | Craig | R. | Sunrise Assisted Living, Inc. (SNRZ) | X ___ Director | | _____ 10% Owner |
| (Last) | (First) | (Middle) | 3. I.R.S. Identification Number of Reporting Person, if an entity (voluntary) | 4. Statement for Month/Year | _____ Officer (give title below) | _____ Other (specify below) |
| 7902 Westpark Drive | | | | January 2001 | | |
| (Street) | | | | | | |
| McLean | VA | 22102 | 5. If Amendment, Date of Original (Month/Year) | | 7. Individual or Joint/Group Filing (Check Applicable Line) | |
| (City) | (State) | (Zip) | | | X Form filed by One Reporting Person | |
| | | | | | ___ Form filed by More than One Reporting Person | |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

Potential persons who are to respond to the collection of information contained in this form are not required
to respond unless the form displays a currently valid OMB control number

(Over)
SEC 1474 (3-99)

SUN 003329

6000

FORM 4 (continued)

### Table II – Derivative Securities Acq`d, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $20.5625 | 1/9/01 | A | | 10,000 | | 1/9/01 | 1/9/11 | Common Stock | 10,000 | | 10,000 | D | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Explanation of Responses:

SUN 003330

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
   *See* 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
   If space is insufficient, *see* Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained
in this form are not required to respond unless the form displays a currently valid OMB Number.

_____    7/9/01
** Signature of Reporting Person    Date
As attorney-in-fact for Craig R. Callen

Page 2

## FORM 4

☐ Check this box if no longer
subject to Section 16. Form 4 or
Form 5 obligations may continue.
See Instruction 1(b).

(Print or Type Responses)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

COPY

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(f) of the Investment Company Act of 1940

| OMB APPROVAL |
| --- |
| OMB Number:        3235-0287 |
| Expires:     December 31, 2001 |
| Estimated average burden |
| hours per response........0.5 |

| 1. Name and Address of Reporting Person* | | | 2. Issuer Name and Ticker or Trading Symbol | | 6. Relationship of Reporting Person(s) to Issuer  (Check all applicable) | |
| --- | --- | --- | --- | --- | --- | --- |
| Donohue        Thomas         J. | | | Sunrise Assisted Living, Inc. (SNRZ) | | X  Director | ____  10% Owner |
| (Last)       (First)       (Middle) | | | 3. I.R.S. Identification Number of Reporting Person, if an entity (voluntary) | 4. Statement for Month/Year | ____  Officer (give title below) | ____  Other (specify below) |
| 7902 Westpark Drive | | | | January 2001 | | |
| (Street) | | | | 5. If Amendment, Date of Original (Month/Year) | 7. Individual or Joint/Group Filing (Check Applicable Line) | |
| McLean        VA        22102 | | | | | X  Form filed by One Reporting Person | |
| (City)       (State)       (Zip) | | | | | ____  Form filed by More than One Reporting Person | |

Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
*If the form is filed by more than one reporting person, see Instruction 4(b)(v).

Potential persons who are to respond to the collection of information contained in this form are not required
to respond unless the form displays a currently valid OMB control number

(Over)
SEC 1474 (3-99)

SUN 003388

0017



Table II - Derivative Securities Acq... J, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2.Conversion or Exercise Price of Derivative Security | 3.Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8.Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $20.5625 | 1/9/01 | A | | 12,000 | | 1/9/01 | 1/9/11 | Common Stock | 12,000 | | 12,000 | D | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Explanation of Responses:

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
    See 18 U.S.C 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
    If space is insufficient, see Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained
in this form are not required to respond unless the form displays a currently valid OMB Number.

** Signature of Reporting Person
As attorney-in-fact for Thomas J. Donohue

7/9/01
Date

Page 2

SUN 003389

# EXHIBIT  26

FORM 4

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person [*] KLAASSEN PAUL J & TERESA M | 2. Issuer Name and Ticker or Trading Symbol SUNRISE SENIOR LIVING INC [SRZ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle) 7902 WESTPARK DRIVE | 3. Date of Earliest Transaction (Month/Day/Year) 03/16/2008 | X  Director                    X  10% Owner X  Officer (give title below)      Other (specify below)                           CEO |
| (Street) MCLEAN        VA        22102 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X  Form filed by One Reporting Person    Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

| Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/16/2008 | | D[(1)] | | 70,141 | D | $ 0 [(1)] | 51,212 [(2)] | D | |
| Common Stock | | | | | | | | 5,071,494 [(3)] | D | |

Source: SUNRISE SENIOR LIVIN, 4, March 19, 2008

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned** _(e.g., puts, calls, warrants, options, convertible securities)_ | | | | | | | | | | | | |
| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. On March 16, 2008, Mr. Klaassen surrendered, for no consideration, for cancellation to the Company the following equity awards (all of which could be settled only with common stock) made to him for the years 2003 through 2005: (a) a total of 15,672 restricted stock units, constituting all of the restricted stock units granted to Mr. Klaassen on September 10, 2003; (b) a total of 17,815 restricted stock units, constituting all of the restricted stock units granted to Mr. Klaassen on March 8, 2006; and (c) 27,777 shares of restricted stock, constituting the remaining unvested portion of the restricted stock granted to Mr. Klaassen on March 14, 2005. Mr. Klaassen also surrendered, for no consideration, 8,877 additional shares of common stock of the Company held by Mr. Klaassen, which represented the portion of the restricted stock granted to him on March 14, 2005 that vested on March 14, 2006, net of applicable tax.

2. Represents 51,212 shares owned directly by Mr. Klaassen.

3. Represents shares held jointly by Mr. and Mrs. Klaassen, as tenants by the entirety.

/s/ Paul J. Klaassen          03/19/2008

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, _see_ Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations _See_ 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, _see_ Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

Created by 10K Wizard   www.10KWizard.com